1c20sasc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MONIQUE DA SLIVA MOORE,

 4              Plaintiff,

 5         v.                            11CV01279

 6   PUBLICIS GROUPE,ET AL,

 7              Defendant.

 8   ------------------------------x
                                   New York, N.Y.
 9                                 December 2, 2011
                                   5:00 p.m.
10
     Before:
11
                     HON. ANDREW J. PECK,
12
                                     Magistrate Judge
13
                        APPEARANCES
14
     SANFORD WITTELS & HEISLER
15        Attorney for Plaintiff
     BY:  STEVEN WITTELS
16        SIHAM NURHUSSEIN

17
     JACKSON LEWIS
18        Attorney for Defendant
     BY:  VICTORIA WOODLIN CHAVEY
19        JEFFREY BRECHER

20

21   MORGAN LEWIS & BOCKIUS, LLP
     BY:  GEORGE STOHNER
22   Attorneys for Defendant Publicis Groupe

23

24

25
```

1c20sasc

| | |
|---|---|
| 1 | THE CLERK:  All rise. |
| 2 | THE COURT:  Be seated.  Okay.  What discovery issues |
| 3 | are still in dispute based on the most recent letters that |
| 4 | Judge Sullivan has not ruled on. |
| 5 | MR. WITTELS:  Your Honor, good afternoon.  Steven |
| 6 | Wittels and Siham Nurhussein the plaintiffs.  Ms. Nurhussein is |
| 7 | going to address the main disputes, as far as we're concerned |
| 8 | in response to the question. |
| 9 | THE COURT:  All right.  And what I will want to do, |
| 10 | once you give me a little bit of background, if you think I |
| 11 | need it -- and I have read the pleadings and Judge Sullivan's |
| 12 | orders -- just take each discovery request one at a time, hear |
| 13 | from one side, then the other as to where things stand, and |
| 14 | then rule. |
| 15 | MS. NURHUSSEIN:  So, your Honor, just a little bit of |
| 16 | very quick general background.  I represent the plaintiffs in |
| 17 | the matter, gender discrimination class action filed on behalf |
| 18 | of female public relations professionals against MSL Group and |
| 19 | Publicis.  And our clients are alleging pattern and practice |
| 20 | discrimination based on pay, promotion, assignment, as well as |
| 21 | pregnancy discrimination. |
| 22 | One of the common policies or practices at issue in |
| 23 | this case is a companywide reorganization that began early |
| 24 | 2008, with the promotion of Jim Tsonakos to the position of |
| 25 | president of the America of MSL Group.  As part of this |

1c20sasc

1    reorganization, women were disproportionately pushed out,

2    demoted, and suffered a number of other adverse employment

3    actions.  And on the flip side, the majority of new hires and

4    promotions, particularly into leadership positions, were

5    disproportionately awarded to men.  And these employment

6    decisions and practices were made by an almost entirely male

7    leadership team put in place by Jim Tsonakos' centralized

8    leadership team that was put in place as part of the

9    company wide reorganization.  And I should add this is a

10   company that is approximately 75 percent female.

11           By way of background, we had an initial scheduling

12   conference before Judge Sullivan in May.  And the Court set a

13   June 3, 2012 fact discovery deadline in this case.

14           Since then, the parties have each served a number of

15   discovery requests, deposition notices.  Unfortunately, you

16   know, discovery has been very one sided, in our view, which

17   has, you know, really prejudiced the plaintiffs.

18           THE COURT:  Which is to say the defendants have all of

19   the documents and you have nothing.

20           MS. NURHUSSEIN:  Exactly.

21           THE COURT:  So let's cut to the chase.  Let's get to

22   where we're going.

23           THE COURT:  Okay, so.

24           MS. NURHUSSEIN:  Okay.  So, really, I mean the two

25   main issues that we -- we that are raised in our letter, first,

1    NSR's failure to produce core discovery relating to a number of

2    issues that are central to the case, number of basic documents

3    such as group policies, but in particular the companywide

4    reorganization, which is the focus of our letter.

5         THE COURT:  The focus seems to be that you view

6    everything that happened after Mr. Tsonakos was hired as

7    quote/unquote a reorganization, and defendants don't.  And that

8    seems to be, at least from the letters, creating the confusion

9    that this is not like the usual wrist case or something where

10   there is, you know, a plan, we're going to reduce the workforce

11   by 10 percent, and then the question is did they reduce that

12   across the board, or did it a heavier hand against a protective

13   class or whatever.  So --

14        MS. NURHUSSEIN:  One thing I should --

15        THE COURT:  Is there a way, now, to get this so that

16   you all understand what you mean by the reorg, so that they can

17   respond appropriately.

18        MS. NURHUSSEIN:  Right.  And your Honor, we spent a

19   fair amount of time explaining what we view as the reorg to

20   defense counsel.  We have spent three meet and confers.  We've

21   put it in writing in various e-mails and letters.  And they

22   continued to maintain they didn't understand what we were

23   talking about, not even they considered it a request, they

24   didn't understand.  Which we find disingenuous.

25        THE COURT:  Let me hear from the defendant, briefly,

1c20sasc

1    about why they still don't understand.

2         MS. NURHUSSEIN:  And your Honor, one more thing I want

3    to add, if I may.  Just to one thing I neglected to mention at

4    the outset, is this is a discovery dispute that went to Judge

5    Sullivan.  He compelled production of reorganization documents.

6    I think the request as written is clearly worded, so.

7         THE COURT:  Okay, thank you.

8         MS. CHAVEY:  Yes.  Good afternoon, your Honor,

9    Victoria Chavey for defendant MSL Group.  I think your Honor

10   has hit the nail on the head in describing the essence of the

11   dispute about the reorganization.  And that is that the

12   reorganization that plaintiff seeks to focus on is one that

13   began on January 1, 2008 and is continuing today.  And does

14   appear to encompass, according to plaintiff's definition,

15   everything that happened in the meantime, whether it is a

16   practice-related change, a personnel-related change, an

17   office-related change, geographic related change, a name change

18   for example from Manning Selvage and Lee to MSL Group.

19        THE COURT:  Somehow I suspect that they don't care

20   about the name change, but I could be wrong.

21        MS. CHAVEY:  According to our discussions, your Honor,

22   I believe that they are interested in this name change.  So the

23   difficulty is at least twofold here.  One is there is a lack of

24   definition to the reorganization, and that the key part of this

25   your Honor which goes back to many discussions that we have had

with plaintiff's counsel is this alleged reorganization which
they claim to be an event, it's a concrete event, is at the
core of their class claim.  This is the event --

THE COURT:  Does it matter if the issue is all of the
promotions and other activity that have taken place since
January 1 of '08, up to either now or whenever we put a stop to
the discovery may not be a reorganization in the traditional
sense, it may not be what you would otherwise understand as a
reorg, but you made the -- you objected to document request
number 11.  Previously Judge Sullivan said, no, you have to
produce it.  So now other than making sure everyone is on the
same page, the ship has sailed to a large extent.

MS. CHAVEY:  Right.  And I guess that brings me to my
second point, your Honor, which is we have produced significant
materials relating --

THE COURT:  Doesn't matter.  What matter is whether
you have completed production.  Yes, I understand that as the
defendant in an employment case, they're going to have
virtually nothing, you have everything, and it is more
expensive, et cetera, et cetera.  That's what happens when you
work for Jackson Lewis, you represent defendants.  I am being
facetious, but the question is not how much you have produced,
but what haven't you produced.

MS. CHAVEY:  So what we have produced is --

THE COURT:  What haven't you produced?

1c20sasc

1          THE WITNESS:  What we haven't produced, I guess, is

2     every document relating to every decision made at MSL Group in

3     the last 4 years.

4          THE COURT:  Can I have someone give me a copy of

5     document request number 11, which I have read previously.  I

6     don't have it at my fingertips.

7          Okay.  Well, being as -- not that I disagree with

8     Judge Sullivan, but being as he has ruled on this and overruled

9     your objections, the question is now, how do you and the

10    plaintiff get on the same page and get material produced.

11         MS. CHAVEY:  We understand that.  And we take our

12    obligation to comply with the Court order serious.  And we have

13    tried to do that one way.  In which we have tried to do that is

14    through the electronic discovery protocol that we have been

15    discussing with plaintiff's counsel.  And we put forward a

16    significant proposal, and are continuing to work through that.

17         THE COURT:  Well, how much of the documentation is

18    e-mail or other forms of ESI, and how much is paper, that no

19    matter what do you with ESI protocol, is not going to pick up

20    the paper.

21         MS. CHAVEY:  This is a company that generally

22    exchanges documents via e-mail.  We think that e-mail is the

23    most significant resource for all documents, both relating to a

24    reorganization and otherwise.

25         THE COURT:  All right, so where -- where are you all

1c20sasc

1    on that protocol.

2              MS. CHAVEY:  If I may, I'll refer to Bret Anders, who

3    has been working on --

4              THE COURT:  If somebody has a copy of the --

5              MS. CHAVEY:  Protocol.

6              THE COURT:  -- ESI proposal that you are working on.

7              MS. CHAVEY:  Okay.

8              MR. ANDREWS:  Your Honor, if I can explain.  It's not

9    yet in a single document proposal form.  We have had a series

10   of discussions trying to flesh out the, you know, manner in

11   which the parties are going to locate what's relevant.  And I

12   think right now there are two core disputes as relates to

13   discovery.

14             The first is plaintiff's reluctance to utilize

15   predictive coding to try to cull down the 2.6 million documents

16   that are in our data base, and what will likely be close to

17   3 million when we obtain the remaining 5 to 10 custodians.

18             The second is the list of custodians where there is,

19   you know, apparent disagreement where I thought there was

20   agreement.

21             On the predictive coding issue, the way defendants --

22             THE COURT:  You must have thought you died and went to

23   Heaven when this was referred to me.

24             MR. ANDREWS:  Yes, your Honor.  Well, I'm just

25   thankful that, you know, we have a person familiar with the

1c20sasc

1    predictive coding concept.

2            What we have done, is partnered with Recombine, and

3    we're using Accelerate software for review.  And our proposal

4    for how to go about culling down the 2.6 million documents that

5    are currently there, was to use the predictive coding feature.

6    Where we are right now, is we had developed a preliminary list

7    of key words that we would test.  And the second letter I gave

8    you, I believe that is the November 18th letter we sent to

9    plaintiff's counsel, that is our preliminary list of key words.

10   But there is charts to show how we test it.  We took the key

11   words, we combined them with other key words.  We reviewed a

12   number of documents.  And we showed plaintiff, of the documents

13   we reviewed, of the 50 we reviewed in this category, these were

14   how many were responsive.  And we explained in the comments

15   section what we were generally finding.  And one of the reasons

16   why we did this, your Honor is, again, plaintiffs have been

17   resistant to the predictive coding, the way we view this

18   happening, is once all of the custodians are loaded, is to take

19   a seed set, we'll review them, we'll let the program pull back

20   responses.  We'll then review those.  And through an interim

21   process hopefully winnow it down.  And our goal is to take the

22   2.6 million, get it down to approximately 40,000 that would

23   then be reviewed manually.  We're looking at a -- per document

24   review cost of $5 a document.  And MSL at this point has

25   committed to spending $200,000 in attorney review time to

1    review that 40,000.  That is in addition to the 169,000 that

2    they have already spent in vendor costs, as well as the $15,000

3    a month that they are spending in hosting costs.

4         While we understand this is a class action, that there

5    obviously is a difference of opinion as to whether or not a

6    class will ever be certified in this case, and the defendants'

7    position is we think this is a reasonable, at least first

8    approach to try to winnow down those documents.  And we believe

9    based on the custodians we have identified, which is very

10   similar and very close to the Class A group that plaintiff has

11   provided, this is where the lions share of the relevant

12   documents should reside.  Our custodians include Jim Tsonakis,

13   his --

14         THE COURT:  Lets slow down.  Is there an agreement on

15   custodians?

16         MS. NURHUSSEIN:  If I may comment for a couple of

17   minutes.  I think the parties -- if I can take the podium for a

18   minute.

19         I think the parties are coming close to reaching

20   agreement on custodians.  I would say it is not the biggest

21   area of dispute with regard to ESI.  There are a number of

22   issues where the parties have, you know, some disagreement on

23   ESI in terms of the methodology and the burden.  However, ESI

24   is a complete red herring when it comes to the topic of the

25   sanctions letter.  We have been working cooperatively with the

1c20sasc

```
 1    other side on ESI protocol.  We just sent them a very detailed

 2    letter on I believe it is November 29th and are still waiting

 3    for responses.  So we're continuing to discuss that.

 4            The issue is, even when we have identified specific

 5    documents related to ESI, documents that are not e-mails, other

 6    documents, we've identified them and brought them to MSL's

 7    attention multiple times, even though it isn't our burden to do

 8    it, even though we're operating at a very severely

 9    informational disadvantage, and MSL has not even addressed

10    them.

11            If I may your Honor, I have a couple here, if I may

12    approach the bench, just to give you a couple of examples.  Or

13    explain the sort of examples --

14            THE COURT:  Hold on.  Because if we do too many things

15    at once, things get lost.

16            If you have got certain documents that you have that

17    they have produced, or your clients have that refer to other

18    core, what you think are core documents --

19            MS. NURHUSSEIN:  Right.

20            THE COURT:  -- there is absolutely no reason why they

21    shouldn't search for them.

22            However, if you are saying that the reorganization is

23    largely everything that happened at the company since 2008,

24    they're telling me that most company material is computerized

25    ESI, and therefore that the fight about request number 11 may
```

1c20sasc

1    be putting the cart before the horse because once you agree on

2    an ESI protocol, you'll get responsive documents.  So I don't

3    really know, you know, whether it is because I'm coming to this

4    case late, and whether it is because it's 4:30 on a Friday or

5    whatever, but I can't quite figure out where you are in

6    agreement and disagreement on anything.

7           MS. NURHUSSEIN:  If I may, your Honor, I think the --

8    the area -- I think what prompted us to bring this to the

9    Court's attention is the fact that we served requests relating

10   to reorganization back in May.  We have been conferring with

11   defense counsel for several months.  We pointed them to

12   specific documents that are not covered by ESI protocol and we

13   have not received them.

14          THE COURT:  Assuming I order them to give you the

15   documents that are referenced in the documents you have given

16   to them promptly, and that I give you all a deadline to agree

17   on the ESI protocol so this doesn't eat up your entire

18   discovery period, is there anything else you need?

19          MS. NURHUSSEIN:  Beyond just the specific documents we

20   have identified.  Because as I mentioned, your Honor, because

21   there is only so much information we have, I think what we

22   would like is for MSL to represent that they have conducted a

23   comprehensive thorough search of all, you know, not e-mail.  I

24   understand that that is going to take time, but --

25          THE COURT:  A search of what?

1c20sasc

1           MS. NURHUSSEIN:  Of other documents.  Restructuring

2    plans, paper --

3           THE COURT:  Stop, stop, stop.  Come on, this really is

4    a problem that you and they are not speaking the same language.

5           As I understand it from what they are saying, there

6    was no restructuring or reorganization.  Am I correct, defense

7    counsel, whichever firm it is on that side.

8           MS. CHAVEY:  There was global reorganization of MSL in

9    November of 2009.  It was publicly announced, it's mentioned on

10   the website.  That was a major reorganization across the world.

11   And the company went from MS&L to MSL Group.  And there was

12   that.  But in terms of a reorganization that occurred when Jim

13   Tsonakos was promoted in January of '08 and continues today,

14   no.

15          THE COURT:  Okay.  Have you produced all of the

16   material about that 2009 reorganization.  Because that, there

17   is no definitional problem on.

18          MS. CHAVEY:  We have produced material relating to

19   that announcement.  I don't know that we have produced

20   everything, because we have not gone all of the way into

21   everything held in the electronic data base.

22          THE COURT:  Other than electronic, have you produced

23   all of the pieces of paper about the 2009 reorg.

24          MS. CHAVEY:  Your Honor, we've produced the core

25   documents.  I -- you know, I -- I don't know that I can

1c20sasc

1       represent --

2                    THE COURT:  That is not a concept under the federal

3       rules.

4                    MS. CHAVEY:  I know.  And as we have told plaintiff's

5       counsel, we are continuing to produce documents as we get them.

6       We have certainly produced everything that we have.  We have

7       made diligent searches, interviewed multiple times key players.

8       We have done what we think is everything we can do to date.  If

9       there is another piece of paper we have not found yet, then

10      we'll supplement.

11                   And I also want to address the one example that

12      plaintiffs have mentioned to us, is there is an e-mail

13      involving the Atlanta office of MSL that makes reference to a

14      reorganization.  Whether there was a reorganization in the

15      Atlanta office, I didn't know.  We have not -- we have actually

16      looked for that e-mail.  But it is not that that e-mail refers

17      to a document.  It just uses the word "reorganization."  And we

18      appreciate plaintiff's counsel's effort to inform us as to what

19      the reorganization is that we're talking about.  And we're

20      trying to track all of these things down at this point, but --

21                   THE COURT:  Okay.  Back to the plaintiff.

22                   MS. NURHUSSEIN:  Okay.  Your Honor, may I approach the

23      bench?  I think it would help clarify what we are talking

24      about.

25                   THE COURT:  If you have documents, give them to Mike.

1c20sasc

| | |
|---|---|
| 1 | MS. CHAVEY:  May I see what you are showing him? |
| 2 | MS. NURHUSSEIN:  I actually brought copies -- |
| 3 | THE COURT:  Okay. |
| 4 | MS. NURHUSSEIN:  I'm getting a copy for defense |
| 5 | counsel. |
| 6 | THE COURT:  Why don't you all look on with one set, if |
| 7 | that's what you need to do.  Let's go. |
| 8 | MS. NURHUSSEIN:  I apologize, your Honor.  I don't |
| 9 | have that one in front of me, since Ms. Chavey -- |
| 10 | THE COURT:  E-mail, first of all, which means things |
| 11 | like it will be picked up by the ESI search. |
| 12 | MS. NURHUSSEIN:  Right. |
| 13 | THE COURT:  And, yes, it is referring to some sort of |
| 14 | plan, which looks like it may have to do with the Atlanta issue |
| 15 | that you have already raised, and that is what the defendants |
| 16 | are saying they're looking for it. |
| 17 | MS. NURHUSSEIN:  Right.  But if I recall correctly, if |
| 18 | I -- if I recall what Ms. Chavey said, is that she asked -- you |
| 19 | know, she's looking into whether -- she didn't mention -- she |
| 20 | neglected to mention is that e-mail specifically references a |
| 21 | plan that Rob Baskin presented.  I don't know understand why -- |
| 22 | THE COURT:  That could be an oral plan, that could be |
| 23 | written, it could be electronic. |
| 24 | MS. NURHUSSEIN:  Uh-huh. |
| 25 | THE COURT:  You know, don't get hung up on one |

1c20sasc

 1  document when you haven't had the ESI search.

 2          MS. NURHUSSEIN:  And, your Honor, just to clarify

 3  though, we have requested clarification or asked them to

 4  respond to that e-mail and to produce the plan or documents

 5  relating to it.  We have asked multiple times.  They have

 6  neglected to even address our question.  So I don't know if

 7  they even asked Rob Baskin about the plan.

 8          Do you have an answer to that?

 9          THE COURT:  Ms. Chavey, have you looked for this

10  so-called plan?

11          MS. CHAVEY:  Yes, we have.

12          THE COURT:  Have you found it?  Have you talked to

13  Rob, whoever Rob is.

14          MS. CHAVEY:  He is no longer employed, so we have not.

15          THE COURT:  Have you talked to any of the people on

16  this e-mail that -- particularly, I guess, Ms. Ivana, is she

17  still employed?

18          MS. CHAVEY:  She is not.

19          THE COURT:  Okay.  Keep looking.  And report back

20  promptly to plaintiff's counsel.

21          MS. NURHUSSEIN:  Your Honor, one additional point I

22  wanted to make, regarding that e-mail, that's an he e-mail

23  dating back to 2008.  You know, defense counsel have

24  consistently maintained that no reorganization --

25          THE COURT:  Counsel, with all due respect, one of the

1c20sasc

1    search terms, in quickly looking at the letter I was just given

2    is reorganization.  And I'm sure when you do it, the right way,

3    you'll get reorg and, you know, all of the various roots and

4    extensions.  You know, you can't say they haven't given you

5    anything when you are taking a very amorphous position on what

6    the reorganization is.  And there may be certain plans.  This

7    looks like it has something to do with staffing of the Atlanta

8    office.

9             Move on.

10            MS. NURHUSSEIN:  Okay.

11            And one additional point, if I may very quickly, your

12    Honor.  I understand that it may appear, at first glance, to be

13    an amorphous, you know, request.  But MSL's own corporate

14    documents, I mean that's in e-mail.  Their own corporate

15    documents refer over and over again to this reorganization.

16            THE COURT:  What reorganization?

17            MS. NURHUSSEIN:  I can show you.

18            THE COURT:  And, again, if they've searched the paper

19    documents, and they say that they have made a good faith

20    search, and you're about to get anything quote/unquote reorg

21    related in the ESI search, what is it you want me to order them

22    to produce?  If I don't understand the request at this point,

23    how can I order it enforced any more than it already has been.

24            MS. NURHUSSEIN:  Uh-huh.  Well, I guess one thing I

25    should add, your Honor.  I mean in the documents, limited

1c20sasc

```
 1    universe of documents we have seen, I mean we have already seen
 2    decisions regarding pay tied to reorganization, we have seen
 3    highering decisions tied to the reorganization.  I can show you
 4    documents --
 5         THE COURT:  But all of those are discrete.  Look, you
 6    can do one thing that would be helpful, is give them a list of
 7    every type of decision you are looking for.
 8         I assume from looking at some of the things in the ESI
 9    protocol, that that is something you all have already
10    discussed.
11         MS. NURHUSSEIN:  We have discussed it at some length.
12    And the response we have gotten, you know, are comments about,
13    you know, whether this would encompass every employment
14    decision --
15         THE COURT:  You define what you want --
16         MS. NURHUSSEIN:  Uh-huh.
17         THE COURT:  -- in specific detail.  Either via the ESI
18    route or through the paper route, and then I can deal with it.
19    At the moment, what you have given me is too vague for me to
20    say that they're not in compliance.  So I'm returning your
21    document set to you.
22         MS. NURHUSSEIN:  Your Honor, would it be possible to
23    revisit the issue after, you know, in a few weeks if we have
24    not been able to reach agreement on whether they actually have
25    conducted --
```

1c20sasc

```
 1           THE COURT:  You keep, for better or for worse, you are
 2    in front of me for general pretrial supervision until the cows
 3    come home or the case is over.  So we can have conferences
 4    daily, weekly, monthly; whatever makes sense.  But if I don't
 5    understand what you are looking for, it's gonna be very hard
 6    for me to come out on your side.  Particularly --
 7           MS. NURHUSSEIN:  Uh-huh.
 8           THE COURT:  -- when, if most of the documentation is
 9    in the form of electronic documents.  And even the letters you
10    handed me, I would bet, are on the company server's word or,
11    the federal government's word perfect documents.  So it's
12    likely all to be electronically searched.
13           MR. WITTEL:  May I address one thing, all right.  The
14    documents that we had to give you, and which we got specific
15    requests to the defendants say things like -- that we gave them
16    and they're on their own Bates stamped documents --
17    restructuring plan being discussed in each region.  This is an
18    October document from 2010.  They have not given us any of the
19    restructuring plans.  It is fine for defendant to say, look, it
20    is in my e-mail.  But if they haven't searched their e-mail at
21    all, we gave them specific --
22           THE COURT:  Stop, stop, stop.
23           MR. WITTEL:  Yes, your Honor.
24           THE COURT:  You don't search e-mail multiple times
25    willy nilly.  Not cost effectively.  So, yes, it may be an
```

1c20sasc

```
1    iterate process and something may come up later.  But I'm not
2    going to have them do an e-mail search because you have two or
3    three documents that refer to various types of reorg when, in a
4    week or two, if you all get your act together -- and if you
5    don't, you know, you may wind up with a special master or me
6    choosing your e-Discovery plan.  Just get the e-Discovery plan
7    done.  Get all of the ESI.  And then figure out what is
8    missing.  And that's the Court's ruling.
9            Now, if you want any more advice, for better or for
10   worse on the ESI plan and whether predictive coding should be
11   used, or anything else, if the case -- I will say right now,
12   what should not be a surprise, I wrote an article in the
13   October Law Technology News called Search Forward, which says
14   predictive coding should be used in the appropriate case.
15           Is this the appropriate case for it?  You all talk
16   about it some more.  And if you can't figure it out, you are
17   going to get back in front of me.  Key words, certainly unless
18   they are well done and tested, are not overly useful.  Key
19   words along with predictive coding and other methodology, can
20   be very instructive.
21           I'm also saying to the defendants who may, from the
22   comment before, have read my article.  If you do predictive
23   coding, you are going to have to give your seed set, including
24   the seed documents marked as nonresponsive to the plaintiff's
25   counsel so they can say, well, of course you are not getting
```

1c20sasc

```
 1    any reorganization related documents, you're not appropriately

 2    training the computer.

 3             MS. CHAVEY:  We understand.

 4             THE COURT:  Okay.

 5             MS. NURHUSSEIN:  And, your Honor, just one point of

 6    clarification.

 7             I think defense counsel, what they said before about

 8    our second over simplified or our stance on predictive coding,

 9    we expressed multiple concerns to defense counsel on the way in

10    which they plan to employ predictive coding.  We asked for a

11    lot of clarification.  We can give you a copy of our last

12    letter.

13             THE COURT:  Well, unless you are all telling me that

14    it is ripe for judicial resolution, I'm willing to give you

15    certain advice.  I don't think it is useful for me to give any

16    rulings.  And while I have been handed two very thick letters

17    from the defendant, all I did was sort of take a look at some

18    of the words that they were talking about using.  Whether that

19    is within predictive coding or just within a pure key word, I

20    don't know.

21             MS. NURHUSSEIN:  So you don't want our response.

22             THE COURT:  No.  And, in fact, if it will make you

23    feel better, I'll give plaintiff and defendant back their two

24    letters before we end the conference.  We'll leave it here for

25    now, just pick it up at the end of the conference, okay,
```

1c20sasc

1    even-steven.

2          MS. NURHUSSEIN:  And, your Honor, one final point, we

3    had also --

4          THE COURT:  You know, there is -- well, look, if you

5    all want to go to a special master on this limited point then,

6    you know, who cannot just rule on anything, but who can help

7    you all perhaps put your ESI plan together, but yes, somebody

8    has to pay that person's freight.  You know, I know enough

9    people in the industry that I can recommend some, or you all

10   can get your vendors to recommend somebody or whatever it is

11   going to be.  If you are perfectly happy, you know, arm

12   wrestling over it and bringing back the issue, once you have

13   finished your meet and confer, which will be some date we'll

14   pick, which will be before Christmas so this is ready to run

15   over the Christmas holiday or whatever, we'll get this moving.

16   If you want a master, either side, tell me.  If you don't,

17   that's fine, too.

18          MS. NURHUSSEIN:  Okay, your Honor.  That sounds good

19   to us, your Honor.

20          The additional point I wanted to make --

21          THE COURT:  What sounds good, my general speaking or

22   you want a master, or you don't.

23          MS. NURHUSSEIN:  I think to have a follow-up

24   conference to try to bring some closure to the dispute we have

25   been having about ESI.  But the related point I wanted to make

1c20sasc

 1    is that we also raised the issue of deposition scheduling.

 2            THE COURT:  You really want to schedule depositions

 3    before you have documents?

 4            If you do, I'll order a schedule now, picking specific

 5    dates.  Or, tell you all to go back to your office and, within

 6    a week, have a deposition schedule.  I'm not sure it makes

 7    sense to have the depositions schedule before you have the

 8    documents because you only get the witness once, but whatever

 9    you want, you --

10            MS. NURHUSSEIN:  And I agree with that, your Honor.

11    And that's the reason we have had to reschedule plaintiff's

12    depositions on numerous occasions, because we haven't received

13    any documents.  But the only point I wanted to bring to your

14    attention is the fact that defense counsel, they are taking the

15    position that we can't receive any of our depositions until

16    they have deposed all of the defendants.

17            THE COURT:  It's not going to happen that way.  While

18    as Judge Sullivan's order said there is no priority, and while

19    there is something usual about, you know, you serve notices

20    that gives you a quasi priority, we're going to do it much more

21    evenhandedly.  Because as a practical matter, plaintiffs can't

22    serve notices until they have the documents.

23            So that is the Court's ruling on that.  You are going

24    to sit down, anyone wants to take depositions now, can do so.

25    Anyone who wants to wait for the documents, can wait.  And as

1c20sasc

```
 1    soon as we have a deadline for the production of the documents,
 2    you're going to sit down and come up with a relatively fair
 3    schedule -- take "relatively" out of that sentence.  A fair
 4    schedule that, you know, might be two for one, might by one for
 5    one, might depend on witness availability.  But you are going
 6    to start cooperating more, and you're going to get a schedule
 7    done.
 8              MS. NURHUSSEIN:  Okay, thank you, your Honor, we'll
 9    discuss the deposition schedule with defense counsel.
10              Thank you.
11              THE COURT:  Any issues from the defense, and any view
12    from the defense on a special master or not?
13              MS. CHAVEY:  Your Honor, it sounds like you don't want
14    to go further into the deposition issue?
15              THE COURT:  Not unless you really think that I am so
16    wrong that you are going to say something that is going to
17    change my mind.
18              MS. CHAVEY:  We do think that, by virtue of serving
19    the notices for the plaintiff's depositions --
20              THE COURT:  Are you ready to take the plaintiff's
21    depositions?
22              MS. CHAVEY:  We are.  We had -- we have been ready
23    since September to take the plaintiff's depositions.  We have
24    three depositions scheduled for next week.  A fourth is
25    scheduled for the week after.  Because of scheduling, those
```

1   four happened to be two of the lower-level named plaintiffs and

2   two opt-in plaintiffs.  So the three named plaintiffs who were

3   at higher levels have not been scheduled yet.

4           THE COURT:  You have all the plaintiff's documents?

5           MS. CHAVEY:  No.

6           THE COURT:  And you realize that you don't get a

7   second bite at the apple.

8           MS. CHAVEY:  We do.

9           And one of the issues that we had presented to Judge

10  Sullivan, which I would like to address with your Honor, is the

11  issue of the plaintiffs' medical records or any documents

12  supporting their claim for emotional distress damages.

13          THE COURT:  All right.  So let's first deal with the

14  last issue on depositions.  It's not a question of priority,

15  but readiness.  I see no reason why they can't start deposing

16  your plaintiffs.  Any reason not to?

17          MS. NURHUSSEIN:  Your Honor, if I may retake the

18  podium?

19          THE COURT:  Yes.

20          MS. NURHUSSEIN:  Your Honor, we have -- even though we

21  don't have all of the documents relating to the case from

22  defense counsel, we've agreed to go forward with the four that

23  are scheduled within the next week and a half.  All we are

24  saying is they shouldn't be allowed to put a complete stop on

25  our depositions --

1c20sasc

1              THE COURT:  Then everybody is on the same page, good.

2      Okay.  Okay, so this is the emotional distress issue?

3              MS. CHAVEY:  Right.

4              THE COURT:  Do we have a -- this is coming back to me.

5      Is this the garden variety versus --

6              MS. CHAVEY:  Yes.

7              THE COURT:  All right.  The general rule on garden

8      variety is, one, it's a damage amount of 25,000 or less.

9              Is that understood by the plaintiffs.

10             MR. WITTELS:  Your Honor, I did a lot of research on

11     this and, actually, was up in White Plains on this very issue.

12     When you say 25,000, there are many cases that garden variety

13     can encompass up to a hundred thousand.  If you say that --

14             THE COURT:  All right, then.  I'm going to give them

15     discovery on it.  Look, not that 25,000 is peanuts.  But as I

16     understand the case law, the argument is, you know, I was

17     annoyed, distressed, hurt by the way I was treated.  That's

18     garden variety and it's somewhere in the zero to 25 range.

19             If you're going for amounts higher than that and you

20     are not prepared, for any or all plaintiffs to limit it to

21     25,000 or less, then I think they're perfectly entitled to

22     discovery on whether you are claiming, you know, a hundred

23     thousand dollars because you didn't get a promotion here, or

24     you were fired, isn't it also true that you broke up and your

25     marriage dissolved during that same time period, or whatever

1c20sasc

          1    else is a cause of emotional distress.  And then the jury

          2    figures it all out.  So that's your choice.

          3              MR. WITTELS:  Well, your Honor, is what you are

          4    suggesting that the plaintiff is to stipulate in advance of

          5    trial as to what --

          6              THE COURT:  Yes, or --

          7              MR. WITTELS:  -- limit would be?

          8              THE COURT:  -- yes, or --

          9              Counsel?

         10              MR. WITTEL:  I'm sorry.

         11              THE COURT:  Yes.  Or, keep your options open and --

         12    but then he they get the discovery.  Because if you don't so

         13    stipulate, they're entitled to the discovery.  You could change

         14    your mind later, but you can't change your mind the other way,

         15    because then they won't have the discovery.

         16              MR. WITTELS:  As I understand the ruling, your Honor,

         17    I'm certainly happy to be informed about it because we briefed

         18    it, was that if you are not claiming -- if you are claiming

         19    garden variety damages and not relying on medical damages,

         20    that's the issue, not so whether a jury awards you 75 or 25 or

         21    a hundred, that is -- the Court then says, well, is that a fair

         22    amount for garden variety.  As I understood it the test, again,

         23    was are you claiming medical damages.  We're not relying on

         24    medical damages --

         25              THE COURT:  That's not the way I understand the law,

1c20sasc

 1    and that's not the way I am enforcing it.  So, that is your

 2    choice.

 3              MR. WITTELS:  Well —

 4              THE COURT:  And obviously —

 5              MR. WITTELS:  Which — I mean, we have not briefed

 6    that.  May we have a two-page letter on that?  Because as I —

 7    not to be disagreeable.  But we have briefed that extensively

 8    and another magistrate judge and the judge affirmed that, came

 9    down very differently on that issue.  So I just ask permission

10    to address that, only because it is something I have never

11    heard before and I have not seen it in a case.

12              I know the Second Circuit case didn't say — didn't

13    have a bright line 25,000 or you have to give medical damages.

14    I didn't understand that to be the rule.  That's — I'm only

15    asking permission on it.

16              MS. CHAVEY:  We presented this issue to Judge

17    Sullivan.  And both parties briefed it before Judge Sullivan in

18    the — in the letters that we submitted to Judge Sullivan, and

19    he ruled on September 14 that the plaintiffs were required to

20    produce these documents.  These were specifically ordered by

21    Judge Sullivan.  And so our motion, our —

22              THE COURT:  And then, you know, then I can't even

23    revisit that if I wanted to.

24              MS. NURHUSSEIN:  Your Honor, I think what you

25    neglected to mention, we did send a joint discovery letter,

1      five-page discovery letter to Judge Sullivan.

2              THE COURT:  Did Judge Sullivan rule against you?

3              MS. NURHUSSEIN:  He didn't specifically address the

4      issue of garden variety damages.

5              THE COURT:  Okay, I have got --

6              MS. NURHUSSEIN:  And -- and --

7              THE COURT:  Stop.

8          I have got his order.  I think, at least from my crib

9      sheet notes, all he just said is you have to respond to these

10     various interrogatories.  Let me get the order out again but,

11     you know, you can't keep briefing issues repetitively.  If the

12     issue came up, and you didn't raise whatever argument you are

13     making now, but the issue was should those discovery requests

14     be enforced or not, I don't see any reason to revisit the

15     issue.

16             MS. CHAVEY:  If I may direct the Court's attention to

17     the parties joint letter to Judge Sullivan dated August 26 of

18     2011.  It contains the plaintiff's statement:  Discovery into

19     plaintiff's medical psychological treatment is not only

20     premature but irrelevant as applies to those plaintiffs seeking

21     only garden variety damages.  And then they cite the case.

22             And this relates specifically to requests that are

23     within the enumerated requests that Judge Sullivan ordered

24     plaintiffs to comply with.  And then when we filed a letter

25     with Judge Sullivan seeking permission to have a conference

1c20sasc

1    with regard to motion for sanctions for plaintiff's failure to

2    comply with this, we submitted our letter, the plaintiffs

3    responded by letter, and that was the request that Judge

4    Sullivan denied without prejudice, and then referred all

5    matters to this Court.

6         But as far as we're concerned, Judge Sullivan has

7    ruled on that.  And, incidentally, Judge, we had asked the

8    plaintiffs if they would propose a stipulation to us, because

9    we would certainly entertain a stipulation if they would be

10   able to do so.  They declined to do that, indicating that by

11   stating in their supplemented initial disclosures that they

12   were only seeking garden variety damages, that's really all we

13   needed.  But this is discovery, this is the only chance we

14   have.

15        THE COURT:  All right.  Give me a copy of your Request

16   for Production.  And which request is it?

17        MS. CHAVEY:  Interrogatories 2 and 3, and Request for

18   Production 7 and 8.  There may be some other numbers, but those

19   are the central ones.  And it's listed as Exhibit B to the

20   document that we just handed up.

21        THE COURT:  Judge Sullivan ordered you to produce it,

22   produce it.

23        MS. NURHUSSEIN:  Your Honor.

24        THE COURT:  The only way I will reverse that order is

25   if you stipulate, as I have already indicated.  And even that

1c20sasc

1    may be technically more than I'm allowed to do, but Judge

2    Sullivan and I are friends.

3              MS. NURHUSSEIN:  Yes, your Honor.

4              And we did we, we did say that we would be willing to

5    put it in writing, we did put it in supplemental disclosures,

6    we asked if there was any reason why that wasn't sufficient --

7              THE COURT:  Now, you have received my response.  You

8    have the choice of 25,000 or less, or producing the documents.

9              How soon can you talk to your client and make that

10   decision?

11             MS. NURHUSSEIN:  We'll try to reach out to them as

12   soon as possible.  I mean -- yeah, I mean we have several

13   clients and we'll need to -- I mean they'll need some time to

14   make the decision.

15             THE COURT:  Just give me a date.  Give me a date.

16             MR. WITTELS:  Two weeks from today, your Honor?

17             THE COURT:  My only concern is four people being

18   deposed next week.  Because, in a way, they have to make that

19   decision before their deposition or they're going to be asked

20   questions about their mental health treatment.

21             MR. WITTELS:  Your Honor, I -- with all due respect on

22   this issue --

23             THE COURT:  We all know what "with all due respect"

24   means, if the lawyer says it.

25             MR. WITTELS:  I have never seen a case that limited

1c20sasc

1 | emotional or garden variety damages to $25,000.

2 |      THE COURT:  This is not the first case I have tried or

3 | had discovery on in this area.  But, fine, you're right, I take

4 | it back.

5 |      You can't stipulate out of it.  Judge Sullivan ordered

6 | you to produce it.  I'm ordering you to produce it.  Period,

7 | end of discussion.  Makes life simple for me and takes away the

8 | "all due respect" argument.

9 |      You want to get me to change my mind, you can think

10 | about stipulating in a way that I have said would be something

11 | I would take my chances on, in essence reversing Judge Sullivan

12 | on.  Otherwise, he ruled, not my problem.  That's the Court's

13 | ruling.  End of discussion on this.

14 |      What else do we need to do besides set a date for our

15 | next conference?

16 |      MS. CHAVEY:  We don't have any other issues, your

17 | Honor.

18 |      THE COURT:  Anything else from the plaintiff?

19 |      MS. NURHUSSEIN:  Well, again, with all due respect --

20 |      THE COURT:  You would think you would learn.

21 |      MS. NURHUSSEIN:  No.  We --

22 |      MR. WITTELS:  We are going to have depositions next

23 | week.  The issue was never brought up.  We're in a very bad

24 | situation.

25 |      THE COURT:  Life is tough.

1c20sasc

1          MR. WITTELS:  But they -- we came down here because

2     defendants had not produced documents that they were ordered to

3     do.

4          THE COURT:  What relief are you asking for?  A minute

5     ago, your associate or colleague said it's fine for depositions

6     to go next week, so I know longer know what you want.

7          MR. WITTELS:  Well, I would like an opportunity to be

8     able to -- I think the depositions shouldn't go until we have

9     had an opportunity to discuss this issue with them, we're in a

10    very -- we have not even --

11         THE COURT:  You have known this issue since

12    September 14th, or whatever date it was that the judge ruled.

13         MR. WITTELS:  We understood -- as I understood it from

14    co-counsel, they had withdrawn their request.  It wasn't an

15    issue coming down here, in terms of the garden variety.

16         MS. NURHUSSEIN:  Not that they had withdrawn the

17    request, per say, they had agreed -- they said if we had agreed

18    that our clients were only seeking garden variety, they were

19    not seeking the documents, as far as I was aware.

20         MR. WITTELS:  Right, in other words --

21         MS. NURHUSSEIN:  So perhaps this is something we need

22    to discuss more with defense counsel.

23         THE COURT:  You want a week extension on depositions

24    to discuss it?

25         MS. NURHUSSEIN:  Your Honor, we're going to have to

1  check with our clients to see.  I think some of them have

2  already made travel arrangements, so --

3          THE COURT:  You know, then the depositions -- look,

4  here is the deal.  For any of them that can't switch it, are

5  you all available the week of the 12th instead of the week of

6  the 5th, whoever is taking these depositions?

7          MS. CHAVEY:  We can make those arrangements, yes.

8          THE COURT:  Good.  So you will find out quickly.  And

9  any of your clients who could be deposed the week of the --

10          How about listening to me, instead of talking to each

11  other?

12          MR. WITTELS:  Sorry.

13          THE COURT:  Any one of them that can be deposed the

14  week of the 12th, instead of the week of the 5th, that's great.

15  Anyone already off to Florida or wherever it may be, then the

16  date sticks for the next week, unless you work out some

17  accommodation in writing with the defendants.

18          Because I don't want to hear misunderstandings or

19  whatever.  If there is a written letter signed, you know, one

20  now e-mail, you e-mail them and say, you know, how about we do

21  it on the 19th instead of the 12th.  If they say yes in

22  writing, then you're fine.  If there is no response or

23  whatever, the deposition goes forward next week as previously

24  scheduled.

25          Clear?  Clear.  Date to come back?  By which point you

1c20sasc

```
 1   must have your ESI plan in place, or very specific and very

 2   targeted, you know, we agree to these 50 custodians, or agree

 3   to X custodians, we're fighting over Y custodians, we agree on

 4   these key words, we're fighting over these.  If you give me

 5   amorphous stuff, it's very hard for me to rule.

 6           When do you want to come back?

 7           MS. CHAVEY:  Something like December 23, would work

 8   for us.

 9           MR. WITTELS:  How about Tuesday, the 20th or 21 --

10           THE COURT:  Tuesday is the 20th.  Does that work for

11   the defendants?

12           MR. ANDREWS:  I'm sure I can make it work, I don't

13   have a calendar with me.  It's locked up downstairs.

14           THE COURT:  The sooner -- you are all local,

15   Morristown, I don't know, whatever.  But if you are

16   quote/unquote New York lawyers, get the New York State Bar

17   card, get a federal bar card, whatever we call it.  That let's

18   you bring your cell phone in.  In any event --

19           MR. WITTELS:  How about the Wednesday, your Honor,

20   give us some time to work out the --

21           THE COURT:  Fine, December 21 at 2:00.  Does that

22   work?

23           MR. ANDREWS:  We can make it work.  That is the date

24   of deposition scheduled in Atlanta, but I guess you know,

25   they're enough lawyers on both sides, we can make that work.
```

1c20sasc

1          THE COURT:  If there is another day early that week

2    that you want that works better for everyone, you know, I'm

3    trying to accommodate you all here.

4          MR. STOHNER:  Your Honor, while they are trying to

5    talk about dates, my name is George Stohner, I represent

6    Publicis Groupe.  I have never been to a discovery conference

7    where I have not uttered a word.  But just a point of

8    clarification.  I came today because I was uncertain as to the

9    scope of this hearing.  There is no dispute at this time.

10   Hopefully, never, vis-a-vis Publicis Groupe.  And I do have a

11   New York Bar card, but I am not local.  And if it's possible

12   for Publicis Groupe to be excused, I would ask that, unless

13   there is some reason for them to be here.

14         THE COURT:  Are you talking about the next conference?

15         MR. STOHNER:  The next conference.

16         THE COURT:  All right.  Does anyone need them at the

17   next conference?  You, certainly from California, can appear

18   telephonically if it's useful, to let you off the hook

19   completely.

20         MS. CHAVEY:  It's fine with us.

21         MR. WITTELS:  We also have a counsel, my co-counsel in

22   and partner Janette Wipper, if she could be on the phone as

23   well, that would be helpful, your Honor.

24         THE COURT:  That's fine.  But the question is do you

25   want Publicis on the phone for the next conference, or are we

1c20sasc

1    only dealing with disputes with MSL?

2            MR. WITTELS:  Well beyond the correspondence, if they

3    feel they need to be here then, or on the phone, that would be

4    appropriate.  If not, I don't see any need to.

5            THE COURT:  All right.  And I don't know what the --

6    how close the relationship is between the two defendants.  If

7    you're not here and something comes up, you run the slight risk

8    that you are relying on your co-defendant to protect your

9    interest.

10           MR. STOHNER:  I'll read the correspondence, your

11   Honor.

12           THE COURT:  Okay.  And if you are going to be on the

13   phone and the plaintiffs in San Francisco, counsel, you two

14   need to coordinate on one call calling in, and we put you on

15   the magic speakerphone in the sky, et cetera.  But you have to

16   be on one phone for that purpose.

17           MR. STOHNER:  Okay.

18           THE COURT:  Have you all figured out what date you

19   really want?  Wednesday, the 21st?

20           MS. NURHUSSEIN:  Yes, your Honor.

21           MS. CHAVEY:  Yes, your Honor.

22           THE COURT:  Okay, the 21st at 2:00, which also is

23   beneficial to the Californians.

24           MR. STOHNER:  Thank you, your Honor.

25           THE COURT:  All right, it is my practice to have the

1c20sasc

```
1   parties, since the only orders you get out of these conferences
2   are what you have heard and what the court reporter
3   transcribes, and unless there is an economic or other
4   objection, I require that the parties to split the cost 50/50,
5   based on each side of the table.  Any problem with that?
6            MS. CHAVEY:  No.
7            MR. WITTELS:  No, your Honor.
8            THE COURT:  Okay.  Make your arrangements with the
9   reporter.
10           (Adjourned)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```