# EXHIBIT C

```
                                                               1
        1214KDASC                    CONFERENCE
  1     UNITED STATES DISTRICT COURT
  1     SOUTHERN DISTRICT OF NEW YORK
  2     ------------------------------x
  2
  3     MONIQUE Da SILVA MOORE, et
  3     al.,
  4
  4                   Plaintiffs,
  5
  5           v.                            11 CV 1279 (RJS)
  6
  6     PUBLICIS GROUPE, et al.,
  7
  7                   Defendants.
  8
  8     ------------------------------x
  9                                     New York, N.Y.
  9                                     January 4, 2011
 10                                     10:58 a.m.
 10
 11     Before:
 11
 12                        HON. ANDREW J. PECK,
 12
 13                                     Magistrate Judge
 13
 14                        APPEARANCES
 14
 15     SANFORD WITTELS & HEISLER LLP
 15          Attorneys for Plaintiffs
 16     JANETTE WIPPER
 16     DEEPIKA BAINS
 17
 17     JACKSON LEWIS LLP
 18          Attorneys for Defendant MSL Group
 18     BRETT M. ANDERS
 19     VICTORIA WOODIN CHAVEY
 20     ALSO PRESENT:
 20
 21     PAUL J. NEALE, DOAR Litigation Consulting
 21     GENE KILMOV, DOAR Litigation Consulting
 22     ERIC SEGGEBRUCH, Recommind
 22     CRAIG CARPENTER, Recommind
 23
 24
 25
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

```
1214KDASC                    CONFERENCE
```

 1              (In open court)
 2              THE COURT:  Having read, to at least a certain extent,
 3      all the things you were kind enough to fax me, including the
 4      51-page fax that came in overnight twice -- so somebody owes us
 5      a ream of paper, which I won't collect, but let's try not to
 6      fax in that much -- here are my thoughts, to start:
 7              We either need to revisit the issue of bifurcation of
 8      class action discovery and full merits discovery and/or, even
 9      treating it as such, it is clear to me that there is a
10      difference between the discovery that would go on in a class
11      action and the discovery treating every possible class
12      plaintiff as an actual plaintiff, which defeats the whole
13      purpose of having a class.
14              In addition, I don't think we have scheduled the
15      motion for class certification, which should be handled sooner
16      rather than later.  So maybe we should start with that
17      question:  When will plaintiffs be ready to move for class
18      certification?  And I read the transcripts before Judge
19      Sullivan dealing with bifurcation where both of you in essence
20      promised Judge Sullivan that, no, no, no, that's not going to
21      lead to all sorts of fights.  And, frankly, I've seen nothing
22      but fights since this case has been referred to me and,
23      frankly, no progress.
24              So that's the first question:  When are you planning
25      to move for class certification?  Who am I going to hear from

3

```
1214KDASC                   CONFERENCE
```

1   on the plaintiffs' side?  Ms. Wipper?

2           MS. WIPPER:  Yes, for the plaintiffs in the class.

3           Your Honor, the current schedule entered by Judge

4   Sullivan has a close for fact discovery, I believe, of

5   June 30th.

6           THE COURT:  But it's too late to do class

7   certification after the close of discovery.  That's not what

8   Rule 23 anticipates.

9           MS. WIPPER:  Understood.  We requested a bifurcated

10  schedule, your Honor, to Judge Sullivan.  We wanted class

11  discovery first so we could address and target discovery for

12  the class issues and also minimize potentially some of the

13  disputes going on.  However, defendant MSL opposed that.

14         THE COURT:  I read all of that.

15         MS. WIPPER:  OK.

16         THE COURT:  And at the time, everyone thought it would

17  be a smooth road and would be faster.  It's not smooth and it's

18  probably not faster.  So maybe I'll do it this way:  Do you

19  both at this point, seeing where you've gotten yourselves --

20  and this I guess is somewhat of a question to both of you, so

21  it will be a single yes-or-no question -- do you want to

22  bifurcate?

23         MS. WIPPER:  Plaintiffs would be willing to bifurcate

24  if we did not change the current schedule, because we've lost

25  so much time with the current schedule with all of these

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

4

1214KDASC                    CONFERENCE

1    discovery disputes.  At this point we haven't taken one
2    deposition of defendant witnesses.  We've gotten a couple of
3    thousands of documents, a lot of them are policy documents that
4    are repetitive.  We haven't gotten a lot of the information we
5    have requested.
6            THE COURT:  Is bifurcation -- and by bifurcation, I
7    mean the only discovery that will go on -- is that aimed at
8    deciding whether this should be a class action?  Is that going
9    to eliminate most of these fights, from plaintiffs' point of
10   view, or if we agree to bifurcation, are you then going to say,
11   but, Judge, we still want everything or 90 percent of
12   everything set forth in our current letters about what the
13   disputes are?
14           MS. WIPPER:  Well, if I could just respond about some
15   of the disputes, as an example --
16           THE COURT:  No, no, no.  In your view -- let me do it
17   this way:  OK, so you're potentially willing to bifurcate, let
18   me leave it at that.
19           For the Jackson Lewis folks, who am I going to hear
20   from?
21           MS. CHAVEY:  Victoria Chavey.
22           THE COURT:  Having opposed bifurcation the first time,
23   what's your view on it now?
24           MS. CHAVEY:  Your Honor, we would have two concerns
25   with bifurcation at this point.  One is, we would like to

5

1214KDASC                    CONFERENCE

1   proceed with discovery on the merits of the individual named
2   plaintiffs' claims.  So if there were a bifurcated discovery
3   order at this point, we would still like to pursue merits
4   discovery as to the individual claims.
5              THE COURT:  But that means they're going to want
6   merits discovery as to the individual claims against you, which
7   is probably going to put us back in the quicksand that I'm
8   trying to get you all out of.
9              MS. CHAVEY:  The second concern, your Honor, that we
10  have is related to that, and, that is, that we understand
11  plaintiffs' position to be that to prove their
12  pattern-or-practice claim, they do need to take discovery, in
13  their view, on every single decision made at MSL over the last
14  ten-plus years.  So if their view of the pattern-and-practice
15  claim is such that they need discovery on every single decision
16  made, as opposed to focusing instead on what should be the
17  common questions, then I don't know that bifurcating the
18  discovery at this point is going to accomplish the goal that we
19  all had back in the summer, which was efficiency.
20             I'd also like to say, your Honor, just at the outset,
21  I conferred with counsel for the parent company, Publicis
22  Groupe yesterday with regard to whether they needed to appear.
23  It didn't appear to be necessary, given what the Court was
24  going to take up but George Stoehner, who was here on
25  December 2nd, is available by phone if that becomes necessary.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1214KDASC                 CONFERENCE
 1              THE COURT:  All right.
 2              MS. WIPPER:  Your Honor, if I can respond, some of the
 3    existing disputes are related to class issues.  For example,
 4    we're requesting personnel action notices because of the errors
 5    that were found in the data, the HR data, that was produced.
 6    Essentially, the coding --
 7              THE COURT:  Why is that relevant to class
 8    certification?
 9              MS. WIPPER:  For our expert to do a statistical
10    analysis and render regression analysis, they need accurate
11    data, including payroll data, which we don't have, which is
12    also in dispute.
13              THE COURT:  Wait.  Are you seriously telling me that
14    for the something like 700 to 1,000 employees of MSL who are at
15    issue here, you need the payroll data as to every single one of
16    them for ten years or some lesser number?
17              MS. WIPPER:  Yes, your Honor.  To run a compensation
18    analysis for regression, we often use payroll data to
19    essentially compare what people are paid during the class
20    period.  So, yes.
21              THE COURT:  All right, Ms. Chavey?
22              MS. CHAVEY:  Your Honor, we have provided the payroll
23    data and other electronic data but what we haven't provided,
24    because it wasn't requested, was paper copies of the personnel
25    action notices.  And we advised plaintiffs' counsel that the
```

```
      1214KDASC                  CONFERENCE
 1    Box 5 data from the W-2s were not available electronically.  We
 2    have of course records of the W-2s that were issued, but that
 3    is not electronically-held data.  That is what was requested,
 4    was electronic-held data, and we have provided it.
 5              THE COURT:  All right.
 6              MS. WIPPER:  Your Honor, if I might, they haven't
 7    provided the data.
 8              THE COURT:  We're either going to do this in some
 9    organized fashion -- we have no more than an hour -- or you can
10    come back this afternoon for the rest of this.
11              Instead of telling me what you need of this, is there
12    a substantial part of what the letters in front of me have you
13    each fighting about that will not need to occur if there is
14    bifurcation, or not?  Because, frankly, if you're going to say
15    I want it all anyway, then I'm not going to bifurcate, the two
16    of you are going to keep beating your heads against the wall
17    with each other, and you'll do what you're going to do within
18    the six months you have for fact discovery that are left.
19              MS. WIPPER:  Your Honor, the HR complaints go to
20    merits in order to show intentional discrimination, so those
21    would not be at issue if there was a bifurcated schedule.
22              Also, in terms of the personnel action notices, that
23    would be a part of it but not every personnel decision for
24    every class member and every comparator.  So it would limit the
25    personnel records we would be requesting and it would also
```

8

1214KDASC                    CONFERENCE

```
 1   limit the HR complaints, discrimination complaints.
 2          THE COURT:  What else?  I've got several hundred pages
 3   of letters before we even get to the dueling ESI protocols.
 4          MS. WIPPER:  Well, in terms of the motion to compel
 5   letters, I think that was the only two issues that -- oh, there
 6   was one other issue, the personnel file of the president, and
 7   that would be a part of the class discovery, because as part of
 8   the common issue --
 9          THE COURT:  Well, it doesn't sound like we're gaining
10   much by bifurcating.  So you all are going to swim or sink with
11   this, but I am going to enforce 26(b)(2)(C) proportionality.
12   So let's go through the letters in detail.
13          I'm starting in chronological order with the
14   December 27 letter, page 4, documents regarding complaints of
15   discrimination.  How are those kept, Ms. Chavey, in the HR
16   department?
17          MS. CHAVEY:  Your Honor, to the extent there are
18   complaints of discrimination, yes, those would be held by the
19   HR department.  The requests are much broader than that, as we
20   have described in our letter.
21          THE COURT:  All right, so let's now deal as to subject
22   matter, gender discrimination by females and sexual harassment
23   complaint by females.  That's the Court's ruling.  Anyone want
24   to argue against that?
25          MS. WIPPER:  No, your Honor.
```

9

1214KDASC                    CONFERENCE
 1          MS. CHAVEY:  Your Honor, as to the sexual harassment
 2  piece of that, there is no claim of sexual harassment here, and
 3  that's why we have objected.
 4          THE COURT:  It's similar enough.  That's the Court's
 5  ruling.
 6          Time period?
 7          MS. WIPPER:  If I may make a comment:  Plaintiffs
 8  would be willing to limit the time period to 2005 to the
 9  present, which is the longest statutory period applicable in a
10  case under the New York Equal Pay Act.  It is also consistent
11  with --
12          THE COURT:  But what has this got to do with the Equal
13  Pay Act?
14          MS. WIPPER:  If there were complaints made about pay
15  discrimination --
16          THE COURT:  OK, but that's a different discrimination;
17  we haven't even talked about that.  If you want to do it in two
18  periods, pay discrimination '05 to whatever gets us back into
19  the Title 7 time period and other gender and sexual harassment
20  in a more limited time period, that sounds more reasonable.
21          MS. WIPPER:  OK, and I would also direct the Court
22  to -- there is case law allowing plaintiffs to get --
23          THE COURT:  I understand, but you're also getting many
24  years' worth of information.  Any problem with -- what's our
25  Title 7 or state parallel statute of limitations?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

10

1214KDASC                    CONFERENCE
1              MS. WIPPER:  February 2008 to the present.
2              THE COURT:  So February 2008 to the present, does that
3    work for the defendants?
4              MS. CHAVEY:  Yes.
5              THE COURT:  And what's the first date in '05?
6              MS. WIPPER:  It would be February 2005.
7              THE COURT:  All right.  And February 2005 only for
8    complaints that deal with pay discrimination.
9              MR. ANDERS:  Your Honor, if I may, the one concern I
10   would have about 2005 -- and this was shifting a little bit in
11   the ESI realm -- is the emails that --
12             THE COURT:  Wait.  How are complaints to HR kept?
13   Let's start with that.  That's what we're talking about.
14             MS. CHAVEY:  They're kept in different ways.  There
15   may well be emails relating to complaints or relating to the
16   company's responses --
17             THE COURT:  Do you know how this is done, or are we
18   doing a law school exam?
19             MS. CHAVEY:  Yes, no, we have investigated this.
20             THE COURT:  Are there paper files?
21             MS. CHAVEY:  Yes.
22             THE COURT:  And in what form may the emails take?  An
23   email to HR from an employee?
24             MS. CHAVEY:  Or between HR people.
25             THE COURT:  Fine, that seems like it's easy enough to
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1214KDASC                    CONFERENCE
```
 1   search.  OK, that's the Court's ruling.
 2              Pay discrimination, February 2005 to date -- well, to
 3   date?  Let's cut it off at the date the complaint was filed,
 4   which is what?
 5              MS. WIPPER:  February 24th, 2011.
 6              THE COURT:  OK, so through February 24, 2011.  And
 7   gender and sexual harassment discrimination by females February
 8   '08 to the date of the complaint.
 9              MS. CHAVEY:  Your Honor, just to clarify to pay
10   discrimination, is it your order that the complaints at issue
11   would be pay discrimination based on gender or any complaint
12   about pay?
13              THE COURT:  No, pay discrimination based on gender.
14              I think that takes care of all of the complaints of
15   discrimination, yes?
16              MS. CHAVEY:  Yes.
17              MS. WIPPER:  If I could just have one point of
18   clarification:  The defendants wanted to limit it to complaints
19   against presidents and managing directors.
20              THE COURT:  No, complaints.
21              OK, next:  Personnel decisions -- and this gets back
22   to -- I'm not exact sure what it is want.  So tell me what you
23   want.
24              MS. WIPPER:  If I could direct the Court to page 7,
25   there are some examples of what we are looking for.  For
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

12

1214KDASC                    CONFERENCE

1   example, the first bullet point addresses the personnel action
2   notices that I have already referenced.  So we're interested in
3   those for two reasons; one, to correct the data, two,
4   because --
5            THE COURT:  Let me just stop.  Are those paper?
6            MS. CHAVEY:  Yes.  They're in the personnel files.
7            THE COURT:  Any problem with producing them?
8            MS. CHAVEY:  Yes.  There are a thousand employees as
9   well as former employees, and to pull all -- these are the
10  forms that are signed by authorized people to submit to payroll
11  to approve a pay increase, for example, or a change of address
12  or what have you.  So these are not held in an electronic
13  database; these are documents that are made part of the
14  personnel files.
15           THE COURT:  Assuming you had to do it for every one of
16  the thousand employees and former employees, how much bulk are
17  we talking about?
18           MS. CHAVEY:  There could be a few a year.  The request
19  is -- these haven't been requested, by the way, to my
20  knowledge.  We did not interpret any of the requests to seek,
21  other than the requests for the plaintiffs' personal files.
22           THE COURT:  I'm now doing it this way because that's
23  the way you both presented it.  If you need 30 days because
24  it's a quote-unquote new request, we'll talk about deadlines at
25  the end.

13

1214KDASC                CONFERENCE

1          MS. CHAVEY:  But the request as it's stated in the
2    letter is for any personnel action notice, which they call a
3    PAN, relating to pay, job title or status.  So sometimes there
4    are personnel action notices that show that somebody goes from
5    one department to another.  Whether that's a status change, I
6    don't know.
7          THE COURT:  Is that what you want?
8          MS. WIPPER:  For purposes of the errors in the data,
9    we found errors in people's departments and their job codes and
10   their status is terminated or active, full time or part time,
11   so if they do reflect that, so for that purpose we would want
12   it, but for purposes of this, within personnel files, we would
13   only want --
14         THE COURT:  But if you're getting it for some reason,
15   you might as well get it through this.  So that's what you
16   want, a department change?
17         MS. WIPPER:  Yes, your Honor.
18         THE COURT:  So pay, job title, status, meaning
19   department change.  What else?  Obviously --
20         MS. WIPPER:  Promotions, terminations.
21         THE COURT:  Well, that's pay or job title.  Can you do
22   this on a sample basis?
23         MS. WIPPER:  Our understanding is that everything is
24   maintained in HR headquarters in New York, all personnel files.
25   We had a plaintiff --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14
1214KDASC                    CONFERENCE

1        THE COURT:  But to have to go through it for thousands
2   of employees for a long period of time, unless you're telling
3   me that that's what your experts demand in order to do the
4   regression analysis, that's not the way it should be done in
5   discovery.  What is it you need this for?
6        MS. WIPPER:  To correct the data, your Honor.  And
7   there's case law supporting the fact that if there are errors
8   in the data, it shouldn't be held against a plaintiff or the
9   other party and they shouldn't be denied discovery --
10        THE COURT:  Are you willing to pay for this?  We're
11   going to start turning this into a pay-for-play if you can't be
12   more reasonable.
13        MS. WIPPER:  We would be willing to discuss sampling
14   as long as it's a significant sample, statistically significant
15   sampling, and random.
16        THE COURT:  Statistical significant sample is probably
17   10 percent of the employees or something like that.  Is that
18   what we're talking about?
19        MS. WIPPER:  And we would also like to ask for
20   additional notices; if we find errors while we're doing the
21   analysis of the data, we would like to have the opportunity to
22   get additional notices as well.
23        MS. CHAVEY:  Your Honor, that's actually the other way
24   that we would propose to do this.  And we had talked with
25   plaintiffs' counsel before, about identifying the errors, to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1214KDASC                    CONFERENCE

```
 1   see if we could then confirm whatever the supposed conflict was
 2   in the data that was provided.  It didn't sound, from our
 3   discussions, like it was more than a handful of alleged errors.
 4   And if that would be a way of doing it, then we could work with
 5   just whatever the errors were that came up.
 6              MS. WIPPER:  But, your Honor, we have seven
 7   plaintiffs, and pretty much every single one of them has an
 8   error in the data.  So it's hard for us to know how
 9   widespread --
10              THE COURT:  An error about what?
11              MS. WIPPER:  One plaintiff is listed as full time,
12   when she's part time; one is listed as current when she's no
13   longer working there, another is listed as has resigned but she
14   was terminated, her job was eliminated; two were listed as
15   taking severance when they didn't; one her job code was
16   incorrect.  So --
17              THE COURT:  All right, you're going to do the
18   personnel action notices.
19              Now, what time period are you talking about?
20              MS. WIPPER:  The same time period as the employment
21   data?
22              THE COURT:  Well, we're not doing the pay
23   discrimination, period, for this.  So February 2008 to the
24   complaint on a statistical sampling basis.
25              MS. WIPPER:  Your Honor, will we also be able to ask
```

16

1214KDASC                    CONFERENCE

1   for additional notices if we find other errors in the data
2   beyond the sample?
3           THE COURT:  The whole purpose of this statistical
4   sample is to avoid having to do it for all 5,000 employees or
5   whatever it is.
6           MS. WIPPER:  I'm not anticipating a thousand.  I don't
7   want a dispute later if there's like five people.
8           THE COURT:  If it's a limited number, I'm sure both
9   sides are going to be reasonable.
10          OK, the second bullet, promotion recommendation forms,
11  what's the purpose of that?
12          MS. WIPPER:  The purpose of the promotion
13  recommendation forms is to show who approves the promotions.
14  And our theory in this case is that there's a centralized
15  decision-making process, kind of the opposite of Wal-Mart
16  versus Dukes where a core group of managers, leadership team,
17  makes the decisions.
18          THE COURT:  Is there a dispute as to that?  Now,
19  whatever you all can stipulate to, you can save a lot of time
20  and money on discovery.
21          But before you answer that, let me just interrupt for
22  a minute off the record.
23          (Discussion off the record)
24          THE COURT:  Back on the record.  Continue.
25          MS. CHAVEY:  So the promotion recommendation forms are
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1214KDASC                CONFERENCE
```
 1  also -- well, let me say, they were introduced in 2008, they
 2  are used with regard to promotions of individuals to the vice
 3  president or senior vice president level, and these are also
 4  forms that aren't held in any centralized place; they are
 5  individualized forms and they are transmitted, as far as we
 6  have seen, by email.  And they are also at times, although I
 7  don't think consistently, appearing in the personnel files of
 8  individuals.  They're routed to human resources.
 9            THE COURT:  So assuming it's on email, is it then
10  something that is saved in HR in a record, it's a business
11  record, as opposed to just it's an email, hey, Joe, somebody
12  just got a promotion?
13            MS. CHAVEY:  No, it is a form that would be sent as an
14  attachment to an email.
15            THE COURT:  And that's easy to find via the email
16  system?
17            MS. CHAVEY:  No, I don't think it would be easy to
18  find.
19            THE COURT:  Then how does your company do business?
20            MS. CHAVEY:  They use a lot of email.
21            THE COURT:  I know, but this sounds like it's
22  something that in the good old-fashioned, pre-electronic days
23  would have been in the employee's personnel file.  For the
24  company to say, we don't do that anymore, we send it by email
25  and then it's in an email system in a way we can't find it,
```

18

1214KDASC                    CONFERENCE

 1  you're going to have to search.  So it seems to me -- or who
 2  approves all of these?
 3              MS. CHAVEY:  Human resources.
 4              THE COURT:  So is the only approval signature on it
 5  going to be HR or is it going to show who in the business side
 6  management approved the promotion?
 7              MS. CHAVEY:  For this particular form, that changed
 8  over the years from 2008 forward, so there isn't one answer to
 9  that question.
10              THE COURT:  Well, at what point does it show who
11  approved it?
12              MS. CHAVEY:  In HR, Rita Masini was a consistent
13  recipient or signatory on these documents through the years.
14              THE COURT:  If that is stipulated to?  Is that
15  sufficient for class purposes?
16              MS. WIPPER:  With respect to HR, yes.
17              THE COURT:  And what else do you need it for?
18              MS. WIPPER:  I believe it also has to be approved by
19  corporate, if it's a VP or an SVP, so it's not just --
20              THE COURT:  Then can you stipulate that all of these
21  were approved -- I don't even know what "approved by corporate"
22  means.
23              MS. WIPPER:  It means a businessperson, so a
24  businessperson, someone outside of HR, the CFO or the
25  president.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

19

1214KDASC                    CONFERENCE

1           MS. CHAVEY:  I don't think that's accurate.  Again,
2  this wasn't requested in the document requests.  I don't have
3  it in front of me.
4           THE COURT:  You all manage to spend your Christmas
5  vacation writing me huge letters, so I would assume that by the
6  time you knew there was a conference on this, you'd know the
7  information.  You're either going to stipulate to what level of
8  senior management had to sign these -- obviously if these are
9  promotions to VP or senior VP, I would assume that the
10  signature has got to be at a fairly high level.
11           MS. CHAVEY:  Rita Masini is the chief talent officer,
12  she's the top HR representative.
13           THE COURT:  If a businessperson besides HR has to
14  approve all of this, you are going to either stipulate
15  sufficiently that it satisfies the class certification issue
16  and gets around the Wal-Mart issues or you're going to have to
17  go through, from 2008 to the date of the complaint, on a
18  sampling basis and produce these.
19           MS. CHAVEY:  Because this form changed over time, your
20  Honor, I'm not in a position to stipulate today --
21           THE COURT:  You don't have to do it today.
22           MS. CHAVEY:  OK.
23           THE COURT:  You have to either produce these or
24  stipulate, and by whatever the deadline is that I'm going to
25  set at the end of all of this.

1214KDASC                    CONFERENCE

```
 1              OK, request for raise exceptions?
 2              MS. WIPPER:  And I think this one also would -- the
 3    stipulation we're proposing would work here.  Essentially what
 4    this request relates to is, there's a global salary freeze that
 5    was implemented by the parent company, Publicis Groupe, for all
 6    subsidiaries during the class period.  There was also
 7    exceptions to that salary freeze, there was also a promotion
 8    freeze and a hiring freeze.  And those exceptions were
 9    essentially sent from MSL, the subsidiary, to the parent.
10              THE COURT:  One second.  Since you're getting the
11    personnel action notices, what do you need this for?
12              MS. WIPPER:  This shows the approval process for pay
13    increases that we're also challenging.  So it shows commonality
14    because not only is it nationwide, it's global, and there was
15    exceptions to the freeze that we believe had a disparate impact
16    on women.
17              THE COURT:  So for what employees are you looking for
18    this?
19              MS. CHAVEY:  Just the public relations employees in
20    the United States.
21              THE COURT:  Then, I'm sorry, the personnel action
22    notice is going to show you when somebody got a pay raise.
23    What do you need this for?
24              MS. WIPPER:  This shows the approval process --
25              THE COURT:  Who cares?
```

21

1214KDASC                    CONFERENCE

1           MS. WIPPER:  -- for commonality purposes.  For the
2   same reason as the promotion recommendation.
3           THE COURT:  At this point you're going to move for
4   commonality, and when they say there isn't, we can revisit
5   this.
6           MS. WIPPER:  OK, your Honor.
7           THE COURT:  If they argue that the raise exceptions
8   were signed off on by different people, they're going to have
9   to say who.
10          So your fate, MSL, is in your hands.  All of the
11  emails on all of this?  No, enough is enough.  So that's the
12  end of this one, as far as I'm concerned.
13          Anything else you want to argue for in this area
14  before we go to page 8 and item number 2 on pregnancy?
15          MS. WIPPER:  No, your Honor.
16          THE COURT:  Anything from the defense?
17          MS. CHAVEY:  No.
18          THE COURT:  OK, pregnancy, what's the fight here?
19          MS. WIPPER:  During one of our meet-and-confer
20  conferences, we asked for a list of the employees who were
21  pregnant during the class period, which we believe would be
22  less than a hundred, probably 60, people.  Defendants' response
23  was that that was captured in the employment data by the leave
24  that the employees took.  But that's not completely true.  We
25  have a plaintiff who was put on a probation letter after she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

1214KDASC                CONFERENCE

1    announced her pregnancy and is claiming a pregnancy
2    discrimination claim as a result of that.
3            THE COURT:  But where is it you believe that they have
4    records on pregnancy?
5            MS. WIPPER:  It's our understanding that HR is
6    informed when there's an announcement of a pregnancy, and
7    that's based on anecdotal evidence we have heard from our
8    clients.
9            THE COURT:  Ms. Chavey?
10           MS. CHAVEY:  Your Honor, it may be that HR is informed
11   when an employee becomes pregnant.  Certainly HR is informed
12   when an employee announces her intention to take a leave
13   related to pregnancy.  But there isn't a centralized list or
14   any document that reflects this information that's being
15   requested.  And the difference here is, I believe the
16   plaintiffs acknowledge that they have information about all of
17   those employees who took maternity leave; the only question
18   relates to employees who were pregnant but didn't take a leave
19   for some reason, so maybe they left before they had the child
20   or something like that.
21           So we don't know of a document that answers that
22   question.
23           MS. WIPPER:  It's our understanding we have anecdotal
24   information that an employee in the L.A. office notified her
25   immediate supervisor that she was pregnant and she was called

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1214KDASC                    CONFERENCE
 1   the next day by Tara Lilly and the HR director in New York
 2   to --
 3               THE COURT:  Why don't you do this:  Why don't you
 4   depose the HR person.  You've already got the information about
 5   those who took leave, correct?
 6               MS. WIPPER:  Yes.
 7               THE COURT:  OK.  What else do you want at this point?
 8   Otherwise, you're doing in essence a trial on a hundred
 9   anecdotal stories, which doesn't make it satisfactory for class
10   certification anyway.
11               MS. WIPPER:  Yes, your Honor.  In order to look at
12   whether there's a pattern for women who were pregnant, whether
13   they did not receive promotions or pay increases or left the
14   company --
15               THE COURT:  How about in addition to the statistical
16   sample we're doing of the personnel action, notices and the
17   promotion recommendation forms, if those get produced, you add
18   them to the statistics?  In other words, if we're doing
19   15 percent of the thousand public relations people as your
20   statistical sample, in addition to that number, you get the
21   personnel action notes for the hundred people, if that's what
22   it is, who took a maternity leave.
23               MS. WIPPER:  OK.
24               THE COURT:  Yes?
25               MS. WIPPER:  Or who announced their pregnancy?
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

24

1214KDASC                CONFERENCE
 1              THE COURT:  If you have any record of that, sure.
 2     They don't apparently.
 3              All right, that's it for pregnancy.
 4              Comparators and key players?
 5              MS. CHAVEY:  Your Honor, on this request, we have
 6     agreed to provide comparator data and we have provided
 7     comparator data.  The difference of opinion or the dispute here
 8     appears to stem from some additional names that the plaintiffs
 9     included on request 50.  And we asked why these people were
10     included, and they didn't explain why they were included other
11     than saying some of them were women whom they believed to have
12     been discriminated against or other things, or maybe they were
13     comparators in 2004, but they aren't within the scope of
14     discovery, in our view.
15              THE COURT:  All right.  Ms. Wipper?
16              MS. WIPPER:  The list included comparators, which
17     obviously there's a dispute with, who's an appropriate
18     comparator in every discrimination case.  So I'm unclear about
19     whether or not defendants are willing to produce everything
20     that we say is a comparator, to --
21              THE COURT:  How about you two not only listen to each
22     other outside of court but in.  Ms. Chavey said there was a
23     list of names they gave you that they said we don't know why
24     you've put these people on a comparator list, and other than
25     that, they have no problem giving you your comparator list.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

25

1214KDASC                    CONFERENCE

1          So, I don't know who any of these folks are.  Why
2    don't you educate me or drop the people that they object to for
3    now without prejudice to coming back to it later, or play the
4    old split-the-baby.  Tell me what you want, educate me here.
5          MS. WIPPER:  With respect to the women on the list,
6    they were women that we have information complained about
7    discrimination or --
8          THE COURT:  Then why are they comparators?
9          MS. WIPPER:  They are not comparators; they were in
10   addition to the comparators on the list.
11         THE COURT:  Are you doing individual discovery for
12   absent class members?
13         MS. WIPPER:  No.  We're just interested in specific
14   instances of discrimination, because if we just --
15         THE COURT:  If there isn't a pattern and practice,
16   there isn't class certification and what happened to these
17   other people is irrelevant.  Right?
18         MS. WIPPER:  Well, your Honor, at the class
19   certification stage, I'm sure defendants will argue that we
20   have to prove not only the statistical disparity but also
21   anecdotal evidence, including specific instances of
22   discrimination.
23         THE COURT:  Well, the anecdotal will come from what
24   your clients tell you and what your clients point you to as to
25   other people to contact.  So at the moment, those people are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1214KDASC                    CONFERENCE

1  off the comparator list without prejudice to you coming back
2  for them before class certification.
3             MS. WIPPER:  That's with respect to the women listed?
4             THE COURT:  You two have to work this out --
5             MS. WIPPER:  OK.
6             THE COURT:  -- because nobody has given me a list in
7  any way that puts it in a way that I can deal with it.
8             That's the Court's ruling.  You both understand it?
9             MS. WIPPER:  Yes, your Honor.
10             MS. CHAVEY:  Yes.
11             THE COURT:  Off the record.
12             (Discussion off the record)
13             THE COURT:  OK, President Tsokanos' personnel file?
14             MS. WIPPER:  Yes, your Honor.  Plaintiffs believe this
15  is very important because the president is at the center of a
16  lot of these claims.
17             THE COURT:  As to comments he allegedly made, I have
18  no problem giving you that.  Other than that, I'm not sure why
19  you should get anything else.
20             MS. WIPPER:  Well, we're aware there were complaints
21  made against him, so --
22             THE COURT:  You can have any comments, any sexist
23  comments he made, any complaints against him for sexual-related
24  issues, gender or sexual harassment.  What else?
25             MS. WIPPER:  Could I also request that that not be

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1214KDASC                    CONFERENCE

```
 1   limited to the time period we already discussed, given the
 2   importance --
 3              THE COURT:  No, no.
 4              OK, anything else on that?
 5              MS. WIPPER:  Can I just clarify what the time period
 6   will be?
 7              THE COURT:  The time period is February 2008 to the
 8   date of the complaint.
 9              Any argument on that by the defense?
10              MS. CHAVEY:  No, your Honor.
11              MS. WIPPER:  If I can just state for the record, we're
12   aware of a complaint against Mr. Tsokanos I would say around
13   2005.
14              THE COURT:  For what, by whom?
15              MS. WIPPER:  Sexual harassment.  And our allegation
16   would be that despite that complaint, he was promoted, and
17   promoted quickly, by passing women who were comparable to his
18   position.
19              THE COURT:  But I thought your argument is that once
20   Mr. Tsokanos became the president, he forced women out and did
21   other terrible things.  So what's the point of what happened to
22   a complaint and then despite that complaint he got promoted?
23              MS. WIPPER:  Because it shows his attitude and motive
24   towards women, so within those documents it would show what
25   type of complaint was made against him.
```

28

1214KDASC                    CONFERENCE
1               THE COURT:  What type of complaint was that '05
2     complaint you're referring to?
3               MS. WIPPER:  Sexual harassment.
4               THE COURT:  By who?  Who was the complaint made to?
5               MS. WIPPER:  It was when he was a managing director in
6     the Atlanta office.
7               THE COURT:  Who made the complaint?  Was it to HR?
8               MS. WIPPER:  It was to HR.
9               THE COURT:  Well, is that something that can be
10    readily found, Ms. Chavey?
11              MS. WIPPER:  Yes.
12              THE COURT:  OK, produce that.
13              Other than single complaint, the time period is
14    February '08 to date.
15              MS. WIPPER:  All right, your Honor.
16              THE COURT:  OK, that, I believe, takes care of
17    plaintiffs' December 27 letter, correct?
18              MS. WIPPER:  Yes, your Honor.
19              THE COURT:  OK, so now we go to your December 29th
20    letter.
21              MS. CHAVEY:  Your Honor, as to this letter, which is a
22    request for a conference, we had intended to file a written
23    response; we just haven't done it yet.
24              THE COURT:  You can respond orally.
25              MS. CHAVEY:  OK.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

29

1214KDASC                    CONFERENCE

 1          THE COURT:  On the compensation data, do you really
 2   want paper copies of a thousand people's W-2s for three, four
 3   years?
 4          MS. WIPPER:  No, your Honor, we just want payroll
 5   data.  It's not paper copies that we're interested in.  We're
 6   just interested in the records that of what people were
 7   actually paid.  What we currently have now is bonus data, which
 8   had to be reproduced because it was incorrect, and then also
 9   the annual rate of pay, which is the rate assigned to an
10   employee but it's not necessarily what that employee was paid
11   that year.
12          MS. CHAVEY:  Your Honor, we have told the plaintiffs'
13   counsel that we have the W-2s, we have copies of those things,
14   but we don't have an electronic database that contains the
15   Box 5 information.
16          MS. WIPPER:  In lieu of the W-2, we would take payroll
17   data, so --
18          THE COURT:  I'm sorry, I don't know what that means.
19          MS. WIPPER:  There's the HR data, which essentially
20   captures all of the personnel action changes, so any time
21   someone gets an increase, is promoted --
22          THE COURT:  Just tell me what the payroll data.
23          MS. WIPPER:  That's how they process their paycheck
24   every two weeks, so that's a separate database that has all the
25   deductions listed, the total earnings, and then that data is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

1214KDASC                    CONFERENCE

1    fed into the W-2 data, which is what's reported to the IRS.
2            MS. CHAVEY:  I don't know, this is the first that I'm
3    hearing this explanation of what the payroll data is that's
4    being sought.
5            THE COURT:  Who does the company's payroll?  Is it
6    internal or ADP?
7            MS. CHAVEY:  They have a payroll department, and I
8    haven't posed this question.
9            THE COURT:  See what you can find out on that.  We'll
10   leave this as:  Produce it if it's electronic, if you're
11   telling me after you investigate -- you'll be telling
12   Ms. Wipper if it doesn't exist, you'll work it out.
13           OK, I think that brings us to requests 6 and 11, about
14   org charts among other things.
15           Does your company really not have org charts?
16           MS. CHAVEY:  We do have org charts.
17           THE COURT:  Were they produced?
18           MS. CHAVEY:  We have produced some and, as we have
19   told plaintiffs, we are continuing to produce org charts that
20   we find.
21           THE COURT:  How long does it take?
22           MS. CHAVEY:  We have been very, very diligent in going
23   through a huge volume of documents, both electronic and paper,
24   and we have told the plaintiffs' counsel -- you know, by the
25   time these issues were raised, your Honor, the September 9th --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

31

1214KDASC                    CONFERENCE

1  our responses to the September 9th discovery requests were
2  about two and a half months old, there were 93 requests, many
3  of them pertained to the individual plaintiffs, many of them
4  were very, very broad.  And we have been working very hard to
5  get through them and we have told plaintiffs' counsel that we
6  have not asserted that we have completed our disclosures.
7          If it's taking too long, from their view, we apologize
8  to them, we apologize to the Court, but we are working through
9  it.
10         THE COURT:  All right, produce it.
11         MS. WIPPER:  Your Honor, if I can make one comment:
12 These org charts were requested eight months ago and were
13 ordered by Judge Sullivan to be produced four months ago.
14         THE COURT:  Did he set a deadline or, rather, four
15 months ago, he said you've got to produce it?
16         MS. WIPPER:  Yes, your Honor.
17         THE COURT:  Well, part of the problem is, if they're
18 going through lots and lots of data, we're now at the point
19 where objections are gone, it's time to produce; and once I
20 order you to produce something, if you don't, you will be
21 sanctioned, personally as well as your client.  So whatever
22 dilatoriness or game-playing that plaintiff suspects was going
23 on is now over.  So we will set a deadline for all production
24 or at least all paper production at the end of this conference.
25         I think I'm now over to page 5, which are specific

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1214KDASC                    CONFERENCE
```
 1   types of documents.
 2           MS. CHAVEY:  Your Honor, when we were here on
 3   December 2nd, you asked or directed plaintiffs' counsel to let
 4   us know, in light of the ambiguity of the term
 5   "reorganization," you asked them to let us know what specific
 6   decisions they were seeking, and they didn't do that.  We did
 7   follow up with them to ask them to do that.  The first we got
 8   this was another midnight email on December 29th, with this
 9   page 5 of bullet-pointed items.  But we didn't have this
10   before.  We sought to do that --
11           THE COURT:  Now that you have got it, do you
12   understand what they're looking for and do you have any
13   objection to searching for it, to any of the bullet points on
14   page 5?
15           MS. CHAVEY:  Some of them are very vague.  For
16   example, the third bullet point, documents relating to
17   restructuring plans, we're not sure if what the plaintiffs are
18   asking us to do is to use a keyword search in the electronic
19   data using the term "restructuring plans" or whether there's
20   something else, but there's not a folder in somebody's desk
21   that says "restructuring plans" on it.
22           MS. WIPPER:  Your Honor, defendants produced
23   PowerPoints to us that had several pages with the heading
24   called "Restructuring" --
25           THE COURT:  The question nowadays, in an ESI world, is
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

1214KDASC                    CONFERENCE
1   how one is going to find the needles in a haystack or the
2   haystack, so you all have to work on that.  And that sounds
3   like the ESI protocol issue that hopefully we'll have time to
4   get to this morning.
5           MS. WIPPER:  Your Honor, in our keywords that we
6   proposed --
7           THE COURT:  So "restructuring" is presumably one of
8   them.
9           MS. WIPPER:  Yes.
10          THE COURT:  So that will turn this up.
11          Anything else?  Let's go off the record a minute.
12          (Discussion off the record)
13          THE COURT:  All right, back on the record.
14          Any of these other bullet points, other than word
15  search or whatever ESI protocol we're going to use, seem to be
16  a problem?
17          MS. WIPPER:  I just want to make one comment.  All of
18  these documents cited here are Bates labeled MSL, not MSLAX,
19  meaning that it's not a part the Recommind platform that
20  they're using on the ESI protocol.  So I just want to clarify,
21  or have defendants clarify, that they would also look outside
22  ESI for any of these documents.
23          MS. CHAVEY:  Of course, of course we would do that.
24          THE COURT:  OK.
25          MS. CHAVEY:  One other kind of general issue with
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

34

1214KDASC                    CONFERENCE
1    these particular bullet points, which again we saw for the
2    first time just a couple of days ago, is the time frame covered
3    because I believe the plaintiffs are intending for these
4    requests as they have now been specifically articulated to go
5    back to 2001, which, in our view, is an overly long period of
6    time, and unreasonable under the circumstances here, and given
7    what the allegation is of the --
8              THE COURT:  What time period do you suggest?
9              MS. CHAVEY:  I would suggest February 1 of 2008
10   forward.
11             THE COURT:  Ms. Wipper?
12             MS. WIPPER:  That's fine -- well, I would suggest
13   January 1st because that's when James Tsokanos was promoted.
14             THE COURT:  OK, fine.  January 1, 2008.
15             MS. CHAVEY:  And, your Honor, as to some of these
16   other bullet points, there are just a lot of words in here that
17   are in quotes -- management structure approved, new business
18   team, reductions, terminations.  These are words that we will
19   work with the plaintiffs in the course of the ESI protocol to
20   uncover, and we'll do our best in terms of hard copy documents.
21             THE COURT:  OK, very good.
22             That concludes this letter, other than the sanction
23   requests are all denied at this time without prejudice to the
24   possibility that if the Court thinks there is gamesmanship
25   going forward, that the Court will go back retroactively to
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1214KDASC                    CONFERENCE

 1  this period as well.  Otherwise, let's all just get along, as
 2  the old saying goes.
 3              I believe that your January 3 letter on the defense
 4  side was just responding to plaintiffs' letter; and therefore
 5  we've taken care of that, correct?
 6              MS. CHAVEY:  Yes.  Our letter on January 3rd related
 7  to the plaintiffs' letter from December 27th.  We had not yet
 8  responded in writing to the --
 9              THE COURT:  Which you don't have to now.
10              MS. CHAVEY:  OK.  Thank you.
11              THE COURT:  On the ESI protocols, we have ten minutes
12  before I'm expecting a telephone emergency conference call from
13  one of my other favorite cases.
14              I'm not sure what your difference is.  Literally, I
15  got plaintiffs' this morning when I came in, to find that you
16  broke my fax machine with a paper jam.  I have skimmed it but
17  I'm not really sure what the difference between the two
18  parties' plans are and what we need to do, perhaps put you,
19  either with your consultants or maybe your consultants without
20  the lawyers, in the jury room for an hour and see what you all
21  can work out.
22              MR. ANDERS:  If I may, your Honor?
23              THE COURT:  Yes.
24              MR. ANDERS:  I think there are a few main areas --
25  some we may have already addressed -- one of which is the

36

1214KDASC                 CONFERENCE

1    overall time period.  As it relates to the emails, where we
2    have pulled the data from is, in 2007-2008 the company put in
3    place a long-term archive which captured every incoming and
4    outgoing email.  That is the data set that we pulled from to
5    get the 3.2 million documents.
6              So, for purposes of a protocol that we have proposed a
7    2008 going forward as the time period, plaintiffs' protocol
8    went back to 2001.  I understand from some of the Court's
9    rulings today that 2008 is the time period with the exception
10   of the EPA claims, which went to 2005.
11             THE COURT:  So any problem with using January 1, '08
12   for this search?
13             MS. WIPPER:  With respect to email only, there is not
14   a problem, but our protocol is much broader than email.
15             THE COURT:  All right.  Well, on the email side,
16   January 1, '08.
17             What else?
18             MR. ANDERS:  Custodians, your Honor.  Our list had
19   included 36 custodians.  That list was higher than we initially
20   intended.  We had made some additions after we received --
21             THE COURT:  Does it include all the HR people, since a
22   lot of this data seems to be in HR?
23             MR. ANDERS:  Yes, it does now.  That was one of the
24   later additions once we received plaintiffs' definition of who
25   the class A custodians are.  The list is the senior executives,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

1214KDASC                    CONFERENCE
1  the managing directors of the various offices, some of the
2  plaintiffs' intermediate supervisors, I believe it has all the
3  HR people.
4              THE COURT:  How many people are in plaintiffs' list?
5              MS. WIPPER:  47.
6              THE COURT:  Is that a difference of 11, or is it a
7  bigger difference because you don't want some of their 36 or
8  whatever?
9              MR. ANDERS:  I have a difference of 12, your Honor.
10 They had removed four people from our list of 36.  They added
11 18 and then very recently took two more people off, so it's a
12 net --
13             THE COURT:  Who are the 12 that are now in dispute?
14 I've got your respective custodian lists in front of me.
15             MR. ANDERS:  Your Honor, I can tell you the 12 in
16 dispute right now.
17             THE COURT:  OK.
18             MR. ANDERS:  If you look at plaintiffs' ESI protocol.
19             THE COURT:  Yes.
20             MR. ANDERS:  Well, my version is a redline version
21 which is page 11, but if you look at the section which lists
22 their custodians --
23             THE COURT:  Yes.
24             MR. ANDERS:  -- from Scott Bedowin down, who I believe
25 is number -- I think he's number 30 on mine.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

38

1214KDASC                 CONFERENCE

 1                THE COURT:  Got it.
 2                MR. ANDERS:  So from him down, with the exception of
 3      Merrill Freund and Lance Breisen, those people are all new
 4      people.
 5                THE COURT:  All right.  Two questions:  Mark Hass,
 6      former CEO, when did he leave?
 7                MS. WIPPER:  2009.
 8                THE COURT:  So we're talking about a year-plus.  Well,
 9      to the extent that some of these are managing directors in what
10      I guess are branch offices -- Seattle, Atlanta, Boston,
11      Detroit, Chicago maybe -- any objection to them?
12                MR. ANDERS:  I guess, your Honor, my concern would be,
13      and what I had said to plaintiffs' counsel, was the database
14      with the 3.2 million documents --
15                THE COURT:  Do you have any idea as to how many would
16      be added if these 12 were tossed in?
17                MR. ANDERS:  We have not collected those, so I don't
18      know what their size is.  One of the things we have encountered
19      with this case is because of the extent to which email is used,
20      the email accounts individually were a lot larger than we have
21      anticipated in the past.
22                THE COURT:  But once you do some screening of them,
23      you'll reduce it down.
24                MR. ANDERS:  Understood.
25                THE COURT:  Unless somebody can give me an argument --
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

1214KDASC                    CONFERENCE

1  and I know there is some argument that I saw somewhere in
2  somebody's letter, about the three or four people from Winter &
3  Associates, but for the internal MSL people, I'm not sure what
4  difference it makes.
5              MS. WIPPER:  Your Honor, if I could address that, the
6  Winter & Associates is part of MSL Group that was folded in as
7  part of the reorganization.
8              THE COURT:  When were they folded in?
9              MS. WIPPER:  2008/2009.  We have been in contact with
10 employees of Winter & Associates, and we believe that they are
11 subject to similar policies and practices and --
12             THE COURT:  As of when they were folded in?
13             MS. WIPPER:  Correct.
14             THE COURT:  And they are also public relations --
15             MS. WIPPER:  Correct.
16             THE COURT:  -- staff?
17             MS. WIPPER:  Correct.  They are not named plaintiffs
18 but they are --
19             THE COURT:  Can your named plaintiffs represent these
20 people?
21             MS. WIPPER:  They're part of MSL Group, and from the
22 organizational charts that we have --
23             THE COURT:  If they are part of MSL Group, then it
24 seems to me you should not be looking at them separately.  And
25 I am certainly concerned with somebody who has the title of
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
1214KDASC              CONFERENCE
```

1  general counsel.
2          So either they're the same as everybody else once the
3  reorg hit, in which case I don't see why you're targeting these
4  folks specifically, or they're different, in which case I'm not
5  sure you've got a plaintiff with standing.  What am I missing?
6          MS. WIPPER:  They're part of the MSL Group, they share
7  an office with MSL in L.A.
8          THE COURT:  At this point I'm denying the three people
9  from Winter.  So that gets our group of difference down to
10 nine.  What do you all want to do about it?
11         MR. ANDERS:  Your Honor, I would request that of the
12 people that we had proposed, that we discuss, or plaintiffs
13 suggest, people that could be removed.  I would like to try to
14 keep the database as close to the size it is now without --
15         THE COURT:  In other words, is the 3.2 million you've
16 referred to before or after the deduping?
17         MR. ANDERS:  It's after deduping and deNISTing.
18         MS. CHAVEY:  Your Honor, if I could also address a
19 number on my list, it's number 41, which is Don Lee the
20 managing director of PBJS Chicago?
21         THE COURT:  What is PBJS?
22         MS. CHAVEY:  PBJS is part of MSL Group but it is not a
23 PR agency; it's a very eclectic kind of media company, and it
24 operates separately and it is not part of the public relations
25 business of MSL Group.

1214KDASC                    CONFERENCE
```
 1              THE COURT:  Why do you want Mr. Lee, Ms. Wipper?
 2              MS. WIPPER:  Because he is part of MSL Group.  And
 3    he's -- we were never told by defendants that they were not a
 4    PR agency.  We have asked --
 5              THE COURT:  Now you have been told they are different
 6    from the rest.  Do you still want Mr. Lee?
 7              MS. WIPPER:  Yes.  And I would propose that --
 8              THE COURT:  All right, you're not getting Lee.
 9              MS. WIPPER:  OK.
10              THE COURT:  Let's narrow this list.
11              MS. WIPPER:  Can we reconsider Winter & Associates
12    because the organization --
13              THE COURT:  No, no, not at this point without further
14    evidence as to why your plaintiffs have standing to deal with
15    this other than if Mr. Tsokanos and others in senior management
16    of MSL were discriminating against women during this period, in
17    which case it doesn't matter what Winter was doing.
18              MS. WIPPER:  Well, I have an org chart right here that
19    shows that Winter & Associates reports right into Jim Tsokanos.
20              THE COURT:  OK.  So what?
21              MS. WIPPER:  So they're part of the leadership team
22    that are making the decisions.
23              THE COURT:  I don't know what a leadership team is in
24    this capacity.
25              MS. WIPPER:  It says leadership team at the top of the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

42

1214KDASC                    CONFERENCE

 1  organization chart.
 2             THE COURT:  Let me see the chart.
 3             I'm missing this.  Where is Winter on here?
 4             MS. WIPPER:  It's in the box at the bottom.  I think
 5  it's sort of in the middle.
 6             THE COURT:  Well, it's various people who report to
 7  Masini, et cetera.
 8             MS. WIPPER:  No, it reports through that top layer to
 9  Jim, if you see --
10             THE COURT:  Yes, it reports to Masini, and Masini
11  reports to Tsokanos.  So does Canada and various other things.
12  So what?
13             OK, denied at this time without prejudice to renewal
14  at some later point.
15             MR. ANDERS:  Your Honor, I guess, going down the list,
16  the first person that I guess I would take issue with, based on
17  how we're doing this is, Scott Bedowin.  He's an SVP of Global
18  Consumer Marketing, not at that MD or HR type level that we
19  were considering, so I think he should come out.
20             THE COURT:  OK, what's his role?
21             MS. WIPPER:  Your Honor, defendants have decided to
22  put in the immediate supervisors of our plaintiffs.  We didn't
23  request that.  What we have done is put in comparators to our
24  plaintiffs, and we had a plaintiff who was --
25             THE COURT:  If he is a comparator -- and this is email

1214KDASC                    CONFERENCE

```
 1    searches that apparently are going to be run across everybody's
 2    email -- you're going to get a lot of stuff from so-called
 3    comparators that isn't relevant, it doesn't make sense to do it
 4    as a uniform group.  If you want to say that you've got certain
 5    comparators who you want different searches run on, that's a
 6    different story.  It doesn't make sense to pull all their
 7    material in because they're a comparator at the same level.
 8             MS. WIPPER:  We would agree to that.
 9             THE COURT:  All right, my 12:00 o'clock call has
10    called in.  I have lunch at 1:00.  I'm hoping this won't take
11    long.  Do you all want to just sit here or do you want to go
12    into the jury room and maybe work out some of these issues?
13    Go, lawyers and consultants, as needed, into the jury room.  Do
14    not leave there.  We will come get you after I deal with this
15    call.
16             (Recess)
17             THE COURT:  OK, it's somewhere between 12:40 and
18    12:45.  We're back on the record after my other conference.
19             What progress have you made?  Or perhaps the other way
20    of looking at it is:  What is it in the 15 minutes we have left
21    before lunch that you want me to rule on or give you advice on
22    with respect to the ESI protocol?
23             MR. ANDERS:  Your Honor, we spent the bulk of the time
24    talking about the custodian list.  We have identified five
25    custodians that are, I think, more on the either comparator
```

44

1214KDASC                    CONFERENCE
1   category or secondary category where I think your Honor
2   suggested that maybe those email accounts get filtered prior to
3   being put into the database -- that's what we were trying to
4   understand -- but we have identified five where at least
5   plaintiffs would be willing to apply some type of keyword
6   search in the filtering to them first.
7               THE COURT:  All right.
8               Ms. Wipper?
9               MS. WIPPER:  With respect to the custodians, I believe
10  that the parties would be able to work it out.  What we would
11  like to hear from the Court is your view on the differences
12  between the two protocols.  Our protocol is --
13              THE COURT:  I have no idea.
14              MS. WIPPER:  OK.
15              THE COURT:  When you send me 50 pages each, late at
16  night and/or the morning of, when you knew this conference was
17  scheduled for quite some time, there's a limit, and it was not
18  done as a redline or anything else as to where your differences
19  are.  So you tell me what it would be most helpful for you, for
20  the ten minutes or so we have left, to rule on or advise on,
21  and I'll deal with it.
22              MR. ANDERS:  Your Honor, I think that the key issue is
23  how we use predictive coding, and that's where there's
24  probably -- that's why we have our experts here, our vendors.
25              The way defendant MSL proposes using the predictive
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

45

1214KDASC                    CONFERENCE

1   coding process would be as follows:  We start with an initial
2   random sample, with a confidence level of 95 percent, with an
3   interval of plus or minus 2 percent.  With the 3.2 million
4   document database, that random sample is 2,399 documents.  We
5   have gone through those preliminarily.  I had associates go
6   through those; I just finished going through it last night.
7           Of that 2,399 --
8           THE COURT:  Just to stop you right there, my
9   understanding of predictive coding is that the coding, as
10  painful as it is, should be done by a very senior attorney,
11  meaning partner level or very senior associate, not the usual
12  team of umpteen lower associates with a lower billing rates.
13          MR. ANDERS:  That's why I reviewed it, your Honor.
14          THE COURT:  Well, as "reviewed it" as every one of the
15  coding decisions or spot-checked it?
16          MR. ANDERS:  No, where I am right now is I have gone
17  through every one that was marked as relevant, I went through
18  400 so far that have been coded as not relevant, and I intend
19  to go through all of those but I first looked at the ones that
20  were relevant.
21          THE COURT:  At the end of the process, you're going to
22  have done every single one of the --
23          MR. ANDERS:  Yes.
24          THE COURT:  Then I'm not sure why your client paid for
25  someone else to do it first, but that's not my problem, that's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

46

1214KDASC                CONFERENCE

1    their problem.
2            OK, continue.
3            MR. ANDERS:  So far 36 were deemed relevant.  Of the
4    400 not relevant I have reviewed, they were clearly not
5    relevant.  So right now the baseline is .015 percent of that
6    random sample was relevant.  If you translate that to the
7    entire database, that's 48,000 documents.
8            After we did a random sample, then what we have done
9    at the same time is we have applied keywords and we have taken
10   the results of those keywords and sample-coded.  So, for
11   example, if there's a keyword "reorganization," we may have
12   reviewed the top 200 random hits.  We did that across the
13   board.
14           Also, to respond to several of plaintiffs' targeted
15   document requests, we ran targeted searches across the
16   database.  That's what we have already produced, about a
17   thousand pages of documents.  So we have that coding that's in
18   there.
19           Plaintiffs' counsel, they have sent us now three
20   different revisions of keywords.  What I have proposed to
21   plaintiffs' counsel is, I'll give you the hit lists.  I've
22   already given them two sets of hit lists; we have another set
23   to give them, I'll review -- or we'll review 3,000 of those
24   hits, you tell us how you want us to review it but pick the
25   hits, we'll review any of the top 200 in these ten categories,

47

1214KDASC                    CONFERENCE

1   you tell us how to review it.  We'll give them those results as
2   well.
3           Once that initial coding part is done, we'll let the
4   system go out, it will do a sample of, you know, train itself,
5   we'll get the results.  Our proposal was to review, one, a
6   random sample of the results that come back as well as certain
7   judgmental sampling, share those results with plaintiff, they
8   can make their suggestions on how certain things should be
9   coded.
10          We have also identified six different categories that
11  documents can be coded towards.  I think plaintiffs have asked
12  for us to do eight or nine.  We can figure that out.  Go
13  through that iterative process twice.  At that point -- and
14  this is where sort of the proportionality and cost-limiting
15  comes in -- after we've gone through the iterative process
16  twice or if we have to go through another time, have the
17  computer give us the documents in rank order.  And we have
18  agreed or proposed reviewing the top 40,000 rank documents.
19  And we arrived at that 40,000 document number -- we estimate it
20  will cost approximately $200,000 using a five-dollar a document
21  cost estimate, it will cost 200,000 to review the 40,000.
22          When you take that 200,000 in review costs and you
23  couple it with our vendor costs, we're looking at a total spend
24  of approximately 550,000.  We understand that plaintiffs take
25  issue with some of our vendor costs -- we can dispute that --

48

1214KDASC                    CONFERENCE

1    but even just looking at the $200,000 attorney fee review cost,
2    we think that that is a more than appropriate amount to spend
3    to see what we get.  We have never told plaintiffs that we're
4    going to do this and this is all that you get.  Our view is,
5    let's see what this yields us first, we think these are the
6    most relevant people, this is a sophisticated and excellent way
7    to find the cream of the crop, if you will.  And after that
8    process is done, we'll be in a much better position to argue
9    and debate whether or not the incremental value of searching
10   another custodian is going to be worth the cost.  And that's
11   essentially our view.
12            THE COURT:  Let me hear from Ms. Wipper.
13            MS. WIPPER:  Your Honor, we disagree with defense
14   counsel's position that the only issue is predictive coding,
15   because that kind of skips over a lot of other issues that --
16            THE COURT:  Well, let's deal with the predictive
17   coding piece.  I understand, from what little I have skimmed of
18   your proposal and theirs, that they're sort of only looking at
19   an email archive and you want lots of other steps looked at.
20            But assume that that other piece gets resolved,
21   meaning where they have to look, and maybe their 3.2 million
22   database will double or go up to whatever, but what's wrong
23   with the predictive coding methodology they have proposed,
24   which also sounds like it's being run on a fairly transparent
25   and cooperative basis?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

49

1214KDASC                    CONFERENCE
1              MS. WIPPER:  Well, the main issue is cost because --
2              THE COURT:  No, but where?  In other words --
3              MS. WIPPER:  It's impacting the methodology.
4              THE COURT:  Well, the question becomes the review.
5    And my understanding of the way this works is by the time that
6    the system spits this out, and whether it's the top 40,000 or
7    whether the break point is 50,000 documents or 30,000, that
8    90-something percent of the relevant documents are going to be
9    found in the top hits, and that the costs of reviewing the rest
10   is not worth the candle in most cases.
11             Now, where that line gets drawn is something that I
12   can't decide until I've seen the results.  In other words, when
13   one sees the results, as I understand it from this method, one
14   can see a sharp drop-off at a certain point, at which you then
15   still sample the documents that are not going to be reviewed,
16   and that's part of this whole iterative process.
17             If you are seeing that the top 40,000 documents give
18   you 90 percent of the responsive documents, and it's going to
19   cost a million dollars to go to the next hundred thousand
20   documents for eyes-on review, to get another 5 percent, it's
21   probably not worth it.  If it's worth it to go to the top
22   50,000 because that's where the cliff line seems to be, that's
23   what people are going to have to do.
24             It also may be that once privilege is determined, that
25   they will let you -- the rest of this is so likely to be junk,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
     1214KDASC                  CONFERENCE
 1   that you want, under an attorneys'-eyes-only or some process,
 2   an informal basis, you want to look at the documents that go
 3   from 40,000 to 80,000, you can look at them and if you tell
 4   them, you know, gee, having looked at it, there's a lot of good
 5   stuff here, then there's some problem with the process.
 6              I'm not saying 40,000 is the cutoff -- I can't really
 7   determine that -- and I invite both sides' experts to tell me
 8   if I've gotten this wrong but I've sat through a lot of
 9   training sessions on this, wherever that cliff is, that where
10   is where the break should be.  So if that was the only problem
11   you had with that part of the predictive coding process, then
12   it sounds like you all can go down this road, all of this,
13   without prejudice to additional search as may be necessary and
14   additional processes as may be necessary.
15              So is that the only problem, Ms. Wipper, or is there
16   anything more?
17              MS. WIPPER:  No, there's a dispute about the scope of
18   relevancy.  What happened --
19              THE COURT:  I've ruled on that.  That's what we spent
20   the morning doing.
21              MS. WIPPER:  OK.
22              THE COURT:  So whatever rulings I gave on that are
23   going to apply to the emails as well.  So any positions they
24   were taking in the ESI protocol are now going to have to be
25   revised, based on what I have done this morning, and similarly
```

51

1214KDASC                    CONFERENCE

1    on your side.
2             MS. WIPPER:  OK, and also I'd like to respond to
3    defense counsel's description of their proposal.  I'd like DOAR
4    to respond and give you an overview, if we may, on our proposal
5    on predictive coding.
6             THE COURT:  All right, though I guess I'd like to know
7    where it differs.
8             MS. WIPPER:  Well, it's actually a direct response to
9    their proposal.
10            THE COURT:  OK.
11            MS. WIPPER:  So who am I going to hear from?
12            MR. NEALE:  Paul Neale, your Honor.
13            THE COURT:  Mr. Neale?
14            MR. NEALE:  I actually think you pointed to exactly
15   the issue.  We have not taken issue with the use of predictive
16   coding or, frankly, with the confidence levels that they have
17   proposed except for the fact that it proposes a limit -- the
18   ultimate result of 40,000 documents before we have seen any of
19   the results coming out of the system.
20            THE COURT:  I've already said -- and I want to make
21   sure that defense counsel realizes it -- I'm not buying your
22   40,000 as a pig in a poke.  I understand the concept, but where
23   that line will be drawn -- whether it's 40,000, 50,000, 60,000,
24   20,000 -- is going to depend on what the statistics show for
25   the results.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1214KDASC                CONFERENCE
 1          MR. ANDERS:  I guess, your Honor, that's why I stood
 2     up before, because I wanted to ask you something.  I understand
 3     that that cliff line may be at 80,000 documents.  The reason
 4     why we picked the 40,000 is what we're trying to do is also
 5     incorporate the cost element.  We picked 200,000 as what we
 6     think --
 7          THE COURT:  Proportionality requires consideration of
 8     results as well as costs.  And if stopping at 40,000 is going
 9     to leave a tremendous number of likely highly responsive
10     documents unproduced, it doesn't work.  Plus, of course once
11     you have the predictive coding run, the cost after that is how
12     much you're doing an eyes-on review of.  And once you've weeded
13     out the privilege documents -- and I assume you either have the
14     502(d) order or you will be providing one for me to sign off
15     on, because I think in a case of this size, if you're not
16     agreeing to one, you're committing malpractice -- how much
17     money you spend thereafter is a result of how much you want to
18     know what's in the documents or, putting it perhaps a different
19     way, CYA.  If the first 60,000 are clearly showing that they're
20     highly relevant but you're running out of money after 40,000,
21     don't review the other 20,000.  That's up to you.
22          MR. ANDERS:  We've considered that, your Honor, and I
23     think the attorney-eyes-only type of agreement or designation
24     may be appropriate here, because one of the concerns we have
25     is, some of the plaintiffs are now working for competitors.  To

53

1214KDASC                 CONFERENCE

 1  the extent that they're seeing --
 2          THE COURT:  This is not a case where I assume, other
 3  than on anecdotal, that there is going to be much need for the
 4  individual plaintiffs to look at the documents.  I'm sure you
 5  can all work that out.
 6          Now, unfortunately it's 1:00 o'clock.  I'm happy to
 7  have you come back.  I've got a 2:00 o'clock, and there may be
 8  a 3:30 from people who forgot to show up this morning and were
 9  told to try to get their act together and get here this
10  afternoon.  You can come back this afternoon, you can come back
11  in a day or two.  I think we have made some good progress, and
12  I know that you're coming from further away than usual, so I'd
13  like to make the most use of your time.
14          What's your pleasure?  You want to come back at 3:30
15  in the afternoon and use the time from now to then?  You can
16  use the jury room.
17          MR. ANDERS:  Maybe, your Honor.  The only reason why I
18  say that is, tomorrow I am leaving the country for a week for a
19  family vacation, so I'm out of pocket for a week; I'll have
20  some email but not a lot.  So, again, I don't want to impose on
21  everybody else, but that's my scheduling issue, so I'm not sure
22  how much we'll get done within the next week.
23          THE COURT:  That's why I'm suggesting you maximize --
24  I don't know what time your flight home is -- well, you're in
25  Morristown.

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

54

1214KDASC                    CONFERENCE

1               MR. ANDERS:  Today's fine for me, your Honor.
2               THE COURT:  You're fine for today.  If everybody wants
3     to stay -- you just spent an hour talking about custodians and
4     made some progress -- there's a certain benefit, I think, in
5     keeping you hostage because it avoids the delay between phone
6     calls, et cetera, et cetera.  So if you want to take an hour
7     for lunch, be all back at 2:00 o'clock, you can use the jury
8     room.
9               MR. ANDERS:  That's perfect.
10              THE COURT:  And as soon as whatever is going on with
11    my afternoon conferences gives me time to see you, we'll deal
12    with you, but you're not leaving until you've checked out with
13    me.
14              MR. ANDERS:  Thank you, your Honor.
15              THE COURT:  OK.  Enjoy lunch, but get back, use the
16    cafeteria on the eighth floor or whatever else, but don't waste
17    half the afternoon by having a nice lunch.
18              MR. ANDERS:  Understood.
19              (Recess)
20              THE COURT:  We are back on the record for part two of
21    Da Silva Moore et al. against Publicis.
22              What progress have you been able to make on the ESI
23    protocols or, more importantly, which of the issues you've
24    talked about would you like a court ruling or guidance on?
25    Whatever you have agreed upon we will memorialize in some other

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1214KDASC                    CONFERENCE

1   way.
2           MR. ANDERS:  I think we made a lot of progress, your
3   Honor.  It may be easier just to say where we are.
4           On the list of custodians, we have identified eight
5   custodians that the plaintiff would like us to add, five where
6   they would be willing to first apply some level of filtering to
7   their results, and then we would either manually review or
8   possibly add those results into the database.  We're going to
9   go back and just confer with our clients and those individuals;
10  there may be certain sensitivities about the particular people
11  but we at least have been able to further narrow the custodians
12  on the overall concept of predictive coding.  We had a lot of
13  conversation and discussion about that; I think we're in
14  agreement on the process.
15          The process is going to be generally as we discussed
16  it before, but what we're going to do is, I think, have more of
17  the iterative reviews, and what we're going to try to do is
18  hopefully be able to do those iterative reviews until we find
19  the cliff that your Honor was referring to.
20          My only concern, and what I want to work into the
21  agreement, is if these iterative reviews are taking longer than
22  anticipated and the costs are mounting, having some mechanism
23  in the agreement where there can be a point where we either
24  discuss it or raise it with your Honor, that, look, we have
25  reviewed 60,000 so far, this is what's coming back, the end

56

1214KDASC                CONFERENCE

1    doesn't seem to be in sight and we've spent X amount, just
2    having something in the agreement to address that possibility.
3            THE COURT:  I have no problem with you all putting in
4    the agreement that you're going to cooperate and work in good
5    faith.  But if things aren't working out because of expense or
6    results not being what either of you hoped for or whatever,
7    that it can be revisited with the Court, the caveat to that is
8    obviously once you go down a certain route, it's going to be
9    very expensive to completely abandon that and say we're now
10   going to do something completely different, so that's probably
11   not something you'll be able to do.
12           Tweaking it, in terms of adding another custodian late
13   or doing a further iteration where you change a search term or
14   better train the computer with some more documents, I don't
15   have a problem with that occurring or the converse of that,
16   with the defendant coming in and saying, you know, we've
17   already spent twice what we thought we were going to spend,
18   we've made enough progress that the next X percent search that
19   that the plaintiff wants us to do is not worth the candle.
20   That's what I said this morning as well.
21           All right, what else?
22           MS. WIPPER:  We would add to that, plaintiffs would
23   propose if we get to that point, that defendants don't do a
24   manual review and just turn over the documents.
25           THE COURT:  All right, that's an argument you can make

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1214KDASC                    CONFERENCE

1    later on, that, OK, this system kicked out all of this.  But
2    usually the sampling is in lieu of that, which is to say that
3    if you get to a certain cliff and you have reviewed -- I'll use
4    defendants' number from before -- 40,000 and the next 50,000
5    are considered not likely to be relevant and you run a sample,
6    statistical or random or whatever, of that balance, you say,
7    OK, we looked at another thousand documents and found one that
8    really was relevant, that's probably the end of the ballgame.
9             On the other hand, if you run a thousand and you find
10   a hundred that are relevant, that may mean that more work has
11   to be done in one way or another.  And I'm not meaning to fully
12   prescribe any, which your experts sitting behind you can
13   probably do better, on what is your 95 percent confidence level
14   or any of that stuff, but at some point it doesn't mean that
15   because predictive coding spits it out as having a 1 percent
16   chance of relevance, that I'm going to say, OK, the defendant
17   has to forego manual review but produce all of it, as opposed
18   to, you'll do a sampling and see if it really is mostly junk.
19            Understood?
20            MR. ANDERS:  Understood.
21            THE COURT:  On both sides?
22            MR. ANDERS:  It makes sense, your Honor.  I guess the
23   way we had initially tried to craft the proposal was by putting
24   up front the dollar figure that we thought was appropriate.
25            THE COURT:  That's somewhat meaningless.  And,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

58

1214KDASC                    CONFERENCE
1   frankly, it then gets into fights about "if you didn't get to
2   Recommind and you went to XYZ company, that piece of it would
3   be 25 percent cheaper and that shouldn't be attributable to us
4   and your associates at Jackson Lewis are paid too much per
5   hour, that shouldn't be attributable to us."  I will look at
6   proportionality, but I'm not telling you that there is a
7   particular number that's better than another on how much work
8   you've got to do.
9               MR. ANDERS:  I understand.  That came across clear.
10              I just want to make sure that I understand what you're
11  saying, is if, as we're going through this iterative review, we
12  reach a point -- and I don't know what point is -- in terms of
13  cost, where even if the computer is saying there is X percent
14  relevance still out there, that we're not foreclosed from
15  making the proportionality argument at that point.
16              THE COURT:  That is correct.
17              MR. ANDERS:  OK.
18              The other thing we had discussed, your Honor, were
19  those sources that would not be reviewed through predictive
20  coding.  For those sources, we have agreed to do targeted
21  searches of some of them; for others, we need to find more
22  information about what information is actually housed there,
23  but I think we were able to work through some of these other
24  sources, shared drives --
25              THE COURT:  This is the material that's on page 2 and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

59

1214KDASC                    CONFERENCE
1   3 of plaintiffs' proposal, I assume?
2            MR. ANDERS:  Yes, your Honor.
3            THE COURT:  I'm not asking you to give me much more
4   detail on that as long as there is agreement so that you're
5   moving forward without the need of further court help on it.
6            MR. ANDERS:  There is, your Honor.  We're moving
7   forward on that.
8            MS. WIPPER:  There are two points that we wanted to
9   raise.  The first one was concerning the time period for the
10  emails.
11           Earlier today defense counsel said that their email
12  archive went back to 2008.  There is also a separate email
13  that's available from a legacy system that's stored in home
14  directories or shared folders.  So we would propose that for
15  pay discrimination issues, that we would apply the longer
16  period to 2 --
17           THE COURT:  For pay discrimination, we're not doing an
18  electronic search.  You're getting that from the personnel
19  material and the material you got on payroll.  It's unlikely
20  that email is going to find anything, and if it is, frankly,
21  it's going to find it in the post-2008 period that's in the --
22  I'll call it the master database, the archive system, that they
23  have established.  So I don't see that as being necessary,
24  certainly not in any immediate wave.
25           On all of this, I'm not foreclosing you, as you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

60

1214KDASC                    CONFERENCE

 1   develop information from the documents produced or from
 2   depositions, from saying that you have learned something new,
 3   but if there is a smoking gun email that says, you know, I'm
 4   the president of the company and it is our policy to pay women
 5   less than men, I guarantee you that will get repeated in the
 6   newer system.  And for that needle in a haystack, I'm not going
 7   to have them bring up an additional search.
 8               What else?
 9               MS. WIPPER:  I would just add to that much.  They
10   haven't produced the payroll data yet.
11               THE COURT:  We talked about all of that this morning.
12   I'm not revisiting things.  It's been a long enough day.
13               MS. WIPPER:  I just wanted, before we move from
14   predictive coding, I also want to address the issue codes, what
15   we agreed to do, because there's a dispute about the
16   definitions that plaintiffs proposed.  We're going to try to
17   deal with that in the coding process; and it's possible, if we
18   can't agree, that we would need the Court's assistance.
19               THE COURT:  I'm sure I'll be seeing you again soon.
20               MS. WIPPER:  OK.
21               MR. ANDERS:  I believe that was it, your Honor.  I
22   think we were going to talk about some time frames.  I think at
23   least with the ESI protocol, my plan is probably the night
24   before I leave to at least get emails out on questions about
25   parts of the systems and then as soon as I return, if not while

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

61

1214KDASC                    CONFERENCE

 1    I'm away a little bit, try to redraft the protocol to address
 2    what we discussed today.
 3            THE COURT:  I know every lawyer thinks they're
 4    indispensable and I'm not pulling the "Jackson Lewis is a big
 5    firm and you're all fungible," but is there not another person
 6    who may be less email savvy or computer savvy than you, such as
 7    Ms. Chavey, for example, who can follow up, along with the
 8    folks from Recommind and plaintiffs' counsel, and not lose an
 9    entire week because you're on vacation?
10            MS. CHAVEY:  Of course, your Honor.
11            THE COURT:  And I happen to know, it may not be on
12    this case, if it's a true e-discovery dispute, I happen to know
13    your Florida e-discovery counsel very well --
14            MR. ANDERS:  He knows a little bit.
15            THE COURT:  You can bring Mr. Losey into the mix if
16    need be.
17            MR. ANDERS:  OK, understood.
18            THE COURT:  What else?
19            MS. CHAVEY:  Your Honor, I know your Honor said you
20    weren't going to reconsider what was addressed this morning,
21    but I did look, during the break, about the issue about
22    Mr. Tsokanos in complaints that had been made against him.  I
23    think on plaintiffs' counsel's representation that their
24    understanding was there had been a complaint in 2005, you
25    ordered us to provide that.  There was not a complaint in 2005.

1214KDASC                    CONFERENCE

```
 1   There was something earlier than that.  And I just wanted to --
 2              THE COURT:  How early?
 3              MS. CHAVEY:  2003.
 4              THE COURT:  But that was the Atlanta --
 5              MS. CHAVEY:  It was in Atlanta.
 6              THE COURT:  Produce it.  Obviously it's discrete and
 7   can be found.
 8              Before I lose track, for the paper discovery we talked
 9   about this morning, how soon can you complete that?  One week,
10   two weeks, six years?  Come on.
11              MS. CHAVEY:  Your Honor, we would need at least 30
12   days.
13              THE COURT:  I don't know how you're going to do that
14   in 30 days, finishing e-discovery protocol that's not going to
15   be finalized for more than a week despite me getting other
16   people involved while Mr. Anders is away, run the ESI, go
17   through iterations and meet a June 30 discovery deadline with
18   depositions and everything else.  I think you're being a little
19   generous there.  So one more chance.  Working harder, faster,
20   et cetera, how soon can you do it?
21              MS. CHAVEY:  Well, one issue, your Honor, for example,
22   is with the personnel action notices.  We understand the order
23   to require us to work with the plaintiffs to come up with a
24   statistically significant sample.  That in and of itself is
25   going to take a while and then there's going to be the
```

63

1214KDASC                    CONFERENCE

1   searching for the notices, so there is time that needs to be
2   built in in order for that to occur.
3            THE COURT:  Can you live with 30 days, Ms. Wipper?  If
4   not, tell me what you can live with.
5            MS. WIPPER:  We have a deposition scheduled with
6   defense witnesses starting the end of this month.
7            THE COURT:  With all due respect, if you want to keep
8   to that schedule, you're going to be deposing them without
9   documents.
10           MS. WIPPER:  Correct.
11           THE COURT:  And let's all be clear on the way I run
12  this, which is, if you want to take early depositions to learn
13  things, that's fine; you don't get to redepose somebody whose
14  deposition was finished because you get documents later that
15  you knew you didn't have, as opposed to when they say, OK,
16  we've completed our document ESI production and you take a
17  deposition and then a week after the deposition they say look
18  what we found in the warehouse somewhere; then you may get
19  another deposition.  So if you want to take a deposition at the
20  end of the month, that's fine, but let's say I push them to get
21  you something in two weeks, which means you both have to be
22  very fast on how you're running the statistical significant
23  determination, you're going to have to review it before the
24  deposition, it's not likely to happen.
25           MS. WIPPER:  I would propose three weeks.  We work

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

64

1214KDASC                    CONFERENCE
1   with statisticians regularly so we can have the sample done or
2   our proposed --
3              THE COURT:  That sounds like a viable compromise.
4              So that is three weeks from today, which is
5   January 25th, subject to somebody, by written agreement or by
6   applying to the Court for more time, we'll go from there.
7              OK, other than a date for you all to come back and
8   probably a date for you to complete the ESI protocol to ensure
9   that your feet are held to the fire, is there anything else we
10  need to do on discovery today?
11             MS. WIPPER:  I just wanted to address one point from
12  earlier today and just get clarification from the Court.  On
13  the cutoff date for the production, you said February 2011 for
14  the HR complaints.  I'm wondering if that's a global cutoff
15  date.  We have a plaintiff that left the company after that
16  date, Carol Pearlman --
17             THE COURT:  Is she in the original complaint or the
18  amended complaint?
19             MS. WIPPER:  She's an opt-in plaintiff.
20             THE COURT:  When did she opt in?
21             MS. WIPPER:  I don't know off the top of my head.
22  Probably months ago.
23             THE COURT:  The amended complaint is dated April 14th.
24  Was it before or after?
25             MS. WIPPER:  No, it was after that.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1214KDASC                    CONFERENCE

```
 1            THE COURT:  You've got to have some way of dealing
 2   with this.  So I'm inclined to either leave it at the February
 3   date or maybe to push it to April 14th of 2011, other than when
 4   we get to privilege issues, I'm not going to require them to
 5   log almost anything post initial complaint.
 6            MS. WIPPER:  We would propose the amended complaint
 7   date as the cutoff.
 8            THE COURT:  So we're adding a month and a half or
 9   something.  Problem, agreement?
10            MS. CHAVEY:  Well, it seems appropriate to limit it to
11   and cut it off at the date of the initial complaint.  The fact
12   that Carol Pearlman opted into the April Pay Act claim later
13   doesn't seem to affect the Court's ruling that the date would
14   be February.
15            THE COURT:  All right, let's leave it where it was
16   originally.
17            What else?
18            MR. ANDERS:  Your Honor, I just want to make sure I
19   heard correctly:  Did you give a definite date for when the ESI
20   protocol must be completed?
21            THE COURT:  No.  Give me a proposal.  A week after you
22   come back or a/k/a two weeks from today?
23            MR. ANDERS:  That would be perfect.
24            THE COURT:  Agreeable?
25            MS. WIPPER:  Sure.  And you want a joint proposal,
```

66

1214KDASC                    CONFERENCE
 1   your Honor?
 2            THE COURT:  Yes.  And if you can't agree, I want it as
 3   a single document with paragraph 3, whatever paragraph 3 is
 4   about, 3(a) plaintiffs' proposal, 3(b) defendants' proposal,
 5   and then a cover letter from each of you explaining, to the
 6   extent it's not immediately obvious, what it is you're
 7   disagreeing on.  So that's January 18th.
 8            OK, next, date for our next court conference, what's
 9   your pleasure?
10            MS. WIPPER:  How about a week after the ESI protocol?
11            THE COURT:  Well, I think that's probably going to be
12   early unless you think there are ESI protocol problems, only in
13   the sense that the document production out of what I'll call
14   this morning's production is due the 25th.  On the other
15   hand --
16            MS. CHAVEY:  Your Honor, what about February 2nd?
17            THE COURT:  That's LegalTech week.  Yes, by Thursday
18   that's OK.  February 2nd at 9:30.
19            Now, the other thing:  When is it you plan to move for
20   class certification?
21            MS. WIPPER:  I believe it's in the schedule, your
22   Honor.
23            THE COURT:  I don't think it is but I'm willing to be
24   educated.
25            MS. CHAVEY:  Your Honor, it is in the scheduling order
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

67

1214KDASC                 CONFERENCE
1   but it is due on or before April 1st of 2013.
2            THE COURT:  Frankly, that makes no sense to me.  I
3   know you convinced Judge Sullivan to do that.  It won't be the
4   first time I've overruled the district judge; it's a strange
5   world that we live in.
6            Yeah, I understand the purpose of getting past the
7   expert period, but if you make the motion on April 1, it won't
8   be fully briefed until the summer of 2013, it won't be decided
9   until the fall of 2013 or January 2014.  You can't really do
10  summary judgment or anything substantive until the class either
11  has or hasn't been certified.  And then if either a class or an
12  FLSA collective action is certified or the appropriate other
13  term for a collective action is approved, you've got to go
14  through 30 days to draft the notice, 60 days or 90 days for
15  people to opt in, you are assuring -- and this is something
16  plaintiffs should be thinking about even more than the
17  defendants -- you're assuring no merits resolution of this,
18  assuming a class of any sort, class or collective is approved,
19  until 2014 or '15.  That hardly seems to be in plaintiffs'
20  interests.  And I'm not sure that on the FLSA collective
21  action -- you've got discrimination claims -- that's one type
22  of motion -- and to the extent you've got FLSA and New York
23  Labor Law claims, that's a much more discrete area, it seems to
24  me.  And leaving all of that until the very end, particularly
25  since FLSA requires opt-in plaintiffs, and my recollection but

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

68

1214KDASC              CONFERENCE

1   you all tell me if I'm wrong, is that there is no stopping of
2   the statute of limitations until they opt in?
3            MS. WIPPER:  Correct.
4            THE COURT:  So if this case, which began in early
5   2011, if it's not certified until 2014 or '15 for collective
6   action issues, the whole period between now and then, when you
7   will assume that if there was anything bad going on at the
8   defendants, they will have cleaned up their act during the
9   course of this lawsuit -- and I'm not saying I know there was
10  anything bad or good going on -- you're assuring that the FLSA
11  in particular, even with a six-year statute of limitations on
12  the state claims, is going to be almost a nullity or it's going
13  to be a totally different lawsuit, that most of the period
14  within the statute of limitations is going to be a period on
15  which there has been no discovery.
16           Does it make sense -- not that I want more work for
17  Judge Sullivan or myself -- to do something differently for the
18  FLSA New York Labor Law than the Title 7 and related
19  discrimination claims?
20           MS. WIPPER:  Well, your Honor, I think it depends on
21  the discovery because we have the burden and we have been
22  spending an enormous amount of time trying to get discovery in
23  this case for many, many months.  So, today, as I stand here
24  today, I can't say for sure we will be prepared to file
25  something until we have the discovery.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

69
1214KDASC              CONFERENCE
 1              THE COURT:  On the FLSA and New York Labor Law?
 2              MS. WIPPER:  We need the payroll data.
 3              THE COURT:  Well, you basically have that, I thought,
 4      subject to the cleanup -- and I'm not revisiting what I ordered
 5      this morning.  So that you're going to have by the end of this
 6      month.  Whatever work your experts need to do, I don't see
 7      waiting until April 1st of 2013, and, frankly -- and I'm not
 8      trying to help the defendants -- if I were them, I'd oppose
 9      certification at that point if for no other reason than that
10      most of the period within the statute of limitations will be a
11      period where there hasn't been discovery.  And if we stick to
12      the schedule, because you got Judge Sullivan to approve it and
13      I decide not to stick my neck out and overrule him, so to
14      speak, I'm not reopening discovery.  You can bet on that.  Once
15      discovery closes, it is done, because nobody wanted bifurcation
16      the second time today because 99 percent of it was held to be
17      relevant either way.  Think about it and maybe in February,
18      too, we can revisit that issue.
19              MS. WIPPER:  OK.
20              THE COURT:  I guess the last issue, although I
21      suspect -- I don't know what I suspect.  I generally at first
22      or early conferences raise the 636(c) issue.  I don't remember
23      raising it at our prior conference because they were on a sort
24      of emergency basis, et cetera.  But I remind both sides that
25      pursuant to 28, U.S. Code, Section 636(c), if all parties
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

70

1214KDASC                 CONFERENCE

 1   consent, then the case can be in front of me for all purposes,
 2   including the jury trial you've asked for here and any appeals
 3   to the Second Circuit, they're the same from a magistrate
 4   judge, consented trial or motion decision, as it would be in
 5   front of a district judge, and it's up to all of you and our
 6   missing friends from Publicis.
 7           So by the February 2 conference, obviously a decision
 8   to keep thinking about it keeps your options open, but it also
 9   keeps one side or the other -- whoever is in favor of it now
10   and the other one is not so sure, by two months later, that
11   position may reverse.  So the sooner you all decide, you
12   decide, I'll ask you to tell me where you are at the February 2
13   conference and we'll go from there.
14           And finally -- perhaps my second "finally" but
15   finally, the jurisdictional discovery and all that against
16   Publicis, is anything happening in that area?  I don't want
17   them to prejudice them from not being here but I don't know
18   that the quietness with respect to that, as opposed to
19   everything going on here, is the result of nothing going on or
20   is the result of there not being the same problems.
21           MS. WIPPER:  Well, we served discovery on October 19th
22   on Publicis Groupe according to the schedule, and on MSL.  They
23   asked for a month extension to respond.  We gave that to them
24   and they produced documents, some documents, Publicis Groupe,
25   and responded with objections on the 21st.  We're probably

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1214KDASC                CONFERENCE
1  going to have to have a meet-and-confer with them concerning
2  some of their objections and their responses, but right now we
3  don't foresee any disputes at this time.
4          THE COURT:  Well, you've got a March 12th cutoff.  The
5  earliest I'm likely to want to deal with that, since it seems
6  like you all are going slowly, is at the February 2 conference.
7  That's going to leave you very little time if there are
8  problems, to get them resolved and get whatever depositions or
9  whatever are going to occur post the paper/ESI side of
10  discovery.  So don't lose sight of it.  Let's have Publicis
11  here at the next conference, even if there is complete
12  agreement that everything they have been doing is fine.
13          The other thing is, you all can figure out how to do
14  this when we're going to have megaconferences like this.  I
15  certainly prefer everyone to be present in person.  If it gets
16  to the point where you know in advance there's one minor issue
17  and one of the local counsel, more local, will be here and the
18  other is from San Francisco, for example, while the airlines
19  need all the help they can get, it's not my job to feather
20  their covers, so if you want to show up telephonically, ask for
21  permission to do that, which, as I say, will be granted if you
22  really think the conference is going to be the typical half
23  hour discovery conference and not the 500 pages of letters,
24  et cetera, et cetera, like we had today.  You do not need to
25  ask permission for your e-discovery consultants to attend.  If
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

72

1214KDASC                CONFERENCE

 1    there are any ESI issues, and assuming you're willing to pay
 2    the freight for them, I am not only delighted to see them but
 3    they're usually a valuable addition.
 4              I think that covers everything.  I guess I'll just
 5    say, my rules provide that if things start going much more
 6    smoothly and two business days before the next conference we
 7    decide you really are getting along swimmingly and you worked
 8    things out and things should just be put off a few weeks, you
 9    can make that application, either by a joint phone call to my
10    secretary or by a fax, requesting that, and nine times out of
11    ten those requests are granted.  They're not granted when they
12    come in at 5:00 o'clock the night before and the Court suspects
13    that somebody's already on an airplane.  And they're not
14    granted unless they're on consent, meaning if one side says I
15    don't need the conference but the other side is frothing at the
16    mouth because they're being frustrated, we're obviously going
17    to have a conference.
18              Any questions?
19              MS. CHAVEY:  No, your Honor.
20              THE COURT:  All right, the transcript, as usual,
21    constitutes the Court's order.  And I think I may have said
22    this once before -- and somebody certainly took up the process
23    and therefore knows the process -- but I'll say it this last
24    time, I may not say it again in the future:  Pursuant to 28,
25    U.S. Code, Section 636 and Federal Rules of Civil Procedure 6
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1214KDASC                    CONFERENCE

 1  and 72, any party aggrieved by a ruling at one of these
 2  discovery conferences has 14 calendar days to bring their
 3  objections to Judge Sullivan.  The 14 days starts running
 4  immediately when you attend any in-person or telephonic
 5  conference and hear my ruling accordingly, regardless of how
 6  long it takes me to obtain the transcript from the reporter.
 7  And failure to file objections within that 14-day period
 8  constitutes a waiver for all further purposes in the case,
 9  including any appellate purposes.
10          With that, I'll require both sides to purchase the
11  transcript from the reporter and with that, we are adjourned.
12  Have a good flight back, or drive back, to everyone going in
13  different places.  Have a good vacation --
14          MR. ANDERS:  Thank you, your Honor.
15          THE COURT:  -- and happy new year.  See you all in a
16  month.
17          MS. CHAVEY:  Thank you, your Honor.
18          MS. WIPPER:  Thank you, your Honor.
19          MR. ANDERS:  Thank you.
20                          * * *
21
22
23
24
25