1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MONIQUE Da SILVA MOORE, et
    al.,
4
                Plaintiffs,
5
                v.                          11 CV 1279 (RJS)
6
    PUBLICIS GROUPE, et al.,
7
                Defendants.
8
    ------------------------------x
9                                           New York, N.Y.
                                            January 4, 2011
10                                          10:58 a.m.

11  Before:

12                      HON. ANDREW J. PECK,

13                                          Magistrate Judge

14                          APPEARANCES

15  SANFORD WITTELS & HEISLER LLP
         Attorneys for Plaintiffs
16  JANETTE WIPPER
    DEEPIKA BAINS
17
18  JACKSON LEWIS LLP
         Attorneys for Defendant MSL Group
    BRETT M. ANDERS
19  VICTORIA WOODIN CHAVEY

20  ALSO PRESENT:

21  PAUL J. NEALE, DOAR Litigation Consulting
    GENE KILMOV, DOAR Litigation Consulting
22  ERIC SEGGEBRUCH, Recommind
    CRAIG CARPENTER, Recommind
23

24

25

1           (In open court)

2           THE COURT:  Having read, to at least a certain extent,

3      all the things you were kind enough to fax me, including the

4      51-page fax that came in overnight twice -- so somebody owes us

5      a ream of paper, which I won't collect, but let's try not to

6      fax in that much -- here are my thoughts, to start:

7           We either need to revisit the issue of bifurcation of

8      class action discovery and full merits discovery and/or, even

9      treating it as such, it is clear to me that there is a

10     difference between the discovery that would go on in a class

11     action and the discovery treating every possible class

12     plaintiff as an actual plaintiff, which defeats the whole

13     purpose of having a class.

14          In addition, I don't think we have scheduled the

15     motion for class certification, which should be handled sooner

16     rather than later.  So maybe we should start with that

17     question:  When will plaintiffs be ready to move for class

18     certification?  And I read the transcripts before Judge

19     Sullivan dealing with bifurcation where both of you in essence

20     promised Judge Sullivan that, no, no, no, that's not going to

21     lead to all sorts of fights.  And, frankly, I've seen nothing

22     but fights since this case has been referred to me and,

23     frankly, no progress.

24          So that's the first question:  When are you planning

25     to move for class certification?  Who am I going to hear from

1    on the plaintiffs' side?  Ms. Wipper?

2            MS. WIPPER:  Yes, for the plaintiffs in the class.

3            Your Honor, the current schedule entered by Judge

4    Sullivan has a close for fact discovery, I believe, of

5    June 30th.

6            THE COURT:  But it's too late to do class

7    certification after the close of discovery.  That's not what

8    Rule 23 anticipates.

9            MS. WIPPER:  Understood.  We requested a bifurcated

10   schedule, your Honor, to Judge Sullivan.  We wanted class

11   discovery first so we could address and target discovery for

12   the class issues and also minimize potentially some of the

13   disputes going on.  However, defendant MSL opposed that.

14           THE COURT:  I read all of that.

15           MS. WIPPER:  OK.

16           THE COURT:  And at the time, everyone thought it would

17   be a smooth road and would be faster.  It's not smooth and it's

18   probably not faster.  So maybe I'll do it this way:  Do you

19   both at this point, seeing where you've gotten yourselves --

20   and this I guess is somewhat of a question to both of you, so

21   it will be a single yes-or-no question -- do you want to

22   bifurcate?

23           MS. WIPPER:  Plaintiffs would be willing to bifurcate

24   if we did not change the current schedule, because we've lost

25   so much time with the current schedule with all of these

1214KDASC                    CONFERENCE

1    discovery disputes.  At this point we haven't taken one

2    deposition of defendant witnesses.  We've gotten a couple of

3    thousands of documents, a lot of them are policy documents that

4    are repetitive.  We haven't gotten a lot of the information we

5    have requested.

6            THE COURT:  Is bifurcation -- and by bifurcation, I

7    mean the only discovery that will go on -- is that aimed at

8    deciding whether this should be a class action?  Is that going

9    to eliminate most of these fights, from plaintiffs' point of

10   view, or if we agree to bifurcation, are you then going to say,

11   but, Judge, we still want everything or 90 percent of

12   everything set forth in our current letters about what the

13   disputes are?

14           MS. WIPPER:  Well, if I could just respond about some

15   of the disputes, as an example --

16           THE COURT:  No, no, no.  In your view -- let me do it

17   this way:  OK, so you're potentially willing to bifurcate, let

18   me leave it at that.

19           For the Jackson Lewis folks, who am I going to hear

20   from?

21           MS. CHAVEY:  Victoria Chavey.

22           THE COURT:  Having opposed bifurcation the first time,

23   what's your view on it now?

24           MS. CHAVEY:  Your Honor, we would have two concerns

25   with bifurcation at this point.  One is, we would like to

1    proceed with discovery on the merits of the individual named

2    plaintiffs' claims.  So if there were a bifurcated discovery

3    order at this point, we would still like to pursue merits

4    discovery as to the individual claims.

5         THE COURT:  But that means they're going to want

6    merits discovery as to the individual claims against you, which

7    is probably going to put us back in the quicksand that I'm

8    trying to get you all out of.

9         MS. CHAVEY:  The second concern, your Honor, that we

10   have is related to that, and, that is, that we understand

11   plaintiffs' position to be that to prove their

12   pattern-or-practice claim, they do need to take discovery, in

13   their view, on every single decision made at MSL over the last

14   ten-plus years.  So if their view of the pattern-and-practice

15   claim is such that they need discovery on every single decision

16   made, as opposed to focusing instead on what should be the

17   common questions, then I don't know that bifurcating the

18   discovery at this point is going to accomplish the goal that we

19   all had back in the summer, which was efficiency.

20        I'd also like to say, your Honor, just at the outset,

21   I conferred with counsel for the parent company, Publicis

22   Groupe yesterday with regard to whether they needed to appear.

23   It didn't appear to be necessary, given what the Court was

24   going to take up but George Stoehner, who was here on

25   December 2nd, is available by phone if that becomes necessary.

1              THE COURT:  All right.

2              MS. WIPPER:  Your Honor, if I can respond, some of the

3    existing disputes are related to class issues.  For example,

4    we're requesting personnel action notices because of the errors

5    that were found in the data, the HR data, that was produced.

6    Essentially, the coding --

7              THE COURT:  Why is that relevant to class

8    certification?

9              MS. WIPPER:  For our expert to do a statistical

10   analysis and render regression analysis, they need accurate

11   data, including payroll data, which we don't have, which is

12   also in dispute.

13             THE COURT:  Wait.  Are you seriously telling me that

14   for the something like 700 to 1,000 employees of MSL who are at

15   issue here, you need the payroll data as to every single one of

16   them for ten years or some lesser number?

17             MS. WIPPER:  Yes, your Honor.  To run a compensation

18   analysis for regression, we often use payroll data to

19   essentially compare what people are paid during the class

20   period.  So, yes.

21             THE COURT:  All right, Ms. Chavey?

22             MS. CHAVEY:  Your Honor, we have provided the payroll

23   data and other electronic data but what we haven't provided,

24   because it wasn't requested, was paper copies of the personnel

25   action notices.  And we advised plaintiffs' counsel that the

1    Box 5 data from the W-2s were not available electronically.  We

2    have of course records of the W-2s that were issued, but that

3    is not electronically-held data.  That is what was requested,

4    was electronic-held data, and we have provided it.

5              THE COURT:  All right.

6              MS. WIPPER:  Your Honor, if I might, they haven't

7    provided the data.

8              THE COURT:  We're either going to do this in some

9    organized fashion -- we have no more than an hour -- or you can

10   come back this afternoon for the rest of this.

11             Instead of telling me what you need of this, is there

12   a substantial part of what the letters in front of me have you

13   each fighting about that will not need to occur if there is

14   bifurcation, or not?  Because, frankly, if you're going to say

15   I want it all anyway, then I'm not going to bifurcate, the two

16   of you are going to keep beating your heads against the wall

17   with each other, and you'll do what you're going to do within

18   the six months you have for fact discovery that are left.

19             MS. WIPPER:  Your Honor, the HR complaints go to

20   merits in order to show intentional discrimination, so those

21   would not be at issue if there was a bifurcated schedule.

22             Also, in terms of the personnel action notices, that

23   would be a part of it but not every personnel decision for

24   every class member and every comparator.  So it would limit the

25   personnel records we would be requesting and it would also

1    limit the HR complaints, discrimination complaints.

2            THE COURT:  What else?  I've got several hundred pages

3    of letters before we even get to the dueling ESI protocols.

4            MS. WIPPER:  Well, in terms of the motion to compel

5    letters, I think that was the only two issues that -- oh, there

6    was one other issue, the personnel file of the president, and

7    that would be a part of the class discovery, because as part of

8    the common issue --

9            THE COURT:  Well, it doesn't sound like we're gaining

10   much by bifurcating.  So you all are going to swim or sink with

11   this, but I am going to enforce 26(b)(2)(C) proportionality.

12   So let's go through the letters in detail.

13           I'm starting in chronological order with the

14   December 27 letter, page 4, documents regarding complaints of

15   discrimination.  How are those kept, Ms. Chavey, in the HR

16   department?

17           MS. CHAVEY:  Your Honor, to the extent there are

18   complaints of discrimination, yes, those would be held by the

19   HR department.  The requests are much broader than that, as we

20   have described in our letter.

21           THE COURT:  All right, so let's now deal as to subject

22   matter, gender discrimination by females and sexual harassment

23   complaint by females.  That's the Court's ruling.  Anyone want

24   to argue against that?

25           MS. WIPPER:  No, your Honor.

1        MS. CHAVEY:  Your Honor, as to the sexual harassment

2   piece of that, there is no claim of sexual harassment here, and

3   that's why we have objected.

4        THE COURT:  It's similar enough.  That's the Court's

5   ruling.

6        Time period?

7        MS. WIPPER:  If I may make a comment:  Plaintiffs

8   would be willing to limit the time period to 2005 to the

9   present, which is the longest statutory period applicable in a

10   case under the New York Equal Pay Act.  It is also consistent

11   with --

12        THE COURT:  But what has this got to do with the Equal

13   Pay Act?

14        MS. WIPPER:  If there were complaints made about pay

15   discrimination --

16        THE COURT:  OK, but that's a different discrimination;

17   we haven't even talked about that.  If you want to do it in two

18   periods, pay discrimination '05 to whatever gets us back into

19   the Title 7 time period and other gender and sexual harassment

20   in a more limited time period, that sounds more reasonable.

21        MS. WIPPER:  OK, and I would also direct the Court

22   to -- there is case law allowing plaintiffs to get --

23        THE COURT:  I understand, but you're also getting many

24   years' worth of information.  Any problem with -- what's our

25   Title 7 or state parallel statute of limitations?

1           MS. WIPPER:  February 2008 to the present.

2           THE COURT:  So February 2008 to the present, does that

3    work for the defendants?

4           MS. CHAVEY:  Yes.

5           THE COURT:  And what's the first date in '05?

6           MS. WIPPER:  It would be February 2005.

7           THE COURT:  All right.  And February 2005 only for

8    complaints that deal with pay discrimination.

9           MR. ANDERS:  Your Honor, if I may, the one concern I

10   would have about 2005 -- and this was shifting a little bit in

11   the ESI realm -- is the emails that --

12          THE COURT:  Wait.  How are complaints to HR kept?

13   Let's start with that.  That's what we're talking about.

14          MS. CHAVEY:  They're kept in different ways.  There

15   may well be emails relating to complaints or relating to the

16   company's responses --

17          THE COURT:  Do you know how this is done, or are we

18   doing a law school exam?

19          MS. CHAVEY:  Yes, no, we have investigated this.

20          THE COURT:  Are there paper files?

21          MS. CHAVEY:  Yes.

22          THE COURT:  And in what form may the emails take?  An

23   email to HR from an employee?

24          MS. CHAVEY:  Or between HR people.

25          THE COURT:  Fine, that seems like it's easy enough to

 1    search.  OK, that's the Court's ruling.

 2              Pay discrimination, February 2005 to date -- well, to

 3    date?  Let's cut it off at the date the complaint was filed,

 4    which is what?

 5              MS. WIPPER:  February 24th, 2011.

 6              THE COURT:  OK, so through February 24, 2011.  And

 7    gender and sexual harassment discrimination by females February

 8    '08 to the date of the complaint.

 9              MS. CHAVEY:  Your Honor, just to clarify to pay

10    discrimination, is it your order that the complaints at issue

11    would be pay discrimination based on gender or any complaint

12    about pay?

13              THE COURT:  No, pay discrimination based on gender.

14              I think that takes care of all of the complaints of

15    discrimination, yes?

16              MS. CHAVEY:  Yes.

17              MS. WIPPER:  If I could just have one point of

18    clarification:  The defendants wanted to limit it to complaints

19    against presidents and managing directors.

20              THE COURT:  No, complaints.

21              OK, next:  Personnel decisions -- and this gets back

22    to -- I'm not exact sure what it is want.  So tell me what you

23    want.

24              MS. WIPPER:  If I could direct the Court to page 7,

25    there are some examples of what we are looking for.  For

1    example, the first bullet point addresses the personnel action

2    notices that I have already referenced.  So we're interested in

3    those for two reasons; one, to correct the data, two,

4    because --

5                THE COURT:  Let me just stop.  Are those paper?

6                MS. CHAVEY:  Yes.  They're in the personnel files.

7                THE COURT:  Any problem with producing them?

8                MS. CHAVEY:  Yes.  There are a thousand employees as

9    well as former employees, and to pull all -- these are the

10   forms that are signed by authorized people to submit to payroll

11   to approve a pay increase, for example, or a change of address

12   or what have you.  So these are not held in an electronic

13   database; these are documents that are made part of the

14   personnel files.

15               THE COURT:  Assuming you had to do it for every one of

16   the thousand employees and former employees, how much bulk are

17   we talking about?

18               MS. CHAVEY:  There could be a few a year.  The request

19   is -- these haven't been requested, by the way, to my

20   knowledge.  We did not interpret any of the requests to seek,

21   other than the requests for the plaintiffs' personal files.

22               THE COURT:  I'm now doing it this way because that's

23   the way you both presented it.  If you need 30 days because

24   it's a quote-unquote new request, we'll talk about deadlines at

25   the end.

 1          MS. CHAVEY:  But the request as it's stated in the

 2     letter is for any personnel action notice, which they call a

 3     PAN, relating to pay, job title or status.  So sometimes there

 4     are personnel action notices that show that somebody goes from

 5     one department to another.  Whether that's a status change, I

 6     don't know.

 7          THE COURT:  Is that what you want?

 8          MS. WIPPER:  For purposes of the errors in the data,

 9     we found errors in people's departments and their job codes and

10     their status is terminated or active, full time or part time,

11     so if they do reflect that, so for that purpose we would want

12     it, but for purposes of this, within personnel files, we would

13     only want --

14          THE COURT:  But if you're getting it for some reason,

15     you might as well get it through this.  So that's what you

16     want, a department change?

17          MS. WIPPER:  Yes, your Honor.

18          THE COURT:  So pay, job title, status, meaning

19     department change.  What else?  Obviously --

20          MS. WIPPER:  Promotions, terminations.

21          THE COURT:  Well, that's pay or job title.  Can you do

22     this on a sample basis?

23          MS. WIPPER:  Our understanding is that everything is

24     maintained in HR headquarters in New York, all personnel files.

25     We had a plaintiff --

1     THE COURT:  But to have to go through it for thousands

2     of employees for a long period of time, unless you're telling

3     me that that's what your experts demand in order to do the

4     regression analysis, that's not the way it should be done in

5     discovery.  What is it you need this for?

6     MS. WIPPER:  To correct the data, your Honor.  And

7     there's case law supporting the fact that if there are errors

8     in the data, it shouldn't be held against a plaintiff or the

9     other party and they shouldn't be denied discovery --

10     THE COURT:  Are you willing to pay for this?  We're

11     going to start turning this into a pay-for-play if you can't be

12     more reasonable.

13     MS. WIPPER:  We would be willing to discuss sampling

14     as long as it's a significant sample, statistically significant

15     sampling, and random.

16     THE COURT:  Statistical significant sample is probably

17     10 percent of the employees or something like that.  Is that

18     what we're talking about?

19     MS. WIPPER:  And we would also like to ask for

20     additional notices; if we find errors while we're doing the

21     analysis of the data, we would like to have the opportunity to

22     get additional notices as well.

23     MS. CHAVEY:  Your Honor, that's actually the other way

24     that we would propose to do this.  And we had talked with

25     plaintiffs' counsel before, about identifying the errors, to

1    see if we could then confirm whatever the supposed conflict was

2    in the data that was provided.  It didn't sound, from our

3    discussions, like it was more than a handful of alleged errors.

4    And if that would be a way of doing it, then we could work with

5    just whatever the errors were that came up.

6              MS. WIPPER:  But, your Honor, we have seven

7    plaintiffs, and pretty much every single one of them has an

8    error in the data.  So it's hard for us to know how

9    widespread --

10             THE COURT:  An error about what?

11             MS. WIPPER:  One plaintiff is listed as full time,

12   when she's part time; one is listed as current when she's no

13   longer working there, another is listed as has resigned but she

14   was terminated, her job was eliminated; two were listed as

15   taking severance when they didn't; one her job code was

16   incorrect.  So --

17             THE COURT:  All right, you're going to do the

18   personnel action notices.

19             Now, what time period are you talking about?

20             MS. WIPPER:  The same time period as the employment

21   data?

22             THE COURT:  Well, we're not doing the pay

23   discrimination, period, for this.  So February 2008 to the

24   complaint on a statistical sampling basis.

25             MS. WIPPER:  Your Honor, will we also be able to ask

1214KDASC                    CONFERENCE

1    for additional notices if we find other errors in the data

2    beyond the sample?

3            THE COURT:  The whole purpose of this statistical

4    sample is to avoid having to do it for all 5,000 employees or

5    whatever it is.

6            MS. WIPPER:  I'm not anticipating a thousand.  I don't

7    want a dispute later if there's like five people.

8            THE COURT:  If it's a limited number, I'm sure both

9    sides are going to be reasonable.

10           OK, the second bullet, promotion recommendation forms,

11   what's the purpose of that?

12           MS. WIPPER:  The purpose of the promotion

13   recommendation forms is to show who approves the promotions.

14   And our theory in this case is that there's a centralized

15   decision-making process, kind of the opposite of Wal-Mart

16   versus Dukes where a core group of managers, leadership team,

17   makes the decisions.

18           THE COURT:  Is there a dispute as to that?  Now,

19   whatever you all can stipulate to, you can save a lot of time

20   and money on discovery.

21           But before you answer that, let me just interrupt for

22   a minute off the record.

23           (Discussion off the record)

24           THE COURT:  Back on the record.  Continue.

25           MS. CHAVEY:  So the promotion recommendation forms are

1   also -- well, let me say, they were introduced in 2008, they

2   are used with regard to promotions of individuals to the vice

3   president or senior vice president level, and these are also

4   forms that aren't held in any centralized place; they are

5   individualized forms and they are transmitted, as far as we

6   have seen, by email.  And they are also at times, although I

7   don't think consistently, appearing in the personnel files of

8   individuals.  They're routed to human resources.

9           THE COURT:  So assuming it's on email, is it then

10  something that is saved in HR in a record, it's a business

11  record, as opposed to just it's an email, hey, Joe, somebody

12  just got a promotion?

13          MS. CHAVEY:  No, it is a form that would be sent as an

14  attachment to an email.

15          THE COURT:  And that's easy to find via the email

16  system?

17          MS. CHAVEY:  No, I don't think it would be easy to

18  find.

19          THE COURT:  Then how does your company do business?

20          MS. CHAVEY:  They use a lot of email.

21          THE COURT:  I know, but this sounds like it's

22  something that in the good old-fashioned, pre-electronic days

23  would have been in the employee's personnel file.  For the

24  company to say, we don't do that anymore, we send it by email

25  and then it's in an email system in a way we can't find it,

1   you're going to have to search.  So it seems to me -- or who

2   approves all of these?

3            MS. CHAVEY:  Human resources.

4            THE COURT:  So is the only approval signature on it

5   going to be HR or is it going to show who in the business side

6   management approved the promotion?

7            MS. CHAVEY:  For this particular form, that changed

8   over the years from 2008 forward, so there isn't one answer to

9   that question.

10           THE COURT:  Well, at what point does it show who

11   approved it?

12           MS. CHAVEY:  In HR, Rita Masini was a consistent

13   recipient or signatory on these documents through the years.

14           THE COURT:  If that is stipulated to?  Is that

15   sufficient for class purposes?

16           MS. WIPPER:  With respect to HR, yes.

17           THE COURT:  And what else do you need it for?

18           MS. WIPPER:  I believe it also has to be approved by

19   corporate, if it's a VP or an SVP, so it's not just --

20           THE COURT:  Then can you stipulate that all of these

21   were approved -- I don't even know what "approved by corporate"

22   means.

23           MS. WIPPER:  It means a businessperson, so a

24   businessperson, someone outside of HR, the CFO or the

25   president.

1          MS. CHAVEY:  I don't think that's accurate.  Again,

2    this wasn't requested in the document requests.  I don't have

3    it in front of me.

4          THE COURT:  You all manage to spend your Christmas

5    vacation writing me huge letters, so I would assume that by the

6    time you knew there was a conference on this, you'd know the

7    information.  You're either going to stipulate to what level of

8    senior management had to sign these -- obviously if these are

9    promotions to VP or senior VP, I would assume that the

10   signature has got to be at a fairly high level.

11         MS. CHAVEY:  Rita Masini is the chief talent officer,

12   she's the top HR representative.

13         THE COURT:  If a businessperson besides HR has to

14   approve all of this, you are going to either stipulate

15   sufficiently that it satisfies the class certification issue

16   and gets around the Wal-Mart issues or you're going to have to

17   go through, from 2008 to the date of the complaint, on a

18   sampling basis and produce these.

19         MS. CHAVEY:  Because this form changed over time, your

20   Honor, I'm not in a position to stipulate today --

21         THE COURT:  You don't have to do it today.

22         MS. CHAVEY:  OK.

23         THE COURT:  You have to either produce these or

24   stipulate, and by whatever the deadline is that I'm going to

25   set at the end of all of this.

1          OK, request for raise exceptions?

2          MS. WIPPER:  And I think this one also would -- the

3    stipulation we're proposing would work here.  Essentially what

4    this request relates to is, there's a global salary freeze that

5    was implemented by the parent company, Publicis Groupe, for all

6    subsidiaries during the class period.  There was also

7    exceptions to that salary freeze, there was also a promotion

8    freeze and a hiring freeze.  And those exceptions were

9    essentially sent from MSL, the subsidiary, to the parent.

10         THE COURT:  One second.  Since you're getting the

11   personnel action notices, what do you need this for?

12         MS. WIPPER:  This shows the approval process for pay

13   increases that we're also challenging.  So it shows commonality

14   because not only is it nationwide, it's global, and there was

15   exceptions to the freeze that we believe had a disparate impact

16   on women.

17         THE COURT:  So for what employees are you looking for

18   this?

19         MS. CHAVEY:  Just the public relations employees in

20   the United States.

21         THE COURT:  Then, I'm sorry, the personnel action

22   notice is going to show you when somebody got a pay raise.

23   What do you need this for?

24         MS. WIPPER:  This shows the approval process --

25         THE COURT:  Who cares?

1            MS. WIPPER:  -- for commonality purposes.  For the

2    same reason as the promotion recommendation.

3            THE COURT:  At this point you're going to move for

4    commonality, and when they say there isn't, we can revisit

5    this.

6            MS. WIPPER:  OK, your Honor.

7            THE COURT:  If they argue that the raise exceptions

8    were signed off on by different people, they're going to have

9    to say who.

10           So your fate, MSL, is in your hands.  All of the

11   emails on all of this?  No, enough is enough.  So that's the

12   end of this one, as far as I'm concerned.

13           Anything else you want to argue for in this area

14   before we go to page 8 and item number 2 on pregnancy?

15           MS. WIPPER:  No, your Honor.

16           THE COURT:  Anything from the defense?

17           MS. CHAVEY:  No.

18           THE COURT:  OK, pregnancy, what's the fight here?

19           MS. WIPPER:  During one of our meet-and-confer

20   conferences, we asked for a list of the employees who were

21   pregnant during the class period, which we believe would be

22   less than a hundred, probably 60, people.  Defendants' response

23   was that that was captured in the employment data by the leave

24   that the employees took.  But that's not completely true.  We

25   have a plaintiff who was put on a probation letter after she

1  announced her pregnancy and is claiming a pregnancy

2  discrimination claim as a result of that.

3          THE COURT:  But where is it you believe that they have

4  records on pregnancy?

5          MS. WIPPER:  It's our understanding that HR is

6  informed when there's an announcement of a pregnancy, and

7  that's based on anecdotal evidence we have heard from our

8  clients.

9          THE COURT:  Ms. Chavey?

10         MS. CHAVEY:  Your Honor, it may be that HR is informed

11 when an employee becomes pregnant.  Certainly HR is informed

12 when an employee announces her intention to take a leave

13 related to pregnancy.  But there isn't a centralized list or

14 any document that reflects this information that's being

15 requested.  And the difference here is, I believe the

16 plaintiffs acknowledge that they have information about all of

17 those employees who took maternity leave; the only question

18 relates to employees who were pregnant but didn't take a leave

19 for some reason, so maybe they left before they had the child

20 or something like that.

21         So we don't know of a document that answers that

22 question.

23         MS. WIPPER:  It's our understanding we have anecdotal

24 information that an employee in the L.A. office notified her

25 immediate supervisor that she was pregnant and she was called

1    the next day by Tara Lilly and the HR director in New York

2    to --

3                THE COURT:  Why don't you do this:  Why don't you

4    depose the HR person.  You've already got the information about

5    those who took leave, correct?

6                MS. WIPPER:  Yes.

7                THE COURT:  OK.  What else do you want at this point?

8    Otherwise, you're doing in essence a trial on a hundred

9    anecdotal stories, which doesn't make it satisfactory for class

10   certification anyway.

11               MS. WIPPER:  Yes, your Honor.  In order to look at

12   whether there's a pattern for women who were pregnant, whether

13   they did not receive promotions or pay increases or left the

14   company --

15               THE COURT:  How about in addition to the statistical

16   sample we're doing of the personnel action, notices and the

17   promotion recommendation forms, if those get produced, you add

18   them to the statistics?  In other words, if we're doing

19   15 percent of the thousand public relations people as your

20   statistical sample, in addition to that number, you get the

21   personnel action notes for the hundred people, if that's what

22   it is, who took a maternity leave.

23               MS. WIPPER:  OK.

24               THE COURT:  Yes?

25               MS. WIPPER:  Or who announced their pregnancy?

1          THE COURT:  If you have any record of that, sure.

2     They don't apparently.

3          All right, that's it for pregnancy.

4          Comparators and key players?

5          MS. CHAVEY:  Your Honor, on this request, we have

6     agreed to provide comparator data and we have provided

7     comparator data.  The difference of opinion or the dispute here

8     appears to stem from some additional names that the plaintiffs

9     included on request 50.  And we asked why these people were

10    included, and they didn't explain why they were included other

11    than saying some of them were women whom they believed to have

12    been discriminated against or other things, or maybe they were

13    comparators in 2004, but they aren't within the scope of

14    discovery, in our view.

15         THE COURT:  All right.  Ms. Wipper?

16         MS. WIPPER:  The list included comparators, which

17    obviously there's a dispute with, who's an appropriate

18    comparator in every discrimination case.  So I'm unclear about

19    whether or not defendants are willing to produce everything

20    that we say is a comparator, to --

21         THE COURT:  How about you two not only listen to each

22    other outside of court but in.  Ms. Chavey said there was a

23    list of names they gave you that they said we don't know why

24    you've put these people on a comparator list, and other than

25    that, they have no problem giving you your comparator list.

1    So, I don't know who any of these folks are.  Why

2    don't you educate me or drop the people that they object to for

3    now without prejudice to coming back to it later, or play the

4    old split-the-baby.  Tell me what you want, educate me here.

5         MS. WIPPER:  With respect to the women on the list,

6    they were women that we have information complained about

7    discrimination or --

8         THE COURT:  Then why are they comparators?

9         MS. WIPPER:  They are not comparators; they were in

10   addition to the comparators on the list.

11        THE COURT:  Are you doing individual discovery for

12   absent class members?

13        MS. WIPPER:  No.  We're just interested in specific

14   instances of discrimination, because if we just --

15        THE COURT:  If there isn't a pattern and practice,

16   there isn't class certification and what happened to these

17   other people is irrelevant.  Right?

18        MS. WIPPER:  Well, your Honor, at the class

19   certification stage, I'm sure defendants will argue that we

20   have to prove not only the statistical disparity but also

21   anecdotal evidence, including specific instances of

22   discrimination.

23        THE COURT:  Well, the anecdotal will come from what

24   your clients tell you and what your clients point you to as to

25   other people to contact.  So at the moment, those people are

1214KDASC                    CONFERENCE

1    off the comparator list without prejudice to you coming back

2    for them before class certification.

3              MS. WIPPER:  That's with respect to the women listed?

4              THE COURT:  You two have to work this out --

5              MS. WIPPER:  OK.

6              THE COURT:  -- because nobody has given me a list in

7    any way that puts it in a way that I can deal with it.

8              That's the Court's ruling.  You both understand it?

9              MS. WIPPER:  Yes, your Honor.

10             MS. CHAVEY:  Yes.

11             THE COURT:  Off the record.

12             (Discussion off the record)

13             THE COURT:  OK, President Tsokanos' personnel file?

14             MS. WIPPER:  Yes, your Honor.  Plaintiffs believe this

15   is very important because the president is at the center of a

16   lot of these claims.

17             THE COURT:  As to comments he allegedly made, I have

18   no problem giving you that.  Other than that, I'm not sure why

19   you should get anything else.

20             MS. WIPPER:  Well, we're aware there were complaints

21   made against him, so --

22             THE COURT:  You can have any comments, any sexist

23   comments he made, any complaints against him for sexual-related

24   issues, gender or sexual harassment.  What else?

25             MS. WIPPER:  Could I also request that that not be

1   limited to the time period we already discussed, given the

2   importance --

3               THE COURT:  No, no.

4               OK, anything else on that?

5               MS. WIPPER:  Can I just clarify what the time period

6   will be?

7               THE COURT:  The time period is February 2008 to the

8   date of the complaint.

9               Any argument on that by the defense?

10              MS. CHAVEY:  No, your Honor.

11              MS. WIPPER:  If I can just state for the record, we're

12  aware of a complaint against Mr. Tsokanos I would say around

13  2005.

14              THE COURT:  For what, by whom?

15              MS. WIPPER:  Sexual harassment.  And our allegation

16  would be that despite that complaint, he was promoted, and

17  promoted quickly, by passing women who were comparable to his

18  position.

19              THE COURT:  But I thought your argument is that once

20  Mr. Tsokanos became the president, he forced women out and did

21  other terrible things.  So what's the point of what happened to

22  a complaint and then despite that complaint he got promoted?

23              MS. WIPPER:  Because it shows his attitude and motive

24  towards women, so within those documents it would show what

25  type of complaint was made against him.

1          THE COURT:  What type of complaint was that '05

2    complaint you're referring to?

3          MS. WIPPER:  Sexual harassment.

4          THE COURT:  By who?  Who was the complaint made to?

5          MS. WIPPER:  It was when he was a managing director in

6    the Atlanta office.

7          THE COURT:  Who made the complaint?  Was it to HR?

8          MS. WIPPER:  It was to HR.

9          THE COURT:  Well, is that something that can be

10   readily found, Ms. Chavey?

11         MS. WIPPER:  Yes.

12         THE COURT:  OK, produce that.

13         Other than single complaint, the time period is

14   February '08 to date.

15         MS. WIPPER:  All right, your Honor.

16         THE COURT:  OK, that, I believe, takes care of

17   plaintiffs' December 27 letter, correct?

18         MS. WIPPER:  Yes, your Honor.

19         THE COURT:  OK, so now we go to your December 29th

20   letter.

21         MS. CHAVEY:  Your Honor, as to this letter, which is a

22   request for a conference, we had intended to file a written

23   response; we just haven't done it yet.

24         THE COURT:  You can respond orally.

25         MS. CHAVEY:  OK.

1214KDASC                    CONFERENCE

 1          THE COURT:  On the compensation data, do you really

 2     want paper copies of a thousand people's W-2s for three, four

 3     years?

 4          MS. WIPPER:  No, your Honor, we just want payroll

 5     data.  It's not paper copies that we're interested in.  We're

 6     just interested in the records that of what people were

 7     actually paid.  What we currently have now is bonus data, which

 8     had to be reproduced because it was incorrect, and then also

 9     the annual rate of pay, which is the rate assigned to an

10     employee but it's not necessarily what that employee was paid

11     that year.

12          MS. CHAVEY:  Your Honor, we have told the plaintiffs'

13     counsel that we have the W-2s, we have copies of those things,

14     but we don't have an electronic database that contains the

15     Box 5 information.

16          MS. WIPPER:  In lieu of the W-2, we would take payroll

17     data, so --

18          THE COURT:  I'm sorry, I don't know what that means.

19          MS. WIPPER:  There's the HR data, which essentially

20     captures all of the personnel action changes, so any time

21     someone gets an increase, is promoted --

22          THE COURT:  Just tell me what the payroll data.

23          MS. WIPPER:  That's how they process their paycheck

24     every two weeks, so that's a separate database that has all the

25     deductions listed, the total earnings, and then that data is

 1    fed into the W-2 data, which is what's reported to the IRS.

 2              MS. CHAVEY:  I don't know, this is the first that I'm

 3    hearing this explanation of what the payroll data is that's

 4    being sought.

 5              THE COURT:  Who does the company's payroll?  Is it

 6    internal or ADP?

 7              MS. CHAVEY:  They have a payroll department, and I

 8    haven't posed this question.

 9              THE COURT:  See what you can find out on that.  We'll

10    leave this as:  Produce it if it's electronic, if you're

11    telling me after you investigate -- you'll be telling

12    Ms. Wipper if it doesn't exist, you'll work it out.

13              OK, I think that brings us to requests 6 and 11, about

14    org charts among other things.

15              Does your company really not have org charts?

16              MS. CHAVEY:  We do have org charts.

17              THE COURT:  Were they produced?

18              MS. CHAVEY:  We have produced some and, as we have

19    told plaintiffs, we are continuing to produce org charts that

20    we find.

21              THE COURT:  How long does it take?

22              MS. CHAVEY:  We have been very, very diligent in going

23    through a huge volume of documents, both electronic and paper,

24    and we have told the plaintiffs' counsel -- you know, by the

25    time these issues were raised, your Honor, the September 9th --

 1    our responses to the September 9th discovery requests were

 2    about two and a half months old, there were 93 requests, many

 3    of them pertained to the individual plaintiffs, many of them

 4    were very, very broad.  And we have been working very hard to

 5    get through them and we have told plaintiffs' counsel that we

 6    have not asserted that we have completed our disclosures.

 7              If it's taking too long, from their view, we apologize

 8    to them, we apologize to the Court, but we are working through

 9    it.

10              THE COURT:  All right, produce it.

11              MS. WIPPER:  Your Honor, if I can make one comment:

12    These org charts were requested eight months ago and were

13    ordered by Judge Sullivan to be produced four months ago.

14              THE COURT:  Did he set a deadline or, rather, four

15    months ago, he said you've got to produce it?

16              MS. WIPPER:  Yes, your Honor.

17              THE COURT:  Well, part of the problem is, if they're

18    going through lots and lots of data, we're now at the point

19    where objections are gone, it's time to produce; and once I

20    order you to produce something, if you don't, you will be

21    sanctioned, personally as well as your client.  So whatever

22    dilatoriness or game-playing that plaintiff suspects was going

23    on is now over.  So we will set a deadline for all production

24    or at least all paper production at the end of this conference.

25              I think I'm now over to page 5, which are specific

 1    types of documents.

 2              MS. CHAVEY:  Your Honor, when we were here on

 3    December 2nd, you asked or directed plaintiffs' counsel to let

 4    us know, in light of the ambiguity of the term

 5    "reorganization," you asked them to let us know what specific

 6    decisions they were seeking, and they didn't do that.  We did

 7    follow up with them to ask them to do that.  The first we got

 8    this was another midnight email on December 29th, with this

 9    page 5 of bullet-pointed items.  But we didn't have this

10    before.  We sought to do that --

11              THE COURT:  Now that you have got it, do you

12    understand what they're looking for and do you have any

13    objection to searching for it, to any of the bullet points on

14    page 5?

15              MS. CHAVEY:  Some of them are very vague.  For

16    example, the third bullet point, documents relating to

17    restructuring plans, we're not sure if what the plaintiffs are

18    asking us to do is to use a keyword search in the electronic

19    data using the term "restructuring plans" or whether there's

20    something else, but there's not a folder in somebody's desk

21    that says "restructuring plans" on it.

22              MS. WIPPER:  Your Honor, defendants produced

23    PowerPoints to us that had several pages with the heading

24    called "Restructuring" --

25              THE COURT:  The question nowadays, in an ESI world, is

 1    how one is going to find the needles in a haystack or the

 2    haystack, so you all have to work on that.  And that sounds

 3    like the ESI protocol issue that hopefully we'll have time to

 4    get to this morning.

 5              MS. WIPPER:  Your Honor, in our keywords that we

 6    proposed --

 7              THE COURT:  So "restructuring" is presumably one of

 8    them.

 9              MS. WIPPER:  Yes.

10              THE COURT:  So that will turn this up.

11              Anything else?  Let's go off the record a minute.

12              (Discussion off the record)

13              THE COURT:  All right, back on the record.

14              Any of these other bullet points, other than word

15    search or whatever ESI protocol we're going to use, seem to be

16    a problem?

17              MS. WIPPER:  I just want to make one comment.  All of

18    these documents cited here are Bates labeled MSL, not MSLAX,

19    meaning that it's not a part the Recommind platform that

20    they're using on the ESI protocol.  So I just want to clarify,

21    or have defendants clarify, that they would also look outside

22    ESI for any of these documents.

23              MS. CHAVEY:  Of course, of course we would do that.

24              THE COURT:  OK.

25              MS. CHAVEY:  One other kind of general issue with

1214KDASC                    CONFERENCE

1   these particular bullet points, which again we saw for the

2   first time just a couple of days ago, is the time frame covered

3   because I believe the plaintiffs are intending for these

4   requests as they have now been specifically articulated to go

5   back to 2001, which, in our view, is an overly long period of

6   time, and unreasonable under the circumstances here, and given

7   what the allegation is of the --

8           THE COURT:  What time period do you suggest?

9           MS. CHAVEY:  I would suggest February 1 of 2008

10  forward.

11          THE COURT:  Ms. Wipper?

12          MS. WIPPER:  That's fine -- well, I would suggest

13  January 1st because that's when James Tsokanos was promoted.

14          THE COURT:  OK, fine.  January 1, 2008.

15          MS. CHAVEY:  And, your Honor, as to some of these

16  other bullet points, there are just a lot of words in here that

17  are in quotes -- management structure approved, new business

18  team, reductions, terminations.  These are words that we will

19  work with the plaintiffs in the course of the ESI protocol to

20  uncover, and we'll do our best in terms of hard copy documents.

21          THE COURT:  OK, very good.

22          That concludes this letter, other than the sanction

23  requests are all denied at this time without prejudice to the

24  possibility that if the Court thinks there is gamesmanship

25  going forward, that the Court will go back retroactively to

1    this period as well.  Otherwise, let's all just get along, as

2    the old saying goes.

3             I believe that your January 3 letter on the defense

4    side was just responding to plaintiffs' letter; and therefore

5    we've taken care of that, correct?

6             MS. CHAVEY:  Yes.  Our letter on January 3rd related

7    to the plaintiffs' letter from December 27th.  We had not yet

8    responded in writing to the --

9             THE COURT:  Which you don't have to now.

10            MS. CHAVEY:  OK.  Thank you.

11            THE COURT:  On the ESI protocols, we have ten minutes

12   before I'm expecting a telephone emergency conference call from

13   one of my other favorite cases.

14            I'm not sure what your difference is.  Literally, I

15   got plaintiffs' this morning when I came in, to find that you

16   broke my fax machine with a paper jam.  I have skimmed it but

17   I'm not really sure what the difference between the two

18   parties' plans are and what we need to do, perhaps put you,

19   either with your consultants or maybe your consultants without

20   the lawyers, in the jury room for an hour and see what you all

21   can work out.

22            MR. ANDERS:  If I may, your Honor?

23            THE COURT:  Yes.

24            MR. ANDERS:  I think there are a few main areas --

25   some we may have already addressed -- one of which is the

1    overall time period.  As it relates to the emails, where we

2    have pulled the data from is, in 2007-2008 the company put in

3    place a long-term archive which captured every incoming and

4    outgoing email.  That is the data set that we pulled from to

5    get the 3.2 million documents.

6           So, for purposes of a protocol that we have proposed a

7    2008 going forward as the time period, plaintiffs' protocol

8    went back to 2001.  I understand from some of the Court's

9    rulings today that 2008 is the time period with the exception

10   of the EPA claims, which went to 2005.

11          THE COURT:  So any problem with using January 1, '08

12   for this search?

13          MS. WIPPER:  With respect to email only, there is not

14   a problem, but our protocol is much broader than email.

15          THE COURT:  All right.  Well, on the email side,

16   January 1, '08.

17          What else?

18          MR. ANDERS:  Custodians, your Honor.  Our list had

19   included 36 custodians.  That list was higher than we initially

20   intended.  We had made some additions after we received --

21          THE COURT:  Does it include all the HR people, since a

22   lot of this data seems to be in HR?

23          MR. ANDERS:  Yes, it does now.  That was one of the

24   later additions once we received plaintiffs' definition of who

25   the class A custodians are.  The list is the senior executives,

1   the managing directors of the various offices, some of the

2   plaintiffs' intermediate supervisors, I believe it has all the

3   HR people.

4             THE COURT:  How many people are in plaintiffs' list?

5             MS. WIPPER:  47.

6             THE COURT:  Is that a difference of 11, or is it a

7   bigger difference because you don't want some of their 36 or

8   whatever?

9             MR. ANDERS:  I have a difference of 12, your Honor.

10  They had removed four people from our list of 36.  They added

11  18 and then very recently took two more people off, so it's a

12  net --

13            THE COURT:  Who are the 12 that are now in dispute?

14  I've got your respective custodian lists in front of me.

15            MR. ANDERS:  Your Honor, I can tell you the 12 in

16  dispute right now.

17            THE COURT:  OK.

18            MR. ANDERS:  If you look at plaintiffs' ESI protocol.

19            THE COURT:  Yes.

20            MR. ANDERS:  Well, my version is a redline version

21  which is page 11, but if you look at the section which lists

22  their custodians --

23            THE COURT:  Yes.

24            MR. ANDERS:  -- from Scott Bedowin down, who I believe

25  is number -- I think he's number 30 on mine.

1          THE COURT:  Got it.

2          MR. ANDERS:  So from him down, with the exception of

3    Merrill Freund and Lance Breisen, those people are all new

4    people.

5          THE COURT:  All right.  Two questions:  Mark Hass,

6    former CEO, when did he leave?

7          MS. WIPPER:  2009.

8          THE COURT:  So we're talking about a year-plus.  Well,

9    to the extent that some of these are managing directors in what

10   I guess are branch offices -- Seattle, Atlanta, Boston,

11   Detroit, Chicago maybe -- any objection to them?

12         MR. ANDERS:  I guess, your Honor, my concern would be,

13   and what I had said to plaintiffs' counsel, was the database

14   with the 3.2 million documents --

15         THE COURT:  Do you have any idea as to how many would

16   be added if these 12 were tossed in?

17         MR. ANDERS:  We have not collected those, so I don't

18   know what their size is.  One of the things we have encountered

19   with this case is because of the extent to which email is used,

20   the email accounts individually were a lot larger than we have

21   anticipated in the past.

22         THE COURT:  But once you do some screening of them,

23   you'll reduce it down.

24         MR. ANDERS:  Understood.

25         THE COURT:  Unless somebody can give me an argument --

1    and I know there is some argument that I saw somewhere in

2    somebody's letter, about the three or four people from Winter &

3    Associates, but for the internal MSL people, I'm not sure what

4    difference it makes.

5             MS. WIPPER:  Your Honor, if I could address that, the

6    Winter & Associates is part of MSL Group that was folded in as

7    part of the reorganization.

8             THE COURT:  When were they folded in?

9             MS. WIPPER:  2008/2009.  We have been in contact with

10   employees of Winter & Associates, and we believe that they are

11   subject to similar policies and practices and --

12            THE COURT:  As of when they were folded in?

13            MS. WIPPER:  Correct.

14            THE COURT:  And they are also public relations --

15            MS. WIPPER:  Correct.

16            THE COURT:  -- staff?

17            MS. WIPPER:  Correct.  They are not named plaintiffs

18   but they are --

19            THE COURT:  Can your named plaintiffs represent these

20   people?

21            MS. WIPPER:  They're part of MSL Group, and from the

22   organizational charts that we have --

23            THE COURT:  If they are part of MSL Group, then it

24   seems to me you should not be looking at them separately.  And

25   I am certainly concerned with somebody who has the title of

1    general counsel.

2            So either they're the same as everybody else once the

3    reorg hit, in which case I don't see why you're targeting these

4    folks specifically, or they're different, in which case I'm not

5    sure you've got a plaintiff with standing.  What am I missing?

6            MS. WIPPER:  They're part of the MSL Group, they share

7    an office with MSL in L.A.

8            THE COURT:  At this point I'm denying the three people

9    from Winter.  So that gets our group of difference down to

10   nine.  What do you all want to do about it?

11           MR. ANDERS:  Your Honor, I would request that of the

12   people that we had proposed, that we discuss, or plaintiffs

13   suggest, people that could be removed.  I would like to try to

14   keep the database as close to the size it is now without --

15           THE COURT:  In other words, is the 3.2 million you've

16   referred to before or after the deduping?

17           MR. ANDERS:  It's after deduping and deNISTing.

18           MS. CHAVEY:  Your Honor, if I could also address a

19   number on my list, it's number 41, which is Don Lee the

20   managing director of PBJS Chicago?

21           THE COURT:  What is PBJS?

22           MS. CHAVEY:  PBJS is part of MSL Group but it is not a

23   PR agency; it's a very eclectic kind of media company, and it

24   operates separately and it is not part of the public relations

25   business of MSL Group.

1214KDASC                    CONFERENCE

1          THE COURT:  Why do you want Mr. Lee, Ms. Wipper?

2          MS. WIPPER:  Because he is part of MSL Group.  And

3     he's -- we were never told by defendants that they were not a

4     PR agency.  We have asked --

5          THE COURT:  Now you have been told they are different

6     from the rest.  Do you still want Mr. Lee?

7          MS. WIPPER:  Yes.  And I would propose that --

8          THE COURT:  All right, you're not getting Lee.

9          MS. WIPPER:  OK.

10          THE COURT:  Let's narrow this list.

11          MS. WIPPER:  Can we reconsider Winter & Associates

12     because the organization --

13          THE COURT:  No, no, not at this point without further

14     evidence as to why your plaintiffs have standing to deal with

15     this other than if Mr. Tsokanos and others in senior management

16     of MSL were discriminating against women during this period, in

17     which case it doesn't matter what Winter was doing.

18          MS. WIPPER:  Well, I have an org chart right here that

19     shows that Winter & Associates reports right into Jim Tsokanos.

20          THE COURT:  OK.  So what?

21          MS. WIPPER:  So they're part of the leadership team

22     that are making the decisions.

23          THE COURT:  I don't know what a leadership team is in

24     this capacity.

25          MS. WIPPER:  It says leadership team at the top of the

1    organization chart.

2            THE COURT:  Let me see the chart.

3            I'm missing this.  Where is Winter on here?

4            MS. WIPPER:  It's in the box at the bottom.  I think

5    it's sort of in the middle.

6            THE COURT:  Well, it's various people who report to

7    Masini, et cetera.

8            MS. WIPPER:  No, it reports through that top layer to

9    Jim, if you see --

10           THE COURT:  Yes, it reports to Masini, and Masini

11   reports to Tsokanos.  So does Canada and various other things.

12   So what?

13           OK, denied at this time without prejudice to renewal

14   at some later point.

15           MR. ANDERS:  Your Honor, I guess, going down the list,

16   the first person that I guess I would take issue with, based on

17   how we're doing this is, Scott Bedowin.  He's an SVP of Global

18   Consumer Marketing, not at that MD or HR type level that we

19   were considering, so I think he should come out.

20           THE COURT:  OK, what's his role?

21           MS. WIPPER:  Your Honor, defendants have decided to

22   put in the immediate supervisors of our plaintiffs.  We didn't

23   request that.  What we have done is put in comparators to our

24   plaintiffs, and we had a plaintiff who was --

25           THE COURT:  If he is a comparator -- and this is email

1  searches that apparently are going to be run across everybody's

2  email -- you're going to get a lot of stuff from so-called

3  comparators that isn't relevant, it doesn't make sense to do it

4  as a uniform group.  If you want to say that you've got certain

5  comparators who you want different searches run on, that's a

6  different story.  It doesn't make sense to pull all their

7  material in because they're a comparator at the same level.

8          MS. WIPPER:  We would agree to that.

9          THE COURT:  All right, my 12:00 o'clock call has

10  called in.  I have lunch at 1:00.  I'm hoping this won't take

11  long.  Do you all want to just sit here or do you want to go

12  into the jury room and maybe work out some of these issues?

13  Go, lawyers and consultants, as needed, into the jury room.  Do

14  not leave there.  We will come get you after I deal with this

15  call.

16          (Recess)

17          THE COURT:  OK, it's somewhere between 12:40 and

18  12:45.  We're back on the record after my other conference.

19          What progress have you made?  Or perhaps the other way

20  of looking at it is:  What is it in the 15 minutes we have left

21  before lunch that you want me to rule on or give you advice on

22  with respect to the ESI protocol?

23          MR. ANDERS:  Your Honor, we spent the bulk of the time

24  talking about the custodian list.  We have identified five

25  custodians that are, I think, more on the either comparator

1   category or secondary category where I think your Honor

2   suggested that maybe those email accounts get filtered prior to

3   being put into the database -- that's what we were trying to

4   understand -- but we have identified five where at least

5   plaintiffs would be willing to apply some type of keyword

6   search in the filtering to them first.

7             THE COURT:  All right.

8             Ms. Wipper?

9             MS. WIPPER:  With respect to the custodians, I believe

10  that the parties would be able to work it out.  What we would

11  like to hear from the Court is your view on the differences

12  between the two protocols.  Our protocol is --

13            THE COURT:  I have no idea.

14            MS. WIPPER:  OK.

15            THE COURT:  When you send me 50 pages each, late at

16  night and/or the morning of, when you knew this conference was

17  scheduled for quite some time, there's a limit, and it was not

18  done as a redline or anything else as to where your differences

19  are.  So you tell me what it would be most helpful for you, for

20  the ten minutes or so we have left, to rule on or advise on,

21  and I'll deal with it.

22            MR. ANDERS:  Your Honor, I think that the key issue is

23  how we use predictive coding, and that's where there's

24  probably -- that's why we have our experts here, our vendors.

25            The way defendant MSL proposes using the predictive

1214KDASC                    CONFERENCE

 1    coding process would be as follows:  We start with an initial

 2    random sample, with a confidence level of 95 percent, with an

 3    interval of plus or minus 2 percent.  With the 3.2 million

 4    document database, that random sample is 2,399 documents.  We

 5    have gone through those preliminarily.  I had associates go

 6    through those; I just finished going through it last night.

 7             Of that 2,399 --

 8             THE COURT:  Just to stop you right there, my

 9    understanding of predictive coding is that the coding, as

10    painful as it is, should be done by a very senior attorney,

11    meaning partner level or very senior associate, not the usual

12    team of umpteen lower associates with a lower billing rates.

13             MR. ANDERS:  That's why I reviewed it, your Honor.

14             THE COURT:  Well, as "reviewed it" as every one of the

15    coding decisions or spot-checked it?

16             MR. ANDERS:  No, where I am right now is I have gone

17    through every one that was marked as relevant, I went through

18    400 so far that have been coded as not relevant, and I intend

19    to go through all of those but I first looked at the ones that

20    were relevant.

21             THE COURT:  At the end of the process, you're going to

22    have done every single one of the --

23             MR. ANDERS:  Yes.

24             THE COURT:  Then I'm not sure why your client paid for

25    someone else to do it first, but that's not my problem, that's

1     their problem.

2            OK, continue.

3            MR. ANDERS:  So far 36 were deemed relevant.  Of the

4     400 not relevant I have reviewed, they were clearly not

5     relevant.  So right now the baseline is .015 percent of that

6     random sample was relevant.  If you translate that to the

7     entire database, that's 48,000 documents.

8            After we did a random sample, then what we have done

9     at the same time is we have applied keywords and we have taken

10    the results of those keywords and sample-coded.  So, for

11    example, if there's a keyword "reorganization," we may have

12    reviewed the top 200 random hits.  We did that across the

13    board.

14            Also, to respond to several of plaintiffs' targeted

15    document requests, we ran targeted searches across the

16    database.  That's what we have already produced, about a

17    thousand pages of documents.  So we have that coding that's in

18    there.

19            Plaintiffs' counsel, they have sent us now three

20    different revisions of keywords.  What I have proposed to

21    plaintiffs' counsel is, I'll give you the hit lists.  I've

22    already given them two sets of hit lists; we have another set

23    to give them, I'll review -- or we'll review 3,000 of those

24    hits, you tell us how you want us to review it but pick the

25    hits, we'll review any of the top 200 in these ten categories,

1   you tell us how to review it.  We'll give them those results as

2   well.

3            Once that initial coding part is done, we'll let the

4   system go out, it will do a sample of, you know, train itself,

5   we'll get the results.  Our proposal was to review, one, a

6   random sample of the results that come back as well as certain

7   judgmental sampling, share those results with plaintiff, they

8   can make their suggestions on how certain things should be

9   coded.

10           We have also identified six different categories that

11  documents can be coded towards.  I think plaintiffs have asked

12  for us to do eight or nine.  We can figure that out.  Go

13  through that iterative process twice.  At that point -- and

14  this is where sort of the proportionality and cost-limiting

15  comes in -- after we've gone through the iterative process

16  twice or if we have to go through another time, have the

17  computer give us the documents in rank order.  And we have

18  agreed or proposed reviewing the top 40,000 rank documents.

19  And we arrived at that 40,000 document number -- we estimate it

20  will cost approximately $200,000 using a five-dollar a document

21  cost estimate, it will cost 200,000 to review the 40,000.

22           When you take that 200,000 in review costs and you

23  couple it with our vendor costs, we're looking at a total spend

24  of approximately 550,000.  We understand that plaintiffs take

25  issue with some of our vendor costs -- we can dispute that --

1214KDASC                    CONFERENCE

1    but even just looking at the $200,000 attorney fee review cost,

2    we think that that is a more than appropriate amount to spend

3    to see what we get.  We have never told plaintiffs that we're

4    going to do this and this is all that you get.  Our view is,

5    let's see what this yields us first, we think these are the

6    most relevant people, this is a sophisticated and excellent way

7    to find the cream of the crop, if you will.  And after that

8    process is done, we'll be in a much better position to argue

9    and debate whether or not the incremental value of searching

10   another custodian is going to be worth the cost.  And that's

11   essentially our view.

12            THE COURT:  Let me hear from Ms. Wipper.

13            MS. WIPPER:  Your Honor, we disagree with defense

14   counsel's position that the only issue is predictive coding,

15   because that kind of skips over a lot of other issues that --

16            THE COURT:  Well, let's deal with the predictive

17   coding piece.  I understand, from what little I have skimmed of

18   your proposal and theirs, that they're sort of only looking at

19   an email archive and you want lots of other steps looked at.

20            But assume that that other piece gets resolved,

21   meaning where they have to look, and maybe their 3.2 million

22   database will double or go up to whatever, but what's wrong

23   with the predictive coding methodology they have proposed,

24   which also sounds like it's being run on a fairly transparent

25   and cooperative basis?

1        MS. WIPPER:  Well, the main issue is cost because --

2        THE COURT:  No, but where?  In other words --

3        MS. WIPPER:  It's impacting the methodology.

4        THE COURT:  Well, the question becomes the review.

5    And my understanding of the way this works is by the time that

6    the system spits this out, and whether it's the top 40,000 or

7    whether the break point is 50,000 documents or 30,000, that

8    90-something percent of the relevant documents are going to be

9    found in the top hits, and that the costs of reviewing the rest

10   is not worth the candle in most cases.

11        Now, where that line gets drawn is something that I

12   can't decide until I've seen the results.  In other words, when

13   one sees the results, as I understand it from this method, one

14   can see a sharp drop-off at a certain point, at which you then

15   still sample the documents that are not going to be reviewed,

16   and that's part of this whole iterative process.

17        If you are seeing that the top 40,000 documents give

18   you 90 percent of the responsive documents, and it's going to

19   cost a million dollars to go to the next hundred thousand

20   documents for eyes-on review, to get another 5 percent, it's

21   probably not worth it.  If it's worth it to go to the top

22   50,000 because that's where the cliff line seems to be, that's

23   what people are going to have to do.

24        It also may be that once privilege is determined, that

25   they will let you -- the rest of this is so likely to be junk,

 1    that you want, under an attorneys'-eyes-only or some process,

 2    an informal basis, you want to look at the documents that go

 3    from 40,000 to 80,000, you can look at them and if you tell

 4    them, you know, gee, having looked at it, there's a lot of good

 5    stuff here, then there's some problem with the process.

 6           I'm not saying 40,000 is the cutoff -- I can't really

 7    determine that -- and I invite both sides' experts to tell me

 8    if I've gotten this wrong but I've sat through a lot of

 9    training sessions on this, wherever that cliff is, that where

10    is where the break should be.  So if that was the only problem

11    you had with that part of the predictive coding process, then

12    it sounds like you all can go down this road, all of this,

13    without prejudice to additional search as may be necessary and

14    additional processes as may be necessary.

15           So is that the only problem, Ms. Wipper, or is there

16    anything more?

17           MS. WIPPER:  No, there's a dispute about the scope of

18    relevancy.  What happened --

19           THE COURT:  I've ruled on that.  That's what we spent

20    the morning doing.

21           MS. WIPPER:  OK.

22           THE COURT:  So whatever rulings I gave on that are

23    going to apply to the emails as well.  So any positions they

24    were taking in the ESI protocol are now going to have to be

25    revised, based on what I have done this morning, and similarly

1     on your side.

2              MS. WIPPER:  OK, and also I'd like to respond to

3     defense counsel's description of their proposal.  I'd like DOAR

4     to respond and give you an overview, if we may, on our proposal

5     on predictive coding.

6              THE COURT:  All right, though I guess I'd like to know

7     where it differs.

8              MS. WIPPER:  Well, it's actually a direct response to

9     their proposal.

10             THE COURT:  OK.

11             MS. WIPPER:  So who am I going to hear from?

12             MR. NEALE:  Paul Neale, your Honor.

13             THE COURT:  Mr. Neale?

14             MR. NEALE:  I actually think you pointed to exactly

15    the issue.  We have not taken issue with the use of predictive

16    coding or, frankly, with the confidence levels that they have

17    proposed except for the fact that it proposes a limit -- the

18    ultimate result of 40,000 documents before we have seen any of

19    the results coming out of the system.

20             THE COURT:  I've already said -- and I want to make

21    sure that defense counsel realizes it -- I'm not buying your

22    40,000 as a pig in a poke.  I understand the concept, but where

23    that line will be drawn -- whether it's 40,000, 50,000, 60,000,

24    20,000 -- is going to depend on what the statistics show for

25    the results.

1           MR. ANDERS:  I guess, your Honor, that's why I stood

2   up before, because I wanted to ask you something.  I understand

3   that that cliff line may be at 80,000 documents.  The reason

4   why we picked the 40,000 is what we're trying to do is also

5   incorporate the cost element.  We picked 200,000 as what we

6   think --

7           THE COURT:  Proportionality requires consideration of

8   results as well as costs.  And if stopping at 40,000 is going

9   to leave a tremendous number of likely highly responsive

10  documents unproduced, it doesn't work.  Plus, of course once

11  you have the predictive coding run, the cost after that is how

12  much you're doing an eyes-on review of.  And once you've weeded

13  out the privilege documents -- and I assume you either have the

14  502(d) order or you will be providing one for me to sign off

15  on, because I think in a case of this size, if you're not

16  agreeing to one, you're committing malpractice -- how much

17  money you spend thereafter is a result of how much you want to

18  know what's in the documents or, putting it perhaps a different

19  way, CYA.  If the first 60,000 are clearly showing that they're

20  highly relevant but you're running out of money after 40,000,

21  don't review the other 20,000.  That's up to you.

22          MR. ANDERS:  We've considered that, your Honor, and I

23  think the attorney-eyes-only type of agreement or designation

24  may be appropriate here, because one of the concerns we have

25  is, some of the plaintiffs are now working for competitors.  To

1    the extent that they're seeing --

2           THE COURT:  This is not a case where I assume, other

3    than on anecdotal, that there is going to be much need for the

4    individual plaintiffs to look at the documents.  I'm sure you

5    can all work that out.

6           Now, unfortunately it's 1:00 o'clock.  I'm happy to

7    have you come back.  I've got a 2:00 o'clock, and there may be

8    a 3:30 from people who forgot to show up this morning and were

9    told to try to get their act together and get here this

10   afternoon.  You can come back this afternoon, you can come back

11   in a day or two.  I think we have made some good progress, and

12   I know that you're coming from further away than usual, so I'd

13   like to make the most use of your time.

14          What's your pleasure?  You want to come back at 3:30

15   in the afternoon and use the time from now to then?  You can

16   use the jury room.

17          MR. ANDERS:  Maybe, your Honor.  The only reason why I

18   say that is, tomorrow I am leaving the country for a week for a

19   family vacation, so I'm out of pocket for a week; I'll have

20   some email but not a lot.  So, again, I don't want to impose on

21   everybody else, but that's my scheduling issue, so I'm not sure

22   how much we'll get done within the next week.

23          THE COURT:  That's why I'm suggesting you maximize --

24   I don't know what time your flight home is -- well, you're in

25   Morristown.

1        MR. ANDERS:  Today's fine for me, your Honor.

2        THE COURT:  You're fine for today.  If everybody wants

3   to stay -- you just spent an hour talking about custodians and

4   made some progress -- there's a certain benefit, I think, in

5   keeping you hostage because it avoids the delay between phone

6   calls, et cetera, et cetera.  So if you want to take an hour

7   for lunch, be all back at 2:00 o'clock, you can use the jury

8   room.

9        MR. ANDERS:  That's perfect.

10        THE COURT:  And as soon as whatever is going on with

11   my afternoon conferences gives me time to see you, we'll deal

12   with you, but you're not leaving until you've checked out with

13   me.

14        MR. ANDERS:  Thank you, your Honor.

15        THE COURT:  OK.  Enjoy lunch, but get back, use the

16   cafeteria on the eighth floor or whatever else, but don't waste

17   half the afternoon by having a nice lunch.

18        MR. ANDERS:  Understood.

19        (Recess)

20        THE COURT:  We are back on the record for part two of

21   Da Silva Moore et al. against Publicis.

22        What progress have you been able to make on the ESI

23   protocols or, more importantly, which of the issues you've

24   talked about would you like a court ruling or guidance on?

25   Whatever you have agreed upon we will memorialize in some other

1    way.

2         MR. ANDERS:  I think we made a lot of progress, your

3    Honor.  It may be easier just to say where we are.

4         On the list of custodians, we have identified eight

5    custodians that the plaintiff would like us to add, five where

6    they would be willing to first apply some level of filtering to

7    their results, and then we would either manually review or

8    possibly add those results into the database.  We're going to

9    go back and just confer with our clients and those individuals;

10   there may be certain sensitivities about the particular people

11   but we at least have been able to further narrow the custodians

12   on the overall concept of predictive coding.  We had a lot of

13   conversation and discussion about that; I think we're in

14   agreement on the process.

15        The process is going to be generally as we discussed

16   it before, but what we're going to do is, I think, have more of

17   the iterative reviews, and what we're going to try to do is

18   hopefully be able to do those iterative reviews until we find

19   the cliff that your Honor was referring to.

20        My only concern, and what I want to work into the

21   agreement, is if these iterative reviews are taking longer than

22   anticipated and the costs are mounting, having some mechanism

23   in the agreement where there can be a point where we either

24   discuss it or raise it with your Honor, that, look, we have

25   reviewed 60,000 so far, this is what's coming back, the end

1214KDASC                    CONFERENCE

1     doesn't seem to be in sight and we've spent X amount, just

2     having something in the agreement to address that possibility.

3              THE COURT:  I have no problem with you all putting in

4     the agreement that you're going to cooperate and work in good

5     faith.  But if things aren't working out because of expense or

6     results not being what either of you hoped for or whatever,

7     that it can be revisited with the Court, the caveat to that is

8     obviously once you go down a certain route, it's going to be

9     very expensive to completely abandon that and say we're now

10    going to do something completely different, so that's probably

11    not something you'll be able to do.

12             Tweaking it, in terms of adding another custodian late

13    or doing a further iteration where you change a search term or

14    better train the computer with some more documents, I don't

15    have a problem with that occurring or the converse of that,

16    with the defendant coming in and saying, you know, we've

17    already spent twice what we thought we were going to spend,

18    we've made enough progress that the next X percent search that

19    that the plaintiff wants us to do is not worth the candle.

20    That's what I said this morning as well.

21             All right, what else?

22             MS. WIPPER:  We would add to that, plaintiffs would

23    propose if we get to that point, that defendants don't do a

24    manual review and just turn over the documents.

25             THE COURT:  All right, that's an argument you can make

1    later on, that, OK, this system kicked out all of this.  But

2    usually the sampling is in lieu of that, which is to say that

3    if you get to a certain cliff and you have reviewed -- I'll use

4    defendants' number from before -- 40,000 and the next 50,000

5    are considered not likely to be relevant and you run a sample,

6    statistical or random or whatever, of that balance, you say,

7    OK, we looked at another thousand documents and found one that

8    really was relevant, that's probably the end of the ballgame.

9          On the other hand, if you run a thousand and you find

10   a hundred that are relevant, that may mean that more work has

11   to be done in one way or another.  And I'm not meaning to fully

12   prescribe any, which your experts sitting behind you can

13   probably do better, on what is your 95 percent confidence level

14   or any of that stuff, but at some point it doesn't mean that

15   because predictive coding spits it out as having a 1 percent

16   chance of relevance, that I'm going to say, OK, the defendant

17   has to forego manual review but produce all of it, as opposed

18   to, you'll do a sampling and see if it really is mostly junk.

19         Understood?

20         MR. ANDERS:  Understood.

21         THE COURT:  On both sides?

22         MR. ANDERS:  It makes sense, your Honor.  I guess the

23   way we had initially tried to craft the proposal was by putting

24   up front the dollar figure that we thought was appropriate.

25         THE COURT:  That's somewhat meaningless.  And,

1214KDASC                    CONFERENCE

1  frankly, it then gets into fights about "if you didn't get to

2  Recommind and you went to XYZ company, that piece of it would

3  be 25 percent cheaper and that shouldn't be attributable to us

4  and your associates at Jackson Lewis are paid too much per

5  hour, that shouldn't be attributable to us."  I will look at

6  proportionality, but I'm not telling you that there is a

7  particular number that's better than another on how much work

8  you've got to do.

9          MR. ANDERS:  I understand.  That came across clear.

10          I just want to make sure that I understand what you're

11  saying, is if, as we're going through this iterative review, we

12  reach a point -- and I don't know what point is -- in terms of

13  cost, where even if the computer is saying there is X percent

14  relevance still out there, that we're not foreclosed from

15  making the proportionality argument at that point.

16          THE COURT:  That is correct.

17          MR. ANDERS:  OK.

18          The other thing we had discussed, your Honor, were

19  those sources that would not be reviewed through predictive

20  coding.  For those sources, we have agreed to do targeted

21  searches of some of them; for others, we need to find more

22  information about what information is actually housed there,

23  but I think we were able to work through some of these other

24  sources, shared drives --

25          THE COURT:  This is the material that's on page 2 and

1   3 of plaintiffs' proposal, I assume?

2          MR. ANDERS:  Yes, your Honor.

3          THE COURT:  I'm not asking you to give me much more

4   detail on that as long as there is agreement so that you're

5   moving forward without the need of further court help on it.

6          MR. ANDERS:  There is, your Honor.  We're moving

7   forward on that.

8          MS. WIPPER:  There are two points that we wanted to

9   raise.  The first one was concerning the time period for the

10  emails.

11          Earlier today defense counsel said that their email

12  archive went back to 2008.  There is also a separate email

13  that's available from a legacy system that's stored in home

14  directories or shared folders.  So we would propose that for

15  pay discrimination issues, that we would apply the longer

16  period to 2 --

17          THE COURT:  For pay discrimination, we're not doing an

18  electronic search.  You're getting that from the personnel

19  material and the material you got on payroll.  It's unlikely

20  that email is going to find anything, and if it is, frankly,

21  it's going to find it in the post-2008 period that's in the --

22  I'll call it the master database, the archive system, that they

23  have established.  So I don't see that as being necessary,

24  certainly not in any immediate wave.

25          On all of this, I'm not foreclosing you, as you

 1    develop information from the documents produced or from

 2    depositions, from saying that you have learned something new,

 3    but if there is a smoking gun email that says, you know, I'm

 4    the president of the company and it is our policy to pay women

 5    less than men, I guarantee you that will get repeated in the

 6    newer system.  And for that needle in a haystack, I'm not going

 7    to have them bring up an additional search.

 8            What else?

 9            MS. WIPPER:  I would just add to that much.  They

10    haven't produced the payroll data yet.

11            THE COURT:  We talked about all of that this morning.

12    I'm not revisiting things.  It's been a long enough day.

13            MS. WIPPER:  I just wanted, before we move from

14    predictive coding, I also want to address the issue codes, what

15    we agreed to do, because there's a dispute about the

16    definitions that plaintiffs proposed.  We're going to try to

17    deal with that in the coding process; and it's possible, if we

18    can't agree, that we would need the Court's assistance.

19            THE COURT:  I'm sure I'll be seeing you again soon.

20            MS. WIPPER:  OK.

21            MR. ANDERS:  I believe that was it, your Honor.  I

22    think we were going to talk about some time frames.  I think at

23    least with the ESI protocol, my plan is probably the night

24    before I leave to at least get emails out on questions about

25    parts of the systems and then as soon as I return, if not while

1    I'm away a little bit, try to redraft the protocol to address

2    what we discussed today.

3            THE COURT:  I know every lawyer thinks they're

4    indispensable and I'm not pulling the "Jackson Lewis is a big

5    firm and you're all fungible," but is there not another person

6    who may be less email savvy or computer savvy than you, such as

7    Ms. Chavey, for example, who can follow up, along with the

8    folks from Recommind and plaintiffs' counsel, and not lose an

9    entire week because you're on vacation?

10           MS. CHAVEY:  Of course, your Honor.

11           THE COURT:  And I happen to know, it may not be on

12   this case, if it's a true e-discovery dispute, I happen to know

13   your Florida e-discovery counsel very well --

14           MR. ANDERS:  He knows a little bit.

15           THE COURT:  You can bring Mr. Losey into the mix if

16   need be.

17           MR. ANDERS:  OK, understood.

18           THE COURT:  What else?

19           MS. CHAVEY:  Your Honor, I know your Honor said you

20   weren't going to reconsider what was addressed this morning,

21   but I did look, during the break, about the issue about

22   Mr. Tsokanos in complaints that had been made against him.  I

23   think on plaintiffs' counsel's representation that their

24   understanding was there had been a complaint in 2005, you

25   ordered us to provide that.  There was not a complaint in 2005.

 1  There was something earlier than that.  And I just wanted to --

 2           THE COURT:  How early?

 3           MS. CHAVEY:  2003.

 4           THE COURT:  But that was the Atlanta --

 5           MS. CHAVEY:  It was in Atlanta.

 6           THE COURT:  Produce it.  Obviously it's discrete and

 7  can be found.

 8           Before I lose track, for the paper discovery we talked

 9  about this morning, how soon can you complete that?  One week,

10  two weeks, six years?  Come on.

11           MS. CHAVEY:  Your Honor, we would need at least 30

12  days.

13           THE COURT:  I don't know how you're going to do that

14  in 30 days, finishing e-discovery protocol that's not going to

15  be finalized for more than a week despite me getting other

16  people involved while Mr. Anders is away, run the ESI, go

17  through iterations and meet a June 30 discovery deadline with

18  depositions and everything else.  I think you're being a little

19  generous there.  So one more chance.  Working harder, faster,

20  et cetera, how soon can you do it?

21           MS. CHAVEY:  Well, one issue, your Honor, for example,

22  is with the personnel action notices.  We understand the order

23  to require us to work with the plaintiffs to come up with a

24  statistically significant sample.  That in and of itself is

25  going to take a while and then there's going to be the

1  searching for the notices, so there is time that needs to be

2  built in in order for that to occur.

3        THE COURT:  Can you live with 30 days, Ms. Wipper?  If

4  not, tell me what you can live with.

5        MS. WIPPER:  We have a deposition scheduled with

6  defense witnesses starting the end of this month.

7        THE COURT:  With all due respect, if you want to keep

8  to that schedule, you're going to be deposing them without

9  documents.

10        MS. WIPPER:  Correct.

11        THE COURT:  And let's all be clear on the way I run

12  this, which is, if you want to take early depositions to learn

13  things, that's fine; you don't get to redepose somebody whose

14  deposition was finished because you get documents later that

15  you knew you didn't have, as opposed to when they say, OK,

16  we've completed our document ESI production and you take a

17  deposition and then a week after the deposition they say look

18  what we found in the warehouse somewhere; then you may get

19  another deposition.  So if you want to take a deposition at the

20  end of the month, that's fine, but let's say I push them to get

21  you something in two weeks, which means you both have to be

22  very fast on how you're running the statistical significant

23  determination, you're going to have to review it before the

24  deposition, it's not likely to happen.

25        MS. WIPPER:  I would propose three weeks.  We work

1   with statisticians regularly so we can have the sample done or

2   our proposed --

3           THE COURT:  That sounds like a viable compromise.

4           So that is three weeks from today, which is

5   January 25th, subject to somebody, by written agreement or by

6   applying to the Court for more time, we'll go from there.

7           OK, other than a date for you all to come back and

8   probably a date for you to complete the ESI protocol to ensure

9   that your feet are held to the fire, is there anything else we

10  need to do on discovery today?

11          MS. WIPPER:  I just wanted to address one point from

12  earlier today and just get clarification from the Court.  On

13  the cutoff date for the production, you said February 2011 for

14  the HR complaints.  I'm wondering if that's a global cutoff

15  date.  We have a plaintiff that left the company after that

16  date, Carol Pearlman --

17          THE COURT:  Is she in the original complaint or the

18  amended complaint?

19          MS. WIPPER:  She's an opt-in plaintiff.

20          THE COURT:  When did she opt in?

21          MS. WIPPER:  I don't know off the top of my head.

22  Probably months ago.

23          THE COURT:  The amended complaint is dated April 14th.

24  Was it before or after?

25          MS. WIPPER:  No, it was after that.

 1          THE COURT:  You've got to have some way of dealing

 2     with this.  So I'm inclined to either leave it at the February

 3     date or maybe to push it to April 14th of 2011, other than when

 4     we get to privilege issues, I'm not going to require them to

 5     log almost anything post initial complaint.

 6          MS. WIPPER:  We would propose the amended complaint

 7     date as the cutoff.

 8          THE COURT:  So we're adding a month and a half or

 9     something.  Problem, agreement?

10          MS. CHAVEY:  Well, it seems appropriate to limit it to

11     and cut it off at the date of the initial complaint.  The fact

12     that Carol Pearlman opted into the April Pay Act claim later

13     doesn't seem to affect the Court's ruling that the date would

14     be February.

15          THE COURT:  All right, let's leave it where it was

16     originally.

17          What else?

18          MR. ANDERS:  Your Honor, I just want to make sure I

19     heard correctly:  Did you give a definite date for when the ESI

20     protocol must be completed?

21          THE COURT:  No.  Give me a proposal.  A week after you

22     come back or a/k/a two weeks from today?

23          MR. ANDERS:  That would be perfect.

24          THE COURT:  Agreeable?

25          MS. WIPPER:  Sure.  And you want a joint proposal,

 1    your Honor?

 2            THE COURT:  Yes.  And if you can't agree, I want it as

 3    a single document with paragraph 3, whatever paragraph 3 is

 4    about, 3(a) plaintiffs' proposal, 3(b) defendants' proposal,

 5    and then a cover letter from each of you explaining, to the

 6    extent it's not immediately obvious, what it is you're

 7    disagreeing on.  So that's January 18th.

 8            OK, next, date for our next court conference, what's

 9    your pleasure?

10            MS. WIPPER:  How about a week after the ESI protocol?

11            THE COURT:  Well, I think that's probably going to be

12    early unless you think there are ESI protocol problems, only in

13    the sense that the document production out of what I'll call

14    this morning's production is due the 25th.  On the other

15    hand --

16            MS. CHAVEY:  Your Honor, what about February 2nd?

17            THE COURT:  That's LegalTech week.  Yes, by Thursday

18    that's OK.  February 2nd at 9:30.

19            Now, the other thing:  When is it you plan to move for

20    class certification?

21            MS. WIPPER:  I believe it's in the schedule, your

22    Honor.

23            THE COURT:  I don't think it is but I'm willing to be

24    educated.

25            MS. CHAVEY:  Your Honor, it is in the scheduling order

1    but it is due on or before April 1st of 2013.

2            THE COURT:  Frankly, that makes no sense to me.  I

3    know you convinced Judge Sullivan to do that.  It won't be the

4    first time I've overruled the district judge; it's a strange

5    world that we live in.

6            Yeah, I understand the purpose of getting past the

7    expert period, but if you make the motion on April 1, it won't

8    be fully briefed until the summer of 2013, it won't be decided

9    until the fall of 2013 or January 2014.  You can't really do

10   summary judgment or anything substantive until the class either

11   has or hasn't been certified.  And then if either a class or an

12   FLSA collective action is certified or the appropriate other

13   term for a collective action is approved, you've got to go

14   through 30 days to draft the notice, 60 days or 90 days for

15   people to opt in, you are assuring -- and this is something

16   plaintiffs should be thinking about even more than the

17   defendants -- you're assuring no merits resolution of this,

18   assuming a class of any sort, class or collective is approved,

19   until 2014 or '15.  That hardly seems to be in plaintiffs'

20   interests.  And I'm not sure that on the FLSA collective

21   action -- you've got discrimination claims -- that's one type

22   of motion -- and to the extent you've got FLSA and New York

23   Labor Law claims, that's a much more discrete area, it seems to

24   me.  And leaving all of that until the very end, particularly

25   since FLSA requires opt-in plaintiffs, and my recollection but

1  you all tell me if I'm wrong, is that there is no stopping of

2  the statute of limitations until they opt in?

3  MS. WIPPER:  Correct.

4  THE COURT:  So if this case, which began in early

5  2011, if it's not certified until 2014 or '15 for collective

6  action issues, the whole period between now and then, when you

7  will assume that if there was anything bad going on at the

8  defendants, they will have cleaned up their act during the

9  course of this lawsuit -- and I'm not saying I know there was

10  anything bad or good going on -- you're assuring that the FLSA

11  in particular, even with a six-year statute of limitations on

12  the state claims, is going to be almost a nullity or it's going

13  to be a totally different lawsuit, that most of the period

14  within the statute of limitations is going to be a period on

15  which there has been no discovery.

16  Does it make sense -- not that I want more work for

17  Judge Sullivan or myself -- to do something differently for the

18  FLSA New York Labor Law than the Title 7 and related

19  discrimination claims?

20  MS. WIPPER:  Well, your Honor, I think it depends on

21  the discovery because we have the burden and we have been

22  spending an enormous amount of time trying to get discovery in

23  this case for many, many months.  So, today, as I stand here

24  today, I can't say for sure we will be prepared to file

25  something until we have the discovery.

1          THE COURT:  On the FLSA and New York Labor Law?

2          MS. WIPPER:  We need the payroll data.

3          THE COURT:  Well, you basically have that, I thought,

4   subject to the cleanup -- and I'm not revisiting what I ordered

5   this morning.  So that you're going to have by the end of this

6   month.  Whatever work your experts need to do, I don't see

7   waiting until April 1st of 2013, and, frankly -- and I'm not

8   trying to help the defendants -- if I were them, I'd oppose

9   certification at that point if for no other reason than that

10  most of the period within the statute of limitations will be a

11  period where there hasn't been discovery.  And if we stick to

12  the schedule, because you got Judge Sullivan to approve it and

13  I decide not to stick my neck out and overrule him, so to

14  speak, I'm not reopening discovery.  You can bet on that.  Once

15  discovery closes, it is done, because nobody wanted bifurcation

16  the second time today because 99 percent of it was held to be

17  relevant either way.  Think about it and maybe in February,

18  too, we can revisit that issue.

19          MS. WIPPER:  OK.

20          THE COURT:  I guess the last issue, although I

21  suspect -- I don't know what I suspect.  I generally at first

22  or early conferences raise the 636(c) issue.  I don't remember

23  raising it at our prior conference because they were on a sort

24  of emergency basis, et cetera.  But I remind both sides that

25  pursuant to 28, U.S. Code, Section 636(c), if all parties

1  consent, then the case can be in front of me for all purposes,

2  including the jury trial you've asked for here and any appeals

3  to the Second Circuit, they're the same from a magistrate

4  judge, consented trial or motion decision, as it would be in

5  front of a district judge, and it's up to all of you and our

6  missing friends from Publicis.

7          So by the February 2 conference, obviously a decision

8  to keep thinking about it keeps your options open, but it also

9  keeps one side or the other -- whoever is in favor of it now

10  and the other one is not so sure, by two months later, that

11  position may reverse.  So the sooner you all decide, you

12  decide, I'll ask you to tell me where you are at the February 2

13  conference and we'll go from there.

14          And finally -- perhaps my second "finally" but

15  finally, the jurisdictional discovery and all that against

16  Publicis, is anything happening in that area?  I don't want

17  them to prejudice them from not being here but I don't know

18  that the quietness with respect to that, as opposed to

19  everything going on here, is the result of nothing going on or

20  is the result of there not being the same problems.

21          MS. WIPPER:  Well, we served discovery on October 19th

22  on Publicis Groupe according to the schedule, and on MSL.  They

23  asked for a month extension to respond.  We gave that to them

24  and they produced documents, some documents, Publicis Groupe,

25  and responded with objections on the 21st.  We're probably

1        going to have to have a meet-and-confer with them concerning

2        some of their objections and their responses, but right now we

3        don't foresee any disputes at this time.

4                    THE COURT:  Well, you've got a March 12th cutoff.  The

5        earliest I'm likely to want to deal with that, since it seems

6        like you all are going slowly, is at the February 2 conference.

7        That's going to leave you very little time if there are

8        problems, to get them resolved and get whatever depositions or

9        whatever are going to occur post the paper/ESI side of

10       discovery.  So don't lose sight of it.  Let's have Publicis

11       here at the next conference, even if there is complete

12       agreement that everything they have been doing is fine.

13                    The other thing is, you all can figure out how to do

14       this when we're going to have megaconferences like this.  I

15       certainly prefer everyone to be present in person.  If it gets

16       to the point where you know in advance there's one minor issue

17       and one of the local counsel, more local, will be here and the

18       other is from San Francisco, for example, while the airlines

19       need all the help they can get, it's not my job to feather

20       their covers, so if you want to show up telephonically, ask for

21       permission to do that, which, as I say, will be granted if you

22       really think the conference is going to be the typical half

23       hour discovery conference and not the 500 pages of letters,

24       et cetera, et cetera, like we had today.  You do not need to

25       ask permission for your e-discovery consultants to attend.  If

1   there are any ESI issues, and assuming you're willing to pay

2   the freight for them, I am not only delighted to see them but

3   they're usually a valuable addition.

4           I think that covers everything.  I guess I'll just

5   say, my rules provide that if things start going much more

6   smoothly and two business days before the next conference we

7   decide you really are getting along swimmingly and you worked

8   things out and things should just be put off a few weeks, you

9   can make that application, either by a joint phone call to my

10  secretary or by a fax, requesting that, and nine times out of

11  ten those requests are granted.  They're not granted when they

12  come in at 5:00 o'clock the night before and the Court suspects

13  that somebody's already on an airplane.  And they're not

14  granted unless they're on consent, meaning if one side says I

15  don't need the conference but the other side is frothing at the

16  mouth because they're being frustrated, we're obviously going

17  to have a conference.

18          Any questions?

19          MS. CHAVEY:  No, your Honor.

20          THE COURT:  All right, the transcript, as usual,

21  constitutes the Court's order.  And I think I may have said

22  this once before -- and somebody certainly took up the process

23  and therefore knows the process -- but I'll say it this last

24  time, I may not say it again in the future:  Pursuant to 28,

25  U.S. Code, Section 636 and Federal Rules of Civil Procedure 6

1214KDASC                        CONFERENCE

1   and 72, any party aggrieved by a ruling at one of these

2   discovery conferences has 14 calendar days to bring their

3   objections to Judge Sullivan.  The 14 days starts running

4   immediately when you attend any in-person or telephonic

5   conference and hear my ruling accordingly, regardless of how

6   long it takes me to obtain the transcript from the reporter.

7   And failure to file objections within that 14-day period

8   constitutes a waiver for all further purposes in the case,

9   including any appellate purposes.

10         With that, I'll require both sides to purchase the

11  transcript from the reporter and with that, we are adjourned.

12  Have a good flight back, or drive back, to everyone going in

13  different places.  Have a good vacation --

14         MR. ANDERS:  Thank you, your Honor.

15         THE COURT:  -- and happy new year.  See you all in a

16  month.

17         MS. CHAVEY:  Thank you, your Honor.

18         MS. WIPPER:  Thank you, your Honor.

19         MR. ANDERS:  Thank you.

20                            *  *  *

21

22

23

24

25