# EXHIBIT A

1

C28rdasc
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   MONIQUE DA SILVA MOORE, et al.,
3
4                    Plaintiffs,
4
5            v.                          11 Civ. 1279 (ALC)
5
6   PUBLICIS GROUPE and MSL GROUP,
6                                        Conference
7                    Defendants.
7
8   ------------------------------x
8
9                                        New York, N.Y.
9                                        February 8, 2012
10                                       3:00 p.m.
10
11  Before:
11
12           HON. ANDREW J. PECK
12
13                                       Magistrate Judge
13
14
14
15           APPEARANCES
15
16
16
17  SANFORD WITTELS & HEISLER LLP
17           Attorneys for Plaintiffs
18  BY:  JANETTE L. WIPPER (tel.)
18       DEEPIKA BAINS
19       SIHAM NURHUSSEIN
19
20
20  JACKSON LEWIS LLP
21           Attorneys for Defendants
21  BY:  JEFFREY W. BRECHER
22       BRETT M. ANDERS
22
23
23  ALSO PRESENT:
24
24       PAUL J. NEALE
25       DAVID BASKIN
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

2

C28rdasc

```
 1              (Case called)
 2              THE COURT:  We have the major issue of e-discovery
 3    protocols and the like.  Also, I got this morning a letter from
 4    the plaintiffs asking for permission to make a motion for
 5    sanctions.  I guess we will deal with that first.
 6              However, I suggest, since lead counsel seems to be out
 7    of state, perhaps, that you all talk to the New York office a
 8    lot more, because we generally don't do discovery motions as
 9    motions.  If all you're asking for is money and you want to
10    make a motion for sanctions and I'll get to it when I get to
11    it, which may well be when discovery otherwise is over, feel
12    free.
13              In addition, in general it is Second Circuit law that
14    I can't stop you from making any motion you want at any point
15    after a pre-motion conference.  I certainly am not giving
16    plaintiffs in this case, or either side in this case, although
17    it was plaintiffs who requested it, the ability to file motions
18    in the future without pre-motion conferences.  I just don't see
19    how that is consistent with our local practice.  Maybe somebody
20    on the plaintiffs' side could try to explain that to me.
21              MS. BAINS:  Your Honor, we are OK with that ruling,
22    but we requested that because of the numerous discovery
23    violations that have been happening --
24              THE COURT:  My question is, why are you trying to
25    practice law the San Francisco way instead of the New York way?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C28rdasc
```
 1              MS. BAINS:  We are not asking to do that.  We respect
 2      the Court's decision.
 3              THE COURT:  That's what the letter says.  You want to
 4      be relieved of all pre-motion conferences, isn't that what your
 5      letter asks for?
 6              MS. BAINS:  Given the circumstances of this case, yes.
 7              THE COURT:  Frankly, given the circumstances in the
 8      case, all the more reason why there should be pre-motion
 9      conferences.  Otherwise, it will be five years before discovery
10      is concluded, because each of you doesn't like what the other
11      is doing.  If we do it the formal motion way for everything you
12      want to do, there will be at least a month delay while a motion
13      is filed and responded to.  So, I'm having a little bit of
14      trouble seriously understanding what it is that you think
15      you're doing.
16              MS. WIPPER:  This is Jeanette Wipper.  Your Honor, if
17      I may address the Court.  We are not asking to not comply with
18      your individual practices.  The issue that we are dealing with
19      and we are trying to address --
20              THE COURT:  Ms. Wipper, with all due respect, excuse
21      me.  Let me read what you wrote me, page 8 of your letter, last
22      sentence on the page "Plaintiffs further respectfully request
23      to be relieved of the obligation to file pre-motion letters and
24      appear for pre-motion conferences before filing future motions
25      to compel in this matter."  That is directly contrary to
```

4

```
C28rdasc
```

 1   Southern District practice.
 2           MS. WIPPER:  Your Honor, if I may address that.  The
 3   reason we raised the issue in the letter is because we are
 4   currently fighting with defense counsel about discovery that
 5   was requested on May 13, 2011, and was compelled by Judge
 6   Sullivan on September 14th of 2012 and was compelled by your
 7   Honor on January 4th of 2012.
 8           THE COURT:  Why is it that adding a month delay, if
 9   not more, to every discovery motion to compel gains anything?
10   Plus, of course, as I explained to all of you at our last
11   conference, whatever may have occurred before I got involved in
12   the case, there is not much I can do about that.  As to
13   noncompliance going forward, I intend to deal with that and
14   deal with it strictly.
15           MS. WIPPER:  Thank you, your Honor.  If you believe
16   that it would be more efficient to have more frequent
17   conferences, obviously we would like that to happen.
18           THE COURT:  Ms. Wipper, have you read my rules?
19           MS. WIPPER:  Yes, your Honor.
20           THE COURT:  What does it say about the frequency of
21   conferences?  I'm going to embarrass you here, because I really
22   don't think you did read them.  What does my rule say?
23           MS. WIPPER:  I understand you have a rocket docket,
24   and I also understand that if you don't move to compel early
25   enough, you may not allow the party to file a motion to compel.

5

C28rdasc

```
 1              THE COURT:  What does my rule say about conferences?
 2              MS. WIPPER:  That you are available for conferences
 3   and that pre-motion conferences are required.
 4              THE COURT:  And that any time you have a discovery
 5   dispute, even if the prescheduled conference is a month away, a
 6   week away, a day away, if you've got an emergency, meaning it
 7   should be decided sooner rather than later, you contact the
 8   Court and I get you in.
 9              I'm not happy, first of all, with the way both sides
10   are handling this case, which frankly is only adding more costs
11   to your respective clients or, if plaintiffs are on a
12   contingency, more work for which you someday hope you will get
13   paid by somebody.
14              In any event, you are not relieved from pre-motion
15   conference requirements.  As to whether you want to make
16   motions after that at any point in discovery matters, even
17   though in almost all cases I will have ruled from the bench, go
18   right ahead.  The result is not going to be any different.
19              With respect to this on the merits, let me hear from
20   defendant.
21              MR. BRECHER:  Good afternoon, your Honor.  Jeffrey
22   Brecher on behalf of MSL Group.  We received this letter last
23   night at around 8 o'clock via email, so we haven't had a full
24   opportunity to review everything in it.  But let me address
25   what is raised in the letter.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

C28rdasc

```
 1              The first issue is complaints.  At the conference that
 2    was held on January 4th, you ordered the defendant to produce
 3    complaints made by females alleging gender discrimination and
 4    sexual harassment for the period of February 2008 to February
 5    24th of 2011.  They have appealed that ruling to District Judge
 6    Carter.  On January 25th we produced documents falling within
 7    the scope of the Court's order.
 8              THE COURT:  Is that a complete production other than
 9    what may be in the ESI?  They say it's not.
10              MR. BRECHER:  Right.  What we did is when they said it
11    is not, we sent them an email saying that is all we are aware
12    of and we conducted a diligent search for any complaints, if
13    you have any other information that might lead us to something
14    else, feel free, give it to us.  We didn't hear back from them
15    for a week.  On Monday they gave us some additional names.
16              On Tuesday, yesterday, we did some further
17    investigation to see if there was anything relating to those
18    individuals mentioned.  At this point we have not identified
19    any other additional complaints that fall within the scope of
20    the Court's order.
21              THE COURT:  Tell me your method of search and who you
22    spoke to, how you went about it, what files were searched.
23              MR. BRECHER:  With respect to the names that they
24    mentioned, we could not find any additional complaints.  We
25    have identified one other person unrelated to anyone they
```

7

C28rdasc
1  mentioned that we believe will probably be responsive and will
2  produce this week.
3          What did we do?  We spoke with the highest levels of
4  the company with respect to the human resources department.
5  That would have included the senior vice president of human
6  resources for North America, the director of human resources,
7  and the chief town officer.  We also had the local HR offices
8  check to see if there were any other complaints that we were
9  not aware of.
10          In addition to that, Judge, for the people that they
11  mentioned specifically, we inquired of the active employees who
12  we are able to contact, are you aware of anything, without
13  divulging the substance of our communications that are
14  privileged.  We have not identified any other complaints, other
15  than the one that I mentioned, that are responsive and within
16  the scope of the Court's order.
17          If they have something more specific, if they have the
18  name of the person who complained, the date that it happened,
19  I'm happy to go look further.  But at this point, Judge, we
20  feel we have complied with the order.  I would say we don't
21  appreciate the last-minute motion for sanctions the night
22  before the court order.  It's not professional, Judge.
23          THE COURT:  Let me hear first from -- who am I hearing
24  from?
25          MS. NURHUSSEIN:  Thank you, your Honor.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

8

C28rdasc

```
 1              THE COURT:  You're Ms.?
 2         MS. NURHUSSEIN:  Siham Nurhussein for plaintiffs.
 3              THE COURT:  It will take me a while to figure out who
 4    is who.  Go ahead.
 5         MS. NURHUSSEIN:  Understandable, your Honor.  If I
 6    could respond to a couple of points Mr. Brecher mention.  First
 7    of all, this is the first we have heard as to the sort of
 8    search he has conducted.
 9              THE COURT:  I suspect that is because you and they
10    don't talk to each other or don't talk to each other very well.
11         MS. NURHUSSEIN:  Actually, your Honor, he mentioned
12    that we raised this issue for the first time in terms of the
13    types of complaints we were aware of on Monday.  We actually
14    sent an email on January 30th, so over a week ago, raising all
15    these concerns, identifying at least one --
16              THE COURT:  Let's get to the merits.  You each think
17    you sandbagged each other.  You may well be on your way to a
18    special master if I lose too much patience with you.  But let's
19    get to the merits.
20              On the employment discrimination complaints, what is
21    it that you want them to do that they haven't done or what is
22    it you think is missing other than you think the company is
23    rife with discrimination and therefore there should be more?
24    That I can't rule on.
25         MS. NURHUSSEIN:  Your Honor, I think we do need
```

9

C28rdasc

1 confirmation, which I think Mr. Brecher has just confirmed, but
2 I'd like him to be clear about that, that he has inquired and
3 searched the files of all individuals that MSL itself
4 identified as having responsibility for investigating and
5 responding to complaints of discrimination.  That's a
6 reasonable request because in response to --
7          THE COURT:  He doesn't necessarily have to search
8 those files if he talks to those people and they say there
9 isn't anything.
10         MS. NURHUSSEIN:  Yes.
11         THE COURT:  That's what I have heard him to be saying.
12         MS. NURHUSSEIN:  I just want to confirm that that
13 conversation occurred with every individual who MSL identified
14 as having responsibility for responding to and/or investigating
15 complaints.
16         MR. BRECHER:  Two comments, I guess, Judge.  The first
17 is, obviously, the Court has discretion to order us to disclose
18 our efforts.  But to the extent that we are constantly being
19 asked for each response to identify every step that we took to
20 respond, that is not how typically we respond to discovery.
21 I'm not obligated to share my work product as to every step I
22 took and what decisions I made.
23         THE COURT:  No, but I'm sure you don't want a 30(b)(6)
24 deposition on useless subjects, because it's just going to be
25 more expensive.

10

C28rdasc

1           MR. BRECHER:  We are going to get that anyway.
2           THE COURT:  That is probably true in this case.
3           MR. BRECHER:  We did, as I said, speak with the
4    highest levels of HR in our discussions with our client, again
5    without revealing any privileged communications.  We believe
6    that that would be sufficient to identify the complaints.
7    However, we went a step further.  I'm not going to represent to
8    the Court I personally spoke with each person, I can't make
9    that representation, but we have inquired with the local HR
10   people who are still active -- I can't speak to former
11   people -- if there are any other complaints, and we have not
12   identified any other than the one that I mentioned earlier.
13          Based on that, instead of calling us, discussing it on
14   Monday, they say, here's what I want you to do, tell us one,
15   two, three, four, five, everything you did, and on Tuesday, the
16   next day, they file a motion for sanctions at 8 o'clock at
17   night.  Judge, this is just an example of what we have been
18   dealing with.
19          THE COURT:  Ms. Nurhussein?
20          MS. NURHUSSEIN:  One other issue I'd like to raise,
21   your Honor.  MSL, our understanding is that they are limiting
22   their search of the shared drives and have only conducted the
23   search as to certain HR drives.
24          THE COURT:  If we are talking about ESI, that's an
25   entirely different issue.  This is paper.

11

C28rdasc

```
 1              MS. NURHUSSEIN:  Your Honor, I think the issue is that
 2    MSL, as we will get into more detail later on --
 3              THE COURT:  Then save it for later on.
 4              MS. NURHUSSEIN:  OK.
 5              THE COURT:  So there are no sanctions as to the
 6    discrimination complaint issue.  Payroll?
 7              MS. WIPPER:  Your Honor, if I can address the Court,
 8    before you move forward to payroll, on the issue of the
 9    complaint?
10              THE COURT:  Excuse me.  Are we doing tag team?
11              MS. WIPPER:  No.  Sorry, your Honor.
12              THE COURT:  You can show up in person next time or you
13    can argue the whole thing yourself on the phone with your
14    associate sitting here.  You can't do both.
15              MS. NURHUSSEIN:  Your Honor, may I make one more
16    point?  We also have concerns, because we are aware of specific
17    complaints against --
18              THE COURT:  Counsel, how do I rule?  Tell me what
19    ruling you'd like.  That I should sanction them because you
20    think there are others or even know of others that they haven't
21    produced?  If you want to do 30(b)(6) depositions, it's a waste
22    of time and money.  At this point on this record I'm not sure
23    what you want me to do.
24              Yes, I understand there is some circularity to all of
25    this, you give them names and then they perhaps find documents.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

C28rdasc

```
 1  But since we are talking about the paper and knowledge
 2  information of the HR department and the like at this point and
 3  there is going to be a much more complete search of ESI if we
 4  ever get to that issue today, I'm not quite sure what you want
 5  me to do.
 6          MS. NURHUSSEIN:  Your Honor, the concern --
 7          THE COURT:  I understand your concern.  You're telling
 8  me they didn't produce everything.  Mr. Brecher is telling me
 9  they did produce whatever they found, and the description he
10  gave of what they did sounds reasonable.  How do I rule for
11  you?
12          MS. NURHUSSEIN:  Your Honor, I think we also need
13  confirmation that at a minimum MSL has conducted a search for
14  complaints relating to the specific individuals that we have
15  identified even though we have much more limited access to
16  information and access to MSL employees.
17          THE COURT:  Write them a letter, and they will respond
18  to it.
19          MS. NURHUSSEIN:  Actually, they have not been
20  responding to the majority of our correspondence, which is
21  another reason why --
22          THE COURT:  New rules.  For example, one, no letter to
23  the Court closer to the conference than two days before.  I
24  didn't see this letter until 9 o'clock this morning.  It came
25  in at 8 o'clock last night.  There are limits.  That's number
```

13

C28rdasc
1  one.
2         Number two, modification of the Rifkind rule, Rifkind
3  being the senior partner of my old firm Paul Weiss Rifkind.
4  The modification is all letters will be responded to within a
5  week, sooner if at all possible, certainly no later than a
6  week.
7         With all due respect, I don't know how it got here.
8  Maybe it's because when you were in front of Judge Sullivan
9  originally, the case was not given as much judicial supervision
10 as it needed, but you're out of control here.  You all had
11 better cooperate with each other.  If you don't, I am going to
12 withdraw Ms. Wipper's telephone privileges; and if you want a
13 regular 9 o'clock every Friday conference or whatever, we'll do
14 it, until I lose even more patience with you, and then you'll
15 get a special master, and whoever loses each issue in front of
16 the special master will pay the special master's fees of
17 several hundred to a thousand dollars an hour.
18        I've seen many a big case in this court go a lot more
19 smoothly than this.  As I say, I cannot speak to what happened
20 before I inherited the case, but I expect cooperation.  Stop
21 the whining and stop the sandbagging.  This goes for both
22 sides.  Get along.  You're going to run out of your judicial
23 time.  And I don't just mean the discovery period will end.
24 You're not my only case, you're not my only big case.  At some
25 point I'm going to say every conference is two hours with you
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

C28rdasc
1   guys and you don't get any more conferences because you have
2   used up your allotment of judicial time.
3           Now let's move on to the payroll.  Mr. Brecher.
4           MR. BRECHER:  Thank you, your Honor.  If I might,
5   could you add one more little rule to your list there?  Just
6   that all correspondence be sent by the close of business, not
7   11 o'clock at night?
8           THE COURT:  It doesn't matter, but it won't count
9   until the next business day.  Obviously, if it is coming to me
10  by two days before, I don't mean anything after when I go home
11  at 6 o'clock at night.  I usually stay later, but we will count
12  that as your cutoff.
13          MR. BRECHER:  Thank you, your Honor.
14          THE COURT:  For a Wednesday conference, I would expect
15  letters no later than 6 o'clock on Monday, etc.  If it's a
16  Monday conference, that means Thursday.  Business days.
17          MR. BRECHER:  Thank you, your Honor.
18          With respect to the payroll, let me go back to the
19  first request for production of documents which asked for a
20  database or computerized information regarding salary.  What we
21  did, Judge, in the case is we gave them data regarding the
22  entire class, every male, every female.  That means every date
23  of hire, every termination, every salary, every promotion,
24  every bonus.  They have all of that information, which would
25  enable them to compare the salaries of one person against
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

15

C28rdasc

```
 1  another.  They have all of that information.
 2             What they then requested was, well, we want the
 3  information on the W-2, box 5 on the W-2.  I'm not quite
 4  certain why that information is more relevant than the annual
 5  salary of a person, since it would seem logical you would
 6  compare two salaries as opposed to what someone earned at a
 7  particular point.
 8             THE COURT:  However.
 9             MR. BRECHER:  However, what we told the plaintiffs was
10  the W-2 is not an electronic document.  The W-2's are PDF's,
11  but it's not a number you can extract from the PDF.
12             THE COURT:  Why can't you just, and maybe it's because
13  you're only doing this for a subset of employees --
14             MR. BRECHER:  Right.
15             THE COURT:  -- give them the disks with the W-2's on
16  it?
17             MR. BRECHER:  Because we have to pull each person's
18  W-2.
19             THE COURT:  Why don't you let them do that?
20             MS. NURHUSSEIN:  It has all the other financial
21  information and salary information of other people.  Judge, you
22  said if there is an electronic way to get that at that time,
23  provide it to them.  What we did was we consulted with the
24  client, is there a way where we can get the gross earnings per
25  year, which is what they want.  If someone worked six months,
```

16

C28rdasc

1  they want to know what someone made for 6 months regardless of
2  what their salary was for the year.  They already had that, but
3  they want the subset.  Is there a way to do that?  We believe
4  there is.  So we extracted that data and we provided it to
5  them.
6           The first I'm hearing is in a motion for sanctions
7  that the information is erroneous, it's got errors in it.  They
8  never said to us, oh, there is a problem with the data or we
9  need to talk about this further.  I'm not sure what the problem
10 is with the data, but we have given them now people's salary,
11 they know exactly what everybody made, and we have given them
12 what they earned.  I'm not sure what the problem is.
13          THE COURT:  At this point are the CD's normal CD's
14 that can be read anywhere?
15          MR. BRECHER:  They are CD's that I believe have PDF's
16 of each W-2, yes.
17          THE COURT:  Do you really want these CD's?
18          MS. BAINS:  Yes, your Honor.
19          THE COURT:  Fine.  Here is what you are going to do.
20 You are going to read them at defense counsel's office.  No
21 notes can be taken.  You will print out what you want to print
22 out page by page only for who you are entitled to the
23 information on.  You will then show those copies to Mr. Brecher
24 or his colleagues.  Then you will get the copies, assuming they
25 are for the right people.  This is all so much ado about
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                17
         C28rdasc
 1    nothing.
 2            MS. BAINS:  Your Honor, at the last conference defense
 3    counsel also claimed that they have given us all pay
 4    information, which we then received actual pay information that
 5    was in the people's database all along.
 6            THE COURT:  One issue at a time.  Do you want the
 7    W-2's or not?
 8            MS. BAINS:  We do, because we didn't get full and
 9    complete payroll.
10            THE COURT:  Stop.  Please.  I take judicial notice of
11    the fact that you don't like the defendants.  Stop whining and
12    let's talk substance.  I don't care how we got here and I'm not
13    giving anyone money today.  In the future not only will there
14    be sanctions for whoever wins or loses these discovery
15    disputes, -- and so far you're one for two, I think -- there
16    will be sanctions payable to the clerk of court for wasting my
17    time because you can't cooperate.
18            You're getting the W-2's in the way I have just
19    ordered.  With that information, is anything else from this
20    thing relevant as opposed to what they gave you in the past or
21    how they screwed you in the past or anything else?
22            MS. BAINS:  No, your Honor, that's it.
23            THE COURT:  Good.  Then we are done with this.  Is
24    there anything else in this nine-page letter that requires the
25    Court to rule?  I'm denying sanctions.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

18

C28rdasc

1           MS. NURHUSSEIN:  Your Honor, there is one issue I
2    would bring up just briefly that we mentioned in passing in the
3    letter, which is the issue of the deposition schedule.  I know
4    your Honor during our first conference instructed us to work to
5    come up with a schedule and to indicate priority.
6           THE COURT:  Are you in any way able to do that before
7    you get the ESI, or is this an issue that we will probably take
8    up at our next six conferences?
9           MS. NURHUSSEIN:  All I'm asking your Honor is -- so
10   far they have had an opportunity to take virtually all the
11   plaintiff depositions, six of the seven.
12          THE COURT:  Stop.  Tell me when you want depositions
13   to start?  Do you want them to start next week?  I'm order them
14   to start next week.
15          MS. NURHUSSEIN:  Your Honor, we submitted a proposed
16   deposition schedule with the first deposition beginning I
17   believe on March 22nd.  What we want is MSL to confirm the
18   deposition dates.
19          THE COURT:  Even if you don't have the ESI by then?
20          MS. NURHUSSEIN:  What we indicated to MSL is that all
21   of these dates are contingent on us receiving the data two
22   weeks ahead.
23          THE COURT:  What's the point?  Your request is denied.
24   At this point it's premature.  Or I'll give you two choices.  I
25   will fix those dates, including quite possibly saying whatever

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

C28rdasc

1  you ask for in your letter you get but they are not
2  adjournable.  To go through hoops and say this person will be
3  made available on March 22, whatever date you said, and the
4  next person will be March 24, and then have the whole thing
5  blow up because we haven't talked about and it's been months
6  and months and other than the fact that I'm probably just going
7  to rule on it all today, I hope, you're making no progress on
8  the ESI.  Once we agree on a protocol, it is not something that
9  is likely to get achieved in two minutes.
10            MS. NURHUSSEIN:  I understand, your Honor.  The only
11  reason I raise it is because --
12            THE COURT:  Do you want a ruling?  That's what I'm
13  asking you.  If not, it's half an hour into the conference.
14  Tell me what ruling you want.
15            MS. NURHUSSEIN:  Your Honor, I think your ruling from
16  earlier today requiring the defendants to respond in a timely
17  manner --
18            THE COURT:  The response now is going to be it's
19  premature.  Come on.  Somebody practice law.  I'm really not
20  happy with this.
21            MS. NURHUSSEIN:  I understand, your Honor.  I think we
22  can resolve it among ourselves.
23            THE COURT:  I doubt you can, but I don't think you can
24  get a court order now, because you don't know what you want.
25            My inclination on all of this is even if it requires
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

20

C28rdasc

1   me to extend the discovery schedule because I'm having so much
2   fun with all of you that I want to keep the pleasure going --
3   note my sarcasm -- I would rather, because of the expense
4   involved here and the size of the case, take this in stages.
5   If that means defendants' proposal wins across the board, which
6   it probably won't, so be it.  Let's get something happening
7   with however many custodians that means.
8           I must say I have a better memory of all your letters
9   before you all canceled or postponed the conference because of
10  somebody's availability.  But we will all get back into it.
11  But that is certainly my inclination.
12          My second inclination is to remind you that at the
13  moment the only plaintiffs are the plaintiffs who are in the
14  case.  I'm not giving you discovery as to class issues other
15  than whether there should be a class or collective action.
16  Basically, as I read some of this, you are going on the
17  assumption that it's going to be a class and collective action
18  on the plaintiffs' side even though you refuse to make a motion
19  on that until after all discovery is over, but you want all
20  discovery on that.  You're not getting it.
21          I remind you we talked about this last time as to the
22  date for your motion.  And particularly now that the case is no
23  longer in front of Judge Sullivan, it seems to me at least the
24  collective action application needs to be made very quickly.
25  How soon can you do it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

C28rdasc
```
 1              MS. NURHUSSEIN:  Your Honor, I'll allow Ms. Wipper to
 2    address that.
 3              THE COURT:  Ms. Wipper.
 4              MS. WIPPER:  Your Honor, we would object to moving the
 5    briefing schedule to an earlier period given the discovery
 6    disputes in this case.
 7              THE COURT:  That wasn't my question.  My question is,
 8    how soon can you do it?  Democracy ends very quickly here,
 9    meaning you don't want to give me a date other than no later
10    than April 1, 2013.  I get to pick the date and you get to
11    whine to Judge Carter.  Collective action is a very easy
12    standard.  The preliminary collective action motion is very
13    easy.
14              MS. WIPPER:  However, your Honor, it's not clear what
15    standard would be applied to the collective action, because
16    discovery has already commenced.  In order to prove a common
17    policy as well as pay disparities and to show that the
18    plaintiffs are similarly situated to the other public relations
19    employees at the company, we would need discovery.  The case
20    law has two standards.  It has the conditional certification
21    standard at the commencement of the action.
22              THE COURT:  Ms. Wipper, that's what I'm talking about.
23    You haven't had enough discovery to say we are beyond that.
24    That's the standard.  How soon?  Last chance.
25              MS. WIPPER:  Your Honor, there is no guarantee what
```

22

C28rdasc
1  standard would be applied.  That would be up to Judge Carter.
2  Depending on his judgment on the level of discovery --
3          THE COURT:  Ms. Wipper, your motion is due two weeks
4  from today.  Thank you very much for not participating.  I'm
5  also withdrawing your ability to participate telephonically in
6  the future.
7          MS. WIPPER:  Your Honor, can I ask you to reconsider
8  given the fact that we don't have the payroll data?
9          THE COURT:  No.  February 29th.  I'll give you one
10 extra week.  February 29th.  If you don't move by that point,
11 you never get to move.  Of course, you can do what you have
12 done before, which is take objections to Judge Carter so he can
13 enjoy the fun I'm having with all of you.  If he affirms me and
14 you haven't moved by that point, you don't get to ever move,
15 period.  That takes care of that.
16         MS. WIPPER:  Your Honor, plaintiffs request that you
17 issue a written order.
18         THE COURT:  You're very close to getting not only your
19 telephone privileges removed but your pro hac vice removed.
20 You have a written order.  It's called the transcript.  If you
21 want to object to every single ruling I make, feel free.  The
22 rules allow you to do that.  Does it make me happy?  You figure
23 that out.
24         Would you like to have your pro hac withdrawn or would
25 you like to learn the rules of the Southern District of New
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

23
C28rdasc

1    York, counsel?  Do you want to practice in California?  Do you
2    want me to transfer this case to California?  I'd be happy to
3    do that.  This is ridiculous, Ms. Wipper.  Do you have anything
4    to say?  Are you there?
5              MS. WIPPER:  Yes, I'm here, your Honor.  No, your
6    Honor.  I would just say that we are complying fully with the
7    local rules of the Southern District of New York as well as
8    your individual rules.
9              THE COURT:  What local rule says I've got to give you
10   a written order other than a transcript?
11             MS. WIPPER:  I was just requesting it, your Honor.
12             THE COURT:  It's not the first time you have requested
13   it and been told we don't do it that way.
14             MS. WIPPER:  OK, your Honor.
15             THE COURT:  Off the record.
16             (Discussion off the record).
17             THE COURT:  Do you want to start with custodians or
18   sources of ESI?  What's your pleasure?
19             MR. ANDERS:  Custodians, your Honor, if you wouldn't
20   mind.
21             THE COURT:  OK.  Let me get the letters organized.
22   What is the dispute on custodians?  Let's get you to summarize
23   your positions.
24             MR. ANDERS:  Thank you, your Honor.  In short, we
25   believe that 30 custodians is more than sufficient for the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

24

C28rdasc

1   first phase of ESI.  Using your Honor's most recent date
2   rulings, the 30 custodians that we have suggested is 2.5,
3   approximately 2.5 million documents.  Those custodians consist
4   of several high-level officers, including the president Jim
5   Tsokanos, other members of the executive team, the majority of
6   the HR staff, including the upper level HR people, and a number
7   of managing directors.
8           It is our belief that given plaintiffs' theory of the
9   case, there was a centralized management team that directed the
10  alleged discriminatory behavior, that this group is the group
11  most likely to contain relevant emails and documents.
12  Certainly if that review identifies other custodians, we would
13  consider reviewing additional custodians.  But we believe the
14  appropriate step is to review these 30 custodians.  Again, that
15  date is set after the duplication is approximately 2.5 million
16  documents.
17          THE COURT:  What are the other custodians that you
18  want, Ms. Bains?
19          MS. BAINS:  Your Honor, the other custodians we want,
20  we included one in error, number 41 Donnelly.  That was subject
21  to your ruling about entities under MSL, so that was in error.
22  Other than that, all of the other custodians are managing
23  directors.  And the CEO and former CEO of MSL, Olivier Fleurot
24  and Mark Haas, who we have emails already showing that they
25  made decisions that affected employees in America about pay and

25

C28rdasc

1  promotion, including the pay freeze, we think those especially.
2           THE COURT:  Slow down one minute.  Which exhibit is
3  your custodian list?
4           MS. BAINS:  The custodians are listed at the beginning
5  of page 17 of the protocol.
6           THE COURT:  Thank you.  How many of these 44, or we
7  are now down to 43, are ones that are in dispute?
8           MS. BAINS:  There are 7.  Start with the ones that are
9  starred with the comparators that the parties agreed last time
10 and defense counsel represented to the Court that we would cull
11 down those database sets before adding them to Axcelerate.  It
12 seems that defense counsel has withdrawn that.
13          THE COURT:  Let's deal with the 7 comparators.
14          MR. ANDERS:  Thank you, your Honor.  If you look at
15 the record of the last time we were here, we did not agree to
16 do anything.  What we agreed was that we would first take a
17 look at those accounts and then make the decision.  We were
18 willing to consider.  We never made an affirmative agreement to
19 do anything.
20          Our current position is for these additional people,
21 we don't believe they should be included as it relates to the
22 comparators.  Our feeling is that as comparators, we don't see
23 what in their email accounts could be of relevance to decisions
24 made about them.  Certainly emails from higher-ups about their
25 employment, we have those people.  But I don't see what in the

26

C28rdasc

1  comparators' email account could be relevant.
2              THE COURT:  Ms. Bains?
3              MS. BAINS:  On that theory there is a comparator
4  already on the defendants' list, number 6, Kelly Dencker.  If
5  we are going to throw out all comparators, we would like to get
6  in all decision-makers instead of taking up a spot.
7              THE COURT:  There is no magic number.  If you're
8  telling me you don't want Kelly Dencker even though they wanted
9  it, I'm sure they are going to be happy to reduce the list, and
10 that will make their list 29 subject to whoever gets added.  So
11 be careful what you wish for.  Let's erase Kelly Dencker.  Do
12 you want Kelly Dencker or not?
13             MS. BAINS:  We want Kelly Dencker if we are going to
14 include comparators.
15             THE COURT:  Tell me about comparators, what it is that
16 means when you run the same email search.
17             I have another case that we have stalled a few times
18 and it is now their turn.  I'm going to put you on hold, Ms.
19 Wipper.  Ms. Wipper, you're going to have to be disconnected.
20 You can call back in 15 minutes.
21             MS. WIPPER:  OK, your Honor.
22             (Recess)
23             MS. BAINS:  I think we were talking about comparators.
24 We think that the comparators are important because their
25 emails will contain important discussion of their job duties,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

C28rdasc

1  which is directly relevant to the claims, especially for the
2  EPA claims.
3          THE COURT:  Aren't you better off deposing?  Is there
4  any dispute as to what their job duties are?
5          MS. BAINS:  Yes.  In the depositions of the
6  plaintiffs, already plaintiffs have claimed that some men were
7  comparators, and the questioning was geared towards showing
8  that those particular men were not their comparators based on
9  their job duties, etc.
10         THE COURT:  I guess my question is, and I'd have to go
11 back and look at all your predictive coding approach to this,
12 unless you run the comparators as a separate unit, are all the
13 other things you're asking for the other 30-plus relevant from
14 the comparators?  And by asking for job responsibility type
15 information through an email search, are you then getting that
16 from everybody, including the president of the company?  I'm
17 not quite sure how, since you want different things from these
18 people, that would work out.
19         MS. BAINS:  We propose to do a targeted search before
20 adding the comparators so that they would be culled down to
21 just the issues that would be relevant to comparators before
22 they are added.
23         THE COURT:  How are you targeting that search, so to
24 speak?
25         MS. BAINS:  We wanted to give search terms to defense

28

C28rdasc
```
 1  counsel, but then defense counsel said they were taking them
 2  off completely.  We would like to create a search term list to
 3  apply to the comparators' mailboxes before they are added to
 4  the Axcelerate system and subjected to predictive coding.
 5              THE COURT:  Then what?
 6              MS. BAINS:  Subject them to predictive coding.
 7              THE COURT:  Subjecting them to predictive coding,
 8  unless you are searching their data for this, you are reducing
 9  the volume, but that means that whatever the words are or the
10  seeds are is going to run across all 37 to 44 people.  It makes
11  no sense to me.  If you want to get your ESI consultant help me
12  out, that's fine.
13              MS. BAINS:  Yes, please.
14              MR. NEALE:  Your Honor, Paul Neale.  I think in this
15  instance the way to address that would be to add another
16  category to the seed set review that would relate to the issues
17  associated with the comparators.
18              THE COURT:  What I think I'm hearing, and maybe I'm
19  wrong here, it seems to me that the search of the comparators
20  data is totally different from the search of everybody else.
21              MR. ANDERS:  Your Honor, not only is it totally
22  different, but if they are looking for emails which would tend
23  to show their job duties, that is going to be most of their
24  emails.  Conceivably, there will be emails saying do you want
25  to handle this meeting or here is a PowerPoint for the next
```

29

C28rdasc
1   presentation.  I am having difficulty even understanding how we
2   would find those types of emails.  It is almost every email
3   related to their job and what they are doing.
4             THE COURT:  Mr. Neale?
5             MR. NEALE:  I think there are two approaches here,
6   your Honor.  We will discuss predictive coding, but the random
7   sampling of the total document set will bring documents up
8   regardless of what search term they were or weren't responsive
9   to, so you will see comparator data during that process.
10            THE COURT:  This is a case where the plaintiffs worked
11  at the company.  What is it that you expect to see in the
12  comparators' email that is relevant?  Describe the concepts to
13  me.  Frankly, I don't disagree that whether they are
14  comparators or not is a relevant issue, but I don't see why, if
15  you want to find out what their job duties were and these
16  people have no stake in the case, you don't just take their
17  deposition.
18            MS. BAINS:  We do want to take their depositions.  To
19  answer your question about the specific things we would be
20  looking for, for example, one of the plaintiffs testified about
21  her job duties, including client contact.  We would look for
22  client contact in the comparators.
23            THE COURT:  That's ridiculous.  That means basically
24  forget sophisticated searches, any email from one of these
25  comparators to or from a client is relevant?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

30

C28rdasc

```
 1              MS. BAINS:  I mean on the substantive issues regarding
 2  contacts.
 3              THE COURT:  How do you train a computer for that?  How
 4  do you do a key word on that?  I'm having a very hard time
 5  seeing what it is you expect.  You've got the plaintiffs'
 6  emails.  If you don't have their emails, you have their memory
 7  of them.  If comparator whoever, Kelly Dencker, I don't know if
 8  that is a he Kelly or a she Kelly, but if Kelly wrote to a
 9  client and said, I'd like to meet with you next week to discuss
10  the following presentation, that's what you're looking for?
11              MS. BAINS:  That would be part of it.
12              THE COURT:  What else?  You keep giving me this is
13  part of it.  If you want me to order this done, you've got to
14  tell me how it is that it could be done in a reasonable way.
15              MS. BAINS:  I think we could treat the comparators as
16  a separate search.
17              THE COURT:  Then what is that search going to be?
18  Also, by the way, we've gone from throw the comparators into
19  the bundle but do a little key word screening first to reduce
20  volume to now we are at the let's do the comparators separate,
21  and I'm still not hearing how you're going to search through
22  their emails separately.
23              MS. BAINS:  One of our allegations is that they were
24  given opportunities, including job assignments, etc., that
25  plaintiffs weren't.
```

                                                                31
        C28rdasc
  1              THE COURT:  That is basically every substantive email,
  2     every business email they have.  All right, comparators are out
  3     at this time without prejudice to you coming up with some
  4     scientific way to get at this.  Otherwise, take the deposition
  5     and go from there.
  6              I think we are down to six or seven where you
  7     disagree.
  8              MS. BAINS:  There are about eight.  All of the other
  9     eight are managing directors or the CEO, former CEO, of the
 10     company.
 11              THE COURT:  If the former CEO is before the time
 12     period that you allege the discrimination started --
 13              MS. BAINS:  It's within the class period.
 14              THE COURT:  When was the last time the former CEO was
 15     the CEO?
 16              MS. BAINS:  2009.
 17              MR. ANDERS:  April '09.
 18              THE COURT:  Remind me when the class period starts
 19     here.
 20              MS. BAINS:  2008 for promotions and pregnancy
 21     discrimination and pay, but 2005 for --
 22              THE COURT:  The pay I thought we are getting at for
 23     all the payroll data and other things.  What is the anecdotal
 24     that you are looking for here?
 25              MS. BAINS:  That's not an issue here.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

32

C28rdasc

1              THE COURT:  Good.
2              MS. BAINS:  Because he started in 2009.  I'm sorry.
3    He was the CEO until 2009.
4              MR. ANDERS:  Your Honor, one maybe very practical way
5    to resolve the Olivier Fleurot issue.  My understanding is that
6    the majority or many of these emails are in French.  We are not
7    able to incorporate him with predictive coding of the English,
8    the majority of the other emails.  I think just from a language
9    standpoint alone that would warrant not including in him in the
10   first set, if at all.
11             MS. BAINS:  I have an email in my hand that is in
12   English from him.
13             THE COURT:  If you want to do a cull that looks for
14   only English language emails and excludes all the French,
15   assuming that that can be done -- can that be done?
16             MR. ANDERS:  I don't know, your Honor.  I'm not sure
17   if that can be done.
18             THE COURT:  Tell me who your expert is and let me hear
19   from him.
20             MR. ANDERS:  This is David Baskin.  He is with
21   Recommind.
22             THE COURT:  OK.
23             MR. BASKIN:  There is a language filter that is
24   roughly 80 percent accurate in it's association of French to
25   English.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C28rdasc

```
 1              THE COURT:  I'm sorry?  I didn't hear.
 2              MR. BASKIN:  In association of French to English, it
 3    is 80 percent accurate.  There is a language filter that is
 4    about 80 percent accurate.
 5              THE COURT:  Knowing we're not getting 100 percent
 6    accurate, it can filter out all the French emails with 80
 7    percent accuracy?
 8              MR. BASKIN:  Filter out French and English emails as
 9    well as other languages.
10              THE COURT:  Where was this person located and what did
11    he do?
12              MR. ANDERS:  He was located in France, your Honor.
13              MR. BRECHER:  Are we talking about Olivier Fleurot?
14              THE COURT:  Yes.
15              MR. BRECHER:  He is the CEO, and he joined I believe
16    it was in May of 2009.  He is located in Paris.
17              THE COURT:  I thought we were talking about --
18              MR. BRECHER:  There are two people.  There is Mark
19    Haas, who is the former CEO.
20              THE COURT:  Who are we talking about?  I thought we
21    were talking with the former CEO.
22              MS. BAINS:  I thought we were, too.
23              THE COURT:  Come on.  Somebody try to stay on one
24    person.  Mark Haas, who is he, where was he located, why isn't
25    he being searched?
```

C28rdasc

```
 1              MR. BRECHER:  He's in New York.
 2              THE COURT:  Why shouldn't he be searched?
 3              MR. ANDERS:  Your Honor, I think there are certainly a
 4    lot of people we could possibly search.
 5              THE COURT:  Right now the dispute at 4 o'clock is
 6    apparent between 6 or 7 people, between your list of 30, which
 7    became 29, and their list of 44, which lost 8 people because
 8    they were comparators.
 9              MR. ANDERS:  Your Honor, I think we are starting to
10    get duplicative now.  We have Jim Tsokanos.  He is the alleged
11    key bad actor.  We have his email accounts.  Certainly emails
12    from Mr. Haas and other people will be included in there.  Once
13    we see what is in there, maybe we can decide to expand it.  My
14    concern right now is the amount of time it takes --
15              THE COURT:  What is the volume of Mr. Haas's email?
16              MR. ANDERS:  6,098.
17              THE COURT:  Include them.  Let's not fight over the
18    miniscule.  Now, who is the Frenchman?  That is Olivier
19    Fleurot?
20              MR. ANDERS:  Yes.
21              THE COURT:  Why is he relevant?
22              MS. BAINS:  He is the successor to Mark Haas.  He is
23    the CEO of MSL Group.  We have emails from the few that were
24    already produced that show that he had discretion over pay and
25    promotion decisions, particularly a companywide salary freeze,
```

C28rdasc

1   and he was on correspondence regarding exceptions to the salary
2   and pay increase freeze.  We think his emails, especially given
3   our theory of the case that it is coming from the highest
4   levels of the company, his emails would be one of the most
5   probative.
6           MR. ANDERS:  Your Honor, if it is coming from him,
7   then he's obviously directing it to somebody.  Those would be
8   the people we already have in the U.S.
9           THE COURT:  We have one other issue here, which is if
10  his emails are either in France physically or coming from
11  France, you've got the privacy and blocking statute.  Let's
12  leave him out from the first wave and only deal with his emails
13  that are in the U.S. because they went to somebody else.
14          MS. BAINS:  Your Honor, can I have my expert address
15  the issue of phasing of the custodians?
16          THE COURT:  Sure.
17          MS. BAINS:  And the effect on predictive coding?
18          MR. NEALE:  One of the issues is agreeing on sources,
19  and custodians fall into that.  In the way we are defining
20  phases, I think, as we have been discussing them, the protocol
21  identifies effectively three phases, phase 1, phase 2, and a
22  to-be-determined phase added by the defendant in their draft.
23          While I think we all agree that a phased approach
24  makes sense to deal with the high priority stuff immediately
25  and factor in the phase 2 stuff, the way that we have been

```
       C28rdasc
 1  talking with the defense is their view is we should finish
 2  phase 1 altogether before even considering what falls into
 3  phase 2 and what to do with it.  Given the time line associated
 4  with this process and the scope of discovery, I don't see us
 5  finishing phase 1 before the discovery deadline approaches.
 6            THE COURT:  If that's the only problem, I'll extend
 7  the discovery cutoff date.
 8            MR. ANDERS:  Your Honor, I apologize, but we haven't
 9  finished the custodians yet.
10            THE COURT:  This is custodian-oriented.
11            MR. NEALE:  The suggestion was moving certain
12  custodians into phase 2.  I'm just saying if we add that to the
13  sources, among the sources that are phase 2, it raises the
14  issue that --
15            THE COURT:  If that's the only problem, which is
16  timing, I can deal with that.
17            Two down, four or five to go.  Who is next?
18            MS. BAINS:  All of the others are managing directors.
19            THE COURT:  Where are they located and are they the
20  managing directors of any office that a named plaintiff works
21  in?
22            MS. BAINS:  The first is Steve Bryant.  It's managing
23  director.
24            THE COURT:  Give me the number from your page 17-18.
25            MS. BAINS:  Number 32.
```

C28rdasc

```
1              THE COURT:  What office is he?
2              MS. BAINS:  Seattle.
3              THE COURT:  Does any plaintiff work in Seattle?
4              MS. BAINS:  None of the current plaintiffs.
5              THE COURT:  That's what we are taking discovery on.
6   He's out, as is any other managing director of an office that
7   doesn't have a plaintiff working at it.  Despite your colleague
8   in San Francisco not liking my approach, that's why you're
9   going to do your conditional certification sooner rather than
10  later.  You get some plaintiffs who work in Seattle opting in,
11  and we have to reconsider this.
12             MS. BAINS:  The next is number 34, Carl Farnham,
13  managing director of Atlanta.  We have a plaintiff from plant a
14  who worked in the Atlanta office.
15             THE COURT:  During the period that Mr. Farnham worked
16  there?
17             MS. BAINS:  I don't have that information with me.
18             MR. ANDERS:  Your Honor, our understanding is he
19  became the managing director in June of 2010, and at that point
20  no plaintiffs were working in the Atlanta office.
21             THE COURT:  Based on that representation, he's out.
22  Next.
23             MS. BAINS:  The next is Megan Gross.
24             THE COURT:  Number 36.
25             MR. ANDERS:  Your Honor, she became a managing
```

38

C28rdasc

1  director in May of 2011, which is after the cutoff date that
2  your Honor prescribed on January 4th.
3          MS. BAINS:  That issue is with Judge Carter, so we
4  understand that ruling.
5          THE COURT:  Then why are you wasting my time?
6          MS. BAINS:  If it's overturned --
7          THE COURT:  If it's overturned, you can make an
8  application for me to consider things.  At the moment I win
9  until someone says I don't.  Anyone else?
10         MS. BAINS:  The next is number 40, Kelly Cohagen, MSL
11  Detroit.
12         THE COURT:  Have you got a plaintiff in Detroit?
13         MS. BAINS:  No, we don't.
14         THE COURT:  My ruling is on any office you don't have
15  a plaintiff, you don't get the managing director of that
16  office.  Do I have to name each one individually?
17         MS. BAINS:  No.  That ruling would also apply to
18  number 42, Michael Morsman.
19         THE COURT:  Good.
20         MS. BAINS:  Actually, I'm sorry, I misspoke.  Michael
21  Morsman was the managing director of the one of the named
22  plaintiffs.
23         THE COURT:  Time period, who, what, where, when?
24         MS. BAINS:  Plaintiff Laurie Mayers.
25         THE COURT:  Mr. Anders, do you want to help out there?

C28rdasc

```
 1              MR. ANDERS:  I'm looking, your Honor.  Your Honor, all
 2  I can tell you is he was hired in January of '09 and terminated
 3  in May of 2010.  I don't know in that interim for what period
 4  of time he was a managing director.
 5              THE COURT:  Ms. Bains, it's your application.
 6              MS. BAINS:  We are looking to verify the dates.
 7              MR. ANDERS:  Your Honor, I will note that there are no
 8  allegations in the amended complaint regarding Mr. Morsman.
 9              MS. BAINS:  There are.  Paragraph 109.
10              THE COURT:  I'm sorry.  What?
11              MS. BAINS:  There are allegations in paragraph 109 and
12  later.
13              THE COURT:  That's not the question.
14              MS. BAINS:  Plaintiff Laurie Mayers worked until May
15  2010.
16              THE COURT:  Any reason Morsman shouldn't be in?  I
17  assume before arguing over this you do have his email?
18              MR. ANDERS:  Yes, your Honor.  We haven't collected it
19  from the client yet, but it exists, and there are 29,000.
20              THE COURT:  Collect it.  Who else?
21              MS. BAINS:  The last is Matthew Gardner.  We have one
22  plaintiff in San Francisco, but I don't believe it was during
23  the same time period.
24              THE COURT:  Then he is out.  We have now agreed on
25  custodians.
```

40

C28rdasc
```
 1              MS. BAINS:  There is one other issue with custodians.
 2   The defense has date-limited many of the custodians, and we are
 3   not sure what those date limitations refer to.  I wanted to get
 4   a little more information on that.
 5              THE COURT:  Mr. Anders?
 6              MR. ANDERS:  Yes, your Honor.  The date limitations
 7   generally refer to the period of time for the managing
 8   directors that they were overseeing one of the plaintiffs.  For
 9   the later set of individuals, and that's numbers 25 through 29
10   on our list, those date limitations correspond to the Court's
11   ruling as it relates to the applicable time period.
12              THE COURT:  That makes sense.  The question is for the
13   ones that are shorter time periods, such as number 21, Donald
14   Hannaford, on your list.
15              MR. BRECHER:  Judge, this is Jeff Brecher.  Don
16   Hannaford was a managing director of the, I believe, D.C.
17   office.  There is one plaintiff, Heather Pierce, who moved to
18   the D.C. office.  That is the period of time when both were
19   employed in the D.C. office.  He left I believe in March of
20   2008, and she arrived in January of 2008 in the D.C. office.
21   She used to work in the San Francisco office.
22              THE COURT:  With those explanations, any problem with
23   the dates?
24              MS. BAINS:  No, to be consistent with your rulings.
25   However, we would like to double-check all these facts after.
```

C28rdasc
```
 1              THE COURT:  That's fine.
 2              MS. BAINS:  Also, can Mr. Brecher explain the date
 3    restrictions for number 23, Neil Dillon?  I think the
 4    explanation was given that a certain plaintiff was there during
 5    those times, but the dates don't seem to match to us.
 6              MR. BRECHER:  I was speaking about Don Hannaford.
 7    That's what we were talking about.
 8              MS. BAINS:  In the last meet-and-confer.
 9              MR. BRECHER:  Neil Dillon, I believe, was the next
10    managing director in D.C., and I believe that time period
11    reflects the period where he was employed and where Ms. Pierce
12    was employed.  If that is inaccurate, then we can reconsider,
13    but I believe that is accurate.
14              MS. BAINS:  Again, like the others, we would like to
15    check the facts.
16              THE COURT:  You can all check out the dates.  If there
17    is a slight variant, hopefully you can reach agreement.  If
18    not, you will bring it back to me.
19              MS. BAINS:  Thank you, your Honor.
20              THE COURT:  Sources beyond custodians.  What is this
21    sources about laptops or whatever before we get to predictive
22    coding and some of the shared drives and other things?
23              MS. BAINS:  Plaintiffs would have liked to have seen
24    all of the data or run searches on the data from laptops, home
25    directories, and desktops.  The defense counsel expressed
```

42

C28rdasc

1  concern that that would be too burdensome, so we came up with a
2  duplication testing theory.  We suggested 7 custodians and they
3  suggested 2.  We just think 2 is too little to do any sort of
4  testing, especially as a run against the sample of the total
5  number of custodians is not a significant percentage.
6          THE COURT:  When you say home directories, are you
7  talking about home computers?  No?
8          MS. BAINS:  No.  The directories on the work
9  computers.
10         THE COURT:  I think this may be ones where the
11 consultants are more useful to me than the lawyers.  Let's
12 start with Mr. Neale.
13         MR. NEALE:  Your Honor, there are certain sources that
14 are controlled by custodians, like laptops, desktops, and the
15 home directories are the My Documents folder to which they
16 would save information.  In our discussions with defendants,
17 they represented they thought that that information would be
18 wholly duplicative of attachments and things that are in the
19 LTA.
20         We had suggested early on that we pick some number of
21 folks and do a comparison between that dataset and what is in
22 the LTA to get a sense of the rate of the duplication.  If it
23 was high, then perhaps we would agree that those sources don't
24 need to be addressed.  Since
25         then, we just haven't been able to agree on the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

43

C28rdasc
1    number.  As Ms. Bains said, we suggested 7, they suggested 2.
2    We just don't think 2 will be representative enough to give a
3    good sense as to whether they are truly duplicative or not.
4               THE COURT:  Let me hear from --
5               MR. ANDERS:  Your Honor, I don't know if we disagree
6    on the technical aspect.
7               THE COURT:  If you don't disagree on the technical why
8    2/why not 7, why not the old split the baby?
9               MR. ANDERS:  Your Honor, if you look at our letter, we
10   don't believe any should be done at this point, for a number of
11   reasons.  One is if there is a comparison, and even if it is
12   shown that there are some differences in the types of
13   documents, the next level of inquiry is, OK, what are the
14   different documents that are in the home directories and are
15   they even relevant, do we even care about them?
16              Our position is before addressing the home directories
17   or the computers, complete the search of the emails.  Let's
18   find out what documents exist there, and then at that point
19   decide is it worth the cost to start looking at the laptops and
20   the home directories.  If it is, and we do a comparison, there
21   is still --
22              THE COURT:  Did you or did you not agree to do it at
23   one point for 2 custodians?
24              MR. ANDERS:  Yes, your Honor, we initially suggested
25   that.

44

C28rdasc

```
1              THE COURT:  Do 2 and we will see where that goes.
2              MR. ANDERS:  OK.
3              THE COURT:  What's next?
4              MS. BAINS:  The other sources.
5              THE COURT:  Where is that in your exhibit and their
6    exhibit?
7              MS. BAINS:  In the letters?
8              THE COURT:  No.  I know where it is in the letters.
9    There are all sorts of lists.
10             MS. BAINS:  In the protocol it begins on page 3.  My
11   expert can speak to the phasing and technical aspects.  If we
12   want to go source by source and talk about the substance of the
13   sources, I can address that.
14             THE COURT:  I think I want to talk about the substance
15   of the sources.  What page is it on your Exhibit D on the
16   defense side?
17             MS. BAINS:  We submitted a joint protocol on January
18   25th.  It was an attachment to plaintiff's letter.
19             THE COURT:  That's what I'm looking at or not?
20             MS. BAINS:  Yes.
21             MR. ANDERS:  Pages 3 and 4, your Honor, of the joint
22   protocol.  The first chart is plaintiffs' proposal.  The second
23   chart is ours.  If it makes it easier, your Honor, I could
24   explain the, I think, 6 items we differ on.
25             THE COURT:  That's all I need to know about.
```

C28rdasc

```
 1              MR. ANDERS:  There was the home directories, which
 2    your Honor just addressed.  The next would be the shared
 3    folders.  These are folders that different groups have shared
 4    access to.  Plaintiffs had asked for a directory tree of all
 5    these shared folders within MSL.  We spoke to the IT
 6    department, and they said that is not something that they can
 7    easily generate.
 8              We located HR shared drives.  These are shared drives
 9    issued by the HR department.  There is a corporate HR drive,
10    there is a North America HR drive, and then there are several
11    local drives.  What we proposed was doing a manual review of
12    all the documents in the corporate and North America as well as
13    New York HR drive for documents.  The types of documents, your
14    Honor, that are in these folders, there are templates, there
15    are form letters, there are some training programs, there are
16    some other general HR documents.
17              We also have the shared drives for some of the other
18    local offices.  All told, if you take everything we have, that
19    is 40,000 documents.  We are proposing to take the corporate
20    and North America, which are the more general HR drives, plus
21    the New York One, review those manually.  Based on the theory
22    of the case, we would think that the general HR directories
23    would be the ones most relevant and review those three main
24    ones and do that outside of the predictive coding.
25              THE COURT:  Let's take this in two steps.  For HR, are
```

46

C28rdasc
```
 1   there other shared folders you want reviewed?
 2             MS. BAINS:  Yes, the local folders at least.
 3             THE COURT:  Whose local folders?
 4             MS. BAINS:  The local HR folders.
 5             THE COURT:  What is in the shared material?  It seems
 6   to me if we are talking about forms and templates, doing the
 7   corporate, New York America, and New York probably is enough.
 8   If you are telling me these are also where people do shared
 9   work type material, that's a different story.
10             MS. BAINS:  We deposed the HR director last week, and
11   she noted that a lot of complaints don't even come to her, that
12   she is in New York, and that the local HR people deal with
13   them.
14             THE COURT:  Would it be in the shared folder?
15             MS. BAINS:  I think you would have to ask defense,
16   because we don't have access and they haven't given us a
17   directory listing.
18             THE COURT:  It would really be nice if you folks
19   talked to each other substantively.  What's in the shared
20   folders?  Let's limit it to HR for the moment.
21             MR. ANDERS:  Other than what I have represented
22   before, your Honor --
23             THE COURT:  Let me put it a different way.  If an
24   employee made some sort of complaint to HR about
25   discrimination, pay issues, or whatever, and for whatever
```

47

```
C28rdasc
```
 1    reason it crossed two offices or more than one person was
 2    working on handling the matter, would that be in a shared
 3    folder?
 4              MR. ANDERS:  I don't know, your Honor.  I can tell you
 5    from my cursory general review going through folders, I didn't
 6    see anything like that.  There are thousands of folders, and I
 7    didn't review every one.  I don't know the answer to that
 8    question.
 9              THE COURT:  I understand that.  But they are your
10    clients.  At the moment I can't rule on the shared folders
11    until somebody tells me what's in it.  Right now the shared
12    folders are up in the air except for the three that they have
13    agreed to include in phase 1.
14              MR. ANDERS:  Your Honor, thank you.  Just so I'm clear
15    about the ones we are reviewing in phase 1, I don't believe we
16    are going to review every single document, but certainly we are
17    going to look at the folders.  If a certain folder has ten
18    documents of a certain type not relevant, we are going to move
19    on.  We are going to do it judgmentally.
20              THE COURT:  You are going to do it judgmentally with
21    the assistance of your clients.
22              MS. BAINS:  Your Honor, for the other non-HR folders,
23    we need some sort of indication of what's in there.
24              THE COURT:  Either you folks are going to talk to each
25    other and develop the information cooperatively or you're going

48

C28rdasc

1   to spend the money and take a 30(b)(6) deposition or hundreds
2   of 30(b)(6) depositions.  They are only saying it doesn't go in
3   phase 1, it goes in phase 2, so already you may be getting it.
4           Number two, I can't rule until I know what you mean by
5   shared folders.  In some corporations the shared folders are
6   templates and the like that somebody then pulls down off the
7   shared folders onto their drive and then uses to create a memo
8   or an action or whatever.  In other companies people do
9   document drafting collectively.
10          I have no idea what you are talking about here.
11  Absent information, it stays in round 2.  In the meantime, talk
12  to each other.
13          What's the next category?
14          MR. ANDERS:  Your Honor, the next category is the
15  company's corporate intranet otherwise known as Noovoo,
16  N-O-O-V-O-O.  We explain in page 9 of our January 25th letter
17  at page 10, that the type of information in Noovoo is general
18  information for employees.  This includes press releases and
19  other company notices, for example, notices regarding upcoming
20  system maintenance, an employee directory.
21          There are more form documents and templates, such as
22  sample PowerPoint decks, electronic company logos that can be
23  used.  There is information regarding company contests, job
24  openings, information about the worldwide offices.  It's
25  generalized employee information.

49

C28rdasc

```
 1              THE COURT:  Job openings may be the only thing that
 2    sounds relevant out of that, and even that is questionable.
 3              Ms. Bains?
 4              MS. BAINS:  Your Honor, counsel also told us that
 5    there are employment policies in Noovoo.  Also, the HR deponent
 6    said that she accesses Noovoo to get employment policies.  We
 7    think those are relevant.
 8              MR. ANDERS:  We have given employment policies.  They
 9    may exist in Noovoo, but they I believe would exist elsewhere.
10    They have asked for employment policies.  We have given them.
11    Now we are focusing on searching the intranet, which is another
12    place where certain information is stored.
13              THE COURT:  Search Noovoo for any documents that are
14    employment policies documents.  It may be redundant, but there
15    is no way to know that unless you do it.
16              Is there anything else, Ms. Bains, from what you have
17    learned that seems relevant in this?
18              MS. BAINS:  That's all from what we have learned.
19              THE COURT:  Your clients worked there.  I know they
20    didn't necessarily work in every department.  But if you can't
21    give me a basis for saying that the defendants are wrong -- and
22    in this case I'm not saying you will never get it, the issue is
23    is it a phase 1 or phase 2 or phase 3 approach -- it seems to
24    me, considering how expensive this case is already going to be
25    for discovery, under 26(b)(2)(C) you have not met your burden.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

C28rdasc

```
 1              MS. BAINS:  Can we clarify the phase?  I think the
 2    parties have a different opinion.
 3              THE COURT:  You're going to finish phase 1 ESI
 4    production.  You're going to have a chance to review that.  We
 5    are going to set a deadline for it once we finish the rest of
 6    the ramifications that you are in dispute over.  Then we are
 7    going to do phase 1.
 8              If as a result of phase 1, depending on both the cost
 9    to the defendants, the information developed, and everything
10    else, it is appropriate to go to phase 2 or 3, we'll go there.
11    If it isn't, it may be that you will do depositions in between,
12    and only if you develop through the deposition enough
13    information that shows we should spend the money to go past the
14    phase 1, will we do so.
15              I can't determine what we are going to do.  There is
16    no sense in getting to phase 2 earlier than the completion of
17    phase 1 or it defeats the whole purpose of phasing, which is to
18    see what is out there.
19              MS. BAINS:  I understand.  I just had the impression
20    that the defense's proposal was to do email only as phase 1 and
21    everything after if costs allowed.
22              THE COURT:  I'm going on what you are all telling me,
23    which is what you are in dispute on.  Reading defendants'
24    position and your position, it seems like there is a lot of
25    stuff in phase 1, such as Prism, PeopleSoft, corporate
```

51

C28rdasc
1  feedback, Halogen, EMC SourceOne archive, and others.
2          MR. ANDERS:  That's correct, your Honor.
3          MS. BAINS:  Thank you.
4          THE COURT:  What else is in dispute?
5          MR. ANDERS:  The last item in dispute is a system
6  called Hyperion Financial Management.  That is the company's
7  financial management program.  That's where they have their P&L
8  information.  When we were here on January 4th, we had
9  discussed this system in particular.  The question that Ms.
10 Wipper had was whether it contained information regarding
11 budgets, bonus pools, and personnel costs.
12          We inquired and found out that it does not contain
13 that information on an individualized level but rather more on
14 a high-level and general basis.  I don't see how that type of
15 information, what their bonus pool or the personnel costs are,
16 is relevant to this case.
17          MS. BAINS:  Your Honor, this is a class case, so we
18 are alleging high-level --
19          THE COURT:  No, it's not.  You refused to move in any
20 way, shape, or form unless I beat you over the head to try to
21 get the court to certify a class of any sort or even a
22 collective action.  Right now it's an action by whatever the
23 number is, half a dozen, individual plaintiffs who hope someday
24 that you will make a motion for class certification.
25          In any event, what difference does it make, even if
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

52

C28rdasc

1   this were classwide, if, as they seem to be describing it, it
2   shows that the budget for bonuses for the company for the year
3   2009 was $1 million or $100 million?  The issue is did your
4   plaintiffs get a fair share of that compared to their
5   comparators.
6           MS. BAINS:  We anticipate that one of the business
7   justifications will be that they just didn't have the money to
8   pay people.
9           THE COURT:  That's not anything I've heard in the
10  case.  Is that one of the justifications?  We have an answer.
11  It would seem to me that that would be something that is an
12  affirmative or other defense that would have been included in
13  the answer.
14          MR. ANDERS:  I think what the plaintiffs may be
15  getting at is there was a salary freeze imposed at some point.
16  Whether or not the it was a good decision or bad decision to
17  freeze the salary, they imposed a salary freeze.  I don't think
18  this case is about whether or not that was a good decision.
19          THE COURT:  I assume the freeze applied to everybody
20  of every sex, age, and other protected class.
21          MR. ANDERS:  Yes, your Honor.
22          MS. BAINS:  We have emails showing that exceptions
23  were made.
24          THE COURT:  The exceptions may be relevant.  What the
25  total pool was or what the policy was has nothing to do with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53

C28rdasc
```
 1   the budget documents.  What am I missing?
 2           MS. BAINS:  We believe the budget is closely tied to
 3   compensation policies.  If there is information in there about
 4   what part of the budget is going to go to compensation, we
 5   think that would be relevant.
 6           THE COURT:  The request is denied.  It's ridiculous.
 7   What else?  Are we done with the sources?
 8           MR. ANDERS:  I believe so, your Honor.
 9           THE COURT:  Good.  What's next?
10           MS. BAINS:  I'm sorry.  I think there was actually one
11   more, Vurv Taleo, that was in this.
12           THE COURT:  That's L on your list, talent recruitment
13   software.
14           MS. BAINS:  I understand that that contains
15   information about job descriptions and job duties.
16           MR. ANDERS:  Your Honor, that is essentially an
17   applicant tracking program.  It tracks an applicant through the
18   hiring process, sort of the date that they applied, the date
19   they had this interview, the date they had the next interview.
20   Again, it's more of a tracking program.
21           THE COURT:  Does it say in doing that we're tracking
22   Sherlock Holmes, who applied for the job of consulting
23   detective, and that job has the following requirements, and
24   then we interviewed him on such and such a date?  Or is it
25   merely person, position, and date tracks?
```

54

C28rdasc

```
 1              MR. ANDERS:  Your Honor, it will track specific
 2    individuals.
 3              THE COURT:  Does it have anything about what the job
 4    description for the job they are applying for is?
 5              MR. ANDERS:  I don't believe it does, your Honor.  The
 6    individualized forms.  If Sherlock Holmes was applying for a
 7    job and there was a printout on Sherlock Holmes's information,
 8    that does not have any information like a job description.  It
 9    identifies the position, but it generally is a time line of on
10    what days various -- this would be really individualized
11    discovery.
12              THE COURT:  Ms. Bains?
13              MS. BAINS:  I have a question.  Does this system also
14    track current employees and promotions?
15              MR. ANDERS:  It would track anybody that applied for a
16    position, whether it's internal or not.
17              MS. BAINS:  That's relevant.  It's similar to the data
18    provided by PeopleSoft for promotions analysis.
19              THE COURT:  You have it with the other system.  There
20    has to be a limit to redundancy here.
21              MS. BAINS:  Not the job qualifications.  That's not in
22    PeopleSoft.
23              THE COURT:  That's not in this, either.  Please listen
24    to each other.
25              MS. BAINS:  The job qualifications of the applicant?
```

55

C28rdasc

1              THE COURT:  Who cares?
2              MS. BAINS:  It would be relevant if somebody is denied
3    a promotion.
4              THE COURT:  If you're telling me that your plaintiff
5    applied for a particular position and you're comparing who was
6    hired for it, that's relevant perhaps, if that's your theory.
7    I don't think it is.  But that is not going to be done through
8    the Vurv Taleo system necessarily.  I didn't hear anything here
9    about it has the qualifications of the person applying.  Did I
10   miss something?
11             MR. ANDERS:  No, your Honor.
12             MS. BAINS:  The HR deponent testified that job
13   applications and rsums could be accessed through Vurv Taleo.
14             MR. ANDERS:  Again, your Honor, what I'm looking at is
15   something that could be exported and printed out.  I asked for
16   a printout of what would a printout look like if I asked for
17   all information on a particular individual.  I received a
18   sample report, and that's what I'm looking at.
19             THE COURT:  Let me see the sample.  Is any of this
20   click-through?  What I mean by that is, for example, it shows
21   that so and so, quote, submitted profile.  If I clicked on that
22   and I were on the system live, would that bring up the profile?
23             MR. ANDERS:  I don't know, your Honor.
24             THE COURT:  Why don't you show this to Ms. Bains and
25   see if that satisfies everybody that this system need not be

56

```
      C28rdasc
 1    included.  Now give the document back.
 2              MS. BAINS:  We ask that MSL verify that there are no
 3    rsums or job descriptions and that --
 4              THE COURT:  Come on.  Job descriptions, you just
 5    looked at the document.  This is the best way to resolve a lot
 6    of this stuff, to look at samples in the system.  The only
 7    thing there might be is the job application, what is called the
 8    submitted profile, and I fail to see the relevance of that
 9    unless it is for a candidate who applied for the same job as
10    your client and your client didn't get it.  And I don't even
11    believe that is one of the allegations in the case as to
12    specific jobs as opposed to glass ceiling type issues in
13    general perhaps.
14              MS. BAINS:  I believe we do have allegations about
15    certain promotions that were denied to plaintiffs.
16              THE COURT:  Then give them a list of those promotions
17    and if the Vurv Taleo system will show who else applied for
18    that job.  Again, unless it also gives the profile, i.e., job
19    application of the person, it doesn't do the least bit of good.
20              MS. BAINS:  That's fine.
21              MR. ANDERS:  Your Honor, so I'm clear, within the
22    system you can although search based on a specific position,
23    not individual, that will have a job description.  My
24    understanding is we have already provided job descriptions.  If
25    their allegation is there was a specific position that they
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57

C28rdasc
```
 1  were denied, we could search for that specific position.
 2            MS. BAINS:  That's fine.
 3            THE COURT:  That's how that will be handled, not part
 4  of the general protocol.  That finishes the sources, at least
 5  as to the dispute between phase 1 and phase 2.
 6            What's next?
 7            MR. ANDERS:  I think the actual protocol, your Honor,
 8  on the application of predictive coding.
 9            THE COURT:  What page are we on on the joint proposal?
10            MR. ANDERS:  That begins, your Honor, at page 20, I
11  believe.
12            MS. BAINS:  Yes, page 20.
13            THE COURT:  Since you all did this mostly in
14  narrative, I guess if I look at number 3, that will take me
15  through the specific?
16            MR. ANDERS:  Yes.
17            THE COURT:  What is the best way to figure out where
18  you disagree?  Whatever you agree on, I'm happy to let you
19  agree upon.
20            MS. BAINS:  I think it might make sense for us to each
21  give a presentation of our position.
22            THE COURT:  I'd rather do it issue by issue.  If you
23  give me your position with five to ten subparts, by the time
24  you finish and they respond, it's going to be very hard for me
25  to rule.  So issue by issue.
```

58

C28rdasc

```
 1              MS. BAINS:  May I have my expert address this?
 2              THE COURT:  Yes.
 3              MR. NEALE:  Your Honor, I think perhaps the best place
 4     to start is at the beginning of the process, which would in my
 5     view and I think in our discussions with defendants be at the
 6     point at which we determine what the confidence level within
 7     the predictive coding system will be set at.
 8              There has been a lot of discussion between us about
 9     their use of 95 percent plus or minus 2, which drives the
10     sample size that is going to be used at the various stages.
11     Leaving the last conference, we were I think close to an
12     agreement on the overall approach.  The recent submission I
13     think took a pretty sharp 180 away from it.
14              THE COURT:  Don't be a lawyer, be a tech person.
15     We're doing one issue at a time.  95 percent confidence level
16     of what?
17              MR. NEALE:  At a 95 percent confidence level against
18     the number of documents in the system.  The sample size would
19     be 2,399 documents.
20              THE COURT:  Go slowly.  Two thousand what?
21              MR. NEALE:  399 documents.
22              THE COURT:  OK.
23              MR. NEALE:  The first point at which that would be
24     applied would be the initial random sample, which is used to
25     determine and give you a sense based on the review of those
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
      C28rdasc
 1    documents what the likely percentage of relevance will be.
 2    It's also used, in my understanding, as one of the components
 3    of the seed set that starts to train the system as to how you
 4    train relevance in the categories.
 5              THE COURT:  Let me back up one second.  Are you all
 6    talking about training the seed set through a random sample or
 7    through a nonrandom sample based on already having found,
 8    through one method or another, certain key documents?
 9              MR. NEALE:  We are actually a great deal ahead of that
10    process.  You have your entire document collection.  You
11    randomly sample 2399 using that confidence level.  At that
12    point you do a review and determine what is relevant and
13    what --
14              THE COURT:  That's if you're doing a random sample
15    seed.
16              MR. NEALE:  We already agreed that that would be at a
17    random sample level.
18              MR. ANDERS:  I think this is maybe where we are
19    disagreeing.  The way I understand and the way we have prepared
20    the protocol, and the more recent one was designed to take some
21    of your Honor's comments, the very first step is a pure random
22    sample to get an understanding of how many relevant documents
23    are likely in the corpus.  Not which ones, just likely how
24    many.  That is where we used the 95 percent confidence level
25    plus or minus 2 percent as the confidence interval, which I
```

60

C28rdasc
1  understand is the industry standard.  That is just an initial
2  random sample to get a sense of what percentage of documents
3  are likely relevant in the system.
4          Yes, we will use the coding of that as part of the
5  ultimate training.  But once we move beyond that random sample,
6  the way we propose doing these seed sets --
7          THE COURT:  Now I see what page you are both on.  The
8  difference seems to be 99 percent versus 95 percent.
9          MR. NEALE:  Actually, if we limit it to this, I think
10 Mr. Anders explained it exactly the way I did, and we have an
11 agreement as to what constitutes the random sample for the
12 initial random sample set.
13         THE COURT:  That's the 2399.
14         MR. NEALE:  Yes.
15         THE COURT:  That's not what your lawyers wrote to me,
16 but OK.
17         MR. NEALE:  Actually in the conference we had we
18 agreed to that number.  And we in our letter indicate that we
19 would, if other components of their process were changed, in
20 taking it a step at a time, I'd say --
21         THE COURT:  Good.  Everybody agrees on the 2399,
22 what's next?
23         MR. NEALE:  However, your Honor, they have already
24 conducted the review of those 2399 documents without taking
25 into account the entire corpus of documents, which makes that
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

C28rdasc
```
 1  set not as random and not taking into account the two
 2  additional categories.
 3           THE COURT:  Despite my ESI expertise, you're going
 4  much too fast.
 5           MR. NEALE:  I'm sorry.
 6           THE COURT:  Dumb it down.  You both agreed to use a
 7  2399 random sample.
 8           MR. NEALE:  Yes.
 9           THE COURT:  What did they do to that that you don't
10  like?
11           MR. NEALE:  They reviewed that sample set in advance
12  of our discussion.
13           THE COURT:  Advance what have?
14           MR. NEALE:  Of us agreeing on that number and --
15           THE COURT:  What's the difference?
16           MR. NEALE:  -- and, importantly, the categories that
17  would be reviewed for during the process.
18           THE COURT:  By categories, you mean?
19           MR. NEALE:  The seven subjective categories that are a
20  critical component of training the system.  We had just
21  suggested, and I thought we had agreed, that those 2399 would
22  be rereviewed to take into account all the categories so the
23  system was properly trained at the first step.
24           THE COURT:  It seems that your issue tags or whatever
25  it is you're doing here -- I'm having a hard time figuring out
```

C28rdasc
1    where you agree and where you disagree.
2              MR. ANDERS:  Your Honor, I'll make it simpler if I
3    can.  On the random sample, we conducted the random sample when
4    there were 2.9 million documents in the system.  We were just
5    trying to get started in doing some of the work.  An additional
6    400, 300,000 have since been added.
7              Plaintiffs' position is because you did that random
8    sample before an additional 300,000 documents were added to the
9    2.9 million, your random sample isn't valid.  I understand, in
10   consulting with our vendor, that adding that number of
11   documents to that large database already doesn't really impact
12   the validity of the sample.
13             The other difference is since we have done that
14   sample, two issue codes were added, so that sample doesn't have
15   those two issue codes.  But that is more for the training of
16   the system.  Our position is when we do further training and
17   incorporate those additional two concept groups, it will
18   eventually catch up; it's not necessary to go back and do
19   another random sample because we have added 300,000 documents
20   to 2.9 million and because we have added two concept groups.
21             THE COURT:  As to the 300,000 additional documents,
22   would it help plaintiffs to take whatever the appropriate
23   random sample is of the 300,000 and review that?
24             MR. BASKIN:  If I may?
25             THE COURT:  Or are they now so mixed in?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

63

C28rdasc

1           MR. BASKIN:  It won't make a difference.  The random
2     sample is still going to be 2399.  What happens is once the
3     categories are reviewed of those 2399, you can retrain the
4     system when the 300,000 additional documents are added, and the
5     similar documents will indeed make it into those categories
6     without a rereview.
7           THE COURT:  That I understand.
8           MR. NEALE:  That we don't disagree with.  However, the
9     system is only as good as the training that it gets.
10          THE COURT:  I agree.
11          MR. NEALE:  This issue of recoding documents will come
12    up through our entire process here.
13          THE COURT:  Let me ask you this.  Other than however
14    many of the 2399 get pulled for privilege, and since you both,
15    as I recall your protocols, are taking a fairly transparent
16    view, am I remembering correctly that plaintiffs' counsel are
17    going to be allowed to review the 2399 that you have coded?
18          MR. ANDERS:  Yes, your Honor.
19          MR. NEALE:  We don't expect necessarily to have an
20    issue with the way in which they were coded.  We take issue
21    with how they get applied and therefore iteratively trained and
22    educate the system.
23          THE COURT:  To the extent that two new subject matter
24    codes or whatever, I take it -- I won't say "I take it,"
25    because I'm not sure I take anything the way you are all

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

64

C28rdasc

1   explaining it -- does that change the relevance?  In other
2   words, will it move a document from relevant to nonrelevant or,
3   rather, probably the other way around, or will it just deal
4   with the issue codes that you can separate what documents are
5   relevant to out of the relevant group?
6             MR. NEALE:  We believe that the two categories are new
7   categories of relevance that would have not otherwise been
8   captured during the initial review.
9             MR. ANDERS:  Your Honor, how about this?  Since we are
10  going to provide those 2399 to them anyway, they are going to
11  review them to make sure that we coded them relevant or not
12  relevant correctly.  If there are any that they think should go
13  into those two new categories, they can tell us, and we'll make
14  those designations in the system.
15            THE COURT:  Does that work?
16            MR. NEALE:  As it relates to this sample, it would.
17            THE COURT:  Good.  What's the next issue where you
18  disagree?
19            MR. ANDERS:  I think it would be the true creation now
20  of the seed set.  There is one area where we did all agree on
21  that, and that was the judgmental sampling that we have done.
22  Those documents have been coded and entered.
23            The remainder of how the seed set will be created is
24  defendants had a list of key words.  There were hits.  We
25  reviewed several thousand of those hits, encoded them.  That's

65

C28rdasc

1  attached I think as Exhibit B to the protocol.  It shows the
2  key words that we used and how we judgmentally sampled those
3  and the number of documents we coded as being relevant.
4          THE COURT:  Wait.  I think it's your Exhibit C, not D.
5          MR. ANDERS:  On the joint protocol I think it would be
6  Exhibit B.  Exhibit A is our key words.  Exhibit B is a
7  document we provided the plaintiffs which showed basically our
8  analysis of our review of our key words.
9          THE COURT:  Right.  I'm sorry.  Are you saying B as in
10 "boy" is what I should be looking at?
11         MR. ANDERS:  B as in "boy."  Sorry.
12         THE COURT:  OK.
13         MR. ANDERS:  That is defendants' half of the training.
14 What we would do is all the documents that we marked relevant
15 here except for the privileged ones we would turn over to
16 plaintiffs' counsel.
17         I think plaintiffs' issue on this is because we
18 conducted this review prior to the inclusion of the two
19 additional issue codes, all of these documents would not have
20 been coded for those two new codes.  I think we can address
21 this the same way as we addressed the random sample.  When we
22 turn over these documents to plaintiffs, if during their review
23 they believe that any of them fall within those two new codes,
24 they can advise us.
25         THE COURT:  Wait.  On these email hits from Exhibit B,

66

C28rdasc
1  are you giving them everything the key word hit or are you just
2  giving them what you reduced from that?  I'm not sure I
3  followed you.
4          MR. ANDERS:  Just from what we reduced.  There were so
5  many hits, we did not review every single hit.  For example, if
6  you look at the first page of Exhibit B, the initial term we
7  used was "training."
8          THE COURT:  Right.
9          MR. ANDERS:  Going back to Exhibit A, the term
10  "training" resulted in 165,000 hits.  What we then did was we
11  connected "training" with "Da Silva Moore," "Mayers."  That
12  second column shows all of the terms that we then did an "and"
13  search essentially.  We show next the document count, and we
14  reviewed the top 50 ranked.  What we reviewed were the top
15  ranked.
16          THE COURT:  All the ones you reviewed, whether you
17  then coded them responsive or not, you're going to give them to
18  review, other than privileged?
19          MR. ANDERS:  Yes.
20          MR. NEALE:  I think our only issue there is that
21  what's being reviewed are those results of the search that was
22  used to bring back those documents.  Again, that search did not
23  apply against at least 300 and now growing number of documents.
24          THE COURT:  Once you get your seed set, that will pull
25  in the 300,000 extra documents.

67

C28rdasc

1           MR. NEALE:  However, your seed set is determined based
2     on a sample of the documents that you have reviewed.
3           THE COURT:  Once you are out of random sample, you're
4     just getting documents to train the system.
5           MR. ANDERS:  Your Honor, importantly --
6           THE COURT:  You're winning.  You talk and you might
7     lose.
8           MR. NEALE:  However, your random sample is not
9     reflective if it's not taken into account all of the documents.
10          THE COURT:  Is there any reason to think that 300,000
11    documents are different than the other 2.9 million?
12          MR. NEALE:  I think there is, and I think the effort
13    to rereview that number of documents does not outweigh the
14    value of getting it right.
15          THE COURT:  What number of documents?
16          MR. NEALE:  Reapplying the search and rereviewing in
17    the initial sample the 2399 which we have moved on from, but
18    now this seed set, load the documents, research the documents,
19    and do your search again.  This is a critical component of the
20    process.
21          THE COURT:  How many documents?  I'm looking at the
22    first page, which already is several hundred, maybe a thousand
23    documents.  If you had to redo all of these --
24          MR. BASKIN:  May I?
25          THE COURT:  Yes, sir, please.  I'm sorry.  I need your
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

68

C28rdasc

1    name again.
2              MR. BASKIN:  David.  David Baskin.  B-A-S-K-I-N.
3              THE COURT:  Mr. Baskin.
4              MR. BASKIN:  Once you go through the random sample and
5    you do any kind of seeding of a particular category, the
6    training algorithm will actually return all of the relevant
7    documents of the 300,000.  You can do this over and over and it
8    continues to iterate.  Our system is a learning process.  It
9    goes over time and it will pull in those documents.
10             As compared to other systems that may be compared to
11   ours, they have to do everything up front.  There is no need to
12   do everything up front.  You can learn as you go within the
13   Recommind Axcelerate system, and all the relevant documents
14   will be pulled in over time through the various iterations.
15             THE COURT:  Where do the extra 300,000 documents come
16   from?
17             MR. ANDERS:  They came from the email accounts of --
18             MS. BAINS:  I believe they were new HR custodians, so
19   they would be largely different.
20             THE COURT:  Why would they be largely different?
21             MS. BAINS:  Because they probably contain mostly
22   complaints.
23             MR. ANDERS:  Your Honor, let me go back.  Plaintiffs
24   also provided us with three different iterations of their key
25   words.  The last round of that was applied against the full

C28rdasc

1  dataset, which includes those additional 300,000.  We still
2  have to review a portion of plaintiffs' key word hits which are
3  based off of that larger database.
4           Our position is that half of the seed set creation
5  which is the result of plaintiffs' key word hits is based off
6  of the entire current database.  So, we still are going to be
7  reviewing a lot of documents in the creation of the seed set
8  that is based off of the full database.
9           THE COURT:  It doesn't sound to me like this needs to
10  be redone in terms of percentages or other things.  You're
11  going to get the thousands of documents that the defendants'
12  key word hits caused them to review.  If you think that the
13  things they coded as nonresponsive should be coded as
14  responsive, you will do so, and they will run it accordingly.
15           MR. NEALE:  Can I just add one comment to Mr.
16  Baskin's?
17           THE COURT:  Yes.
18           MR. NEALE:  I think we agree that as long as the
19  system has some exemplar documents to go, it will iteratively
20  be trained.  However, I think it is important to point out, and
21  we'll get to it, that the defendants have from the beginning
22  tried to limit significantly the number of documents that are
23  subject to the iterative process.  You can't have one and not
24  the other.
25           THE COURT:  No, I think what they have said is that

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

70

C28rdasc

1  once the system is fully trained and run, at some point,
2  undetermined and subject to court approval, they are going to
3  say the likely relevance when you have reached X number is too
4  small.
5          MR. NEALE:  Actually, their initial protocol suggested
6  that they would do two rounds of iterative review for training
7  of 2399 each using the 95 percent confidence.  There is nothing
8  to say that after two rounds the system will be trained.
9          THE COURT:  That's what you are all going to figure
10  out.
11          MR. NEALE:  The latest protocol suggests we'll add
12  more rounds but we will significantly reduce the confidence
13  level or the number of documents to 500.  Now we will do 7
14  rounds of 500 or 3500 documents to be relied upon in order
15  to determine relevance.
16          MR. BASKIN:  No, that is completely wrong.  There is
17  no random sample or confidence anymore.  The process that we
18  have created in our algorithms returns as many documents as it
19  finds.  It finds it with a certain quality score.  Then it
20  ranks them by the highest score to the lowest score.
21          THE COURT:  Is that zero to 100?
22          MR. BASKIN:  It's 100 to zero.  The top ones are the
23  100 percent or close to it, and it goes down from there.  I
24  believe that is what defendants are looking to review, the 500
25  top ones.

C28rdasc

1           MR. NEALE:  The patent submitted by Recommind I think
2      is inconsistent with that.  Despite that, taking that
3      representation, you cannot at this point determine how many
4      rounds of iterative review you can do to get the system right.
5           THE COURT:  That is a different issue from what we are
6      talking about now, although it may be the one you want me to
7      get to next.
8           MR. NEALE:  There is one issue related to the seed
9      set.  We have the defendants' search terms, which we have dealt
10     with.  We have the judgmental sample, which I think Mr. Anders
11     mentioned first.  Then we have the plaintiffs' search terms
12     which would be applied against the entire document collection.
13          THE COURT:  Right.
14          MR. NEALE:  We suggest 5,000 documents be reviewed as
15     a result of that search.  I think defense suggests 3.
16          THE COURT:  You know what King Solomon suggests.
17          MR. ANDERS:  4,000.
18          THE COURT:  Is there any magic to any of these numbers
19     other than everybody gets paid a lot more depending on how much
20     work is done?  4,000.  Solomon rules.
21          MR. ANDERS:  Your Honor, that's fine.
22          Going back to defendants' seed set and what we are
23     going to be turning over to plaintiffs, the only issue that we
24     were discussing is the way we had reviewed our key word hits
25     was, for example, the key word "training" yielded a few hundred

```
      C28rdasc
 1    thousand hits.
 2              THE COURT:  Then you did training within --
 3              MR. ANDERS:  With "Da Silva Moore."  The document
 4    count was 133 documents.
 5              THE COURT:  You reviewed 50.
 6              MR. ANDERS:  The top 50 ranked.  We didn't find any
 7    relevant.  The only issue I may foresee, because more documents
 8    were added to the system, is if we were to do that same search
 9    right now, I don't know if the top 50 would be the same top 50.
10    We can certainly produce all of the relevant documents.
11              THE COURT:  Wait.  Are you telling me that you didn't
12    save these results and that you have to rerun the system to get
13    them and therefore there might be some slight differences?
14              MR. ANDERS:  Yes, your Honor.  I think as we were
15    learning the system and when we were doing these initial
16    reviews, I don't know if each specific search was saved as an
17    individualized search.
18              THE COURT:  It sounds like you have to run it again,
19    which also solves the plaintiffs' problem, because then you're
20    running against the full 300,000 added to the set.  You will
21    still review the same number.  Whether you rereview them on
22    your side or as long as you have screened for privilege, if you
23    did 50 before, it may not be the same top 50, but you're going
24    to give 50 to the plaintiffs, etc.
25              MR. ANDERS:  What I would envision producing is not
```

73

C28rdasc
```
 1   necessarily these 50 went with this grouping.  It would just be
 2   here are all of the relevant ones and all of the nonrelevant
 3   ones.  I don't think it really matters how we got to it.  What
 4   matters is how we coded it.
 5            THE COURT:  Any problem with that?
 6            MR. NEALE:  I wanted to clarify that that, to the
 7   extent it is being rerun now, also includes the custodians that
 8   were added today.  That will round out the entire dataset.
 9            THE COURT:  Yes.  Good.  We have made progress.
10            MR. NEALE:  All of the documents that are reviewed as
11   a function of the seed set, whether are ultimately coded
12   relevant or irrelevant, aside from privilege, will be turned
13   over to us?
14            MR. ANDERS:  Correct.
15            MR. NEALE:  OK.
16            THE COURT:  Good.
17            MR. ANDERS:  Your Honor, if I may move on to the
18   iterative rounds.  I heard what Mr. Neale was saying, and I
19   think there is one big source of disagreement.  When we were
20   here last time we had proposed doing two rounds and then, after
21   that second round, reviewing the top 40,000.  Your Honor said
22   no, that wasn't sufficient.  The way we revised the protocol
23   was to include seven iterative rounds where at each round we
24   review a minimum of 500 documents, not 500 total.
25            We discussed this with our vendor.  Because this is
```

74

C28rdasc

1   such a fluid process and we don't really know what is going to
2   come back in that first round or that second round, it is tough
3   to pinpoint an exact number.  What we said in our protocol was
4   we are going to use our best judgment along with the assistance
5   of the project manager to review an appropriate number but at
6   least 500 during each round.
7           We'll look at different concept groups.  There may be
8   certain rounds that have better sets.  And we will stop either
9   at the end of the seventh round or if, between two rounds, the
10  number of new documents being brought back is less than 5
11  percent.  That was a number that we picked.  There is no
12  science to it.  What we are trying to find is a point where the
13  machine is not returning a large number of new documents.
14          But assume we get to the seventh round.  I think
15  plaintiffs' concern was we don't know if seven rounds is
16  enough.  What we have in our protocol is at the end of that
17  seventh round we will do another random sample of the discards
18  to compare against the first random sample.  That will give us
19  a sense of whether additional highly relevant documents are
20  being left out in the discards.
21          THE COURT:  When you say you are comparing the
22  discards at that stage to the original discards, what do you
23  mean by that?
24          MR. ANDERS:  What I mean by that is at the very
25  beginning of the process we did the random sample of 2399
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

C28rdasc

1  documents, and a certain number of documents, I think 26 or 30
2  of that, were found to be relevant.  We now have a general
3  baseline.  After we go through the seven iterations, the system
4  is going to be pulling out what it believes are the most
5  relevant documents.
6          When that is done, we are going to have the documents
7  the computer pulled and then everything else that's out there.
8  We are going to do a random sample of everything else that is
9  out there and see how many relevant documents are in that set.
10         The idea and the hope is it is going to be much less
11 than what we found the first time.  If it is, that is the
12 assurance that the process worked.  If it's not, and if it's
13 the same number or higher or just one or two lower, we'll have
14 to discuss.  Maybe we will need to do another one or two
15 iterations.
16         That is our proposal for how we do the iterations.
17         THE COURT:  Mr. Neale.
18         MR. NEALE:  I think we are stating that we don't at
19 this point agree that this is going to work.  This is new
20 technology, and it has to be proven out.  We are going to have
21 insight into it and we are glad to see it proven out.
22 However --
23         THE COURT:  Does Doar have its own computer-assisted
24 review a/k/a predictive coding tool?
25         MR. NEALE:  We advise clients on its use and its not

76

```
        C28rdasc
 1  being used.  But no.
 2              THE COURT:  I'm sorry.  You advise clients on its use?
 3              MR. NEALE:  On the use of other predictive coding
 4  systems.
 5              THE COURT:  So you know if done right, in theory if
 6  not in practice, and I think in practice, it works?
 7              MR. NEALE:  Yes.
 8              THE COURT:  It certainly works better than most of the
 9  alternatives, if not all of the alternatives.  So the idea is
10  not to make this perfect, it's not going to be perfect.  The
11  idea is to make it significantly better than the alternative
12  without nearly as much cost.
13              MR. NEALE:  Right.  I think it is fair to say we are
14  big proponents of it.  However --
15              THE COURT:  Let me ask one more question.  If my
16  memory is right, your protocol is that at each of these rounds
17  they are going to see the same documents you see, again except
18  privilege?
19              MR. ANDERS:  Yes.
20              THE COURT:  It seems to me I'm accepting the protocol
21  that you have suggested in that regard.  But if you get to the
22  seventh round and people are saying the computer is still doing
23  weird things, it's not stabilized, etc., we need to do another
24  round or two, either you will agree to that or you will both
25  come in with the appropriate QC information and everything else
```

77

C28rdasc

1  and do another round or two or five or 500 or whatever it takes
2  to stabilize the system.
3           MR. NEALE:  I just want to add in response that our
4  concern about the approach overall, and Recommind in particular
5  in this instance, is the complexity of the case and the data.
6  Along with that is the fact that it is only going to serve up
7  for review after your initial seed set what it determined at
8  that point to be relevant.
9           THE COURT:  Right.
10          MR. NEALE:  Those 500-document iterative reviews or
11 3500 documents plus or minus subject to review are not being
12 randomly sampled and giving us a proper representation of
13 whether it is getting the irrelevancy right.  So it is a very
14 limited verification for the training set of what's relevant.
15          THE COURT:  In the end you're going to be sampling
16 probably greater than 2399 because it may be both a statistical
17 sample and what I will call comfort sample and you will see how
18 much of that is coming out of the system is not relevant that
19 should have been coded as relevant.
20          MR. NEALE:  The proposal suggests 2399 of whatever the
21 number of the irrelevant documents, I think in their estimation
22 a few million, one round of 2399 to verify the irrelevancy,
23 which we have had no insight into throughout the entire
24 process.
25          THE COURT:  You have had insight only in the sense
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

78

C28rdasc
1   that you're seeing everything they are seeing in terms of
2   training.
3           MR. NEALE:  But we are only seeing what the system
4   thought was relevant that they coded to be irrelevant, not to
5   be what the system thought was irrelevant that should have been
6   coded relevant.
7           THE COURT:  Maybe the answer is that the seven
8   iterative rounds of a minimum of 500 should not only be looking
9   at the highest-response documents but should be looking at some
10  other group of the low-response documents, whether that is 2399
11  or, because we are doing lots of iterations, it's 500 or
12  whatever you all think.  That may make perfect sense.  If it
13  keeps turning up relevant documents, that's good.  But if it's
14  missing a lot of documents on each of those reviews, we need to
15  figure that out sooner rather than later.
16          MR. ANDERS:  Your Honor, one of my understandings is
17  with each iterative round, the system will create, I think we
18  have it set for up to 40 different concept groups where it just
19  finds like documents.  That was going to be part of the
20  500-plus documents we review, picking different concept groups
21  that seem to make sense.
22          THE COURT:  What about the concept group that they say
23  is totally irrelevant?  That's probably not a group, but it's
24  what I call the tail.
25          MR. ANDERS:  I guess is the request that we would also
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

79

C28rdasc

1    review a certain number of documents at the lower end of the
2    spectrum?
3              THE COURT:  Or the middle of the spectrum.
4              MR. NEALE:  That's the suggestion.  Our protocol
5    suggests a random sample of everything.
6              THE COURT:  How big a random sample?
7              MR. NEALE:  At the 95 percent confidence level of
8    2399.
9              THE COURT:  That's 2399 each time?
10             MR. ANDERS:  Yes.
11             MR. NEALE:  Getting to the 500 document number --
12             MR. BASKIN:  It's not, no.
13             MR. NEALE:  -- our sense is that we will wind up doing
14   several more rounds of iterative review at 500 than we would if
15   we agreed to 2399, and that in the end we will get there faster
16   and review less documents.
17             THE COURT:  Does that make sense, Mr. Baskin?  In
18   other words, instead of 7 times 500, 5 times 1,000 or whatever
19   the math is?
20             MR. BASKIN:  I'm trying to make sure that both parties
21   get what they want in the scenario.  What happens in the
22   proposal by the defendants is that they are providing the most
23   relevant documents in their review.
24             THE COURT:  Right.
25             MR. BASKIN:  If you do a random sample within that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

80

C28rdasc
1  particular subset, it is not the 2399, because if the computer
2  returns let's say 10,000 documents, 95 percent plus or minus 2
3  is no longer 2399.
4           MR. NEALE:  We are not talking about that's the
5  difference.  We are not limiting it to what you think is
6  relevant.  We want to randomly sample everything and the coding
7  that was applied or not applied, so that we know whether your
8  irrelevancy categorization is correct.
9           MR. BASKIN:  That will happen at the end.
10          MR. NEALE:  We don't think one random sample of
11 3 million documents will give us enough.
12          MR. BASKIN:  Judge, from what I understand, the
13 request is not to do the random sample iterations, finish the
14 iterations.  I'm still not understanding.
15          THE COURT:  What they are saying is each time you run
16 it, whether it's 7 or less, and it may be two different things
17 to satisfy yourself on the defense side and something else to
18 satisfy the plaintiffs, but whether you do the 500 best
19 documents or not, the 500 and possibly more, Mr. Neale was
20 suggesting that on each iteration there is a random sample
21 drawn and the computer will have coded some of those as
22 relevant and some of them as not relevant; and if it is
23 miscoding the documents that are not relevant, then there's a
24 problem.
25          MR. BASKIN:  Let me clarify.  The computer doesn't
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

81

C28rdasc

1   code documents.  The computer suggests documents that are
2   potentially relevant or similar.
3           THE COURT:  Same thing.
4           MR. BASKIN:  What happens is during the seven
5   iterations, all the defense attorneys are going to do is refine
6   the documents that they are looking at.  After the seven
7   iterations, what you are getting is a sum of it all.  Then you
8   are performing a random sample.  Doing random samples in
9   between makes no sense.  The actual sum of the seven iterations
10  will just be the sum of that.  You are refining and learning.
11          THE COURT:  What Mr. Neale is saying is that you might
12  not have to do it seven times and that the sooner you find out
13  how well the seed set or the training has worked, the better.
14          MR. BASKIN:  What's going to happen, at least from
15  what I understand the request to be, is that you do one
16  iteration, which is 500, then you do 2399 samples, then you do
17  another iteration, do another 2399.  I think they are looking
18  for the 7 times 2400 plus the 500 each.  We are looking at
19  21,000.
20          MR. NEALE:  That's not what we are suggesting.  We are
21  actually suggesting that each iteration be one sample randomly
22  selected of 2399, indicating which of those the system would
23  have flagged as relevant so we know the difference in the way
24  in which it is being categorized.
25          MR. ANDERS:  I would think, too, we are now just
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

82

C28rdasc

 1   completely missing the power of the system.  What we were going
 2   to review at each iteration are the different concept groups
 3   where the computer is taking not only documents it thinks are
 4   relevant but it has clustered them together and we can now
 5   focus on what is relevant to this case.  By reverting back to a
 6   random sample after each iteration, we are losing out on all
 7   the ranking and all the other functionality of this system.  It
 8   doesn't seem to make sense to me.
 9           THE COURT:  I'm not sure I understand the seven
10   iterations.  As I understand computer-assisted review, you want
11   to train the system and stabilize it.
12           MR. BASKIN:  If I may.  What happens when you seed the
13   particular category is you take documents, you review them.
14   The relevant documents are now teaching the system that these
15   are good documents.
16           THE COURT:  Right.
17           MR. BASKIN:  It also takes the irrelevant documents
18   and says these are not good documents.  It continues to add
19   more relevant documents and less irrelevant documents into the
20   iterations.  The seven iterations will then refine that set and
21   continue to add the responsive documents to each category.
22           At the end of that, after seven iterations, you will
23   have not only positive responsive documents, also the
24   nonresponsive documents, but the last set of computer-suggested
25   documents the system suggests.  From that point the defense is
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

C28rdasc

1   saying we can then verify with a 95 percent plus or minus 2 of
2   2399 to see if there is anything else that the system did not
3   find.
4           THE COURT:  Let me make sure I understand the
5   iterations then.  Is the idea that you are looking at different
6   things in each iteration?
7           MR. BASKIN:  Correct.  It's learning from the input by
8   the attorneys.  That's the difference.  That's why the random
9   sample makes no sense.
10          MR. NEALE:  I don't doubt that that is how Recommind
11  proposes to do it.  Other systems are, however, --
12          THE COURT:  We are stuck with their black box.
13          MR. NEALE:  -- fine to do it.
14          MR. BASKIN:  It's not a black box.  We actually show
15  everything that we are doing.
16          THE COURT:  I'm using "black box" in the legal tech
17  way of talking.  Let's try it this way, then we'll see where it
18  goes.  To the extent there is a difference between plaintiffs'
19  expert and the defendants' on what to do -- and to the extent
20  I'm coming down on your side now, on the defense side, that
21  doesn't give you a free pass -- random sample or supplemented
22  random sample, once you tell me and them the system is trained,
23  it's in great shape, and there are not going to be very many
24  documents, there will be some but there are not going to be
25  many, coded as irrelevant that really are relevant, and

84

C28rdasc

1  certainly there are not going to be any documents coded as
2  irrelevant that are smoking guns or game changers, if it turns
3  out that that is proved wrong, then you may at great expense
4  have to redo everything and do it more like the way Mr. Neale
5  wants to do it or whatever.
6          For the moment, since I think I understand the
7  training process, and going random is not necessarily going to
8  help at that stage, and since Mr. Neale and the lawyers for the
9  plaintiffs are going to be involved with you at all of these
10  stages, let's see how it develops.
11          MR. ANDERS:  Your Honor, the last phase, just so we
12  close this out, at the end of the seventh iteration our
13  proposal calls for them to manually review all of the results
14  with the caveat and the provision that depending on that
15  number, we reserve the right to come to the Court for some
16  level of relief, whether it's cost shifting, whether it's you
17  stop at the top 30, 40, 50,000, whatever that number is.  Also,
18  by that point we will have the relevance rankings or
19  percentages and we will have a sense of what is there.
20          THE COURT:  As I said before, I'm not prepared to rule
21  on where you stop until I see those relevance rankings.  Any
22  issue on that, Mr. Neale?
23          MR. NEALE:  Again, the biggest concern that I will
24  convey to my clients here is that we are not going to have
25  proper insight into how the system is determining irrelevancy.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

85

C28rdasc
```
 1   We are not going to see representative samples of those
 2   documents.
 3           THE COURT:  You're going to see the training.
 4   Frankly, since you're going to see all the documents used to
 5   train the system, it's not like the system is then black box or
 6   not -- Mr. Baskin doesn't like me referring to it as a black
 7   box -- you're going to know how the system was trained to find
 8   relevance.
 9           MR. NEALE:  Right.  But we are only going to see as a
10   result what is relevant.  We are not going to see how it
11   actually interpreted it to the result set.  We are only going
12   to see coming out of the seed set things that are relevant.
13           THE COURT:  That's always how it's going to be.
14           MR. NEALE:  Maybe in their system, but not in other
15   systems.
16           THE COURT:  In other computer-assisted review systems?
17           MR. NEALE:  They are simultaneous random samples that
18   compare machine-generated review to human review, compare the
19   two, reach a level, and tell you you're there.  This is we are
20   going to tell you what is relevant, as long as you confirm it,
21   we're good, we're done.
22           THE COURT:  I thought seven iterations is doing
23   exactly what you are saying.
24           MR. BASKIN:  That is correct.  It's human review.
25           MR. NEALE:  I think it is actually worse because it's
```

86

C28rdasc

1   only giving you what it first determined to be relevant, having
2   you verify or not those calls, and then using that to determine
3   better what's relevant, not against how you have miscoded for
4   irrelevancy.  So, if I think 500 documents as a sample is too
5   small, 7 is certainly too much of a limit.  I question why the
6   original protocol suggested 2399 and was valid and this
7   protocol suggests 500.
8            THE COURT:  How many times?
9            MR. NEALE:  2.
10           THE COURT:  Will 2 times through at 2399 work, and
11  then you do whatever else you want to do after that in terms of
12  irrelevance as opposed to relevance?
13           MR. BASKIN:  The system could return 300 documents in
14  the first iteration.  At that point you can't do 2399.  I'm
15  actually impartial.  I designed the system.  I work for the
16  company, and I'm not getting paid for this.  I just wanted to
17  let you know that 7 iterations from a quality perspective is
18  better to the plaintiff.
19           MR. NEALE:  It is also inconsistent with your patent,
20  which suggests that you do the iterations until the system
21  tells you it's got it right.  Speaking to the limit on that
22  without having done it is not consistent with your own patent
23  and with what is generally accepted as best practice.
24           THE COURT:  They also claim to have a patent on the
25  word "predictive coding" or a trademark or a copyright.  We

87

C28rdasc
```
 1  know where that went in the industry.  But I'm just tweaking
 2  you.
 3          MR. BASKIN:  No problem.  The predictive patent coding
 4  does indeed go through that.  However, when you have a certain
 5  number of iterations and you have a final review of all
 6  computer-suggested documents and you are confined to 7
 7  iterations as well as having the plaintiffs review those
 8  documents and seeing yourself what's happening, then you can
 9  judge for yourself whether or not the defendants are making the
10  right decisions on these documents.  If you agree on those
11  decisions, then you will agree on the actual response of the
12  computer-suggested returns from the training sets.  If you
13  don't agree on those, then you might have a different opinion.
14          THE COURT:  Let's see how it works.
15          MR. NEALE:  The other thing on the second part of
16  that, which is where the cliff comes in, I don't think counsel
17  truly understands what the expectations of the process should
18  be, assuming it works.  Again, the patent itself suggests that
19  as a result of this process you should be reviewing 10 to 35
20  percent of your total document collection, which is supposed to
21  indicate a significant savings, which in this case would be
22  about 300 to 1 million documents.  They keep talking about
23  40,000 to 75 as being burdensome and disproportional.  If they
24  don't understand the result of the system, what to expect, I
25  don't understand why they are proposing it in the first place.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

88

C28rdasc

1            MR. ANDERS:  Your Honor, one of the reasons why we
2    developed this work flow was, again, this is not a case where
3    we are prepared to review a million documents during this first
4    phase.  We worked with our vendor and came up with a modified
5    work flow that we believe is defensible but is also reviewing a
6    more reasonable number of documents for this case.
7            THE COURT:  We'll see.  Make sure you're keeping track
8    of your costs in ways that you will be able on both sides to
9    present to the Court not for reimbursement but for
10   proportionality as to where you draw the line.  I'm not saying
11   that there is a dollar number that I'm going to cut it off at
12   or a percentage or where the cliff is.  We are going to figure
13   all that out.
14           All of this, obviously at some expense, can be
15   revisited if things are not working well.  I also remind both
16   sides that by the time you get to trial, even with six
17   plaintiffs, if you have more than 100 trial exhibits it will be
18   a miracle.  The idea is I think people should focus less on do
19   I have every last document that says the same thing or do I
20   have the big hot docs that are going to prove my case, I know
21   the response from the bench on that is, sure, if they can
22   assure me they will give me the 100 hot docs that I'm going to
23   use as my trial exhibits, I'll quit right there.  It doesn't
24   quite work that way.  Let's not overkill the system.
25           Is there anything else we are supposed to be doing or

89

C28rdasc
1  resolving or have we now got the protocol locked?
2          MS. BAINS:  Your Honor, on the 500 documents, I'd just
3  ask that it is at least raised to the number that was
4  originally suggested, which was the 2399 times 2.  That gets
5  you more documents than they are proposing in the 3500.  Can we
6  raise the 500 document number?
7          THE COURT:  The difference is 500 relevant versus 2399
8  of which probably 2200 are going to be not relevant.  Mr.
9  Neale, do you agree?  Let me not ask it that way.  Do you have
10 any suggestion?
11         MR. NEALE:  If we are going to apply their suggestion,
12 I believe that 7 rounds of 500 as an indicator as to whether it
13 is working is better than 2 rounds of 2399.
14         JUROR NO. 94:  It is at least 500, maybe more,
15 depending on what we see.
16         THE COURT:  OK.
17         MR. ANDERS:  The last thing I want to mention, your
18 Honor, and it is nothing we need to decide, but we have a
19 clawback provision in the current confidentiality agreement.  I
20 will likely be submitting a more detailed clawback provision
21 for counsel's consideration.
22         THE COURT:  Detailed?  Are we talking 502(d) or
23 something else?
24         MR. ANDERS:  502(e), I believe.  Well, we will ask
25 your Honor to so order it.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

90

C28rdasc

1          THE COURT:  You can do one that says if you do the
2    following 52 steps, then we should be covered under 502(d).
3    That's great, but when step 49 got screwed up somewhere, you've
4    lost your protection.  It seems to me that 502(d) can say that
5    unless you intended to waive the privilege, whether you were
6    sloppy or careful, you retain the privilege and you get the
7    clawback.  I'm happy to sign an order that says exactly that.
8    If you all want to do it a different way --
9          What I dislike and what I usually refuse to sign are
10   orders that purport to be 502(d) orders that really do nothing
11   better than repeat the language of 502(b), as in "boy," which
12   is already a federal rule in place.
13         MR. ANDERS:  Let me review the language in our
14   confidentiality agreement.  I just want to make sure that the
15   language we have in place is sufficient to cover us.
16         THE COURT:  Did I sign the confidentiality agreement?
17         MR. ANDERS:  I don't believe so.  I don't believe it
18   was you, your Honor.
19         THE COURT:  Then it probably isn't right.  I'm happy
20   to give you the plain vanilla protected against anything except
21   an intentional waiver 502(d) order.  That is almost all it has
22   to say.  Write it up as a separate the document and submit it
23   to me, preferably by consent.  I can't imagine why there would
24   be any objection.
25         MR. ANDERS:  Thank you, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

91

C28rdasc

1       THE COURT:  Now are we done with the protocol?

2       MS. BAINS:  I guess the last thing is defense doesn't

3  want to put anything in the protocol about its preservation

4  obligations.

5       THE COURT:  That's what that got to do with the

6  protocol as opposed to the Zubulake Compensation Committee?

7       MS. BAINS:  It's in a lot of the model protocols.

8  There are extensive sections on it.

9       THE COURT:  What is it you want it to say?  Is that in

10  the draft in front of me in any way?

11       MS. BAINS:  Yes.  Just a couple of sentences here and

12  there.  I didn't understand what the problem was.

13       THE COURT:  Give me the page.

14       MR. ANDERS:  It essentially says that we agree to

15  preserve everything in their section C.  My concern, your

16  Honor, is we understand our obligation, we have an obligation

17  to preserve.  I don't see why we need to sign another

18  agreement, especially when their proposal had longer time

19  frames than we had agreed to, has different sources that we had

20  disagreement over.  We have an obligation to preserve.  We have

21  sent out the preservation notices at least three separate

22  times.  I don't see why I need to sign another agreement now on

23  the preservation issue.

24       MS. BAINS:  Because of the phasing.

25       THE COURT:  What paragraph?  What page, what

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

C28rdasc
1   paragraph?
2           MR. ANDERS:  It appears in a few different places,
3   your Honor.  The first time it appears is --
4           MS. BAINS:  (b), page 2.
5           THE COURT:  That's near the beginning.
6           MR. ANDERS:  At page 2, (b)(1).
7           THE COURT:  I don't see that this does anything.
8   Indeed, if you do it your way and then don't hold something
9   from a source other than a source in paragraph C, you've given
10  them a free ride on something that is otherwise required to be
11  held under Zubulake Pension Committee and the like.
12          In addition, since so far you have not been able to
13  prove to me that a lot of the systems that we killed have
14  anything to do with this case.  I don't want to hear it today
15  at 2 to 6:00, but if someone came to me and said, I want a
16  preservation order, Judge, that says I do not need to preserve
17  anything in source XYZ, etc., I might well agree to that.
18          MS. BAINS:  OK.  Lastly, the issue tags.  Plaintiffs
19  have inserted definitions of what the issue tag would mean so
20  that the system is accurate, the reviewers are looking for the
21  right things.  We think we should have some language in there
22  for what each issue tag means rather than just two words.
23          THE COURT:  First of all, I assume, with the number of
24  documents we are talking about for the seed set, that the
25  review is going to be done by high-level attorneys.

93

C28rdasc

```
 1              MR. ANDERS:  Yes.
 2              THE COURT:  If you all want to try to write something,
 3    that's fine.  I'm not sure what page on that you want me to
 4    look at, or what attachment.
 5              MS. BAINS:  It's on page 24.  Given that a high-level
 6    attorney is going to be reviewing and will see the documents,
 7    if it becomes an issue, we'll deal with it later.
 8              THE COURT:  OK.  This may be for the benefit of the
 9    greater bar, but I may wind up issuing an opinion on some of
10    what we did today.  It would be very helpful to now finalize
11    the protocol, without prejudice to anyone's rights to go to
12    Judge Carter, finalize the protocol based on everything that
13    was agreed or directed today and submit that back to me
14    quickly.
15              How soon can I get that?  That I assume will mean
16    largely taking out the argument parts of the protocol of
17    plaintiff wants this and defendant wants that and merely show
18    what's in phase 1, what's in later phases or not in a phase,
19    the five rounds, the seven rounds, etc.
20              MR. ANDERS:  Can we do it by next Friday?
21              THE COURT:  Sooner if you can.
22              MR. ANDERS:  Certainly.
23              MS. BAINS:  As in next week, Friday?
24              THE COURT:  I'd rather have it a week from today,
25    which is next Wednesday.  Where does Lincoln come in?  You
```

94

C28rdasc

1 probably work through Lincoln.
2          MR. ANDERS:  That's probably the 20th.
3          THE COURT:  Presidents Day is the 20th.  Lincoln's
4 birthday is going to be either the 13th or the 14th.  Thursday
5 the 16th, does that work for all of you?
6          MR. ANDERS:  Yes, your Honor.
7          MS. BAINS:  Sure.  Can we set an intermediate deadline
8 to have a draft from one party to the other?  It became a
9 problem last time because we didn't have enough time to review
10 it.
11          THE COURT:  Sure.  Who is drafting it?
12          MR. ANDERS:  I'll draft it, your Honor.
13          THE COURT:  Can you get them a draft by Monday?
14          MR. ANDERS:  Yes, your Honor.
15          THE COURT:  Good.
16          MS. BAINS:  Thank you.
17          THE COURT:  With all due respect to both of you, if I
18 have to start doing Mickey Mouse of who does a draft to whom
19 when on something somewhere between what's already on paper so
20 all you have to do is delete all the arguments and the things
21 that one side or the other lost -- it should be a no-brainer.
22 You will have the transcript.  Really, if you all can't do
23 this, you're going to encourage me greatly to give you a
24 special master and run your bills up instead of me dealing with
25 all of you.

95

C28rdasc

1          MR. BRECHER:  Judge, I have one quick issue, if I can,
2    before we end.
3          THE COURT:  Yes.  We are also going to have to pick a
4    date for your next visit here.
5          MR. BRECHER:  The plaintiffs served a third-party
6    subpoena yesterday on ADP.  I'm just asking, in light of the
7    Court's ruling today, whether that subpoena was going to be
8    withdrawn so that we can avoid further motion practice.
9          MS. BAINS:  Yes, if we get the W-2's from the
10   defendant, we can withdraw that.
11         MR. BRECHER:  Thank you.
12         THE COURT:  Withdraw it now, period, without prejudice
13   if the W-2 issue somehow doesn't work.
14         MS. BAINS:  Sure.
15         MR. BRECHER:  Thank you, your Honor.
16         THE COURT:  When do you all want to come back?
17         MS. NURHUSSEIN:  Your Honor, if I could address one
18   more issue very quickly?  I need about 30 seconds.
19         THE COURT:  Sure.  I have to remember to start giving
20   you six-hour conference blocks.
21         MS. NURHUSSEIN:  I just want to note, your Honor, that
22   since the last conference we have been conferring with the
23   defendants regarding the jurisdictional discovery requests.  We
24   have had meet-and-confers with the defendants, some follow-up
25   correspondence regarding some of the outstanding discovery.  We

96

C28rdasc

1   received a response from Publicis yesterday which we are
2   reviewing.
3             I discussed with Mr. Evans, counsel for Publicis just
4   before this conference.  What we proposed is that the parties
5   confer again this week and then submit to the Court a proposed
6   schedule on jurisdictional discovery.  We are trying to narrow
7   the discovery disputes and reach agreement on any additional
8   time that we need.
9             THE COURT:  Good.
10            MS. NURHUSSEIN:  Thank you, your Honor.
11            THE COURT:  I guess the other thing is since there is
12  going to be lots of cooperation and iteration, what sort of
13  deadline do you want me to impose on everything you're all
14  doing collectively to make the predictive coding end up?  Or
15  should I leave you to your own devices?
16            MR. ANDERS:  Your Honor, it's tough for me to estimate
17  how long it's going to take.  We are going to start on it right
18  away, obviously.  It's just tough to give a time estimate right
19  now.
20            THE COURT:  That means we will probably get you in for
21  conferences sooner rather than later to make sure things are
22  moving along.  With that, when do you all want to come back?
23            MS. BAINS:  The first week of March.
24            MR. ANDERS:  The 5th and the 7th are good for me, your
25  Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

97

C28rdasc

```
 1              THE COURT:  The amount of time you all need, are you
 2   free on the 8th in the morning?
 3              MR. ANDERS:  I have a deposition that day, your Honor.
 4              THE COURT:  What about the 9th?
 5              MR. ANDERS:  That looks good, your Honor.
 6              MS. BAINS:  That's fine.
 7              THE COURT:  I'm going to give you a date of March 9 at
 8   9:30.  I may have to move that date to earlier in that week.
 9   I'm supposed to be talking at an e-discovery conference or a
10   conference with an e-discovery session on the 9th, but I'm
11   trying to bail out of that because I just don't have time for
12   it.  It depends on whether they can get someone to replace me,
13   since I said I was going to do it.  Right now I'm assuming that
14   I'm replaceable.  If that changes, we'll let you know.
15              For the last time perhaps but so it's on the record
16   again, pursuant to 28 U.S.C. Code section 636, Federal Rules 6
17   and 72, any party aggrieved by any of my rulings has 14 days,
18   calendar days, to bring objections to Judge Carter.  Failure to
19   file objections constitutes a waiver for all purposes.
20   Obviously, not a waiver on anything that I said is a phase 1
21   versus phase 2, other than if you want it in phase 1.  In other
22   words, anything that I said you may get later but you are not
23   getting now is probably not ripe for review.  But you'll figure
24   that out and objections filed with Judge Carter will figure
25   that out.
```

98

C28rdasc

1          Failure to file objections within the 14 day period
2    constitutes a waiver for all purposes, including appeal.  The
3    14 days starts immediately regardless of how soon you get the
4    transcript because you have heard the rulings.  In any event,
5    because I think you're all going to need the transcript and I'm
6    certainly going to need the transcript because of all the
7    protocol-related decisions made on it, I'm going to direct both
8    sides to split the cost 50-50 for an expedited transcript.
9    That means, since we have kept Tom late, as soon as he can get
10   it, which is probably Friday, maybe, Monday at the latest.
11          I think that's it.  Is there something I forgot to do?
12   I don't think so.
13          (Adjourned)
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300