UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS LLP
*ATTORNEYS FOR DEFENDANT MSLGroup*
58 South Service Rd., Ste. 410
Melville, New York 11747
(631) 247-0404
     ATTORNEYS OF RECORD:
         BRETT M. ANDERS, ESQ.
         JEFFREY W. BRECHER, ESQ.
         VICTORIA WOODIN CHAVEY, ESQ.

--------------------------------------------------------------X

MONIQUE DA SILVA MOORE,
MARYELLEN O'DONOHUE, LAURIE
MAYERS, HEATHER PIERCE, and
KATHERINE WILKINSON, on behalf of
themselves and all others similarly situated,

               Plaintiffs,       Case No. 11-cv-1279 (ALC) (AJP)

      vs.

PUBLICIS GROUPE SA and
MSLGROUP,

            Defendants.

--------------------------------------------------------------X

**DEFENDANT MSLGROUP'S OPPOSITION TO
PLAINTIFFS' RULE 72(A) OBJECTION TO
MAGISTRATE JUDGE PECK'S FEBRUARY 8, 2012 RULINGS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY ..................... 2

ARGUMENT .............................................................................................. 6

I.    Standard of Review ........................................................................... 6

II.   Judge Peck's Discovery Rulings Were Neither Clearly Erroneous Nor
      Contrary to Law ............................................................................... 7

      A.    Judge Peck's Decisions Are Consistent With Rule 26. ........................... 8

            1.    Plaintiffs Provide No Support For Their Assertion
                  Regarding The Completeness Of MSL's Final E-Mail
                  Production. .................................................................... 8

            2.    Discovery Need Not Meet A Standard Of Perfection. ............. 11

      B.    Federal Rule Of Evidence 702 Is Not Applicable ................................ 13

      C.    Plaintiffs' Concerns Regarding The Reliability Of The ESI
            Protocol Are Sufficiently Addressed Within The Protocol And
            Are, At Best, Premature. .............................................................. 15

            1.    The ESI Protocol Does Contain Standards For
                  Assessing And Measuring Reliability. ............................... 15

            2.    The Measurement Standards Contained Within The
                  ESI Protocol Are Appropriate. ....................................... 17

                  i.    The ESI Protocol Sets Forth An Appropriate
                        Standard of Acceptance. ..................................... 17

                  ii.   The ESI Protocol Is Not Inconsistent With
                        Recommind's Patent. .......................................... 19

                  iii.  Plaintiffs' Arguments Regarding A Defined
                        Standard of Relevance Ignore The Parties' Prior
                        Agreement. ...................................................... 20

3.      Plaintiffs' Arguments Regarding The Reliability Or Efficacy Of The Process Are Premature.....................................21

D.      Judge Peck's Ruling Regarding Production Of W-2s Was Not Clearly Erroneous Or Contrary To Law.............................................23

CONCLUSION ......................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Autotech v. Automationdirect.com,*
248 F.R.D. 556 (N.D. Ill. 2008) ................................................................7

*Cedar Petrochemicals, Inc., v. Dongbu Hannong Chemical Co., Ltd.,*
2011 U.S. Dist. LEXIS 110715 (S.D.N.Y. Sept. 28, 2011) ......................7

*Cendant Mortgage Corp. v. Saxon Nat'l Mortgage,*
492 F. Supp. 2d 119 (E.D.N.Y. 2007) .....................................................6

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579, 113 S. Ct. 2786 (1993) ....................................................13

*Gibbs v. Bank of America Corp.,*
2011 U.S. Dist. LEXIS 136013 (E.D.N.Y. Nov. 28, 2011) .....................6

*Graves v. Deutsche Bank Securities, Inc.,*
2011 U.S. Dist. LEXIS 140429 (S.D.N.Y. Dec. 5, 2011) ...................7, 23

*In Re Agent Orange Product Liability Litigation,*
517 F.3d 76 (2d Cir. 2008) ......................................................................6

*In Re Consolidated RNC Cases,*
2009 U.S. Dist. LEXIS 40293 (S.D.N.Y. Jan. 8, 2009) ..........................7

*Kay Beer Distrib., Inc. v. Energy Brands, Inc.,*
2009 U.S. Dist. LEXIS 108451 (E.D. Wis. Nov. 12, 2009) ...................22

*Moody v. Turner Corp.,*
Case No. 1:07-cv-692 (S.D. Oh. September 21, 2010) ..........................12

*Moody v. Turner Corp.,*
Case No. 1:07-cv-692 (S.D. Ohio September 21, 2010) .........................12

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,*
685 F. Supp. 2d 456 (S.D.N.Y. 2010).........................................7, 11, 19

*Rimkus Consulting Group, Inc. v. Cammarata,*
688 F. Supp. 2d 598 (S.D. Tx. 2010).................................................7, 12

*Southern Capital Enters., Inc. v. Conseco Servs., L.L.C.,*
2008 U.S. Dist. LEXIS 87618 (M.D. La. Oct. 24, 2008).......................22

iii

*United States v. O'Keefe,*
    537 F. Supp. 2d 14 (D.D.C. 2008) ...................................................................11

*Victor Stanley, Inc. v. Creative Pipe, Inc.,*
    250 F.R.D. 251 (D. Md. 2008) ..........................................................11, 14, 18

*William A. Gross Const Assocs., Inc. v. Am. Mfrs. Mul. Ins. Co.,*
    256 F.R.D. 134 (S.D.N.Y. 2009) .................................................................11, 14

**RULES**

*Fed. R. Civ. P. 1* ........................................................................................................7

*Fed. R. Civ. P. 26* ..............................................................................................8, 11, 12

*Fed. R. Civ. P. 26(a)(1)* ...........................................................................................13

*Fed. R. Civ. P. 26(b)(2)* ...........................................................................................25

*Fed. R. Civ. P. 26(b)(2)(C)* ..........................................................................7, 13, 21, 22

*Fed. R. Civ. P. 26(g)(1)(A)* ......................................................................................13

*Fed. R. Civ. P. 26(g)(1)(B)* ......................................................................................13

*Fed. R. Civ. P. 72(a)* ....................................................................................6, 8, 15, 17, 21

*Fed. R. Evid. 104(a)* ...........................................................................................13, 14

*Fed. R. Evid. 702* ................................................................................................13, 14

**OTHER AUTHORITIES**

*Baron, J. & Paul G., Information Inflation: Can the Legal System Adapt?*
    *http://law.richmond.edu/jolt/v13i3/article10.pdf* .....................................................9

*Cormack, Grossman, Hedin, Oard, Overview of TREC 2010 Legal Track (Feb. 21, 2012),*
    *at p. 6, available at http://trec.nist.gov/pubs/trec19/papers/LEGAL10.OVERVIEW.pdf* ..........9

*Cormack, Technology-Assisted Review in E-Discovery Can Be More Effective and More
    Efficient Than Exhaustive Manual Review, XVII Rich. J.L. & Tech. 11, 48 (2011),
    available at http://jolt.richmond.edu/v17i3/article11.pdf* ..........................................2

*Jason R. Baron, Law in the Age of Exabytes, J.L. & TECH. 9 (2011), available at
    http://jolt.richmond.edu/v17i3/article9.pdf* ..........................................................10

*Overview of the TREC 2009 Legal Track, available at
    http://trec.nist.gov/pubs/trec18/papers/LEGAL09.OVERVIEW.pdf* .................................10

*Overview of TREC 2010 Legal Track, available at http://trec-
    legal.umiacs.umd.edu/other/legal10m.pdf* ............................................................................ 9

*Roitblat, Kershaw, and Oot, Document categorization in legal electronic discovery:
    computer classification vs. manual review, Journal of the American Society for
    Information Science and Technology, 61(1):70-80 (2010)* ...................................................... 9

*Second Edition (The Sedona Conference Working Group Series, 2007), available at
    http://www.thesedonaconference.org* ............................................................................... 7, 12

*The Sedona Conference Commentary on Achieving Quality in the E-Discovery Process,
    10 SEDONA CONF. J. 299 (2009, )http://www.thesedonaconference.org/
    dltForm?did=Achieving_Quality.pdf* ....................................................................................... 18

Defendant, MSLGroup Americas, Inc. ("MSL"), hereby submits this memorandum in opposition to Plaintiffs' Objection to Magistrate Judge Peck's February 8, 2012 discovery rulings.

## PRELIMINARY STATEMENT

Plaintiffs' Objection to Magistrate Judge Peck's February 8, 2012 rulings should be denied. The Objection fails to satisfy Plaintiffs' "heavy burden" to establish any legal or factual deficiency in the ESI Protocol entered by Judge Peck, as the Magistrate Judge's rulings on non-dispositive pre-trial matters are entitled to "substantial deference." Instead, Plaintiffs seek to generate concern about using advanced technology to facilitate the discovery process in a case, like this, that involves significant volumes of electronic data. Plaintiffs argue that their challenge to Judge Peck's rulings is based on such principles as "completeness" and "reliability," but, in fact, their Objection ignores the extensive reviews that are built into the ESI Protocol, the transparency that it requires from beginning to end, and the thoroughness of the iterative process by which the technology identifies relevant documents. Moreover, in addition to raising objections that are legally and/or factually deficient, Plaintiffs offer no potentially viable suggestions or alternatives to the phantom issues they raise. After several months of negotiation between the parties through their experienced counsel, the extensive involvement by both parties' ESI consultants, and the careful guidance of Judge Peck, who is a national leader in the field of e-discovery, the ESI Protocol outlines a process that is more than reasonable and is consistent in all respects with prevailing case law and applicable rules.

The ESI Protocol entered by Judge Peck, including the application of "predictive coding" to reasonably cull down the volume of documents which will then be reviewed manually for relevance, confidentiality and privilege, is supported by the Federal Rules of Civil Procedure as well as applicable case law. Plaintiffs offer no valid basis upon which to conclude that this type of technology-assisted review is any less effective or reliable than other more commonly used

1

techniques (e.g., manual review, keyword searching, etc.).  In fact, conspicuously absent from Plaintiffs' Objection to Judge Peck's rulings is any mention of the effectiveness of these other techniques and the fact that these other techniques have been found to be *less effective* than predictive coding.[1]   Indeed, although Plaintiffs extensively reference the Text Retrieval Conference ("TREC") to support the metrics they provide regarding the effectiveness of predictive coding, they fail to mention that the data gathered from TREC supported the conclusion that technology-assisted review is ***more effective*** and ***more efficient*** than manual review.[2]

For the reasons set forth more fully below, and given the heavy burden that Plaintiffs bear in seeking to reverse the non-dispositive rulings of Judge Peck, MSL respectfully submits that Plaintiffs' Objection should be dismissed.

### FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY

Plaintiffs' objections relate to discovery rulings that Judge Peck made at an extended discovery conference held on February 8, 2012.  Prior to the conference, the parties had engaged in extensive discussions regarding the development of an ESI Protocol, specifically, a protocol that governed the manner in which the parties would conduct a search of the millions of documents that had been collected from various e-mail accounts.

Given the large volume of documents to be reviewed, and the fact that manual reviews and even keyword searching have been found to be ineffective or overly costly, MSL selected the Axcelerate Review Software by Recommind in May 2011.  During the parties' first conference scheduled for e-discovery on June 10, 2011, Plaintiffs' counsel was advised of MSL's intended use of Axcelerate.  Thereafter, as early as October 21, 2011, MSL formally advised Plaintiffs in

---

[1] *See, e.g.,* Maura R. Grossman & Gordon v. Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, XVII Rich. J.L. & Tech. 11, 48 (2011), *available at* http://jolt.richmond.edu/v17i3/article11.pdf.

[2] *Id.* FN 1, In summarizing the 2009 TREC official results Grossman and Cormack conclude: "Overall, the myth that exhaustive manual review is the most effective – and therefore, the most defensible – approach to document review is strongly refuted. Technology-assisted review can (and does) yield more accurate results than exhaustive manual review, with much lower effort."

writing of their general plan and manner of use of the predictive coding features of Axcelerate. (*See* Declaration of Brett M. Anders ("Anders Decl.") at Exhibit A.)  On November 3, 2011, MSL provided Plaintiffs with more information regarding the framework for the proposed ESI Protocol, including the identities of additional custodians whose e-mail accounts MSL had agreed to collect and the issue codes that MSL proposed to utilize as part of the predictive coding process, as well as the e-discovery costs incurred to date and its position on proportionality.  (*Id.* at Exhibit B.)

Discussions regarding the various provisions of the ESI Protocol continued and, on January 25, 2012, the parties submitted a proposed ESI Protocol for Judge Peck's consideration. (*Id.* at Exhibit C.)  Because the parties disagreed regarding several aspects of the protocol, the protocol submitted to Judge Peck contained the parties' respective positions concerning these disputed aspects of the protocol.

As it relates to the ESI Protocol and the proposed search methodology, predictive coding is a form of technology-assisted review designed to improve the speed and efficiency of culling through large sets of data to reduce the number of documents that will be reviewed manually for relevance, confidentiality and privilege.  The predictive coding workflow set forth in the ESI Protocol that MSL proposed is generally as follows:  First, all of the information in the e-mail accounts of specific individuals for a specified time period are collected and imported into a database. Next, a random sample of documents within the database is reviewed by senior attorneys familiar with the case and coded for relevance.[3]  The results of the random sample are then used as a benchmark to enable the parties to later gauge the effectiveness of the process.

---

[3] A double-pass subject matter expert review was used in this case to improve the quality of the initial seed set generation. Although this double review process may not be required in most cases, it was considered necessary here for quality control purposes in view of the initially vague and general relevancy guidance provided by the requesting party.  For that reason, the first-pass expert review was performed by associate attorneys who specialize in employment law matters, and then reviewed again by the partner specialists ("merits" or trial counsel) who are responsible for the overall conduct on the case and have been personally involved in all communications with the counsel for the requesting party (*i.e.*, Plaintiffs' counsel).

The next step involves the creation of a "seed set" of documents that will be used to train the software as to the types of documents that are relevant to the case. The ESI Protocol utilizes a multifaceted approach to generate the seed set, which includes the active participation of Plaintiffs' counsel. Specifically, both Plaintiffs and MSL supplied keywords they believed were likely to identify documents relevant to the case. Given the volume of documents identified as a result of the keyword searches, a sampling of the documents will be reviewed by counsel for MSL and coded as relevant or not relevant and, if relevant, placed into one or more of eight possible issue categories. (These issue categories assist the software in understanding the connection between documents and making predictions of relevancy.) In addition, Plaintiffs' counsel will be provided with copies of the documents reviewed as well as how they were coded, so they can advise as to whether they disagree with the coding designation for a particular document. For example, Plaintiffs may take the position that a document coded as "not relevant" is, in fact, relevant and, if agreement cannot be reached between the parties, the issue of relevance can be resolved by the Court as it would in any other discovery dispute.

In addition to utilizing keywords to help generate the initial seed set of documents to train the software, counsel for MSL also proposed targeted searches for documents in response to several of Plaintiffs' specific document requests, which, along with other judgmental sampling reviews, will be used as part of the seed set.

Once the seed set has been generated, and any disputes regarding the relevance of certain documents have been resolved, the software will analyze the seed set of documents and, based on that analysis, review all of the documents in the database, returning those documents the software deems similar in nature, and thus, relevant to the lawsuit. In addition, the documents will be given a ranking from zero to one hundred, which will enable the reviewers to focus their attention on the documents with a higher relevance ranking, as well as spot check documents with lower relevance

scores.  The software also will automatically create "concept groups" where similar documents will be grouped together.  By looking at the concept groups to see if any of the groups contain relevant documents, counsel for MSL also will be able to target their review and coding to concept groups which may contain a high percentage of relevant documents.  Counsel for MSL will review a minimum of 500 documents returned by the software – and potentially more – and code them as either relevant or not relevant, as well as code them based on issue category.  This subsequent coding further trains the software by showing where it correctly predicted a document as being relevant by issues and where its prediction was incorrect.  As with the generation of the seed set, all of the documents reviewed during this phase, including irrelevant non-privileged ones, will be provided to Plaintiffs' counsel along with an indication as to how the documents were coded so that Plaintiffs' counsel can provide feedback.

This process, known as the iterative training phase, will be repeated up to seven times and, during each round, the software will continue to learn about the case and the types of documents that are relevant. The protocol also provides that the iterative training phase may cease before the conclusion of seven rounds if, between two successive rounds, the number of documents returned by the software changes by less than 5%.[4]

At the end of the iterative training phase, but before the final review of all the documents predicted to be relevant by the software during the last training round, a second random sample will be taken from the remainder of documents in the database (i.e., those documents which were not selected by the software as relevant).  This is the last quality control phase where the parties,

---

[4] Although Plaintiffs seek to cast aspersions on the process based on the statement that there was "no science" behind the decision to consider concluding the up to seven rounds of iterative training if the number of predicted relevant documents returned between two successive rounds was less than 5%, their argument is misplaced. A cut-off point before seven iterations is reasonable and appropriate for efficiency purposes when there is very little change between rounds.  The quality control of a final random sample remains in place. The threshold of 5% is a trigger at which point the second random sample would be taken and reviewed to determine the likely number of relevant documents remaining in the database and whether any of them were likely to be *highly relevant*.  It is this analysis of the actual results that is important, where not only the number of documents but the nature of any remaining relevant documents will be scrutinized.

including Plaintiffs' counsel, will have an opportunity to review a sampling of the documents not selected by the computer to confirm that no highly relevant documents exist and, to the extent there are relevant documents, that they are only of marginal relevance or cumulative in nature. Any disagreement regarding the reliability of the process can then be presented to the Court along with any evidence based on the actual results of the process. Thereafter, the final step will be for MSL to review all of the documents that were returned as a result of the final iteration and produce those documents which are relevant and not privileged.

On February 8, 2012, Judge Peck heard extensive argument regarding the proposed ESI Protocol and ruled on the ESI Protocol, including, *inter alia*, the manner in which predictive coding will be applied. On February 17, 2012, the parties submitted a joint ESI Protocol to the Court, which incorporated Judge Peck's rulings. Thereafter, on February 22, 2012, at 11:49 p.m. (EST), Plaintiffs filed their objections to Judge Peck's rulings.[5] On February 24, 2012, Judge Peck issued a written order and opinion memorializing the rulings from February 8, 2012. (*See* Anders Decl. at Exhibit F.)

## ARGUMENT

### I.   *Standard of Review*

Magistrate Judges have broad discretion in resolving discovery matters, and a party seeking to overturn a discovery order bears a heavy burden. *Gibbs v. Bank of America Corp.*, 2011 U.S. Dist. LEXIS 136013, *3 (E.D.N.Y. Nov. 28, 2011) (noting that the standard of review is "highly deferential"); *see also In Re Agent Orange Product Liability Litigation*, 517 F.3d 76, 103 (2d Cir. 2008). The District Court's review of a discovery order is not de novo. *Cendant*

---

[5] At the February 8, 2012 conference, Judge Peck ordered that all submissions be submitted to the Court by 6:00 p.m., or else they would be deemed received on the following day. (*See* Dkt. No. 94: Nurhussein Decl. at Exhibit A, p. 14:4-16.) Pursuant to *Fed. R. Civ. P.* 72(a), any objections to Judge Peck's rulings must be filed within 14 days (i.e., by February 22, 2012). Here, Plaintiffs did not file their objections until 11:49 p.m. on February 22, 2012 – after the 6:00 p.m. deadline. (*See* Dkt. No. 93: Pls. Rule 72(a) Objection.) Therefore, based on Judge Peck's rule, it should not be deemed filed until February 23, 2012, in which case, the Objection is untimely.

*Mortgage Corp. v. Saxon Nat'l Mortgage*, 492 F. Supp. 2d 119, 124 (E.D.N.Y. 2007). Rather, a non-dispositive order of a Magistrate Judge is afforded "substantial deference" and, pursuant to Rule 72(a), may be set aside only if the order is clearly erroneous or is contrary to law. *Graves v. Deutsche Bank Securities, Inc.*, 2011 U.S. Dist. LEXIS 140429 (S.D.N.Y. Dec. 5, 2011).

An order is "clearly erroneous" when the reviewing court, based on the entire record, is left with the definite and firm conviction that a mistake has been committed. *In Re Consolidated RNC Cases*, 2009 U.S. Dist. LEXIS 40293, *16 (S.D.N.Y. Jan. 8, 2009). An order is "contrary to law" when it fails to apply or misapplies relevant statutes, case law or rules of procedure. *Id.* As noted, the party seeking to overturn a Magistrate Judge's discretion carries a "heavy burden." *Cedar Petrochemicals, Inc., v. Dongbu Hannong Chemical Co., Ltd.*, 2011 U.S. Dist. LEXIS 110715, *3 (S.D.N.Y. Sept. 28, 2011). Plaintiffs have not met their burden.

## II.     *Judge Peck's Discovery Rulings Were Neither Clearly Erroneous Nor Contrary to Law*

Judge Peck's rulings on February 8, 2012 were fully consistent with *Federal Rules of Civil Procedure*[6] and applicable case law. When responding to discovery – and in particular, electronic discovery – the Rules do not require perfection. *See, e.g.*, *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 461 (S.D.N.Y. 2010). Rather, the Rules require that the parties engage in "reasonable efforts" and what is reasonable "depends on whether what was done – or not done – was proportional to that case …" *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tx. 2010); *see also The Sedona Principles: Second Edition* (2007), p. 17 cmt. 2.b.[7] ("Electronic discovery burdens should be proportional to the

---

[6] *See Fed. R. Civ. P. 1 and 26(b)(2)(C)(i), (iii).*

[7] The formal title is *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production*, Second Edition, (The Sedona Conference Working Group Series, 2007), *available at* http://www.thesedonaconference.org (hereinafter "*The Sedona Principles*"). In resolving e-discovery disputes, courts will rely upon the principles adopted by the Sedona Conference, "a non-profit legal policy research and educational organization […] comprised of judges, attorneys, and technologists experienced in electronic discovery and document management matters." *See Autotech v. Automationdirect.com*, 248 F.R.D. 556, 560 n.3 (N.D. Ill. 2008).

amount in controversy and the nature of the case.  Otherwise, transaction costs due to electronic discovery will overwhelm the ability to resolve disputes fairly in litigation.")

### A. *Judge Peck's Decisions Are Consistent With Rule 26.*

Plaintiffs' first argument in objection to Judge Peck's ruling with respect to the ESI Protocol is that it will prevent Plaintiffs from receiving relevant discovery because MSL's ultimate e-mail production will be "alarmingly under-inclusive" and "*grossly* exclude a large volume of responsive email."  (*See* Dkt. No. 93: Pls. Rule 72(a) Objection at pp. 7-8) (emphasis in original). In addition, Plaintiffs erroneously assert that the ruling "provides unlawful 'cover' for MSL's counsel, who as a duty to 'certify' that their client's document production is 'complete' and 'correct' as of the time it was made." (*Id.* at p. 8, n.7.)  Both of these arguments lack merit.

1. <u>Plaintiffs Provide No Support For Their Assertion Regarding The Completeness Of MSL's Final E-Mail Production.</u>

Plaintiffs offer no support for their statements that MSL's ultimate e-mail production will be "alarmingly under-inclusive" or "*grossly* exclude a large volume of responsive e-mail." (*Id.* at pp. 7-8.)  These statements are nothing short of sheer speculation by Plaintiffs' counsel.  Indeed, noticeably absent from Plaintiffs' Objection are citations to any support for these representations. For this reason alone, MSL respectfully submits that the Court should give no weight or consideration to Plaintiffs' unsupported statements regarding the results of a search that has not even commenced.

Moreover, and contrary to the unsupported and speculative statements by Plaintiffs, studies have shown that the use of predictive coding can be *more* effective and efficient than a linear manual review of every document in a collection – especially in large collections like the one in this case where fatigue, inattention, poor comprehension and data entry errors can cause human

reviewers to incorrectly code documents.[8]   For example, in the 2009 TREC study cited by Plaintiffs, the qualitative results showed that the recall of the manual reviewers varied from about 25% to about 80%.  (*See* Grossman, Cormack, *supra* note 1, at p. 37.)  That is, for a review conducted solely by humans – the so-called "gold standard" -- the "human assessors missed between 20% and 75% of all relevant documents." (*Id.*)  Furthermore, when comparing the results of a manual review with a technology-assisted review, the 2009 TREC study showed that the technology-assisted review was far superior and, on average, produced an $F_1$ score of 80% compared to a score of 36% for the manual review.  (*Id.* at p. 37, Table 7.)[9]  (The $F_1$ score, otherwise referred to as the "harmonic mean," is a combination of the recall score and precision score and typically is used as the final score in measuring accuracy.)[10]

The official report of the 2010 TREC Legal Track testing was just released on February 21, 2012.  (Cormack, Grossman, Hedin, Oard, *Overview of TREC 2010 Legal Track, available at* http://trec-legal.umiacs.umd.edu/other/legal10m.pdf.)  One of the most interesting findings, which we understand is new for TREC in the 2010 tests, is the rate of human agreement on documents identified as relevant. The tests showed that, on average, the relevancy determinations were only consistent among reviewers 50% (actually 49.6%) of the time.  (*Id.* at pg. 30.)  This means that half of the time the professional reviewers disagreed on whether a document was relevant.  This

---

[8] Grossman, Cormack, *supra* note 1, at 39.  *See also* Roitblat, Kershaw, and Oot, *Document categorization in legal electronic discovery: computer classification vs. manual review*, Journal of the American Society for Information Science and Technology, 61(1):70–80 (2010).
[9] Further, given the volume of documents to be reviewed in this case – approximately 2.4 million based on the Magistrate Judge's rulings concerning the applicable time period of January 1, 2008 until February 24, 2011 – it is anticipated that a manual review of 2.4 million documents would require approximately 24,000 attorney hours. (Based on the industry standard that a skilled attorney reviewer, with a good software review platform, can now review approximately 100 documents per hour. Baron, J. & Paul G., *Information Inflation: Can the Legal System Adapt?*, 13 RICH. J.L. & TECH. 10, at pg. 13 (2007), *available at* http://law.richmond.edu/jolt/v13i3/article10.pdf (assumed a more conservative 50 documents per hour). Therefore, not only do the studies cited above demonstrate that a manual review of the e-mail database for this matter likely would be less effective than a technology-assisted review, but the anticipated time and cost to conduct such a review would be astronomical.
[10] Cormack, Grossman, Hedin, Oard, *Overview of TREC 2010 Legal Track*, (Feb. 21, 2012), at p. 6, *available at* http://trec-legal.umiacs.umd.edu/other/legal10m.pdf.

lack of consistency between human reviews proves, once again, the necessity of technology-assisted review.

Plaintiffs further ignore the fact that studies and experience both show that keyword searching can also be incredibly ineffective as a method for identifying relevant documents. This has been proven many times, beginning with the classic study by information scientists David C. Blair and M.E. Maron, which found that the actual recall for keyword searching was only 20%. (Grossman, Cormack, *supra* note 1, at p. 18 (citing study by D.C. Blair and M.E. Maron).)

Similarly, in the 2009 TREC Legal Track to which Plaintiffs refer, the results of the study found that, on average, keyword searching substantially underperformed the other methods tested. Hedlin, Tomlinson, Baron, Oard, *Overview of the TREC 2009 Legal Track*, *available at* http://trec.nist.gov/pubs/trec18/papers/LEGAL09.OVERVIEW.pdf.   In fact, in one of the tasks, the negotiated keywords had an average recall of less than 4%, which means that the keywords missed 96% of the relevant documents. (*Id.* at Section 3.10.9.)

Therefore, not only do Plaintiffs fail to substantiate their assertion that use of predictive coding as outlined in the ESI Protocol will "*grossly* exclude a large volume of responsive email," but Plaintiffs fail to offer any reasonable alternative that will be more effective and achievable at a reasonable cost.   Conversely, as Judge Peck recognized, the use of predictive coding has been shown through numerous studies likely to be more effective than the potential alternatives of manual review and/or keyword searching.   This view is in accord with the majority of experts of legal search.[11]   The ineffectiveness of keyword searching also is in accord with the leading judicial scholars in this small field.[12]

---

[11] *The Sedona Conference Commentary, supra*, 10 SEDONA CONF. J. at 302 ("The legal profession is at a crossroads: the choice is between continuing to conduct discovery as it has 'always been practiced' in a paper world – before the advent of computers [and] the Internet . . . or, alternatively, embracing new ways of thinking in today's digital world"); Jason R. Baron, *Law in the Age of Exabytes*, XVII RICH. J.L. & TECH. 9 (2011), *available at* http://jolt.richmond.edu/v17i3/article9.pdf, at Section 32: "Easily fitting under the umbrella term "[n]ew

More importantly, to verify that the final production is not "alarmingly under-inclusive," the ESI Protocol entered by the Court includes a procedure to test the efficacy of the process. Specifically, in Section E.8, entitled "Quality Control by Random Sample of Irrelevant Documents," prior to conducting the final review of documents, a random sample of documents that were excluded by the program as irrelevant will be reviewed to determine whether any "hot" or "highly relevant" documents were excluded or whether, to the extent that any relevant documents remain, whether they are of the same nature and quality of documents already identified or are of marginal relevance. (*See* Dkt. No. 94: Nurhussein Decl. at Exhibit B, p. 17.) This section of the ESI Protocol also provides Plaintiffs with the opportunity to object based on the results of the random sample and, if the parties are unable to resolve any disputes regarding the results of the final random sample, apply to the Court for relief.

### 2. Discovery Need Not Meet A Standard Of Perfection.

Plaintiffs' arguments pursuant to Rule 26 also are based on the mistaken assumption that, through the discovery process, they automatically are entitled to receive every relevant document, regardless of the burden or expense in finding and producing it, and whether there are more efficient and less costly alternatives to discovering relevant facts. Given the ever-expanding volume of electronic information that is available, in many cases it is neither reasonable, nor appropriate, for a party to incur the expense of searching for and producing every relevant document. *See Pension Comm.*, 685 F. Supp. 2d at 461 (noting that "[i]n an era where vast amounts of electronic information is available for review, discovery in certain cases has become

---

'[i]nformation [c]oncepts' [i]n the [p]ractice of [l]aw" is a fusion of various techniques well known for decades by information retrieval scientists as forms of latent semantic indexing, and going under such currently fashionable names as "predictive coding," "clustering" technologies, "content analytics," and "auto-categorization," among many others … Such methods present the possibility for greatly increasing present rates of document review because they provide the possibility to reduce the overall manual search burden on counsel, thereby dramatically reducing review costs."

[12] Judge Andrew Peck, *William A. Gross Const Assocs., Inc. v. Am. Mfrs. Mul. Ins. Co.*, 256 F.R.D. 134, 134, 136 (S.D.N.Y. 2009); Judge Paul Grimm, *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 261-62 (D. Md. 2008); Judge John Facciola, *United States v. O'Keefe*, 537 F. Supp. 2d 14, 24 (D.D.C. 2008).

11

increasingly complex and expensive. Courts cannot and do not expect that any party can meet a standard of perfection.")

For example, in the *Moody v. Turner Corp.*, Case No. 1:07-cv-692 (S.D. Ohio September 21, 2010),[13] when faced with the plaintiff's argument that defendants did not conduct a search for "all" documents within their custody or control, the Court largely denied the plaintiff's demand for additional documents and held that:

> [t]he increasing amount of electronic information in the possession of parties to litigation has caused discovery in some cases to become increasingly complex and expensive. In this Court's view, **the mere availability of such vast amounts of electronic information can lead to a situation of the ESI-discovery-tail wagging the poor old merits-of-the-dispute dog.**

*Id.* at 9 (emphasis added).

Contrary to Plaintiffs' arguments, the goal of Rule 26 should be to provide litigants with the most relevant documents as well as the documents reasonably needed to prosecute or defend their claims. *See Rimkus*, 688 F. Supp. 2d at 613 ("Whether preservation or discovery conduct is acceptable in a case depends on what is *reasonable*, and that in turn depends on whether what was done—or not done—was *proportional* to that case…"); *The Sedona Principles*, p. 57 cmt. 11 ("A responding party may satisfy its good faith obligation to preserve and produce relevant electronically stored information by using electronic tools and processes, such as data sampling, searching, or the use of selection criteria, to identify data reasonably likely to contain relevant information.")

Here, the ESI Protocol entered by the Judge Peck is wholly transparent, provides Plaintiffs with ample opportunity to participate in both the seed set creation phase as well as the iterative

---

[13] A true and correct copy of the unpublished decision Moody v. Turner Corp., Case No. 1:07-cv-692 (S.D. Oh. September 21, 2010) is attached to Anders Decl. at Exhibit D.

training phase, and includes a quality control check prior to the final review of documents for production to ensure that highly relevant documents have not been missed by the program. (*See* Dkt. No. 94: Nurhussein Decl. at Exhibit B, pp. 10-18.) As a result, Plaintiffs cannot demonstrate that the Judge Peck's ruling was clearly erroneous or contrary to law.

### 3.   Judge Peck's Ruling Does Not Run Afoul Of Fed. R. Civ. P. 26(g).

Plaintiffs' assertion that Judge Peck's ruling somehow violates Rule 26(g) should be readily dismissed because Plaintiffs have misread the rule to conflate the standards for disclosures and discovery responses.   Rule 26(g)(1)(A) requires a certification of completeness for a party's "disclosure," referring to the mandatory initial disclosures required by Rule 26(a)(1).   However, Rule 26(g)(1)(B), which applies to discovery responses, does not require a certification of completeness, but rather, incorporates the concept of proportionality found in Rule 26(b)(2)(C). Therefore, Judge Peck's rulings do not conflict with Rule 26(g), and are not clearly erroneous or contrary to law on this basis.

### B. *Federal Rule Of Evidence 702 Is Not Applicable.*

Plaintiffs also argue, for the first time,[14] that the rulings were "clearly erroneous and contrary to law" because the Judge Peck did not apply F.R.E. 702 and the *Daubert*[15] standard or take sworn expert testimony regarding the effectiveness of the ESI Protocol.   These requirements, however, do not apply to the methods used to take discovery, but apply only to evidence sought to be admitted at trial.   Accordingly, Plaintiffs' argument under Rule 702 and *Daubert* should be rejected.

Judge Peck has already addressed this issue in the February 24, 2012 Ruling memorializing the decisions that are the subject of this appeal. (*See* Anders Decl. at Exhibit F, Dkt. No. 96: February 24, 2012 Ruling, p. 15) ("[Rule] 702 and ... *Daubert* ... deal with the trial

---

[14] Plaintiffs never raised the alleged need for expert testimony on the ESI Protocol with Judge Peck.
[15] Referring to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

court's role as gatekeeper to exclude unreliable expert testimony from being submitted to the jury at trial ... It is a rule for <u>admissibility</u> of evidence at trial.") (Emphasis in original.)

Judge Peck's Ruling in this regard is supported by relevant case law. For example, in *Gross*, the Court held: "This Court need not now decide whether expert testimony is required [as to a search and retrieval methodology]; what is required is something other than a lawyer's guesses, without client input, and without any control testing to see if the search terms produce reasonably all the responsive ESI and limited false positives." *Gross*, 256 F.R.D. at 136, n 3. *See also Victor Stanley*, 250 F.R.D. at 261, n.10 (D. Md. 2008) (cited by Plaintiffs for proposition that "the trial judge must rely on the aid of experts [when considering use of a novel methodology]," but court expressly noted that "Fed. R. Evid. 702 and 104(a) [are not] 'engrafted' into the rules of discovery in civil proceedings"). Plaintiffs simply are incorrect in their assertion that *Victor Stanley* requires expert testimony regarding the methodology selected by a party to search for electronically stored information. Rather, this case only requires that the selected methodology was carefully planned by qualified persons, contains provisions for quality assurance, and is supported by persons with the requisite qualifications and experience. *Victor Stanley*, 250 F.R.D. at 260, n.10.

Here, the ESI Protocol entered by Judge Peck more than satisfies these guidelines. The search protocol was carefully planned by MSL's outside counsel, who are well-qualified to design an effective search methodology. These attorneys acted with the assistance, guidance, and expert advice of Recommind, MSL's e-discovery vendor and consultant.[16] Moreover, the protocol contains multiple provisions for quality assurance, including broad disclosures. For all the reasons set forth herein, Plaintiffs' argument under Rule 702 thus fails.

---

[16] In connection with this opposition, MSL submits the declarations of Eric Seggebruch and Jan Puzicha at Recommind to provide further information regarding the effectiveness of the ESI Protocol ordered by Judge Peck.

**C. *Plaintiffs' Concerns Regarding The Reliability Of The ESI Protocol Are Sufficiently Addressed Within The Protocol And Are, At Best, Premature.***

Plaintiffs' final argument is that the ESI Protocol either: (i) does not contain standards for assessing reliability; or (ii) includes measurements that are not reliable standards. Plaintiffs' arguments, however, lack merit because they ignore the quality control standards contained within the protocol as well as the transparency of the process, which includes participation by Plaintiffs' counsel at several key stages. In addition, Plaintiffs' arguments are premature because a determination of the effectiveness of the process in identifying the most relevant documents can be made only during or after the process, at which point the parties – and the Court – will be in a position to assess the documents actually predicted by the software to be relevant.

1. The ESI Protocol Does Contain Standards For Assessing And Measuring Reliability.

While Plaintiffs continue to assert that this is a "standardless protocol,"[17] and assert "there is no way to be certain if MSL's method is reliable," they are wrong. (Dkt. No. 93: Pls. Rule 72(a) Objection at p. 13.) To the contrary, the parties – including Plaintiffs – will be able to assess the reliability of the process: (i) during the creation of the seed set; (ii) during the iterative review training process; and (iii) through the use of random sampling both before and after the training of the system. (Dkt. No. 94: Nurhussein Decl. at Exhibit B, pp. 10-18.)

For example, during the development of the seed set and each iterative training round, Plaintiffs will receive copies of all documents that were reviewed (as well as whether they were coded as relevant or not relevant), and will have an opportunity to challenge the coding designation (including the coding as to issue tags). In fact, the ESI Protocol entered by Judge Peck calls for a "triple-pass review," which provides for three different levels of review to check

---

[17] In an article appearing in Law360, Plaintiffs' counsel, Janette Wipper, Esq., was quoted as stating "Despite Magistrate Judge Peck's apparent eagerness to issue the first opinion endorsing predictive coding, his decision to accept defendant's standardless ESI protocol will ultimately prove to be a set-back to the federal judiciary's potential acceptance of predictive coding as a reliable discovery search method." (See Exhibit E to Anders Decl.)

the reliability of the process (i.e., by counsel for MSL (first level of review), by Plaintiffs' counsel (second level of review), and the Court (if necessary, third level of review)).[18]

Moreover, Plaintiffs fail to mention in their Objection that the generation of the seed set of documents also will include a review of a random sample of 4,000 documents identified as a result of Plaintiffs' proposed keywords. In fact, the document attached as Exhibit C of the ESI Protocol represents the third iteration of Plaintiffs' proposed keywords and reflects Plaintiffs' current modifications based on the results of prior keyword searches Plaintiffs requested be performed.[19] Therefore, Plaintiffs' own keywords will be utilized to identify documents to train the system and, based on the transparent nature of the process, Plaintiffs will be able to verify that the keyword hits were coded correctly.

In addition, through the use of random sampling – both before and after the iterative training rounds – the parties will be able to assess the reliability of the results. Specifically, at the very beginning of the process, a random sample of 2,399 documents[20] was drawn from the entire database as it existed at the time. (*Id.* at p. 13.) Each of those documents was reviewed by an associate, and then a partner-level attorney, and were coded as relevant or not relevant. Thereafter, as a final measure of quality control, the ESI Protocol calls for a second random sample of 2,399 documents to be drawn at the conclusion of the last iterative training round. This random sample will be drawn from the documents not identified as relevant by the software. The

---

[18] Importantly, this triple-pass review is far more robust and balanced than the procedure used by TREC where all adjudications on relevancy appeals are made only by the topic authority for the producing party. The requesting party or neutral judge has no role in the TREC simulation of a request for production. *See* FN 10, *Overview of the TREC 2010 Legal Track*, at pgs. 18-22 (Task Design).

[19] It is worth noting that, even after being revised twice, Plaintiffs' proposed keywords resulted in 1,368,218 documents being identified and several search terms resulting in more than 100,000 hits. If nothing else, these metrics provide further evidence of the ineffectiveness of keyword searching – especially as it relates to this matter. (Dkt No. 94-1: Nurhussein Decl. at Exhibit C to Exhibit C.)

[20] This number of 2,399 documents represents a confidence level of 95% with a confidence interval of +/- 2%. Importantly, during the February 8, 2012 hearing, Plaintiffs' ESI consultant agreed with the sample size of 2,399 documents. (Dkt No. 94-1: Nurhussein Decl. at Exhibit A, pp. 59-61.) We note that this representation by Plaintiffs' ESI consultant before Judge Peck is *inconsistent* with his representation in paragraph 49 of his certification in support of Plaintiffs' Objection.

purpose of this final random sample is to determine both the number of any relevant documents that may not have been captured by the review process (through comparison to the first random sample), as well as the nature of the documents (i.e., are any of the documents "hot" documents or highly relevant, or do they consist of only marginally relevant documents). This element of the ESI Protocol was explained to the Magistrate Judge during the February 8, 2012 conference (Dkt. No. 94-1: Nurhussein Decl. at Exhibit A, pp. 74-75) and incorporated into the February 24, 2012 Ruling. (Dkt. No. 96: February 24, 2012 Ruling at pp. 11-12, 16.)

Therefore, despite Plaintiffs' press statements and arguments to this Court, the ESI Protocol <u>does</u> contain numerous, substantial standards for measuring the reliability of the process, including a triple-pass review during the seed set generation and iterative training phase, a high level of transparency, and the use of before and after random sampling.

2.  <u>The Measurement Standards Contained Within The ESI Protocol Are Appropriate.</u>

Plaintiffs argue that the measurement standards set forth in the ESI Protocol are not reliable. For example, Plaintiffs argue that the protocol "fails to state the standard of acceptance [it is] trying to achieve" and is not consistent with Recommind's patent and "with what is generally accepted as best practice." (Dkt. No. 93: Pls. Rule 72(a) Objection at p. 17.) Plaintiffs' arguments, however, are misguided and incorrect.

i.  <u>The ESI Protocol Sets Forth An Appropriate Standard of Acceptance.</u>

The ESI Protocol, as further explained by Judge Peck in the February 24 Ruling, sets forth appropriate standards for gauging its effectiveness. Specifically, Section E.8 of the ESI Protocol calls for a random sample to be taken at the conclusion of the iterative training phase to allow the parties to analyze the types of documents that remain in the database and were not selected by the software. (Dkt. No. 94: Nurhussein Decl. at Exhibit B, pp. 17-18.) If there is a dispute, the Court

will evaluate the nature of the documents that were not selected by the software, as well as the costs incurred by MSL, and then make a determination as to whether additional rounds of iterative training need to be conducted, or whether some other search method needs to be used for a particular issue or type of document. (Dkt. No. 96: February 24, 2012 Ruling, p. 16.) As Judge Peck explained, "In the final sample of documents deemed irrelevant, are there any relevant documents found that are "hot," "smoking gun" documents (i.e., highly relevant)? Or are the only relevant documents more of the same thing." (Id. at p. 17.) Therefore, the final quality control will depend more on the *nature* of any relevant documents not selected by the software, as opposed simply to the *number* of relevant documents not selected.

Moreover, Plaintiffs are incorrect that rigid and mechanical standards are required for a discovery review process to be appropriate.[21] This position is inconsistent with prevailing standards. *See, e.g., The Sedona Conference Commentary on Achieving Quality in the E-Discovery Process*, 10 SEDONA CONF. J. 299 (2009)[22] p. 12 (hereinafter the "*Sedona Conference Commentary*") ("it is not surprising that objective benchmarks, standards and regulations specific to the governing of this process do not exist"); *see also Victor Stanley*, 250 F.R.D. at 260, n.10 (noting that the goal of TREC – to create uniform standards and "industry best practices" – has not yet been met and still needs to be developed.)[23] Rather, in determining when to cease the iterative process of sampling and refinement, the *Sedona Conference Commentary* cited above provides that the process stops when "the acceptable threshold of accuracy defined for

---

[21] In their Objection, Plaintiffs also assert that the ESI Protocol, and specifically the limitation on the number of iterative training rounds, is inconsistent with "generally accepted best practice." (Dkt. No. 93: Pls. Rule 72(a) Objection, p. 16.) However, the declaration from Plaintiffs' ESI consultant in no way explains – or even mentions – this so-called "generally accepted best practice." Therefore, MSL respectfully requests that the Court disregard any argument by Plaintiffs or their ESI consultant that the number of iterative training rounds is insufficient.

[22] This publication can be found at http://www.thesedonaconference.org/dltForm?did=Achieving_Quality.pdf.

[23] MSL notes that this statement by Magistrate Judge Grimm in *Victor Stanley* directly contradicts the following representation by Plaintiffs: "The Text Retrieval Conference (TREC), a project of the National Institute of Standards and Technology (NIST), ... has established reliability standards for e-discovery search methods." (Dkt. No. 93: Plaintiffs' Rule 72(a) Objection at p. 1.) Simply put, Plaintiffs' statement that TREC has established defined standards is false.

the project" is met.  10 SEDONA CONF. J. 299 at p. 18.  As set forth above, both the ESI Protocol and Judge Peck's February 24, 2012 Ruling establish this "acceptable threshold" as one which appropriately considers the principles of proportionality, relevancy, and cumulatively.  For example, Judge Peck specifically advised the parties to "[m]ake sure you're keeping track of your costs in ways that you will be able on both sides to present to the Court not for reimbursement <u>but for proportionality as to where you draw the line.</u>"  (Dkt. 94: Nurhussein Decl., Exhibit A at p. 88:7-10) (emphasis added).

For these reasons, MSL respectfully submits that the ESI Protocol does contain an appropriate measure of reliability and that Judge Peck's rulings enforcing the protocol were not clearly erroneous or contrary to law.

> ii.   <u>The ESI Protocol Is Not Inconsistent With Recommind's Patent.</u>

As set forth in the attached Declaration of Eric Seggebruch at Recommind, the workflow set forth in Recommind's patent as it relates to the use of their Axcelerate (predictive coding) software is designed, in part,  to uncover relevant documents, regardless of the level or degree of relevance (i.e., highly relevant v. marginally relevant) and regardless of whether the process results in a large number of duplicative or cumulative documents being produced and regardless of the cost. (Seggebruch Decl. at ¶ 8.)  In other words, the workflow or protocol as set forth in the patent seeks to achieve perfection – i.e., the identification of all relevant documents.[24]  However, the standard of perfection is not required in litigation, and certainly not required when attempting to sift through a database of approximately 2.4 million documents.  *Pension Comm.*, 685 F. Supp. 2d at 461.

---

[24] This same argument holds true for the Recommind marketing materials attached as Exhibits 1 and 2 to the Neale Decl.  That is, the workflows described in those documents, are for situations – such as TREC – where the ultimate goal was to identify all relevant documents regardless of burden or expense.  (Seggebruch Decl. at ¶¶ 7-8.)

Furthermore, Mr. Seggebruch certified that it is not uncommon for the workflow described in Recommind's patent to be modified on a case-by-case basis depending on the needs of the particular matter. (Seggebruch Decl. at ¶ 7.)  Therefore, the fact that the workflow for the instant matter differs from what is explained in the referenced patent or marketing materials is neither relevant nor uncommon.  As the Declaration of Dr. Jan Puzicha makes clear, counsel for MSL worked with Recommind, including the software's designer – Dr. Jan Puzicha – to develop a search protocol that would be effective as well as consistent with the concept of proportionality. (Puzicha Decl. at ¶¶ 6, 13.)

        iii.       <u>Plaintiffs' Arguments Regarding A Defined Standard Of Relevance Ignore The Parties' Prior Agreement.</u>

Plaintiffs argue that the ESI Protocol is flawed because it does not contain a "defined standard of relevance." (*Id.* at p. 14.)  Plaintiffs appear to be referring to the fact that the "issue tags"[25] that appear in Section E.3 of the ESI Protocol (e.g., Reorganization, Termination, Compensation, etc.) do not have specific definitions.  The parties discussed this issue, however, at the conference on January 4, 2012, and agreed that it was unnecessary to have lengthy definitions for each of these terms since Plaintiffs will see how the documents are being coded for issues and have an opportunity to comment/object if they believed a document was miscoded.  (Anders Decl. at ¶ 2.)  In any event, because there have been numerous rulings already in this case regarding the discoverability of various categories of documents, and because Plaintiffs will have an opportunity to comment as to how the documents are coded, it is unnecessary to now include further definitions within the body of the protocol.

---

[25] These issue tags are used by the software to help categorize the documents and learn relationships between the documents, both of which assist the software in identifying relevant documents based on concepts. (Seggebruch Decl. at ¶ 10.)

3. <u>Plaintiffs' Arguments Regarding The Reliability Or Efficacy Of The Process Are Premature.</u>

Plaintiffs' arguments regarding the reliability of the ESI Protocol are premature because, as explained above, the effectiveness and reliability of the process – in the context of this litigation – cannot be analyzed in a vacuum.  Moreover, Plaintiffs' ESI consultant's application of "recall" and "precision" to the ESI Protocol in this matter is misguided because an analysis of the process cannot be reduced simply to a mathematical formula.  While recall and precision are valid measures of reliability, they lose their effectiveness when a valid process is one where perfection is not required and it is acceptable not to uncover every relevant document.  For example, Plaintiffs' ESI consultant criticizes the protocol because it does not contain a specific score for recall and precision that would be acceptable.  (Dkt. No. 95: Neale Decl. at ¶ 33(C).)[26]

Specifically, Plaintiffs use the example of what would happen if the final random sample contained 20 relevant documents?  That is, would that be acceptable under the protocol or not?[27] (Dkt. No. 93: Pls. Rule 72(a) Objection, pp. 15-16.)  This is not a question, however, that can be answered mechanically by a formula, without actual information regarding the results and without consideration Rule 26(b)(2)(C).  Pursuant to the applicable rules and case law cited at length above, the answer will depend on the nature of the documents (i.e., are they highly relevant or more of the same) as well as the cost incurred by MSL.  If the twenty documents were similar to other documents already located through the search process and were merely cumulative, then the Rules may not require them to be produced.  *Fed. R. Civ. P.* 26(b)(2)(C) (limiting discovery that is

---

[26] It is important to note that the ESI Protocol submitted to Judge Peck which contained Plaintiffs' position on the various provisions did not include any proposal for specific recall and precision scores.  (Anders Decl. at Exhibit C.)

[27] Plaintiffs at no time provided any proposed language as to what standard they believe would be appropriate.  For example, when the parties provided Judge Peck with a copy of the joint ESI Protocol on January 25, 2012, which contained each of the parties competing provisions, the only difference between MSL's provision on quality control and Plaintiffs' provision on quality control was the number of documents in the random sample.  (Anders Decl. at Exhibit C, Section E.8.) Although Plaintiffs now criticize the ESI Protocol because this section allegedly does not have enough detail, during the negotiation process, Plaintiffs failed to provide any alternative language that was more specific or contain the precise standards they now reference.

unreasonably cumulative or duplicative, or if the burden or expense of the proposed discovery outweighs its likely benefit). The point is, Judge Peck, who is a nationally recognized judicial scholar and expert in e-discovery, especially search protocols, was not simply "kicking the can down the road" as Plaintiffs argue, but making a reasonable determination that a final decision could not be rendered without more information regarding the actual results of the process – a determination that was in no way clearly erroneous or contrary to law.

Furthermore, as Judge Peck correctly notes, this decision cannot be made in a vacuum and another important consideration is the cost to MSL to produce the documents which were already identified as relevant. (Dkt. No. 96: February 24, 2012 Ruling at p. 16.) That is, the Court must be in a position to consider not only nature of the documents retrieved and not retrieved, but the cost incurred by the producing party as well as the potential cost of conducting further searches as compared to the likely incremental benefit. *See* Rule 26(b)(2)(C); *see also Southern Capital Enters., Inc. v. Conseco Servs., L.L.C.*, 2008 U.S. Dist. LEXIS 87618, at *7 (M.D. La. Oct. 24, 2008) ("[p]erfection in document production is not required… [a]t this point in the litigation, the likely benefit that could be obtained from [further discovery] is outweighed by the burden and expense"); *Kay Beer Distrib., Inc. v. Energy Brands, Inc.*, 2009 U.S. Dist. LEXIS 108451, at *4 (E.D. Wis. Nov. 12, 2009) ("[t]he mere possibility of locating some needle in the haystack of ESI . . . does not warrant the expense").

In light of the above, Judge Peck correctly noted that Plaintiffs' Objection concerning the "reliability" of the process were premature and that "[i]n order to determine proportionality, it is necessary to have more information than the parties (or the Court) now has, including how many relevant documents will be produced and at what cost to MSL." (Dkt. No. 96: February 24, 2012 Ruling at p. 16.) Without this information, the Court cannot assess whether it is necessary, reasonable or proportional to require further searches. Again, Judge Peck was not simply "kicking

the can down the road," but making a reasoned determination – a determination that was in no way clearly erroneous or contrary to law.

> **D.    Judge Peck's Ruling Regarding Production Of W-2s Was Not Clearly Erroneous Or Contrary To Law.**

Plaintiffs have not identified any error of law in Judge Peck's ruling regarding the production of W-2s. They do not cite a single statute, rule, or precedent that Judge Peck allegedly violated. Rather, their Objection makes clear that they just disagree with the ruling. Because the Magistrate Judge's ruling is owed "substantial deference," however, Plaintiffs' Objection to the ruling about W-2s should be rejected in the absence of any alleged error of law. *See Graves*, 2011 U.S. Dist. LEXIS 140429 (S.D.N.Y. December 5, 2011).

Plaintiffs' Objection also fails on the issue of W-2s because it relies on a misstatement of the relevant facts. Plaintiffs did not request the W-2s in discovery at all. Instead, Plaintiffs initially sought a "database or computerized information" from which information could be obtained concerning "compensation, including salary…. including data from Box 5 of W-2 form".[28] In response, MSL produced human resources data from its PeopleSoft database, which contained the requested salary information. This information specifically included salary, raises, and bonuses.[29] This information is more than sufficient to meet Plaintiffs' initial request and obviously permits comparison of compensation levels of various employees.

Plaintiffs, however, wanted more. They wanted the annual wage amount stated on each individual's W-2, even though they did not provide any explanation to the Court regarding how this information is more relevant than information regarding an employee's annual salary, which

---

[28] *See* Dkt. No. 93: Pls. Rule 72(a) Objection at p. 18, Plaintiffs' Request for Production No. 1.

[29] Plaintiffs' counsel acknowledged: "What we currently have now is bonus data, which had to be reproduced because it was incorrect, and then also the annual rate of pay, which is the rate assigned to an employee . . ." (*See* Anders Decl. at Exhibit G, Jan. 4, 2012 Transcript., p. 29.)

they had.[30] (Dkt. 94: Nurhussein Decl., Exhibit A at pp. 14-18.)  MSL explained to Plaintiffs and

to the Court at the January 4 conference that W-2s are not kept in an electronic format so as to

permit MSL to extract the data from Box 5 electronically; it would have to be extracted manually.

(*See* Anders Decl. at Exhibit G, Jan. 4, 2012 Transcript, p. 29.)  Indeed, Plaintiffs had requested

only a "database or computerized information," and the fact that W-2s are saved on a CD does not

mean that the data is kept electronically—the W-2s are simply saved as PDF documents on a CD,

no different than if they were printed on single pieces of paper and put in a stack.  Moreover, the

PDFs are sorted by year, not by person, and the CDs contain W-2s for *all* MSL employees, not

only those within the scope of the putative class.  Thus, a CD containing only the class members

could not be produced without manually identifying and printing the class members' W-2s, and

then creating a new CD containing only these documents.  Accordingly, Judge Peck stated at the

January 4, 2012 conference that if MSL could produce in an electronic format the amount each

class member was paid, it should do so, but if not, the parties were to "work it out." (*Id.* at p. 30.)

　　　Subsequently, MSL produced, in an electronic format, each class member's earnings at the

close of each year, pulled from a source other than the W-2s.  Instead of "working it out,"

however, at 8:06 p.m. the night before the February 8, 2012 conference before Judge Peck,

Plaintiffs filed a letter motion asking for sanctions, complaining the electronic compensation data

was not accurate.

　　　After considering MSL's production of compensation data, and Plaintiffs' inability to

explain the need for the W-2s, the Court *still* did not deny Plaintiffs' request, which the Court

certainly had the discretion to do.  Instead, Judge Peck ordered MSL to permit Plaintiffs to review

the W-2s and identify the W-2s they wanted, and then required MSL to produce, after review, the

W-2s they identified.  (Dkt. 94: Nurhussein Decl., Exhibit A at p. 16.)

---

[30]  The W-2 information, for example, would not permit one to compare the wages received by two employees unless
they both completed the full year.

The issue is now moot.  MSL, in accordance with the Court's Order, made the W-2s available.  Plaintiffs then identified the W-2s they wanted, and MSL has produced them.  Plaintiffs complained this process was burdensome, but this is the very process Plaintiffs wished to impose on MSL after it had already produced the information in an electronic format.  The Court was well within its authority to order such relief and to quash a subpoena to ADP that sought the same information.[31]  (*See* Fed. R. Civ. P. 26(b)(2).)  Accordingly, Plaintiffs' objections should be denied.

**CONCLUSION**

Plaintiffs have not met their "heavy burden" to establish that Judge Peck's rulings were in error, and MSL respectfully requests that the Court affirm the rulings of Judge Peck at the February 8 conference.

Dated: March 7, 2012
       Melville, New York

Respectfully submitted,

JACKSON LEWIS LLP
*ATTORNEYS FOR DEFENDANT MSLGROUP*
58 S. Service Road, Suite 410
Melville, New York  11747
Tel.:  (631) 247-4605

By:  _____/s/ *Brett M. Anders*_____
     VICTORIA WOODIN CHAVEY, ESQ.
     JEFFREY W. BRECHER, ESQ.
     BRETT M. ANDERS, ESQ.

---

[31] In light of the Court's ruling regarding production of the W-2s, Plaintiffs withdrew the subpoena at the conclusion of the February 8, 2012 conference before Judge Peck.  (*See* Dkt. 94: Nurhussein Decl., Exhibit A at p. 95.)  Plaintiffs then stated in a letter to the Court that they had "misstated" Plaintiffs' position.  (*See* Dkt. No. 83.)

## CERTIFICATE OF SERVICE

  I hereby certify that on March 7, 2012, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Southern District's Local Rules, and/or the Southern District's Rules on Electronic Service upon the following parties and participants:

Janette Wipper, Esq.
Sanford Wittels & Heisler LLP
555 Montgomery Street,
Suite 1206
San Francisco, CA  94111


George Stohner, Esq.
Paul C. Evans, Esq.
Morgan Lewis Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

                /s/  *Brett M. Anders*
                BRETT M. ANDERS