# EXHIBIT A

Representing Management Exclusively in Workplace Law and Related Litigation



Jackson Lewis LLP
58 South Service Road
Suite 410
Melville, New York 11747
Tel 631 247-0404
Fax 631 247-0417
www.jacksonlewis.com

ALBANY, NY
ALBUQUERQUE, NM
ATLANTA, GA
BALTIMORE, MD
BIRMINGHAM, AL
BOSTON, MA
CHICAGO, IL
CINCINNATI, OH
CLEVELAND, OH
DALLAS, TX
DENVER, CO
DETROIT, MI
GREENVILLE, SC
HARTFORD, CT
HOUSTON, TX
INDIANAPOLIS, IN
JACKSONVILLE, FL
LAS VEGAS, NV
LONG ISLAND, NY
LOS ANGELES, CA
MEMPHIS, TN
MIAMI, FL
MILWAUKEE, WI
MINNEAPOLIS, MN
MORRISTOWN, NJ
NEW ORLEANS, LA
NEW YORK, NY
NORFOLK, VA
OMAHA, NE
ORANGE COUNTY, CA
ORLANDO, FL
PHILADELPHIA, PA
PHOENIX, AZ
PITTSBURGH, PA
PORTLAND, OR
PORTSMOUTH, NH
PROVIDENCE, RI
RALEIGH-DURHAM, NC
RICHMOND, VA
SACRAMENTO, CA
SAN DIEGO, CA
SAN FRANCISCO, CA
SEATTLE, WA
STAMFORD, CT
WASHINGTON, DC REGION
WHITE PLAINS, NY

My Direct Dial Is: 973-451-6305
My Email Address Is: andersb@jacksonlewis.com

October 21, 2011

**VIA EMAIL AND REGULAR MAIL**
Janette Wipper, Esq.
Sanford Wittels, & Heisler, LLP
555 Montgomery Street,
Suite 820
San Francisco, CA 94111

Re: da Silva Moore v. Publicis Groupe SA, et al.
Case No. 11-CV-1279

Dear Janette:

We write in response to your October 13, 2011 correspondence regarding the parties' respective proposals for the discovery of electronically stored information ("ESI").

**Protocol For Collection And Review Of ESI**

As an initial matter, it appears from your letter that Plaintiffs harbor several misunderstandings concerning MSL's proposal as it relates to the collection and review of ESI. First, although MSL believes its proposal of five custodians in addition to the five named Plaintiffs and the two opt-in Plaintiffs was appropriate and reasonable, at no time did MSL state that it would not consider including additional custodians to the list of custodians whose e-mail data will be reviewed during the first phase of e-discovery. To the contrary, MSL remains willing to discuss modifications to the custodian list provided, however, that any such modifications are reasonable and do not unduly burden the search process.

Second, Plaintiffs apparently misunderstand MSL's proposal for conducting a review of ESI in phases. That is, at no time did MSL suggest that potentially relevant sources of ESI never be searched. Rather, given the volume of ESI potentially at issue, MSL proposed that the sources most likely to contain the highest volume of ESI be searched first, namely, the e-mail data of the individuals previously identified by MSL. This approach is consistent with the *Sedona Conference Principles Of Proportionality*, in particular, Principle 2, which provides that "[d]iscovery generally should be obtained from the most convenient, least burdensome and least expensive sources." 11 Sedona Conf. J. 291 (2010). In commenting on the need for proportionality, The Sedona Conference noted that "the court, or the parties on their own






initiative, may find it appropriate to conduct discovery in phases, starting with discovery of clearly relevant information located in the most accessible and least expensive sources. Id. at 297.

MSL already has collected in excess of 2.1 million documents, including e-mail messages and attachments. As previously suggested by Plaintiffs, if MSL was to collect and incorporate the e-mail data for all 51 individuals identified in the Plaintiffs' Initial Disclosures, as well as the additional people identified on page 2 of your October 13, 2011 letter (e.g., "class members, their comparators, human resources staff and many decision-makers at MSL"), it is likely that the number of documents to be reviewed would eclipse 10,000,000. Moreover, this number would be significantly higher if all of the data contained in the several sources identified in the second paragraph of page 2 of your October 13, 2011 correspondence also were incorporated.

It is MSL's position that it is not reasonable – nor proportional – to expect MSL to incur the burden and expense of conducting such an expansive review in the first instance. Rather, MSL proposes that the first phase of the ESI review be limited to a review of the e-mail data for the custodians previously identified by MSL (or as subsequently agreed to by the parties). Once the parties are able to assess the nature, quantity and overall relevance of the documents identified as a result of the review of the email data for the agreed upon custodians, they will be in a better position to evaluate whether the likely incremental benefit of conducting additional searches will outweigh the cost. At that point, the parties can meet and confer regarding what additional sources or custodians may need to be searched and the process for conducting same. Again, at this time MSL is not refusing to conduct additional searches; rather, MSL's position is that process should be conducted in phases so, at each phase, the parties can reevaluate the marginal utility of additional searches as compared to the associated cost. See generally, Southern Capital Enters., Inc. v. Conseco Servs., L.L.C., 2008 U.S. Dist. LEXIS 87618, at *7 (M.D. La. Oct. 24, 2008) ("Perfection in document production is not required.... In these circumstances Rule 26(b)(2)(C)(iii) comes into play. At this point in the litigation, the likely benefit that could be obtained from [further discovery] is outweighed by the burden and expense of requiring the defendants to renew their attempts to retrieve the electronic data.") See also Fed. R. Civ. P. 26(f)(3)(B) (contemplating that discovery may be conducted in phases).

Third, Plaintiffs misunderstand MSL's proposal as it relates to the review of ESI. Contrary to Plaintiffs' October 13, 2011 correspondence, MSL does not propose replacing or eliminating a manual review of e-mail data prior to production. Conversely, MSL does not propose conducting a manual review of each and every electronic document that has been collected. Indeed, it would not be reasonable to expect MSL to conduct a manual review of the 2.1 million documents which have already been collected as any such review would take in excess of 21,000 hours.[1] Therefore, prior to conducting any manual review, the documents

[1] This estimate is based on the assumption that a reviewer can typically review approximately 100 documents per hour.





collected from the agreed upon custodians will have to culled down to a more manageable number. To this end, and similar to Plaintiffs' proposal, MSL proposes utilizing key words as well as the analytical tools available in the Axcelerate review platform, which includes predictive coding, to cull the volume of documents to be reviewed manually. Although this will need to be the topic of further discussions, in general, the culling process will consist of us first manually reviewing and coding a random sample of all documents that have been collected. Based on how these documents are coded for responsiveness, as well as for pre-determined issues, the Axcelerate software will then identify other potentially relevant documents. We would then review a sample of those additional documents identified as being relevant as well as those identified by Axcelerate as being not relevant to evaluate the precision of the search. If necessary, additional documents will be coded until a degree of precision acceptable to both parties is reached. (Of course, if the parties are unable to reach agreement, either is free to bring the matter to the Court for resolution.)

This process also may be supplemented by the use of keywords, either keywords selected by the parties or keywords suggested by the Axcelerate software based on how other documents have been coded. Unfortunately, our efforts in this regard thus far have been hampered by the fact that Plaintiffs have repeatedly refused to set forth with specificity their theories of liability. As a result, it is difficult – if not impossible – for MSL to develop a comprehensive list of search terms. Therefore, we ask that Plaintiffs meaningfully participate in the development of a search and review protocol by providing us with their list of proposed search terms for us to test and/or a complete description of their various theories of liability.

**Proposed Form Of Production For ESI**

As it relates to the form of production, we have been advised by our vendor that their standard format for production is to produce single-page TIFF images with corresponding multi-page text and necessary load files. The load files typically include an image load file as well as a metadata (.DAT) file containing the agreed upon metadata fields. As it relates to the production of native files, it appears your request seeks the production of unredacted ESI not only in native form, but also in multi-page text files. Rather than produce the same information in two different forms, MSL proposes producing all ESI as single-page TIFF images with corresponding multi-page text and necessary load files as our vendor recommends. However, we are agreeable to producing spreadsheets (.xls files) as well as PowerPoint presentations (.ppt files) files in native form as well as any documents that cannot be converted to a TIFF format (e.g., audio or video files such as mp3s, wavs, megs, etc.).

In terms of the metadata fields, we have been advised that although Plaintiffs' list goes beyond what is typically requested, we can accommodate most of the fields. However, our understanding is that we do not have metadata fields for the following categories requested by Plaintiffs: (i) Folder; (ii) ReadFlag; (iii) Importance Flag; (iv) Priority; and (v) ReadReceipt. Therefore, these fields would not be included in the .DAT file. Additionally, for any redacted documents that are produced, MSL proposes that the metadata fields be stripped, with the





exception of BeginBates/EndBates and BegAttach/EndAttach, to prevent the inadvertent disclosure of any information intended for redaction.

Please advise if the above proposal concerning the format of production is unacceptable to you and, assuming it is not, we will prepare a more formalized ESI protocol. Please let me know if you wish to discuss further, in which case, we propose that we schedule a call with our respective ESI vendors available.

**Follow-Up Questions To October 12, 2011 Conference Call On ESI**

Lastly, as it relates to Plaintiffs' follow-up questions to the October 12, 2011 conference call, we are continuing to review the questions you presented and will respond under separate cover or schedule a follow-up telephone call.

* * * * *

In the meantime, please contact us if you have any questions regarding the above.

Very truly yours,

JACKSON LEWIS LLP

Brett M. Anders

BMA

# EXHIBIT B

Representing Management Exclusively in Workplace Law and Related Litigation

jackson lewis
Attorneys at Law

Direct Dial: 973-451-6305
Email Address: andersb@jacksonlewis.com

Jackson Lewis LLP
90 State House Square
8th Floor
Hartford, Connecticut 06103
Tel 860 522-0404
Fax 860 247-1330
www.jacksonlewis.com

ALBANY, NY; ALBUQUERQUE, NM; ATLANTA, GA; BALTIMORE, MD; BIRMINGHAM, AL; BOSTON, MA; CHICAGO, IL; CINCINNATI, OH; CLEVELAND, OH; DALLAS, TX; DENVER, CO; DETROIT, MI; GREENVILLE, SC; HARTFORD, CT; HOUSTON, TX; INDIANAPOLIS, IN; JACKSONVILLE, FL; LAS VEGAS, NV; LONG ISLAND, NY; LOS ANGELES, CA; MEMPHIS, TN; MIAMI, FL; MILWAUKEE, WI; MINNEAPOLIS, MN; MORRISTOWN, NJ; NEW ORLEANS, LA; NEW YORK, NY; NORFOLK, VA; OMAHA, NE; ORANGE COUNTY, CA; ORLANDO, FL; PHILADELPHIA, PA; PHOENIX, AZ; PITTSBURGH, PA; PORTLAND, OR; PORTSMOUTH, NH; PROVIDENCE, RI; RALEIGH-DURHAM, NC; RICHMOND, VA; SACRAMENTO, CA; SAN DIEGO, CA; SAN FRANCISCO, CA; SEATTLE, WA; STAMFORD, CT; WASHINGTON, DC REGION; WHITE PLAINS, NY

November 3, 2011

**VIA ELECTRONIC MAIL**
Janette Wipper, Esq.
Sanford Wittels & Heisler LLP
555 Montgomery Street
Suite 820
San Francisco, CA 94111

Re: da Silva Moore v. Publicis Groupe SA, *et al.*
Case No. 11-CV-1279

Dear Janette:

We are writing in response to your October 13, 2011 letter seeking additional information regarding the sources of electronically stored information ("ESI") discussed during our conference call on October 12, 2011, as well as your October 25, 2001 letter regarding the discovery of ESI.

**I. Defendant MSL's Response To Plaintiffs' Follow-Up Questions To October 12, 2011 ESI Conference Call.**

As you will recall, we participated in a nearly two-hour teleconference with you on October 12, 2011, at which John Grantman, Global Services and Operations Manager for Resources, was available to answer questions posed by you and your e-discovery consultant, Gene Klimov of DOAR Consulting. Following that teleconference, you sent a letter on October 13, 2011 with 34 follow-up questions, in addition to a list of 22 questions that you asked us to answer with regard to each system identified in your questions. In response to this extensive inquiry, Defendant MSL provides the following information:

- As it relates to Adium, a free and open source instant messaging client for Mac OS X, we have confirmed that Defendant MSL supports that application for the limited number of Mac OS X users. Adium is a substitute for the Mac platform since Pidgin (discussed below) does not have a compatible offering for non-Windows, Linux and other UNIX operating systems.

- As it relates to other "social media" or instant messaging systems, MSL provides Pidgin as part of its standard desktop to employees. As explained on the Pidgin






webpage, "Pidgin is a chat program which lets you log in to accounts on multiple chat networks simultaneously." (See http://pidgin.im/about/) We have been advised that the content of any chat message will reside with the messaging provider (e.g., AIM, Yahoo!, Google Talk, MSN Messenger, etc.).

- Since 2008, MSL utilized a performance management program provided by Halogen to conduct performance evaluations. Halogen houses the system and the data resides on Halogen's servers. Upon an employee's separation, the employee's account is deactivated, but any employee data will remain on the Halogen servers.

- MSL utilizes PeopleSoft to record employee data such as date of hire, date of termination, promotions, salary increases, transfers, etc. Such information is retained indefinitely.

- MSL does not utilize any database servers.

- MSL does not utilize any "systems" to manage corporate forms. Rather, commonly used personnel forms are stored on the network on the "North America HR Drive."

- With the exception of Halogen (performance management application) and Vurv/Taleo (talent recruitment application), MSL does not utilize any third-party systems to store data for the Company.

- MSL utilizes ServiceNow as its Help Desk application. This system covers a wide variety of requests by employees computer-related assistance (e.g., troubleshoot incidents, install software, etc.) Logs generally are maintained for seven years.

- MSL does not utilize any mainframes.

- MSL does not utilize any audio recording systems.

- MSL employees do not use unified messaging.

- As it relates to the Lotus Notes database, and as explained by Mr. Grantman during the October 12, 2011 teleconference, all email data is archived to the EMC SourceOne archive system. Any folder structure created by the user is not part of the archived data.





- Hard copy documents concerning personnel matters generally are stored in the employee's personnel file.

Defendant MSL will supplement its response to Plaintiffs' request for follow-up information if and when additional information becomes available.

As to your request that, for each "system" identified, we provide specific information about each system for the time period of 2001 to the present, we object. The specific information requested is delineated in subparts (a) through (v), and seeks information such as the software type and version, the database type, the time zone and geographic location, whether external access is available, etc. This request is overly broad and it would be unduly burdensome to gather the requested information, for the requested time period, for each and every system identified in good faith by Defendant MSL. This is especially true because not every system is believed to possess ESI reasonably related to Plaintiffs' claims and because Defendant MSL has already produced, or will produce, information from a number of the systems identified. Notwithstanding this objection, if there are specific systems that we have identified for which you believe you require additional information, please identify the system as well as the specific additional information requested, along with an explanation as to why the additional information is necessary.

## II. Defendant MSL's Response To Plaintiffs' October 25, 2011 Letter Regarding the Collection And Review of ESI.

As you know, the search and retrieval of potentially relevant ESI in an enterprise of this size requires careful thought, quality control, and testing. We began this planning, search, and culling process months ago, not only in email, but, as we have explained, in other areas and types of ESI as well. Based on our initial inventory and assessment of the client's ESI architecture, we knew that the search and culling of the email collections would be the most difficult and expensive of all ESI sources, and the most useful. We also assumed that the Plaintiffs would want production of emails in their discovery requests. We have focused our efforts and planning accordingly.

The development of appropriate search and information retrieval protocols in a case like this not only requires careful thought, quality control and testing, it also requires cooperation of opposing counsel. The requesting party's disclosure of the specifics of the information desired is especially important for the process to work. The producing and requesting parties need to have a common understanding of relevance to the claims and discovery requests. We attempted to involve Plaintiffs in this process early on, and scheduled our first e-discovery specific conference on June 10, 2011 for that purpose.

You had already disclosed your e-discovery expert and we advised you that we had requested that Ralph Losey of our firm, a nationally recognized expert in this area, to assist us. Mr. Losey prepared for and participated in the June 10th phone conference. He began





disclosures at that time on our preservation efforts and our overall e-discovery plan. We were prepared and expected to have a detailed discussion and disclosure, but you explained that you were not yet ready for such a conference (even though that was the advance stated purpose of the call). You also did not have your expert present for the meeting. We were thereafter forced to go it alone on preservation and e-discovery planning, even though, after the *Dukes* decision, you changed your theory of the case. You have also declined to provide specific guidance on exactly what you are looking for in Defendant MSL's email collection. You advised us during the June 10, 2011 call that Plaintiffs had not yet made any significant requests relating to e-mail, but would be serving a supplemental request relating to e-mail shortly. When you did in the second request specify emails, most of the categories were very broad and general in scope. Hopefully you are now ready to focus on the specifics of what you want us to search for in the email collections of Defendant MSL's key players and we can begin to cooperate in earnest. This is the kind of cooperation that we need to improve the efficacy of our search and relevancy calls.

To facilitate our dialogue regarding collection and review of ESI, we will now provide more detailed disclosures of our efforts in this regard and our proposal for going forward. Please be advised that the disclosures are made to facilitate cooperation and settlement of our discovery issues. These disclosures are not intended as a blanket waiver of our work-protect protections.

As of October 27, 2011 we have loaded into the Axcelerate search and review platform 2,353,327 emails and attachments. This number is after *deNisting* and *deduplication*, both vertical and horizontal. This number is still growing. We are still loading additional custodians to try to accommodate your requests for more expansive first-phase email review. This does not mean that we agree with your requests, but Defendant MSL is paying for their processing, loading, and ongoing hosting charges so that we can analyze the ESI in additional custodian email stores and be ready to make production.

Although we negotiated very favorable rates for Defendant MSL, in view of the broad scope of your ongoing demands for e-discovery, and the volume of information involved, the costs for these services are substantial. Our primary e-discovery vendor, Recommind, Inc., has as of September 30, 2011, billed our client $166,900. This is for their copying and exemplification of client email onto the Axcelerate search and review platform. The $166,900 in costs continue daily with hosting fees and grow in amount each month. The monthly hosting costs are now approximately $15,000 and this charge increases in amount as new data is added.

The Recommind charges are all for e-discovery production related expenses. Our client is incurring other significant costs and expenses related to preservation and collection activities. Obviously, our client also incurred substantial attorney fees related to the preservation and collection issues, and the search process. These fees, currently estimated to be in excess of $80,000, are also not included in the stated $166,900 costs incurred with Recommind.






As you probably know, more and more courts are now awarding external vendor costs to prevailing parties under 28 U.S.C. §1920(4) and Rule 54(d)(1) *FRCP*. *See, e.g., In re Aspartame Antitrust Litigation*, No. 2:06-CV-1732, 2011 (E.D. Penn. Oct. 5, 2011) ($500,000 e-discovery costs award to defendants); *Race Tires America v. Hoosier Racing Tire Corp.*, 2011 WL 1748620 (W.D. Pa. May 6, 2011) ($400,000 award); *Tibble v. Edison International*, 2011 Lexis 94995 (C.D. Cal., July 8, 2011) ($370,000 award that more than offset the plaintiffs' judgment on one of nine counts).

You can expect that if Defendant MSL prevails in this action, it will seek an award of all costs incurred, including the substantial e-discovery expenses incurred with Recommind. We ask that you bear this in mind, and temper your e-discovery demands, knowing that someday your clients may be required to personally pay for the expenses that your demands now necessitate.

The 2,353,327 emails and attachments in Axcelerate now are comprised of the emails stores (after processing, including deduplication) of the following twenty-two custodians:

| | **Custodian** | **Unique Item Count** |
|---|---|---|
| 1. | Lund, Wendy | 311,820 |
| 2. | Fite, Vickie | 265,930 |
| 3. | Wilson, Renee | 232,382 |
| 4. | Brennan, Nancy | 227,051 |
| 5. | Lilien, Tara | 218,347 |
| 6. | Masini, Rita | 185,011 |
| 7. | Dasilva, Monique | 181,508 |
| 8. | Miller, Peter | 173,032 |
| 9. | Perlman, Carol | 153,626 |
| 10. | Tsokanos, Jim | 147,028 |
| 11. | O'Donohue, MaryEllen | 132,441 |
| 12. | Mayers, Laurie | 128,088 |
| 13. | Wilkinson, Kate | 84,439 |





| | | |
|---|---|---|
| 14. | Shapiro, Maury | 46,190 |
| 15. | Kashanian, T | 45,176 |
| 16. | Pierce, Heather | 33,420 |
| 17. | Hubbard, Zaneta | 5,088 |
| 18. | Branam, Jud | 28,532 |
| 19. | Orr, Bill | 12,269 |
| 20. | Dhillon, Neil | 12,000 |
| 21. | Euston, Greg | 24,442 |
| 22. | Hannaford, Donald | 14,909 |

The custodian imports of Branam, Orr, Dhillon, Euston and Hannaford in the list above also have been date range limited. No date range was imposed for any of the other custodians on the list. In fact, we are updating to the present the ESI collected for the *Class A Key Custodians:* Tara Lilien, Jim Tsokanos, Peter Miller, and Maury Shapiro. The particulars of the date range limitation imposed are as follows:

1. Branam (from 7/1/09 to 5/31/10).

2. Orr (from 8/1/06 to 1/1/08).

3. Dhillon (from 9/9/08 to 1/31/09).

4. Euston (from 1/1/08 to 12/31/08).

5. Hannaford (from 6/1/07 to 3/1/08).

We have collected (or are in the process of collecting) the following eight additional custodians with date range restrictions, but their emails have not yet been loaded into the Axcelerate system. When they are added, the 2,353,327 count will increase. We do not have the total counts for these custodians yet, but will share them when we do. The particulars of the date range limitation imposed are as follows:

1. Jordan, Megan (from 2/1/08 to 12/31/09).

2. Rogers, Lisa (from 2/1/08 to 12/31/09).





3. Dencker, Kelly (from 1/1/07 to 2/8/10).

4. O'Kane, Jeanine (from 2/8/10 to present).

5. McLean, Sheila (from 1/1/08 to 12/31/08).

6. McDonough, Jenni (from 1/1/08 to 12/31/08).

7. Baskin, Rob (from 1/1/08 to 12/31/08).

8. Curran, Joel (from 7/1/09 to 5/31/10).

To assist the parties in focusing their search efforts, it will be helpful if Plaintiffs can rank the custodians identified by the parties in order of general importance (e.g., Class A Custodians, Class B Custodians and Class C Custodians). It is our hope that this exercise will enable the parties to reach an agreement as to the true key players in this matter and the individuals most likely to possess relevant ESI.

Further, we want you to know what we believe the top-six issues are that a document, if it is relevant, would relate to. We base relevance broadly on your theory of the case, as we understand it, including, but not limited to, the many general document requests you have made. Please note that even when using subject matter experts for review, as we are now doing for the current analysis and predictive coding seeding, five categories is ideal, and it is not realistic to use more than nine categories, as I think you will find most experts in the field agree. After much work we were able to boil it down to six inclusive issue categories. Further, the artificial intelligence of the Axcelerate software, which is often referred to as the computer-assisted coding functions, has the same issue count limitations. The software bases its predictive coding on the classifications made by the human reviewers on the sample document reviews, the seed sets. Here are the issue codes that we propose to use:

1. **Reorganization** [Documents relating to the formation of MSLGroup and any other alleged "reorganization"]

2. **Promotion** [Documents concerning the decision to grant or deny an employee a promotion]

3. **Work/Life Balance** [Documents relating to workplace flexibility, alternate work arrangements, and complaints, if any, regarding lack of work/life balance]

4. **Termination** [Documents relating to the termination of employees]

5. **Compensation** [Documents relating to initial starting salaries, raises, bonuses, and other compensation]






6. **Maternity** [Documents relating to employees who have taken a maternity leave]

We invite your input on this and look forward to your early comments and suggestions on the proposed codes. We do not purport to impose a particular deadline, but would appreciate your prompt attention to this. Our ongoing efforts to train the computer on relevance will be facilitated by our having a common understanding on the issues that relevant documents may fall into. Such training by review of sample sets of documents is an essential part of modern predictive coding practice using Axcelerate software.

On the issue of predictive coding, based on our prior letters we think there may be some miscommunications on this issue. We are not using the term in this context to speak about the final review and production stage where the use of computer-assisted coding can speed up review. We are speaking of computer-assisted coding to identify relevant documents. We are speaking about the use of so called *concept* type searches and other artificial intelligence techniques to improve the precision and recall of the culling process. It is that search and retrieval process that we were referring to in our prior discussions by use of the generic term of *computer assisted coding* or predictive coding.

It has always been our plan to use the power of the Axcelerate software to assist us in coding or identification of potentially relevant documents for review. This is also in the best interests of your clients because this will allow us to find and produce more relevant documents for the dollar. The extent of the efforts are, of course, always constrained by the costs and the factors enumerated in Rule 26(b)(2)(C). Obviously we all agree that it is not reasonable to have the Defendant MSL review all 2,353,327 documents (or more as the database increases) for relevance. We understand that you are not asking us to do that. What we are proposing is the use of advanced software that can be trained to identify relevant documents to assist in the automated review and culling of the final set of documents, including quality control and testing of the culling process. The final culled-set would then be reviewed by our lawyers, as usual, for relevance, privilege, confidentiality, and the like. In this final review stage we will also use predictive coding and other techniques to speed up the review and improve quality. But that is not what we are discussing now.

The computer-assisted culling process we are using is based on advanced techniques, such as predictive coding, and concept searches, but it also still uses keyword search as an important tool. Indeed, keyword search is just an early, some might say, simplistic, sleepy tool for computer-assisted culling. Still, it is part of the process, and we will soon provide you with detailed reports on the metrics of many of the keywords that we have already tested, and invite your participation in refinement of the terms, including suggestions for testing of additional terms, and Boolean connector limitations. We would like for this to be a collaborative process and are interested in your input.





Although keywords are a part of the process, we want to be clear that we do not think that keyword searches alone are adequate. We hope that you will change you position on this. We want to be cooperative, which our disclosures and invitation to participate here confirm, but if you will not agree to the use of computer-assisted coding in the general manner here described, we will have no choice but to apply to the court for advance approval.

To repeat, it is in your clients', and our client's, best interest to employ the most advanced search systems possible, so if you really are inclined to *agree to disagree* on this issue, we urgently request a telephone conference to include our respective experts on these issues. We know of no rational argument to rely on keywords alone and must assume any continued opposition on your part is based on misunderstandings and miscommunications that discussions should be able to resolve. Still, if we cannot agree, we can at least focus and clarify the exact issues, so that we can make the court's adjudication less burdensome.

There is one other issue that we feel needs to be addressed and clarified at this time, and is also, for us, a non-negotiable threshold item. That pertains to our assessment of proportionality under Rule 26(b)(2)(C) and related case law for first phase email review and production in this case. Simply put, our client is willing to expend up to $200,000 in fees for review and production of emails in first phase of discovery, but no more. In our evaluation this is a not only a reasonable offer, it is a very generous one. If the plaintiffs insist on email discovery requiring greater fee expenditures than that, then they should pay for it.

Please note that the stated $200,000 review fee budget does not include the $166,900 in costs incurred with Recommind, and additional anticipated expenses. The total anticipated costs with Recommind are expected to exceed $200,000. Thus the offer to spend $200,000 in fees for review, when coupled with the $200,000 in costs represents total expenditures for email production alone of $400,000. Again, this does not include fees for other discovery, and it does not include fees and costs for the extensive preservation efforts made, and still being made. Finally, and this is very important, it does not include the at least $50,000 in fees incurred and projected to complete the analysis, planning, quality control, testing and attempted cooperation with you as generally described above to locate the most relevant documents in the 2,353,327, and growing, email/attachment collection. In total this amounts to an offer by Defendant MSL to spend $450,000+ for the efforts to search, locate and produce to plaintiffs the relevant email for the judge of jury to decide this case.

In Defendant MSL's view this is a very generous offer, which is made reluctantly to move this case along and avoid further delay. Defendant MSL is confident that the email, once found, will show Plaintiffs' case to be without merit. This is not an opening offer. We do not have time at this point for any further delays and posturing. This is Defendant MSL's bottom line, one which we jump to immediately as a gesture of our good will and cooperation. We would be happy to clarify this offer and discuss the specifics of the future $200,000+ fee spend, or address any other questions you may have. But Defendant MSL not willing to increase the $450,000 spend amount offered.






Again, if you if you really are inclined to *agree to disagree* on this important cost issue, we again urgently request a telephone conference that includes our respective e-discovery experts for a full discussion. We think it is in everyone's best interest to proceed with the email related discovery and not waste more time and money on motion practice. Still, if we cannot agree, we could at least focus and clarify the exact issues, so that we can make the court's adjudication less burdensome.

* * * * *

We look forward to speaking with you regarding these issues.

Very truly yours,

JACKSON LEWIS LLP

Brett M. Anders

BMA:jg

cc: Siham Nurhussein, Esq. (via electronic mail)
Paul C. Evans, Esq. (via electronic mail)
Victoria Woodin Chavey, Esq. (via electronic mail)
Jeffrey W. Brecher, Esq. (via electronic mail)