# EXHIBIT C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MONIQUE DA SILVA MOORE,
MARYELLEN O'DONOHUE, LAURIE
MAYERS, HEATHER PIERCE, and
KATHERINE WILKINSON, on behalf of
themselves and all others similarly
situated,

                Plaintiffs,

    vs.

PUBLICIS GROUPE SA and
MSLGROUP,

                Defendants.

Case No. 11-cv-1279 (RJS) (AJP)

**PARTIES' PROPOSED PROTOCOL
RELATING TO THE PRODUCTION OF
ELECTRONICALLY STORED
INFORMATION ("ESI")**

### A. Scope

1.   <u>General</u>. The procedures and protocols outlined herein govern the production of electronically stored information ("ESI") by Defendant MSL during the pendency of this litigation. The parties to this protocol will take reasonable steps to comply with this agreed-upon protocol for the production of documents and information existing in electronic format. Nothing in this protocol will be interpreted to require disclosure of documents or information protected from disclosure by the attorney-client privilege, work-product product doctrine or any other applicable privilege or immunity.

2.   <u>Limitations and No-Waiver</u>. This protocol provides a general framework for the production of ESI on a going forward basis. The parties and their attorneys do not intend by this protocol to waive their rights to the attorney work-product privilege, except as specifically required herein, and any such waiver shall be strictly and narrowly construed and shall not extend to other matters of information not specifically described herein. All parties preserve their attorney client privileges and other privileges and there is no intent by the protocol to in any way waive or weaken these privileges. All documents produced hereunder are fully protected

and covered by the parties' confidentiality and clawback agreements and orders of the Court effectuating same.

     3.   Relevant Time Period.

      **Plaintiffs' Position:** January 1, 2008 through February 24, 2011 for all non-email ESI relating to topics besides pay discrimination and for all e-mails. January 1, 2005 through February 24, 2011 for all non-e-mail ESI relating to pay discrimination.[1]

      **Defendant's Position:** January 1, 2008 through February 24, 2011 for all non-email ESI relating to topics besides pay discrimination and for all e-mails. January 1, 2005 through February 24, 2011 for all non-e-mail ESI relating to pay discrimination for New York Plaintiffs.

  B. ESI Preservation

     1.   **Plaintiffs' Position:** Defendant MSL has issued litigation notices to designated employees on February 10, 2010, March 14, 2011 and June 9, 2011. Defendant MSL agrees to continue to enforce the litigation hold of information located in the Sources outlined below under section C.

      **Defendant's Position:** Defendant MSL has issued litigation notices to designated employees on February 10, 2010, March 14, 2011 and June 9, 2011.

  C. Sources

     1.   **Plaintiffs' Position:** The parties have identified the following sources of potentially discoverable ESI at Defendant MSL. Phase I sources will be addressed first, and Phase II sources will be addressed after Phase I source searches are complete. In addition, social

---

[1] Plaintiffs reserve the right to alter this time period to extend to the date of judgment and to be consistent with Judge Carter's upcoming ruling on Plaintiffs' Rule 72(a) Objections to Judge Peck's January 4, 2012 Rulings.

media sources used by MSL employees and other sources containing employee and HR complaints yet to be identified by MSL shall be Phase I sources.

| | Data Source | Description | Phase |
|---|---|---|---|
| a | EMC SourceOne Archive | Archiving System used to capture and store all incoming and outbound e-mails and selected instant message conversations saved through IBM Sametime (see below). | I |
| b | Lotus Notes E-mail | Active corporate system that provides e-mail communication and calendaring functions. | N/A |
| c | GroupWise E-mail | Legacy corporate system that provided e-mail communication and calendaring functions. | N/A |
| d | IBM Sametime | Lotus Notes Instant Messaging and collaboration application. | N/A |
| e | Home Directories | Personal network storage locations on the file server(s) dedicated to individual users. | I |
| f | Shared Folders | Shared network storage locations on the file server(s) that are accessible by individual users, groups of users or entire departments. | I |
| g | Database Servers | Backend databases (e.g. Oracle, SQL, MySQL) used to store information for front end applications or other purposes. | N/A |
| h | Halogen Software | Performance management program provided by Halogen to conduct performance evaluations. | I |
| i | Noovoo | Corporate Intranet site. | I |
| j | Corporate Feedback | E-mail addresses that employees may utilize to provide the company with comments, suggestions and overall feedback. | I |
| k | Hyperion Financial Management ("HFM") | Oracle application that offers global financial consolidation, reporting and analysis. | I |
| l | Vurv/ Taleo | Talent recruitment software. | I |
| m | ServiceNow | Help Desk application used to track employee computer related requests. | N/A |
| n | PeopleSoft | Human resources information management system. | I |
| o | PRISM | PeopleSoft component used for Time and billing management. | I |
| p | Portal | A project based portal provided through Oracle/BEA Systems. | II |
| q | Desktops/Laptops | Fixed and portable computers provided to employees to perform work related activities. | I |
| r | Publicis Benefits Connection | Web based site that maintains information about employee benefits and related information. | II |
| s | GEARS | Employee expense reporting system. | II |

| | | | |
|---|---|---|---|
| t | MS&L City | Former corporate Intranet. | N/A |
| u | Adium | Instant Messaging application. | N/A |
| v | Pidgin | Instant Messaging application. | N/A |
| w | IBM Lotus Traveler and MobileIron | Mobile device synchronization and security system. | N/A |
| x | Webmail | Web-based email application. | N/A |
| y | Mobile Communication Devices | Portable PDAs, smart phones, tablets used for communication. | N/A |
| z | Yammer | Social media and collaboration portal. | N/A |
| aa | SalesForce.com | Web-based customer relationship management application. | N/A |
| bb | Removable Storage Devices | Portable storage media, external hard drives, thumb drives, etc. used to store copies of work related ESI. | N/A |

**Defendant's Position:** The parties have identified the following sources of potentially discoverable ESI at Defendant MSL. Phase I sources will be addressed first, and Phase II sources will be addressed after Phase I source searches are complete.

| | Data Source | Description | Phase |
|---|---|---|---|
| a | EMC SourceOne Archive | Archiving System used to capture and store all incoming and outbound e-mails and selected instant message conversations saved through IBM Sametime (see below). | I |
| b | Lotus Notes E-mail | Active corporate system that provides e-mail communication and calendaring functions. | N/A |
| c | GroupWise E-mail | Legacy corporate system that provided e-mail communication and calendaring functions. | N/A |
| d | IBM Sametime | Lotus Notes Instant Messaging and collaboration application. | N/A |
| e | Home Directories | Personal network storage locations on the file server(s) dedicated to individual users. | II |
| f | Shared Folders | Shared network storage locations on the file server(s) that are accessible by individual users, groups of users or entire departments. (With the exception of the following Human Resources shared folders which will be in Phase I: Corporate HR, North America HR and New York HR.) | II |
| g | Database Servers | Backend databases (e.g. Oracle, SQL, MySQL) used to store information for front end applications or other purposes. | N/A |
| h | Halogen Software | Performance management program provided by | I |

|   |   | Halogen to conduct performance evaluations. | II |
|---|---|---|---|
| i | Noovoo | Corporate Intranet site. | I |
| j | Corporate Feedback | E-mail addresses that employees may utilize to provide the company with comments, suggestions and overall feedback. | N/A |
| k | Hyperion Financial Management ("HFM") | Oracle application that offers global financial consolidation, reporting and analysis. | TBD |
| l | Vurv/ Taleo | Talent recruitment software. | N/A |
| m | ServiceNow | Help Desk application used to track employee computer related requests. | I |
| n | PeopleSoft | Human resources information management system. | I |
| o | PRISM | PeopleSoft component used for time and billing management. | II |
| p | Portal | A project based portal provided through Oracle/BEA Systems. | II |
| q | Desktops/Laptops | Fixed and portable computers provided to employees to perform work related activities. | II |
| r | Publicis Benefits Connection | Web based site that maintains information about employee benefits and related information. | II |
| s | GEARS | Employee expense reporting system. | N/A |
| t | MS&L City | Former corporate Intranet. | N/A |
| u | Adium | Application which aggregates instant messages. | N/A |
| v | Pidgin | Application which aggregates instant message. | N/A |
| w | IBM Lotus Traveler and MobileIron | Mobile device synchronization and security system. | N/A |
| y | Mobile Communication Devices | Portable PDAs, smart phones, tablets used for communication. | N/A |
| z | Yammer | Social media and collaboration portal. | N/A |
| aa | SalesForce.com | Web-based customer relationship management application. | N/A |
| bb | Removable Storage Devices | Portable storage media, external hard drives, thumb drives, etc. used to store copies of work related ESI. | N/A |

      a.  **Plaintiffs' Position:** <u>EMC SourceOne</u> - Defendant MSL uses SourceOne, an EMC e-mail archiving system that captures and stores all e-mail messages that pass through the corporate e-mail system. In addition, if a user chooses to save an instant messaging chat conversation from IBM Sametime (referenced below), that too would be archived in SourceOne. Defendant MSL also acknowledged that all Calendar information is part of the e-mail content

that is archived to the SourceOne system. The system was installed on **[Date]** and has a seven (7) year retention period for data that is archived after which it is purged. Defendant MSL will suspend all automated data destruction policies for the duration of this litigation. The parties have agreed that this data source will be handled as outlined in section E below.

**Defendant's Position:** EMC SourceOne - Defendant MSL uses SourceOne, an EMC e-mail archiving system that captures and stores all e-mail messages that pass through the corporate e-mail system. In addition, if a user chooses to save an instant messaging chat conversation from IBM Sametime (referenced below), that too would be archived in SourceOne. Defendant MSL also acknowledges that calendar items are regularly ingested into the SourceOne system. The parties have agreed that this data source will be handled as outlined in section E below

b.   **Plaintiffs' Position:**   Lotus Notes E-mail - Defendant MSL currently maintains multiple Lotus Notes Domino servers in various data centers around the world. All e-mail communication and calendar items are journaled in real time to the EMC SourceOne archive. Defendant MSL migrated to the Lotus Notes environment from the former GroupWise e-mail system (referenced below) from **[Date]** to **[Date]** with a clean cutover on **[Date]**. The parties have agreed to not collect any information from this data source at this time.

**Defendant's Position:** Lotus Notes E-mail - Defendant MSL currently maintains multiple Lotus Notes Domino servers in various data centers around the world. All e-mail communication and calendar items are journaled in real time to the EMC SourceOne archive. The parties have agreed to not collect any information from this data source at this time.

c.   **Plaintiffs' Position:**   GroupWise E-mail – Prior to the implementation of the Lotus Notes environment, GroupWise was used for all e-mail and calendar functionality. Before the decommissioning of the GroupWise servers, Defendant MSL created backup tapes of

all servers that housed the GroupWise e-mail databases. The parties have agreed to not collect any information from this data source at this time and that Defendant MSL will continue to preserve the backup tapes for the duration of this litigation.

**Defendant's Position:** GroupWise E-mail -- Prior to the implementation of the Lotus Notes environment, GroupWise was used for all e-mail and calendar functionality. Before the decommissioning of the GroupWise servers, Defendant MSL created backup tapes of all servers that housed the GroupWise e-mail databases. The parties have agreed to not collect any information from this data source at this time.

d. **Plaintiffs' Position:** IBM Sametime – Defendant MSL provides custodians with the ability to have real time chat conversations via the IBM Sametime application that is part of the Lotus Notes suite of products. While chat conversations are not retained automatically, custodians may choose to save them on an ad hoc basis which would then be retained within the EMC SourceOne archive.

**Defendant's Position:** IBM Sametime – Defendant MSL provides custodians with the ability to have real time chat conversations via the IBM Sametime application that is part of the Lotus Notes suite of products.

e. **Plaintiffs' Position:** Home Directories – Custodians with corporate network access at Defendant MSL also have a dedicated and secured network storage location where they are able to save files. Defendant MSL suggests that the content stored within this data source is wholly duplicative of what is maintained in the EMC SourceOne archive. The parties have agreed to select 7 custodians whose home directory data will be collected and analyzed to determine the level of duplication of documents in this data source against the data contained in the EMC SourceOne archive for the same custodians. The results of the analysis will be provided to Plaintiffs so that a determination can be made by the parties as to whether

Defendant MSL will include this data source in its production of ESI to Plaintiffs. If so, the parties will attempt to reach an agreement as to the approach used to collect, review and produce responsive and non-privileged documents.

**Defendant's Position:** Home Directories – Custodians with corporate network access at Defendant MSL also have a dedicated and secured network storage location where they are able to save files. The parties have agreed to select 2 custodians whose home directory data will be collected and analyzed to determine the level of duplication of documents in this data source against the data contained in the EMC SourceOne archive for the same custodians. The results of the analysis will be provided to Plaintiffs so that a determination can be made by the parties as to whether Defendant MSL will include this data source in its production of ESI to Plaintiffs. If so, the parties will attempt to reach an agreement as to the approach used to collect, review and produce responsive and non-privileged documents.

f. **Plaintiffs' Position:** Shared Folders – Individual employees, groups of employees and entire departments at MSL are given access to shared network storage locations to save and share files. Defendant MSL has agreed to create and share with Plaintiffs a directory listing of all shared folders contained within the File Servers. Plaintiffs will then review and designate those folders that will be collected, reviewed and produced. In addition, as it relates to the Human Resources related shared folders (i.e., North America HR Drive (10.2 GB), Corporate HR Drive (440 MB), NY HR Drive (1.9 GB), Chicago HR Drive (1.16 GB), Boston HR Drive (43.3 MB), and Atlanta HR Drive (6.64 GB)), the parties will meet and confer as to the approach used to collect, review and produce responsive and non-privileged documents.

**Defendant's Position:** Shared Folders – Individual employees, groups of employees and entire departments at MSL are given access to shared network storage locations to save and share files. Defendant MSL has agreed to create and share with Plaintiffs a directory

listing of all shared folders contained within the File Servers. The parties will then meet and confer regarding whether any of these shared folders are likely to contain responsive information and, if so, the parties will attempt to reach an agreement as to the approach used to collect, review and produce responsive and non-privileged documents. In addition, as it relates to the Human Resources related shared folders (i.e., North America HR Drive (10.2 GB), Corporate HR Drive (440 MB), NY HR Drive (1.9 GB), Chicago HR Drive (1.16 GB), Boston HR Drive (43.3 MB), and Atlanta HR Drive (6.64 GB)), Defendant MSL will review and produce responsive and non-privileged documents from the North America HR Drive, Corporate HR Drive, and NY HR Drive.

g.   Database Servers – Defendant MSL has indicated that it does not utilize any database servers, other than those that pertain to the sources outlined above in C, which are likely to contain information relevant to Plaintiffs' claims.

h.   **Plaintiffs' Position:** Halogen Software – Defendant MSL utilizes a third party product, Halogen, for performance management and employee evaluations. Plaintiffs request additional clarification about employee ratings data maintained within this system. The parties will meet and confer in order to exchange additional information and attempt to reach an agreement as to the scope of data and the approach used to collect, review and produce responsive and non-privileged documents.

**Defendant's Position:** Halogen Software – Defendant MSL utilizes a third party product, Halogen, for performance management and employee evaluations. The parties will meet and confer in order to exchange additional information and attempt to reach an agreement as to the scope of data and the approach used to collect, review and produce responsive and non-privileged documents.

i. **Plaintiffs' Position:** <u>Noovoo</u> – Defendant MSL maintains a corporate Intranet site called "Noovoo" where employees are able to access company related information, offer anonymous suggestions and download corporate documents. The parties have agreed that all responsive and non-privileged ESI will be produced.

**Defendant's Position:** <u>Noovoo</u> – Defendant MSL maintains a corporate Intranet site called "Noovoo" where employees are able to access Company-related information

j. <u>Corporate Feedback</u> – Defendant MSL has maintained various e-mail addresses that employees may utilize to provide the company with comments, suggestions and overall feedback. These e-mail addresses include "powerofone@mslworldwide.com", "poweroftheindividual@mslworldwide.com", "townhall@mslworldwide.com" and "whatsonyourmind@mslworldwide.com". The parties have agreed that all responsive and non-privileged ESI will be produced from these e-mail accounts and any other e-mail accounts that fall under this category of information. At present, Defendant MSL intends to manually review the contents of each of these e-mail accounts. However, if after collecting the contents of each of the e-mail accounts Defendant MSL determines that a manual review would be impractical, the parties will meet and confer as to the approach used to collect, review and produce responsive and non-privileged documents.

k. **Plaintiffs' Position:** <u>Hyperion Financial Management ("HFM")</u> – Defendant MSL uses an Oracle application called HFM that offers global financial consolidation, reporting and analysis capabilities. Plaintiffs request clarification with respect to office budgets, bonus pool, and personnel costs and savings that may or may not be maintained within the HFM system. The parties will meet and confer in order to exchange additional information and attempt to reach an agreement as to the scope of data and the approach used to collect, review and produce responsive and non-privileged documents.

**Defendant's Position:** Hyperion Financial Management ("HFM") – Defendant MSL uses an Oracle application called HFM that offers global financial consolidation, reporting and analysis capabilities.

l.   **Plaintiffs' Position:** Vurv/Taleo – Since approximately 2006, Defendant MSL used an application known as Vurv as its talent recruitment software. As of August 31, 2011, as a result of Vurv being purchased by Taleo, Defendant MSL has been using a similar application by Taleo as its talent recruitment software. The application, which is accessed through Defendant MSL's public website, allows users to search for open positions as well as input information about themselves. Plaintiffs request additional clarification about the specific type of data maintained within this system and other seemingly related sources (e.g. http://karma.recruitmax.com). The parties will meet and confer in order to exchange additional information and attempt to reach an agreement as to what, if any, data will be collected and the approach used to review and produce responsive and non-privileged documents.

**Defendant's Position:** Vurv/Taleo – Since approximately 2006, Defendant MSL used an application known as Vurv as its talent recruitment software. As of August 31, 2011, as a result of Vurv being purchased by Taleo, Defendant MSL has been using a similar application by Taleo as its talent recruitment software. The application, which is accessed through Defendant MSL's public website, allows users to search for open positions as well as input information about themselves. The parties will meet and confer in order to exchange additional information and attempt to reach an agreement as to what, if any, data will be collected and the approach used to review and produce responsive and non-privileged documents.

m.   **Plaintiffs' Position:** ServiceNow – Defendant MSL utilizes ServiceNow as its Help Desk application. This system covers a wide variety of requests by employees

computer-related assistance (e.g., troubleshoot incidents, install software, etc.). Logs generally are maintained for seven years. Defendant MSL will suspend all automated data destruction policies for the duration of this litigation. The parties have agreed to not collect any information from this data source at this time.

**Defendant's Position:** ServiceNow – Defendant MSL utilizes ServiceNow as its Help Desk application. This system covers a wide variety of requests by employees computer-related assistance (e.g., troubleshoot incidents, install software, etc.).

n. **Plaintiffs' Position:** PeopleSoft – Defendant MSL utilizes PeopleSoft, an Oracle-based software product, to record employee data such as date of hire, date of termination, promotions, salary increases, transfers, etc. Such information is retained indefinitely. Plaintiffs understand that the payroll processing function is a component of PeopleSoft and is referred to as "HRAS". The parties have agreed that all responsive and non-privileged ESI, including payroll information, relating to all class members and comparators will be produced from this system.

**Defendant's Position:** PeopleSoft – Defendant MSL utilizes PeopleSoft, an Oracle-based software product, to record employee data such as date of hire, date of termination, promotions, salary increases, transfers, etc. Defendant MSL already has produced data from this source and will consider producing additional data in response to a specific inquiry from Plaintiffs.

o. **Plaintiffs' Position:** PRISM – Defendant MSL utilizes PRISM for tracking time and billing. It is used primarily to track an employee's billable time. PRISM is a component of the PeopleSoft system. PRISM data is stored in the North America Data Center located in Virginia and is retained indefinitely. The parties have agreed that all responsive and non-privileged ESI relating to all class members and comparators will be produced from this system.

**Defendant's Position:** PRISM – Defendant MSL utilizes PRISM for tracking time and billing. It is used primarily to track an employee's billable time. .Defendant MSL will consider producing additional data in response to a specific inquiry from Plaintiffs.

p.   **Plaintiffs' Position:** Portal – Defendant MSL maintains a portal provided through Oracle/BEA Systems. The portal is web-based and is used for light workflow activities (such as reviewing draft documents). Use of the portal is project-based and used only for a single client. Plaintiffs request additional clarification about the specific type of data maintained within this system. The parties will meet and confer in order to exchange additional information and attempt to reach an agreement as to what, if any, data will be collected and the approach used to review and produce responsive and non-privileged documents.

**Defendant's Position:** Portal – Defendant MSL maintains a portal provided through Oracle/BEA Systems. The portal is web-based and is used for light workflow activities (such as reviewing draft documents).

q.   **Plaintiffs' Position:** Desktops/Laptops – Defendant MSL provided employees with desktop and/or laptop computers to assist in work related activities. Defendant MSL does not have a synchronization function that would transfer ESI from the local computer's hard drive to the network storage locations. Plaintiffs understand the custodians may or may not manually transfer ESI to the network storage. The parties have agreed to select 7 custodians whose local desktop and/or laptop data will be collected and analyzed for duplication against the data contained in the EMC SourceOne archive for the same custodians. The results of the analysis will be provided to Plaintiffs so that a determination can be made by the parties as to whether Defendant MSL will include this data source in its production of ESI to Plaintiffs. If so, the parties will attempt to reach an agreement as to the approach used to collect, review and produce responsive and non-privileged documents.

**Defendant's Position:** <u>Desktops/Laptops</u> – Defendant MSL provided employees with desktop and/or laptop computers to assist in work related activities.

r.   **Plaintiffs' Position:** <u>Publicis Benefits Connection</u> – Plaintiffs understand that Defendant MSL provides employees with access to a centralized web based site that provides access to corporate benefits information and other related content.  The parties have agreed that all responsive and non-privileged ESI relating to corporate specific documents will be produced from this system.

**Defendant's Position:** <u>Publicis Benefits Connection</u> – Plaintiffs understand that Defendant MSL provides employees with access to a centralized web based site that provides access to corporate benefits information and other related content.

s.   **Plaintiffs' Position:** <u>GEARS</u> – Defendant MSL maintains a centralized web-based expense tracking and reporting system called "GEARS" where users are able to enter expenses and generate reports.  Plaintiffs request additional clarification about the specific type of data maintained within this system.  The parties will meet and confer in order to exchange additional information and attempt to reach an agreement as to what, if any, data will be collected and the approach used to review and produce responsive and non-privileged documents.

**Defendant's Position:** Defendant MSL maintains a centralized web-based expense tracking and reporting system called "GEARS" where users are able to enter expenses and generate reports.

t.   **Plaintiffs' Position:** <u>MS&L City</u> – Defendant MSL maintained a corporate web-based Intranet prior to migrating to Noovoo.  All data was transferred from MS&L City into Noovoo.

**Defendant's Position:** MS&L City – Defendant MSL maintained this corporate web-based Intranet prior to migrating to Noovoo.

u. **Plaintiffs' Position:** Adium – Defendant MSL offers a free and open source instant messaging client for Mac OS X users. Defendant MSL confirms that there is no potentially discoverable ESI within this its custody or control relating to this data source.

**Defendant's Position:** Adium – This is a free and open source instant messaging client for Mac OS X users.

v. **Plaintiffs' Position:** Pidgin – Defendant MSL provides employees with a "social media" or instant messaging system, whose data resides with a third party messaging provider (e.g. AIM, Yahoo!, Google Talk, MSN Messenger, etc.) Defendant MSL confirms that there is no potentially discoverable ESI within this its custody or control relating to this data source.

**Defendant's Position:** Pidgin – Pidgin is a chat program which lets users log into accounts on multiple chat networks simultaneously, however, the data resides with a third party messaging provider (e.g. AIM, Yahoo!, Google Talk, MSN Messenger, etc.).

w. **Plaintiffs' Position:** IBM Lotus Traveler and MobileIron – Defendant MSL maintains these systems for e-mail devise sync and security features for employees' mobile devices, including Blackberry devices, iPhones, iPads, Android phones, and Android tablets. Defendant MSL confirms that there is no potentially discoverable ESI within this its custody or control relating to this data source.

**Defendant's Position:** IBM Lotus Traveler and MobileIron – Defendant MSL maintains these systems for e-mail device sync and security features for employees' mobile devices, including Blackberry devices, iPhones, iPads, Android phones, and Android tablets.

x.   **Plaintiffs' Position:**   <u>Webmail</u> – Defendant MSL allows employees to access email remotely and on the Internet.  Defendant MSL confirms that there is no potentially discoverable ESI within this its custody or control relating to this data source.

**Defendant's Position:**  *Defendant MSL's position is that webmail should be removed entirely from the ESI Protocol.  "Webmail" is not a source of information, but rather, a means of accessing the Lotus Notes e-mail client.*

y.   **Plaintiffs' Position:**   <u>Mobile Communication Devices</u> - Defendant MSL provides mobile devices and/or connectivity including Blackberry devices, iPhones, iPads, Android phones, and Android tablets to designated employees.  Defendant MSL confirms that there is no potentially discoverable ESI within this its custody or control relating to this data source.

**Defendant's Position:** <u>Mobile Communication Devices</u> - Defendant MSL provides mobile devices and/or connectivity including Blackberry devices, iPhones, iPads, Android phones, and Android tablets to designated employees.

z.   **Plaintiffs' Position:**   <u>Yammer</u> – Defendant MSL provided employees with an instant messaging application hosted externally, used for approximately one year in or around 2008 through 2009.  Defendant MSL confirms that there is no potentially discoverable ESI within this its custody or control relating to this data source.

**Defendant's Position:**   <u>Yammer</u> – This is an instant messaging application hosted externally, used for approximately one year in or around 2008 through 2009.

aa.  **Plaintiffs' Position:**   <u>SalesForce.com</u> – This is a web-based customer relationship management application but it was not widely used.  Defendant MSL confirms that there is no potentially discoverable ESI within this its custody or control relating to this data source.

**Defendant's Position:** <u>SalesForce.com</u> – This is a web-based customer relationship management application that was not widely used.

**bb. Plaintiffs' Position:** <u>Removable Storage Devices</u> – Defendant MSL does not restrict authorized employees from using removable storage devices. Defendant MSL confirms that there is no potentially discoverable ESI within this its custody or control relating to this data source.

**Defendant's Position:** <u>Removable Storage Devices</u> – Defendant MSL does not restrict authorized employees from using removable storage devices.

D. Custodians

1.   **Plaintiffs' Position:** The Parties agree that Defendant MSL will review and produce all relevant ESI stored in sources identified under section C.1 (except for sources listed under section C.1.a, e & q). The Parties agree that the production of ESI from the data sources identified under section C.1.a, e, & q will be limited to the following individuals:[2]

|     | Custodian Name | Title |
| --- | --- | --- |
| 1. | Lund, Wendy | Executive VP of Global Client and Business Development |
| 2. | Fite, Vicki | Managing Director, MSL Los Angeles |
| 3. | Wilson, Renee | President, NE Region, Managing Director NY |
| 4. | Brennan, Nancy | SVP/Director Corporate Branding |
| 5. | Lilien (Lillien, Kashanian), Tara | SVP, North America Human Resources |
| 6. | Dencker, Kelly | Senior VP, Practice Director, NY Healthcare |
| 7. | Miller, Peter | Executive Vice President, CFO |
| 8. | Masini, Rita | Chief Talent Officer |
| 9. | Tsokanos, Jim | President of the Americas |
| 10. | Dasilva, Monique | Director Healthcare Practice, Global |
| 11. | O'Kane, Jeanine | Director of Healthcare North America |
| 12. | Perlman, Carol | Senior VP |
| 13. | Mayers, Laurie | SVP MS&L Digital |
| 14. | Wilkinson, Kate | Account Executive |

---

[2] Plaintiffs have removed the following custodians: Charles Winner, Founder, Winner & Associates; Zachary Winner, CEO, Winner & Associates; Justyn Winner, Executive VP & General Counsel, Winner & Associates. Plaintiffs reserve the right to add these custodians if consistent with Judge Carter's upcoming ruling on Plaintiffs' Rule 72(a) Objections to Judge Peck's January 4, 2012 Rulings.

| 15. | Curran, Joel | Managing Director MSL Chicago |
|---|---|---|
| 16. | Shapiro, Maury | North American CFO |
| 17. | Baskin, Rob | Managing Director |
| 18. | Pierce, Heather | VP |
| 19. | Branam, Jud | Managing Director, MS&L Digital |
| 20. | McDonough, Jenni | VP, Director of Human Resources |
| 21. | Hannaford, Donald | Managing Director |
| 22. | Orr, Bill | Managing Director |
| 23. | Dhillon, Neil | Managing Director MSL Washington DC |
| 24. | Hubbard, Zaneta | Account Supervisor |
| 25. | Morgan, Valerie | HR Director |
| 26. | Daversa, Kristin | HR Director |
| 27. | Vosk, Lindsey | HR Manager |
| 28. | Carberry, Joe | President, Western Region |
| 29. | Sheffield, Julie | HR/Recruiting Associate |
| 30. | Beaudoin, Scott* | SVP of Global Consumer Marketing, NA Director of Cause Marketing and CSR |
| 31. | Binkowski, David* | Web Project Manager, SVP |
| 32. | Bryant, Steve | Managing Director, Seattle |
| 33. | Chamberlin, David* | SVP and Director of Issues and Crisis Management |
| 34. | Farnham, Kyle | Managing Director, Atlanta |
| 35. | Fleurot, Olivier | CEO, MSLGroup |
| 36. | Gross, Meghan | Managing Director, MSL Boston |
| 37. | Hass, Mark | (former) CEO |
| 38. | Harris, Peter* | NA Director of Corporate |
| 39. | Hughes, Keith* | NA Director of Consumer Operations |
| 40. | Kolhagen, Kelly | Managing Director, MSL Detroit |
| 41. | Lee, Don | Managing Director, PBJS Chicago |
| 42. | Morsman, Michael | (former) MD of Ann Arbor |
| 43. | Matthew Gardner | Managing Director, MSL San Francisco |
| 44. | MaryEllen O'Donohue | SVP |

Comparators – The Parties agree that comparators' email data (noted above by *) will be searched prior to being loaded into the Axcelerate system. Plaintiffs will provide Defendant MSL with a list of potential key words to be used to cull this data set.

**Defendant's Position:** The Parties agree that Defendant MSL will search the e-mail accounts of the following individuals as they exist on Defendant MSL EMC SourceOne

archive.  (Except where a date range is noted, the custodian's entire e-mail account was collected from the archive.)

| | Custodian Name | Title |
|---|---|---|
| 1. | Lund, Wendy | Executive VP of Global Client and Business Development |
| 2. | Fite, Vicki | Managing Director, MSL Los Angeles |
| 3. | Wilson, Renee | President, NE Region, Managing Director NY |
| 4. | Brennan, Nancy (1/1/08 to 5/08) | SVP/Director Corporate Branding |
| 5. | Lilien (Lillien , Kashanian), Tara | SVP, North America Human Resources |
| 6. | Dencker, Kelly (1/1/07 to 2/8/10) | Senior VP, Practice Director, NY Healthcare |
| 7. | Miller, Peter | Executive Vice President, CFO |
| 8. | Masini, Rita | Chief Talent Officer |
| 9. | Tsokanos, Jim | President of the Americas |
| 10. | Da Silva Moore, Monique | Director Healthcare Practice, Global |
| 11. | O'Kane, Jeanine (2/8/10 to 2/24/11) | Director of Healthcare North America |
| 12. | Perlman, Carol | Senior VP |
| 13. | Mayers, Laurie | SVP MS&L Digital |
| 14. | Wilkinson, Kate | Account Executive |
| 15. | Curran, Joel (7/1/09 to 5/31/10) | Managing Director MSL Chicago |
| 16. | Shapiro, Maury | North American CFO |
| 17. | Baskin, Rob (1/1/08 to 12/31/08) | Managing Director |
| 18. | Pierce, Heather | VP |
| 19. | Branam, Jud (7/1/09 to 5/31/10) | Managing Director, MS&L Digital |
| 20. | McDonough, Jenni (1/1/08 to 12/31/08) | VP, Director of Human Resources |
| 21. | Hannaford, Donald (1/1/08 to 3/1/08) | Managing Director |
| 22. | Orr, Bill (1/1/08 to 2/24/11) | Managing Director |
| 23. | Dhillon, Neil (9/8/08 to 12/31/09) | Managing Director MSL Washington DC |
| 24. | Hubbard, Zaneta | Account Supervisor |
| 25. | Morgan, Valerie (1/1/08 to 2/24/11) | HR Director |
| 26. | Daversa, Kristin (1/1/08 to 2/24/11) | HR Director |
| 27. | Vosk, Lindsey (1/1/08 to 2/24/11) | HR Manager |
| 28. | Carberry, Joe (1/1/08 to 2/24/11) | President, Western Region |
| 29. | Sheffield, Julie (1/1/08 to 2/24/11) | HR/Recruiting Associate |
| 30. | MaryEllen O'Donohue | SVP (2010) |

E. Search Methodology

    1.    **Plaintiffs' Position:** <u>General</u>. The Parties have discussed the methodologies or protocols for the search and review of ESI collected from the EMC SourceOne archive and the following is a summary of the Parties' agreement on the use of Predictive Coding. This section relates solely to the EMC SourceOne data source.

    **Defendant's Position:** <u>General</u>. The Parties have discussed the methodologies or protocols for the search and review of ESI collected from the EMC SourceOne archive and the following is a summary of the Parties' agreement on the use of Predictive Coding. This section relates solely to the EMC SourceOne data source (hereinafter referred to as the "e-mail collection").

    2.    **Plaintiffs' Position:** <u>General Overview of Predictive Coding Process</u>. Defendant MSL will utilize the Axcelerate software by Recommind to search and review the EMC SourceOne ESI for production in this case.

    The process begins with Jackson Lewis attorneys developing an understanding of the entire EMC SourceOne corpus while identifying a small number of documents, the initial seed set, that is representative of the categories to be reviewed and coded (relevance, privilege, issue-relation). It is the step when the first seed sets are generated which is done by use of search and analytical tools, including keyword, Boolean and concept search, concept grouping, and more than 40 other automatically populated filters available within the Axcelerate system. This assists in the attorneys' identification of probative documents for each category to be reviewed and coded. The seed sets are then used to begin the Predictive Coding process. Each seed set of documents is applied to its relevant category and starts the software "training" process. The software uses each seed set to identify and prioritize all substantively similar documents over the complete corpus of the EMC SourceOne archive. The attorneys then review and code all

"computer suggested" documents to ensure their proper categorization and to further calibrate the system by recoding documents into their proper categories. Axcelerate learns from the new corrected coding and the Predictive Coding process is repeated.

Attorneys representing Defendant MSL will have access to the all of the EMC SourceOne ESI to be searched and will lead the computer training, but they will obtain input and approval from Plaintiffs' counsel during the iterative seed selection and quality control processes and will share the information used to craft the search protocol as further described herein. Documents within each seed set determined to be relevant and not privileged after a double-pass review by Defendant MSL will be produced to Plaintiffs' counsel during the iterative seed set selection process. This is expected to involve multiple small set productions. Plaintiffs' counsel will review the documents produced and promptly provide defense counsel with its own evaluation of the initial coding applied to the documents, including identification of any documents it deems irrelevant.

Plaintiffs' counsel also will be provided with preliminary results of hit counts using keyword searches to create a high priority relevant seed set, and will be invited to contribute keyword and other search criteria suggestions for testing as the seed sets are developed. Again, the keyword testing and sample review will result in iterative small set productions to Plaintiffs' counsel of documents categorized as relevant and non-privileged. Plaintiffs' counsel shall again provide prompt feedback in writing as to the documents produced in this stage. In addition, when the seed sets have been fully developed and run through the entire universe of documents, a random sample of the documents categorized as irrelevant and non-privileged by the seed sets shall be produced to Plaintiffs' counsel so they can approve or modify the categorization of the quality control findings. The irrelevant documents so produced shall be promptly returned after review and analysis by Plaintiffs' counsel.

The accuracy of the search processes, both the systems' functions and the attorney judgments to train the computer, will be tested and quality controlled by both judgmental and statistical sampling.  In statistical sampling, a small set of documents is randomly selected from the total corpus of the documents to be tested.  The small set is then reviewed and an error rate calculated therefrom.  The error rates can then be reliably projected on the total corpus, having a margin or error directly related to the sample size.

Once trained, the predictive coding tools in Axcelerate will suggest coding categorizations for the remaining documents in the total collection.  The documents deemed to be irrelevant will be sampled to verify that they are unlikely to contain relevant documents. Plaintiffs will be provided with a copy of the non-privileged documents from the sample so they can approve the quality control findings.   Plaintiffs' counsel shall promptly report any disagreements on classification, and the parties shall discuss these issues in good faith, so that the seed set training may be improved accordingly.  The irrelevant, non-privileged documents so produced shall be promptly returned after review and analysis by Plaintiffs' counsel. The relevant, non-privileged documents will be produced to Plaintiffs as outlined below in section G.

**Defendant's Position:**    <u>General Overview of the Search Process</u>.
Defendant MSL will utilize the Axcelerate software by Recommind to search and, in part, review the e-mail collection for production in this case.

The process begins with Jackson Lewis attorneys developing an understanding of the entire e-mail collection while identifying a small number of documents, the initial seed set, that is representative of the categories to be reviewed and coded (relevance, privilege, issue-relation). It is the step when the first seed sets are generated which is done by use of search and analytical tools, including keyword, Boolean and concept search, concept grouping, and, as needed, up to 40 other automatically populated filters available within the Axcelerate system.  This assists in

the attorneys' identification of probative documents for each category to be reviewed and coded. The seed sets are then used to begin the Predictive Coding process. Each seed set of documents is applied to its relevant category and starts the software "training" process. The software uses each seed set to identify and prioritize all substantively similar documents over the complete corpus of the e-mail collection that has been loaded into the Axcelerate review platform. The attorneys then review and code a judgmental sampling of the "computer suggested" documents to ensure their proper categorization and to further calibrate the system by recoding documents into their proper categories. Axcelerate learns from the new corrected coding and the Predictive Coding process is repeated.

Attorneys representing Defendant MSL will have access to the entire e-mail collection to be searched and will lead the computer training, but they will obtain input from Plaintiffs' counsel during the iterative seed selection and quality control processes and will share the information used to craft the search protocol as further described herein. Documents within each seed set determined to be relevant and not privileged after a review by Defendant MSL will be produced to Plaintiffs' counsel during the iterative seed set selection process. This is expected to involve multiple small set productions. Plaintiffs' counsel will review the documents produced and promptly provide defense counsel with its own evaluation of the initial coding applied to the documents, including identification of any documents it deems irrelevant.

Plaintiffs' counsel also will be provided with preliminary results of hit counts using keyword searches to create a high priority relevant seed set, and will be invited to contribute keyword and other search criteria suggestions for testing as the seed sets are developed. Again, the keyword testing and sample review will result in iterative small set productions to Plaintiffs' counsel of documents categorized as relevant and non-privileged. Plaintiffs' counsel shall again provide prompt feedback in writing as to the documents produced in this stage.

The accuracy of the search processes, both the systems' functions and the attorney judgments to train the computer, will be tested and quality controlled by both judgmental and statistical sampling. In statistical sampling, a small set of documents is randomly selected from the total corpus of the documents to be tested. The small set is then reviewed and an error rate calculated therefrom. The error rates can then be reliably projected on the total corpus, having a margin or error directly related to the sample size.

3.   **Plaintiffs' Position:** Issue Tags. The parties agree that, to the extent applicable, as part of the seed set training described above, all documents categorized as relevant and not privileged, to the extent applicable, also shall be coded by Jackson Lewis attorneys with one or more of the following agreed-upon issue tags. Plaintiffs hereby provide issue tag definitions to guide Defendant through its review process. The parties will work together to negotiate issue tag definitions and the scope of relevancy throughout the iterative process.

a.   **Reorganization:** Documents relating to the formation of MSLGroup; the reorganization, restructure, realignment or formation of the North American Leadership Team or the leadership or management team under President Jim Tsokonas; the centralization of all MSL offices and specialized units under MSLGroup; the restructure, realignment, formation or elimination of MSL's regional or local offices, practice groups, projects, teams or staff under President Jim Tsokanos; budgets and financial estimates relating to the reorganization and/or restructuring of MSLGroup; and all other documents related to reorganization and/or restructuring of MSLGroup.

b.   **Promotion/Assignments:** Documents concerning decisions to request, recommend, grant or deny employees promotions or demotions, applications for promotions, recruitment or choosing of employees for promotions or demotions, job assignments, the promotion freeze, and complaints about promotions, demotions and job assignments.

c. **Work/Life Balance**: Documents relating to workplace flexibility, alternate work arrangements, flexible or reduced schedules, part-time schedules, freelance, consultants, hours spent on or at work-related activities, and complaints regarding work/life balance or work schedules.

d. **Termination:** Documents relating to termination, severance or resignation of employees, the hiring freeze, and complaints regarding terminations.

e. **Compensation**: Documents relating to salaries, raises, pay cuts, bonuses, commission, benefits, the salary/raise freeze, any other type of compensation to employees, and complaints regarding compensation.

f. **Maternity/Pregnancy**: Documents relating to pregnancy of employees, working mothers, and maternity, paternity, any other pregnancy related leave of employees, and complaints regarding pregnancy, maternity, parental leave.

g. **Complaints/HR:** Documents relating to complaints by employees regarding discrimination, harassment, pregnancy, work-life balance, compensation, promotion, demotion, termination, assignments, discipline, inappropriate comments or actions by management, the freeze or the reorganization/restructuring of MSLGroup to anyone at MSL, including but not limited to Human Resources.

h. **Publicis Groupe/Jurisdiction**: Documents relating to the relationship between MSL and Publicis Groupe.

This issue coding will take place during the initial random sample, creation of the seed set and initial and iterative training (see paragraphs 4, 5 and 6 below). This input shall be provided to Plaintiffs' counsel along with the initial document productions. Plaintiffs' counsel shall promptly report any disagreements on classification, and the parties shall discuss these issues in good faith, so that the seed set training may be improved accordingly. This issue-tagging and

disclosure shall take place during the described collaborative seed set training process only and shall not be required in subsequent productions.

**Defendant's Position:**  <u>Issue Tags</u>.  The parties agree that, to the extent applicable, as part of the seed set training described above, all documents categorized as relevant and not privileged, to the extent applicable, also shall be coded by Jackson Lewis attorneys with one or more of the following agreed-upon issue tags:

    a.   Reorganization.

    b.   Promotion/Assignments.

    c.   Work/Life Balance.

    d.   Termination.

    e.   Compensation.

    f.   Maternity/Pregnancy.

    g.   Complaints/HR.

    h.   Publicis Groupe/Jurisdiction.

This issue coding will take place during the initial random sample, creation of the seed set and initial and iterative training (<u>see</u> paragraphs 4, 5 and 6 below).  This input shall be provided to Plaintiffs' counsel along with the initial document productions.  Plaintiffs' counsel shall promptly report any disagreements on classification, and the parties shall discuss these issues in good faith, so that the seed set training may be improved accordingly.  This issue-tagging and disclosure shall take place during the described collaborative seed set training process.  The disclosures here made by MSL on its issue coding are not required in the final production set.

    4.  **Plaintiffs' Position:**  <u>Initial Random Sample</u>.  Using the Axcelerate software to generate a random sample of the entire corpus of documents uploaded to the Axcelerate search and review platform, Defendant MSL's attorneys will conduct a review of the random sample for

relevance and to develop a baseline for calculating recall and precision. To the extent applicable, any relevant documents also will be coded with one or more of the issue tags referenced in paragraph E.3 above. The random sample consists of 16,555 documents, which represents a 99% confidence level with a confidence estimation of plus or minus 1%.[3]

**Defendant's Position:** Initial Random Sample. Using the Axcelerate software to generate a random sample of the entire corpus of documents uploaded to the Axcelerate search and review platform, Defendant MSL's attorneys will conduct a review of the random sample for relevance and to develop a baseline for calculating recall and precision. To the extent applicable, any relevant documents also will be coded with one or more of the issue tags referenced in paragraph E.3 above. The random sample consists of 2,399 documents, which represents a 95% confidence level with a confidence estimation of plus or minus 2%. The Parties agree to utilize the random sample generated prior to the finalization of this protocol.

5.   Seed Set.

a.   **Plaintiffs' Position:** Defendant MSL. To create the initial seed set of documents that will be used to "train" the Axcelerate software as described generally above, Defendant MSL primarily utilized keywords listed on Exhibits A, B and C to this protocol, but also utilized other judgmental analysis and search techniques designed to locate highly relevant documents, including the Boolean, concept search and other features of Axcelerate. Given the volume of hits for each keyword (Exhibit A), Defendant MSL reviewed a sampling of the hits and coded them for relevance as well as for the following six preliminary issues: (i) Reorganization; (ii) Promotion; (iii) Work/Life Balance; (iv) Termination; (v) Compensation; and (vi) Maternity. Specifically, except for key words that were proper names, Defendant MSL

---

[3] At the time the random sample was generated, the Axcelerate database contained 2,980,104 documents. However, it did not include the e-mail accounts of: (i) Valerie Morgan, (ii) Kristin Daversa; (iii) Lindsay Vosk; (iv) Julie Sheffield; and (v) Joe Carberry. These accounts were still in the process of being loaded when the random sample was generated. [MSL to update figures.]

performed several searches within each set of key word hits and reviewed a sample of the hits. The Axcelerate software ranked the hits in order of relevance based on the software's analytical capabilities and the documents were reviewed in decreasing order of relevance (i.e., each review of the sample of supplemental searches started with the highest ranked documents). Exhibit B identifies the supplemental searches conducted, the number of hits, the number of documents reviewed, the number of documents coded as potentially responsive and general comments regarding the results.[4]  In addition, to the extent applicable, documents coded as responsive also were coded with one or more issue tags.  Defendant MSL will repeat the process outlined above for the newly defined issues.  Defendant MSL will provide Plaintiffs with all of the non-privileged documents and will provide, to the extent applicable, the issue tag(s) coded for each document, as described above.  Plaintiffs shall promptly review and provide notice as to any documents where they disagree with or do not understand the coding.  If necessary, counsel will meet and confer to attempt to resolve any disagreements regarding the coding applied to the documents in this seed set.

**Defendant's Position:** <u>Defendant MSL</u>.  To create the initial seed set of documents that will be used to "train" the Axcelerate software as described generally above, Defendant MSL primarily utilized keywords listed on Exhibits A, B and C to this protocol, but also utilized other judgmental analysis and search techniques designed to locate highly relevant documents, including the Boolean, concept search and other features of Axcelerate.  Given the volume of hits for each keyword (Exhibit A), Defendant MSL reviewed a sampling of the hits and coded them for relevance as well as for the following six preliminary issues: (i) Reorganization; (ii) Promotion; (iii) Work/Life Balance; (iv) Termination; (v) Compensation;

---

[4] The documents were coded as "potentially responsive" because the initial review was conducted by reviewers who were instructed to interpret responsiveness broadly and, at the time this disclosure was made to Plaintiffs' counsel, a second level review had not been conducted.

and (vi) Maternity. Specifically, except for key words that were proper names, Defendant MSL performed several searches within each set of key word hits and reviewed a sample of the hits. The Axcelerate software ranked the hits in order of relevance based on the software's analytical capabilities and the documents were reviewed in decreasing order of relevance (i.e., each review of the sample of supplemental searches started with the highest ranked documents). Exhibit B identifies the supplemental searches conducted, the number of hits, the number of documents reviewed, the number of documents coded as potentially responsive and general comments regarding the results. In addition, to the extent applicable, documents coded as responsive also were coded with one or more issue tags. Defendant MSL will repeat the process outlined above for the newly defined and agreed issues for subsequent reviews, but will not redo past work that has already been completed. Defendant MSL will provide Plaintiffs with all of the non-privileged documents and will provide, to the extent applicable, the issue tag(s) coded for each document, as described above. Plaintiffs shall promptly review and provide notice as to any documents where they disagree with or do not understand the coding. If necessary, counsel will meet and confer to attempt to resolve any disagreements regarding the coding applied to the documents in this seed set.

   b.   **Plaintiffs' Position:** Plaintiffs. To help create the initial seed set of documents that will be used to "train" the Axcelerate software, Plaintiffs provided a list of potential key words to Defendant MSL. Defendant MSL provided Plaintiffs with a hit list for their proposed key words and Plaintiffs hereby provide a revised list of potential key words. (See Exhibit C.) Defendant MSL will provide Plaintiffs with an updated hit list using the key words provided in Exhibit C. Defendant MSL will review 5,000 randomly sampled documents from Plaintiffs' supplemental list of key words to be coded for relevance and issues. Defendant MSL will provide Plaintiffs with all non-privileged documents and will provide, to the extent

applicable, the issue tag(s) coded for each document. Plaintiffs shall promptly review and provide notice as to any documents where they disagree with or do not understand the coding. If necessary, the parties' counsel will meet and confer to attempt to resolve any disagreements regarding the coding applied to the documents in this seed set.

**Defendant's Position:** <u>Plaintiffs</u>. To help create the initial seed set of documents that will be used to "train" the Axcelerate software, Plaintiffs provided a list of potential key words to Defendant MSL. Defendant MSL provided Plaintiffs with a hit list for their proposed key words. This process was repeated twice with the hit list for Plaintiffs' most recent set of keywords attached as Exhibit C. Defendant MSL will review 3,000 randomly sampled documents from Plaintiffs' supplemental list of key words to be coded for relevance and issues. Defendant MSL will provide Plaintiffs with all non-privileged documents and will provide, to the extent applicable, the issue tag(s) coded for each document. Plaintiffs shall promptly review and provide notice as to any documents where they disagree with or do not understand the coding. If necessary, the parties' counsel will meet and confer to attempt to resolve any disagreements regarding the coding applied to the documents in this seed set.

      c. <u>Judgmental Sampling</u>. In addition to the above, a number of targeted searches were conducted by Defendant MSL in an effort to locate documents responsive to several of Plaintiffs' specific discovery requests. Approximately 578 documents have already been coded as responsive and produced to Plaintiffs. In addition, several judgmental searches were conducted which resulted in approximately 300 documents initially being coded as responsive and several thousand additional documents coded as irrelevant. The documents coded as relevant and non-privileged also will be reviewed by Plaintiffs and, subject to their feedback, included in the seed set. An explanation shall be provided by MSL's attorneys for the basis of the bulk tagging of irrelevant documents (primarily electronic periodicals and

newsletters that were excluded in the same manner as spam junk mail is excluded).   The explanation shall include the types of documents bulk tagged as irrelevant as well as the process used to identify those types of documents and other similar documents that were bulk tagged as irrelevant.

     6.   **Plaintiffs' Position:** Initial And Iterative Training.  Following the creation of the first seed set, the Axcelerate software will review the entire data set to identify other potentially relevant documents.  Defendant MSL will then review a random sample of 16,555 documents (generated by the Axcelerate software) to be coded for relevance and any applicable issue tags. (This 16,555 number is based on a 99% confidence level with a confidence estimation of plus or minus 1%.)  The results of this review, both the documents coded as relevant and not relevant, will be provided to Plaintiffs' counsel for review and comment as described above.  Further, all documents produced by the parties herein to each other, including, without limitation, these small seed set development productions, shall be made under the Confidentiality Stipulation in this matter as well as any clawback agreement that shall be reduced to an order acceptable to the Court.  Following the initial review and any related meet and confer sessions, the Axcelerate software will conduct a second review of the entire data set to identify potentially relevant documents and, thereafter, Defendant MSL will review a random sample of 16,555 documents to be coded for relevance and any applicable issue tags.  The results of this review, both the documents coded as relevant and not relevant, will be provided to Plaintiffs' counsel for review and comment.  (Again, any documents coded as "not relevant" will be provided subject to the Confidentiality Stipulation and any clawback agreement.)  Any documents marked as irrelevant shall be returned to counsel for Defendant MSL at the conclusion of the iterative training phase, unless the relevancy of any documents are disputed, in which case they may be submitted to the Court for review.

**Defendant's Position:** <u>Initial And Iterative Training</u>.  Following the creation of the first seed set, the Axcelerate software will review the entire data set to identify other potentially relevant documents.  Defendant MSL will then review and tag a judgmental based sample, consisting of a minimum of 500 documents, including all documents ranked as *highly relevant* or *hot*, of the new "Computer Suggested" documents, which were suggested by the Axcelerate software. Defendant MSL's attorneys shall act in consultation with the Axcelerate software experts to make a reasonable, good faith effort to select documents in the judgmental sample that will serve to enhance and increase the accuracy of the predictive coding functions.  The results of this first iteration, both the documents newly coded as relevant and not relevant for particular issue code or codes, will be provided to Plaintiffs' counsel for review and comment.  (All documents produced by the parties herein to each other, including, without limitation, these small seed set development productions, shall be made under the Confidentiality Stipulation in this matter as well as any clawback agreement that shall be reduced to an order acceptable to the Court.  Any documents marked as irrelevant shall be returned to counsel for Defendant MSL at the conclusion of the iterative training phase, unless the relevancy of any documents are disputed, in which case they may be submitted to the Court for review.)

Upon completion of the initial review, and any related meet and confer sessions and agreed upon coding corrections, the Axcelerate software will be run again over the entire data set for suggestions on other potentially relevant documents following the same procedures as the first iteration.  The purpose of this second and any subsequent iterations of the predictive coding process will be to further refine and improve the accuracy of the predictions on relevance and various other codes. The results of the second iteration shall be reviewed and new coding shared with Plaintiffs as described for the first iteration. This process shall be repeated five more times, for a total of seven iterations, unless the change in the total number of relevant documents

returned from a new iteration, as compared to the last iteration, is less that five percent (5%), and no new documents are found that are predicted to be *hot* (aka *highly relevant*), at which point MSL shall have the discretion to stop the iterative process and begin the final review as next described. If more than 40,000 documents are returned in the final iteration, then MSL reserves the right to apply to the court for relief and limitations in its review obligations hereunder.

7. **Plaintiffs' Position:** <u>Final Search and Production</u>. Based on the seed set, as well as the initial and iterative reviews, the Axcelerate software will again review the entire data set to identify other potentially relevant and non-privileged documents. Of the results, all relevant and non-privileged documents will be produced to Plaintiffs.

**Defendant's Position:** <u>Final Search and Production</u>. All of the documents predicted to be relevant in the final iteration described in paragraph six above will be reviewed by Defendant MSL, unless it applies to the court for relief hereunder. All documents found by Defendant MSL's review to be relevant and non-privileged documents will be promptly produced to Plaintiffs. If more than 40,000 documents are included in the final iteration, then MSL reserves its right to seek payment from Plaintiffs for all reasonable costs and fees Defendant MSL incurred related to the attorney review and production of more 40,000 documents. The reservation of rights to seek cost shifting for what Defendant MSL contends would be disproportional expenses is further set forth in paragraph F.1. below. This provision is not intended as a waiver by Defendant MSL to also seek an award of all discovery costs incurred, including costs related to the first 40,000 documents, at the conclusion of this action under 28 U.S.C. §1920(4) and Rule 54(d)(1) *Federal Rules of Civil Procedure*.

8. **Plaintiffs' Position:** <u>Quality Control by Random Sample of Irrelevant Documents</u>. In addition, at the conclusion of this search protocol development process described above, and before the final search and production described in Paragraph 7 above, Defendant

MSL will review a random sample of 16,555 documents contained in the remainder of the database that were excluded as irrelevant. The results of this review, both the documents coded as relevant and not relevant, but not privileged, will be provided to Plaintiffs' counsel for review. (Any documents initially coded as "not relevant" will be provided subject to the Confidentiality Stipulation and any clawback agreements entered in this matter will be returned to counsel for Defendant MSL within 60 days of their production.) The purpose for this review is to allow calculation of the approximate degree of recall and precision of the search and review process used. If Plaintiffs object to the proposed review based on the random sample quality control results, or any other valid objection, they shall provide MSL with written notice thereof within fourteen days of the receipt of the random sample. The parties shall then meet and confer in good faith to resolve any difficulties, and failing that shall apply to the Court for relief. Defendant MSL shall not be required to proceed with the final search and review described in Paragraph 7 above unless and until objections raised by Plaintiffs have been adjudicated by the Court or resolved by written agreement of the parties.

**Defendant's Position:** <u>Quality Control by Random Sample of Irrelevant Documents</u>. In addition, at the conclusion of this search protocol development process described above, and before the final search and production described in Paragraph 7 above, Defendant MSL will review a random sample of 2,399 documents contained in the remainder of the database that were excluded as irrelevant. The results of this review, both the documents coded as relevant and not relevant, but not privileged, will be provided to Plaintiffs' counsel for review. (Any documents initially coded as "not relevant" will be provided subject to the Confidentiality Stipulation and any clawback agreements entered in this matter will be returned to counsel for Defendant MSL within 60 days of their production.) The purpose for this review is to allow calculation of the approximate degree of recall and precision of the search and review process

used. If Plaintiffs object to the proposed review based on the random sample quality control results, or any other valid objection, they shall provide MSL with written notice thereof within five days of the receipt of the random sample. The parties shall then meet and confer in good faith to resolve any difficulties, and failing that shall apply to the Court for relief. Defendant MSL shall not be required to proceed with the final search and review described in Paragraph 7 above unless and until objections raised by Plaintiffs have been adjudicated by the Court or resolved by written agreement of the parties.

F.  Costs

1.  **Plaintiffs' Position:**  Defendant MSL proposes to limit the review of the EMC SourceOne data resulting from the search methodology indicated above under section E. to 40,000 documents based on the costs incurred to date and the estimated future costs associated with the production of document from the EMC SourceOne archive.

**Defendant's Position:**  Defendant MSL proposes to limit the costs of its final review and production of responsive ESI from the MSL email collection to an additional $200,000, above and beyond the approximate $350,000 it has already paid or is anticipated to pay in e-discovery related activities as previously described and disclosed to Plaintiffs. Defendant MSL proposes to limit its review costs by restricting its cost burden for the final review to the top 40,000 ranked documents that the predicting coding processes has determined will be the most responsive and relevant documents. Although Defendant MSL potentially will conduct and pay for review of more than 40,000 documents, if that is required under the predictive coding process described in paragraphs six and seven above, it reserves its right to seek relief from the Court (e.g., a cost shifting award and/or ruling that Defendant MSL need to review more than a specified number of documents). Defendant MSL contends that the Doctrine of Proportionality in discovery requires this constraint and cost-shifting because: (a) the 40,000

highest ranked documents likely will provide all of the information reasonably required from MSL's email in this case; (b) production of the lesser-ranked documents will needlessly increase the cost of litigation by including cumulative, less relevant, less important, and less useful information; (c) the burden and expense to review and produce more than 40,000 of the strongest predictive coding ranked documents likely will be unreasonable, unduly burdensome, and expensive, considering the needs of the case, prior and other discovery in the case, the amount in controversy, and the importance of the issues at stake in the action, and the fact that the Plaintiffs' maintain their rights to later make more focused follow-up production requests that include the email collection. *See* Rule 1, Rule 26(b)(2)(C), Rule 26(b)(2)(B), and Rule 26(g), *Federal Rules of Civil Procedure*; *Commentary on Proportionality in Electronic Discovery*, 11 SEDONA CONF. J. 289 (2010); Oot, *et al*, *Mandating Reasonableness in a Reasonable Inquiry*, Denver University Law Review, 87:2, 522-559 (2010); *Also see* Rule 403 of the *Federal Evidence Code* (inadmissibility of cumulative evidence). It is Defendant MSL's position that Plaintiffs should be required to bear the costs of any additional review and production that requires disproportional expenses in excess of $200,000 for the final review and production of e-mail and attachments.

2. **Plaintiffs' Position:** Plaintiffs agree to bear all of the costs associated with its compliance with the terms of this protocol and with the receipt and review of ESI produced hereunder including the costs associated with its ESI experts at DOAR Litigation Consulting who will be involved with Plaintiffs in all aspects of this ESI protocol. Plaintiffs propose that Defendant MSL bear all of the costs associated with its obligations under the terms of this

protocol and do not agree to limit the amount of information subject to the review and production of ESI by Defendant MSL.[5]

   **Defendant's Position:** Plaintiffs agree to bear all of the costs associated with its compliance with the terms of this protocol and with the receipt and review of ESI produced hereunder including the costs associated with its ESI experts at DOAR Litigation Consulting who will be involved with Plaintiffs in all aspects of this ESI protocol.  Plaintiffs propose that Defendant MSL bear all of the costs associated with its obligations under the terms of this protocol and do not agree to limit the amount of information subject to the review and production of ESI by Defendant MSL.

   G.  Format of Production [**Defendant's Addition To Title: For Documents Produced From Axcelerate**]

   1.  **Plaintiffs' Position:** <u>TIFF/Native File Format Production</u>.  Documents will be produced as single-page TIFF images with corresponding multi-page text and necessary load files.  The load files will include an image load file as well as a metadata (.DAT) file with the metadata fields identified on Exhibit D.  Defendant MSL will produce spreadsheets (.xls files) and PowerPoint presentations (.ppt files) in native form as well as any documents that cannot be

---

5    Plaintiffs take issue with Defendant MSL's proposal to limit the number of the EMC SourceOne documents subject to its review and production as a matter of principle. Furthermore, Plaintiffs will not agree to be adversely affected by Defendant MSL's unilateral decisions regarding the custodians selected, approach taken, the vendors selected and the search protocol and related costs associated with those decisions.
     Plaintiffs are confident that the costs MSL claims it has incurred, "$253,549 in vendor costs for the copying and exemplification of e-mail onto the Axcelerate search and review platform" and the hosting fees of $17,000 per month are well in excess of what they should have been and what they would have been if Defendant MSL had sought Plaintiffs' involvement in the factors that lead to those costs.  **Plaintiffs also strongly disagree with the estimated cost of $5.00 per document set forth by Defendant MSL to conduct its review of documents and question, given the exorbitant costs of the entire process, why the proposed search methodology is being put forward as predictive coding which, at its core, is a cost-saving mechanism.**
     Ralph Losey, National E-Discovery Counsel and a partner at Defendant MSL's law firm, Recommind, and Judge Peck all acknowledge that the reduction of cost is a key factor in the use of predictive coding over traditional manual review.

converted to TIFF format (e.g., audio or video files, such as mp3s, wavs, megs, etc.). In addition, for any redacted documents that are produced, the documents' metadata fields will be redacted where required. For the production of ESI from the sources listed at C.1.h through C.1.p and C.1.r through C.1.s, the parties will meet and confer to attempt to reach an agreement of the format of production.

**Defendant's Position:** <u>TIFF/Native File Format Production</u>. Documents will be produced as single-page TIFF images with corresponding multi-page text and necessary load files. The load files will include an image load file as well as a metadata (.DAT) file with the metadata fields identified on Exhibit D. Defendant MSL will produce spreadsheets (.xls files) and PowerPoint presentations (.ppt files) in native form as well as any documents that cannot be converted to TIFF format (e.g., audio or video files, such as mp3s, wavs, megs, etc.). In addition, for any redacted documents that are produced, the documents' metadata fields will be redacted where required. For the production of ESI from non-email sources, the parties will meet and confer to attempt to reach an agreement of the format of production.

2. <u>Appearance</u>. Subject to appropriate redaction, each document's electronic image will convey the same information and image as the original document. Documents that present imaging or formatting problems will be promptly identified and the parties will meet and confer in an attempt to resolve the problems.

3. <u>Document Numbering</u>. Each page of a produced document will have a legible, unique page identifier "Bates Number" electronically "burned" onto the image at a location that does not obliterate, conceal or interfere with any information from the source document. The Bates Number for each page of each document will be created so as to identify the producing party and the document number. In the case of materials redacted in accordance with applicable law or confidential materials contemplated in any Confidentiality Stipulation entered into by the

parties, a designation may be "burned" onto the document's image at a location that does not obliterate or obscure any information from the source document.

4. <u>Production Media</u>. The producing party will produce documents on readily accessible, computer or electronic media as the parties may hereafter agree upon, including CD-ROM, DVD, external hard drive (with standard PC compatible interface), (the "Production Media"). Each piece of Production Media will be assigned a production number or other unique identifying label corresponding to the date of the production of documents on the Production Media (e.g., "Defendant MSL Production April 1, 2012") as well as the sequence of the material in that production (e.g. "-001", "-002"). For example, if the production comprises document images on three DVDs, the producing party may label each DVD in the following manner "Defendant MSL Production April 1, 2012", "Defendant MSL Production April 1, 2012-002", "Defendant MSL Production April 1, 2012-003." Additional information that will be identified on the physical Production Media includes: (1) text referencing that it was produced in *da Silva Moore v. Publicis Groupe SA, et al.*; and (2) the Bates Number range of the materials contained on the Production Media. Further, any replacement Production Media will cross-reference the original Production Media and clearly identify that it is a replacement and cross-reference the Bates Number range that is being replaced.

5. <u>Write Protection and Preservation</u>. All computer media that is capable of write-protection should be write-protected before production.

6. <u>Inadvertent Disclosures</u>. The terms of the parties' Clawback Agreement and Court Order shall apply to this protocol.

7. <u>Duplicate Production Not Required</u>. A party producing data in electronic form need not produce the same document in paper format.

**H. Timing.**

    1. To the extent a timeframe is not specifically outlined herein, the parties will use their reasonable efforts to produce ESI in a timely manner consistent with the Court's discovery schedule.

    2. The parties will produce ESI on a rolling basis.

**I. General Provisions.**

    1. Any practice or procedure set forth herein may be varied by agreement of the parties, and first will be confirmed in writing, where such variance is deemed appropriate to facilitate the timely and economical exchange of electronic data.

    2. Should any party subsequently determine it cannot in good faith proceed as required by this protocol, the parties will meet and confer to resolve any dispute before seeking Court intervention.

    3. **Defendant's Proposed Paragraph On Phases:** The Parties agree that e-discovery will be conducted in phases and, at the conclusion of the search process described in Section E above, the Parties will meet and confer regarding whether further searches of additional custodians and/or the Phase II sources is warranted and/or reasonable. If agreement cannot be reached, either party may seek relief from the Court.

This protocol may be executed in counterparts.  Each counterpart, when so executed, will be deemed and original, and will constitute the same instrument.


By: _____

JANETTE WIPPER, ESQ.
SANFORD WITTELS & HEISLER, LLP
*Attorneys for Plaintiffs and Class*
555 Montgomery Street, Ste. 1206
San Francisco, CA 94111
Telephone: (415) 391-6900


Date: _____, 2012


By: _____

BRETT M. ANDERS, ESQ.
VICTORIA WOODIN CHAVEY, ESQ.
JEFFREY W. BRECHER, ESQ.
JACKSON LEWIS LLP
*Attorneys for Defendant* MSLGROUP
58 South Service Road, Suite 410
Melville, NY 11747
Telephone: (631) 247-0404


Date: _____, 2012

**EXHIBIT A**

| Search Term | Hits |
|---|---|
| | 70,376 |
| "Anita" | 43,890 |
| "Binkowski" | 40,756 |
| "Bonus" | 66,959 |
| "Branam" | 3 |
| "Centralized Management Team" | 55,602 |
| "Compensation" | 8,672 |
| "Complaint " | 201,179 |
| "da Silva" OR "daSilva" | 7,211 |
| "Discrimination" | 38,315 |
| "Diversity " | 6,853 |
| "Ellena" | 17,354 |
| "Exception" | 290,518 |
| "Fite" | 34,304 |
| "Friedman" | 242,054 |
| "Healthcare" | 36,317 |
| "Heather" /2 "Pierce" | 694 |
| "Hiring Freeze" | 70,352 |
| "Jud" | 93,107 |
| "Kate" /2 "Wilkinson" | 328 |
| "Kelly" /2 "Denker" | 38,346 |
| "Krista" | 137,706 |
| "Laurie" /2 "Mayers" | 299,955 |
| "Lilien" | 353,246 |
| "Lund" | 170,064 |
| "Manning" | 26,195 |
| "Mark" /2 "Hass" | 160,491 |
| "MaryEllen" OR "Mary Ellen" | 242,991 |
| "Masini" | 13,210 |
| "Maternity Leave" | 4,399 |
| "Mission Critical" | 210,734 |
| "Monique" | 520 |
| "North American Leadership" | 6,618 |
| "Organization Chart" OR "Org Chart" | 156,070 |
| "O'Donohue" OR "Odonohue" OR "O Donohue" | 2,140 |
| "Performance Evaluation" | 4,987 |
| "PMP" | 10,659 |
| "Pregnancy" | 73,925 |
| "Promotion" | |

|  | |
|---|---:|
|  | 60,272 |
| "Raise" | 71 |
| "Regional Leadership Team" | 9,113 |
| "Relocation" | 5,816 |
| "Reorganization" | 252,314 |
| "Rita" | 895 |
| "Salary Freeze" | 360,352 |
| "Tara" | 18,204 |
| "Termination" | 165,208 |
| "Training" | 39,252 |
| "Transfer" | 292,868 |
| "Vickie" | 59,925 |
| "Webster" | 380,940 |
| "Wendy " | 2,671 |
| "Work/Life Balance" OR "Work-Life Balance" OR "Work Life Balance" | 36,108 |
| (Bill OR Will OR William) /2 "Orr" | 846 |
| (Dave OR David) /2 "Chamberlain" | 42,978 |
| (Dave OR David) /2 Binkowski | 20,046 |
| (Don OR Donald) /2 "Hannaford" | 40,023 |
| (Ed OR Edward OR Eduard) /2 Cafasso | 247,162 |
| (Jim OR James) /2 "Tsokanos" | 28,510 |
| (Joe OR Joseph) /2 "Carberry" | 7,179 |
| (Mike OR Michael) /2 "Manning" | 11,445 |
| (Mike OR Michael) /2 "Morsman" | 12,492 |
| (Mike OR Michael) /2 Sullivan | 3,525 |
| (Steve* OR Steph*) /2 Chipman | 26,661 |
| Alicia /2 Dorset | 166,224 |
| Jeanine /2 ("O'Kane" OR Okane OR "O Kane") | 50,956 |
| Joel /2 "Curran" | 52,753 |
| Karl* /2 Trimble | 2,053 |
| Kath* /2 "Wilkinson" | 5,040 |
| Keith /2 Hughes | 26,354 |
| Kelly /2 McKenna | 158 |
| Michelle /2 Parisi | 236,288 |
| Nancy /2 "Brennan" | 14,735 |
| Nancy /2 Glick | 43,555 |
| Neil /2 "Dhillon" | 62,388 |
| Pete* /2 "Harris" | 229,255 |
| Pete* /2 Miller | 24,075 |
| Scott /2 Beaudoin | 12,556 |
| Stu* /2 "Wilson" | |