# EXHIBIT G

```
                                                                    1
        1214KDASC              CONFERENCE
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   MONIQUE Da SILVA MOORE, et
 3   al.,
 4
 4              Plaintiffs,
 5
 5          v.                        11 CV 1279 (RJS)
 6
 6   PUBLICIS GROUPE, et al.,
 7
 7              Defendants.
 8
 8   ------------------------------x
 9                                    New York, N.Y.
 9                                    January 4, 2011
10                                    10:58 a.m.
10
11   Before:
11
12                    HON. ANDREW J. PECK,
12
13                                    Magistrate Judge
13
14                    APPEARANCES
14
15   SANFORD WITTELS & HEISLER LLP
15        Attorneys for Plaintiffs
16   JANETTE WIPPER
16   DEEPIKA BAINS
17
17   JACKSON LEWIS LLP
18        Attorneys for Defendant MSL Group
18   BRETT M. ANDERS
19   VICTORIA WOODIN CHAVEY
20   ALSO PRESENT:
20
21   PAUL J. NEALE, DOAR Litigation Consulting
21   GENE KILMOV, DOAR Litigation Consulting
22   ERIC SEGGEBRUCH, Recommind
22   CRAIG CARPENTER, Recommind
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
1214KDASC                    CONFERENCE
```

1    (In open court)
2              THE COURT:  Having read, to at least a certain extent,
3    all the things you were kind enough to fax me, including the
4    51-page fax that came in overnight twice -- so somebody owes us
5    a ream of paper, which I won't collect, but let's try not to
6    fax in that much -- here are my thoughts, to start:
7              We either need to revisit the issue of bifurcation of
8    class action discovery and full merits discovery and/or, even
9    treating it as such, it is clear to me that there is a
10   difference between the discovery that would go on in a class
11   action and the discovery treating every possible class
12   plaintiff as an actual plaintiff, which defeats the whole
13   purpose of having a class.
14             In addition, I don't think we have scheduled the
15   motion for class certification, which should be handled sooner
16   rather than later.  So maybe we should start with that
17   question:  When will plaintiffs be ready to move for class
18   certification?  And I read the transcripts before Judge
19   Sullivan dealing with bifurcation where both of you in essence
20   promised Judge Sullivan that, no, no, no, that's not going to
21   lead to all sorts of fights.  And, frankly, I've seen nothing
22   but fights since this case has been referred to me and,
23   frankly, no progress.
24             So that's the first question:  When are you planning
25   to move for class certification?  Who am I going to hear from

3

```
1214KDASC                CONFERENCE
```

1  on the plaintiffs' side?  Ms. Wipper?
2          MS. WIPPER:  Yes, for the plaintiffs in the class.
3          Your Honor, the current schedule entered by Judge
4  Sullivan has a close for fact discovery, I believe, of
5  June 30th.
6          THE COURT:  But it's too late to do class
7  certification after the close of discovery.  That's not what
8  Rule 23 anticipates.
9          MS. WIPPER:  Understood.  We requested a bifurcated
10 schedule, your Honor, to Judge Sullivan.  We wanted class
11 discovery first so we could address and target discovery for
12 the class issues and also minimize potentially some of the
13 disputes going on.  However, defendant MSL opposed that.
14         THE COURT:  I read all of that.
15         MS. WIPPER:  OK.
16         THE COURT:  And at the time, everyone thought it would
17 be a smooth road and would be faster.  It's not smooth and it's
18 probably not faster.  So maybe I'll do it this way:  Do you
19 both at this point, seeing where you've gotten yourselves --
20 and this I guess is somewhat of a question to both of you, so
21 it will be a single yes-or-no question -- do you want to
22 bifurcate?
23         MS. WIPPER:  Plaintiffs would be willing to bifurcate
24 if we did not change the current schedule, because we've lost
25 so much time with the current schedule with all of these

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

1214KDASC                    CONFERENCE

1   discovery disputes.  At this point we haven't taken one
2   deposition of defendant witnesses.  We've gotten a couple of
3   thousands of documents, a lot of them are policy documents that
4   are repetitive.  We haven't gotten a lot of the information we
5   have requested.
6            THE COURT:  Is bifurcation -- and by bifurcation, I
7   mean the only discovery that will go on -- is that aimed at
8   deciding whether this should be a class action?  Is that going
9   to eliminate most of these fights, from plaintiffs' point of
10  view, or if we agree to bifurcation, are you then going to say,
11  but, Judge, we still want everything or 90 percent of
12  everything set forth in our current letters about what the
13  disputes are?
14           MS. WIPPER:  Well, if I could just respond about some
15  of the disputes, as an example --
16           THE COURT:  No, no, no.  In your view -- let me do it
17  this way:  OK, so you're potentially willing to bifurcate, let
18  me leave it at that.
19           For the Jackson Lewis folks, who am I going to hear
20  from?
21           MS. CHAVEY:  Victoria Chavey.
22           THE COURT:  Having opposed bifurcation the first time,
23  what's your view on it now?
24           MS. CHAVEY:  Your Honor, we would have two concerns
25  with bifurcation at this point.  One is, we would like to

5

1214KDASC                    CONFERENCE

1  proceed with discovery on the merits of the individual named
2  plaintiffs' claims.  So if there were a bifurcated discovery
3  order at this point, we would still like to pursue merits
4  discovery as to the individual claims.
5          THE COURT:  But that means they're going to want
6  merits discovery as to the individual claims against you, which
7  is probably going to put us back in the quicksand that I'm
8  trying to get you all out of.
9          MS. CHAVEY:  The second concern, your Honor, that we
10 have is related to that, and, that is, that we understand
11 plaintiffs' position to be that to prove their
12 pattern-or-practice claim, they do need to take discovery, in
13 their view, on every single decision made at MSL over the last
14 ten-plus years.  So if their view of the pattern-and-practice
15 claim is such that they need discovery on every single decision
16 made, as opposed to focusing instead on what should be the
17 common questions, then I don't know that bifurcating the
18 discovery at this point is going to accomplish the goal that we
19 all had back in the summer, which was efficiency.
20         I'd also like to say, your Honor, just at the outset,
21 I conferred with counsel for the parent company, Publicis
22 Groupe yesterday with regard to whether they needed to appear.
23 It didn't appear to be necessary, given what the Court was
24 going to take up but George Stoehner, who was here on
25 December 2nd, is available by phone if that becomes necessary.

6

```
1214KDASC                    CONFERENCE
 1               THE COURT:  All right.
 2               MS. WIPPER:  Your Honor, if I can respond, some of the
 3     existing disputes are related to class issues.  For example,
 4     we're requesting personnel action notices because of the errors
 5     that were found in the data, the HR data, that was produced.
 6     Essentially, the coding --
 7               THE COURT:  Why is that relevant to class
 8     certification?
 9               MS. WIPPER:  For our expert to do a statistical
10     analysis and render regression analysis, they need accurate
11     data, including payroll data, which we don't have, which is
12     also in dispute.
13               THE COURT:  Wait.  Are you seriously telling me that
14     for the something like 700 to 1,000 employees of MSL who are at
15     issue here, you need the payroll data as to every single one of
16     them for ten years or some lesser number?
17               MS. WIPPER:  Yes, your Honor.  To run a compensation
18     analysis for regression, we often use payroll data to
19     essentially compare what people are paid during the class
20     period.  So, yes.
21               THE COURT:  All right, Ms. Chavey?
22               MS. CHAVEY:  Your Honor, we have provided the payroll
23     data and other electronic data but what we haven't provided,
24     because it wasn't requested, was paper copies of the personnel
25     action notices.  And we advised plaintiffs' counsel that the
```

7

1214KDASC                    CONFERENCE

1   Box 5 data from the W-2s were not available electronically.  We
2   have of course records of the W-2s that were issued, but that
3   is not electronically-held data.  That is what was requested,
4   was electronic-held data, and we have provided it.
5           THE COURT:  All right.
6           MS. WIPPER:  Your Honor, if I might, they haven't
7   provided the data.
8           THE COURT:  We're either going to do this in some
9   organized fashion -- we have no more than an hour -- or you can
10  come back this afternoon for the rest of this.
11          Instead of telling me what you need of this, is there
12  a substantial part of what the letters in front of me have you
13  each fighting about that will not need to occur if there is
14  bifurcation, or not?  Because, frankly, if you're going to say
15  I want it all anyway, then I'm not going to bifurcate, the two
16  of you are going to keep beating your heads against the wall
17  with each other, and you'll do what you're going to do within
18  the six months you have for fact discovery that are left.
19          MS. WIPPER:  Your Honor, the HR complaints go to
20  merits in order to show intentional discrimination, so those
21  would not be at issue if there was a bifurcated schedule.
22          Also, in terms of the personnel action notices, that
23  would be a part of it but not every personnel decision for
24  every class member and every comparator.  So it would limit the
25  personnel records we would be requesting and it would also

8

1214KDASC                    CONFERENCE
1   limit the HR complaints, discrimination complaints.
2         THE COURT:  What else?  I've got several hundred pages
3   of letters before we even get to the dueling ESI protocols.
4         MS. WIPPER:  Well, in terms of the motion to compel
5   letters, I think that was the only two issues that -- oh, there
6   was one other issue, the personnel file of the president, and
7   that would be a part of the class discovery, because as part of
8   the common issue --
9         THE COURT:  Well, it doesn't sound like we're gaining
10  much by bifurcating.  So you all are going to swim or sink with
11  this, but I am going to enforce 26(b)(2)(C) proportionality.
12  So let's go through the letters in detail.
13        I'm starting in chronological order with the
14  December 27 letter, page 4, documents regarding complaints of
15  discrimination.  How are those kept, Ms. Chavey, in the HR
16  department?
17        MS. CHAVEY:  Your Honor, to the extent there are
18  complaints of discrimination, yes, those would be held by the
19  HR department.  The requests are much broader than that, as we
20  have described in our letter.
21        THE COURT:  All right, so let's now deal as to subject
22  matter, gender discrimination by females and sexual harassment
23  complaint by females.  That's the Court's ruling.  Anyone want
24  to argue against that?
25        MS. WIPPER:  No, your Honor.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

9

```
1214KDASC                    CONFERENCE
```

```
 1              MS. CHAVEY:  Your Honor, as to the sexual harassment
 2    piece of that, there is no claim of sexual harassment here, and
 3    that's why we have objected.
 4              THE COURT:  It's similar enough.  That's the Court's
 5    ruling.
 6              Time period?
 7              MS. WIPPER:  If I may make a comment:  Plaintiffs
 8    would be willing to limit the time period to 2005 to the
 9    present, which is the longest statutory period applicable in a
10    case under the New York Equal Pay Act.  It is also consistent
11    with --
12              THE COURT:  But what has this got to do with the Equal
13    Pay Act?
14              MS. WIPPER:  If there were complaints made about pay
15    discrimination --
16              THE COURT:  OK, but that's a different discrimination;
17    we haven't even talked about that.  If you want to do it in two
18    periods, pay discrimination '05 to whatever gets us back into
19    the Title 7 time period and other gender and sexual harassment
20    in a more limited time period, that sounds more reasonable.
21              MS. WIPPER:  OK, and I would also direct the Court
22    to -- there is case law allowing plaintiffs to get --
23              THE COURT:  I understand, but you're also getting many
24    years' worth of information.  Any problem with -- what's our
25    Title 7 or state parallel statute of limitations?
```

10

1214KDASC                    CONFERENCE
1            MS. WIPPER:  February 2008 to the present.
2            THE COURT:  So February 2008 to the present, does that
3     work for the defendants?
4            MS. CHAVEY:  Yes.
5            THE COURT:  And what's the first date in '05?
6            MS. WIPPER:  It would be February 2005.
7            THE COURT:  All right.  And February 2005 only for
8     complaints that deal with pay discrimination.
9            MR. ANDERS:  Your Honor, if I may, the one concern I
10    would have about 2005 -- and this was shifting a little bit in
11    the ESI realm -- is the emails that --
12           THE COURT:  Wait.  How are complaints to HR kept?
13    Let's start with that.  That's what we're talking about.
14           MS. CHAVEY:  They're kept in different ways.  There
15    may well be emails relating to complaints or relating to the
16    company's responses --
17           THE COURT:  Do you know how this is done, or are we
18    doing a law school exam?
19           MS. CHAVEY:  Yes, no, we have investigated this.
20           THE COURT:  Are there paper files?
21           MS. CHAVEY:  Yes.
22           THE COURT:  And in what form may the emails take?  An
23    email to HR from an employee?
24           MS. CHAVEY:  Or between HR people.
25           THE COURT:  Fine, that seems like it's easy enough to
                  SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

```
     1214KDASC                    CONFERENCE
 1   search.  OK, that's the Court's ruling.
 2          Pay discrimination, February 2005 to date -- well, to
 3   date?  Let's cut it off at the date the complaint was filed,
 4   which is what?
 5          MS. WIPPER:  February 24th, 2011.
 6          THE COURT:  OK, so through February 24, 2011.  And
 7   gender and sexual harassment discrimination by females February
 8   '08 to the date of the complaint.
 9          MS. CHAVEY:  Your Honor, just to clarify to pay
10   discrimination, is it your order that the complaints at issue
11   would be pay discrimination based on gender or any complaint
12   about pay?
13          THE COURT:  No, pay discrimination based on gender.
14          I think that takes care of all of the complaints of
15   discrimination, yes?
16          MS. CHAVEY:  Yes.
17          MS. WIPPER:  If I could just have one point of
18   clarification:  The defendants wanted to limit it to complaints
19   against presidents and managing directors.
20          THE COURT:  No, complaints.
21          OK, next:  Personnel decisions -- and this gets back
22   to -- I'm not exact sure what it is want.  So tell me what you
23   want.
24          MS. WIPPER:  If I could direct the Court to page 7,
25   there are some examples of what we are looking for.  For
```

12

1214KDASC                    CONFERENCE
1   example, the first bullet point addresses the personnel action
2   notices that I have already referenced.  So we're interested in
3   those for two reasons; one, to correct the data, two,
4   because --
5            THE COURT:  Let me just stop.  Are those paper?
6            MS. CHAVEY:  Yes.  They're in the personnel files.
7            THE COURT:  Any problem with producing them?
8            MS. CHAVEY:  Yes.  There are a thousand employees as
9   well as former employees, and to pull all -- these are the
10  forms that are signed by authorized people to submit to payroll
11  to approve a pay increase, for example, or a change of address
12  or what have you.  So these are not held in an electronic
13  database; these are documents that are made part of the
14  personnel files.
15           THE COURT:  Assuming you had to do it for every one of
16  the thousand employees and former employees, how much bulk are
17  we talking about?
18           MS. CHAVEY:  There could be a few a year.  The request
19  is -- these haven't been requested, by the way, to my
20  knowledge.  We did not interpret any of the requests to seek,
21  other than the requests for the plaintiffs' personal files.
22           THE COURT:  I'm now doing it this way because that's
23  the way you both presented it.  If you need 30 days because
24  it's a quote-unquote new request, we'll talk about deadlines at
25  the end.

13

1214KDASC                    CONFERENCE

 1          MS. CHAVEY:  But the request as it's stated in the
 2     letter is for any personnel action notice, which they call a
 3     PAN, relating to pay, job title or status.  So sometimes there
 4     are personnel action notices that show that somebody goes from
 5     one department to another.  Whether that's a status change, I
 6     don't know.
 7          THE COURT:  Is that what you want?
 8          MS. WIPPER:  For purposes of the errors in the data,
 9     we found errors in people's departments and their job codes and
10     their status is terminated or active, full time or part time,
11     so if they do reflect that, so for that purpose we would want
12     it, but for purposes of this, within personnel files, we would
13     only want --
14          THE COURT:  But if you're getting it for some reason,
15     you might as well get it through this.  So that's what you
16     want, a department change?
17          MS. WIPPER:  Yes, your Honor.
18          THE COURT:  So pay, job title, status, meaning
19     department change.  What else?  Obviously --
20          MS. WIPPER:  Promotions, terminations.
21          THE COURT:  Well, that's pay or job title.  Can you do
22     this on a sample basis?
23          MS. WIPPER:  Our understanding is that everything is
24     maintained in HR headquarters in New York, all personnel files.
25     We had a plaintiff --

1214KDASC                    CONFERENCE

1     THE COURT:  But to have to go through it for thousands
2  of employees for a long period of time, unless you're telling
3  me that that's what your experts demand in order to do the
4  regression analysis, that's not the way it should be done in
5  discovery.  What is it you need this for?
6     MS. WIPPER:  To correct the data, your Honor.  And
7  there's case law supporting the fact that if there are errors
8  in the data, it shouldn't be held against a plaintiff or the
9  other party and they shouldn't be denied discovery --
10     THE COURT:  Are you willing to pay for this?  We're
11  going to start turning this into a pay-for-play if you can't be
12  more reasonable.
13     MS. WIPPER:  We would be willing to discuss sampling
14  as long as it's a significant sample, statistically significant
15  sampling, and random.
16     THE COURT:  Statistical significant sample is probably
17  10 percent of the employees or something like that.  Is that
18  what we're talking about?
19     MS. WIPPER:  And we would also like to ask for
20  additional notices; if we find errors while we're doing the
21  analysis of the data, we would like to have the opportunity to
22  get additional notices as well.
23     MS. CHAVEY:  Your Honor, that's actually the other way
24  that we would propose to do this.  And we had talked with
25  plaintiffs' counsel before, about identifying the errors, to

15

1214KDASC                    CONFERENCE

 1   see if we could then confirm whatever the supposed conflict was
 2   in the data that was provided.  It didn't sound, from our
 3   discussions, like it was more than a handful of alleged errors.
 4   And if that would be a way of doing it, then we could work with
 5   just whatever the errors were that came up.
 6            MS. WIPPER:  But, your Honor, we have seven
 7   plaintiffs, and pretty much every single one of them has an
 8   error in the data.  So it's hard for us to know how
 9   widespread --
10            THE COURT:  An error about what?
11            MS. WIPPER:  One plaintiff is listed as full time,
12   when she's part time; one is listed as current when she's no
13   longer working there, another is listed as has resigned but she
14   was terminated, her job was eliminated; two were listed as
15   taking severance when they didn't; one her job code was
16   incorrect.  So --
17            THE COURT:  All right, you're going to do the
18   personnel action notices.
19            Now, what time period are you talking about?
20            MS. WIPPER:  The same time period as the employment
21   data?
22            THE COURT:  Well, we're not doing the pay
23   discrimination, period, for this.  So February 2008 to the
24   complaint on a statistical sampling basis.
25            MS. WIPPER:  Your Honor, will we also be able to ask

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

16

1214KDASC                    CONFERENCE

1  for additional notices if we find other errors in the data
2  beyond the sample?
3         THE COURT:  The whole purpose of this statistical
4  sample is to avoid having to do it for all 5,000 employees or
5  whatever it is.
6         MS. WIPPER:  I'm not anticipating a thousand.  I don't
7  want a dispute later if there's like five people.
8         THE COURT:  If it's a limited number, I'm sure both
9  sides are going to be reasonable.
10        OK, the second bullet, promotion recommendation forms,
11 what's the purpose of that?
12        MS. WIPPER:  The purpose of the promotion
13 recommendation forms is to show who approves the promotions.
14 And our theory in this case is that there's a centralized
15 decision-making process, kind of the opposite of Wal-Mart
16 versus Dukes where a core group of managers, leadership team,
17 makes the decisions.
18        THE COURT:  Is there a dispute as to that?  Now,
19 whatever you all can stipulate to, you can save a lot of time
20 and money on discovery.
21        But before you answer that, let me just interrupt for
22 a minute off the record.
23        (Discussion off the record)
24        THE COURT:  Back on the record.  Continue.
25        MS. CHAVEY:  So the promotion recommendation forms are
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

17

1214KDASC                    CONFERENCE

1   also -- well, let me say, they were introduced in 2008, they
2   are used with regard to promotions of individuals to the vice
3   president or senior vice president level, and these are also
4   forms that aren't held in any centralized place; they are
5   individualized forms and they are transmitted, as far as we
6   have seen, by email.  And they are also at times, although I
7   don't think consistently, appearing in the personnel files of
8   individuals.  They're routed to human resources.
9           THE COURT:  So assuming it's on email, is it then
10  something that is saved in HR in a record, it's a business
11  record, as opposed to just it's an email, hey, Joe, somebody
12  just got a promotion?
13          MS. CHAVEY:  No, it is a form that would be sent as an
14  attachment to an email.
15          THE COURT:  And that's easy to find via the email
16  system?
17          MS. CHAVEY:  No, I don't think it would be easy to
18  find.
19          THE COURT:  Then how does your company do business?
20          MS. CHAVEY:  They use a lot of email.
21          THE COURT:  I know, but this sounds like it's
22  something that in the good old-fashioned, pre-electronic days
23  would have been in the employee's personnel file.  For the
24  company to say, we don't do that anymore, we send it by email
25  and then it's in an email system in a way we can't find it,

18

1214KDASC                    CONFERENCE

1    you're going to have to search.  So it seems to me -- or who
2    approves all of these?
3            MS. CHAVEY:  Human resources.
4            THE COURT:  So is the only approval signature on it
5    going to be HR or is it going to show who in the business side
6    management approved the promotion?
7            MS. CHAVEY:  For this particular form, that changed
8    over the years from 2008 forward, so there isn't one answer to
9    that question.
10           THE COURT:  Well, at what point does it show who
11   approved it?
12           MS. CHAVEY:  In HR, Rita Masini was a consistent
13   recipient or signatory on these documents through the years.
14           THE COURT:  If that is stipulated to?  Is that
15   sufficient for class purposes?
16           MS. WIPPER:  With respect to HR, yes.
17           THE COURT:  And what else do you need it for?
18           MS. WIPPER:  I believe it also has to be approved by
19   corporate, if it's a VP or an SVP, so it's not just --
20           THE COURT:  Then can you stipulate that all of these
21   were approved -- I don't even know what "approved by corporate"
22   means.
23           MS. WIPPER:  It means a businessperson, so a
24   businessperson, someone outside of HR, the CFO or the
25   president.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

1214KDASC                    CONFERENCE

1           MS. CHAVEY:  I don't think that's accurate.  Again,
2      this wasn't requested in the document requests.  I don't have
3      it in front of me.
4           THE COURT:  You all manage to spend your Christmas
5      vacation writing me huge letters, so I would assume that by the
6      time you knew there was a conference on this, you'd know the
7      information.  You're either going to stipulate to what level of
8      senior management had to sign these -- obviously if these are
9      promotions to VP or senior VP, I would assume that the
10     signature has got to be at a fairly high level.
11          MS. CHAVEY:  Rita Masini is the chief talent officer,
12     she's the top HR representative.
13          THE COURT:  If a businessperson besides HR has to
14     approve all of this, you are going to either stipulate
15     sufficiently that it satisfies the class certification issue
16     and gets around the Wal-Mart issues or you're going to have to
17     go through, from 2008 to the date of the complaint, on a
18     sampling basis and produce these.
19          MS. CHAVEY:  Because this form changed over time, your
20     Honor, I'm not in a position to stipulate today --
21          THE COURT:  You don't have to do it today.
22          MS. CHAVEY:  OK.
23          THE COURT:  You have to either produce these or
24     stipulate, and by whatever the deadline is that I'm going to
25     set at the end of all of this.

20

1214KDASC                    CONFERENCE
1              OK, request for raise exceptions?
2              MS. WIPPER:  And I think this one also would -- the
3      stipulation we're proposing would work here.  Essentially what
4      this request relates to is, there's a global salary freeze that
5      was implemented by the parent company, Publicis Groupe, for all
6      subsidiaries during the class period.  There was also
7      exceptions to that salary freeze, there was also a promotion
8      freeze and a hiring freeze.  And those exceptions were
9      essentially sent from MSL, the subsidiary, to the parent.
10             THE COURT:  One second.  Since you're getting the
11     personnel action notices, what do you need this for?
12             MS. WIPPER:  This shows the approval process for pay
13     increases that we're also challenging.  So it shows commonality
14     because not only is it nationwide, it's global, and there was
15     exceptions to the freeze that we believe had a disparate impact
16     on women.
17             THE COURT:  So for what employees are you looking for
18     this?
19             MS. CHAVEY:  Just the public relations employees in
20     the United States.
21             THE COURT:  Then, I'm sorry, the personnel action
22     notice is going to show you when somebody got a pay raise.
23     What do you need this for?
24             MS. WIPPER:  This shows the approval process --
25             THE COURT:  Who cares?
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

21

1214KDASC                    CONFERENCE

1           MS. WIPPER:  -- for commonality purposes.  For the
2     same reason as the promotion recommendation.
3           THE COURT:  At this point you're going to move for
4     commonality, and when they say there isn't, we can revisit
5     this.
6           MS. WIPPER:  OK, your Honor.
7           THE COURT:  If they argue that the raise exceptions
8     were signed off on by different people, they're going to have
9     to say who.
10          So your fate, MSL, is in your hands.  All of the
11    emails on all of this?  No, enough is enough.  So that's the
12    end of this one, as far as I'm concerned.
13          Anything else you want to argue for in this area
14    before we go to page 8 and item number 2 on pregnancy?
15          MS. WIPPER:  No, your Honor.
16          THE COURT:  Anything from the defense?
17          MS. CHAVEY:  No.
18          THE COURT:  OK, pregnancy, what's the fight here?
19          MS. WIPPER:  During one of our meet-and-confer
20    conferences, we asked for a list of the employees who were
21    pregnant during the class period, which we believe would be
22    less than a hundred, probably 60, people.  Defendants' response
23    was that that was captured in the employment data by the leave
24    that the employees took.  But that's not completely true.  We
25    have a plaintiff who was put on a probation letter after she

                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1214KDASC                    CONFERENCE
1   announced her pregnancy and is claiming a pregnancy
2   discrimination claim as a result of that.
3            THE COURT:  But where is it you believe that they have
4   records on pregnancy?
5            MS. WIPPER:  It's our understanding that HR is
6   informed when there's an announcement of a pregnancy, and
7   that's based on anecdotal evidence we have heard from our
8   clients.
9            THE COURT:  Ms. Chavey?
10           MS. CHAVEY:  Your Honor, it may be that HR is informed
11   when an employee becomes pregnant.  Certainly HR is informed
12   when an employee announces her intention to take a leave
13   related to pregnancy.  But there isn't a centralized list or
14   any document that reflects this information that's being
15   requested.  And the difference here is, I believe the
16   plaintiffs acknowledge that they have information about all of
17   those employees who took maternity leave; the only question
18   relates to employees who were pregnant but didn't take a leave
19   for some reason, so maybe they left before they had the child
20   or something like that.
21           So we don't know of a document that answers that
22   question.
23           MS. WIPPER:  It's our understanding we have anecdotal
24   information that an employee in the L.A. office notified her
25   immediate supervisor that she was pregnant and she was called

```
1214KDASC                    CONFERENCE
```

```
 1   the next day by Tara Lilly and the HR director in New York
 2   to --
 3              THE COURT:  Why don't you do this:  Why don't you
 4   depose the HR person.  You've already got the information about
 5   those who took leave, correct?
 6              MS. WIPPER:  Yes.
 7              THE COURT:  OK.  What else do you want at this point?
 8   Otherwise, you're doing in essence a trial on a hundred
 9   anecdotal stories, which doesn't make it satisfactory for class
10   certification anyway.
11              MS. WIPPER:  Yes, your Honor.  In order to look at
12   whether there's a pattern for women who were pregnant, whether
13   they did not receive promotions or pay increases or left the
14   company --
15              THE COURT:  How about in addition to the statistical
16   sample we're doing of the personnel action, notices and the
17   promotion recommendation forms, if those get produced, you add
18   them to the statistics?  In other words, if we're doing
19   15 percent of the thousand public relations people as your
20   statistical sample, in addition to that number, you get the
21   personnel action notes for the hundred people, if that's what
22   it is, who took a maternity leave.
23              MS. WIPPER:  OK.
24              THE COURT:  Yes?
25              MS. WIPPER:  Or who announced their pregnancy?
```

24

1214KDASC                    CONFERENCE
1              THE COURT:  If you have any record of that, sure.
2     They don't apparently.
3              All right, that's it for pregnancy.
4              Comparators and key players?
5              MS. CHAVEY:  Your Honor, on this request, we have
6     agreed to provide comparator data and we have provided
7     comparator data.  The difference of opinion or the dispute here
8     appears to stem from some additional names that the plaintiffs
9     included on request 50.  And we asked why these people were
10    included, and they didn't explain why they were included other
11    than saying some of them were women whom they believed to have
12    been discriminated against or other things, or maybe they were
13    comparators in 2004, but they aren't within the scope of
14    discovery, in our view.
15             THE COURT:  All right.  Ms. Wipper?
16             MS. WIPPER:  The list included comparators, which
17    obviously there's a dispute with, who's an appropriate
18    comparator in every discrimination case.  So I'm unclear about
19    whether or not defendants are willing to produce everything
20    that we say is a comparator, to --
21             THE COURT:  How about you two not only listen to each
22    other outside of court but in.  Ms. Chavey said there was a
23    list of names they gave you that they said we don't know why
24    you've put these people on a comparator list, and other than
25    that, they have no problem giving you your comparator list.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

25

1214KDASC                    CONFERENCE

1       So, I don't know who any of these folks are.  Why
2  don't you educate me or drop the people that they object to for
3  now without prejudice to coming back to it later, or play the
4  old split-the-baby.  Tell me what you want, educate me here.
5       MS. WIPPER:  With respect to the women on the list,
6  they were women that we have information complained about
7  discrimination or --
8       THE COURT:  Then why are they comparators?
9       MS. WIPPER:  They are not comparators; they were in
10  addition to the comparators on the list.
11       THE COURT:  Are you doing individual discovery for
12  absent class members?
13       MS. WIPPER:  No.  We're just interested in specific
14  instances of discrimination, because if we just --
15       THE COURT:  If there isn't a pattern and practice,
16  there isn't class certification and what happened to these
17  other people is irrelevant.  Right?
18       MS. WIPPER:  Well, your Honor, at the class
19  certification stage, I'm sure defendants will argue that we
20  have to prove not only the statistical disparity but also
21  anecdotal evidence, including specific instances of
22  discrimination.
23       THE COURT:  Well, the anecdotal will come from what
24  your clients tell you and what your clients point you to as to
25  other people to contact.  So at the moment, those people are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
     1214KDASC                    CONFERENCE
1    off the comparator list without prejudice to you coming back
2    for them before class certification.
3             MS. WIPPER:  That's with respect to the women listed?
4             THE COURT:  You two have to work this out --
5             MS. WIPPER:  OK.
6             THE COURT:  -- because nobody has given me a list in
7    any way that puts it in a way that I can deal with it.
8             That's the Court's ruling.  You both understand it?
9             MS. WIPPER:  Yes, your Honor.
10            MS. CHAVEY:  Yes.
11            THE COURT:  Off the record.
12            (Discussion off the record)
13            THE COURT:  OK, President Tsokanos' personnel file?
14            MS. WIPPER:  Yes, your Honor.  Plaintiffs believe this
15   is very important because the president is at the center of a
16   lot of these claims.
17            THE COURT:  As to comments he allegedly made, I have
18   no problem giving you that.  Other than that, I'm not sure why
19   you should get anything else.
20            MS. WIPPER:  Well, we're aware there were complaints
21   made against him, so --
22            THE COURT:  You can have any comments, any sexist
23   comments he made, any complaints against him for sexual-related
24   issues, gender or sexual harassment.  What else?
25            MS. WIPPER:  Could I also request that that not be
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

27

1214KDASC                    CONFERENCE
1    limited to the time period we already discussed, given the
2    importance --
3            THE COURT:  No, no.
4            OK, anything else on that?
5            MS. WIPPER:  Can I just clarify what the time period
6    will be?
7            THE COURT:  The time period is February 2008 to the
8    date of the complaint.
9            Any argument on that by the defense?
10           MS. CHAVEY:  No, your Honor.
11           MS. WIPPER:  If I can just state for the record, we're
12   aware of a complaint against Mr. Tsokanos I would say around
13   2005.
14           THE COURT:  For what, by whom?
15           MS. WIPPER:  Sexual harassment.  And our allegation
16   would be that despite that complaint, he was promoted, and
17   promoted quickly, by passing women who were comparable to his
18   position.
19           THE COURT:  But I thought your argument is that once
20   Mr. Tsokanos became the president, he forced women out and did
21   other terrible things.  So what's the point of what happened to
22   a complaint and then despite that complaint he got promoted?
23           MS. WIPPER:  Because it shows his attitude and motive
24   towards women, so within those documents it would show what
25   type of complaint was made against him.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

28

1214KDASC                    CONFERENCE
1              THE COURT:  What type of complaint was that '05
2    complaint you're referring to?
3              MS. WIPPER:  Sexual harassment.
4              THE COURT:  By who?  Who was the complaint made to?
5              MS. WIPPER:  It was when he was a managing director in
6    the Atlanta office.
7              THE COURT:  Who made the complaint?  Was it to HR?
8              MS. WIPPER:  It was to HR.
9              THE COURT:  Well, is that something that can be
10   readily found, Ms. Chavey?
11             MS. WIPPER:  Yes.
12             THE COURT:  OK, produce that.
13             Other than single complaint, the time period is
14   February '08 to date.
15             MS. WIPPER:  All right, your Honor.
16             THE COURT:  OK, that, I believe, takes care of
17   plaintiffs' December 27 letter, correct?
18             MS. WIPPER:  Yes, your Honor.
19             THE COURT:  OK, so now we go to your December 29th
20   letter.
21             MS. CHAVEY:  Your Honor, as to this letter, which is a
22   request for a conference, we had intended to file a written
23   response; we just haven't done it yet.
24             THE COURT:  You can respond orally.
25             MS. CHAVEY:  OK.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1214KDASC                    CONFERENCE

1     THE COURT:  On the compensation data, do you really
2  want paper copies of a thousand people's W-2s for three, four
3  years?
4     MS. WIPPER:  No, your Honor, we just want payroll
5  data.  It's not paper copies that we're interested in.  We're
6  just interested in the records that of what people were
7  actually paid.  What we currently have now is bonus data, which
8  had to be reproduced because it was incorrect, and then also
9  the annual rate of pay, which is the rate assigned to an
10  employee but it's not necessarily what that employee was paid
11  that year.
12     MS. CHAVEY:  Your Honor, we have told the plaintiffs'
13  counsel that we have the W-2s, we have copies of those things,
14  but we don't have an electronic database that contains the
15  Box 5 information.
16     MS. WIPPER:  In lieu of the W-2, we would take payroll
17  data, so --
18     THE COURT:  I'm sorry, I don't know what that means.
19     MS. WIPPER:  There's the HR data, which essentially
20  captures all of the personnel action changes, so any time
21  someone gets an increase, is promoted --
22     THE COURT:  Just tell me what the payroll data.
23     MS. WIPPER:  That's how they process their paycheck
24  every two weeks, so that's a separate database that has all the
25  deductions listed, the total earnings, and then that data is

30

1214KDASC                      CONFERENCE
1   fed into the W-2 data, which is what's reported to the IRS.
2           MS. CHAVEY:  I don't know, this is the first that I'm
3   hearing this explanation of what the payroll data is that's
4   being sought.
5           THE COURT:  Who does the company's payroll?  Is it
6   internal or ADP?
7           MS. CHAVEY:  They have a payroll department, and I
8   haven't posed this question.
9           THE COURT:  See what you can find out on that.  We'll
10  leave this as:  Produce it if it's electronic, if you're
11  telling me after you investigate -- you'll be telling
12  Ms. Wipper if it doesn't exist, you'll work it out.
13          OK, I think that brings us to requests 6 and 11, about
14  org charts among other things.
15          Does your company really not have org charts?
16          MS. CHAVEY:  We do have org charts.
17          THE COURT:  Were they produced?
18          MS. CHAVEY:  We have produced some and, as we have
19  told plaintiffs, we are continuing to produce org charts that
20  we find.
21          THE COURT:  How long does it take?
22          MS. CHAVEY:  We have been very, very diligent in going
23  through a huge volume of documents, both electronic and paper,
24  and we have told the plaintiffs' counsel -- you know, by the
25  time these issues were raised, your Honor, the September 9th --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

31

1214KDASC                    CONFERENCE

1    our responses to the September 9th discovery requests were
2    about two and a half months old, there were 93 requests, many
3    of them pertained to the individual plaintiffs, many of them
4    were very, very broad.  And we have been working very hard to
5    get through them and we have told plaintiffs' counsel that we
6    have not asserted that we have completed our disclosures.
7             If it's taking too long, from their view, we apologize
8    to them, we apologize to the Court, but we are working through
9    it.
10            THE COURT:  All right, produce it.
11            MS. WIPPER:  Your Honor, if I can make one comment:
12   These org charts were requested eight months ago and were
13   ordered by Judge Sullivan to be produced four months ago.
14            THE COURT:  Did he set a deadline or, rather, four
15   months ago, he said you've got to produce it?
16            MS. WIPPER:  Yes, your Honor.
17            THE COURT:  Well, part of the problem is, if they're
18   going through lots and lots of data, we're now at the point
19   where objections are gone, it's time to produce; and once I
20   order you to produce something, if you don't, you will be
21   sanctioned, personally as well as your client.  So whatever
22   dilatoriness or game-playing that plaintiff suspects was going
23   on is now over.  So we will set a deadline for all production
24   or at least all paper production at the end of this conference.
25            I think I'm now over to page 5, which are specific
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

32

1214KDASC                    CONFERENCE

1    types of documents.
2            MS. CHAVEY:  Your Honor, when we were here on
3    December 2nd, you asked or directed plaintiffs' counsel to let
4    us know, in light of the ambiguity of the term
5    "reorganization," you asked them to let us know what specific
6    decisions they were seeking, and they didn't do that.  We did
7    follow up with them to ask them to do that.  The first we got
8    this was another midnight email on December 29th, with this
9    page 5 of bullet-pointed items.  But we didn't have this
10   before.  We sought to do that --
11           THE COURT:  Now that you have got it, do you
12   understand what they're looking for and do you have any
13   objection to searching for it, to any of the bullet points on
14   page 5?
15           MS. CHAVEY:  Some of them are very vague.  For
16   example, the third bullet point, documents relating to
17   restructuring plans, we're not sure if what the plaintiffs are
18   asking us to do is to use a keyword search in the electronic
19   data using the term "restructuring plans" or whether there's
20   something else, but there's not a folder in somebody's desk
21   that says "restructuring plans" on it.
22           MS. WIPPER:  Your Honor, defendants produced
23   PowerPoints to us that had several pages with the heading
24   called "Restructuring" --
25           THE COURT:  The question nowadays, in an ESI world, is
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

33

1214KDASC                    CONFERENCE

1   how one is going to find the needles in a haystack or the
2   haystack, so you all have to work on that.  And that sounds
3   like the ESI protocol issue that hopefully we'll have time to
4   get to this morning.
5              MS. WIPPER:  Your Honor, in our keywords that we
6   proposed --
7              THE COURT:  So "restructuring" is presumably one of
8   them.
9              MS. WIPPER:  Yes.
10             THE COURT:  So that will turn this up.
11             Anything else?  Let's go off the record a minute.
12             (Discussion off the record)
13             THE COURT:  All right, back on the record.
14             Any of these other bullet points, other than word
15   search or whatever ESI protocol we're going to use, seem to be
16   a problem?
17             MS. WIPPER:  I just want to make one comment.  All of
18   these documents cited here are Bates labeled MSL, not MSLAX,
19   meaning that it's not a part the Recommind platform that
20   they're using on the ESI protocol.  So I just want to clarify,
21   or have defendants clarify, that they would also look outside
22   ESI for any of these documents.
23             MS. CHAVEY:  Of course, of course we would do that.
24             THE COURT:  OK.
25             MS. CHAVEY:  One other kind of general issue with

34

1214KDASC                    CONFERENCE
1   these particular bullet points, which again we saw for the
2   first time just a couple of days ago, is the time frame covered
3   because I believe the plaintiffs are intending for these
4   requests as they have now been specifically articulated to go
5   back to 2001, which, in our view, is an overly long period of
6   time, and unreasonable under the circumstances here, and given
7   what the allegation is of the --
8           THE COURT:  What time period do you suggest?
9           MS. CHAVEY:  I would suggest February 1 of 2008
10  forward.
11          THE COURT:  Ms. Wipper?
12          MS. WIPPER:  That's fine -- well, I would suggest
13  January 1st because that's when James Tsokanos was promoted.
14          THE COURT:  OK, fine.  January 1, 2008.
15          MS. CHAVEY:  And, your Honor, as to some of these
16  other bullet points, there are just a lot of words in here that
17  are in quotes -- management structure approved, new business
18  team, reductions, terminations.  These are words that we will
19  work with the plaintiffs in the course of the ESI protocol to
20  uncover, and we'll do our best in terms of hard copy documents.
21          THE COURT:  OK, very good.
22          That concludes this letter, other than the sanction
23  requests are all denied at this time without prejudice to the
24  possibility that if the Court thinks there is gamesmanship
25  going forward, that the Court will go back retroactively to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

35

1214KDASC                    CONFERENCE

1  this period as well.  Otherwise, let's all just get along, as
2  the old saying goes.
3           I believe that your January 3 letter on the defense
4  side was just responding to plaintiffs' letter; and therefore
5  we've taken care of that, correct?
6           MS. CHAVEY:  Yes.  Our letter on January 3rd related
7  to the plaintiffs' letter from December 27th.  We had not yet
8  responded in writing to the --
9           THE COURT:  Which you don't have to now.
10          MS. CHAVEY:  OK.  Thank you.
11          THE COURT:  On the ESI protocols, we have ten minutes
12 before I'm expecting a telephone emergency conference call from
13 one of my other favorite cases.
14          I'm not sure what your difference is.  Literally, I
15 got plaintiffs' this morning when I came in, to find that you
16 broke my fax machine with a paper jam.  I have skimmed it but
17 I'm not really sure what the difference between the two
18 parties' plans are and what we need to do, perhaps put you,
19 either with your consultants or maybe your consultants without
20 the lawyers, in the jury room for an hour and see what you all
21 can work out.
22          MR. ANDERS:  If I may, your Honor?
23          THE COURT:  Yes.
24          MR. ANDERS:  I think there are a few main areas --
25 some we may have already addressed -- one of which is the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1214KDASC                    CONFERENCE
```

 1   overall time period.  As it relates to the emails, where we
 2   have pulled the data from is, in 2007-2008 the company put in
 3   place a long-term archive which captured every incoming and
 4   outgoing email.  That is the data set that we pulled from to
 5   get the 3.2 million documents.
 6              So, for purposes of a protocol that we have proposed a
 7   2008 going forward as the time period, plaintiffs' protocol
 8   went back to 2001.  I understand from some of the Court's
 9   rulings today that 2008 is the time period with the exception
10   of the EPA claims, which went to 2005.
11              THE COURT:  So any problem with using January 1, '08
12   for this search?
13              MS. WIPPER:  With respect to email only, there is not
14   a problem, but our protocol is much broader than email.
15              THE COURT:  All right.  Well, on the email side,
16   January 1, '08.
17              What else?
18              MR. ANDERS:  Custodians, your Honor.  Our list had
19   included 36 custodians.  That list was higher than we initially
20   intended.  We had made some additions after we received --
21              THE COURT:  Does it include all the HR people, since a
22   lot of this data seems to be in HR?
23              MR. ANDERS:  Yes, it does now.  That was one of the
24   later additions once we received plaintiffs' definition of who
25   the class A custodians are.  The list is the senior executives,

37

1214KDASC                    CONFERENCE

1   the managing directors of the various offices, some of the
2   plaintiffs' intermediate supervisors, I believe it has all the
3   HR people.
4            THE COURT:  How many people are in plaintiffs' list?
5            MS. WIPPER:  47.
6            THE COURT:  Is that a difference of 11, or is it a
7   bigger difference because you don't want some of their 36 or
8   whatever?
9            MR. ANDERS:  I have a difference of 12, your Honor.
10  They had removed four people from our list of 36.  They added
11  18 and then very recently took two more people off, so it's a
12  net --
13           THE COURT:  Who are the 12 that are now in dispute?
14  I've got your respective custodian lists in front of me.
15           MR. ANDERS:  Your Honor, I can tell you the 12 in
16  dispute right now.
17           THE COURT:  OK.
18           MR. ANDERS:  If you look at plaintiffs' ESI protocol.
19           THE COURT:  Yes.
20           MR. ANDERS:  Well, my version is a redline version
21  which is page 11, but if you look at the section which lists
22  their custodians --
23           THE COURT:  Yes.
24           MR. ANDERS:  -- from Scott Bedowin down, who I believe
25  is number -- I think he's number 30 on mine.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

38

1214KDASC                    CONFERENCE

```
 1              THE COURT:  Got it.
 2              MR. ANDERS:  So from him down, with the exception of
 3    Merrill Freund and Lance Breisen, those people are all new
 4    people.
 5              THE COURT:  All right.  Two questions:  Mark Hass,
 6    former CEO, when did he leave?
 7              MS. WIPPER:  2009.
 8              THE COURT:  So we're talking about a year-plus.  Well,
 9    to the extent that some of these are managing directors in what
10    I guess are branch offices -- Seattle, Atlanta, Boston,
11    Detroit, Chicago maybe -- any objection to them?
12              MR. ANDERS:  I guess, your Honor, my concern would be,
13    and what I had said to plaintiffs' counsel, was the database
14    with the 3.2 million documents --
15              THE COURT:  Do you have any idea as to how many would
16    be added if these 12 were tossed in?
17              MR. ANDERS:  We have not collected those, so I don't
18    know what their size is.  One of the things we have encountered
19    with this case is because of the extent to which email is used,
20    the email accounts individually were a lot larger than we have
21    anticipated in the past.
22              THE COURT:  But once you do some screening of them,
23    you'll reduce it down.
24              MR. ANDERS:  Understood.
25              THE COURT:  Unless somebody can give me an argument --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

1214KDASC                    CONFERENCE

1    and I know there is some argument that I saw somewhere in
2    somebody's letter, about the three or four people from Winter &
3    Associates, but for the internal MSL people, I'm not sure what
4    difference it makes.
5             MS. WIPPER:  Your Honor, if I could address that, the
6    Winter & Associates is part of MSL Group that was folded in as
7    part of the reorganization.
8             THE COURT:  When were they folded in?
9             MS. WIPPER:  2008/2009.  We have been in contact with
10   employees of Winter & Associates, and we believe that they are
11   subject to similar policies and practices and --
12            THE COURT:  As of when they were folded in?
13            MS. WIPPER:  Correct.
14            THE COURT:  And they are also public relations --
15            MS. WIPPER:  Correct.
16            THE COURT:  -- staff?
17            MS. WIPPER:  Correct.  They are not named plaintiffs
18   but they are --
19            THE COURT:  Can your named plaintiffs represent these
20   people?
21            MS. WIPPER:  They're part of MSL Group, and from the
22   organizational charts that we have --
23            THE COURT:  If they are part of MSL Group, then it
24   seems to me you should not be looking at them separately.  And
25   I am certainly concerned with somebody who has the title of
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

40

1214KDASC                      CONFERENCE

1   general counsel.
2          So either they're the same as everybody else once the
3   reorg hit, in which case I don't see why you're targeting these
4   folks specifically, or they're different, in which case I'm not
5   sure you've got a plaintiff with standing.  What am I missing?
6          MS. WIPPER:  They're part of the MSL Group, they share
7   an office with MSL in L.A.
8          THE COURT:  At this point I'm denying the three people
9   from Winter.  So that gets our group of difference down to
10  nine.  What do you all want to do about it?
11         MR. ANDERS:  Your Honor, I would request that of the
12  people that we had proposed, that we discuss, or plaintiffs
13  suggest, people that could be removed.  I would like to try to
14  keep the database as close to the size it is now without --
15         THE COURT:  In other words, is the 3.2 million you've
16  referred to before or after the deduping?
17         MR. ANDERS:  It's after deduping and deNISTing.
18         MS. CHAVEY:  Your Honor, if I could also address a
19  number on my list, it's number 41, which is Don Lee the
20  managing director of PBJS Chicago?
21         THE COURT:  What is PBJS?
22         MS. CHAVEY:  PBJS is part of MSL Group but it is not a
23  PR agency; it's a very eclectic kind of media company, and it
24  operates separately and it is not part of the public relations
25  business of MSL Group.
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300