1214KDASC                    CONFERENCE

```
 1              THE COURT:  Why do you want Mr. Lee, Ms. Wipper?
 2              MS. WIPPER:  Because he is part of MSL Group.  And
 3    he's -- we were never told by defendants that they were not a
 4    PR agency.  We have asked --
 5              THE COURT:  Now you have been told they are different
 6    from the rest.  Do you still want Mr. Lee?
 7              MS. WIPPER:  Yes.  And I would propose that --
 8              THE COURT:  All right, you're not getting Lee.
 9              MS. WIPPER:  OK.
10              THE COURT:  Let's narrow this list.
11              MS. WIPPER:  Can we reconsider Winter & Associates
12    because the organization --
13              THE COURT:  No, no, not at this point without further
14    evidence as to why your plaintiffs have standing to deal with
15    this other than if Mr. Tsokanos and others in senior management
16    of MSL were discriminating against women during this period, in
17    which case it doesn't matter what Winter was doing.
18              MS. WIPPER:  Well, I have an org chart right here that
19    shows that Winter & Associates reports right into Jim Tsokanos.
20              THE COURT:  OK.  So what?
21              MS. WIPPER:  So they're part of the leadership team
22    that are making the decisions.
23              THE COURT:  I don't know what a leadership team is in
24    this capacity.
25              MS. WIPPER:  It says leadership team at the top of the
```

42

1214KDASC                    CONFERENCE

```
 1   organization chart.
 2           THE COURT:  Let me see the chart.
 3           I'm missing this.  Where is Winter on here?
 4           MS. WIPPER:  It's in the box at the bottom.  I think
 5   it's sort of in the middle.
 6           THE COURT:  Well, it's various people who report to
 7   Masini, et cetera.
 8           MS. WIPPER:  No, it reports through that top layer to
 9   Jim, if you see --
10           THE COURT:  Yes, it reports to Masini, and Masini
11   reports to Tsokanos.  So does Canada and various other things.
12   So what?
13           OK, denied at this time without prejudice to renewal
14   at some later point.
15           MR. ANDERS:  Your Honor, I guess, going down the list,
16   the first person that I guess I would take issue with, based on
17   how we're doing this is, Scott Bedowin.  He's an SVP of Global
18   Consumer Marketing, not at that MD or HR type level that we
19   were considering, so I think he should come out.
20           THE COURT:  OK, what's his role?
21           MS. WIPPER:  Your Honor, defendants have decided to
22   put in the immediate supervisors of our plaintiffs.  We didn't
23   request that.  What we have done is put in comparators to our
24   plaintiffs, and we had a plaintiff who was --
25           THE COURT:  If he is a comparator -- and this is email
```

```
1214KDASC                    CONFERENCE
```

```
 1   searches that apparently are going to be run across everybody's
 2   email -- you're going to get a lot of stuff from so-called
 3   comparators that isn't relevant, it doesn't make sense to do it
 4   as a uniform group.  If you want to say that you've got certain
 5   comparators who you want different searches run on, that's a
 6   different story.  It doesn't make sense to pull all their
 7   material in because they're a comparator at the same level.
 8           MS. WIPPER:  We would agree to that.
 9           THE COURT:  All right, my 12:00 o'clock call has
10   called in.  I have lunch at 1:00.  I'm hoping this won't take
11   long.  Do you all want to just sit here or do you want to go
12   into the jury room and maybe work out some of these issues?
13   Go, lawyers and consultants, as needed, into the jury room.  Do
14   not leave there.  We will come get you after I deal with this
15   call.
16           (Recess)
17           THE COURT:  OK, it's somewhere between 12:40 and
18   12:45.  We're back on the record after my other conference.
19           What progress have you made?  Or perhaps the other way
20   of looking at it is:  What is it in the 15 minutes we have left
21   before lunch that you want me to rule on or give you advice on
22   with respect to the ESI protocol?
23           MR. ANDERS:  Your Honor, we spent the bulk of the time
24   talking about the custodian list.  We have identified five
25   custodians that are, I think, more on the either comparator
```

```
       1214KDASC                  CONFERENCE
 1     category or secondary category where I think your Honor
 2     suggested that maybe those email accounts get filtered prior to
 3     being put into the database -- that's what we were trying to
 4     understand -- but we have identified five where at least
 5     plaintiffs would be willing to apply some type of keyword
 6     search in the filtering to them first.
 7                THE COURT:  All right.
 8                Ms. Wipper?
 9                MS. WIPPER:  With respect to the custodians, I believe
10     that the parties would be able to work it out.  What we would
11     like to hear from the Court is your view on the differences
12     between the two protocols.  Our protocol is --
13                THE COURT:  I have no idea.
14                MS. WIPPER:  OK.
15                THE COURT:  When you send me 50 pages each, late at
16     night and/or the morning of, when you knew this conference was
17     scheduled for quite some time, there's a limit, and it was not
18     done as a redline or anything else as to where your differences
19     are.  So you tell me what it would be most helpful for you, for
20     the ten minutes or so we have left, to rule on or advise on,
21     and I'll deal with it.
22                MR. ANDERS:  Your Honor, I think that the key issue is
23     how we use predictive coding, and that's where there's
24     probably -- that's why we have our experts here, our vendors.
25                The way defendant MSL proposes using the predictive
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

1214KDASC                    CONFERENCE

```
 1   coding process would be as follows:  We start with an initial
 2   random sample, with a confidence level of 95 percent, with an
 3   interval of plus or minus 2 percent.  With the 3.2 million
 4   document database, that random sample is 2,399 documents.  We
 5   have gone through those preliminarily.  I had associates go
 6   through those; I just finished going through it last night.
 7              Of that 2,399 --
 8              THE COURT:  Just to stop you right there, my
 9   understanding of predictive coding is that the coding, as
10   painful as it is, should be done by a very senior attorney,
11   meaning partner level or very senior associate, not the usual
12   team of umpteen lower associates with a lower billing rates.
13              MR. ANDERS:  That's why I reviewed it, your Honor.
14              THE COURT:  Well, as "reviewed it" as every one of the
15   coding decisions or spot-checked it?
16              MR. ANDERS:  No, where I am right now is I have gone
17   through every one that was marked as relevant, I went through
18   400 so far that have been coded as not relevant, and I intend
19   to go through all of those but I first looked at the ones that
20   were relevant.
21              THE COURT:  At the end of the process, you're going to
22   have done every single one of the --
23              MR. ANDERS:  Yes.
24              THE COURT:  Then I'm not sure why your client paid for
25   someone else to do it first, but that's not my problem, that's
```

46

1214KDASC                    CONFERENCE
1    their problem.
2              OK, continue.
3              MR. ANDERS:  So far 36 were deemed relevant.  Of the
4    400 not relevant I have reviewed, they were clearly not
5    relevant.  So right now the baseline is .015 percent of that
6    random sample was relevant.  If you translate that to the
7    entire database, that's 48,000 documents.
8              After we did a random sample, then what we have done
9    at the same time is we have applied keywords and we have taken
10   the results of those keywords and sample-coded.  So, for
11   example, if there's a keyword "reorganization," we may have
12   reviewed the top 200 random hits.  We did that across the
13   board.
14             Also, to respond to several of plaintiffs' targeted
15   document requests, we ran targeted searches across the
16   database.  That's what we have already produced, about a
17   thousand pages of documents.  So we have that coding that's in
18   there.
19             Plaintiffs' counsel, they have sent us now three
20   different revisions of keywords.  What I have proposed to
21   plaintiffs' counsel is, I'll give you the hit lists.  I've
22   already given them two sets of hit lists; we have another set
23   to give them, I'll review -- or we'll review 3,000 of those
24   hits, you tell us how you want us to review it but pick the
25   hits, we'll review any of the top 200 in these ten categories,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

47

1214KDASC                 CONFERENCE

 1   you tell us how to review it.  We'll give them those results as
 2   well.
 3         Once that initial coding part is done, we'll let the
 4   system go out, it will do a sample of, you know, train itself,
 5   we'll get the results.  Our proposal was to review, one, a
 6   random sample of the results that come back as well as certain
 7   judgmental sampling, share those results with plaintiff, they
 8   can make their suggestions on how certain things should be
 9   coded.
10         We have also identified six different categories that
11   documents can be coded towards.  I think plaintiffs have asked
12   for us to do eight or nine.  We can figure that out.  Go
13   through that iterative process twice.  At that point -- and
14   this is where sort of the proportionality and cost-limiting
15   comes in -- after we've gone through the iterative process
16   twice or if we have to go through another time, have the
17   computer give us the documents in rank order.  And we have
18   agreed or proposed reviewing the top 40,000 rank documents.
19   And we arrived at that 40,000 document number -- we estimate it
20   will cost approximately $200,000 using a five-dollar a document
21   cost estimate, it will cost 200,000 to review the 40,000.
22         When you take that 200,000 in review costs and you
23   couple it with our vendor costs, we're looking at a total spend
24   of approximately 550,000.  We understand that plaintiffs take
25   issue with some of our vendor costs -- we can dispute that --

1214KDASC                    CONFERENCE
```
 1  but even just looking at the $200,000 attorney fee review cost,
 2  we think that that is a more than appropriate amount to spend
 3  to see what we get.  We have never told plaintiffs that we're
 4  going to do this and this is all that you get.  Our view is,
 5  let's see what this yields us first, we think these are the
 6  most relevant people, this is a sophisticated and excellent way
 7  to find the cream of the crop, if you will.  And after that
 8  process is done, we'll be in a much better position to argue
 9  and debate whether or not the incremental value of searching
10  another custodian is going to be worth the cost.  And that's
11  essentially our view.
12          THE COURT:  Let me hear from Ms. Wipper.
13          MS. WIPPER:  Your Honor, we disagree with defense
14  counsel's position that the only issue is predictive coding,
15  because that kind of skips over a lot of other issues that --
16          THE COURT:  Well, let's deal with the predictive
17  coding piece.  I understand, from what little I have skimmed of
18  your proposal and theirs, that they're sort of only looking at
19  an email archive and you want lots of other steps looked at.
20          But assume that that other piece gets resolved,
21  meaning where they have to look, and maybe their 3.2 million
22  database will double or go up to whatever, but what's wrong
23  with the predictive coding methodology they have proposed,
24  which also sounds like it's being run on a fairly transparent
25  and cooperative basis?
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1214KDASC                 CONFERENCE
 1              MS. WIPPER:  Well, the main issue is cost because --
 2              THE COURT:  No, but where?  In other words --
 3              MS. WIPPER:  It's impacting the methodology.
 4              THE COURT:  Well, the question becomes the review.
 5    And my understanding of the way this works is by the time that
 6    the system spits this out, and whether it's the top 40,000 or
 7    whether the break point is 50,000 documents or 30,000, that
 8    90-something percent of the relevant documents are going to be
 9    found in the top hits, and that the costs of reviewing the rest
10    is not worth the candle in most cases.
11              Now, where that line gets drawn is something that I
12    can't decide until I've seen the results.  In other words, when
13    one sees the results, as I understand it from this method, one
14    can see a sharp drop-off at a certain point, at which you then
15    still sample the documents that are not going to be reviewed,
16    and that's part of this whole iterative process.
17              If you are seeing that the top 40,000 documents give
18    you 90 percent of the responsive documents, and it's going to
19    cost a million dollars to go to the next hundred thousand
20    documents for eyes-on review, to get another 5 percent, it's
21    probably not worth it.  If it's worth it to go to the top
22    50,000 because that's where the cliff line seems to be, that's
23    what people are going to have to do.
24              It also may be that once privilege is determined, that
25    they will let you -- the rest of this is so likely to be junk,
```

50

1214KDASC                     CONFERENCE

1   that you want, under an attorneys'-eyes-only or some process,
2   an informal basis, you want to look at the documents that go
3   from 40,000 to 80,000, you can look at them and if you tell
4   them, you know, gee, having looked at it, there's a lot of good
5   stuff here, then there's some problem with the process.
6           I'm not saying 40,000 is the cutoff -- I can't really
7   determine that -- and I invite both sides' experts to tell me
8   if I've gotten this wrong but I've sat through a lot of
9   training sessions on this, wherever that cliff is, that where
10  is where the break should be.  So if that was the only problem
11  you had with that part of the predictive coding process, then
12  it sounds like you all can go down this road, all of this,
13  without prejudice to additional search as may be necessary and
14  additional processes as may be necessary.
15          So is that the only problem, Ms. Wipper, or is there
16  anything more?
17          MS. WIPPER:  No, there's a dispute about the scope of
18  relevancy.  What happened --
19          THE COURT:  I've ruled on that.  That's what we spent
20  the morning doing.
21          MS. WIPPER:  OK.
22          THE COURT:  So whatever rulings I gave on that are
23  going to apply to the emails as well.  So any positions they
24  were taking in the ESI protocol are now going to have to be
25  revised, based on what I have done this morning, and similarly

51

1214KDASC                      CONFERENCE

```
 1   on your side.
 2              MS. WIPPER:  OK, and also I'd like to respond to
 3   defense counsel's description of their proposal.  I'd like DOAR
 4   to respond and give you an overview, if we may, on our proposal
 5   on predictive coding.
 6              THE COURT:  All right, though I guess I'd like to know
 7   where it differs.
 8              MS. WIPPER:  Well, it's actually a direct response to
 9   their proposal.
10              THE COURT:  OK.
11              MS. WIPPER:  So who am I going to hear from?
12              MR. NEALE:  Paul Neale, your Honor.
13              THE COURT:  Mr. Neale?
14              MR. NEALE:  I actually think you pointed to exactly
15   the issue.  We have not taken issue with the use of predictive
16   coding or, frankly, with the confidence levels that they have
17   proposed except for the fact that it proposes a limit -- the
18   ultimate result of 40,000 documents before we have seen any of
19   the results coming out of the system.
20              THE COURT:  I've already said -- and I want to make
21   sure that defense counsel realizes it -- I'm not buying your
22   40,000 as a pig in a poke.  I understand the concept, but where
23   that line will be drawn -- whether it's 40,000, 50,000, 60,000,
24   20,000 -- is going to depend on what the statistics show for
25   the results.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1214KDASC                    CONFERENCE
```

 1            MR. ANDERS:  I guess, your Honor, that's why I stood
 2   up before, because I wanted to ask you something.  I understand
 3   that that cliff line may be at 80,000 documents.  The reason
 4   why we picked the 40,000 is what we're trying to do is also
 5   incorporate the cost element.  We picked 200,000 as what we
 6   think --
 7            THE COURT:  Proportionality requires consideration of
 8   results as well as costs.  And if stopping at 40,000 is going
 9   to leave a tremendous number of likely highly responsive
10   documents unproduced, it doesn't work.  Plus, of course once
11   you have the predictive coding run, the cost after that is how
12   much you're doing an eyes-on review of.  And once you've weeded
13   out the privilege documents -- and I assume you either have the
14   502(d) order or you will be providing one for me to sign off
15   on, because I think in a case of this size, if you're not
16   agreeing to one, you're committing malpractice -- how much
17   money you spend thereafter is a result of how much you want to
18   know what's in the documents or, putting it perhaps a different
19   way, CYA.  If the first 60,000 are clearly showing that they're
20   highly relevant but you're running out of money after 40,000,
21   don't review the other 20,000.  That's up to you.
22            MR. ANDERS:  We've considered that, your Honor, and I
23   think the attorney-eyes-only type of agreement or designation
24   may be appropriate here, because one of the concerns we have
25   is, some of the plaintiffs are now working for competitors.  To

53

1214KDASC                    CONFERENCE

1     the extent that they're seeing --
2              THE COURT:  This is not a case where I assume, other
3     than on anecdotal, that there is going to be much need for the
4     individual plaintiffs to look at the documents.  I'm sure you
5     can all work that out.
6              Now, unfortunately it's 1:00 o'clock.  I'm happy to
7     have you come back.  I've got a 2:00 o'clock, and there may be
8     a 3:30 from people who forgot to show up this morning and were
9     told to try to get their act together and get here this
10    afternoon.  You can come back this afternoon, you can come back
11    in a day or two.  I think we have made some good progress, and
12    I know that you're coming from further away than usual, so I'd
13    like to make the most use of your time.
14             What's your pleasure?  You want to come back at 3:30
15    in the afternoon and use the time from now to then?  You can
16    use the jury room.
17             MR. ANDERS:  Maybe, your Honor.  The only reason why I
18    say that is, tomorrow I am leaving the country for a week for a
19    family vacation, so I'm out of pocket for a week; I'll have
20    some email but not a lot.  So, again, I don't want to impose on
21    everybody else, but that's my scheduling issue, so I'm not sure
22    how much we'll get done within the next week.
23             THE COURT:  That's why I'm suggesting you maximize --
24    I don't know what time your flight home is -- well, you're in
25    Morristown.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54

1214KDASC                    CONFERENCE

1      MR. ANDERS:  Today's fine for me, your Honor.
2      THE COURT:  You're fine for today.  If everybody wants
3  to stay -- you just spent an hour talking about custodians and
4  made some progress -- there's a certain benefit, I think, in
5  keeping you hostage because it avoids the delay between phone
6  calls, et cetera, et cetera.  So if you want to take an hour
7  for lunch, be all back at 2:00 o'clock, you can use the jury
8  room.
9      MR. ANDERS:  That's perfect.
10      THE COURT:  And as soon as whatever is going on with
11  my afternoon conferences gives me time to see you, we'll deal
12  with you, but you're not leaving until you've checked out with
13  me.
14      MR. ANDERS:  Thank you, your Honor.
15      THE COURT:  OK.  Enjoy lunch, but get back, use the
16  cafeteria on the eighth floor or whatever else, but don't waste
17  half the afternoon by having a nice lunch.
18      MR. ANDERS:  Understood.
19      (Recess)
20      THE COURT:  We are back on the record for part two of
21  Da Silva Moore et al. against Publicis.
22      What progress have you been able to make on the ESI
23  protocols or, more importantly, which of the issues you've
24  talked about would you like a court ruling or guidance on?
25  Whatever you have agreed upon we will memorialize in some other

```
      1214KDASC                    CONFERENCE
 1    way.
 2              MR. ANDERS:  I think we made a lot of progress, your
 3    Honor.  It may be easier just to say where we are.
 4              On the list of custodians, we have identified eight
 5    custodians that the plaintiff would like us to add, five where
 6    they would be willing to first apply some level of filtering to
 7    their results, and then we would either manually review or
 8    possibly add those results into the database.  We're going to
 9    go back and just confer with our clients and those individuals;
10    there may be certain sensitivities about the particular people
11    but we at least have been able to further narrow the custodians
12    on the overall concept of predictive coding.  We had a lot of
13    conversation and discussion about that; I think we're in
14    agreement on the process.
15              The process is going to be generally as we discussed
16    it before, but what we're going to do is, I think, have more of
17    the iterative reviews, and what we're going to try to do is
18    hopefully be able to do those iterative reviews until we find
19    the cliff that your Honor was referring to.
20              My only concern, and what I want to work into the
21    agreement, is if these iterative reviews are taking longer than
22    anticipated and the costs are mounting, having some mechanism
23    in the agreement where there can be a point where we either
24    discuss it or raise it with your Honor, that, look, we have
25    reviewed 60,000 so far, this is what's coming back, the end
```

56

1214KDASC                    CONFERENCE

1   doesn't seem to be in sight and we've spent X amount, just
2   having something in the agreement to address that possibility.
3          THE COURT:  I have no problem with you all putting in
4   the agreement that you're going to cooperate and work in good
5   faith.  But if things aren't working out because of expense or
6   results not being what either of you hoped for or whatever,
7   that it can be revisited with the Court, the caveat to that is
8   obviously once you go down a certain route, it's going to be
9   very expensive to completely abandon that and say we're now
10  going to do something completely different, so that's probably
11  not something you'll be able to do.
12          Tweaking it, in terms of adding another custodian late
13  or doing a further iteration where you change a search term or
14  better train the computer with some more documents, I don't
15  have a problem with that occurring or the converse of that,
16  with the defendant coming in and saying, you know, we've
17  already spent twice what we thought we were going to spend,
18  we've made enough progress that the next X percent search that
19  that the plaintiff wants us to do is not worth the candle.
20  That's what I said this morning as well.
21          All right, what else?
22          MS. WIPPER:  We would add to that, plaintiffs would
23  propose if we get to that point, that defendants don't do a
24  manual review and just turn over the documents.
25          THE COURT:  All right, that's an argument you can make

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1214KDASC                    CONFERENCE

```
 1    later on, that, OK, this system kicked out all of this.  But
 2    usually the sampling is in lieu of that, which is to say that
 3    if you get to a certain cliff and you have reviewed -- I'll use
 4    defendants' number from before -- 40,000 and the next 50,000
 5    are considered not likely to be relevant and you run a sample,
 6    statistical or random or whatever, of that balance, you say,
 7    OK, we looked at another thousand documents and found one that
 8    really was relevant, that's probably the end of the ballgame.
 9            On the other hand, if you run a thousand and you find
10    a hundred that are relevant, that may mean that more work has
11    to be done in one way or another.  And I'm not meaning to fully
12    prescribe any, which your experts sitting behind you can
13    probably do better, on what is your 95 percent confidence level
14    or any of that stuff, but at some point it doesn't mean that
15    because predictive coding spits it out as having a 1 percent
16    chance of relevance, that I'm going to say, OK, the defendant
17    has to forego manual review but produce all of it, as opposed
18    to, you'll do a sampling and see if it really is mostly junk.
19            Understood?
20            MR. ANDERS:  Understood.
21            THE COURT:  On both sides?
22            MR. ANDERS:  It makes sense, your Honor.  I guess the
23    way we had initially tried to craft the proposal was by putting
24    up front the dollar figure that we thought was appropriate.
25            THE COURT:  That's somewhat meaningless.  And,
```

1214KDASC                    CONFERENCE
```
 1   frankly, it then gets into fights about "if you didn't get to
 2   Recommind and you went to XYZ company, that piece of it would
 3   be 25 percent cheaper and that shouldn't be attributable to us
 4   and your associates at Jackson Lewis are paid too much per
 5   hour, that shouldn't be attributable to us."  I will look at
 6   proportionality, but I'm not telling you that there is a
 7   particular number that's better than another on how much work
 8   you've got to do.
 9           MR. ANDERS:  I understand.  That came across clear.
10           I just want to make sure that I understand what you're
11   saying, is if, as we're going through this iterative review, we
12   reach a point -- and I don't know what point is -- in terms of
13   cost, where even if the computer is saying there is X percent
14   relevance still out there, that we're not foreclosed from
15   making the proportionality argument at that point.
16           THE COURT:  That is correct.
17           MR. ANDERS:  OK.
18           The other thing we had discussed, your Honor, were
19   those sources that would not be reviewed through predictive
20   coding.  For those sources, we have agreed to do targeted
21   searches of some of them; for others, we need to find more
22   information about what information is actually housed there,
23   but I think we were able to work through some of these other
24   sources, shared drives --
25           THE COURT:  This is the material that's on page 2 and
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

59

1214KDASC                    CONFERENCE

1    3 of plaintiffs' proposal, I assume?
2            MR. ANDERS:  Yes, your Honor.
3            THE COURT:  I'm not asking you to give me much more
4    detail on that as long as there is agreement so that you're
5    moving forward without the need of further court help on it.
6            MR. ANDERS:  There is, your Honor.  We're moving
7    forward on that.
8            MS. WIPPER:  There are two points that we wanted to
9    raise.  The first one was concerning the time period for the
10   emails.
11           Earlier today defense counsel said that their email
12   archive went back to 2008.  There is also a separate email
13   that's available from a legacy system that's stored in home
14   directories or shared folders.  So we would propose that for
15   pay discrimination issues, that we would apply the longer
16   period to 2 --
17           THE COURT:  For pay discrimination, we're not doing an
18   electronic search.  You're getting that from the personnel
19   material and the material you got on payroll.  It's unlikely
20   that email is going to find anything, and if it is, frankly,
21   it's going to find it in the post-2008 period that's in the --
22   I'll call it the master database, the archive system, that they
23   have established.  So I don't see that as being necessary,
24   certainly not in any immediate wave.
25           On all of this, I'm not foreclosing you, as you
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

60

1214KDASC                    CONFERENCE

1    develop information from the documents produced or from
2    depositions, from saying that you have learned something new,
3    but if there is a smoking gun email that says, you know, I'm
4    the president of the company and it is our policy to pay women
5    less than men, I guarantee you that will get repeated in the
6    newer system.  And for that needle in a haystack, I'm not going
7    to have them bring up an additional search.
8              What else?
9              MS. WIPPER:  I would just add to that much.  They
10   haven't produced the payroll data yet.
11             THE COURT:  We talked about all of that this morning.
12   I'm not revisiting things.  It's been a long enough day.
13             MS. WIPPER:  I just wanted, before we move from
14   predictive coding, I also want to address the issue codes, what
15   we agreed to do, because there's a dispute about the
16   definitions that plaintiffs proposed.  We're going to try to
17   deal with that in the coding process; and it's possible, if we
18   can't agree, that we would need the Court's assistance.
19             THE COURT:  I'm sure I'll be seeing you again soon.
20             MS. WIPPER:  OK.
21             MR. ANDERS:  I believe that was it, your Honor.  I
22   think we were going to talk about some time frames.  I think at
23   least with the ESI protocol, my plan is probably the night
24   before I leave to at least get emails out on questions about
25   parts of the systems and then as soon as I return, if not while
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1214KDASC                    CONFERENCE

```
 1   I'm away a little bit, try to redraft the protocol to address
 2   what we discussed today.
 3            THE COURT:  I know every lawyer thinks they're
 4   indispensable and I'm not pulling the "Jackson Lewis is a big
 5   firm and you're all fungible," but is there not another person
 6   who may be less email savvy or computer savvy than you, such as
 7   Ms. Chavey, for example, who can follow up, along with the
 8   folks from Recommind and plaintiffs' counsel, and not lose an
 9   entire week because you're on vacation?
10            MS. CHAVEY:  Of course, your Honor.
11            THE COURT:  And I happen to know, it may not be on
12   this case, if it's a true e-discovery dispute, I happen to know
13   your Florida e-discovery counsel very well --
14            MR. ANDERS:  He knows a little bit.
15            THE COURT:  You can bring Mr. Losey into the mix if
16   need be.
17            MR. ANDERS:  OK, understood.
18            THE COURT:  What else?
19            MS. CHAVEY:  Your Honor, I know your Honor said you
20   weren't going to reconsider what was addressed this morning,
21   but I did look, during the break, about the issue about
22   Mr. Tsokanos in complaints that had been made against him.  I
23   think on plaintiffs' counsel's representation that their
24   understanding was there had been a complaint in 2005, you
25   ordered us to provide that.  There was not a complaint in 2005.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1214KDASC                    CONFERENCE

```
 1   There was something earlier than that.  And I just wanted to --
 2           THE COURT:  How early?
 3           MS. CHAVEY:  2003.
 4           THE COURT:  But that was the Atlanta --
 5           MS. CHAVEY:  It was in Atlanta.
 6           THE COURT:  Produce it.  Obviously it's discrete and
 7   can be found.
 8           Before I lose track, for the paper discovery we talked
 9   about this morning, how soon can you complete that?  One week,
10   two weeks, six years?  Come on.
11           MS. CHAVEY:  Your Honor, we would need at least 30
12   days.
13           THE COURT:  I don't know how you're going to do that
14   in 30 days, finishing e-discovery protocol that's not going to
15   be finalized for more than a week despite me getting other
16   people involved while Mr. Anders is away, run the ESI, go
17   through iterations and meet a June 30 discovery deadline with
18   depositions and everything else.  I think you're being a little
19   generous there.  So one more chance.  Working harder, faster,
20   et cetera, how soon can you do it?
21           MS. CHAVEY:  Well, one issue, your Honor, for example,
22   is with the personnel action notices.  We understand the order
23   to require us to work with the plaintiffs to come up with a
24   statistically significant sample.  That in and of itself is
25   going to take a while and then there's going to be the
```

63

1214KDASC                    CONFERENCE

1  searching for the notices, so there is time that needs to be
2  built in in order for that to occur.
3           THE COURT:  Can you live with 30 days, Ms. Wipper?  If
4  not, tell me what you can live with.
5           MS. WIPPER:  We have a deposition scheduled with
6  defense witnesses starting the end of this month.
7           THE COURT:  With all due respect, if you want to keep
8  to that schedule, you're going to be deposing them without
9  documents.
10          MS. WIPPER:  Correct.
11          THE COURT:  And let's all be clear on the way I run
12 this, which is, if you want to take early depositions to learn
13 things, that's fine; you don't get to redepose somebody whose
14 deposition was finished because you get documents later that
15 you knew you didn't have, as opposed to when they say, OK,
16 we've completed our document ESI production and you take a
17 deposition and then a week after the deposition they say look
18 what we found in the warehouse somewhere; then you may get
19 another deposition.  So if you want to take a deposition at the
20 end of the month, that's fine, but let's say I push them to get
21 you something in two weeks, which means you both have to be
22 very fast on how you're running the statistical significant
23 determination, you're going to have to review it before the
24 deposition, it's not likely to happen.
25          MS. WIPPER:  I would propose three weeks.  We work
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

64

1214KDASC                    CONFERENCE

1   with statisticians regularly so we can have the sample done or
2   our proposed --
3              THE COURT:  That sounds like a viable compromise.
4              So that is three weeks from today, which is
5   January 25th, subject to somebody, by written agreement or by
6   applying to the Court for more time, we'll go from there.
7              OK, other than a date for you all to come back and
8   probably a date for you to complete the ESI protocol to ensure
9   that your feet are held to the fire, is there anything else we
10  need to do on discovery today?
11             MS. WIPPER:  I just wanted to address one point from
12  earlier today and just get clarification from the Court.  On
13  the cutoff date for the production, you said February 2011 for
14  the HR complaints.  I'm wondering if that's a global cutoff
15  date.  We have a plaintiff that left the company after that
16  date, Carol Pearlman --
17             THE COURT:  Is she in the original complaint or the
18  amended complaint?
19             MS. WIPPER:  She's an opt-in plaintiff.
20             THE COURT:  When did she opt in?
21             MS. WIPPER:  I don't know off the top of my head.
22  Probably months ago.
23             THE COURT:  The amended complaint is dated April 14th.
24  Was it before or after?
25             MS. WIPPER:  No, it was after that.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

65

1214KDASC                    CONFERENCE
1          THE COURT:  You've got to have some way of dealing
2    with this.  So I'm inclined to either leave it at the February
3    date or maybe to push it to April 14th of 2011, other than when
4    we get to privilege issues, I'm not going to require them to
5    log almost anything post initial complaint.
6          MS. WIPPER:  We would propose the amended complaint
7    date as the cutoff.
8          THE COURT:  So we're adding a month and a half or
9    something.  Problem, agreement?
10          MS. CHAVEY:  Well, it seems appropriate to limit it to
11    and cut it off at the date of the initial complaint.  The fact
12    that Carol Pearlman opted into the April Pay Act claim later
13    doesn't seem to affect the Court's ruling that the date would
14    be February.
15          THE COURT:  All right, let's leave it where it was
16    originally.
17          What else?
18          MR. ANDERS:  Your Honor, I just want to make sure I
19    heard correctly:  Did you give a definite date for when the ESI
20    protocol must be completed?
21          THE COURT:  No.  Give me a proposal.  A week after you
22    come back or a/k/a two weeks from today?
23          MR. ANDERS:  That would be perfect.
24          THE COURT:  Agreeable?
25          MS. WIPPER:  Sure.  And you want a joint proposal,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

66

1214KDASC                    CONFERENCE

1     your Honor?
2                THE COURT:  Yes.  And if you can't agree, I want it as
3     a single document with paragraph 3, whatever paragraph 3 is
4     about, 3(a) plaintiffs' proposal, 3(b) defendants' proposal,
5     and then a cover letter from each of you explaining, to the
6     extent it's not immediately obvious, what it is you're
7     disagreeing on.  So that's January 18th.
8                OK, next, date for our next court conference, what's
9     your pleasure?
10               MS. WIPPER:  How about a week after the ESI protocol?
11               THE COURT:  Well, I think that's probably going to be
12    early unless you think there are ESI protocol problems, only in
13    the sense that the document production out of what I'll call
14    this morning's production is due the 25th.  On the other
15    hand --
16               MS. CHAVEY:  Your Honor, what about February 2nd?
17               THE COURT:  That's LegalTech week.  Yes, by Thursday
18    that's OK.  February 2nd at 9:30.
19               Now, the other thing:  When is it you plan to move for
20    class certification?
21               MS. WIPPER:  I believe it's in the schedule, your
22    Honor.
23               THE COURT:  I don't think it is but I'm willing to be
24    educated.
25               MS. CHAVEY:  Your Honor, it is in the scheduling order
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

67

1214KDASC                    CONFERENCE

1   but it is due on or before April 1st of 2013.
2            THE COURT:  Frankly, that makes no sense to me.  I
3   know you convinced Judge Sullivan to do that.  It won't be the
4   first time I've overruled the district judge; it's a strange
5   world that we live in.
6            Yeah, I understand the purpose of getting past the
7   expert period, but if you make the motion on April 1, it won't
8   be fully briefed until the summer of 2013, it won't be decided
9   until the fall of 2013 or January 2014.  You can't really do
10  summary judgment or anything substantive until the class either
11  has or hasn't been certified.  And then if either a class or an
12  FLSA collective action is certified or the appropriate other
13  term for a collective action is approved, you've got to go
14  through 30 days to draft the notice, 60 days or 90 days for
15  people to opt in, you are assuring -- and this is something
16  plaintiffs should be thinking about even more than the
17  defendants -- you're assuring no merits resolution of this,
18  assuming a class of any sort, class or collective is approved,
19  until 2014 or '15.  That hardly seems to be in plaintiffs'
20  interests.  And I'm not sure that on the FLSA collective
21  action -- you've got discrimination claims -- that's one type
22  of motion -- and to the extent you've got FLSA and New York
23  Labor Law claims, that's a much more discrete area, it seems to
24  me.  And leaving all of that until the very end, particularly
25  since FLSA requires opt-in plaintiffs, and my recollection but

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1214KDASC                    CONFERENCE
1   you all tell me if I'm wrong, is that there is no stopping of
2   the statute of limitations until they opt in?
3           MS. WIPPER:  Correct.
4           THE COURT:  So if this case, which began in early
5   2011, if it's not certified until 2014 or '15 for collective
6   action issues, the whole period between now and then, when you
7   will assume that if there was anything bad going on at the
8   defendants, they will have cleaned up their act during the
9   course of this lawsuit -- and I'm not saying I know there was
10  anything bad or good going on -- you're assuring that the FLSA
11  in particular, even with a six-year statute of limitations on
12  the state claims, is going to be almost a nullity or it's going
13  to be a totally different lawsuit, that most of the period
14  within the statute of limitations is going to be a period on
15  which there has been no discovery.
16          Does it make sense -- not that I want more work for
17  Judge Sullivan or myself -- to do something differently for the
18  FLSA New York Labor Law than the Title 7 and related
19  discrimination claims?
20          MS. WIPPER:  Well, your Honor, I think it depends on
21  the discovery because we have the burden and we have been
22  spending an enormous amount of time trying to get discovery in
23  this case for many, many months.  So, today, as I stand here
24  today, I can't say for sure we will be prepared to file
25  something until we have the discovery.

69

1214KDASC                    CONFERENCE
1            THE COURT:  On the FLSA and New York Labor Law?
2            MS. WIPPER:  We need the payroll data.
3            THE COURT:  Well, you basically have that, I thought,
4    subject to the cleanup -- and I'm not revisiting what I ordered
5    this morning.  So that you're going to have by the end of this
6    month.  Whatever work your experts need to do, I don't see
7    waiting until April 1st of 2013, and, frankly -- and I'm not
8    trying to help the defendants -- if I were them, I'd oppose
9    certification at that point if for no other reason than that
10   most of the period within the statute of limitations will be a
11   period where there hasn't been discovery.  And if we stick to
12   the schedule, because you got Judge Sullivan to approve it and
13   I decide not to stick my neck out and overrule him, so to
14   speak, I'm not reopening discovery.  You can bet on that.  Once
15   discovery closes, it is done, because nobody wanted bifurcation
16   the second time today because 99 percent of it was held to be
17   relevant either way.  Think about it and maybe in February,
18   too, we can revisit that issue.
19           MS. WIPPER:  OK.
20           THE COURT:  I guess the last issue, although I
21   suspect -- I don't know what I suspect.  I generally at first
22   or early conferences raise the 636(c) issue.  I don't remember
23   raising it at our prior conference because they were on a sort
24   of emergency basis, et cetera.  But I remind both sides that
25   pursuant to 28, U.S. Code, Section 636(c), if all parties
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

70

1214KDASC                    CONFERENCE

1  consent, then the case can be in front of me for all purposes,
2  including the jury trial you've asked for here and any appeals
3  to the Second Circuit, they're the same from a magistrate
4  judge, consented trial or motion decision, as it would be in
5  front of a district judge, and it's up to all of you and our
6  missing friends from Publicis.
7        So by the February 2 conference, obviously a decision
8  to keep thinking about it keeps your options open, but it also
9  keeps one side or the other -- whoever is in favor of it now
10 and the other one is not so sure, by two months later, that
11 position may reverse.  So the sooner you all decide, you
12 decide, I'll ask you to tell me where you are at the February 2
13 conference and we'll go from there.
14       And finally -- perhaps my second "finally" but
15 finally, the jurisdictional discovery and all that against
16 Publicis, is anything happening in that area?  I don't want
17 them to prejudice them from not being here but I don't know
18 that the quietness with respect to that, as opposed to
19 everything going on here, is the result of nothing going on or
20 is the result of there not being the same problems.
21       MS. WIPPER:  Well, we served discovery on October 19th
22 on Publicis Groupe according to the schedule, and on MSL.  They
23 asked for a month extension to respond.  We gave that to them
24 and they produced documents, some documents, Publicis Groupe,
25 and responded with objections on the 21st.  We're probably
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

71

1214KDASC                    CONFERENCE

1   going to have to have a meet-and-confer with them concerning
2   some of their objections and their responses, but right now we
3   don't foresee any disputes at this time.
4           THE COURT:  Well, you've got a March 12th cutoff.  The
5   earliest I'm likely to want to deal with that, since it seems
6   like you all are going slowly, is at the February 2 conference.
7   That's going to leave you very little time if there are
8   problems, to get them resolved and get whatever depositions or
9   whatever are going to occur post the paper/ESI side of
10  discovery.  So don't lose sight of it.  Let's have Publicis
11  here at the next conference, even if there is complete
12  agreement that everything they have been doing is fine.
13          The other thing is, you all can figure out how to do
14  this when we're going to have megaconferences like this.  I
15  certainly prefer everyone to be present in person.  If it gets
16  to the point where you know in advance there's one minor issue
17  and one of the local counsel, more local, will be here and the
18  other is from San Francisco, for example, while the airlines
19  need all the help they can get, it's not my job to feather
20  their covers, so if you want to show up telephonically, ask for
21  permission to do that, which, as I say, will be granted if you
22  really think the conference is going to be the typical half
23  hour discovery conference and not the 500 pages of letters,
24  et cetera, et cetera, like we had today.  You do not need to
25  ask permission for your e-discovery consultants to attend.  If

1214KDASC                    CONFERENCE
1   there are any ESI issues, and assuming you're willing to pay
2   the freight for them, I am not only delighted to see them but
3   they're usually a valuable addition.
4            I think that covers everything.  I guess I'll just
5   say, my rules provide that if things start going much more
6   smoothly and two business days before the next conference we
7   decide you really are getting along swimmingly and you worked
8   things out and things should just be put off a few weeks, you
9   can make that application, either by a joint phone call to my
10  secretary or by a fax, requesting that, and nine times out of
11  ten those requests are granted.  They're not granted when they
12  come in at 5:00 o'clock the night before and the Court suspects
13  that somebody's already on an airplane.  And they're not
14  granted unless they're on consent, meaning if one side says I
15  don't need the conference but the other side is frothing at the
16  mouth because they're being frustrated, we're obviously going
17  to have a conference.
18           Any questions?
19           MS. CHAVEY:  No, your Honor.
20           THE COURT:  All right, the transcript, as usual,
21  constitutes the Court's order.  And I think I may have said
22  this once before -- and somebody certainly took up the process
23  and therefore knows the process -- but I'll say it this last
24  time, I may not say it again in the future:  Pursuant to 28,
25  U.S. Code, Section 636 and Federal Rules of Civil Procedure 6
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

73

1214KDASC                    CONFERENCE
1  and 72, any party aggrieved by a ruling at one of these
2  discovery conferences has 14 calendar days to bring their
3  objections to Judge Sullivan.  The 14 days starts running
4  immediately when you attend any in-person or telephonic
5  conference and hear my ruling accordingly, regardless of how
6  long it takes me to obtain the transcript from the reporter.
7  And failure to file objections within that 14-day period
8  constitutes a waiver for all further purposes in the case,
9  including any appellate purposes.
10           With that, I'll require both sides to purchase the
11  transcript from the reporter and with that, we are adjourned.
12  Have a good flight back, or drive back, to everyone going in
13  different places.  Have a good vacation --
14           MR. ANDERS:  Thank you, your Honor.
15           THE COURT:  -- and happy new year.  See you all in a
16  month.
17           MS. CHAVEY:  Thank you, your Honor.
18           MS. WIPPER:  Thank you, your Honor.
19           MR. ANDERS:  Thank you.
20                          * * *
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300