## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONIQUE DA SILVA MOORE, MARYELLEN O'DONOHUE, LAURIE MAYERS, HEATHER PIERCE, KATHERINE WILKINSON and ZANETA HUBBARD on behalf of themselves and all others similarly situated,<br><br>    PLAINTIFFS,<br><br>v.<br><br>PUBLICIS GROUPE SA, and MSLGROUP,<br><br>    DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **SECOND AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>**Civ No. 11-CV-1279 (ALC) (AJP)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Monique da Silva Moore, MaryEllen O'Donohue, Laurie Mayers, Heather Pierce, Katherine Wilkinson, and Zaneta Hubbard ("Named Plaintiffs" or "Plaintiffs"), by and through their attorneys Sanford Wittels & Heisler, LLP, bring this action in their individual capacities and on behalf of a class of women defined below against Defendants Publicis Groupe SA ("Publicis") and MSLGroup ("MSL"), (collectively "the Company" or "Defendants"). Plaintiffs allege upon knowledge as to themselves and their own acts, and otherwise upon information and belief, as follows:

### INTRODUCTION

1.      Publicis is one of the world's "big four" advertising conglomerates. With a public relations ("PR") practice spanning 104 countries on five continents, Publicis sets

the standards in a majority-female industry where women remain a rarity at the highest levels of management.

2.      Like nearly every agency in the PR industry, Publicis employs a predominantly female workforce. Of the 45,000 PR professionals employed by the world's third largest advertising and media conglomerate, women account for approximately 70 percent of the staff and men account for only 30 percent.

3.      "Viva La Difference!" celebrates the slogan in Publicis's diversity program. For women employed at Publicis, there may be a "La Difference" but it gives them nothing to "Viva" about. A gender hierarchy haunts Publicis; and the Company's diversity program announces it explicitly: "every employee – both male and female – has his or her place . . . ." This sentence captures the essence of how Publicis treats its women. All employees have their place: males come before females. A Publicis woman's place is in the back of the line, far removed from senior management positions, almost all of which are reserved for the men.

4.      While Publicis funnels women into entry level rank-and-file positions at a disproportionate rate, these female PR employees rarely break through the glass ceiling at any agency in the conglomerate. Men dominate the senior management ranks throughout Publicis worldwide.

5.      From Publicis's Management Board to MSLGroup Americas ("MSL Americas") – the Company's PR network in the United States – Publicis reserves positions of power and influence for men. Only men serve on Publicis's 5-member Management Board, known as the "*Directoire,*" and only two women are members of Publicis's 13-member Executive Board, the "P12."

6.      Publicis's glass ceiling might as well be a cement wall.  Gender discrimination permeates Publicis's entire PR practice.  Only two women are part of the MSL leadership team worldwide and only one female sits on the senior management team of MSL Americas in the United States.

7.      Across Publicis's PR practice, upon information and belief, women hold approximately 15 percent of leadership positions compared to 75 percent of staff positions.

8.      Publicis's lack of women in leadership positions and key decision-making roles reflects its systemic, company-wide gender discrimination against female PR employees like Plaintiffs.  Such gender discrimination includes: (1) paying Plaintiffs and other female PR employees less than similarly-situated male employees; (2) failing to promote or advance Plaintiffs and other female PR employees at the same rate as similarly-situated male employees; (3) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers; (4) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination, sexual harassment, and pregnancy/caregiver discrimination in the workplace; and  (5) carrying out discriminatory hires, terminations, demotions, and/or job reassignments based on gender when the Company reorganized its PR practice and management structure beginning in 2008, including wrongfully terminating Plaintiff da Silva Moore immediately following her return from maternity leave after thirteen years of exemplary employment with the Company.

## OVERVIEW OF THE CLASS-WIDE
## GENDER DISCRIMINATION AT PUBLICIS

### Publicis's Male Management Team

9.      When identifying the "number of women in senior management positions" in its 2009 Corporate Social Responsibility Report, Publicis actually refers to its "Management Board" which is "composed of 5 men."  Ignoring its underrepresentation of women in management, Publicis admits that its "agencies have already had discrimination claims brought against them (especially in the USA)."[1]

10.      At the top of the Publicis hierarchy is the "Management Board."[2]  Its all-male members include Maurice Levy, Chief Executive Officer ("CEO") of Publicis; Kevin Roberts, CEO of Saatchi & Saatchi Worldwide; Jack Klues, CEO of Vivaki; Jean-Yves Naouri, Chief Operating Officer ("COO") of Publicis; and Jean-Michel Etienne, Executive Vice President ("EVP") and Chief Financial Officer ("CFO") of Publicis.

11.      These five men also sit on Publicis's "P12" Executive Board, made up of 13 members, including only two women (15%).[3]  The "P12" represent the leaders of the conglomerate.  Women have never had a real presence on the "P12" despite the predominately female staff working under it.

12.      One of the male members of "P12," Publicis CEO Levy, appointed another male "P12" member, Senior Vice President and General Secretary of Publicis Mathias Emmerich, to run ███████████████████████████████████

---

[1] Publicis Groupe 2009 Social Responsibility Report at 6, 15
http://www.publicisgroupe.com/media/display/id/2924.pdf.
[2] http://www.publicisgroupe.com/#/en/group/governance/management-board.
[3] Publicis Groupe 2009 Social Responsibility Report at 6,
http://www.publicisgroupe.com/media/display/id/2924.pdf.

Publicis General Secretary Emmerich makes employment decisions for Publicis worldwide along with Publicis CFO Etienne.

13.     Publicis CEO Levy also appointed another male "P12" member, Olivier Fleurot, to run Publicis's PR practice worldwide.  Under the brand "MSLGroup," CEO Fleurot heads a consolidated network of PR agencies under the Publicis umbrella.

### MSL's Male Executive Team

14.     Like its male-led parent, MSL is run by men.  MSL CEO Fleurot created one centralized leadership team of nearly all male members immediately after taking the helm of the newly formed PR network in July 2009.  CEO Fleurot's PR leadership team is divided into three levels: the Officers, the Presidents, and the Directors.  At the top is the Officer level, which included two males with work experience at other Publicis subsidiaries: Pascal Beucler, Chief Strategy Officer and Peter Miller, CFO, who works out of New York.  Under CEO Fleurot's leadership, four males were appointed to the middle Presidents level: Fabrice Fries, President of France; Anders Kempe, President of Europe; Glenn Osaki, President of Asia; and Jim Tsokanos, President of the Americas, who also works out of New York.  The Presidents level also excluded women.

15.     The only level of CEO Fleurot's PR leadership team with any female representation was initially the bottom level, Director – a level which, unsurprisingly, has no males.  At that level, two females, Sophie Martin-Chantepie, HR Director; and Trudi Harris, Communication Director; were able to "join" the team.  Since "joining," it is unclear whether Ms. Martin-Chantepie and Ms. Harris still hold Director titles.[4]

---

[4] On its webpage, MSLGroup labels Sophie Martin-Chantepie and Trudi Harris as "Officers" on its leadership team; however, when describing both women's positions in their bios on the same webpage, the Company states that they are Directors.  No male on the leadership team has a similar discrepancy in their position description on the webpage.  http://www.mslgroup.com/support/about-us.aspx

Regardless, these women hold support roles (*e.g.,* HR and communications) without significant decision-making authority on the team.

## MSL Americas's Male Executive Team

16.     In the United States, Publicis and MSL operate their public relations practice through MSLGroup Americas ("MSL Americas"), which is also run by men. One of the members of CEO Fleurot's management team, Jim Tsokanos, is the President of MSL Americas.

17.     Like CEO Fleurot, President Tsokanos created a nearly all-male regional organizational team in 2008 to lead approximately 1,000 PR employees working across the United States.  To head the South region, President Tsokanos selected Robert Baskin. In 2008, he also hired Joel Curran to head the Midwest region and Neil Dhillon to head the Mid-Atlantic region.  In 2009, President Tsokanos hired Joseph Carberry to head the West region.  Renee Wilson, the only woman on the U.S. team, oversees the Northeast region while working under the direct supervision of President Tsokanos at MSL Americas's New York headquarters.

## Five Male Executives' Unfettered Power Over Employment Decisions at MSL:
### *Publicis's Global Employment Manual:* ███████████

18.     From Publicis to MSL to MSL Americas, male-dominated executive leadership reigns with unfettered power through highly centralized employment policies.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████     ███████████████████████████

███████████████████████████████████████████████



20.     For example, MSL Americas President Tsokanos must authorize all salary decisions for MSL employees in the United States. ██████████████

21.     Bonus decisions are also controlled by the same group of male executives.



22.     Furthermore, determinations about individual annual bonuses must be made by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24.     Although ▮▮▮ empowers a handful of Defendants' male executives to decide salary increases, bonuses, and other decisions for thousands of public relations professionals worldwide, it fails to give any guidance or directives with regard to how that power should be wielded. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████   Thus, Defendants fail to have a performance evaluation system that is designed and implemented to compensate, promote and terminate employees in a manner that is consistent, reliable and equitable.   In addition, Defendants do not require that employment decisions made by the all male executives have any connection to an employee's performance evaluation, or to the employee's overall work-quality or contributions to the company.  Without any neutral evaluative system in place, the power given to the all male executives, as set forth in ████████ results in decisions that have had an adverse impact on female PR professionals in the United States.  The decisions made by these few individuals has also perpetuated systemic, company-wide gender discrimination against female PR employees at MSL.

### Publicis's Global Hiring and Salary Freeze, and Exceptions to the Freeze (2008-2011)

25.    In October 2008, Publicis CEO Levy instituted a global hiring and salary freeze at MSL and its other worldwide subsidiaries.  The freeze prohibited new hires and salary increases for existing employees, and continued at MSL Americas until 2011.

26.    In practice, however, Publicis CEO Levy ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[10] *Id.* at 80.

████████████████████████████████████████████

██████████████████████

██       ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

28.     Like ████ policies, ██████████████████ practices lacked the quality standards, controls, or implementation metrics that could ensure consistent, reliable, or equitable decisions that correlated with an employee's overall quality or contributions to the Company.

29.     For example, at or around the time of the freeze, CFO Etienne and General Secretary Emmerich approved MSL President Tsokanos' request to hire his male regional leadership team, including Neil Dhillon in 2008, Joel Curran in 2008 and Joel Carberry in 2009, at salaries approximately ████ above their female counterparts.  At the same time, President Tsokanos demoted two high-performing female management employees in the Midwest. ████████████████████████ also approved MSL President Tsokanos' request to ████████████████████████████████

████████████████████████████████████████████

██████████████████████████ while many high-performing female employees were told increases were prohibited.  Indeed, Plaintiffs da Silva Moore, O'Donohue, Pierce, Wilkinson and Hubbard did not receive a salary increase during the freeze.

30.     As a result of unchecked decision-making by male dominated leadership, the freeze had a disparate impact on female public relations professionals and perpetuated the systemic, company-wide gender discrimination against Defendants' female PR employees in the United States.

## MSL's Common Employment Policies and Practices and Centralized Decisionmaking

31.     MSL's policies mirror Publicis's centralized policies. ████████ ████████
████████████████████████████████████████████████████████████
████████████████████████████

32.     President Tsokanos plays a key decisionmaking role under both ██████ and MSL's policies.  He has final approval over the major employment decisions for MSL employees in the United States, including hiring, termination, and compensation decisions.

33.     For example, in 2008, when Tsokanos was promoted from Managing Director of New York to President of the Americas, he reorganized MSL's PR practice in the United States into five regions: the Northeast, South, Mid-Atlantic, Midwest and West.  He hired a predominantly male North American Leadership Team, eliminated predominantly female teams, dedicated resources to male dominated teams, and demoted several female managers. President Tsokanos was able to make these discriminatory decisions due to his largely unchecked authority.

34.     MSL CFO Miller also plays a key decisionmaking role under both ██████ and MSL's policies.  For example, MSL Americas's nationwide compensation policy mandates that ████████████████████████████████████████████████████

---

[11] ██████ Vol. I, at 77.

██████████████████████████████████████████████ ██████

MSL's CFO Miller also signs off on nearly every personnel action involving ████████

██████████████████████████ at MSL that is recorded in ████████████████████

kept by Publicis subsidiary, Re:Sources.[13]

35.    According to MSL's compensation policy, President Tsokanos and CFO

Miller are required to make salary decisions consistent with MSL's salary structure,

which ████████████████████████████████████████████████████

████████████████████████████████████

36.    MSL's salary bands are defined by ████████████████████████

████████████████    For example, salary bands exist for the Atlanta, Boston, Chicago,

Los Angeles, San Francisco, Seattle, New York, and Washington D.C. offices.  Salary

bands set pay ranges for each job title along the standard PR professional's career

progression:    Account Associate, Assistant Account Executive, Account Executive,

Senior Account Executive, Account Supervisor, Senior Account Supervisor, Vice

President, and Senior Vice President.  Salary bands for each job title are often identical

across offices.

37.    According to MSL's policy, the salary bands are ██████ to allow for

████████████████████████████████████████████████    The

policy, however, lacks any definitions of ████████████████████████ nor

does it set quality standards, controls, or implementation metrics by which to measure

these terms or by which to apply such ████████    Without definitions or standards,

---

[12] MSLGroup Americas ████████████████ Guide at 1-4 (undated).
[13] Re:Sources is a wholly owned subsidiary of Publicis Groupe with offices in New York.  Re:Sources
provides shared services such as payroll, technology and legal services to Publicis subsidiaries.
[14] *Id.* at 1 (Industry wide surveys include ████████████████████████████████████
████████████████████████)

compensation decisions do not correlate consistently and equitably with employees' overall quality or contributions to the company.

38.     MSL's compensation policy also encourages ████████████████

████████████████████████████████████████████████████████████

████  Again, MSL's compensation policy lacks any standards concerning ██████████ or ██████ that would standardize and consistently apply such decisions.

39.     Without any standards, the Company's centralized, and mostly male, decisionmakers have made employment and compensation decisions that have had a disparate impact on female public relations professionals and have perpetuated systemic, company-wide gender discrimination against Defendants' female PR employees in the United States.

## MSL's Common Public Relations Professional Career Track

40.     The job titles of MSL's PR professional career track are consistent with those in the PR industry. Throughout the PR industry, entry-level PR positions include Account Associate, Assistant Account Executive, Account Executive and Senior Account Executive, who are responsible for day-to-day client contact and account management activities.  Similarly at the mid-level, industry-wide positions include Account Supervisor and Senior Account Supervisor, who are primarily responsible for a part of a large account or all activities on several smaller accounts with minimal support from more senior management.  Finally, management positions include Vice President and Senior Vice President, who are the management level ultimately responsible for a significant portion of a large account or all activities on several smaller accounts.

41.     For each of MSL's PR professional career track job titles, MSL has created a job description that sets out common job duties.  These job descriptions by title, apply nationwide in every MSL office in the U.S.

42.     Countless women have started on MSL's standard career track and progressed with rave reviews, only to have their careers stopped short of the leadership ranks due to MSL's glass ceiling.

### *"That's Just Jim. You Know How He Is"*:
### MSL's Deliberate Indifference to Discrimination in the Workplace

43.     MSL has long been on notice regarding its company-wide gender discrimination, particularly with respect to President Tsokanos, but it has taken no steps to remedy it.

44.     In 2002, a female PR professional submitted a written complaint against President Tsokanos (then Managing Director of the Atlanta office) stating : ████████

████████████████████████████████████████████████████

██████████████████████████ In response, Human Resources did nothing.

45.     In 2003, another female PR professional employee submitted a written complaint against President Tsokanos stating: ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

46.     President Tsokanos also regularly made comments about the appearance of his female subordinates during Managing Directors' conference calls attended by Plaintiff da Silva Moore (while she was Managing Director of the Boston office).

47.     Despite ongoing inappropriate conduct and complaints, Tsokanos was promoted to Executive Vice President and Managing Director of the Company's largest office in New York and ultimately to President of the Americas.    In his new role, Tsokanos continues to make comments about the appearance of female employees often discussing their "looks" in front of other employees and during meetings.  He is also known to take young female employees out for drinks frequently.  Human Resources has never taken any action to end President Tsokanos' ongoing inappropriate conduct.

48.     In 2008, President Tsokanos proudly announced to many in the company that he "need[ed] a big swinging dick to lead the Midwest" while searching for a candidate to fill the head position for the Midwest region.  The comment was widely circulated around the company.  Tsokanos later hired a male, Joel Curran, for the Midwest Regional President position, while demoting two female Directors, Nancy Brennan and Kelly Kolhagen, working in the same region.  Again, Human Resources took no action.

49.     In 2009, President Tsokanos made a sexist comment to Plaintiff O'Donohue during a national meeting attended by over 40 employees, including the head of Human Resources, Rita Masini.  He questioned Plaintiff in the presence of the attendees at the close of her presentation, asking: "How are you going to deliver on this project when you have two young kids at home and you work a flexible schedule?"  Plaintiff O'Donohue complained about the comment to Masini, but Human Resources again did nothing.

50.     In 2009, President Tsokanos made sexist comments about former Executive Vice President Wendy Lund, including stating to other employees during well-

attended meetings that he was "imagining her in a porn movie."  Human Resources again did nothing.

51.     In or around 2010, President Tsokanos verbally attacked two female Senior Vice Presidents during a meeting.   The female employee later reported the incident to head of Human Resources, Rita Masini, who did nothing.

52.     President Tsokanos has hired like-minded men to fill his leadership ranks. For example, Tsokanos hired Neil Dhillon as Managing Director of the Washington D.C. office in 2008.   Soon after his hire, Dhillon held a work-related holiday party at his home for employees from MSL's Washington, D.C. office.  At the party, Dhillon stripped down to his boxer shorts and groped several female employees.  Human Resources was notified about the party and Dhillon's actions, but again did nothing.   Indeed, Dhillon was later promoted to Regional President of the Mid-Atlantic region.

53.     Other female employees also complained about MSL's discrimination, only to have their complaints fall on deaf ears.  In 2011, a female Account Supervisor complained to Human Resources when a male Vice President gave her an assignment and said,  "she needed to get her big girl panties on" to complete it.   Another female employee complained to Human Resources when a male Senior Vice President said she could not advance because she had a sign on her head that said "I want to get married." Faced with these complaints, the Company again sat on its hands and allowed the discrimination and harassment to continue unabated.

54.     Human Resources is also directly involved in the terminations of female PR employees upon return from maternity leave, including Plaintiffs Monique da Silva Moore, Heather Pierce and Zaneta Hubbard, as well as Heather Wadia, Lorie Hirson,

Erin Mand, Kristin Rubi, Taryn Green, Tara Meadows, Jamillah Renard, Heather Hall, Ana DaCosta, Erica Kless, Jennifer Hazard, Beth McIntyre, and Renae Wolter, among others. Instead of investigating Defendants' apparent pattern of terminating female employees upon return from leave, Human Resources actively facilitates it.

55. Human Resources also did nothing to address numerous complaints raised during exit interviews with female PR employees. For example, Vice President Lisa Marinelli, Senior Vice President Maryellen O'Donohue and Executive Vice President Wendy Lund raised gender discrimination issues with Human Resources Senior Vice President Tara Lilien during their exit interview. Again, nothing was done in response.

56. Defendants' mishandling of repeated complaints highlights various system-wide flaws in Defendants' HR complaint mechanisms, including inadequate reporting mechanisms; the lack of a defined channel to report complaints of discrimination and harassment; insufficiently defined and implemented investigation procedures; and inadequate training of Human Resources and other professionals tasked with addressing complaints of discrimination and harassment. These system-wide flaws allow President Tsokanos's direct participation in discrimination, and his active encouragement of others' discrimination, such that a sexist "old boys" culture is permitted to flourish at the Company.

57. The blatant disregard and indifference displayed by Defendants towards complaints of discrimination is all the more shocking given the Company's awareness that these problems are systemic. As both Rita Masini, Chief of Human Resources and Tara Lillien, Senior Vice President of Human Resources told Plaintiffs time and time again, "*That's just Jim. You know how he is.*"

* * *

58.     Plaintiffs bring this lawsuit on their own behalf and on behalf of a class of similarly-situated female PR professionals company-wide to remedy the gender discrimination they have witnessed and experienced during their years of exemplary service to Defendants.  The lawsuit is designed to achieve systemic injunctive relief and to change Defendants' discriminatory employment policies, practices and/or procedures based on gender, including: (1) assigning female PR professionals to lower titles than similarly-situated male employees; (2) paying female PR professionals less compensation than their male counterparts; (3) denying female PR professionals promotion and advancement opportunities in favor of male employees; (4) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers; (5) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination, sexual harassment, and pregnancy/caregiver discrimination in the workplace; and  (6) carrying out discriminatory hires, terminations, demotions, and/or job reassignments based on gender when the Company reorganized its PR practice and management structure beginning in 2008, including wrongfully terminating Plaintiff da Silva Moore immediately following her return from maternity leave after thirteen years of exemplary employment with the Company.

59.     Had the changes sought been in place previously, Plaintiffs might still be employed there.  Should the changes come about as a result of this action, Plaintiffs might, in fact, be able to pursue careers with Defendants in the future.

## JURISDICTION AND VENUE

60.     This Court has subject matter jurisdiction over this suit pursuant to 28

U.S.C. § 1332(a)(1); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended ("Title VII"); 29 U.S.C. § 201, *et seq.*, the Equal Pay Act of 1963 ("EPA"); and 29 U.S.C. § 2601, *et seq.*, the Family and Medical Leave Act of 1993 ("FMLA"); and supplemental jurisdiction pursuant to 28 U.S.C. § 1367, to redress and enjoin employment practices of Defendants in violation of these federal statutes and Plaintiffs' pendent state claims.

61.     The matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

62.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. 2000e-5(g) because Defendants Publicis and MSL do business in New York, New York, and because the unlawful employment practices were committed in this District.

63.     Plaintiffs have standing to bring this suit as Plaintiff da Silva Moore has duly filed her administrative class charge of discrimination before the U.S. Equal Employment Opportunity Commission ("EEOC") and has received her right to sue letter from the EEOC.

### THE PARTIES

64.     At all times relevant to this action, **PLAINTIFF MONIQUE DA SILVA MOORE** has been a resident of New York, Maine, or Massachusetts.  Ms. da Silva Moore worked for Defendants from approximately 1991 through 1993, and from September 1999 through January 7, 2010.  Ms. Da Silva worked in MSL's Boston and New York offices in MSL Americas's Northeast region.

65.     At all times relevant to this action, **PLAINTIFF MARYELLEN O'DONOHUE** has been a resident of New York.   Ms. O'Donohue worked for

Defendants from June 1985 through January 2010.  Ms. O'Donohue worked in MSL's New York office in MSL Americas's Northeast region.

66.     At all times relevant to this action, **PLAINTIFF LAURIE MAYERS** has been a resident of Michigan and Washington, D.C.  Ms. Mayers worked for Defendants from early 2000 until May 2010.  Ms. Mayers worked in MSL's Ann Arbor office in MSL Americas's Midwest region and MSL's Washington, D.C. office in MSL Americas's Mid-Atlantic region.

67.     At all times relevant to this action, **PLAINTIFF HEATHER PIERCE** has been a resident of California and Washington, D.C.  Ms. Pierce worked for Defendants from October 2004 through December 2008.  Ms. Pierce worked in MSL's San Francisco office in MSL's Western region and MSL's Washington, D.C. office in MSL Americas's Mid-Atlantic region.

68.     At all times relevant to this action, **PLAINTIFF KATHERINE WILKINSON** has been a resident of California.  Ms. Wilkinson worked for Defendants from February 2009 through February 2010.  Ms. Wilkinson worked in MSL's Los Angeles office in MSL Americas's Western region.

69.     At all times relevant to this action, **PLAINTIFF ZANETA HUBBARD** has been a resident of Georgia.  Ms. Hubbard worked for Defendants from February 2008 through December 2008.   Ms. Hubbard worked in MSL's Atlanta office in MSL Americas's Southern region.

70.     **DEFENDANT PUBLICIS GROUPE SA**, based in Paris, France, is a top four global communications group and employs approximately 45,000 professionals, including one thousand MSL employees in the United States.  Publicis Groupe SA does

business in New York through at least forty-one wholly-owned subsidiaries operating in New York, including (1) atelier New York; (2) BBH New York; (3) Digitas USA - New York; (4) Forty-Two Degrees at MediaVest New York; (5) In-sync Customer Insight; (6) Kekst& Company New York; (7) Leo Burnett Business; (8) Leo Burnett USA New York; (9) masiusPublicis Consultants New York; (10) MediaVest USA – New York; (11) Medicus International – New York; (12) Moxie Interactive New York (13) Mundocom USA – New York; (14) Optimedia USA – New York; (15) PBJS New York, Performics USA – New York; (16) Prodigious Worldwide USA – New York; (17) Publicis BOS Group; (18) Publicis Consultants USA – New York; (19) Publicis Events USA – New York; (20) Publicis Healthcare Communications Group; (21) PublicisHealthware International – New York; (22) Publicis Life Brands Medicus New York; (23) Publicis Life Brands Resolute – New York; (24) Publicis Modem East – NY; (25) Publicis USA – New York; (26) Razorfish New York; (27) Re:Sources USA – New York; (28) Rosetta New York; (29) Saatchi &Satchi Healthcare Communication New York; (30) Saatchi & Saatchi Healthcare Wellness; (31) Saatchi &Satchi New York; (32) Saatchi & Saatchi Worldwide USA; (33) Saatchi & Saatchi X New York; (34) Science & Medicine; (35) SMG Performance Marketing – New York; (36) StarcomMediaVest Group Corporate; (37) StarcomMediaVest Group USA – New York;  (38) The Third Act – New York;  (39) Youth Connection, Zenith Direct USA; (40) Zenith Media Services USA – New York; (41) ZenithOptimedia USA – New York.  Many of Publicis's subsidiaries are located in the "Publicis" building at 950 Sixth Avenue, New York, NY 10001.  These New York subsidiaries do all the business which Publicis would do if Publicis was located in New York.  Additionally, all of Publicis's subsidiaries are governed by Publicis's compulsory

employment policies known as ███████████, discussed *supra*, and as demonstrated by the allegations herein, Publicis interferes in the selection and assignment of MSL's executive personnel; fails to observe corporate formalities; and wholly controls the marketing and operational policies of MSL. Publicis's global hiring and salary freeze, initiated by Publicis from 2008 until 2011, had a direct effect on MSL employees working through the United States, including within its headquarters in New York. In 2009, Publicis brought in revenues of over 6.1 billion dollars.

71. **DEFENDANT MSLGROUP** is a Brand of Defendant Publicis. It is a one of the world's top 5 public relations and events networks. MSL does business in the United States through MSLGroup Americas, which is headquartered in New York, NY and employs approximately 1,000 employees in at least 10 offices, located in New York, NY; Boston, MA; Washington, D.C.;; Atlanta, GA; Chicago, IL; Ann Arbor, MI; San Francisco, CA; Los Angeles, CA; and Seattle, WA, and organized into five regions: Northeast; Mid-Atlantic, South; Midwest; and West.[15]

## FACTUAL ALLEGATIONS

### A. PLAINTIFF MONIQUE DA SILVA MOORE

72. Defendants employed Plaintiff Monique da Silva Moore from approximately 1991 to 1993 and from September 1999 until Defendants wrongfully terminated Ms. da Silva Moore in January 2010.

73. Ms. da Silva Moore spent the last six years of her career at the Senior Vice President/ Director level at the Company. While she worked as Vice President in MSL's

---

[15] MSL's offices in the United States can be found at http://www.mslgroup.com/where-we-are/americas/offices/. MSL five regions in the United States can be found at http://www.mslworldwide.com/global-reach/north-america

New York office from September 1999 through May 2004, she became a Senior Vice President/Director of the Boston office in 2004 and she remained a Senior Vice President/Director until her termination in 2010.  In October 2004, Ms. da Silva Moore took the position of Managing Director of the Boston office, and then in January 2007 she became an MSL Senior Vice President/North American Director.  From January 2008 through her wrongful termination in January 2010, Plaintiff served as an MSL Senior Vice President/Global Director, based out of Boston, Massachusetts.

74.     Despite her slow advancement, Ms. da Silva Moore received strong performance evaluations and feedback from her supervisors, colleagues, and clients throughout her thirteen-year tenure with the Company.

75.     Plaintiff da Silva Moore was consistently recognized as "best in class" in the PR industry.  Indeed over the course of her career, she has received more than 22 industry awards, including a 2009 Silver Anvil from the Public Relations Society of America.  Plaintiff's stellar performance while working for Defendants is reflected in her increased responsibilities from Managing Director of the MSL Boston office in 2004, North American Health Care Director in 2007, and Senior Vice President/Global Health Care Director in January 2008.

76.     In addition, Plaintiff da Silva Moore grew existing client business and brought in a number of new accounts to MSL every year she worked for the Company.

77.     Under Plaintiff da Silva Moore's leadership, the Boston office earned a profit in 2004 for the first time in years.  A year later, in 2005, the Boston office was one of two offices across the whole global network with the highest annual revenue growth.

The office's pitch to win the Virgin Life Care account was highlighted at the July 2005 MSL leadership meeting in Chicago for its creativity.

78.     Defendants repeatedly turned to Ms. da Silva Moore to help shore up troubled accounts and floundering offices.  For example, in 2007, MSL sent Ms. da Silva Moore to London to help rebuild its health care team and successfully put the healthcare practice on a more profitable path.  Also in 2007, MSL transferred the floundering BD account to Boston from the Washington, D.C. office, and Ms. da Silva Moore stabilized the account.  In 2009, when MSL was attempting to retain the Philips account, CEO Mark Hass, London CEO Stuart Wilson, and EVP Wendy Lund had a serious discussion with Ms. da Silva Moore about relocating to Amsterdam to manage the account if Philips agreed to stay with MSL.

79.     Ms. da Silva Moore continued her strong performance in her role as Global Health Care Director, the last position she held before Defendants terminated her.

**Pay Discrimination**

80.     Plaintiff da Silva Moore's stellar performance was never recognized in her compensation.  Upon information and belief, throughout Plaintiff's career and in every position she held at MSL, the Company paid Ms. da Silva Moore less than similarly-situated males.

81.     Upon information and belief, from May to October 2004 when Plaintiff da Silva Moore was a Senior Vice President/Director of the Boston Office, Defendants paid Plaintiff less than similarly-situated males such as Kelly Denker, a Director of the New York Office.

82.     Upon information and belief, from October 2004 to December 2006 when Plaintiff da Silva Moore was Managing Director of the Boston Office, Defendants paid her less than the following similarly-situated males: Jim Tsokanos, Managing Director of the Atlanta office; Don Hannaford, Managing Director of the Washington, D.C. Office; and Bill Orr, Managing Director of the San Francisco Office.

83.     Upon information and belief, from January 2007 to January 2010 when Plaintiff da Silva Moore was a Senior Vice President/North American Director and a Senior Vice President/Global Director, Defendants paid her less than the following similarly-situated males: Peter Harris, Senior Vice President/North American Director of the Corporate Practice; and Keith Hughes, Senior Vice President/North American Director of Consumer Operations.

84.     Upon information and belief, Defendants paid Mr. Harris approximately █████ more than Ms. Da Silva Moore in salary for the same work in the same position, despite Ms. Da Silva Moore's superior qualifications and longer tenure in the position and at the Company.

85.     For example, when Peter Harris was promoted to serve as the Senior Vice President/North America Director in 2009, Ms. Da Silva Moore had been working as North American Director of North America Healthcare Practice since 2007.  As Senior Vice Presidents/North American Directors, Ms. Da Silva Moore and Mr. Harris performed substantially equal client work, worked across offices to expand business, and managed teams.

86.     From January 2007 until Defendants wrongfully terminated her in January 2010, Ms. da Silva Moore never received a raise in salary.  Upon information and belief,

comparable male employees such as Senior Vice President David Chamberlin continued to receive raises in their salaries although Publicis CEO Levy had instituted a salary freeze during this time period.

87.     Furthermore, when Ms. da Silva Moore moved from Senior Vice President/North American Director to Global Director, Defendants did not raise her salary or compensation.  Rather, the Company considered Plaintiff to continue to be at the same level as the other Senior Vice President/Directors, and the promotion was in name only.

88.     Defendants pay female PR management employees at the Senior Vice President/Director level like Plaintiff Ms. da Silva Moore less than similarly-situated male employees across the PR practice in the United States.

89.     Upon information and belief, Defendants pay female PR employees like Plaintiff Ms. da Silva Moore less than similarly-situated male employees across the PR practice in the United States.

**Promotion Discrimination**

90.     While Defendants steadily increased Ms. da Silva Moore's responsibilities and she advanced from Vice President in 1999 to Global Director in 2008, her career progression was much slower than that of her male peers at MSL.  She stagnated at the Director level for six years while Defendants promoted her male counterparts to Presidents and Officers.  Eventually, Defendants demoted and abruptly terminated her in January 2010.

91.     For example, Ms. da Silva Moore and Jim Tsokanos held comparable positions when they served as Managing Directors of the Boston and Atlanta Offices, respectively, in 2004.

92.     By 2005, Mr. Tsokanos was promoted to Executive Vice President and Managing Director of the Company's largest office in New York.  Ms. da Silva Moore was not promoted.

93.     In 2008, Defendants promoted Mr. Tsokanos to President of North America.  Ms. da Silva Moore took a new position at the Senior Vice President/Director level, MSL's Global Director, with no increase in pay.

94.     Most recently, when Publicis formally reorganized and combined MS&L Worldwide with its other agencies to form MSLGroup in November 2009, Defendants again made drastically different plans for Ms. da Silva Moore and Mr. Tsokanos.

95.     Defendants promoted Mr. Tsokanos to the global leadership team of MSL in November 2009.  Two months later, Ms. da Silva Moore's employment abruptly ended when Defendants wrongfully terminated her immediately after her return from maternity leave.

96.     In addition to Mr. Tsokanos, Defendants promoted several other men during the reorganization.  For example, Defendants promoted Peter Harris as North American Director in January 2009.  Defendants promoted Scott Beaudoin to North American Director in February 2010.  Defendants promoted Steve Bryant to Managing Director of the Seattle Office in June 2010.

97.     In addition to internal promotions, MSL's reorganization led to many appointments of men to senior leadership positions from outside the Company.  For

example, Defendants hired Michael Sullivan as North American Director in July 2010. Defendants hired Joel Curran to head its Midwest region in May 2008.  Defendants hired Neil Dhillon to head the mid-Atlantic region in September 2008.  Defendants hired Joseph Carberry to head its Western region in April 2009.

98.     Through the reorganization, Defendants promoted and hired men with children.  However, few, if any, women with children were promoted or hired through the reorganization.

99.     By promoting a disproportionate amount of men to senior management positions in the reorganization, Defendants denied numerous promotions to qualified female PR management employees in the PR practice across the United States.

**Discriminatory Terminations, Demotions, Reassignments, and Hires**

100.     While the Company's reorganization led to significant promotions and hires for male employees like Mr. Tsokanos, a disproportionate number of women, including Ms. da Silva Moore, suffered discriminatory terminations, demotions, and job reassignments.

101.     As part of the reorganization, Defendants planned to demote Wendy Lund, the only female PR Executive in the United States who held the position of Executive Vice President of Global Client and Business Development, by eliminating her position and her entire team, and offering her a position reporting to Jim Tsokanos, her former peer on the Global Leadership Team.   In turn, MSL forced Ms. Lund to leave the Company.

102.     Additionally, although female employees once led four out of MSL's ten U.S. offices, the number of female leaders has been reduced to one since 2008.  One of

the former female U.S. office leaders left, while two peers were demoted to roles that required them to report to their newly hired male peers.

103.    Defendants demoted the former female leaders of MSL's Chicago and Los Angeles offices.  In 2008, Nancy Brennan, the then Managing Director of the Chicago office, was demoted to Senior Vice President of Corporate Branding.  She now reports to her male replacement, Joel Curran.  Vicki Fite, the Managing Director of the Los Angeles office, still holds her title but reports to the Western Region President, Joseph Carberry, who reported to Mr. Tsokanos until Mr. Carberry left the Company.  Ms. Fite had previously reported directly to Mr. Tsokanos.

104.    Like Plaintiff da Silva Moore as well as Ms. Lund, Ms. Brennan and Ms. Fite, Defendants targeted female PR management employees with discriminatory terminations, demotions and reassignments during its reorganization of the PR practice and management structure across the United States.

**Pregnancy/ Caregiver Discrimination**

105.    While Defendants' glass ceiling has led to an underrepresentation of women in leadership positions, pregnant employees and working mothers at the Company face similar systemic barriers to equal employment opportunities.

106.    For example, beginning on September 5, 2009, Plaintiff da Silva Moore took maternity leave to care for her newborn child.  She returned from maternity leave on January 4, 2010.

107.    Despite her superior performance and service to the Company, Defendants terminated Plaintiff immediately upon her return from maternity leave in January 2010.

108.    Prior to beginning her leave, it became apparent to Ms. da Silva Moore that MSL would soon be reorganized under the new CEO.  At that time, Plaintiff's supervisor, Executive Vice President of Global Client and Business Development Wendy Lund, advised Plaintiff that the Senior Vice President/Global Director position would be eliminated but that a new position would be available to Plaintiff upon her return from maternity leave.  Ms. Lund informed Plaintiff that Plaintiff would be asked to run the oncology business of Sanofi Aventis, working primarily from Boston, with some time also spent in Publicis's PR office in New York.  Following this initial conversation, Ms. Lund again mentioned to Plaintiff that Ms. da Silva Moore would take the oncology position upon her return from maternity leave.

109.    Later on December 23, 2009, less than two weeks before Plaintiff's scheduled return from maternity leave, Mr. Tsokanos called Plaintiff da Silva Moore to tell her that she would have to run the MSL brand Publicis Consultants out of the New York City office or Defendants would terminate her employment with the Company.  Mr. Tsokanos also confirmed that he would meet with Plaintiff and Senior Vice President of Human Resources Tara Lilien on January 7, 2010, to discuss his employment decision.  Ms. Lilien refused Plaintiff's requests for additional information prior to the January 7 meeting.

110.    Defendants placed Plaintiff da Silva Moore on paid administrative leave for three days as she awaited her meeting with Mr. Tsokanos and Ms. Lilien after returning from maternity leave on January 4, 2010.  At the January 7 meeting in New York City, Mr. Tsokanos repeated his ultimatum to Plaintiff and required her to respond by the following day.

111.   As Plaintiff da Silva Moore was at the time a mother of a newborn and two other children aged 10 and 12, she asked Mr. Tsokanos if there was any flexibility in the transition period in which she would have to move to New York City.  Mr. Tsokanos stated that he required Plaintiff to move immediately, as the business required immediate "in-office" attention, and that the Company would not reimburse Plaintiff's moving expenses.  MSL thus forced Ms. da Silva Moore to accept termination of her employment with the Company.

112.   Although Mr. Tsokanos denied Plaintiff da Silva Moore's request for time to relocate to New York City, MSL has granted similar requests from Plaintiff's similarly-situated male peers and female peers without children.  For example, Mr. Tsokanos paid David Chamberlain tens of thousands of dollars in relocation expenses and also provided him with several months to relocate from Dallas to New York on or around early 2009.  Michael Morsman was also given relocation expenses when he was hired as an SVP in the Ann Arbor office.  Around the same time, Mr. Tsokanos requested that Plaintiff's female peer who did not have any children, Krista Webster, relocate from Toronto to New York.  Mr. Tsokanos extended the time to several months for Ms. Webster to make her move.  When Karlenne Trimble, the new Chief Growth Officer, was asked to move to New York, she declined and now divides her time equally between two offices.  Ms. Trimble has no children.

## B.   PLAINTIFF MARYELLEN O'DONOHUE

113.   Defendants employed Plaintiff O'Donohue, a mother of two young children, from June 1985 until her constructive discharge in January 2010.  Though she received regular promotions before the Company's reorganization in 2008, Ms.

O'Donohue did not advance beyond the Senior Vice President/Director level after the reorganization. Before her constructive discharge in January 2010, Plaintiff served as MSL's Senior Vice President/North American Director.

114.    Ms. O'Donohue served as Account Coordinator, Assistant Account Executive, Account Executive, Senior Account Executive, Supervisor, and Vice President in High Technology; Vice President; Senior Vice President/Director, Senior Vice President/Co-Director; and finally Senior Vice President/North American Director.

115.    After MSL's 2008 reorganization, Jim Tsokanos, President of the Americas for MSL, began to assume responsibility for Ms. O'Donohue.

**Pay Discrimination**

116.    Plaintiff O'Donohue's excellent performance over the course of twenty-three years was rewarded until the Company's reorganization, when the Company began compensating her at a level lower than that which she deserved.  Upon information and belief, after the Company's reorganization, the Company paid Ms. O'Donohue less than similarly-situated males.

117.    In 1996, Ms. O'Donohue began working on a flexible work schedule due to her caregiving responsibilities for her family.  From 1996 through 2008, while Ms. O'Donohue worked on a flexible schedule, she worked as part of a senior team that built the respected healthcare practice at MSL.  During this time, she was promoted twice. When she began working on this reduced schedule, Executive Vice President of Global Client and Business Development, Wendy Lund, paid Ms. O'Donohue hourly for any hours she worked beyond those set in her flexible schedule.

118.    After MSL's 2008 reorganization, Jim Tsokanos assumed responsibility of

Ms. O'Donohue.  Mr. Tsokanos was known to be hostile towards working mothers with young children.  His actions and comments revealed that he felt that women were a "liability" to the Company.

119.   After assuming the role as her supervisor, Jim Tsokanos required Ms. O'Donohue to work a full-time schedule despite the fact that she had elected to work on a Company-sanctioned flexible schedule.  Until that point, Ms. O'Donohue had a history of proven success working on a flexible schedule.  Mr. Tsokanos inundated Ms. O'Donohue with additional assignments, making it impossible for her to continue working on the flexible schedule.  Though Ms. O'Donohue was thus forced to work on a full-time schedule, Defendants continued to pay her at the reduced rate of a flexible schedule based on her gender and her status as a working mother.

120.   From 2008 until her employment ended in 2010, Ms. O'Donohue never received a raise in salary.  Upon information and belief, comparable male employees such as David Chamberlin continued to receive raises in their salaries although Publicis had instituted a salary freeze during this time period.

121.   Upon information and belief, when Plaintiff O'Donohue was Senior Vice President/North American Director, MSL paid her less than the following similarly-situated males: Peter Harris, Senior Vice President/North American Director and Kelly Dencker, Senior Vice President/Director.

122.   Peter Harris, as a Senior Vice President/Director in the New York office, performed the same job duties and worked less hours than Ms. O'Donohue.  Mr. Tsokanos circulated a memo in January 2009 that outlined Mr. Harris' responsibilities, which were similar to Ms. Donohue's responsibilities.

123.    Upon information and belief, Defendants paid Mr. Harris approximately ████ more than Ms. O'Donohue in salary for the same work in the same position, despite Ms. Donohue's superior qualifications and longer tenure in the position and at the Company.

124.    Defendants pay female PR employees like Plaintiff O'Donohue less than similarly-situated male employees across the PR practice in the United States.

**Promotion Discrimination**

125.    Despite working at the company for twenty-five years, Ms. O'Donohue reached Defendants' glass ceiling when she hit the Senior Vice President/Director level at the Company.  In contrast, during the same time period, newcomer Jim Tsokanos quickly rose through the ranks beyond the Director level to the President level until he was appointed to the highest position in the United States, President of the Americas for MSL.

126.    After the Company's 2008 reorganization, when Mr. Tsokanos assumed responsibility for Ms. O'Donohue, Ms. O'Donohue could no longer advance in the Company after over two decades of dedication to the Company.

127.    Ms. O'Donohue advanced up to the Senior Vice President/Director level, where the glass ceiling at Publicis exists.  Men were regularly promoted to President levels and above.

128.    Upon information and belief, Defendants promote female employees at a slower rate than similarly-situated male employees across the PR practice in the United States.  Defendants also deny promotions to female employees in favor of less qualified male employees across the PR practice in the United States.

**Caregiver Discrimination**

129.    Ms. O'Donohue went on a flexible work schedule in 1996 in order to care for a sick family member and continued on the flexible schedule through the birth of her two children in 2003 and 2004.   After Mr. Tsokanos assumed responsibility for the Company's North American region in 2008, he forced Ms. O'Donohue to work a full-time schedule; she often worked late nights and weekends.   Mr. Tsokanos told Ms. O'Donohue she had to work and travel more, requiring her to inform him of her whereabouts every hour of every day.   Still, Defendants refused to pay Ms. O'Donohue for a full-time work schedule.

130.    Conversely, Mr. Tsokanos allowed Bill Orr, Managing Director of the San Francisco Office and full-time employee, to be absent from the office.   Mr. Orr's poor performance was apparent throughout the office.   Mr. Orr maintained his job and salary while Mr. Tsokanos continued to place additional work duties on Ms O'Donohue to help fix the problems Mr. Orr had created in the San Francisco office.   Additionally, Mr. Tsokanos never required that Mr. Orr inform him of his whereabouts at all times, as he required Ms. O'Donohue to do, after years of her consistently excellent work at the Company.

131.    Unlike female PR employees, male PR employees who have children are not treated less favorably because they have a career and children.

132.    Furthermore, Plaintiff O'Donohue endured constant derogatory comments at the Company regarding her and other women's status as working mothers.   When Mr. Tsokanos met with Ms. O'Donohue in his office, he made reference to another telecommuting working mother, stating, "She needs to pick up that baby and get to New York."

133.    Mr. Tsokanos also made discriminatory comments directly to Ms. O'Donohue.  For example, at a 2009 leadership meeting in Washington, D.C., Plaintiff O'Donohue made a successful presentation for an audience of over 40 professionals, including Mr. Tsokanos. While Mr. Tsokanos congratulated Ms. O'Donohue on her practice plan and platform in private, he questioned Plaintiff in the presence of the attendees at the close of her presentation, asking: "How are you going to deliver on this project when you have two young kids at home and you work a flexible schedule?"

134.    Ms. O'Donohue complained about this blatantly discriminatory comment to the head of HR, Rita Masini.  Ms. Masini agreed that Mr. Tsokanos's comment was inappropriate.  The Company, however, did not investigate the complaint or discipline Mr. Tsokanos in any way.

135.    Since MSL's reorganization, Defendants have made it a policy to hire only childless females.  For example, after the reorganization, the Company hired Ellena Friedman, Senior Vice President, Director of the Healthcare and Life Sciences Practice and Deputy Managing Director in Boston; Nancy Glick, Senior Vice President in the Healthcare Practice in Washington, D.C.; Jeanine O'Kane, North America Director of MS&L Healthcare; and Anita Manning, Senior Strategist – all of whom have no children.

136.    Mr. Tsokanos's and the Company's discriminatory behavior gave Ms. O'Donohue no choice but to leave the Company.  After twenty-five years at the Company and less than two years working with Mr. Tsokanos, Ms. O'Donohue was forced to resign from the Company in January 2010.

137.    Upon information and belief, Defendants have subjected and continue to subject female employees with caregiving responsibilities and/or young children like

Plaintiff O'Donohue to disparate terms and conditions of employment across the PR practice in the United States.

### C.   PLAINTIFF LAURIE MAYERS

138.   Plaintiff Mayers, a working mother with children, began working for Hass Associates in September 2000.   Defendants employed Plaintiff Mayers beginning in 2000, when Defendants acquired Hass Associates, until Ms. Mayers's constructive discharge in May 2010.   Ms. Mayers worked as a Vice President, Senior Vice President, and Senior Vice President/Deputy Managing Director in the Company's Ann Arbor, Michigan and Washington, D.C. offices.

139.   While at the Company, Ms. Mayers achieved stellar performance appraisals, winning two awards from the PRWeek publication.   She was responsible for the high-profile General Motors ("GM") account.   In 2009, despite dire financial straits at GM, Ms. Mayers's GM accounts thrived.   As a result of her superior management of her accounts, Ms. Mayers even won new business with GM.

**Discriminatory Assignment**

140.   Although Ms. Mayers was highly qualified for the Senior Vice President position at the time MSL acquired Hass Associates in 2002, she was initially assigned to the position of Vice President.   The Company did not promote her to Senior Vice President until after she had worked at the Company for approximately five years.

141.   In January 2009, Defendants hired Michael Morsman from outside the Company and immediately assigned him into the position of Senior Vice President in the Ann Arbor office.   When the Company assigned Mr. Morsman to the Senior Vice President position, he was less qualified for the position than Ms. Mayers had been at the

time she was appointed Vice President in the Ann Arbor office.

142.    As they did with Plaintiff Mayers, Defendants consistently assign females to lower-level positions than males who are less qualified than them across the PR practice in the United States.

**Pay Discrimination**

143.    Upon information and belief, the Company paid Ms. Mayers less than similarly-situated male employees throughout her career at the Company.

144.    In 2004, Ms. Mayers hired David Binkowski as a Web Project Manager. Three years later, MSL promoted Mr. Binkowski to Vice President.  Only one year after Mr. Binkowski's promotion to VP, Mr. Tsokanos promoted Mr. Binkowski again to Senior Vice President, the same position held by Ms. Mayers, but Mr. Tsokanos doubled Mr. Binkowski's salary.  Mr. Binkowski's new salary was approximately ███ more than Ms. Mayers's salary for the same work in the same position, despite Ms. Mayers's superior qualifications and longer tenure in the position and at the Company.

145.    In January 2009, Defendants hired Michael Morsman from outside the Company as a Senior Vice President in the Ann Arbor office.  The Company rewarded him with relocation expenses and a higher salary than that of Ms. Mayers.  At the time, Plaintiff Mayers had been with the Company approximately seven years and had served as Senior Vice President and Deputy Managing Director two years.  Mr. Morsman had significantly less qualifications than Ms. Mayers.

146.    Defendants paid Mr. Morsman at a higher rate than Ms. Mayers as a Senior Vice President, although they performed the same job duties.  Mr. Morsman and Ms. Mayers did the same client work, new business work, financial/budgeting work and

staffing work.  At the time of Mr. Morsman's hire, Mr. Curran informed Ms. Mayers that Mr. Morsman was being paid more than her.

147.    From 2008 until her employment ended in 2010, Ms. Mayers never received a raise in salary.  Upon information and belief, comparable male employees such as David Binkowski continued to receive raises in their salaries, even though Publicis had instituted a salary freeze during this time period.

148.    Defendants pay female PR management employees at the Senior Vice President level like Plaintiff Mayers less than similarly-situated male employees across the PR practice in the United States.

149.    Upon information and belief, Defendants pay female PR employees like Plaintiff Mayers less than similarly-situated male employees across the PR practice in the United States.

**Promotion Discrimination**

150.    Before the Company's reorganization in 2008, Ms. Mayers received periodic promotions.  She began working for Hass Associates in September 2000.  She became a Vice President in MSL's Ann Arbor office when it acquired Hass Associates in 2000.  In 2007, she was promoted to Senior Vice President and Deputy Managing Director.

151.    After the Company's reorganization in 2008, however, Ms. Mayers hit a glass ceiling and was no longer allowed to advance.

152.    Unlike the glass ceiling Plaintiff Mayers faced after the reorganization, similarly-situated males were consistently promoted to the Director, President, and Officer levels.

153.    On May 27, 2008, President Tsokanos appointed Joel Curran as Senior Vice President and Managing Director of the Midwest region.  After assuming his role, Mr. Curran told Plaintiff Mayers that Mr. Tsokanos had told him during the interview process that he "need[ed] a big swinging dick" to lead the Midwest.  Although Plaintiff Mayers was qualified for the position, Mr. Tsokanos apparently had a different gender in mind for it.

154.    In February 2009, the Company hired Michael Morsman as Senior Vice President in the Ann Arbor office and only a few months later, promoted him to Deputy Managing Director of the Ann Arbor office.  As a result of Mr. Morsman's promotion, the Company stripped the title from Ms. Mayers.  Plaintiff Mayers only learned about her demotion, however, by reviewing a new organizational chart.

155.    When Plaintiff Mayers asked Mr. Curran, head of MSL's Midwest region, about the demotion, Mr. Curran justified Plaintiff Mayers's demotion and Mr. Morsman's promotion by stating to Plaintiff Mayers, "You don't want to run the office and deal with that financial stuff."  Mr. Curran defended the Company's discrimination and entirely dismissed Plaintiff Mayers's concerns.

156.    In the same conversation with Mr. Curran, Plaintiff Mayers asked whether Mr. Morsman was getting paid more than her.  Mr. Curran said he was.

157.    In October 2009, Plaintiff Mayers moved from Michigan and continued to work as Senior Vice President for Ann Arbor from the Company's Washington, D.C. office.

158.    In February 2010, only one year after joining MSL, the Company promoted Mr. Morsman to Managing Director of the Ann Arbor office.  Although

Plaintiff Mayers was Deputy Director for three years and Senior Vice President for seven years, MSL did not select her for the position.

159.    Upon information and belief, Defendants promote female employees like Plaintiff Mayers at a slower rate than similarly-situated male employees across the PR practice in the United States.  Defendants also deny promotions to female employees like Plaintiff Mayers in favor of less qualified male employees across the PR practice in the United States.

### Constructive Discharge

160.    After Mr. Morsman's promotion to Managing Director, he showed Plaintiff Mayers his proposed new organization chart for the Ann Arbor office.  Plaintiff Mayers's name was not on the chart.

161.    In November 2009, Plaintiff Mayers's manager, Jud Branam, former Managing Director of the Ann Arbor office, called Plaintiff Mayers at home to confidentially warn her that she was no longer on the Washington, D.C. books or the Ann Arbor books for 2010 and that Mr. Curran and Mr. Morsman planned to offer her either freelance work or a reduced salary.

162.    Later in November 2009, Alicia Dorset, Plaintiff Mayers's direct report, told her that Mr. Morsman had shown her his new organization chart the previous week and said, "Now, the first thing you'll notice is that Laurie [Mayers] isn't on here."  He also told her that Ms. Mayers was not on the books in either Washington, D.C. or Ann Arbor next year.

163.    Plaintiff Mayers also witnessed discriminatory and harassing comments and behavior while working for the Company.  Routinely at business meetings at which

Plaintiff Mayers and others were present, Mr. Tsokanos made sexually derogatory comments about female employees commenting on their looks, personal lives, and other inappropriate subjects.

164.    In May 2008, President Tsokanos hired Joel Curran as Regional President of the Midwest region.  After joining the Company, Mr. Curran told Ms. Mayers that Mr. Tsokanos had told him during his interview that he "need[ed] a big swinging dick" to lead the Midwest.

165.    Because she could not endure the discrimination and hostile work environment at the Company, and because MSL executives actively attempted to force Plaintiff Mayers to resign, she had no choice to but to leave in May 2010.

**D.    PLAINTIFF HEATHER PIERCE**

166.    Defendants employed Plaintiff Heather Pierce, a mother of two young children, from October 2004 until they forced her to leave the Company in December 2008.  From October 2004 through January 2008, Ms. Pierce worked as Account Supervisor, Management Supervisor, and Vice President in MSL's San Francisco office in MSL Americas's Western region.  From January 2008 until her constructive discharge in December 2008, she served as Vice President in the Healthcare Practice in MSL's Washington, D.C. office in MSL Americas's Mid-Atlantic region.

167.    Throughout her four years at the Company, Ms. Pierce never advanced beyond Vice President to the Senior Vice President, Director or Officer levels, while her male counterparts quickly advanced to the highest ranks of management across the PR practice in the United States.  During Ms. Pierce's tenure, for example, the Company promoted David Binkowski from Supervisor to Senior Vice President in less than three

years, and Mr. Tsokanos also doubled Mr. Binkowski's salary over the same time period.

168.   Throughout her time at MSL, Plaintiff Pierce was a stellar employee, receiving extremely positive feedback from clients, colleagues and supervisors.   In her 2005 performance review, her colleagues and supervisor wrote, "Heather integrated seamlessly into the team and has become an essential element not only of the practice but on the accounts she manages with efficiency and apparent ease."  They continued, "She is a tremendous asset to the team."

169.   The Company also praised Plaintiff Pierce in her 2007 performance review, writing, "[Heather] is a strong leader and motivator."  The review further states: "Heather excels at client and account management" and "Heather has demonstrated a keen ability to organically grown [sic] current business."

170.   In May 2006, Plaintiff Pierce won the San Francisco office's "Superstar of the Month" award.

171.   Plaintiff Pierce's stellar performance continued until she was forced to resign due to gender discrimination in December 2008.

**Pay Discrimination**

172.   Plaintiff Pierce's excellent performance over the course of four years was never rewarded with the compensation she deserved.   Upon information and belief, throughout Plaintiff Pierce's career and in every position she held at MSL, the Company paid her less than similarly-situated males.   For example, the Company paid David Binkowski, a Vice-President, well above ███████ annually and Mr. Tsokanos doubled his salary in 2008.

173.   When Plaintiff Pierce was transferred to the Washington, D.C. office, her

new Managing Director told her he was increasing her annual salary by $25,000 without giving her any explanation.  Although Plaintiff Pierce did not have knowledge of her male counterparts' salaries, this sudden and inexplicable increase suggested that she may have been underpaid by at least $25,000 in her position at the San Francisco office.

174.    Even after her abrupt and unexplained salary adjustment, the Company continued to pay Plaintiff Pierce less than similarly-situated males for her remaining tenure at MSL in Washington, D.C.  For example, Randolph Court, Jonathan Osmundsen, and Michael King were Vice Presidents in the Washington, DC office.  Although these male VPs performed substantially equal work to Ms. Pierce, Defendants paid them higher compensation.

175.    Upon information and belief, Defendants paid Mr. Court, Mr. Osmundsen and Mr. King approximately ███████████ more than Ms. Pierce in salary for the same position, despite Ms. Pierce's superior qualifications and longer tenure in the position and at the Company.

176.    Upon information and belief, Defendants pay female employees like Plaintiff Pierce less than similarly-situated male employees across the PR practice in the United States.

**Promotion Discrimination**

177.    During her first two years at the Company, from 2004 through 2006, Plaintiff Pierce was periodically promoted from Account Supervisor to Management Supervisor, and finally to Vice President.  For her last two years at the Company, however, Ms. Pierce remained at the Vice President level while her male counterparts were promoted to the Senior Vice President, Director, and President levels.

178.    In August 2008, Plaintiff Pierce went on maternity leave.  Before she went on maternity leave, a Managing Director position became available.  Although several female employees in the Washington, D.C. office were highly qualified for and strongly interested in this position; they did not receive the promotion.  When the position had been available for approximately seven months, the Company filled it by hiring Neil Dhillon, a male from outside the Company.

179.    Upon information and belief, Defendants deny promotions to female employees like Plaintiff Pierce in favor of less qualified male employees across the PR practice in the United States.  Defendants also promote male employees at a more rapid rate than similarly-situated female employees across the PR practice in the United States.

**Pregnancy/Caregiver Discrimination**

180.    In January 2008, Plaintiff Pierce relocated from the Company's San Francisco office to its Washington, D.C. office.

181.    Plaintiff Pierce went on maternity leave in August 2008.  While on maternity leave, newly hired Managing Director Dhillon had a meeting with Ms. Pierce in the office to talk to him about her anticipated assignments upon her return from maternity leave.  At this meeting, Mr. Dhillon told Plaintiff Pierce that she would be required to work on San Francisco accounts to "cover" for Kelly McKenna, another female who was going on maternity leave.

182.    At the same meeting, Mr. Dhillon suggested that Plaintiff Pierce "deal" with the constant travel across the country to San Francisco by hiring a live-in nanny.

183.    Mr. Dhillon also suggested that Plaintiff Pierce travel with her newborn to San Francisco since children under two years old "fly for free" and "drop off" her

newborn at her mother's house in California while she worked.  Mr. Dhillon's suggestion was both presumptuous and lacking in common sense, as Ms. Pierce's mother lived in Thousand Oaks, California – approximately four hundred miles from San Francisco – and worked full-time.

184.    Mr. Dhillon's message was clear to Plaintiff Pierce: Defendants had no interest in keeping Ms. Pierce as an employee.  Without consulting Ms. Pierce, Mr. Dhillon decided that her first assignment, immediately upon returning from maternity leave, would be to cover for another woman on maternity leave three thousand miles away from her home.

185.    Plaintiff Pierce expressed her concerns about covering an account in San Francisco in an effort to work with Mr. Dhillon to determine an appropriate balance between her job responsibilities and her responsibilities as a mother.  Mr. Dhillon, however, dismissed her concerns and offered unrealistic solutions.  Mr. Dhillon did not question any male employee's ability to be a successful working parent.  Ms. Pierce, however, was labeled by the Company's prevalent gender stereotyping as less committed to her job after having a child.  Therefore, Mr. Dhillon intended to test her commitment to the Company by giving her burdensome assignments that included cross-country travel.

186.    Mr. Dhillon made it clear to Plaintiff Pierce that as long as she worked for Defendants, she would not be given employment opportunities comparable to those of males or childless females.  Thus, Plaintiff Pierce was forced to resign from the Company in December 2008.

187.    Upon information and belief, Defendants have subjected and continue to

subject pregnant employees and/or female employees with young children and/or caregiving responsibilities like Plaintiff Pierce to disparate terms and conditions of employment across the PR practice in the United States.

### E.   PLAINTIFF KATHERINE WILKINSON

188.   Defendants employed Plaintiff Wilkinson, a mother of a young child, from February 2008 until her constructive discharge from the Company in early 2010. Plaintiff Wilkinson worked as an Account Executive in MSL's Los Angeles office in MSL Americas's Western region.

**Discriminatory Assignment**

189.   Although Plaintiff Wilkinson was qualified for a higher level position at the time the Company hired her in 2008, she was initially assigned to the position of Account Executive.

190.   Unlike the low-level assignment of Plaintiff Wilkinson and other female employees, Defendants hired males into higher level positions without the requisite qualifications for those positions. For example, in early 2009, Defendants hired a male from outside the Company, Steve Chipman, as Vice President and West Coast Director of Digital Innovation and Strategy, even though Mr. Chipman was not qualified for this position.  Mr. Chipman exhibited his lack of skills quickly and, consequently, Defendants terminated him three months after hiring him into this high-level position.

191.   Like Plaintiff Wilkinson, females at the Company are consistently assigned into lower-level positions than males who are less qualified than them across the PR practice in the United States.

**Pay Discrimination**

192.    Upon information and belief, Defendants paid Plaintiff Wilkinson less than similarly-situated male employees throughout her career as an Account Executive at the Company.  In her two years at the Company, Defendants never gave Ms. Wilkinson a pay increase.

193.    Upon information and belief, Defendants pay female employees like Plaintiff Wilkinson less than similarly-situated male employees across the PR practice in the United States.

**Promotion Discrimination**

194.    In June 2009, Plaintiff Wilkinson received a positive performance review. Because she was initially hired as a high-level, overqualified Account Executive, she expected to be promoted after her review to Senior Account Executive along the standard track of progression at the Company.

195.    Although Ms. Wilkinson received an excellent review, satisfied the prerequisites for the promotion, and was already performing the duties of a Senior Account Executive, the Company refused to promote her because she "had not learned the financial side of running an account and had no direct reports."  Neither of these criticisms was applicable to Ms. Wilkinson, as knowledge of the financial side and direct reports were essential for Account Directors, but not for Account Executives like Ms. Wilkinson.

196.    Defendants pressured Ms. Wilkinson to sign her performance review, despite her disagreement with the comments from her superiors explaining her promotion denial.

197.    Upon information and belief, male employees who did not have direct

reports at the Company were promoted to Senior Account Executives and above.

198.    When Ms. Wilkinson was denied this promotion, Vickie Fite, Managing Director, offered her a regroup meeting in four months so that in the interim, she would have an opportunity to showcase her leadership and to take over the finances on one of her accounts.  Again, these goals were suitable for an Account Director, not an Account Executive like Ms. Wilkinson.  Despite this, she achieved these goals as successfully as her job allowed throughout the next four months.  At the end of the four month period, Ms. Wilkinson requested the regroup meeting, but it never took place.

199.    Ms. Wilkinson never received a promotion at the Company, while her male counterparts were consistently promoted along the standard progression track outlined in HR policies, often reaching Vice President and above.

200.    Upon information and belief, Defendants also deny promotions to female employees like Plaintiff Wilkinson in favor of less qualified male employees across the PR practice in the United States.  Defendants also promote male employees at a faster rate than similarly-situated female employees across the PR practice in the United States.

**Pregnancy/Caregiver Discrimination**

201.    In October 2009, Plaintiff Wilkinson announced she was pregnant with her first child.  Although the Company acknowledged her pregnancy, it assigned greater responsibilities to Ms. Wilkinson in response to the announcement.  She was expected to successfully perform the work of several employees.  By increasing her workload to an unattainable level after announcing her pregnancy, the Company sent a clear message that she was no longer welcome there.

202.    Around the same time, Ms. Wilkinson's immediate supervisor went on

maternity leave.  Consequently, Ms. Wilkinson became the only Account Executive in the Los Angeles office working on a large account.  Although the account required substantial resources and staffing by several employees, the Company did not establish a plan to properly manage this large account during this employee's absence.  The Company assigned an Executive Vice President to the account, but she was not able to dedicate enough time to service the account properly.  Thus, Ms. Wilkinson was in charge of the account.

203.    The client on the account finally lodged a complaint, stating that it was not receiving strategic counsel from senior management.  The Company did not respond to this complaint by assigning an additional senior employee to the account.  Instead, as a result of this complaint alone, Ms. Wilkinson was put on probation for ninety days in December 2009, 2 months after announcing her pregnancy.

204.    Further, Defendants told Ms. Wilkinson that she would be relocated to an interior office so that she would be "closer to the team."  This move functioned as a demotion and damaged Ms. Wilkinson's reputation with the Company by suggesting that she needed to be constantly monitored.

205.    Because of the Company's response to her pregnancy, Ms. Wilkinson felt she had no choice but to leave the Company.  She resigned on December 22, 2009 and continued to do freelance work for the Company until February 2010, so that she could help transition another employee onto one of her several accounts.  She only continued to work short-term for the Company because she had slightly more tolerable conditions as a freelancer.  First, she had set hours that she could not exceed, and unlike before, she was compensated for each hour of work.  She also did not have to interact with several of her

colleagues responsible for the discrimination.

206.    After Ms. Wilkinson resigned from the Company, it assigned several more employees to the account that she had been unable to handle on her own.  It also filled her position with two employees, confirming its awareness that they had given Ms. Wilkinson more responsibilities than one employee could possibly handle – a fact that the Company did not take into account when it chose to wrongfully discipline Ms. Wilkinson for its own mistakes and in response to her pregnancy.

207.    Upon information and belief, Defendants have subjected and continue to subject pregnant employees and/or female employees with young children and/or caregiving responsibilities like Plaintiff Wilkinson to disparate terms and conditions of employment across the PR practice in the United States.

###    F.    PLAINTIFF ZANETA HUBBARD

208.    Defendants employed Plaintiff Hubbard from February 2008 through her termination in December 2008.  Ms. Hubbard was terminated while on maternity leave.

209.    Ms. Hubbard served as an Account Supervisor in MSL's Atlanta office in the Southern region.

### Pay Discrimination

210.    In Ms. Hubbard's three-month review, the Company found that she "meets expectations" – the highest assessment available.  Her supervisor also wrote, "[I]t's clear that Zaneta has excellent project management skills."

211.    Ms. Hubbard's excellent performance at the Company was never rewarded.  Ms. Hubbard did not receive any raises or bonuses during her time at the Company and was paid much less than similarly-situated males.

212.   For example, two male employees in MSL's Atlanta office, Matt Fogt and Carlos Campos, had similar job duties to Ms. Hubbard's.  They also had less experience than Ms. Hubbard.  Mr. Campos and Mr. Fogt, however, received substantially higher salaries than Ms. Hubbard's.

213.   Upon information and belief, MSL paid Mr. Campos approximately ████ more than Ms. Hubbard in salary for performing substantially equal work.

**Promotion Discrimination**

214.   In her three-month review, Ms. Hubbard wrote that her long term goal was "to be promoted to [Senior Account Supervisor]."

215.   Despite having more experience than Mr. Fogt and Mr. Campos, and having similar job duties to theirs, Ms. Hubbard was never promoted to their level, Senior Account Supervisor.

**Pregnancy/Caregiver Discrimination**

216.   In early 2008, Ms. Hubbard became pregnant.

217.   Ms. Hubbard discussed working from home with her supervisor, Greg Euston, a Senior Vice President.  Mr. Euston told Ms. Hubbard, "You need to be in the office so we can see your face and you can interact with clients."

218.   In June 2008, Ms. Hubbard's doctor informed her that she needed a pregnancy-related operation performed immediately.  After the surgery, Ms. Hubbard's doctor put her on bed-rest.

219.   Ms. Hubbard informed the Company that she was on bed-rest.  Although the Company initially told her she could work from home, soon thereafter a Vice President in Human Resources, Susan Stewart, told Ms. Hubbard that working from

home was against Defendants' policy, and Ms. Hubbard was forced to take disability leave.

220.    On October 9, 2008, Jenni McDonough, a Vice President in Human Resources, emailed Ms. Hubbard: "I'd like to be able to help [Managing Director,] Rob [Baskin] and [Senior Vice President,] Greg [Euston] prepare for finding work for you if you chose to return full-time." Although Ms. Hubbard was allegedly a valued employee at MSL, she had lost her accounts and responsibilities after the Company forced her to take disability leave.

221.    Ms. McDonough also wrote in her October 9, 2008 email to Ms. Hubbard: "Just so you know, regardless of what your decision is, you remain an employee of MS&L until the end of your disability period. So, even if you decide you want to be a stay-at-home mom, it would not in any way affect your benefits if you have already made that decision." The Company was clearly giving Ms. Hubbard incentive to leave by telling her she could keep her benefits if she decided to leave, despite the fact that Ms. Hubbard had not intended to leave the Company.

222.    Ms. Hubbard's maternity leave began on October 23, 2008, the day she gave birth. While on maternity leave, Ms. Hubbard corresponded with Ms. McDonough about the possibility of returning either full time with flexibility or part time.

223.    Ms. McDonough submitted Ms. Hubbard's proposed flexible work schedule to the Managing Director of the Atlanta office, Robert Baskin. On October 15, 2008, Ms. McDonough told Ms. Hubbard in an email: "We'll all be fluid and work this out as time marches on." Thus, Defendants led Ms. Hubbard to believe she would be able to return on a flexible schedule.

224.    Two months later, in December 2008, Ms. Hubbard was terminated due to the "economic downturn" and "clients slashing budgets."  Ms. Hubbard's male peers who were working on the same accounts, however, were not termintated.

225.    Ms. McDonough told Ms. Hubbard to keep checking back because the Company might need freelancers.  Ms. Hubbard emailed Ms. McDonough every few weeks seeking a freelance position.

226.    Ms. Hubbard was never again hired by the Company.

G.    **WIDESPREAD PREGNANCY DISCRIMINATION AT PUBLICIS**

227.    Like Plaintiffs da Silva Moore, O'Donohue, Pierce, Wilkinson, and Hubbard, Defendants subjected other female employees who took maternity leave to similar systemic barriers to equal employment opportunities across the Company.

228.    Defendants terminated Plaintiffs da Silva Moore and Pierce shortly after their returns from maternity leave, Plaintiff Wilkinson before she left for maternity leave, and Plaintiff Hubbard while out on maternity leave.  Defendants also forced several other women out of the Company under similar circumstances.

229.    Upon information and belief, Defendants terminated a Vice President at MSL in the San Francisco office, Heather Wadia, while she was on maternity leave, effective the day she was scheduled to return from maternity leave in September 2009. Ms. Wadia had been a stellar employee for Defendants since August 2005.  Soon after Ms. Wadia's termination, Defendants filled her position with Brian Baker, a male who had previously worked with the new head of the Western region, Joseph Carberry, at another company.  Approximately two weeks after Mr. Baker began working at the Company, he went on paternity leave.  Mr. Baker faced no adverse actions by the

Company for taking leave, as Ms. Wadia had.

230.    Upon information and belief, around the same time period, Defendants also terminated another Vice President at MSL in the San Francisco office, Lorie Hirson, three weeks after she returned from maternity leave.

231.    Upon information and belief, Defendants also terminated Jamillah Renard, the Financial Director at MSL's Washington, D.C. office, shortly after her return from maternity leave in April 2009, effective June 2009.  She had worked at the Company since October 2007.

232.    Upon information and belief, Defendants terminated Senior Account Manager in the Washington, D.C. office, Taryn Dorsey, shortly after her return from maternity leave.  She worked at the Company from October 2005 until her termination in September 2010.

233.    Upon information and belief, Shula Sarner worked as a Scientific Director at Publicis in New York, New York for approximately eight years.   During her pregnancy, the Company significantly increased Ms. Sarner's job responsibilities without a comparable increase in pay or status.  After she returned from maternity leave, the Company subjected Ms. Sarner to disparate treatment based on her status as a working mother.  As a result, Ms. Sarner was forced to leave the Company in December 2010.

234.    Upon information and belief, Defendants terminated Lorna Feeney, an Associate Creative Director for Defendants in New York, New York, shortly after returning from maternity leave.  Ms. Feeney worked for Defendants from 2006 until July 2010.

235.    Upon information and belief, Defendants terminated Jeannie Kang, an Art

Director for Defendants in New York, New York, shortly after she returned from maternity leave. Ms. Kang worked for Defendants from April 2006 until February 2010.

236.    Upon information and belief, Martha Connor-VanDyke worked as a Creative Director for Defendants in New York, New York for five years. While on maternity leave, she was transferred to a new group, which adversely impacted her employment. Approximately one year later, Defendants terminated Ms. Connor-VanDyke.

237.    Upon information and belief, Jill Lewis, a Vice President for Defendants in New York, New York, went on maternity leave in 2001. She had been at the Company since approximately 1998. Soon after her return, Defendants terminated her employment with the Company.

238.    Upon information and belief, Francine Cohen, Group Media Director for Defendants in New York, New York, worked for the Company from approximately 1998 until May 2003. After she returned from maternity leave, the Company subjected her to disparate treatment and she had no choice but to resign from the Company.

## V.    CLASS ACTION ALLEGATIONS

239.    Plaintiffs da Silva Moore, O'Donohue, Mayers, Pierce, Wilkinson, and Hubbard ("Class Representatives") incorporate by reference the allegations from the previous paragraphs of this Complaint alleging common policies and practices resulting in discrimination against female PR management employees.

240.    Class Representatives and the class of female PR employees they seek to represent have been subjected to a pattern or practice of gender discrimination and disparate impact gender discrimination as a result of Defendants' common discriminatory

employment policies and practices.  Such gender discrimination includes: (1) paying Plaintiffs and other female PR employees less than similarly-situated male employees; (2) failing to promote or advance Plaintiffs and other female PR employees at the same rate as similarly-situated male employees; (3) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers; (4) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination, sexual harassment, and pregnancy/caregiver discrimination in the workplace; and  (5) carrying out discriminatory hires, terminations, demotions, and/or job reassignments based on gender when the Company reorganized its PR practice and management structure beginning in 2008, including wrongfully terminating Plaintiff da Silva Moore immediately following her return from maternity leave after thirteen years of exemplary employment with the Company.

241.   Defendants, in effect, bar female PR employees from better and higher-paying positions which have traditionally been held by male employees.  The systemic means of accomplishing such gender-based stratification include, but are not limited to, Defendants' assignment, development, promotion, advancement, compensation, performance evaluation, leave, and termination policies, practices and procedures.  These practices and procedures all suffer from a lack of: transparency, adequate quality standards and controls; sufficient implementation metrics; management/HR review; and opportunities for redress or challenge. As a result, employees are assigned, evaluated, compensated, developed,  promoted and terminated within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or equitably manage or reward employees.

242.     Within these flawed structures, specific policies and practices negatively affect Defendants' female PR professionals. For example, Defendants' common and centralized employment policies have been implemented in an intentionally discriminatory manner and have had an adverse disparate impact on female PR employees. Defendants' centralized decisionmaking by predominately male executive staff has been implemented in an intentionally discriminatory manner and has had an adverse disparate impact on female PR employees. Defendants' hiring and salary freeze and exceptions have been implemented in an intentionally discriminatory manner and have had an adverse disparate impact on female PR employees. Defendants' reorganization of its PR practice, management structure and resource allocation has been implemented in an intentionally discriminatory manner and has had an adverse disparate impact on female PR employees. Such policies, practices and procedures are not valid, job-related, or justified by business necessity.

243.     Without the appropriate standards, guidelines, or transparency necessary to ensure an equitable workplace, unfounded criticisms may be lodged against female PR professionals who are female, pregnant, or mothers, and legitimate criticisms may be given undue weight. Moreover, taking leave or flex time for pregnancy and caretaking reasons can constitute a negative factor in employees' evaluations, compensation, and promotion prospects; Defendants' HR and management have failed to curb a corporate culture that presumes that being a mother makes an employee less dedicated or productive.

244.    These problems are systemic and company-wide, because, upon information and belief, they all stem from flawed policies, practices and procedures which emanate from the Company's Paris and New York headquarters.

245.    Where Human Resources complaint and compliance policies exist, they lack meaningful quality controls, standards, implementation metrics, and means of redress.   Concerns about discrimination made to supervising staff and HR itself are allowed to go unaddressed.   Worse, there is no meaningful separation between HR complaint processes and the executives and managers who create discriminatory or hostile work conditions for women and mothers, such that victims of discrimination often face retaliation or are dissuaded from voicing concerns altogether.

246.    Defendants have failed to impose adequate discipline on managers and employees who violate equal employment opportunity laws and have failed to create adequate incentives for its managerial and supervisory personnel to comply with such laws regarding the employment policies, practices, and procedures described above.

247.    Thus, Defendants tolerate and even cultivate a hostile environment in which women and mothers are openly devalued and where (a) retaliation for voicing gender discrimination complaints is the norm, and (b) women and mothers who question or even inadvertently disrupt the Company's gendered norms are routinely pushed out of the Company.

248.    In sum, Defendants demonstrate a reckless disregard – a deliberate indifference – to its female employees by overlooking or otherwise dismissing even blatant evidence of gender discrimination.

249.    Because of Defendants' pattern or practice of gender discrimination and disparate impact gender discrimination, the Class Representatives and class they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, promotion and other advancement opportunities, employment benefits and non-economic damages.

250.    The Class Representatives and the class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit is their only means of securing adequate relief.   The Class Representatives and the class have suffered, and will continue to suffer, irreparable injury from Defendants' ongoing, unlawful policies, practices, and procedures as set forth herein unless those policies, practices, and procedures are enjoined by this Court.

### A.    General Facts Relevant to Class Claims and Class Definition

251.    Class Representatives seek to maintain claims on their own behalf and on behalf of a class of current, former and future female PR employees who worked at any time in Defendants' PR practice in the United States during the applicable liability period.

252.    The class consists of all female public relations employees, who are, have been, or will be employed by Defendants in the United States at any time during the applicable liability period, including until the date of judgment in this case ("female public relations employees" or "female public relations professionals").   Upon information and belief, there are hundreds of such employees in the proposed class.

253.    The Class Representatives seek to represent all of the female PR employees described above.   The systemic gender discrimination described in this

Complaint has been, and is, continuing in nature.

**B.    Efficiency of Class Prosecution of Common Claims**

254.    Certification of a class of female PR employees is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the Class Representatives and the proposed class.

255.    The individual claims of the Class Representatives require resolution of the common question of whether Defendants have engaged in a systemic pattern or practice of gender discrimination or disparate impact discrimination against female public relations employees.   Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers, and working conditions, and in the lives, careers, and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.

256.    Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female public relations employees generally.   Defendants caused Plaintiffs' injuries through its discriminatory practices, policies, and procedures, as well as its disparate treatment of employees who are female, pregnant, and/or have caregiving responsibilities.   These injuries are redressable through systemic relief, such as an injunction, and other appropriate class-wide and individual remedies sought in this action.

257.    In addition, proper relief for Plaintiffs' individual constructive discharge and wrongful termination claims can include reinstatement.  As such, each has a personal interest in the policies, practices, and procedures implemented at Defendants moving forward.

258.    In order to gain such relief for themselves, as well as for the class members, Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek.

259.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the proposed class of females is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed class, and Defendants.

### C.    Numerosity and Impracticability of Joinder

260.    The class that the Class Representatives seek to represent is too numerous to make joinder practicable. Upon information and belief, the proposed class consists of hundreds of current, former, and future female public relations employees during the liability period. Defendants' pattern or practice of gender discrimination and disparate impact gender discrimination also makes joinder impracticable by discouraging females from applying for or pursuing promotional, training, or transfer opportunities, thereby making it impractical and inefficient to identify many members of the class prior to determination of the merits of Defendants' class-wide liability.

### D.    Common Questions of Law and Fact

261.    The prosecution of the claims of Class Representatives requires the adjudication of numerous questions of law and fact common to both their individual claims and those of the class they seek to represent.

262.    The common questions of law include, *inter alia*: (a) whether Defendants

have engaged in a pattern or practice of unlawful, systemic gender discrimination in its compensation, assignment, selection, performance evaluation, promotion, advancement, transfer, leave, and termination policies, practices, and procedures, and in the general terms and conditions of work and employment; (b) whether Defendants have engaged in unlawful disparate impact gender discrimination in its compensation, assignment, selection, performance evaluation, promotion, advancement, transfer, leave, and termination policies, practices, and procedures, and in the general terms and conditions of work and employment; (c) whether the failure to institute adequate standards, quality controls, implementation metrics, or oversight in assignment, compensation, evaluation, development, maternity and flex/time, promotion, and termination systems violates Title VII and/or other statutes; (d) whether the lack of transparency and of opportunities for redress in those systems violates Title VII and/or other statutes; (e) whether senior management and HR's failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Title VII and/or other statutes; and (f) whether Defendants are liable for a continuing systemic violation of Title VII and/or other statutes; and a determination of the proper standards for proving a pattern or practice of discrimination by Defendants against its female PR professionals.

263.   The common questions of fact include whether Defendants have, *inter alia*: (a) used a system of assignment that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (b) through the use of that system of assignment, placed female PR professionals in job titles or classifications lower than similarly-situated male employees; (c) systematically, intentionally, or knowingly placed female PR professionals in job titles or classifications

lower than similarly-situated male employees; (d) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (e) through the use of that compensation system, compensated female PR professionals less than similarly-situated males in salary, bonuses, and/or other perks; (f) systematically, intentionally, or knowingly compensated female PR professionals less than similarly-situated males; (g) used a system of development and mentoring that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress (h) through the use of that development and mentoring system failed to develop or mentor female PR professionals in a commensurate manner to their similarly-situated male counterparts; (i) systematically, intentionally, or knowingly failed to develop or mentor female PR professionals in a commensurate manner to their similarly-situated male counterparts; (j) used a promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (k) through the use of that promotion system, precluded or delayed the promotion of female PR professionals into higher level jobs traditionally held by male employees; (l) systematically, intentionally, or knowingly precluded or delayed the promotion of female PR professionals into higher level jobs traditionally held by male employees; (m) used a system for performance evaluations that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (n) through use of that performance evaluation system, inaccurately, inequitably, or disparately measured and classified female and male PR professionals' performance; (o) systematically, intentionally, or knowingly subjected female PR professionals to

inaccurate, inequitable, or discriminatorily lowered performance evaluations; (p) through its policies, practices, and procedures, developed male and female PR professionals inequitably; (q) used maternity and flex time policies, practices, and procedures that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency, or opportunities for redress; (r) through use of those policies, practices and procedures, treated pregnant employees and mothers differently and discriminatorily from non-pregnant employees, male employees, and non-caregivers; (s) systematically, intentionally, or knowingly subjected pregnant employees and mothers to disparate and discriminatory terms and conditions of employment; (t) used HR and EEO systems that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency, or opportunities for redress; (u) through the use of those systems, minimized, ignored, or covered up evidence of gender discrimination and harassment in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination and harassment brought to the attention of senior management, the human resources department, or other reporting channels; (v) systematically, intentionally, knowingly, or deliberately showed an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled, or covered up evidence of or complaints about gender and pregnancy discrimination and harassment in the workplace; (w) failed to adequately or meaningfully train, coach, or discipline senior management on EEO principles and compliance; and (x) carried out discriminatory hires, terminations, demotions, and/or job reassignments based on gender when the Company reorganized its PR practice and management structure beginning in 2008.

264.    The employment policies, practices, and procedures to which the Class Representatives and the class members are subjected are set at Defendants' corporate level, which is headquartered in and directed from Paris, France and New York, New York, and apply universally to all class members.  These employment policies, practices and procedures are not unique or limited to any office location; rather, they apply to all office locations and, thus, affect the Class Representatives and class members in the same ways no matter the office, area, or position in which they work.

265.    Throughout the liability period, a disproportionately large percentage of Defendants' executives, senior executives, and officers have been male.

266.    Defendants' assignment, development, promotion, advancement, compensation, performance evaluation, leave, and termination policies, practices, and procedures all suffer from a lack of: transparency, adequate quality standards and controls; sufficient implementation metrics; management/HR review; and opportunities for redress or challenge.  As a result, employees are assigned, evaluated, compensated, developed, promoted, and terminated within a system that is insufficiently designed, articulated, explained, or implemented to consistently, reliably or equitably manage or reward employees.

267.    Discrimination in development, promotion, advancement, compensation, performance evaluation, leave, and terminations occurs in a pattern or practice throughout all offices in Defendants' PR practice in the U.S.  Employment opportunities are driven by personal familiarity, subjective decision-making, pre-selection, and interaction between male executives and subordinates, rather than by merit or equality of opportunity.  As a result, male employees have advanced and continue to advance more

rapidly to better and higher-paying jobs than do female employees.  Defendants' policies, practices, and procedures have had an adverse impact on female PR employees seeking selection for, or advancement to, better and higher-paying positions.  In general, the higher the level of the job classification, the lower the percentage of female PR employees holding it.

### E.  Typicality of Claims and Relief Sought

268.   The claims of Class Representatives are typical of the claims of the class. The relief sought by the Class Representatives for gender discrimination complained of herein is also typical of the relief which is sought on behalf of the class.

269.   Like the members of the class, Class Representatives are female PR employees who have worked for Defendants during the liability period.

270.   Discrimination in assignment, selection, promotion, advancement, compensation, leave, and termination affects the compensation and employment opportunites of the Class Representatives and all the PR employee class members in the same or similar ways.

271.   Defendants have failed to create adequate incentives for its executives and managers to comply with its own policies and equal employment opportunity laws regarding each of the employment policies, practices, and procedures referenced in this Complaint, and have failed to discipline adequately its executives, managers and other employees when they violate Company policy or discrimination laws.  These failures have affected the Class Representatives and the class members in the same or similar ways.

272.   The relief necessary to remedy the claims of the Class Representatives is

exactly the same as that necessary to remedy the claims of the class members in this case. Class Representatives seek the following relief for their individual claims and for those of the members of the proposed class: (A) a declaratory judgment that Defendants have engaged in systemic gender discrimination and disparate impact discrimination against female PR employees by (1) paying female PR employees less than their male counterparts, (2) denying female PR employees promotions into better and higher-paying positions, (3) advancing female PR employees at a slower rate than their male counterparts, (4) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers, (5) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination and pregnancy/caregiver discrimination in the workplace, and (6) terminating, demoting, and reassigning a disproportionate number of females during its reorganization of its PR practice and management structure beginning in 2008; (B) a permanent injunction against such continuing discriminatory conduct; (C) injunctive relief which effects a restructuring of Defendants' promotion, transfer, assignment, demotion, training, performance evaluation, compensation, leave, and termination policies, practices, and procedures – so that female PR employees will be able to compete fairly in the future for promotions, transfers, and assignments to better and higher-paying positions with terms and conditions of employment traditionally enjoyed by male employees; (D) back pay, front pay, and other equitable remedies necessary to make the female PR employees whole from the Defendants' past discrimination; (E) punitive and nominal damages to prevent and deter Defendants from engaging in similar discriminatory practices in the future; (F) compensatory damages; (G) pre- and post-judgment interest; and (H) attorneys' fees,

costs and expenses.

### F.   Adequacy of Representation

273.   The Class Representatives' interests are co-extensive with those of the members of the proposed class which they seek to represent in this case.   Class Representatives seek to remedy Defendants' discriminatory employment policies, practices, and procedures so that female PR employees will no longer be prevented from advancing into higher paying and more desirable higher level positions.   Plaintiffs are willing and able to represent the proposed class fairly and vigorously as they pursue their individual claims in this action.

274.   Class Representatives have retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.   The combined interests, experience, and resources of Plaintiffs' counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G.   Requirements Of Rule 23(b)(2)

275.   Defendants have acted on grounds generally applicable to the Class Representatives and the class by adopting and following systemic policies, practices, and procedures which are discriminatory.   Disparate impact and systemic gender discrimination is Defendants' standard operating procedure rather than a sporadic occurrence.   Defendants have refused to act on grounds generally applicable to the class by, *inter alia*: (1) paying Plaintiffs and other female PR employees less than similarly-situated male employees; (2) failing to promote or advance Plaintiffs and other female PR

employees at the same rate as similarly-situated male employees; (3) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers; (4) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination, sexual harassment and pregnancy/caregiver discrimination in the workplace; and (5) carrying out discriminatory hires, terminations, demotions, and/or job reassignments based on gender when the Company reorganized its PR practice and management structure beginning in 2008.

276.    Defendants' systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the class as a whole.

**H.    Requirements of Rule 23(b)(3)**

277.    The common issues of fact and law affecting the claims of Class Representatives and proposed class members, including, but not limited to, the common issues previously identified herein, predominate over any issues affecting only individual claims.  These issues include whether Defendants have engaged in gender discrimination against female employees by: (1) paying Plaintiffs and other female PR employees less than similarly-situated male employees; (2) failing to promote or advance Plaintiffs and other female PR employees at the same rate as similarly-situated male employees; (3) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers; (4) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination, sexual harassment, and pregnancy/caregiver discrimination in the workplace; and (5) carrying out discriminatory hires, terminations, demotions, and/or job reassignments based on gender when the

Company reorganized its PR practice and management structure beginning in 2008.

278.   A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the proposed class.

279.   The cost of proving Defendants' pattern or practice of discrimination makes it impracticable for the Class Representatives and members of the proposed class to prosecute their claims individually.

## VI.   COLLECTIVE ACTION ALLEGATIONS (EQUAL PAY ACT)

280.   Plaintiffs da Silva Moore, O'Donohue, Mayers, and Pierce ("EPA Collective Action Plaintiffs") incorporate by reference the allegations from the previous paragraphs of this Complaint alleging class-based common policies and practices resulting in unequal pay earned by similarly-situated female PR management employees.

281.   Plaintiffs da Silva Moore, O'Donohue, Mayers, and Pierce bring collective claims alleging violations of the Equal Pay Act ("EPA") as a collective action pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) on behalf of all members of the EPA Class.  The EPA Class consists of female public relations management employees who are, have been, or will be employed by Defendants in the following positions, including but not limited to Vice President, Senior Vice President, Senior Vice President/Director, and/or Senior Vice President/Deputy Managing Director (classified in the job codes of ███████████ in Defendants' compensation/payroll policies and records) in the United States, at any time during the applicable liability period ("female PR management employees").

282.   Plaintiffs da Silva Moore, O'Donohue, Mayers, and Pierce seek to

represent all of the female PR management employees described above. The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

283.   The EPA action includes female PR management employees who (a) were not compensated equally to males who had substantially similar job classifications, job functions, job families, job codes, job titles, job descriptions, and/or job duties based on Defendants' common employment policies and centralized decisionmaking; (b) were not compensated equally to males who performed substantially similar work based on Defendants' common employment policies and centralized decisionmaking; and (c) who were denied assignment, placement, promotion, and/or advancement opportunities that would have resulted in greater compensation in favor of lesser qualified male employees based on Defendants' common employment policies and centralized decisionmaking.

284.   Questions of law and fact common to the EPA Collective Action Plaintiffs and the EPA Class as a whole include but are not limited to the following:

(a) Whether Defendants unlawfully failed and continue to fail to compensate female PR management employees at a level commensurate with similarly-situated male employees;

(b) Whether Defendants unlawfully failed and continue to fail to assign, place, promote, and advance female PR management employees to higher paying positions in a fashion commensurate with similarly-situated males;

(c) Whether Defendants' policy or practice of failing to compensate female PR management employees on a par with comparable male employees as a result of (a) and (b) violate applicable provisions of the EPA; and

(d)  Whether Defendants' failure to compensate female PR management employees on a par with comparable male employees as a result of (a) and (b) was willful within the meaning of the EPA.

285.  Counts for violation of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs, because their claims are similar to the claims of the EPA Class.

286.  Plaintiffs da Silva Moore, O'Donohue, Mayers, and Pierce,  and the EPA Collective Action Class (a) are similarly situated; (b) have substantially similar job classifications, job functions, job families, job titles, job descriptions, and/or job duties; and (c) are subject to Defendants' common compensation policies and practices, and centralized decisionmaking resulting in unequal pay based on sex by (i) failing to compensate female PR management employees on a par with men who perform substantially equal work and/or hold equivalent levels, job titles, and positions, and (ii) failing to provide female PR management employees equal pay by denying opportunities for assignment, placement, promotion, and advancement that would have resulted in greater compensation to them comparable to those afforded to males who perform substantially equal work.

## COUNTS

### COUNT I
**(INDIVIDUAL AND CLASS ACTION CLAIMS)**

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII") - GENDER DISCRIMINATION 42 U.S.C. § 2000e, *et seq*. (Plaintiffs da Silva Moore, O'Donohue, Mayers, and Wilkinson Against All**

**Defendants)**

287.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

288.    This Count is brought on behalf of Class Representatives da Silva Moore, O'Donohue, Mayers, and Wilkinson, and all members of the class.

289.    Defendants have discriminated against the Class Representatives and all members of the class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis of their gender.  Plaintiffs have suffered both disparate impact and disparate treatment discrimination as a result of Defendants' wrongful conduct.

290.    Defendants have discriminated against the Class Representatives and all members of the class by treating them differently from and less preferably than similarly-situated male employees and by subjecting them to discriminatory pay, discriminatory denial of promotions, disparate terms and conditions of employment, discriminatory job assignment, discriminatory terminations and demotions, and other forms of discrimination, in violation of Title VII.

291.    Defendants have failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination, sexual harassment, and pregnancy/caregiver discrimination in the workplace.

292.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representatives and all members of the class, entitling the Class Representatives and all members of the class

to punitive damages.

293.    By reason of the continuous nature of Defendants' discriminatory conduct, which persisted throughout the employment of the Class Representatives and the members of the class, the Class Representatives and the members of the class are entitled to application of the continuing violations doctrine to all violations alleged herein.

294.    As a result of Defendants' conduct alleged in this complaint, the Class Representatives and the members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

295.    Defendants' policies, practices, and/or procedures have produced a disparate impact on the Class Representatives and the members of the class with respect to the terms and conditions of their employment.

296.    By reason of Defendants' discrimination, the Class Representatives and the members of the class are entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of compensatory and punitive damages.

297.    Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

### COUNT II
### (INDIVIDUAL AND CLASS ACTION CLAIMS)

### VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 1(a) – GENDER DISCRIMINATION
### (Against All Defendants)

298.    Plaintiffs re-allege and incorporate by reference each and every allegation

in each and every aforementioned paragraph as if fully set forth herein.

299.   This Count is brought on behalf of New York Plaintiffs and all appropriate members of the class.

300.   Defendants have discriminated against New York Plaintiffs and members of the class in violation of Section 296, subdivision 1(a) of the New York Executive Law, by subjecting them to different treatment and disparate impact discrimination on the basis of their gender.

301.   Defendants have discriminated against New York Plaintiffs and members of the class by treating them differently from and less preferably than similarly-situated male employees and by subjecting them to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, discriminatory terminations and demotions, and other forms of discrimination, in violation of New York Executive law.

302.   Defendants' policies, practices, and procedures have produced disparate impacts on New York Plaintiffs and members of the class with respect to the terms and conditions of employment.

303.   As a result of Defendants' conduct alleged in this complaint, New York Plaintiffs and members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

304.   By reason of Defendants' discrimination, New York Plaintiffs and members of the class are entitled to all legal and equitable remedies available for violations of the New York Executive Law, including reinstatement and compensatory

damages.

305.    Attorneys' fees and costs should be awarded under the New York Executive Law.

**COUNT III**
**(INDIVIDUAL AND CLASS ACTION CLAIMS)**

**VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107,**
**subd. 1(a) – GENDER DISCRIMINATION**
**(Plaintiffs da Silva Moore and O'Donohue Against All Defendants)**

306.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

307.    This Count is brought on behalf of the New York Plaintiffs, and all appropriate members of the class to whom this statute applies.

308.    Defendants have discriminated against New York Plaintiffs and members of the class in violation of Section 8-107, subdivision 1(a) of the New York City Administrative Code, by subjecting them to different treatment and disparate impact discrimination on the basis of their gender.

309.    Defendants have discriminated against New York Plaintiffs and members of the class by treating them differently from and less preferably than similarly-situated male employees and by subjecting them to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, discriminatory terminations and demotions, and other forms of discrimination, in violation of New York City Administrative Code.

310.    Defendants' policies, practices, and procedures have produced disparate impacts on the Plaintiffs and members of the class with respect to the terms and conditions of employment.

311.    As a result of Defendants' conduct alleged in this complaint, New York Plaintiffs and members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

312.    By reason of Defendants' discrimination, New York Plaintiffs and members of the class are entitled to all legal and equitable remedies available for violations of the New York City Administrative Code, including reinstatement and an award of compensatory and punitive damages.

313.    Attorneys' fees and costs should be awarded under the New York Administrative Code.

**COUNT IV**
**(INDIVIDUAL AND COLLECTIVE ACTION CLAIMS)**

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,**
**AS AMENDED BY THE EQUAL PAY ACT OF 1963 – 29 U.S.C. §§ 206,** *et seq.*
**DENIAL OF EQUAL PAY FOR EQUAL WORK**
**(Plaintiffs da Silva Moore, O'Donohue, Mayers, and Pierce Against All Defendants)**

314.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

315.    This Count is brought on behalf of Plaintiffs da Silva Moore, O'Donohue, Mayers, and Pierce, and all members of the EPA Collective Action Class.

316.    Defendants are employers of Plaintiffs and the EPA Collective Action Class within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, et seq., as amended by the Equal Pay Act of 1963 ("EPA").

317.    Defendants have paid the EPA Collective Action Plaintiffs and the EPA Class less than similarly-situated male employees in violation of the Fair Labor Standards

Act of 1938, 29 U.S.C. §§ 206, et seq., as amended by the Equal Pay Act of 1963 ("EPA"), by paying them less for substantially equal work on the basis of sex.

318.    Defendants have discriminated against EPA Collective Action Plaintiffs and the EPA Class by paying them less than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.  Defendants so discriminated by subjecting the EPA Collective Action Plaintiffs and EPA Class to common discriminatory pay policies, including discriminatory salaries, bonuses, and other compensation incentives, and discriminatory assignments, denials of promotions, and other advancement opportunities that would result in higher compensation, and other forms of discrimination in violation of the Equal Pay Act.

319.    Defendants caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the Equal Pay Act.  Moreover, Defendants willfully violated the Equal Pay Act by intentionally paying women less than men.

320.    As a result of Defendants' conduct alleged in this Complaint and/or Defendants' willful, knowing, and intentional discrimination, the EPA Collective Action Plaintiffs and EPA Class have suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

321.    The EPA Collective Action Plaintiffs and EPA Class are therefore entitled to all legal and equitable remedies, including doubled awards for all willful violations.

322.    Attorneys' fees and costs should be awarded under 29 U.S.C. §§ 216, et

seq.

## COUNT V
### (INDIVIDUAL AND CLASS ACTION CLAIMS)

### VIOLATION OF THE NEW YORK EQUAL PAY LAW–
### N.Y. LABOR LAW § 194
### DENIAL OF EQUAL PAY FOR EQUAL WORK
### (Against All Defendants)

323.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

324.    Defendants, an employer of the Plaintiffs and all members of the class within the meaning of the New York Equal Pay Law, have discriminated against New York Plaintiffs and appropriate class members in violation of the New York Labor Law § 194, by subjecting them to unequal pay on the basis of sex.

325.    Defendants have discriminated against New York Plaintiffs and class members by treating them differently from and less preferably than similarly-situated male employees who performed jobs that required equal skill, effort, and responsibility, and which were performed under similar working conditions.    Defendants so discriminated by subjecting them to discriminatory pay, discriminatory denials of bonuses and other compensation incentives, discriminatory denials of promotions and other advancement opportunities that would result in higher compensation, and other forms of discrimination in violation of the New York Equal Pay Law.

326.    Defendants caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the New York Equal Pay Law.  Moreover, Defendants willfully violated the New York Equal Pay Law by intentionally paying women less than similarly-situated men.

327.   As a result of Defendants' conduct alleged in this Complaint and/or Defendants' willful, knowing, and intentional discrimination, New York Plaintiffs and class members have suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

328.   New York Plaintiffs and class members are therefore entitled to all legal and equitable remedies, including doubled awards for all willful violations and attorneys' fees and costs.

## COUNT VI
## (INDIVIDUAL AND CLASS CLAIMS)

## VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000e(k) *et seq.*
## PREGNANCY DISCRIMINATION
### (Plaintiffs da Silva Moore and Wilkinson Against All Defendants)

329.   Plaintiffs da Silva Moore and Wilkinson re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

330.   Defendants discriminated against the Plaintiffs da Silva Moore and Wilkinson and members of the class because of or on the basis of pregnancy, childbirth, or related medical conditions.

331.   Plaintiffs da Silva Moore and Wilkinson and members of the class were not treated the same for all employment-related purposes, as other not-pregnant persons, who were similarly-situated in their ability or inability to work.

332.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiffs da Silva Moore and Wilkinson and members of the class.

333.    As a direct and proximate result of Defendants' aforementioned conduct, Plaintiffs da Silva Moore and Wilkinson and all members of the class were damaged and suffered economic and non-economic damages.

334.    By reason of the continuous nature of Defendants' discriminatory conduct, persistent throughout the employment of Plaintiffs da Silva Moore and Wilkinson and the class members, Plaintiffs da Silva Moore and Wilkinson and the class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

335.    By reason of the pregnancy discrimination suffered as a result of Defendants' discriminatory conduct, Plaintiffs da Silva Moore and Wilkinson and members of the class are entitled to legal and equitable remedies available under Title VII, including reinstatement and an award of compensatory and punitive damages.

336.    Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT VII**
**(INDIVIDUAL CLAIM – PLAINTIFF DA SILVA MOORE)**

**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT OF 1993**
**("FMLA")**
**29 U.S.C. § 2601, *et seq*.**
**(Plaintiff da Silva Moore Against All Defendants)**

337.    Plaintiff da Silva Moore re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

338.    This Count is brought on behalf of Plaintiff da Silva Moore.

339.    Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent

position with equivalent employment benefits, pay, and other terms and conditions of employment.

340.   From September 5, 2009 to January 4, 2010, Ms. da Silva Moore took approved FMLA leave for maternity leave to care for her newborn child.  Upon her return from such leave, Defendants failed to restore Ms. da Silva Moore to the position she held in September 2009, when the leave commenced.  Defendants demoted Ms. da Silva Moore by eliminating her position, gave her less desirable terms and conditions of employment,  and terminated her upon her return from FMLA leave.

341.   Defendants acted willfully, intentionally, and with reckless disregard to Plaintiff's FMLA rights.

342.   As a result of Defendants' conduct alleged in this Complaint and/or Defendants' willful, knowing, and intentional discrimination, Plaintiff da Silva Moore has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

343.   Plaintiff da Silva Moore is therefore entitled to all legal and equitable remedies, including doubled awards for all willful violations.

344.   Attorneys' fees and costs should be awarded under 29 U.S.C. §§ 216, et seq.

## COUNT VIII
### (INDIVIDUAL CLAIM – PLAINTIFF DA SILVA MOORE)

### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT OF 1993
### ("FMLA") - RETALIATION
### 29 U.S.C. § 2601, *et seq.*
### (Plaintiff da Silva Moore Against All Defendants)

345.   Plaintiff da Silva Moore re-alleges and incorporates by reference each and

every allegation in each and every aforementioned paragraph as if fully set forth herein.

346.    This Count is brought on behalf of Plaintiff da Silva Moore.

347.    Under the FMLA, it is unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful under the FMLA.

348.    Moreover, employers may not use the taking of FMLA leave as a negative factor in employment decisions, such as hiring, promotions, or disciplinary actions.

349.    In September 2009, Ms. da Silva Moore took approved FMLA leave to care for her newborn daughter.   In so doing, Ms. da Silva Moore exercised her rights protected under FMLA. Upon her return from protected FMLA leave, Defendants unlawfully terminated Ms. da Silva Moore because she had taken FMLA leave and because she insisted upon exercising her rights under the FMLA.

350.    In retaliating against Plaintiff, by ultimately terminating her because she had taken FMLA leave and because she had insisted upon exercising her rights under the FMLA, Defendants acted willfully, intentionally, and with reckless disregard of Ms. da Silva Moore's FMLA-protected rights.

351.    As a result of Defendants' conduct alleged in this Complaint and/or Defendants' willful, knowing, and intentional discrimination, Plaintiff da Silva Moore has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

352.    Plaintiff da Silva Moore is therefore entitled to all legal and equitable remedies, including doubled awards for all willful violations.

353.    Attorneys' fees and costs should be awarded under 29 U.S.C. §§ 216, et

seq.

## COUNT IX
### (INDIVIDUAL CLAIM – PLAINTIFF PIERCE)

### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT OF 1993 ("FMLA")
### 29 U.S.C. § 2601, *et seq*.
### (Plaintiff Pierce Against All Defendants)

354.    Plaintiff Pierce re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

355.    This Count is brought on behalf of Plaintiff Pierce.

356.    Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

357.    Ms. Pierce went on maternity leave in August 2008.  Shortly thereafter, Ms. Pierce's supervisor forced her to work across the country from her home, making it impossible to work at the Company.  As a result, Ms. Pierce was forced to resign in December 2008.

358.    Defendants acted willfully, intentionally, and with reckless disregard to Plaintiff's FMLA rights.

359.    As a result of Defendants' conduct alleged in this Complaint and/or Defendants' willful, knowing, and intentional discrimination, Plaintiff Pierce has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

360.    Plaintiff Pierce is therefore entitled to all legal and equitable remedies,

including doubled awards for all willful violations.

361.    Attorneys' fees and costs should be awarded under 29 U.S.C. §§ 216, et seq.

**COUNT X**
**(INDIVIDUAL CLAIM – PLAINTIFF PIERCE)**

**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT OF 1993**
**("FMLA") - RETALIATION**
**29 U.S.C. § 2601, *et seq*.**
**(Plaintiff Pierce Against All Defendants)**

362.    Plaintiff Pierce re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

363.    This Count is brought on behalf of Plaintiff Pierce.

364.    Under the FMLA, it is unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful under the Act.

365.    Moreover, employers may not use the taking of FMLA leave as a negative factor in employment decisions, such as hiring, promotions, or disciplinary actions.

366.    Ms. Pierce took approved FMLA leave in August 2008 to care for her newborn child.  In so doing, Ms. Pierce exercised her rights protected under the FMLA. Shortly thereafter, Ms. Pierce's supervisor forced her to work across the country from her home, making it impossible to work at the Company.  As a result, Ms. Pierce was forced to resign in December 2008.

367.    In retaliating against Plaintiff, by ultimately terminating her because she had taken FMLA leave and because she had insisted upon exercising her rights under the FMLA, Defendants acted willfully, intentionally, and with reckless disregard of Ms.

Pierce's FMLA-protected rights.

368.    As a result of Defendants' conduct alleged in this Complaint and/or Defendants' willful, knowing, and intentional discrimination, Plaintiff Pierce has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

369.    Plaintiff Pierce is therefore entitled to all legal and equitable remedies, including doubled awards for all willful violations.

370.    Attorneys' fees and costs should be awarded under 29 U.S.C. §§ 216, et seq.

**COUNT XI**
**(INDIVIDUAL CLAIM – PLAINTIFF WILKINSON)**


**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,**
**AS AMENDED BY THE EQUAL PAY ACT OF 1963 – 29 U.S.C. §§ 206,** *et seq.*
**DENIAL OF EQUAL PAY FOR EQUAL WORK**
**(Plaintiff Wilkinson Against All Defendants)**

371.    Plaintiff Wilkinson re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

372.    This Count is brought on behalf of Plaintiff Wilkinson.

373.    Defendants are an employer of Plaintiff Wilkinson within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, et seq., as amended by the Equal Pay Act of 1963 ("EPA").

374.    Defendants paid Plaintiff Wilkinson less than similarly-situated male employees in violation of the EPA on the basis of sex.

375.    Defendants have discriminated against Plaintiff Wilkinson by paying her

less than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.  Defendants so discriminated by subjecting Plaintiff Wilkinson to common discriminatory pay policies, including discriminatory salaries, bonuses and other compensation incentives, and discriminatory assignments and denials of promotions and other advancement opportunities that would result in higher compensation, and other forms of discrimination in violation of the Equal Pay Act.

376.    Defendants caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the Equal Pay Act.  Moreover, Defendants willfully violated the Equal Pay Act by intentionally paying Plaintiff Wilkinson less than similarly-situated men.

377.    As a result of Defendants' conduct alleged in this Complaint and/or Defendants' willful, knowing and intentional discrimination, Plaintiff Wilkinson has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

378.    Plaintiff Wilkinson is therefore entitled to all legal and equitable remedies, including doubled awards for all willful violations.

379.    Attorneys' fees and costs should be awarded under 29 U.S.C. §§ 216, et seq.

## COUNT XII
### (INDIVIDUAL CLAIM – PLAINTIFF HUBBARD)

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,
AS AMENDED BY THE EQUAL PAY ACT OF 1963 – 29 U.S.C. §§ 206, *et seq.*
DENIAL OF EQUAL PAY FOR EQUAL WORK
(Plaintiff Hubbard Against All Defendants)**

380.    Plaintiff Hubbard re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

381.    This Count is brought on behalf of Plaintiff Hubbard.

382.    Defendants are an employer of Plaintiff Hubbard within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, et seq., as amended by the Equal Pay Act of 1963 ("EPA").

383.    Defendants paid Plaintiff Hubbard less than similarly-situated male employees in violation of the EPA on the basis of sex.

384.    Defendants have discriminated against Plaintiff Hubbard by paying her less than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.  Defendants so discriminated by subjecting Plaintiff Hubbard to common discriminatory pay policies, including discriminatory salaries, bonuses and other compensation incentives, and discriminatory assignments and denials of promotions and other advancement opportunities that would result in higher compensation, and other forms of discrimination in violation of the Equal Pay Act.

385.    Defendants caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the Equal Pay Act.  Moreover, Defendants willfully violated the Equal Pay Act by intentionally paying Plaintiff Hubbard less than similarly-situated men.

386.    As a result of Defendants' conduct alleged in this Complaint and/or Defendants' willful, knowing and intentional discrimination, Plaintiff Hubbard has

suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

387.    Plaintiff Hubbard is therefore entitled to all legal and equitable remedies, including doubled awards for all willful violations.

388.    Attorneys' fees and costs should be awarded under 29 U.S.C. §§ 216, et seq.

## PRAYER FOR RELIEF ON CLASS, COLLECTIVE ACTION, AND INDIVIDUAL CLAIMS

WHEREFORE, Plaintiffs, on their own behalves and on behalf of the class, prays that this Court:

A.    Certify the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23(a), (b)(2) and/or (b)(3), on behalf of the proposed Plaintiff class, and designate Ms. da Silva Moore, Ms. O'Donohue, Ms. Mayers, and Ms. Wilkinson as the representatives of this class and their counsel of record as class counsel;

B.    Designate this action as a collective action on behalf of the proposed EPA Collective Action Plaintiffs (asserting EPA claims) and

(i) promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly-situated members of the EPA Collective Action Opt-In Class, which (a) apprises them of the pendency of this action, and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and

(ii) toll the statute of limitations on the claims of all members of the EPA Collective Action Opt-In Class from the date the original complaint was filed until the Class members are provided with

reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt-in as Plaintiffs;

C.      Designate Plaintiffs da Silva Moore, O'Donohue, Mayers, and Pierce as representatives of the EPA Collective Action Class;

D.      Declare and adjudge that Defendants' employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of: (i) Class Representatives and members of the class under Title VII of the Civil Rights Act of 1964, as amended; (ii) New York Plaintiffs and class members under the New York Executive Law, the New York City Administrative Code, and the New York Equal Pay Law; (iii) Collective Action Plaintiffs and members of the collective action under the Federal Equal Pay Act; (iv) Plaintiffs da Silva Moore and Pierce under the Family and Medical Leave Act of 1993; and (v) Plaintiffs Wilkinson and Hubbard under the Federal Equal Pay Act;

E.      Issue a permanent injunction against the Defendants and their partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives and any and all persons acting in concert with them from engaging in any conduct violating the rights of the Class Representatives, class members and those similarly situated as secured by 42 U.S.C. §§ 2000e *et seq.*, and order such injunctive relief as will prevent Defendants from continuing their discriminatory practices and protect others similarly situated;

F.      Issue a permanent injunction against Defendants and their partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, usages, gender discrimination or retaliation

by the Defendants as set forth herein;

G.     Order Defendants to initiate and implement programs that will: (i) provide equal employment opportunities for female PR employees; (ii) remedy the effects of the Defendants' past and present unlawful employment policies, practices and/or procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above;

H.     Order Defendants to initiate and implement systems of assigning, training, transferring, compensating and promoting female PR employees in a non-discriminatory manner;

I.     Order Defendants to establish a task force on equality and fairness to determine the effectiveness of the programs described above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described above;

J.     Order Defendants to adjust the wage rates and benefits for the Class Representatives and the class members to the level that they would be enjoying but for the Defendants' discriminatory policies, practices and/or procedures;

K.     Order Defendants to place or restore the Class Representatives and the class members into those jobs they would now be occupying but for Defendants' discriminatory policies, practices and/or procedures;

L.      Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that the Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law;

M.      Award nominal, compensatory and punitive damages to the Class Representatives, the class members, and individual Plaintiffs in excess of 100 million dollars;

N.      Award liquidated damages to the EPA Collective Action Plaintiffs, EPA Class, and individual Plaintiffs;

O.      Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Class Representatives, the class members, the EPA Collective Action Plaintiffs, the EPA Class, and individual Plaintiffs;

P.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by the Class Representatives, the class members, the EPA Collective Action Plaintiffs, the EPA Class, and individual Plaintiffs to be determined at trial;

Q.      Order Defendants to make whole Class Representatives, the class members, the EPA Collective Action Plaintiffs, the EPA Class, and individual Plaintiffs by providing them with appropriate lost earnings and benefits, and other affirmative relief;

R.      Award any other appropriate equitable relief to the Class Representatives, the class members, the EPA Collective Action Plaintiffs, the EPA Class, and individual Plaintiffs; and

S.     Award any additional and further relief as this Court may deem just and

proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable of right by jury.

Dated: February 29, 2012

Jeremy Heisler (JH-0145)
Steven L. Wittels (SLW-8110)
Deepika Bains (DB-4935)
Siham Nurhussein
SANFORD WITTELS, & HEISLER, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 723-2947
Facsimile:  (646) 723-2948
swittels@swhlegal.com

Janette Wipper (CA Bar No. 275264)
(*admitted pro hac vice*)
SANFORD WITTELS, & HEISLER, LLP
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 391-6900
Facsimile:  (415) 421-4784
jwipper@swhlegal.com

*Attorneys for Plaintiffs Monique da Silva
Moore, MaryEllen O'Donohue, Laurie
Mayers, Heather Pierce, Katherine
Wilkinson, Zaneta Hubbard and the Class*