# EXHIBIT 6

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
     MONIQUE DA SILVA MOORE,              )
4    MARYELLEN O'DONOHUE, LAURIE          )
     MAYERS, HEATHER PIERCE, and          )
5    KATHERINE WILKINSON on behalf        )
     Of themselves and all others        )
6    similarly situated,                  )
                                          )
7                    Plaintiffs,          )
                                          )
8    -against-                            )
                                          ) Index No.
9                                         ) 11-CV-1279(RJS)
     PUBLICIS GROUPE SA and               )
10   MSLGROUP,                            )
                                          )
11                   Defendants.          )
     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
12

13

14

15

16

17

18          DEPOSITION OF KATHERINE WILKINSON
                   New York, New York
19                 December 6, 2011
20

21

22

23   Reported by:
24   Judi Johnson, RPR, CRR, CLR
25   Job No.: 44188

                    KATHERINE WILKINSON

1

2   and the second act being when I had my review.

3        Q      Which review?

4        A      My performance review regarding when I

5   requested a promotion and -- when I requested a

6   promotion.

7        Q      Okay.  Do you remember when that was?

8        A      It was in May of '09.

9        Q      Okay.  And what did Jim Tsokanos do at

10  that time that you believe was discriminatory?

11       A      After I was done with my review and

12  was told there was no money for increases and

13  there was a freeze on promotion -- promotions

14  and he was visiting our LA office and stopped

15  into my office and basically said, I know you

16  were upset -- and I'm paraphrasing because I

17  don't remember the exact words.  But I know

18  you're upset by your review, but I just want to

19  affirm the amazing work you're doing.  That

20  you're doing a great job and to hang on is what

21  he said.

22       Q      Sounds okay.  Well, you haven't

23  identified anything Jim Tsokanos did.  What did

24  he say to you that you believe was

25  discriminatory?

1          KATHERINE WILKINSON

2          MS. WIPPER:  Objection.  Asked and

3      answered.

4      A     It was obvious to me that he was aware

5  of my review.  He was aware that I was unhappy.

6  He obviously had all the knowledge about what

7  was going on.  So --

8      Q     Well, let's go back.  Why were you

9  unhappy with your review?

10     A     And I was also told there was a

11 freeze, the pay, hiring -- the entire office was

12 told there was a pay, hiring and promotion

13 freeze mandated by Publicis and so we were all

14 kind of told to suck it up but, yet there were

15 exceptions to that rule.

16     Q     Okay.  Let's go back to your review.

17     A     Okay.

18     Q     The May 2009 review?

19     A     Okay.

20     Q     Why were you upset with your review?

21     A     I was upset with my review because it

22 didn't even enter into the minds of those

23 reviewing me that I would be interested or

24 desire a promotion.  And they were shocked and

25 surprised at my unhappiness of my review, since

1                KATHERINE WILKINSON

2    in their minds, it was a positive and good

3    review.

4         Q    Okay.  And who are you referring to --

5    who gave you your May 2009 review?

6         A    Lisa Rogers was the one who gave me

7    the review.

8         Q    Okay.

9         A    Even though Vickie Fite was the one

10   listed and signed off on the review and she was

11   the one that was supposed to review me and I

12   actually requested she review me.  But she

13   delegated that down to Lisa and after I had a

14   review with Lisa, I was unhappy and requested a

15   meeting with Vickie to clarify things and go

16   over things.

17        Q    Were you told at that review that

18   because of the salary freeze you were not going

19   to be getting any increase in pay?

20        A    It's -- yes, and also it was -- the

21   comments on my review from Vickie under agency

22   core values, she had stated it's important to

23   understand that in an economic downturn that new

24   business is basically the only priority and I --

25   I'm sorry, I'd have to look at the document.  I

1              KATHERINE WILKINSON
2    don't know the exact wording, but the thought
3    was there was no money.  There was no money and
4    we're in a freeze so we can't get any of that
5    kind of stuff, promotion or money.
6         Q    When did you meet with Jim Tsokanos?
7    Was that after your review?
8         A    Yes.
9         Q    Do you recall the date that you met
10   with Jim Tsokanos?
11        A    No.  It was soon after though.
12        Q    Was it a week after or a month after?
13             MS. WIPPER:  Objection.  Asked and
14        answered.  Calls for speculation.
15        A    It was around a month after.  I don't
16   really recall the exact time.
17        Q    Do you recall on what occasion Jim
18   Tsokanos was at the LA office?
19        A    No.
20        Q    You did meet him in the LA office?
21        A    Yes.
22        Q    When you met with Jim, were you by
23   yourself?
24        A    Yes.  It was in my office.  He stopped
25   in.

1                    KATHERINE WILKINSON

2    that type of thing because of the freeze

3    mandated by Publicis.  All of those requests

4    have to go through headquarters.  They all have

5    to go through the New York office.

6         Q     You said that there was -- you were

7    told there was a hiring freeze and salary

8    freeze, correct?

9         A     Hiring, promotion and pay increase.

10        Q     And that applied to everybody?

11        A     Correct.  That's what I was told.

12        Q     Well, the reason I'm having trouble

13   understanding.  If you're -- if you're telling

14   me that you were told there was a hiring freeze,

15   a freeze on promotion and a freeze on

16   compensation, then why do you believe it was

17   discriminatory that you didn't get a promotion

18   or a salary increase at that time?

19        A     Because there was exceptions to the

20   rule which we saw with the hiring of Michael

21   Strapazon, with the hiring of Steve Chipman,

22   with the hiring of Joe Carberry.  And -- and I

23   do recall that Kate Greenberg also received a

24   promotion and a pay increase but she fought

25   tooth and nail to get that.

Page 74

1               KATHERINE WILKINSON

2      Q      What increase did Michael Strapazon

3  get?

4      A      He was hired.  He was an intern, and

5  he was hired in.

6      Q      Do you know if he replaced somebody

7  else?

8      A      He did not.

9      Q      Do you know when he was hired?

10     A      I don't recall.

11     Q      Are you aware of any other individuals

12 who got -- who were hired during the period

13 where you were told there was a salary or hiring

14 freeze?

15            MS. WIPPER:  Objection.  Asked and

16     answered.

17     A      I -- I know that I heard about hires

18 in other offices, but I can only speak directly

19 to what I recall in the LA office.

20     Q      Okay.  And you only know what you have

21 personal knowledge about?

22     A      Right.

23     Q      If I told you that during this hiring

24 freeze that there were more women that were

25 hired, that there were exceptions made for women

1                     KATHERINE WILKINSON

2      then there were for men, would that change your

3      opinion as to whether or not it was

4      discriminatory that you did not get a promotion?

5              MS. WIPPER:  Objection.  I mean, calls

6          for speculation.  She doesn't have any

7          evidence in front of her.

8          A      I really can't make a determination on

9      that.

10         Q      Well, I'm asking you if I told you --

11     you told me that you were aware of three men who

12     were hired during the hiring freeze, correct?

13         A      Right.

14         Q      Okay.  So if I told you that there

15     were women hired and more women hired than men

16     during the hiring freeze, would that change your

17     opinion as to whether it was discriminatory or

18     not?

19             MS. WIPPER:  Objection.  Vague and

20         ambiguous.  Hired at the appropriate level

21         or hired just in general?

22             MR. BRECHER:  Again, Janette --

23     Janette --

24             MS. WIPPER:  It's vague and ambiguous.

25             MR. BRECHER:  Janette, this is our

1               KATHERINE WILKINSON

2        A    No.

3        Q    How many times did you speak with Joe

4   Carberry from the time he was hired up until the

5   time that you resigned?

6        A    Too many to count.  I mean, a lot.

7        Q    Did you speak with him by phone or was

8   it via E-mail?

9        A    No, it was mostly in-person.

10       Q    He came to the LA office?

11       A    Often.

12       Q    Often, okay.  And just so I understand

13  your allegation.  Are you claiming that MSL

14  should have made an exception for you during the

15  freeze in May of 2009 so that you would've been

16  promoted at that time?

17       A    My -- I'm saying that I should've been

18  hired in at the higher level.  I was hired in at

19  a high level AE with the promise of a six-month

20  review which I never received because my

21  supervisors kept changing.  So my -- my

22  statement is that I should've already been hired

23  in as an SAE based on my experience level, but I

24  was told that because I had no agency

25  experience, that they were going to hire me in

1                KATHERINE WILKINSON

2        A     No.

3        Q     Okay.  Was that during the same period

4   there was a salary freeze?

5        A     So -- yeah.  There was.

6        Q     Did you have a subsequent meeting with

7   Vickie Fite after you met with Lisa Rogers?

8        A     Yes, I did.

9        Q     Did you meet about anyone else

10  regarding your review other than Vickie and

11  Lisa?

12       A     No, I did not.

13       Q     When was the meeting with Vickie?

14       A     It was within a week, around there,

15  after I met with Lisa.  I don't really recall.

16       Q     Okay.  And why did you have a

17  subsequent meeting with Vickie?  Was it

18  something you requested or --

19       A     It was something I requested.  Sorry,

20  I interrupted you.

21       Q     It's okay.

22       A     I could finish my thought if you want

23  me to.

24       Q     Sure, go ahead.  It was something you

25  requested.

1          KATHERINE WILKINSON

2   SAE level person to be doing.  But I was trying

3   desperately to get this -- to get this job

4   title.  Another thing that we discussed that I

5   wanted to make sure was on the record was that

6   when I asked her, because what I kept hearing is

7   there's no money, there's no money, there's no

8   money.  This is a freeze, there's no money.  So

9   I asked her, well, I would be willing to take,

10  you know, a title change without the money right

11  away and her response was, well, I don't really

12  know how that really works.  I don't even know

13  if we can do that.  I'd have to ask about that.

14  You know, I'm not really sure if that's gonna

15  help morale.  And she even asked me, do you

16  think that would help morale in the office if we

17  were giving titles without pay increases?  Or

18  you know, do you think that would be -- that

19  would help or people would like that?  Would

20  they even go for that?  And then I said, Well, I

21  can't speak to that.  I can speak to me and I

22  said that I was willing to do that and she said,

23  Well, I don't even know if that's possible.  I'm

24  not really sure how this all works.

25          Q     So the intangibles was that you would

1               KATHERINE WILKINSON

2    he was qualified for would know discriminatory.

3    Is that what you meant by "practice"?

4        Q    Page 174 of the Amended Complaint, it

5    states that "Defendant's promotions, policies

6    and procedures have had a disparate action on

7    the class representatives and members of the

8    class."

9               So my question is, what specific

10   policies, practices or procedures are you

11   alleging had a disparate impact on the class

12   representative and members of the class?

13              MS. WIPPER:   Objection.   Calls for a

14       legal conclusion.   Vague and ambiguous.

15       A    I believe I just answered that with my

16   example.

17       Q    Is that -- is your previous answer the

18   only knowledge you have of any promotion,

19   policies, practices and procedures that have had

20   a disparate impact on class representatives and

21   members of the class?

22       A    My understanding was there was a --

23   that there was a freeze on pay increases,

24   promotions and such and yet there was exceptions

25   to that rule, most of which, you know, from my

# EXHIBIT 7

Page 1

1                    ZANETA HUBBARD

2            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK
3


4      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                         )
5      MONIQUE DA SILVA MOORE,           )
       MARYELLEN O'DONOHUE, LAURIE       )
6      MAYERS, HEATHER PIERCE, and       )
       HEATHER PIERCE, individually      )
7      and on behalf of themselves and   )
       all others similarly situated,    )
8                                        )
                    Plaintiffs,          )
9                                        )
       -against-                         )
10                                       )  Index No.
                                         )  11-CV-1279(RJS)
11     PUBLICIS GROUPE SA and            )
       MSLGROUP,                         )
12                                       )
                    Defendants.          )
13     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _   )

14

15

16        VIDEOTAPED DEPOSITION OF ZANETA HUBBARD

17            Wednesday, December 21, 2011

18

19

20

21

22

23

24     Reported by:
       Sharon A. Gabrielli, RPR, CCR
25     Job No.: 44191

1                    ZANETA HUBBARD

2       Q     What's your understanding of what the Statute

3    of Limitation means?

4       A     That claims -- certain claims can't be made

5    after a certain period of time has passed.

6       Q     Okay.  You worked -- you've worked for a -- a

7    law firm in the past, correct?

8       A     Correct.

9       Q     Are you aware that the maximum Statute of

10   Limitation for an equal pay claim is three

11   years from --

12           MS. BAINS:  Objection.

13      Q     (BY MR. BRECHER)  -- from the date that you

14   file your consent form to join the case?

15           MS. BAINS:  Objection, calls for a legal

16      conclusion.

17           THE WITNESS:  No, I was not aware of

18      that.

19      Q     (BY MR. BRECHER)  Okay.  You joined the case

20   in June of 2011, correct?

21      A     I believe that's correct, yes.

22      Q     And when was the last date that you actually

23   performed any work for MSL?

24      A     It would have been sometime in May of 2008

25   when I was put on bed rest.

Page 38

ZANETA HUBBARD

1

2     Q     So that's more than three years prior to the
3     time that you filed your consent form to join this
4     case, correct?
5     A     Yes.
6     Q     Okay.  Were you aware prior to coming here
7     today that your claim is time barred by the Statute Of
8     limitation?
9           MS. BAINS:  Objection, calls for
10          speculation and inaccurate.
11          THE WITNESS:  I was not aware of that.
12    Q     (BY MR. BRECHER)  Have you ever been deposed
13    before?
14    A     No.
15    Q     What's your current address?
16    A     1427 Mandalay Court, Southwest, Lilburn,
17    Georgia, 30047.
18    Q     And how long have you lived there?
19    A     Six years.
20    Q     Okay.  So that's where you were living during
21    the entire period that you were employed by MSL?
22    A     Yes.
23    Q     And you're married?
24    A     Yes.
25    Q     And your husband's name?

1                    ZANETA HUBBARD

2      Q    Okay.  And did you meet in person with anyone

3  or you just spoke on the phone?

4      A    You mean prior to, like, signing the form?

5      Q    Right.

6      A    No, I didn't meet personally with anyone.

7      Q    Okay.  Just on the phone?

8      A    Correct.

9      Q    For -- how many phone calls did you have with

10 the attorneys before you signed the consent form?

11     A    Maybe two.

12     Q    And how long was each one of those calls?

13     A    I don't recall.  They -- they weren't long.

14 I -- I just don't recall how long they were.

15     Q    Approximately 10 minutes, 20 minutes?

16     A    Maybe 15, 20 minutes.

17     Q    Okay.  Have you contacted anybody, whether by

18 phone or email, who was formerly an employee or

19 currently is an employee at MSL to see whether they

20 wished to join the case?

21     A    No.

22     Q    How did you first become aware that there was

23 a position available at MSL in the Atlanta office?

24     A    I believe I saw it online.

25     Q    Do you remember on which online Website it

# EXHIBIT 8

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See Privacy Act Statement before completing this form.

| AGENCY | |
|---|---|
| X | FEPA |
| X | EEOC |

| New York State Division of Human Rights | and EEOC |
|---|---|

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Monique de Silva Moore | (978) 255-1237 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 4 Doe Run | Newburyport, MA 01950 | 5/24/67 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| MS&L/MS&L Worldwide | Approximately 1,300 | (212) 468-4200 |
| MS&L Group | Approximately 2,500 | |
| Publicis Groupe | Approximately 43,000 | +33 (0)1 44 43 70 00 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1675 Broadway | New York, NY 10019 | Borough of Manhattan |
| 133 Avenue des Champs Elysees | 75008 Paris France | N/A |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

[ ] RACE   [ ] COLOR   [X] SEX   [ ] RELIGION   [ ] AGE
[ ] RETALIATION   [ ] NATIONAL ORIGIN   [ ] DISABILITY   [X] OTHER (Specify)*
*FMLA

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST (ADEA/EPA) | LATEST (ALL) |
| December 2009   through   January 2010 | |
| [ ] CONTINUING ACTION | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

[Please see attached sheets.]
Alternative Contact Information:
Sanford Wittels & Heisler, LLP
1666 Connecticut Ave. NW, Suite 310
Washington, DC 20009

NOTARY – (When necessary for State and Local Requirements)

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

Charging Party (Signature)

Date 1/26/2010

**Charge of Discrimination**
**Monique da Silva Moore**

## I.    Overview of Individual and Class Allegations

1.    MS&L, MS&L Worldwide, MS&L Group, and Publicis Groupe ("MS&L" or the "Company") have discriminated against me in the terms and conditions of my employment on the basis of my gender, female, and for my taking of protected leave under the Family and Medical Leave Act ("FMLA").    Specifically, MS&L terminated my employment, in contrast to similarly situated males and females who had not taken FMLA leave, and subjected me to disparate terms and conditions of employment and other forms of discrimination.

2.    MS&L has known or should have known that MS&L's business practices (including but not limited to its highly subjective selection, compensation, evaluation, and promotion practices) have an illegal disparate impact on women (including me) and has failed to take measures to rectify such illegal disparate impact.

3.    I believe that MS&L's actions are part of a continuing pattern and practice of discrimination against female MS&L employees, including, but not limited to, denying female employees pay and promotional opportunities equal to those of similarly situated males and subjecting female employees to disparate terms and conditions of employment and other forms of discrimination.

## II.    Employment History

4.    After leaving MS&L in 1993, I began my employment with the Company again in September 1999 as a contracted Vice President in MS&L's New York Healthcare Group. From January 2008 until my termination in January 2010, I served as the Global Health Care Director, a position that was based in MS&L's Boston office.

5.    Throughout my employment with MS&L, I have always received strong performance evaluations from my supervisor, colleagues, and clients. I have consistently been recognized as "best in class" in the PR industry, and I have received more than 22 industry awards, including the Silver Anvil in 2009.

## III.    Statement of Facts

6.    Despite my superior performance and service to the Company, MS&L terminated me immediately following my return from maternity leave in January 2010. I had originally gone on maternity leave on September 5, 2009. Prior to the beginning of my leave, in the summer of 2009, it became apparent that MS&L would be undergoing a reorganization under the new CEO.  At this point, my supervisor, Executive Vice President of Global Client and Business Development Wendy Lund, advised me that the Global Healthcare Director position would be eliminated but that a new position would be available to me when I returned from my maternity leave.  In October 2009, Ms. Lund

Monique da Silva Charge of Discrimination
January 27, 2010
Page 2

informed me that under this reorganization, I would be asked to run the oncology business of Sanofi Aventis, working primarily from Boston, with some time also spent in Publicis Consultants PR's New York office. Following this conversation, Ms. Lund confirmed on at least two occasions that I would take this oncology position. At no point did Ms. Lund state that I would have to move to New York to take this position.

7.      Then, on December 23, 2009, President of the Americas Jim Tsokanos called me and suddenly informed me that I would either have to run the MS&L Group brand Publicis Consultants out of the New York City office or terminate my employment with the Company. He then confirmed that we would meet with SVP of Human Resources Tara Lilien in New York on January 7, 2010 to discuss my options.

8.      I returned from maternity leave on January 4, 2010 and was placed on paid administrative leave for three days while I awaited my meeting with Ms. Lilien and Mr. Tsokanos. Although I requested more details regarding my options from Ms. Lilien prior to this January 7th meeting, Ms. Lilien refused to provide me with any additional information. Then, during my January 7th meeting with Mr. Tsokanos and Ms. Lilien, Mr. Tsokanos repeated his ultimatum to me, specifically stating that I could take a new position in New York City as Managing Director for PCPR NY and Account Director for Sanofi-Aventis or take a severance package and terminate my employment. Mr. Tsokanos further required me to give him my response to this ultimatum by the following day.

9.      As I was a mother with a newborn and two additional children aged 10 and 12, I asked Mr. Tsokanos if there was any flexibility in the transition period in which I had to move to New York City. In response, Mr. Tsokanos stated that I had to move immediately, as the business required immediate "in-office" attention, and that the Company would not reimburse my moving expenses. I was thus forced to accept termination of my employment with MS&L.

10.     Although Mr. Tsokanos denied my request for time in which to relocate full-time to New York City, MS&L has granted similar requests from my similarly situated male peers and female peers without children. Specifically, one of my male peers who moved from Dallas to New York in early 2009 under Mr. Tsokanos' direction had over six weeks to relocate. In addition, in early 2009, Mr. Tsokanos requested that my female peer, who ran the Consumer Practice and did not have any children, relocate from Toronto to New York. In contrast to the way he treated me, Mr. Tsokanos extended the time for my female peer to make this move.

11.     Following my termination, MS&L hired a freelancer to fill the Managing Director role initially offered to me. Although MS&L refused to accommodate me in this position, the freelancer is not required to work out of the New York office full-time and has the flexibility to work out of both her business office in New Jersey and the Publicis Consultants Office in New York. Moreover, other senior MS&L executives with North

Monique da Silva Charge of Discrimination
January 27, 2010
Page 3

America wide responsibilities are not required to work out of the New York office full-time.

## IV.   Discrimination Claims

12.   I believe that MS&L has discriminated against me in the terms and conditions of my employment on the basis of my gender, female, and my taking of protected FMLA leave by terminating my employment, in contrast to similarly situated males and females who had not taken FMLA leave, and subjecting me to disparate terms and conditions of employment and other forms of discrimination.

## V.   Class Claims

13.   Based on my observations and experience, I believe that MS&L has engaged and continues to engage in a pattern and practice of discrimination against its female employees on the basis of their gender and/or their taking of FMLA-protected leave and/or their status as caregivers. Women, particularly those who take FMLA-protected leave and/or are caregivers, are routinely forced to leave the Company or accept demotions, in contrast to similarly situated males, and are denied promotional opportunities equal to those of similarly situated males. For instance, in the last several months, at least two other women were terminated only days after returning from maternity leave. Another female employee, who worked a reduced schedule at MS&L in order to care for her children, recently resigned after MS&L subjected her to intolerable working conditions that made it impossible for her to continue her employment.

14.   In addition, the vast majority of leadership positions at MS&L are held by males, even though females comprise approximately 70% of the Company. When women do attain leadership positions, they are often terminated or subjected to demotions. For instance, although female employees once led four out of MS&L's ten U.S. offices, this number of female leaders has been reduced to one within the last eighteen months. One of the former female U.S. office leaders left, while two others were demoted to roles that required them to report to their newly hired male peers. Further, although MS&L's senior leadership team once included two women, MS&L has failed to replace these female leaders since their departures in late 2009.

15.   MS&L has engaged and continues to engage in a pattern and practice of discrimination against its female employees and denies them equal employment opportunities in ways including, but not limited to, the following: denying them pay and promotional opportunities equal to those of similarly situated male employees and subjecting them to disparate terms and conditions of employment and other forms of discrimination, including highly subjective selection, compensation, evaluation, and promotion practices. I believe that these discriminatory patterns and practices occur throughout MS&L. I make this charge on behalf of myself and on behalf of all similarly situated female employees.

Monique da Silva Charge of Discrimination
January 27, 2010
Page 4

I declare under penalty of perjury that the foregoing is true and correct.

January 27, 2010 _____
Monique da Silva Moore

# EXHIBIT 9



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Boston Area Office**

John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA 02203-0506
Toll Free Number: (866) 408-8075
Boston Direct Dial: (617) 565-4805
Boston Direct Line: (617) 565-3200
TTY:   (617) 565-3204
FAX:   (617) 565-3196

Internet: www.eeoc.gov
Email: info@eeoc.gov

NOV 2 9 2010

Monique da Silva Moore
4 Doe Run
Newburyport, MA  01950

Re:   Monique da Silva Moore v. MS&L/MS&L Worldwide/MS&L Group
      EEOC Charge No.  520-2010-01256

Dear Ms. Moore:

The United States Equal Employment Opportunity Commission (EEOC) has concluded its
inquiry into your allegations of discrimination. Under the EEOC charge prioritizing procedures,
we focus our resources only on those charges that are most likely to result in findings of
violations of the laws we enforce. In accordance with these procedures, the EEOC has evaluated
this charge based on the evidence you provided. The evidence fails to indicate that a violation of
the laws occurred and it is not likely that additional investigation will result in our finding of a
violation.

According to the charge of employment discrimination you have filed with the EEOC, you
alleged that you were subjected to employment discrimination including different terms and
conditions of employment and was terminated in January of 2010 by MS&L/MS&L
Worldwide/MS&L Group, hereinafter referred to as Respondent, because of your Sex (Female)
in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII). You believe
Respondent discriminated against you for taking maternity leave and as a caregiver. In addition,
you alleged that Respondent subjected female employees as a class to discriminatory treatment
on issues including pay and promotion.

The record obtained by the EEOC showed that you separated your employment with the
Respondent in 1993 and were recruited by the Respondent in September of 1999 for the position
of a contracted Vice President. In January of 2008, you were reassigned to the position of
Global Health Care Director.

There is no dispute over the fact that you took a maternity leave that began on or near September
5, 2009 to January 4, 2010, and that you were informed by the Respondent prior to your
maternity leave that your position as a Global Health Care Director would be eliminated.
Although Respondent was under no obligation to find another job for you, it did. Initially, and
given your salary structure, Respondent felt you will be a good candidate to run the Oncology

business in New York; however, and due to legitimate, non-discriminatory reasons that had nothing to do with your Sex, your caregiver status or the fact that you took maternity leave, Respondent was unable to assign this position to you. Again, Respondent was under no obligation to find another job for you, but it did and offered you the Managing Director position[1] in NY. On January 7, 2010, Respondent told you in lieu of the Managing Director position, you may also elect separation of employment from the Respondent with a severance package valued at approximately $100,000 thousand dollars. You accepted the separation of employment and felt you were forced to select this option because Respondent gave you no flexibility for the Managing Director position as it did for others who were reassigned to another position. The evidence obtained by the EEOC showed that Respondent gave those individuals some sort of flexibility in their new position because those positions are not similar to yours in terms of business expectations and needs for a newly created position. It is worth noting that one of the individuals you had identified as a comparator is also a caregiver. You claimed Respondent hired a certain individual as a freelancer to fill the Managing Director position but this is not true as the job duties of the Managing Director were absorbed by existing employees; however, and assuming you are correct, you should know that the individual Respondent hired is, like you, a female and a caregiver. As such, she also is not a valid comparator for you.

Finally, and with respect to your claim that females were subjected to employment discrimination as a class that include: salary, forced to resign/retire, demoted, denied promotions, and, denied leadership positions. There is no evidence to support your allegation that Respondent[2] has a policy in practice that subjects female employees, as a class, to these sorts of discriminatory treatments. There is no evidence that the witnesses you identified were forced out by the Respondent. In fact, many senior management employees employed by the Respondent took maternity leave and returned to work successfully, and, 50% of the employees in the department you would have worked in as a Managing Director are female and two female employees in particular holds leadership positions and they too, are like you, a mother and a caregiver.

We have considered the additional information you submitted in response to your employer's position statement. We have determined that the additional information which you have submitted does not change the proposed recommendation.

Respondent articulated legitimate, non-discriminatory reasons for its actions that may have been unfair to you but they were not illegal. You were not terminated or treated any less favorably by the Respondent as compared to similarly situated male, non-caregiver individuals who did not take maternity leave. Likewise, there is no evidence that Respondent has any policy in practice that has a discriminatory impact towards females as a class.

Based upon the Commission's investigation, the Commission is unable to conclude that the information establishes probable violations of statutes. This does not certify that the Respondent is in compliance with statutes. No finding is made as to any other issue that might be construed as having been raised by this charge.

---

[1] A position that was *created* for you.
[2] An organization were 70% of its workforce are female.

Even though you may disagree, it is unlikely that EEOC would find a violation if it invested additional resources. Thus, the EEOC's processing of this charge has been concluded. Included with this letter is your Notice of Dismissal and Right to Sue. Following this dismissal, you may only pursue this matter by filing suit against the Respondent named in the charge within ninety (90) days of receipt of said notice. Otherwise, your right to sue will be lost. For more information, please contact Kenneth An, Enforcement Supervisor, at 1-617-565-3192, Monday to Friday, during normal business hours.

Sincerely,

Robert L. Sanders
Area Office Director