UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MONIQUE DA SILVA MOORE,** ) <br> **MARYELLEN O'DONOHUE,** ) <br> **LAURIE MAYERS, HEATHER** ) <br> **PIERCE, and KATHERINE** ) <br> **WILKINSON on behalf of themselves** ) <br> **and all others similarly situated,** ) <br> ) <br>     **PLAINTIFFS,** ) <br> ) <br>     **v.** ) <br> ) <br> **PUBLICIS GROUPE SA and** ) <br> **MSLGROUP,** ) <br> ) <br>     **DEFENDANTS.** ) <br> _____) | Civ No. 11-CV-1279 (ALC) (AJP) |

**PLAINTIFFS' REPLY IN SUPPORT OF RULE 72(a) OBJECTION TO MAGISTRATE
JUDGE PECK'S FEBRUARY 8, 2012 DISCOVERY RULINGS**

**TABLE OF CONTENTS**

i

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................... 1

II. ARGUMENT ........................................................................................................... 3

    A. Judge Peck's Adoption of MSL's Method Without Expert Evidence on the Record, and His Reliance on Other Improper Sources, Was Contrary to Law .... 3

        1. Judge Peck's Failure to Conduct an Evidentiary Hearing or Receive Expert Testimony Before Issuing His Opinion Was Contrary to the Federal Rules ... 3

        2. Judge Peck's Reliance on Secondary Sources and Other Information That is Outside the Record and/or Unreliable Was Contrary to Law ........................... 5

    B. Judge Peck's Adoption of MSL's Method Without Statistically Sound Quality Assurance Measurements Was Contrary to Law ....................................................... 7

    C. Judge Peck's Additional *Sua Sponte* Rulings Should Be Reversed ........................ 9

III. CONCLUSION ...................................................................................................... 10

I.  **INTRODUCTION**

On February 24, 2012, two days after Plaintiffs filed objections to his ruling from the bench, Magistrate Judge Peck became the first judge to issue a written opinion approving the use of predictive coding.[1] The ESI protocol that Judge Peck approved ("MSL's Method") was adopted virtually wholesale from Defendant MSLGroup. As Plaintiffs repeatedly warned, although the use of predictive coding *may* be appropriate under certain circumstances, the devil is in the details. This is where MSL's Method fails and where Judge Peck erred. Indeed, *MSL's Method risks failing to capture a staggering 65% of the relevant documents in this case*.

Judge Peck has long been a vocal advocate of predictive coding. In the ten months between the filing of the Amended Complaint and the February 24 written opinion, Judge Peck authored an article and made no fewer than six public appearances espousing the use of predictive coding.[2] A frequent presence on these panels is Ralph Losey, Jackson Lewis' e-discovery counsel <u>in this case</u> – another outspoken predictive coding advocate whom Judge Peck "know[s] very well." *See* Jan. 4, 2012 Tr. (Declaration of Siham Nurhussein in Support of

---

[1] Judge Peck's written opinion, which expanded on his reasoning and included "observations" about Plaintiffs' Objection, erroneously claimed to be the first to approve of computer-assisted review. In fact, keyword searches, which have been approved by numerous courts throughout the country, are also a type of computer-assisted review.

[2] In July 2011, Judge Peck was a keynote speaker at the 2011 Carmel Valley eDiscovery retreat, where he sanctioned the use of predictive coding. [http://www.cvedr.com/blog/289-2011-cvedr-recap] On October 1, 2011, Judge Peck published an article entitled "Search Forward," espousing the virtues of predictive coding. On November 17-18, 2011, Judge Peck again discussed predictive coding at the Georgetown Law CLE 8th Annual Advanced eDiscovery Institute Conference. [http://www.ediscoveryreadingroom.com/?p=1392] On January 18, 2012, Judge Peck participated in a CLE event with defense counsel Ralph Losey entitled "e-Discovery Judges in Charlotte," where predictive coding was discussed at length. [http://e-discoveryteam.com/2012/01/22/my-cle-event-this-week-with-the-e-discovery-triumvirate-judges-facciola-grimm-and-peck-and-my-upcoming-battle-at-legal-tech-with-craig-ball/] On January 30, 2012, Judge Peck served on a panel with Mr. Losey at the LegalTech New York 2012 Conference entitled "Man v. Machine: The Promise/Challenge of Predictive Coding and Other Disruptive Technologies," where both men promoted the use of predictive coding. [http://www.legaltechshow.com/r5/cob_page.asp?category_id=72043&initial_file=cob_page-ltech_agenda.asp] On January 31, 2012, Judge Peck moderated another panel discussion at Legal Tech, in which Mr. Losey promoted the use of predictive coding. [http://www.legaltechshow.com/r5/cob_page.asp?category_id=72044&initial_file=cob_page-ltech_agenda.asp] On January 31, 2012, Judge Peck also participated in a panel entitled "Judicial Perspectives on Technology-Assisted Review, in which he promoted predictive coding and noted that Defendants in this case "must have thought [they] died and went to heaven." [https://www.brainshark.com/xerox/Tech-AssistedReview]

Plaintiffs' Reply ("Nurhussein Decl."), Ex. A) at 61.[3] In January 2012 alone, the month before Judge Peck issued his ESI opinion, the two men shared the stage at three panels where predictive coding was discussed extensively.[4] Moreover, defense counsel Losey and Judge Peck cited each other's positions on predictive coding with approval in their respective articles, which came out just four months before Judge Peck issued his ESI opinion.[5] At no point has either Judge Peck or MSL disclosed their extrajudicial activities on the very issues before the Court to Plaintiffs.

Recommind, MSL's e-discovery vendor, has not been absent from these activities.[6] On April 26, 2011 (less than two weeks after Plaintiffs filed their Amended Complaint), Recommind patented its predictive coding technology. To promote its product, Recommind is a frequent sponsor of the e-discovery panels on which Judge Peck and Defense counsel Losey sit. Judge Peck's February 24 e-discovery ruling is expected to be a boon not only to the predictive coding industry, but also to Recommind's bottom line.[7] Computer-assisted review vendors have been eagerly eyeing the multi-billion e-discovery market currently devoted to document review. Given

---

[3] Mr. Losey has been involved in this case as early as June 2011, when the parties participated in an ESI call.
[4] *See* n. 2, *supra*.
[5] In "Search Forward," Judge Peck relied on a posting from Defense counsel Losey's personal blog to support the proposition that "In too many cases, however, the way lawyers choose keywords is the equivalent of the child's game of 'Go Fish.'" (*See* Doc. 96 at 20 (citing Ralph C. Losey , "Child's Game of 'Go Fish' is a Poor Model for e-Discovery Search," in *Adventures in Electronic Discovery* 209-10 (2011), *available at* http://e-discoveryteam. com/ 2009/10/04/childs-game-of-go-fish-is-a-poor-model-for-e-discovery-search/).) In his blog posting entitled "Judge Peck Calls Upon Lawyers to Use Artificial Intelligence and Jason Barn Warns of a Dark Future of Information Burn-Out If We Don't," defense counsel Losey in turn embraces Judge Peck's position on predictive coding, as conveyed in "Search Forward." *See* http://e-discoveryteam.com/2011/10/16/judge-peck-calls-upon-lawyers-to-use-artificial-intelligence-and-jason-baron-warns-of-a-dark-future-of-information-burn-out-if-we-dont/.
[6] For example, Recommind has sponsored at least six e-discovery conferences at which Judge Peck spoke: the Georgetown Law CLE e-discovery conference in November 2009 (where defense counsel Losey was also a panelist), the same conference in November 2010, a panel at the Information Retention & E-Disclosure Management Summit in May 2011, the 2011 Carmel Valley eDiscovery retreat in July 2011, the Georgetown Law CLE e-discovery conference in November 2011, and three panels at the LegalTech New York 2012 Conference in January 2012. Contrary to MSL's assertion in its response to Plaintiffs' Objection, MSL did not inform Plaintiffs that it had retained Recommind – or that it planned to employ predictive coding – in June 2011. Plaintiffs first learned that MSL planned to use Recommind in September 2011, well into discovery.
[7] *See* Carpenter, Craig (VP of Marketing at Recommind), *Judge Peck's Predictive Coding Game-Changer*, *available at* http://www.recommind.com/blogs/20120227/Judge_Pecks_Predictive_Coding_Game_Changer (Feb. 27, 2012) ("The sooner we as an industry begin to reap [the] benefits [of Judge Peck's opinion], the better.")

the stakes, Judge Peck should have more closely scrutinized the many red flags in MSL's ESI protocol. Instead, Judge Peck rushed to issue an opinion for the "benefit of the bar."

Extrajudicial activities aside, what should matter is whether MSL's Method will ensure that MSL fulfills its obligations under Rule 26 to produce *reasonable* discovery. Here, the answer is a resounding no. Judge Peck's adoption of MSL's Method was contrary to law and/or clearly erroneous for two main reasons. First, Judge Peck adopted MSL's Method on an insufficient record; Judge Peck failed to hold an evidentiary hearing or obtain expert testimony as to its reliability and accuracy. Second, MSL's Method fails to meet basic standards for reliability; the protocol risks failing to capture up to 65% of the documents material to Plaintiffs' case. Accordingly, Plaintiffs respectfully request that the Court reverse Judge Peck's ESI rulings.

## II. ARGUMENT

### A. Judge Peck's Adoption of MSL's Method Without Expert Evidence on the Record, and His Reliance on Other Improper Sources, Was Contrary to Law

#### 1. Judge Peck's Failure to Conduct an Evidentiary Hearing or Receive Expert Testimony Before Issuing His Opinion Was Contrary to the Federal Rules

Judge Peck's Opinion and MSL's opposition brief assert that Federal Rule of Evidence 702 and the established *Daubert* regime for judicially screening scientific and technical evidence and methodology have no application to predictive coding. (Doc. 96 at 4, 14-15; Doc. 104 at 13-14) The outright rejection of the principles of *Daubert* is contrary to the rulings of multiple courts – including Judge Peck's own rulings – which have previously held that "resolving contested issues of whether a particular search and information retrieval method was appropriate . . . involves scientific, technical or specialized information." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 260 n.10 (D. Md. 2008).[8] Hence, a comprehensive and searching

---

[8]*See also William A. Gross Constr. Assocs., Inc. v. Am. Mfg. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) (M.J. Peck); *United States v. O'Keefe*, 537 F. Supp. 2d 14, 24 (D.D.C. 2008); *Equity Analytics, LLC v. Lundin*, 248 F.R.D. 331, 333 (D.D.C. 2008).

3

judicial review is required; "the trial judge must decide a method's appropriateness with the benefit of information from some reliable source – whether an affidavit from a qualified expert, a learned treatise, or, if appropriate, from information judicially noticed." *Id.*

A similar case debating the merits of competing search technologies – including predictive coding – is instructive. In *Kleen Prods., LLC v. Packaging Corp. of Am.*, No. 10 C 5711 (N.D. Ill.), Magistrate Judge Nan R. Nolan required the parties to fully brief the issues and submit expert reports in advance of a full-blown evidentiary hearing that is anticipated to take at least two full days. *See* Docket Report of *Kleen Prods.* (Nurhussein Decl., Ex. B) at Doc. 277; *see also id.* at Docs. 266, 267, 274, 288-98, 301. A review of the types of evidence submitted in that case, as well as the questions raised by Judge Nolan, provides insight into what a Court is required to consider when applying the law in this area to the specific facts of a case. *See generally* Tr. of Feb. 21, 2012 Hearing in *Kleen Prods.* (Nurhussein Decl., Ex. C).

Judge Peck demanded no such rigor here before adopting MSL's ESI protocol. Judges are required to rely on the aid of experts when resolving disputes as to the reliability or appropriateness of a novel methodology. *See Victor Stanley*, 250 F.R.D. at 260 n.10 (citing *Am. Nat'l Bank & Trust Co. v. Equitable Life Assurance Soc.*, 406 F.3d 867, 879 (7th Cir. 2005)). However, in his rush to be the first in line to approve predictive coding, Judge Peck did not elicit expert testimony or give the parties an opportunity to question or cross-examine the experts.

Judge Peck attempted to distinguish *Kleen Prods.* by characterizing it as a "more difficult case" where "[one] party wants to use computer-assisted review and the [other] party objects." (Doc. 96 at 18.) By contrast, he claims, the decision to allow predictive coding in the instant case was "relatively easy" because "the parties agreed to its use." *Id.* at 17. This grossly mischaracterizes Plaintiffs' position and the history of the parties' negotiations. As evidenced by

4

the transcripts in this case, the letters submitted by Plaintiffs to Defense counsel and the Court over the last five months, and the declarations from the parties' experts, Plaintiffs' willingness to consider the use of predictive coding was contingent on certain critical safeguards being built into the ESI protocol. *See* Plaintiffs' correspondence (Nurhussein Decl., Exs. D to H.) Plaintiffs indicated that they only would be willing to *consider* the use of an ESI protocol that employed predictive coding *if* it was established as reliable. In keeping with the Sedona Conference's cooperation principles, Plaintiffs attempted to work on a joint protocol with MSL, rather than dismiss predictive coding outright. However, Plaintiffs' efforts to cooperate on the protocol were effectively treated as a waiver of all objections. In so doing, Judge Peck sets a dangerous precedent that is likely to deter future litigants from even considering predictive coding, lest they be bound by a protocol that contains no measure of reliability.

### 2. Judge Peck's Reliance on Secondary Sources and Other Information That is Outside the Record and/or Unreliable Was Contrary to Law

Equally problematic is the information upon which Judge Peck *did* choose to rely in his opinion. Judge Peck's reliance on secondary sources such as outdated and/or non-peer reviewed articles (including one of his own); blog entries by Defense counsel; and untested, unverified information from Recommind, was contrary to law. "The Second Circuit has held that 'when facts or opinions found in . . . secondary sources are disputed, it is error to accept the data (however authentic) as evidence, at least without affording an opposing party the opportunity to present information which might challenge the fact or the propriety of noticing it." *MacNamara v. City of NY*, 249 F.R.D. 70, 93 n.16 (S.D.N.Y. 2008)(citation omitted). Judge Peck implicitly and improperly took judicial notice of the facts and opinions in five secondary sources, without affording Plaintiffs an opportunity to challenge these facts and opinions. Because Plaintiffs

5

"dispute the accuracy of the articles relied on… it is contrary to law to take judicial notice of the articles for the truth of the matters asserted therein." *See id.*[9]

Similarly, it is contrary to law for Judge Peck to rely on other factual information that he learned outside of this case – for example, from seminars and conferences on e-discovery or *ex parte* conversations with Defense counsel. In order to rely on factual information outside of the record, the Court must take judicial notice pursuant to Fed. R. Civ. P. 201.[10] Indeed, it is for this reason that Judge Peck may not serve as both "expert" and "judge" in this case.

The facts noticed by Judge Peck (i.e. that keyword searches are ineffective and predictive coding is undoubtedly superior) are subject to reasonable dispute. *See* Fed. R. Evid. 201(b); *Int'l Star Class Yacht Racing Assoc.*, 146 F.3d at 70. The vast majority of federal courts in this

---

[9] Indeed, the information within the articles is also unpersuasive when applied to the parties' dispute. For example, Judge Peck relied on an unsourced, hyperbolic blog posting from Defense counsel's personal blog. *See* Doc. 96 at 20; n. 5, *supra*. Similarly, Judge Peck admitted that his own non-peer reviewed article posted on the website "Legal Technology News," simply "explained *my understanding* of computer-assisted review." (Doc. 96 at 3, emphasis added). For obvious reasons, an article explaining one judge's understanding of how predictive coding and other computer-assisted review technologies are supposed to work is not evidence that all versions of predictive coding will meet the reasonable search requirements of Rule 26, much less that MSL's preferred method will do so.

Apart from his own writings and those of Defense counsel, Judge Peck cited to three articles. First, Judge Peck cited an article from 1985, in which the authors focused on the cost-benefit analysis of a technologically unsophisticated litigator's use of keyword searches as compared to the costs of a complete manual review of only 40,000 documents. *See id.* (citing David L. Blair & M.E. Maron, *An Evaluation of Retrieval Effectiveness for a Full-Text Document-Retrieval* System, 28 Comm. ACM 289 (1985) *available at* http://opim-sun.wharton.upenn.edu/~sok/papers/b/blair-maron.pdf.) This reference does not support a conclusion that keyword searches conducted in 2012 would be "largely ineffective." Second, Judge Peck cited an article in which the authors conclude only that "two computer-assisted categorization processes" had similar (**but not superior**) results to a manual review process. (Doc. 96 at 18 (quoting *Document Categorization in Legal Electronic Discovery: Computer Classification vs. Manual Review*, 61 Am. Soc'y for Info. Sci. & Tech. 70, 79 (2010).) There is no information in the article or the record regarding how the processes reviewed in the article worked, how many items were sampled and reviewed manually in order to train the computer-review system, or any other identifying features enabling a comparison to MSL's method. Third, Judge Peck quotes extensively from Maura R. Grossman & Gordon V. Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, XVII Rich. J.L. & Tech. 11 (2011), http://jolt.richmond.edu/v17i3/article11.pdf. (Doc. 96 at 17-19.) The facts in this non-peer reviewed piece, published by a lawyer at Wachtel, support an exceedingly narrow proposition: that a single study indicates that two types of computer-assisted review (neither involving predictive coding) appeared to yield more accurate search results than manual review. In fact, 8 of the 10 computer-assisted methods tested in the study were determined to be less accurate than manual review. This does not support Judge Peck's conclusions about predictive coding, much less bear upon the parties' dispute regarding MSL's specific protocol.

[10] *See Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70-71 (2d Cir. 1998) (vacating the district court opinion for relying on statements of fact from another opinion to establish prevailing trademark search practices; "industry practice is subject to dispute, [Plaintiff] is entitled to have its day in court, and, through time-honored methods, test the accuracy of [Defendant's] submissions and introduce evidence of its own") (internal quotation marks and citations omitted).

District and nationwide allow keyword searches, which is one of many types of computer-assisted review, as a reliable discovery method under Rule 26.[11] Even Judge Peck conceded that no other court has found predictive coding superior to all alternatives. Thus, neither of these facts is "generally known." Moreover, for all of the reasons set forth above, neither of the facts can be "accurately and readily determined" from the sources cited by Judge Peck, nor are the sources cited by Judge Peck "sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201. In short, it was contrary to law for Judge Peck to judicially notice these facts.

Finally, any potential reliance on information provided by MSL's supposed "experts," employees of MSL's e-discovery vendor Recommind, is clearly misplaced. MSL's experts were never sworn-in and their declarations were submitted after Judge Peck had already adopted MSL's Method. More importantly, MSL's experts are far from disinterested; they have a large financial stake in whether the Court adopts MSL's Method, which is premised on Recommind's proprietary and patented technology. Plaintiffs recently learned of facts that further undermine the reliability of MSL's experts. MSL failed to note that Recommind was banned from participating in future Text Retrieval Conference (TREC) studies for improperly representing the results of the 2011 tests. *See* Declaration of Paul J. Neale ("Neale Decl.") ¶ 19.

### B. Judge Peck's Adoption of MSL's Method Without Statistically Sound Quality Assurance Measurements Was Contrary to Law

Judge Peck not only derived his analysis from improper sources but focused on the wrong question. Judge Peck primarily discussed, as a general matter, the propriety of computer-assisted

---

[11]*See, e.g.*, *In re: Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York*, Standing Order M10-468 at 21 (S.D.N.Y. Nov. 11, 2011) *available at http://www.nysd.uscourts.gov/cases/show.php?db=notice_bar&id=261*; Ad Hoc Committee for Electronic Discovery, *Default Standard For Discovery, Including Discovery of Electronically Stored Information* at 5 (D. Del. Dec. 8, 2011) *available at http://www.ded.uscourts.gov/*; Seventh Circuit Electronic Discovery Committee, *Principles Relating to the Discovery of Electronically Stored Information* at Principle 2.05 (7th Cir. Aug. 1, 2010) *available at http://www.discoverypilot.com/sites/default/files/Principles8_10.pdf.*

document review (no doubt meaning some variation of predictive coding), but the real question was whether MSL's specific protocol would adequately address its Rule 26 obligations.[12]

It is clear error to find that, as adopted, MSL's Method has proper quality assurance measurements in place.[13] Focusing only on the "training" section, Judge Peck and MSL claim that MSL's Method is "transparent." Specifically, they assert that the method is based on the following numbers: (a) an initial random sample of 2,399 documents coded by category for relevance, to determine the "yield" of relevant documents; (b) up to seven trainings with attorney review of at least 500 documents to "teach" the system; and (c) a final random sample of 2,399 documents of the "deemed-irrelevant" documents, again coded by category for relevance. Judge Peck and MSL erroneously argue that this last sample can be used to gauge the effectiveness of the system by providing a check to ensure that smoking gun-type documents are captured.

Judge Peck's determination is clearly erroneous because the final random sample size of 2,399 documents is not statistically significant. In other words, it is far too small to obtain meaningful estimates of the system's "recall." *See* Neale Decl. ¶ 26. A precise estimate of the system's recall is important so that the Court and the parties can determine the percentage of documents the system has successfully identified as relevant and irrelevant. Using MSL's most recent estimation that the likely "yield" of relevant documents is 1.5% of the roughly 2.5 million electronic documents,[14] one can predict that the system will identify 37,500 documents as "relevant" and deem 2,462,500 documents (98.5% of the 2.5 million documents) "irrelevant."

---

[12] Judge Peck dismissed Plaintiffs' misgivings as "premature;" however, once MSL's protocol is adopted, the horse will have already left the barn.

[13] As previously noted by Plaintiffs' expert, MSL's method does not comply with generally accepted industry practices, which require that one set out preliminary metrics and definitions prior to the use and testing of a system. Predetermined standards increase trust in the system and prevent later accusations of bias; in other words, you set the rules before you play the game.

[14] To the extent that the large volume of ESI in this case is being used to justify the adoption of MSL's method (*See* Doc. 96 at 22), Plaintiffs contend that MSL has purposefully performed the equivalent of a "document dump" to inflate the numbers. For example, MSL has claimed that a wide range of business documents ordinarily kept in hard copy (policies, procedures, organizational charts, etc.) are only accessible through an e-mail search.

Neale Decl. ¶ 24. It is from this set of 2,462,500 "irrelevant" documents that MSL's Method will, as its last quality assurance phase, randomly sample only 2,399 documents. *Id.* ¶ 23. Although 2,399 is a statistically significant sample size for estimating the "yield," there is no formula that supports the use of the same number for estimating the system's "recall." *Id.* ¶ 26.

Prior to the February 8 hearing, Plaintiffs proposed using a minimum sample size of 16,555 documents at this final phase. This is a statistically significant number that will allow for a meaningful estimate of the system's recall. *Id.* ¶ 28. Although MSL originally agreed to this number, MSL unexpectedly and unilaterally imposed a seven-fold decrease without any explanation – scientific or otherwise – justifying the number 2,399. Since MSL's about-face, neither Judge Peck nor MSL has set forth any reasons to support the use of this number, or set forth evidence as to why it would be problematic to randomly sample 16,555 documents.

Indeed, in the same preliminary study MSL relies on to tout the quality of the technology to be used in its predictive coding protocol, the technology's "recall," was very low, on average 35%. *See* 2011 TREC Study Draft (Neale Decl., Ex. 1) Therefore, the Court can fairly assume that MSL's method will miss 65% of the relevant documents. *Id.* ¶ 16. This raises serious questions about the adoption of a novel discovery method, particularly without a scientifically sound way to measure its accuracy. *See generally id.*

### C. Judge Peck's Additional *Sua Sponte* Rulings Should Be Reversed[15]

Plaintiffs also object to two additional rulings made by Judge Peck. First, Judge Peck's *sua sponte* decision to quash Plaintiffs' subpoena seeking W-2s from ADP, a third party payroll provider, was clearly erroneous and contrary to law. The issue is not, as MSL suggests, moot; ten months after Plaintiffs served their document requests, and nearly six weeks after Judge Peck

---

[15] Plaintiffs incorporate by reference all arguments made in their February 22, 2012 Objection. The omission of certain arguments from this reply brief should not be construed as a waiver.

quashed the subpoena, Plaintiffs have yet to receive all the requested W-2s from MSL. These documents could have been produced weeks ago, with minimal burden, by ADP. Second, in deciding to delay production of emails from MSL's CEO, Olivier Fleurot, until "Phase II" of the ESI protocol, Judge Peck determined that "emails stored in France likely would be covered by the French privacy and blocking laws." (Doc. 96 at 8.) This *sua sponte* ruling, made without considering any evidence, is clearly erroneous and contrary to law. Judge Peck failed to engage in the required comity analysis, under which the vast majority of U.S. precedents have found that French law does not preempt discovery.[16]

### III.   CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant Plaintiffs' Objections and reverse Judge Peck's February 8, 2012 rulings. Because Plaintiffs' willingness to consider predictive coding was conditioned on the development of an ESI protocol that contained sufficient quality control standards – a condition that has not been met – Plaintiffs ask that the Court reject MSL's use of predictive coding and require the parties to come up with a new ESI Protocol. To the extent that the Court needs further information about the failings of MSL's method, Plaintiffs request that the Court hold an evidentiary hearing or direct Judge Peck to do so. Alternatively, Plaintiffs request that the Court modify the Protocol in advance of its implementation to include (a) a statistically significant sampling of "irrelevant" documents to establish the recall percentage; and (b) a defined standard of recall and precision (which can be used to determine the system's accuracy).

---

[16] *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the S.D. of Iowa*, 482 U.S. 522, (1987) (setting forth the comity factors to be considered by courts and holding that the French blocking law did not preempt the Federal Rules of Civil Procedure); *True Position, Inc. v. LM Eriksson Telephone Co.*, No. 11-4574, 2012 U.S. Dist. LEXIS 29294 (E.D. Pa Mar. 6, 2012) (noting that other courts "have held the French Blocking Statute does not subject defendant to a realistic risk of prosecution, and cannot be construed as a law intended to universally govern the conduct of litigation within the jurisdiction of a United States court.") (citations omitted); *In re Am. Int'l Grp., Inc., 2008 Securities Litig.*, 2010 U.S. Dist. LEXIS 127660, at *7-9 (S.D.N.Y. Dec. 1, 2010) (same); *In re Air Cargo Shipping Svcs. Antitrust Litig.*, 2010 U.S. Dist. LEXIS 30598, at *58-60 (E.D.N.Y. Mar. 29, 2010) (same).

DATED: March 19, 2012

        SANFORD WITTELS & HEISLER, LLP
           /s/ Janette Wipper
        Janette Wipper Esq.
        Jeremy Heisler, Esq.
        Steven L. Wittels, Esq.
        Siham Nurhussein, Esq.
        Deepika Bains, Esq.

        *Attorneys for the Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I, Siham Nurhussein, hereby certify under penalty of perjury that on this 19th day of March true and correct copies of the foregoing Reply in Support of Rule 72(a) Objection to Magistrate Judge Peck's Rulings were served on all counsel of record by operation of the Court's ECF system.

/s/

Siham Nurhussein