**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MONIQUE DA SILVA MOORE, MARYELLEN O'DONOHUE, LAURIE MAYERS, HEATHER PIERCE, and KATHERINE WILKINSON on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| | ) | Civ No. 11-CV-1279 (ALC) (AJP) |
| PLAINTIFFS, | ) ) | |
| v. | ) ) | |
| PUBLICIS GROUPE SA and MSLGROUP, | ) ) ) | |
| DEFENDANTS. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR RECUSAL OR DISQUALIFICATION**

## TABLE OF CONTENTS

**INTRODUCTION** ..........................................................................................................1

**BACKGROUND** .........................................................................................................5

    **A.**  **JUDGE PECK'S WRITINGS ALIGN HIS INTERESTS WITH**
        **THOSE OF DEFENSE COUNSEL**.............................................................5

    **B.** **DEFENDANTS "MUST HAVE THOUGHT THEY DIED AND WENT TO HEAVEN"**...............................7

    **C.**  **JUDGE PECK ENCOURAGED DEFENDANTS TO**
        **ENLIST THE ASSISTANCE OF MR. LOSEY** ....................................................7

    **D.**  **IN A PUBLIC E-DISCOVERY PANEL, JUDGE PECK INDICATED THAT HE ESSENTIALLY STRONG-
        ARMED PLAINTIFFS INTO ACCEPTING THE USE OF PREDICTIVE CODING AND THAT THEIR
        ONLY ALTERNATIVE WOULD BE TO SEEK HIS RECUSAL** .................................7

    **E.**  **JUDGE PECK ENGAGED IN *EX PARTE* CONTACTS WITH DEFENSE COUNSEL LOSEY AT A CLE
        CONFERENCE AND FAILED TO INFORM PLAINTIFFS** .......................................7

    **F.**  **JUDGE PECK ENGAGED IN CONTACTS WITH MR. LOSEY ON LEGALTECH PANELS DISCUSSING
        PREDICTIVE CODING AND FAILED TO INFORM PLAINTIFFS** .............................8

    **G.**  **JUDGE PECK FAILED TO INFORM PLAINTIFFS OF RECOMMIND'S SPONSORSHIP OF THE LEGAL
        TECH CONFERENCE** ...............................................................................8

    **H.**  **JUDGE PECK MADE PUBLIC COMMENTS CONCERNING THE PREDICTIVE CODING DISPUTE IN
        THE INSTANT CASE AND FAILED TO SO INFORM PLAINTIFFS** ...........................8

    **I.**  **JUDGE PECK FAILED TO INFORM PLAINTIFFS THAT HE HAS RECEIVED SOME COMPENSATION
        FOR HIS PARTICIPATION AT E-DISCOVERY CONFERENCES** ..............................9

    **J.**  **JUDGE PECK REPRIMANDED PLAINTIFFS FOR EXERCISING THEIR RIGHTS TO APPEAL HIS
        RULINGS TO DISTRICT COURT JUDGE CARTER**..........................................9

    **K.**  **JUDGE PECK CITED TO MATERIALS OUTSIDE OF THE RECORD IN ORDER TO SUPPORT HIS
        FEBRUARY 24, 2012 OPINION AND ORDER ON PREDICTIVE CODING WITHOUT GIVING
        PLAINTIFFS A CHANCE TO RESPOND OR OBJECT**........................................9

    **L.**  **MR. LOSEY'S RESPONSE TO JUDGE PECK'S PREDICTIVE CODING ORDER** .................................10

    **M.** **SHORTLY FOLLOWING JUDGE PECK'S ORDER, RECOMMIND ISSUED PRESS RELEASES AND
        CONDUCTED INTERVIEWS STATING THAT JUDGE PECK ENDORSED ITS TECHNOLOGY AND
        USING HIS ENDORSEMENT TO ADVANCE THE COMPANY'S FINANCIAL INTEREST** ...................10

**LEGAL ANALYSIS: RECUSAL FOR MERE APPEARANCE OF PARTIALITY** ......................11

**ARGUMENT**.................................................................................................................12

    **A.** **JUDGE PECK'S PUBLIC COMMENTS CONCERNING THE CASE REQUIRE HIS RECUSAL** ...........12

    **B.** **JUDGE PECK'S PARTICIPATION ON PRO-PREDICTIVE CODING PANELS WITH DEFENSE COUNSEL RALPH LOSEY WHILE PRESIDING OVER THE PARTIES' DISPUTE ON PREDICTIVE CODING REQUIRES HIS RECUSAL UNDER § 455(a)**.........................................................14

    **C.** **JUDGE PECK'S NUMEROUS SPEAKING ENGAGEMENTS IN FAVOR OF PREDICTIVE CODING, WHICH WERE AT LEAST INDIRECTLY SPONSORED AND FUNDED BY RECOMMIND AND OTHER E-DISCOVERY VENDORS, MANDATE RECUSAL** ...............................................................15

    **D.** **JUDGE PECK'S RECUSAL IS REQUIRED UNDER § 455(a) BECAUSE OF THE APPEARANCE THAT HE LENT THE "PRESTIGE OF THE JUDICIAL OFFICE TO ADVANCE THE PRIVATE INTERESTS OF THE JUDGE OR OTHERS"** ...............................................................................17

    **E.** **JUDGE PECK'S FAILURE TO DISCLOSE HIS ACTIVITIES ENHANCES THE APPEARANCE OF IMPROPRIETY, REQUIRING RECUSAL UNDER § 455(a)** ...............................................19

    **F.** **RECUSAL IS REQUIRED UNDER § 455(a) BECAUSE OF THE PERSONAL OFFENSE THAT JUDGE PECK HAS TAKEN TO PLAINTIFFS' OBJECTIONS TO HIS RULINGS AND TO THE LETTER REQUESTING HIS VOLUNTARY RECUSAL** ..............................................................21

    **G.** **JUDGE PECK'S APRIL 2, 2012 ORDER IN RESPONSE TO PLAINTIFFS' MARCH 28, 2012 LETTER REQUESTING HIS RECUSAL FAILS TO ADDRESS THE APPEARANCE OF PARTIALITY OR IMPROPRIETY CREATED BY HIS ACTIONS** ............................................................23

        1. JUDGE PECK CLAIMS THAT PLAINTIFF CONTENDS THAT HIS PUBLIC STATEMENTS APPROVING GENERALLY OF COMPUTER-ASSISTED REVIEW MAKE HIM BIASED ...........................................23

        2. JUDGE PECK CLAIMS THAT HE DID NOT ACCEPT MONEY DIRECTLY FROM RECOMMIND AND NEVER SPECIFICALLY ENDORSED RECOMMIND'S METHODOLOGY OR TECHNOLOGY ............23

        3. JUDGE PECK CLAIMS THAT HE WAS NOT AWARE THAT DEFENSE COUNSEL LOSEY WAS WORKING ON THIS CASE AND THAT THEY DID NOT SPEAK ABOUT THE CASE ITSELF ............23

        4. JUDGE PECK CLAIMS THAT RECUSAL HERE WOULD SERVE ONLY TO DISCOURAGE JUDGES FROM SPEAKING ON EDUCATIONAL PANELS ABOUT EDISCOVERY (OR ANY OTHER SUBJECT) ..................................................................24

**CONCLUSION** ..........................................................................................................25

## INTRODUCTION

"Justice must satisfy the appearance of justice." *Offutt v. U.S.*, 348 U.S. 11, 14 (1954 Frankfurter, J.). 28 U.S.C. § 455(a) mandates: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The statute's purpose of promoting public confidence in the judiciary demands that judges resolve any doubts in favor of recusal, even when the decision to recuse is a close one.[1] The decision is not close in this case: Magistrate Judge Peck himself anticipated Plaintiffs' recusal motion three months ago in light of his conduct. *See* Discussion of January 11, 2012 ReviewLess Panel at p. 2.

During the first conference over which Judge Peck presided on December 2, 2011, he remarked that Defendants "must have thought they died and went to Heaven" to have him assigned to this case.

> [Defense Counsel from Jackson Lewis LLP]: . . . I think right now there are two core disputes as it relates to discovery. The first is plaintiffs' reluctance to utilize predictive coding . . . .[2]
>
> **M.J. PECK: You must have thought you died and went to Heaven when this was referred to me.** (Dec. 2, 2011 Tr. at 8).

This remark was not confined to the courtroom. Less than six weeks later, on January 11, 2012, Judge Peck appeared on a public panel hosted by ReviewLess, a predictive coding vendor, in which he

---

[1] *See, e.g., In re U.S.*, 158 F.3d 26, 30 (1st Cir. 1998); *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *U.S. v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993); *U.S. v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989); *Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir. 1980); *German v. Federal Home Loan Mortg. Corp.*, 943 F. Supp. 370, 373 (S.D.N.Y. 1996); Plaintiffs maintain that the facts set forth herein satisfy the recusal standards under 28 U.S.C. § 455(a)-(b).

[2] Plaintiffs' reluctance about predictive coding is related to the asymmetrical eDiscovery sources in employment discrimination cases like this one. Like every employment case, the employer here, Defendants, control nearly all the discovery Plaintiffs will need to prove their claims and to maintain the action through class certification, dispositive motions, and trial. Indeed, Plaintiffs have virtually no access to relevant evidence except through the discovery methods available under the Federal Rules of Civil Procedure.

As noted by Judge Peck on December 2, 2012: "What matter[s] is whether [Defendants] have completed production. Yes, **I understand that as the defendant in an employment case, [Plaintiffs are] going to have virtually nothing, [Defendants] have everything...**" *See* Dec. 2, 2011 Tr. at 6 (emphasis added).)

Unfortunately, MSL has taken advantage of this one-sided reality, and thus far has produced only a narrow sliver of the documents requested by Plaintiffs. Indeed, seemingly confident that Judge Peck would agree, MSL has withheld the vast majority of documents (even if they exist in paper format or were compelled by Judge Sullivan) based on its proposed predictive coding protocol. Thus, in this case, MSL's reliance on this novel and unproven eDiscovery tool to fulfill its every discovery obligation has taken on a heightened importance. Plaintiffs' essential concern is that, particularly without proper safeguards to ensure the reliability, accuracy, and transparency of MSL's protocol, predictive coding will be used to deny them access to the critical documents needed to prove their case on the merits.

repeated this statement; admitted that it may have served to compel Plaintiffs' partial acquiescence to his

and Defendants' position on the key issue before him; and openly remarked about recusal – agreeing

there was "no doubt" it was Plaintiffs' only alternative to capitulation.

> M.J. PECK:  I'll also tell one quick war story, which is in the first case where I know that the parties are using predictive coding.  They had a conference in front of me – a general discovery status conference – and the defendant was saying that they were about to use predictive coding but they had not yet had a buy-in from the plaintiff. And I just smiled and said "**And when you got assigned to me you, the defendant, must have thought you died and went to Heaven**" in light of my *Search* article in Law Technology News.  And indeed, whether because of that comment or otherwise, plaintiff said "Oh no no, we're ok with using computer-assisted review; we just had some questions about the exact process."[3]  And they went out and they worked it all out.
>
> MODERATOR:  The alternative was to ask you to recuse yourself, I suppose, Andy?
>
> M.J. PECK:  **No doubt**.[4]

Again, on January 31, 2012, Judge Peck participated in a public panel hosted by Xerox, entitled

"Judicial Perspectives on Technology-Assisted Review."  In a publicly-available video recording of the

panel, Judge Peck espouses the virtues of predictive coding and, notes that he "couldn't resist" telling

Defendants they must have "thought they **died and went to Heaven**" when he got the case.

> M.J. PECK:  When the District Judge referred the matter to me and I saw from the letters that had been submitted to the District Judge that the Defendant was particularly pushing computer-assisted review, I couldn't resist and the first thing I said to them when they walked in my courtroom was saying to the Defendant, '**Boy, you must have thought you died and went to Heaven when this discovery matter got referred to me**,' in light of my article on the subject.[5]

In the second status conference held before Judge Peck on January 4, 2012, he encouraged

Defendants to enlist the assistance of their eDiscovery counsel, Ralph Losey – whom Judge Peck

claimed to know "very well."  (Doc. 70-3: Jan. 4, 2012, Tr. at 61).  During the next four weeks, Judge

---

[3] As Judge Peck acknowledges in his own public statement, Plaintiffs reluctantly assented to predictive coding in principle under compulsion from Judge Peck (*see* Background, § D, infra) but never agreed to the use of Defendants' flawed method. Rather, Plaintiffs argued that the "devil is in the details' and consistently objected to Defendants' vendor Recommind's shifting and unreliable methods. Plaintiffs contend that Judge Peck swept aside their concerns in his haste to give judicial blessing to predictive coding and to implement it here without proper safeguards.

[4] *See* audio recording available at http://www.esibytes.com/?p=2122. at 22:18-23:15.  Declaration of Steven L. Wittels in Support of Plaintiffs' Motion for Recusal or Disqualification at ¶ 2, Ex. A (hereinafter, cross-citations reference the Exhibit Number only).

[5] *See* video at https://www.brainshark.com/xerox/Tech-AssistedReview, at 2:50 – 3:47 of chapter *Suitable Matters,* Ex. B.

Peck served on three public panels with defense counsel Losey about predictive coding: on January 18, 2012, Judge Peck participated in a conference with Mr. Losey entitled *eDiscovery Judges in Charlotte*;[6] on January 31, 2012, Judge Peck sat on a panel with Losey at an eDiscovery LegalTech "trade show" called *Man vs. Machine The Promise and Challenge of Predictive Coding and other Disruptive Technologies*.[7]   At the same trade show, Judge Peck moderated a panel discussion in which Mr. Losey highlighted what he perceived to be the substantial advantages of predictive coding.[8]

One week after the trade show, on February 8, 2012, Judge Peck adopted Defendant MSL's predictive coding protocol wholesale from the bench.  For the "benefit of the Bar," as he put it, Judge Peck issued a written order on February 24, 2012 adopting Defendants' proposed protocol and improperly cited to a number of non-peer reviewed articles and studies outside of the record without providing Plaintiffs an opportunity to review or object to his use of the materials.[9]  Some of the materials cited were authored by Judge Peck, Mr. Losey, and Maura R. Grossman, eDiscovery counsel at Wachtell, Lipton, Rosen & Katz, all of whom served together on the *Man vs. Machine* panel at LegalTech.

Magistrate Peck also opined that:

This Opinion appears to be the first in which a Court has approved of the use of computer-assisted review . . . Counsel no longer have to worry about being the 'first' or 'guinea pig' for judicial acceptance of computer-assisted review . . . Computer assisted review now can be considered judicially-approved for use in appropriate cases.  (Doc. 96: Feb. 24, 2012, Opinion and Order at 25).

Judge Peck never properly disclosed his personal interest in predictive coding, his extrajudicial

---

[6] Mr. Losey posted a blog entry about his interaction with Judge Peck at this CLE event, available athttp://e-discoveryteam.com/2012/01/22/my-cle-event-this-week-with-the-e-discovery-triumvirate-judges-facciola-grimm-and-peck-and-my-upcoming-battle-at-legal-tech-with-craig-ball/, s*ee* Ex. C.

[7] *See*  http://www.legaltechshow.com/r5/cob_page.asp?category_id=72043&initial_file=cob_page-ltech_agenda.asp. Ex. D; *See also* http://www.eddupdate.com/ 2012/01/ralph-losey-at-legaltech.html, Ex. E.

[8] *See*  http://www.legaltechshow.com/r5/cob_page.asp?category_id=72044&initial_file=cob_page-ltech_agenda.asp, Ex. F.

[9] *See, e.g., Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996).

activities on the subject, or his *ex parte* contacts with defense counsel to Plaintiffs.[10]  When Plaintiffs

uncovered these facts, Plaintiffs sent a letter to Judge Peck requesting that he voluntarily recuse himself

without a formal motion.[11]  Judge Peck responded as follows:

> M.J. PECK:  The Court is in receipt of plaintiffs' March 28, 2012 letter requesting my recusal… **I
> strongly suggest that plaintiffs rethink their 'scorched earth' approach to this litigation.**
> (Doc. 158: April 2, 2012, Order at 2).

The apparent threats, intimidation, and mockery inherent in Judge Peck's latest Order are typical

of his treatment of Plaintiffs throughout this action.  Indeed, he has chastised Plaintiffs for appealing his

rulings – some of which were directly contrary to Second Circuit precedent.  He has also accused

Plaintiffs of "whining" to District Judge Carter and suggested that such appeals do not "make me

happy."  (Doc. 97, Feb. 8, 2012, Tr. at 20-22).

In responding to Plaintiffs' letter, Judge Peck also offers various explanations for his conduct and

for his unwillingness to recuse himself: his position in favor of predictive coding is well-known; he did

not engage in actual *ex parte* communications with Mr. Losey on the subject of this action; he did not

know Mr. Losey was involved in this case; he did not specifically endorse Recommind's technology; he

did not receive reimbursement directly from Recommind; and, essentially, he is not actually biased.

Judge Peck further stated that Plaintiffs have nothing to complain about because they agreed to predictive

coding and then changed their minds. Finally, he concluded that recusal would only serve to discourage

judges and attorneys from speaking on educational panels.  Notably, Judge Peck has no response to his

comments about this case, including his statements – once on the record and twice to the public – that

Defendants must have thought they "**died and went to Heaven**" to have him assigned to the matter.

Judge Peck's justifications miss the point: 28 U.S.C. § 455(a), Plaintiffs' ground for recusal, is

concerned not with actual bias or impropriety but its potential appearance.  28 U.S.C. § 455(a) **mandates**

---

[10] 28 U.S.C. § 455(e).

[11] *See* Plaintiffs' March 28, 2012 Letter to the Court, Ex. G.

recusal if a reasonable outsider might entertain a plausible suspicion as to the judge's impartiality.[12] Indeed, recusal is frequently appropriate under § 455(a) even when the judge is unaware of the facts that give rise to such an appearance.[13] This standard counsels that the judge's subjective feelings that he or she can decide the matter fairly and impartially are of no consequence. Rather, the Court considers how the facts appear to a member of the public and exercises the benefit of the doubt towards recusal.[14]

Magistrate Peck should recuse himself to protect public confidence in the judiciary and, if he does not, should make no further rulings in this case until the issue of his recusal is finally determined by a higher court. To members of the public, the totality of the circumstances here might suggest a cozy relationship between Judge Peck, defense counsel Losey, and the eDiscovery industry (particularly Recommind) to members of the public and call into question Judge Peck's impartiality over the issue of predictive coding. At a minimum, a reasonable member of the public might conclude that, given his activities, Judge Peck was predisposed to lend judicial imprimatur to predictive coding and to give short shrift to Plaintiffs' concerns and objections about the details of the eDiscovery protocol to be implemented in this action. At worst, one could entertain suspicions of a *quid pro quo* in return for the financial and reputational perks Judge Peck has received and continues to receive for espousing predictive coding – i.e. that Judge Peck had a personal interest in the outcome of the parties' dispute.

## **BACKGROUND**

### A. JUDGE PECK'S WRITINGS ALIGN HIS INTERESTS WITH THOSE OF DEFENSE COUNSEL

On October 1, 2011, Judge Peck authored an article for the Law Technology News titled *Search Forward*.[15] In the article, Judge Peck promoted predictive coding as a superior alternative to traditional

---

[12]  *See, e.g., Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860, 865 (1988); *U.S. v. Amico*, 486 F.3d 764, 775-76 (2d Cir. 2007); *U.S. v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992).

[13]  *E.g. Liljeberg,* 486 U.S. at 859-67 (no *scienter* requirement).

[14]  *See, e.g., In re Martinez-Catala*, 129 F.3d 213, 220 (1st Cir. 1997); *Roberts*, 625 F.2d at 129; *Doehla v. Wathne Ltd.*, 1999 U.S. Dist. LEXIS 18915, at *4-5 (S.D.N.Y. Dec. 7, 1999); *German*, 943 F.Supp. at 373-74.

[15]  Doc. 94-5: Andrew Peck, *Search, Forward*, L. Tech. News, Oct. 2011, http://www.law.com/jsp/law

manual review.[16]  Judge Peck also cited favorably to defense counsel Losey's blog post *Go Fish*, which

spoke disparagingly of traditional review methods such as keyword searches. [17]  Judge Peck concluded

his article by stating: "Until there is a judicial opinion approving (or even critiquing) the use of predictive

coding, counsel will just have to rely on this article as a sign of judicial approval."  Mr. Losey responded

in kind to Judge Peck's article by posting a blog entry, entitled *Judge Peck Calls Upon Lawyers to Use*

*Artificial Intelligence and Jason Barn Warns of a Dark Future of Information Burn-Out If We Don't*,

where he embraced Judge Peck's position on predictive coding.[18]

Less than two months later, the parties came before Judge Peck in the instant case.  During his

first status conference with the parties on December 2, 2011, in response to Defendants' statement that

Plaintiffs were reluctant to adopt their predictive coding protocol, Judge Peck instructed the parties to

read *Search Forward* to glean his position on the issue.  Shortly thereafter, Judge Peck issued a Memo

Endorsed Order, once again instructing the parties to read his *Search Forward* article.  (Doc. 58).  In

recognition of Judge Peck's willingness to write and speak extensively in favor of predictive coding, he

recently received Law Technology News' "Champion of Technology" Innovation Award.[19]

---

technologynews/PubArticleLTN.jsp?id=1202516530534&slreturn=1.

[16] Prior to authoring *Search Forward*, Judge Peck made at least two separate public pronouncements concerning his affinity toward the adoption of predictive coding in the eDiscovery context.  He was a keynote speaker at the 2011 Carmel Valley eDiscovery retreat where he sanctioned the use of predictive coding and he also appeared on a panel at a Georgetown CLE, at which he also promoted predictive coding.  Both of these events were sponsored by Defendant MSL's eDiscovery vendor, Recommind.  *See* http://www.cvedr.com/blog/289-2011-cvedr-recap, Ex. H; *See also* Georgetown Law CLE 8th Annual Advanced eDiscovery Institute Conference, https://www.law.georgetown.edu/ cle/pdfs/257.pdf, Ex. I.

[17] Ralph Losey, *Child's Game of 'Go Fish' is a Poor Model for e-Discovery* Search, Oct. 4, 2009, http://e-discoveryteam.com/2009/10/04/childs-game-of-go-fish-is-a-poor-model-for-e-discovery-search/, Ex. J.

[18] Ralph Losey, Oct. 16, 2011, http://e-discoveryteam.com/2011/10/16/judge-peck-calls-upon-lawyers-to-use-artificial-intelligence-and-jason-baron-warns-of-a-dark-future-of-information-burn-out-if-we-dont, s*ee* Ex. K.  Mr. Losey also cited favorably to a previous article authored by Your Honor and David J. Lender entitled, *10 Key E-Discovery Issues in 2011: Expert Insight to Manage Successfully*, whereby Your Honor suggested that computer-assisted review techniques should be used in light of the problems that manual review presents.  *See* The Metropolitan Corporate Counsel, Apr. 3, 2011, http://www.metrocorpcounsel.com/ articles/13724/10-key-e-discovery-issues-2011-expert-insight-manage-successfully, Ex. L.

[19] *See* http://www.law.com/jsp/lawtechnologynews/PubArticleLTN.jsp?id=1202545638880&slreturn=1, Ex. M.

## B.  Defendants "Must Have Thought They Died and Went to Heaven"

During the December 2, 2011 status conference, after Defendants voiced their preference to use predictive coding in satisfaction of their discovery obligations, Judge Peck told Defendants they "must have thought they died and went to Heaven when this case was referred" to him.  (Doc. 51: Dec. 2, 2011, Tr. at 8).

## C.  Judge Peck Encouraged Defendants To Enlist The Assistance Of Mr. Losey

In the second status conference held before Judge Peck on January 4, 2012, he encouraged Defendants to enlist the assistance of their eDiscovery counsel, Ralph Losey – whom Judge Peck claimed to know "very well."  (Doc. 70-3: Jan. 4, 2012, Tr. at 61).  Judge Peck did not state how he knew Mr. Losey or in what context.

## D.  In A Public E-Discovery Panel, Judge Peck Indicated that He Essentially Strong-Armed Plaintiffs Into Accepting the Use of Predictive Coding and that Their Only Alternative Would Be to Seek His Recusal

On January 11, 2012, Judge Peck was on a panel of judges on the topic of predictive coding. At the beginning of the panel, the sponsor and moderator – the president of ReviewLess, an eDiscovery vendor – admitted he was "very biased" on the subject. As discussed above, Judge Peck indicated that his "died and went to Heaven" remark may have compelled Plaintiffs to accept predictive coding, at least in principle, and that their only recourse was his recusal.  He did not disclose his appearance to Plaintiffs.

## E.  Judge Peck Engaged in *Ex Parte* Contacts With Defense Counsel Losey at a CLE Conference and Failed to Inform Plaintiffs

On January 18, 2012, two weeks after Judge Peck encouraged Defendants to enlist Mr. Losey's assistance, Judge Peck participated in a conference with Mr. Losey entitled *eDiscovery Judges in Charlotte*.[20]  One of the topics of discussion was predictive coding, the very issue in dispute between the parties and before Judge Peck.  Judge Peck failed to notify Plaintiffs.

---

[20] Mr. Losey posted a blog entry about his interaction with Judge Peck at this CLE event.  *See*. Ex. C.

**F.  JUDGE PECK ENGAGED IN CONTACTS WITH MR. LOSEY ON LEGALTECH PANELS DISCUSSING PREDICTIVE CODING AND FAILED TO INFORM PLAINTIFFS**

Not two weeks later, on January 30, 2012, while the parties in the instant case continued to debate the use of predictive coding, Judge Peck served on a panel with Mr. Losey at the 2012 LegalTech New York Conference entitled *Man vs. Machine: The Promise and Challenge of Predictive Coding and other Disruptive Technologies*.[21]  As the title of the panel suggests, Judge Peck and Mr. Losey discussed predictive coding extensively.  For a second time, Judge Peck failed to disclose to Plaintiffs that he would be serving on a panel with defense counsel in which the topic of predictive coding – and more specifically how predictive coding should be utilized in litigation – would be discussed.

On January 31, 2012, at the same LegalTech Conference, Judge Peck moderated a panel discussion involving defense counsel, in which Mr. Losey highlighted what he perceived to be the substantial advantages of predictive coding.[22]  Once again, Judge Peck failed to apprise Plaintiffs.

**G.  JUDGE PECK FAILED TO INFORM PLAINTIFFS OF RECOMMIND'S SPONSORSHIP OF THE LEGAL TECH CONFERENCE**

Judge Peck also failed to disclose that Recommind, Defendant MSL's eDiscovery vendor and the originator of its predictive coding protocol, sponsored the LegalTech Conference at which he spoke with defense counsel on predictive coding.[23]

**H.  JUDGE PECK MADE PUBLIC COMMENTS CONCERNING THE PREDICTIVE CODING DISPUTE IN THE INSTANT CASE AND FAILED TO SO INFORM PLAINTIFFS**

On January 31, 2012, as set forth above, Judge Peck participated in a LegalTech panel entitled "Judicial Perspectives on Technology-Assisted Review." In a publicly-available video recording, Judge Peck espouses the virtues of predictive coding and **unmistakably refers to the instant case**, noting that

---

[21] *See* Ex. D; *See also* Ex. E.

[22] *See* Ex. F.

[23] *See*  http://www.legaltechshow.com/r5/cob_page.asp?category_id=71685&initial_file=cob_page-sponsors.asp,  Ex. O.

he has only seen computer-assisted review utilized in one of his cases and that he "couldn't resist" telling

Defendants they must have "thought they **died and went to Heaven**" when he got the case.[24]

    This appearance represented the fifth time in three weeks that Judge Peck failed to notify

Plaintiffs he would be participating in a panel endorsing views on predictive coding virtually identical to

those advocated by Defendants in this case.

### I. JUDGE PECK FAILED TO INFORM PLAINTIFFS THAT HE HAS RECEIVED SOME COMPENSATION FOR HIS PARTICIPATION AT E-DISCOVERY CONFERENCES

    Judge Peck's most recent Financial Disclosure Report for Calendar Year 2010 confirms that he

received, at a minimum, transportation, lodging, and meals free of cost for no less than 10 appearances at

eDiscovery conferences in 2010.[25]   He failed to make any disclosure to Plaintiffs regarding this

compensation. Nor did he make any disclosures to Plaintiffs regarding remuneration for similar

appearances in 2011 and 2012, including the five January 2012 panels.

### J. JUDGE PECK REPRIMANDED PLAINTIFFS FOR EXERCISING THEIR RIGHTS TO APPEAL HIS RULINGS TO DISTRICT COURT JUDGE CARTER

    On February 8, 2012, during the third status conference, Plaintiffs demurred to a *sua sponte*

ruling by Judge Peck.  In response, Judge Peck chided, "you get to **whine to Judge Carter**…. Of

Course, you can do what you have done before, which is take objections to Judge Carter so he can enjoy

the fun I'm having with all of you. . . . If you want to object to every single ruling I make, feel free.  The

rules allow you to do that.  Does it make me happy?  You figure that out."  (Doc. 97: Feb. 8, 2012, Tr. at

20-22).

### K. JUDGE PECK CITED TO MATERIALS OUTSIDE OF THE RECORD IN ORDER TO SUPPORT HIS FEBRUARY 24, 2012 OPINION AND ORDER ON PREDICTIVE CODING WITHOUT GIVING PLAINTIFFS A CHANCE TO RESPOND OR OBJECT

    In his February 24 Order sanctioning Defendants' proposed predictive coding protocol, Judge

---

[24] *See* Ex. B.
[25] *See* Judge Peck's Financial Disclosure Report for Calendar Year 2010, Ex. CC.

Peck cited to a number of articles and studies outside of the record without providing Plaintiffs an opportunity to review or object to his use of the materials.  Some of the materials cited were authored by Judge Peck, defense counsel Losey, and Maura R. Grossman, eDiscovery counsel at Wachtell, Lipton, Rosen & Katz, all of whom served together on the aforementioned LegalTech panel.[26]

## L.  MR. LOSEY'S RESPONSE TO JUDGE PECK'S PREDICTIVE CODING ORDER

Judge Peck's Order states: "Counsel no longer have to worry about being the 'first' or 'guinea pig' for judicial acceptance of computer-assisted review." (Doc. 96: Feb. 24, 2012, Order at 25). Mr. Losey almost immediately posted a blog entry, "Picking Battles and Knowing When Not to Speak," depicting a digital recreation of himself posturing in celebration and calling himself one "happy guinea pig." In the animated short, Losey is gleefully holding his tongue and implying a juicy backstory. This did not escape attention.[27]

## M.  SHORTLY FOLLOWING JUDGE PECK'S ORDER, RECOMMIND ISSUED PRESS RELEASES AND CONDUCTED INTERVIEWS STATING THAT JUDGE PECK ENDORSED ITS TECHNOLOGY AND USING HIS ENDORSEMENT TO ADVANCE THE COMPANY'S FINANCIAL INTEREST

On February 27, 2012, Recommind issued a press release entitled, *Judge Peck's Predictive Coding Game-Changer*.[28]  The press release describes Judge Peck's "opinion [as] nothing short of a game-changer for the eDiscovery industry because it signals that eDiscovery, and indeed discovery, has entered a new phase where Predictive Coding will quickly go from cutting-edge approach to mainstream technology and workflow embraced by most, and eventually all. . . .  The opinion, and the rapid

---

[26] The articles included Judge Peck's, *Search Forward*,; Ralph C. Losey, "Child's Game of 'Go Fish' is a Poor Model for e-Discovery Search," in *Adventures in Electronic Discovery* 209-10 (2011); and Maura R. Grossman & Gordon V. Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, Rich. J.L.& Tech., Spring 2011.

[27]   *See*  http://chrisdale.wordpress.com/2012/02/27/predictive-codings-silver-blaze-the-dogs-who-didnt-bark-in-the-night-time, Ex. P ("The defendants' lawyers are Jackson Lewis, where Ralph Losey is a partner, and it is reasonable to suppose that he personally is engaged in the case.   *The apparent curiosity – that neither Recommind nor Ralph Losey barked in the night – is explained by their involvement in the case.* The dog who did not bark when Silver Blaze was taken away was similarly inhibited – it was the horse's trainer who took him away and dogs don't bark at people they are *close to.*").  [Mr. Losey has removed the original blog entry from his website.]

[28] http://www.recommind.com/blogs/20120227/Judge_Pecks_Predictive_Coding_Game_Changer, s*ee* Ex. Q.

mainstream adoption of Predictive Coding it portends, clearly point to a brighter future.  *The sooner we as an industry begin to reap its benefits, the better.*"  On March 5, 2012, Recommind issued another press release announcing its launch of the industry's first Predictive Coding Training Program and citing Judge Peck's Order as the direct impetus.[29]

## LEGAL ANALYSIS: RECUSAL FOR MERE APPEARANCE OF PARTIALITY

More than eighty years ago, in *R. v. Sussex Justices, ex Parte McCarthy*, 1 K.B. 256, 259 (1923), Lord Hewart of England famously proclaimed the absolute imperative that justice must not only be impartial in fact, but in **appearance** as well:

> It is of fundamental importance that justice should not only be done, but should manifestly and undoubtedly be seen to be done. . . .  Nothing is to be done which creates even a suspicion that there has been an improper interference with the course of justice.

*See also U.S. v. Edwardo-Franco,* 885 F.2d 1002, 1005 (2d Cir. 1989) (citing *Offutt* , 348 U.S. at 14).

Reflecting this principle, § 455(a) requires a judge's recusal for the mere appearance of impropriety or partiality – i.e. if a reasonable outsider might entertain a plausible suspicion or doubt as to the judge's impartiality.  *See*, *e.g.*, *Amico*, 486 F.3d at 775-76; *Liljeberg*, 486 U.S. at 860 (emphasis added); *U.S. v. Bayless*, 201 F.3d 116, 126 (2d Cir. 2000); *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 127 (2d Cir. 2003).   This timeworn tenet is aptly reflected in the Code of Conduct for United States Judges ("Judicial Code of Conduct").[30]

---

[29]  http://www.recommind.com/releases/20120305/Recommind_Announces_Predictive_Coding_Education_Training_ and_Certification_Program;  *see  also*  http://www.metrocorpcounsel.com/articles/18424/predictive-coding-and-patented-workflow-defensible-e-discovery-system, s*ee* Ex. R.

[30]  See Code of Conduct for United States Judges, available at http://www.uscourts.gov/RulesAndPolicies/ CodesOfConduct.aspx  (Canon 2:"A judge . . . should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."; Canon 2B: "A judge should avoid lending the prestige of judicial office to advance the private interests of the judge or others."; Canon 3: "A judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers;" Canon 6: "A judge should not make public comment on the merits of a matter pending or impending in any court."); *see also* Judicial Conference's Committee on Codes of Conduct, Guide to Judiciary Policies & Procedures ("Advisory Opinion"), Vol. 2B, Ch. 2 at 67-3, s*ee* Ex. S ("it would be improper for a judge to attend a seminar if the sponsor or source of substantial funding for the seminar is a litigant before the judge and the topics covered in the seminar are directly related to the subject matter of the litigation."); Advisory Opinion No. 87, s*ee* Ex. T. (Canon 2A and 2B of the Code principles apply to participation in legal training

"[W]here the appearance of partiality exists, recusal is required regardless of the judge's own inner conviction that he or she can decide the case fairly despite the circumstances." *In re Martinez-Catala*, 129 F.3d at 220.[31]   "The [] purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg*, 486 U.S. at 865. **Therefore, where the decision to recuse is a close one, the statute's purpose of promoting public confidence in the judiciary requires that judges resolve any doubts in favor of recusal.**[32]

On the facts and circumstances set forth herein – taken collectively –Judge Peck should be recused under § 455(a).[33]

## ARGUMENT

**A. Judge Peck's Public Comments Concerning the Case Require His Recusal**

Canon 3(A)(6) of the Judicial Code of Conduct states that a "judge should not make public comment on the merits of a matter pending or impending in any court."  The Commentary to Canon 3(A)(6) explains further: "If the public comment involves a case from the judge's own court, the judge should take particular care so that the comment does not denigrate public confidence in the judiciary's integrity and impartiality, which would violate Canon 2(A)."

In *U.S. v. Cooley*, 1 F.3d 985 (10th Cir. 1993), the Tenth Circuit ruled that a trial judge who had gone on national television to promote an injunction he had issued to prohibit protestors from blocking access to an abortion clinic was required to recuse himself.  The court explained: "Two messages were

---

programs); and Advisory Opinion No. 105, 105-3, *see* Ex. U ("Requests to speak at seminars sponsored by . . . business entities raise concerns under Canon 2B regarding lending the prestige of office. . . . [T]he Committee recommends a variety of checks on both the judge's and the sponsor's activities to limit the possibility that the judicial office will be improperly exploited.").

[31] *See also Roberts*, 625 F.2d at 129; *Doehl*a, 1999 U.S. Dist. LEXIS 18915, at *4-5; *Goebel*, 830 P.2d at 999.

[32] *See n. 1, supra*.

[33] The "cumulative effect" of a Judge's statements and conduct "in the aggregate" can give rise to an appearance of partiality warranting recusal.  *See, e.g., Amico*, 486 F.3d at 775-76; *Hathcock*, 53 F.3d 36, 41 (4th Cir. 1995); *In re School Asbestos Litig.*, 977 F.2d 764, 782 (3d Cir. 1992). *See also Sao Paulo State of the Federative Republic of Brazil v. Am. Tobacco Co., Inc.*, 535 U.S. 229, 232-33 (2002) (*per curiam*) (reaffirming holding in *Liljeberg* that § 455(a) "requires judicial recusal 'if a reasonable person, *knowing all the circumstances*, would expect that the judge would have actual knowledge' of his interest or bias in the case."); *In re Martinez-Catala*, 129 F.3d at 221.

conveyed by the judge's appearance. . . . One message consisted of the words actually spoken regarding the protesters' apparent plan to bar access to the clinics . . . . The other was the judge's expressive conduct in deliberately making the choice to appear in such a forum at a sensitive time to deliver strong views on matters which were likely to be ongoing before him. Together, these messages unmistakenly conveyed an uncommon interest and degree of personal involvement in the subject matter. It was an unusual thing for a judge to do, and it unavoidably created the appearance that the judge had become an active participant in bringing law and order to bear on the protesters, rather than remaining as a detached adjudicator." *Id* at 995. *See also U.S. v. Microsoft Corp.*, 253 F.3d 34, 115-116 (D.C. Cir. 2001).

As mentioned above, Judge Peck appeared on pro-predictive coding panels on January 11, 2012 and at the LegalTech Conference on January 31, 2012.  While sitting on these panels, Judge Peck undeniably referred to this case by repeating the "**died and went to Heaven**" remark from the December 2 status conference. In fact, Judge Peck divulged that he "couldn't resist" making this comment to the parties.  Judge Peck further intimated that he had compelled Plaintiffs into accepting the concept of predictive coding and that their only recourse was to seek his recusal.  Judge Peck apparently couldn't resist divulging his war stories at the expense of Plaintiffs and the judiciary.

As in *Cooley*, there are at least two messages that an objective observer might reasonably take from Judge Peck's public comments. Each of them creates an appearance of partiality. First is the clear meaning of his language -- i.e. that Defendant was fortunate to have the case assigned to him because Defendant intended to utilize a particular predictive coding protocol as its ESI document review tool that Judge Peck was predisposed to approve regardless of Plaintiffs' concerns about its efficacy.  Second is that Judge Peck was so personally invested in predictive coding, and such an active participant in seeing its full-scale adoption by the legal profession, that he could not refrain from making a public comment on an issue material to a case pending before him.

Judge Peck touted his Order approving predictive coding as a judicial milestone. (Doc. 96 at 1-2,

13

25-26). As the D.C. Circuit remarked in *Microsoft*: "Judges who covet publicity, or convey the appearance that they do, lead any objective observer to wonder whether their judgments are being influenced by the prospect of favorable coverage in the media." 253 F.3d at 115.

**B. JUDGE PECK'S PARTICIPATION ON PRO-PREDICTIVE CODING PANELS WITH DEFENSE COUNSEL RALPH LOSEY WHILE PRESIDING OVER THE PARTIES' DISPUTE ON PREDICTIVE CODING REQUIRES HIS RECUSAL UNDER § 455(a).**

A number of federal decisions have ordered the disqualification of judges on facts raising less of a specter of partiality than those at bar. For example, *In re School Asbestos Litig.*, 977 F.2d 764, was a high-profile product liability case. There, while the case was pending, the judge attended a "predominantly pro-plaintiff conference on a key merits issue; the conference was indirectly sponsored by the plaintiff, largely with funding that [the judge] himself had approved; and his expenses were largely defrayed by the conference sponsors with those same court-approved funds." The trial judge denied defendant's motion to disqualify. On appeal, the Third Circuit concluded that it need not consider whether any of these facts alone required disqualification, because together they created an appearance of partiality mandating disqualification. *Id.* at 782.

Here, Judge Peck has not only attended pro-predictive coding conferences, he has spoken on such panels with defense counsel Losey, and cited Mr. Losey's writings, while presiding over a heated dispute concerning a predictive coding protocol in this case. Together, Judge Peck and Mr. Losey have advocated pro-predictive coding views at conferences sponsored by Defendant's eDiscovery vendor, Recommind, who has indirectly reimbursed Judge Peck for his panel appearances. These facts, together with Judge Peck's on-the-record statement that Defendants "must have thought they died and went to Heaven" when the case was referred to him; the repetition of this remark to members of the general public during two eDiscovery panels; and his on-the-record recommendation that Defendants employ the assistance of their eDiscovery counsel, Mr. Losey, who Judge Peck knew "very well," create at least a comparable appearance of doubt regarding Judge Peck's impartiality.

*Amico*, 486 F. 3rd at 767, is also instructive. There, the Second Circuit overruled the convictions of defendants on charges arising from a mortgage fraud scheme because of the trial judge's failure to recuse himself under § 455(a). In that case, a cooperating witness, who had entered a guilty plea fifteen years earlier with the government in exchange for his testimony, revealed that he fraudulently prepared a mortgage application for the trial judge. After some back and forth in which the cooperating witness changed his story multiple times and the judge denied misrepresenting any facts in his application, defendants moved to disqualify the judge. The trial judge refused to recuse himself, stating that the witness' allegations were irrelevant to the case. The Second Circuit ruled that recusal was required because the trial judge's reactions to the problems surrounding the application created the impression that he may have been acting in such a way as to protect his own reputation. Furthermore, the witness' accusations involved the same type of behavior for which defendants were on trial. *Id.* at 776.

Here, Judge Peck has engaged in *contemporaneous ex parte* contacts with Mr. Losey on the very discovery issue in contention between the parties, *predictive coding protocols*. That Judge Peck's oral ruling ordering the parties to effectively adopt Defendants' predictive coding protocol ensued approximately one week after these *ex parte* contacts only heightens the appearance of impropriety.[34]

**C. JUDGE PECK'S NUMEROUS SPEAKING ENGAGEMENTS IN FAVOR OF PREDICTIVE CODING, WHICH WERE AT LEAST INDIRECTLY SPONSORED AND FUNDED BY RECOMMIND AND OTHER E-DISCOVERY VENDORS, MANDATE RECUSAL**

---

[34] *See also*, *e.g.*, *Liljeberg*, 486 U.S. at 859-67 (affirming the disqualification of a trial judge who was a member of the Board of Trustees of a university that had an unknown financial interest in the litigation); *In re Continental Airlines Corp.*, 901 F.2d 1259 (5th Cir. 1990); *U.S. v. Murphy*, 768 F.2d 1518 (7th Cir. 1985) (ruling that a judge should have disqualified himself when he and the prosecuting attorney were close friends who planned on vacationing together after the trial); *Parker v. Connors Steel Co.*, 855 F.2d 1510 (11th. Cir. 1988) (ruling that a judge should have recused himself where his former law clerk, who was also the father of the judge's current law clerk, was a partner at a firm representing one of the parties). The appearance of partiality created in the instant case relates directly to the relevant discovery dispute before Judge Peck, and thus is far greater than that requiring recusal in decisions such as these.

Plaintiffs also note that the District Judge in this case, the Honorable Andrew L. Carter, has taken his obligations under § 455(a) so seriously as to recuse himself from a previous matter in which the concerns over his partiality can best be described as superficial when compared to Plaintiffs' concerns here. In *Kosher Sports, Inc. v. Queens Ballpark Co., LLC*, No. 10-CV-2618 (E.D.N.Y. Mar. 1, 2011 minute entry), Judge Carter recused himself from a case brought against the company which operates the New York Mets' ballpark after plaintiff's attorney voiced concerns about Judge Carter wearing a Mets cap during a lunch break and wearing an orange and blue tie in the courtroom.

In *In re Aguinda*, 241 F.3d 194, 206 (2d Cir. 2001), the Second Circuit cautioned that:

[R]ecusal may be required after accepting meals or lodging from organizations that may receive a significant portion of their general funding from litigants or counsel to them. . . . accepting something of value from an organization whose existence is arguably dependent upon a party to litigation or counsel to a party might well cause a reasonable observer to lift the proverbial eyebrow. . . . Judges should be wary of attending presentations involving litigation that is before them or likely to come before them without at the very least assuring themselves that parties or counsel to the litigation are not funding or controlling the presentation.

The rationale behind the Second Circuit's cautionary words is reflected in Canon 4(H) of the

Judicial Code of Conduct, which states:

A judge may accept compensation and reimbursement of expenses for the law-related and extrajudicial activities permitted by this Code **if** the source of the payments does not give the appearance of influencing the judge in the judge's judicial duties or otherwise give the appearance of impropriety.

However, in this instance, the strict condition is not satisfied: the source of payments for Judge Peck's

panel appearances does create a potential appearance of impropriety.

In January 2012, while the parties' discovery dispute over predictive coding reached its

crescendo, Judge Peck served on at least three pro-predictive coding panels at the LegalTech Conference

–sponsored by MSL's eDiscovery vendor, Recommind.  Recommind is the very party responsible for

devising the particular predictive coding protocol proposed by Defendants (and challenged by the

Plaintiffs) and whose technology will be implemented under that protocol.  When Judge Peck accepted

reimbursement, he was indirectly compensated by Recommind for promoting predictive coding, while at

the same time presiding over a closely related discovery dispute in which it had an immediate interest.[35]

Any reasonable observer might entertain suspicion that Judge Peck's paid-participation in pro-

---

[35] Since November 2009, Judge Peck has made at least eight appearances at eDiscovery conferences sponsored by Recommind, most, if not all of which, he has been compensated for.  *See, e.g., 6th Annual Advanced E-Discovery Institute: Identifying Today's Problems & Tomorrow's Solutions*, http://www.law. georgetown.edu/cle/pdfs/213.pdf, Ex. V; *7th Annual Advanced E-Discovery Institute*, https://www.law. georgetown.edu/cle/pdfs/232.pdf, Ex. W; *Information Retention & E-Disclosure Management Summit*, http://www.informationretention.co.uk/Event.aspx?id=448804, Ex. X; *2011 Carmel Valley eDiscovery Retreat*, Ex. H; *Georgetown Law CLE 8th Annual Advanced eDiscovery Institute*, https://www.law.georgetown.edu/cle/pdfs/257.pdf, Ex. I; *LegalTech New York 2012*, http://www. legaltechshow.com/r5/cob_page.asp?category_id=71685&initial_file=cob_page-sponsors.asp, Ex. O.

predictive coding panels funded, at least partially, by Recommind, made him more susceptible to embracing Defendants' proposed predictive coding protocol. The perception is only reinforced by the fact that Judge Peck issued his February 8, 2012 oral ruling – adopting MSL's and Recommind's protocol in wholesale fashion – approximately one week after attending these events, and by Recommind's press releases glorifying in the Order.  As these press releases proclaim, as one of the only patent holders of predictive coding technology, Recommind stands to benefit enormously; indeed it has launched a new initiative in response, the industry's first Predictive Coding Training Program.

### D. JUDGE PECK'S RECUSAL IS REQUIRED UNDER § 455(a) BECAUSE OF THE APPEARANCE THAT HE LENT THE "PRESTIGE OF THE JUDICIAL OFFICE TO ADVANCE THE PRIVATE INTERESTS OF THE JUDGE OR OTHERS"

Canon 2(B) of the Judicial Code of Conduct states: "A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge."  By serving on pro-predictive coding panels, sponsored in part by Recommind; receiving reimbursement indirectly from Recommind; and shortly thereafter issuing a ruling that Recommind publicly describes as an endorsement of its technology which will improve its commercial prospects, Judge Peck has created the appearance that he "lent the prestige of his judicial office to advance [ ] private interests."

Advisory Opinion No. 105 addresses the ethical hurdles that judges must overcome in order to participate in *private* law-related training programs: "Requests to speak at seminars sponsored by . . . business entities raise concerns under Canon 2B. . . . the Committee recommends a variety of checks on both the judge's and the sponsor's activities to limit the possibility that the judicial office will be improperly exploited."[36]  Further:

> [F]actors that may affect a judge's decision as to the propriety of participation in a law-related training program include: 1. the sponsor of the training program; 2. the subject matter; 3. whether there is a commercial motivation for the program; 4. the attendees, including whether members

---

[36] Advisory Opinion at 105-3, *see* Ex. U.

of different constituencies are invited to attend; and 5. other factors, including the location of the program and advertising or promotion of the event."[37]

Analyzing these factors under circumstances similar to those in this case, the Committee advised against a judge "speaking at a program on discovery issues hosted by a for-profit company offering discovery services, where the company marketed its services in part through the training program."[38]

Here, (1) Judge Peck appeared on LegalTech panels sponsored in part by Recommind, MSL's eDiscovery vendor; (2) the panels promoted adoption of predictive coding by the legal profession, the very issue at the heart of the discovery dispute in this case; (3) the sponsors of the programs, Recommind included, had a commercial interest in seeing to it that their technology and protocols were embraced by lawyers and judges alike, including Judge Peck; and (4) the attendees of the panels were primarily eDiscovery vendors and corporate defense attorneys, both of whom shared a common interest in promoting predictive coding technologies. These factors alone should have cautioned restraint.

Shortly following the panels, Judge Peck published an oral and then written decision not only adopting Defendant's eDiscovery protocol in this litigation but announcing the propriety of predictive coding in all future cases, stating: "Counsel no longer have to worry about being the 'first' or 'guinea pig' for judicial acceptance of computer-assisted review." (Doc. 96: Feb. 24, 2012, Order at 25). Mr. Losey almost immediately posted a blog entry calling himself one "happy guinea pig."

Recommind's public reaction was swift and furious. Days after Judge Peck's Order, Recommind issued press releases and conducted interviews stating that Judge Peck endorsed its technology and they used his endorsement to advance the Company's financial interests. The first press release called the decision a "game-changer" which portend a brighter future for Recommind.[39]

On March 5, 2012, Recommind issued another press release announcing its launch of the

---

[37] *Id.* at 105-2, *see* Advisory Opinion 67, Ex. S.

[38] *See* Ex. U at 105-3.

[39] *See* Ex. Q.

industry's first Predictive Coding Training Program and citing Judge Peck's Order as the direct impetus.

The press release quotes a partner at WilmerHale:

> While we and many of our clients were early champions of Predictive Coding, *Judge Peck's groundbreaking opinion endorsing Recommind's Predictive Coding technology and workflow in Da Silva Moore v. Publicis Groupe should stimulate demand for predictive coding tools.*

Further, Morgan Lewis, counsel for Publicis, broadcasts its close partnership with Recommind.[40]

Finally, on March 26, 2012, in an interview conducted by The Metropolitan Corporate Counsel, Howard Sklar, Senior Counsel at Recommind states:

> We've maintained for a long time that a validating case, such as *Moore*, would be a great asset, and it might drive new users toward Predictive Coding technology. . . .  The Peck opinion certainly has raised awareness about the technology, and it broke ground for those who needed a judicial opinion in order to feel comfortable with adoption.[41]

In light of these circumstances, an objective, reasonable observer might plausibly suspect an improper influence on Judge Peck's Opinion.

### E. JUDGE PECK'S FAILURE TO DISCLOSE HIS ACTIVITIES ENHANCES THE APPEARANCE OF IMPROPRIETY, REQUIRING RECUSAL UNDER § 455(a)

It is often said that the cover up is worse than the deed itself.    Canon 3(A)(4) of the Judicial Code of Conduct precludes judges from initiating, permitting, or considering *ex parte* communications and in the event that *ex parte* communications occur, "**the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond**." Several Circuit Courts have ruled that pursuant to § 455(a), "judges have an ethical duty to 'disclose on the record information [(including *ex parte* conduct)] which the judge believes the parties or their lawyers might consider relevant to the question of disqualification." *American Textile Mfrs. Inst., Inc. v. Limited, Inc.*, 190 F.3d 729, 742 (6th Cir. 1999) (quoting *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995)); *See also U.S. v. Murphy*, 768 F.2d 1518, 1536-1537 (7th Cir. 1985) ("[T]he statute places on

---

[40] *See* Ex. R.

[41] *See* Ex. Y.

the judge a personal duty to disclose on the record any circumstances that may give rise to a reasonable question about his impartiality."); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1525 (11th Cir. 1988) (stating that the trial judge must have known of the grounds for disqualification and should have fully disclosed the issue to the parties). Nonetheless, Judge Peck repeatedly failed to disclose his activities, creating the appearance that he has something to hide and is seeking to protect his reputation. *Cf. Amico*, *supra*.

To this day, Judge Peck has failed to disclose to Plaintiffs his various *ex parte* contacts with Mr. Losey; this despite his being acutely aware during the January 4, 2012 status conference that the 2012 LegalTech conference was fast approaching. At the status conference, when defense counsel Victoria Chaney suggested the date of February 2, 2012 for the next status conference, Judge Peck noted: "That's LegalTech week." (Doc. 70-3: Jan. 4, 2012 Tr., at 66). Nevertheless, Judge Peck failed to reveal the truly salient point about the LegalTech conference, which was that he would be preparing for and participating in pro-predictive coding panels with Mr. Losey.

Additionally, Judge Peck's citation to extrajudicial sources – including articles outside of the record -- in support of his predictive coding decision raises similar concerns to undisclosed *ex parte* contacts and requires recusal. *Cf. Edgar v. K.L.*, 93 F.3d 256 (7th Cir. Ill. 1996). Canon 3(A)(4)(c) permits judges to obtain **written advice** of a **disinterested** expert on the law, but only after giving **advance notice** to the parties of the person to be consulted and the subject matter of the advice and affording the parties reasonable opportunity to object and respond to the notice and to the advice received. Peck's predictive coding Order relies upon materials cited were authored by **interested**, non-expert parties including defense counsel Mr. Losey and Maura R. Grossman, eDiscovery counsel at Wachtell, both of whom served together with Judge Peck on the aforementioned predictive coding panel at LegalTech . Moreover, Judge Peck provided no notice or opportunity to respond before relying on

20

such sources.[42]

Judge Peck's Order approving Defendants' protocol was largely derived from extrajudicial sources not part of the record – articles and blog entries penned by Mr. Losey and other members of the pro-predictive coding community with which Judge Peck is associated.[43]   Similarly, it would be reasonable for a neutral observer to assume that Judge Peck gleaned the "facts" supporting his decision – namely on the efficacy and reliability of predictive coding as compared to other forms of review – from his attendance at eDiscovery conferences.

Likewise, Judge Peck's failure to disclose his pro-predictive coding speaking engagements and the compensation he received for these appearances supports recusal under § 455(a). To the extent that Judge Peck was unaware of Recommind's status as a major sponsor of eDiscovery conferences such as LegalTech, he had an affirmative obligation to take reasonable steps to investigate.   *See* Advisory Opinion 67, Ex. S.

### F.   RECUSAL IS REQUIRED UNDER § 455(a) BECAUSE OF THE PERSONAL OFFENSE THAT JUDGE PECK HAS TAKEN TO PLAINTIFFS' OBJECTIONS TO HIS RULINGS AND TO THE LETTER REQUESTING HIS VOLUNTARY RECUSAL

"[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, *ordinarily* do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; *and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.*" *Liteky v. U.S.*, 510 U.S. 540, 555 (1994).   Here, Judge Peck's repeated comments towards Plaintiffs may create an appearance of such partiality and – collectively with his other conduct – warrant recusal.

---

[42] In contrast, in *Kleen Prods., LLC v. Packaging Corp. of Am.*, No. 10 C 5711 (N.D. Ill.), Magistrate Judge Nan R. Nolan required the parties to fully brief the issue of predictive coding  and submit expert reports in advance of a full-blown evidentiary hearing that is anticipated to take at least two full days. *See* Docket Report of *Kleen Prods.* (Doc. 124-2) at entry 277; *see also id.*at 266, 267, 274, 288-98, 301.  A review of the types of evidence submitted in that case, as well as the questions raised by Judge Nolan, provides insight into what a Court is required to consider when applying the law in this area. (Doc. 124-3: Feb. 21, 2012, Tr. in Kleen Prods).

[43] *See, e.g., Edgar v. K.L.*, 93 F.3d 256 (7th Cir. Ill. 1996).

In *U.S. v. Holland*, 655 F.2d 44 (5th Cir. 1981), the Fifth Circuit reversed defendant's conviction based in part on improper comments by the district court judge. Defendant had won a first appeal and proceeded to a second trial before the same judge.  During the trial, the judge remarked, outside of the presence of the jury, that defendant had "broken faith" with him by raising the first appeal.  *Id*. at 45. The Fifth Circuit reversed once again, this time under 28 U.S.C. § 455(a),:"The trial judge's remarks also reflect a personal prejudice against [defendant] for successfully appealing his conviction on the basis of the judge's actions during the prior trial.  The fact that these comments were made in a judicial context outside the presence of the jury does not prevent a finding of bias." *Id*. at 47.

In *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3d. Cir. 1993), the Third Circuit reversed a district court judge's refusal to recuse himself, where the judge had responded to a petitioners' mandamus motion for disqualification by writing a lengthy letter, personally refuting petitioners' "'incomplete or inaccurate summaries' of his comments and opinions."  Ordering the assignment of the case to another district judge on remand, the Circuit Court concluded, "we find it difficult to resist the suggestion that [the judge], in responding to the mandamus petition by letter to petitioners' counsel, has exhibited a personal interest in the outcome of this litigation."  *Id*. at 165.

Here, Judge Peck has taken personal offense to Plaintiffs' invoking their right to appeal his rulings and to seek his recusal.  He has characterized Plaintiffs' objections as "**whining**" and has warned Plaintiffs against filing them.  (Doc. 97: Feb. 8, 2012, Tr. at 20-22.).  Most recently, he strongly urged Plaintiffs' to abandon their recusal motion, labeling Plaintiffs intransigent "scorched earth" litigants. (Doc. 158: April 2, 2012, Order at 2). One can only assume that Judge Peck is again referring to his displeasure at Plaintiffs' series of Rule 72(a) objections.  Especially taken together with his public statements about the case, Judge Peck's repeated attempts to intimidate Plaintiffs into acquiescing to his rulings may evince to a neutral observer  such a "high degree of antagonism" or "personal interest" in the case as to require his recusal under § 455(a).

22

### G. JUDGE PECK'S APRIL 2, 2012 ORDER IN RESPONSE TO PLAINTIFFS' MARCH 28, 2012 LETTER REQUESTING HIS RECUSAL FAILS TO ADDRESS THE APPEARANCE OF PARTIALITY OR IMPROPRIETY CREATED BY HIS ACTIONS

1. JUDGE PECK CLAIMS THAT PLAINTIFF CONTENDS THAT HIS PUBLIC STATEMENTS APPROVING GENERALLY OF COMPUTER-ASSISTED REVIEW MAKE HIM BIASED

Plaintiffs do not claim that Judge Peck's public comments expressing his general support for predictive coding make him biased. However, under the present circumstances, his various conduct in direct relation to the very issue in dispute between the parties – such as his "died and went to Heaven" remarks – *appear* biased.

2. JUDGE PECK CLAIMS THAT HE DID NOT ACCEPT MONEY DIRECTLY FROM RECOMMIND AND NEVER SPECIFICALLY ENDORSED RECOMMIND'S METHODOLOGY OR TECHNOLOGY

Again, the question is not whether Judge Peck has an actual financial interest in this matter or is actually biased, but whether a reasonable outsider would entertain suspicions of impropriety or partiality. As discussed above, Judge Peck had an obligation to discern the programs' sponsors and sources of funding.  Judge Peck's February 24 Opinion and Order is careful not to endorse a particular vendor or computer-assisted review tool. (Doc. 96 at 25).  Nevertheless, as the same Opinion also makes clear, the ESI protocol attached to the Opinion does reveal the name of the predictive coding vendor in this case, Recommind, and it mentions Recommind's patented Axcelerate software no less than 15 times. Nevertheless, Recommind's media blitz following the Order is clear that the decision advances the Company's commercial interests. Judge Peck's care not to specifically shill for Recommind does not dispel the appearance of partiality engendered by the circumstances taken as a whole

3. JUDGE PECK CLAIMS THAT HE WAS NOT AWARE THAT DEFENSE COUNSEL LOSEY WAS WORKING ON THIS CASE AND THAT THEY DID NOT SPEAK ABOUT THE CASE ITSELF

In an attachment to a January 25, 2012 letter sent from defense counsel Jackson Lewis to Judge Peck, Counsel explained Mr. Losey's involvement in this case: "we had requested that Ralph Losey of our firm, a nationally recognized expert in this area, to assist us.  Mr. Losey prepared for and participated

in the June 10th phone conference."[44]  In addition, as mentioned above, on January 4, 2012 took it upon himself to urge Defendants to enlist Mr. Losey in their predictive coding cause.  Thus, Judge Peck should have, at the very least, been aware of the probability that Mr. Losey was involved in the instant case and he should have avoided any potentially questionable contacts with Mr. Losey.[45]

Even if Judge Peck did not know Mr. Losey was involved in this case, recusal is frequently appropriate under § 455(a) even when the judge is unaware of the facts that give rise to such an appearance.  Moreover, Judge Peck's frequent extrajudicial contacts with Mr. Losey on the very subject at issue between the parties create an "inevitable" appearance of impropriety even if they did not discuss the case itself – particularly due to the failure to disclose the nature and extent of the contacts.[46]  More importantly, § 455(a) deals with the appearance of bias and it does not require that Judge Peck be aware of all the facts which create the appearance of bias requiring his disqualification.  *Liljeberg*, 486 U.S. at 860.

4.  JUDGE PECK CLAIMS THAT RECUSAL HERE WOULD SERVE ONLY TO DISCOURAGE JUDGES FROM SPEAKING ON EDUCATIONAL PANELS ABOUT eDISCOVERY (OR ANY OTHER SUBJECT)

Plaintiffs reiterate that they seek Judge Peck's disqualification  not because of his service on eDiscovery panels in general, but because of his service on pro-predictive coding panels, in particular, *with* defense counsel Losey that were *sponsored by* Recommind, *while* the parties' discovery dispute concerning predictive coding was ongoing.  This is in addition to the other factors cumulatively supporting recusal, such as Judge Peck's public comments regarding this litigation and his failure to properly disclose his activities.  The confluence of facts in this case is unique, and judges will not be deterred from participating in legal education should Plaintiffs prevail on their motion.

---

[44] Jackson Lewis, LLP's January 25, 2012 Letter to Judge Peck, s*ee* Ex. Z, at 3.

[45] Even a neutral third-party blogger discerned Mr. Losey's presumable involvement.  *See* n. 26, *supra*.

[46] *See*, e.g., *Matter of Huttner*, http://www.scjc.state.ny.us/Determinations/H/huttner_%282%29.htm, Ex. AA; *In re Slusher*, http://www.cjc.state.wa.us/case%20material/1994/1518%20stipulation.pdf, Ex. BB (finding violation of code of judicial conduct where judge engaged in casual conversation in the courtroom with one of the parties even though there was no evidence that the judge discussed the proceeding).

It has long been established that judges appearing in legal education or training programs must ensure that their attendance does not violate the Judicial Code of Conduct. The Committee has advised:

> Canon 2A and 2B of the Code are concerned with (1) preserving the appearance of impartiality, (2) prohibiting the lending of a judge's prestige to advance the interests of others, and (3) avoiding the impression that others are in a position to influence the judge.  Thus, even though Canon 4 encourages judges to assist with legal education, the Committee has previously applied Canon 2 principles to participation in legal training programs, whether such programs offer CLE credit or not and whether the sponsor is a 'for-profit' or 'non-profit' entity.  In other words, merely because a provider offers CLE credit or is a 'non-profit' entity does not eliminate the requirement that a judge determine whether his or her participation runs afoul of Canon 2.[47]

Judge Peck's obligation to ensure that his appearance on predictive coding panels would not conflict with Canon 2 was especially pronounced here, where the panels were sponsored by "for-profit" entities, who, for commercial reasons, wished to see predictive coding adopted as the mainstream eDiscovery review tool in the legal profession.

## **CONCLUSION**

The course this Court must therefore take is plain and indisputable: in the interest of judicial integrity and the appearance of equal justice under the law, Judge Peck must recuse himself from further participation in this case and any Orders issued since Judge Peck's pro-predictive coding appearances in January 2012 should be vacated.  If he does not recuse himself, Judge Peck should make no further rulings in this case until the issue of his recusal is finally determined by a higher court.

DATED: April 13, 2012

Respectfully submitted,
SANFORD WITTELS & HEISLER, LLP
*/s/ Janette Wipper*_____
Janette Wipper Esq.
Steven L. Wittels, Esq.
Siham Nurhussein, Esq.
Deepika Bains, Esq.
*Attorneys for the Plaintiffs and the Class*

---

[47] *See* Advisory Opinion No. 87, Ex. T; *See also* Advisory Opinion 105, Ex. T; Opinion 67, Ex. S.  *See also* Missouri Committee on Retirement, Removal and Discipline Opinion 179 (2001), Ex. N ("the judge should avoid speaking at any continuing legal educational program or educational endeavor that is sponsored and advertised by an organization, public or private, that is likely to appear before the judge;" further cautioning that judge's name and title should not appear in promotional materials related to the program).