C57LMOOC                        Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MONIQUE DA SILVA MORE, et al.,

4                  Plaintiffs,

5           v.                          11 CV 1279 (ALC)(AJP)

6    PUBLICIS GROUPE SA, et al.,

7                  Defendants.

8    ------------------------------x
                                        New York, N.Y.
9                                       May 7, 2012
                                        9:35 a.m.
10
     Before:
11
                         HON. ANDREW J. PECK,
12
                                        Magistrate Judge
13
                              APPEARANCES
14
     SANFORD WITTELS & HEISLER, LLP
15        Attorneys for Plaintiffs
     BY:  STEVEN WITTELS
16        SIHAM NURHUSSEIN
          DEEPIKA BAINS
17
     JACKSON LEWIS LLP
18        Attorneys for Defendants MSLGroup
     BY:  VICTORIA WOODIN CHAVEY
19        JEFFREY W. BRECHER
          BRETT M. ANDERS
20

21

22

23

24

25

1           (In open court)

2           THE COURT:  How many of the 3,300 documents have you

3    whittled down and reached agreement on?

4           MR. WITTELS:  Well over probably two-thirds.  We're

5    done to about 840, roughly, down from the last week we were

6    about 3,300, your Honor.  The defendants agreed to change all

7    of the issue tag codes we had issues with.  We thereafter met.

8    We lowered our list from about 3,300 down by about half.  We

9    met again, well, by meeting, talking.  The defendants took out

10   about 300.  We then after hearing their arguments took out 60,

11   and then over the weekend we took down another hundred.

12          And where we are now is a dispute really about

13   relevance versus irrelevant.  To us that's a very important

14   issue obviously because that's how the computers are trained,

15   and we need to make sure there's reliability here so that the

16   system has the right coding.

17          And one of our major concerns today is that the

18   documents that we're concerned about are where, for example,

19   the defendants have said any document not relating to a

20   plaintiff is irrelevant, and what we're concerned about is that

21   the computer apparently can't distinguish between, when they do

22   the search, between the relevant and irrelevant so that we

23   don't think there will be reliability if the computer can't

24   distinguish and is not sophisticated enough to drill down, then

25   our documents won't get pulled out when the computer is

C57LMOOC                    Conference

1      trained.

2              And we've asked defendants to explain that.  We want

3      to really talk to their experts about it.  We haven't been able

4      to have a response on that.  So that's a big concern of ours.

5              THE COURT:  Why don't we start with that issue.  Are

6      you finished, Mr. Wittels?

7              MR. WITTELS:  There are a few others, but if we could

8      take them one at a time.

9              THE COURT:  Mr. Anders.

10             MR. ANDERS:  Thank you, your Honor.  Friday when we

11     had the phone call, that's when that issue was raised again.  I

12     spoke to Recommind that afternoon, and the short answer is the

13     computer will be able to make distinctions and nuances between

14     documents that only relate to the plaintiffs about compensation

15     and documents that relate to others.

16             The open question is how quickly does the computer

17     learn it.  It may learn it on the first iteration; it may learn

18     it on the seventh.  That's not something that we know right

19     now.

20             In an effort to address plaintiffs' concern what we

21     can do is as we do coding going forward, if there's a document

22     again let's say related to a compensation decision that we mark

23     as relevant because it relates to a plaintiff, we can add a

24     subcode with that plaintiff's name.  So we're telling the

25     computer this is relevant.  It's in the compensation category,

C57LMOOC                      Conference

1    but it also relates to this plaintiff.  That will help drive

2    the computer in that direction.

3            The other thing that we can do is, again, using a

4    compensation document as an example, if there's a compensation

5    document that we coded as not responsive because it did not

6    deal with a named plaintiff, we would code it as "no" for

7    responsive, but there would be a subcategory "out of scope."

8    And what that means is here's a document that potentially could

9    be relevant based on the content, but because of the discovery

10   rulings on the scope of discovery, this document is out of the

11   scope.

12           That assists us because as we go forward if other

13   plaintiffs join the case and are pulled in, we now have a group

14   of documents that are premarked as potentially being responsive

15   but for the scope of that document.

16           So in short answer that is what Recommind has advised

17   me about that concern and how we can possibly address it.

18           THE COURT:  Mr. Wittels.

19           MR. WITTELS:  I may need a little assistance from my

20   colleagues on this but, as I understand it, our expert would

21   like to talk to their expert, Recommind, about that because

22   from our understanding of the system, Recommind talks about

23   doing searches as content searches and it doesn't appear from

24   what they say on their website and our expert that they could

25   make the distinctions that we're hearing counsel doing.  So

C57LMOOC                          Conference

1   we're asking if we could do that today or tomorrow, our experts

2   would be ready to talk to theirs to confirm that.

3          THE COURT:  I certainly think expert-to-expert

4   discussions, if it doesn't become harassing, meaning, if it's

5   not every five minutes there's going to be a call, is probably

6   the best way to avoid the game of telephone where, you know,

7   you ask your expert some question or your expert asks you a

8   question, you ask Mr. Anders or his colleagues, he asks someone

9   at Recommind, and the answer goes back through the chain and

10  has little resemblance to what it started as.

11         Any objection to that?

12         MR. ANDERS:  No, your Honor, not with the caveat or

13  instruction you provided.  Again, I'm happy to let our expert

14  answer a question or two.  I just know we have our protocol.  I

15  don't want this to devolve into every day another question

16  about the process.  We have the final random sample which will

17  help determine the reliability.  We just need to let the

18  process run its course.

19         THE COURT:  This at least is clearly an important

20  issue.  Either it can do what you just described or it can't.

21  If it can, it sounds like plaintiff will be satisfied with

22  that.

23         All right.  So with that, does that eliminate the

24  issue on the 800 something documents or do I need to review

25  some of them further?

C57LMOOC                    Conference

1              MR. ANDERS:  Your Honor, if I could just briefly

2       address that.  In terms of what we discussed on Friday as a way

3       to resolve the 800 that are in dispute, our proposal to

4       plaintiffs was as follows.

5              As we reviewed, we identified approximately nine

6       different categories where the documents where we disagreed

7       could be classified:  documents regarding individualized

8       personnel decisions, org charts where plaintiffs were not

9       mentioned, client presentations.

10             Our proposal to plaintiffs' counsel was for each of

11      those categories, we each select a representative sampling of

12      the types of documents that fall within those categories.  For

13      some categories we would only need a few because there's much

14      of the same, financial spreadsheets, for example.  Other

15      categories we may need more.  But the idea was pick some number

16      that we each select the documents that we think are

17      representative, provide that to your Honor, and based on your

18      Honor's rulings, we can then go back and apply it to the rest

19      of the set.

20             Plaintiffs, you know, I believe they rejected that

21      proposal.  Their response was they want to preserve their

22      rights and get a ruling on each of the at that point 970

23      documents we were disagreeing on.

24             THE COURT:  Let's start with the samples and go from

25      there.  And if plaintiffs want a ruling on every particular

1    document in the 800, we'll see whether we go to a special

2    master or I've got all afternoon free as well today.  We'll see

3    what we do but, you know.

4           MR. WITTELS:  Our response, your Honor, why -- what we

5    were willing to do Friday was go through all the documents.

6    Defendants said they had to leave and we were prepared to sit

7    there and go through them on the phone and we proposed that but

8    the defendants didn't want to do that, so.

9           THE COURT:  Would you all like to do that this morning

10   in the jury room, and I'll deal with what's left on a sample

11   basis or a document-by-document basis starting at 2 o'clock.

12          MR. WITTELS:  We're ready to do that.  The problem we

13   had, just so your Honor knows, with the sampling was this.  We

14   asked the defendants and we said Friday, we put it in -- I

15   think we put it in writing as well, we would like to know which

16   of the documents fall into which of these categories because,

17   obviously, if it was an expense report, that was maybe a

18   category we could live with.  But they were very broad

19   categories, generation operation, which meant many things or

20   could mean many things.

21          So we asked them to tell us which of the 900 fit into

22   which category because, obviously, if they're going to pull a

23   few samples, they would have to know from what group they're

24   pulling.  They didn't do that so we don't know where they fall

25   in in these categories.

C57LMOOC                    Conference

1          THE COURT:  Here's my question.  We had this on the

2     docket for today.  I'd like to use at least between now and 11

3     when the next case comes in to get as much done as possible.  I

4     don't feel that it's useful when it just keeps throwing the

5     schedule off if you all, for whoever's fault, and I don't know,

6     but you all needed to be ready to proceed today.

7          So tell me how you'd like to proceed.  I hear

8     Mr. Anders say samples out of nine categories at least to

9     start.  If there is something you'd like to do, look, you want

10    me to start going through document one through 860 or whatever

11    number we're talking about, that's fine, but at some point

12    you're either going to say I understand your rulings, Judge, we

13    can stop the process or it's going to cost you.  It's not my

14    job to review hundreds and hundreds, almost a thousand

15    documents.  That's what special masters are for who you pay by

16    the hour.

17         You tell me what you'd like to do.  I'm willing to do

18    whatever you want, and I'm willing to give you all of the today

19    except for the roughly hour and a half or two hours that I've

20    got a settlement conference coming in at 11 o'clock.

21         MR. WITTELS:  May I confer for one minute?

22         THE COURT:  Sure.

23         MS. CHAVEY:  I'm ready, your Honor.

24         MR. WITTELS:  Your Honor, we would like to go back

25    into the room, but we'd like to show you a few documents so we

C57LMOOC                    Conference

 1    can just sort of have, so we have a flavor of what the dispute

 2    is, but we can go back in the room.

 3            THE COURT:  Sounds like an awful lot like defendant's

 4    proposal in some ways, but that's fine.

 5            Ms. Chavey, you've been standing for a minute.  Is

 6    there something you want to add before we start looking at

 7    documents?

 8            MS. CHAVEY:  I would agree with Mr. Wittels that it

 9    would be most useful to the parties to put some samples before

10    the Court and get rulings.  The parties did spend about two and

11    a half hours on Friday and we had scheduled a one-hour call but

12    we went long; and I don't believe we resolved any issues on the

13    approximately 20 documents that we looked at.  So we do need

14    some guidance, I think, to make any further conversations

15    between the parties directly effective.

16            THE COURT:  Fine.  Let's start with a few samples from

17    the plaintiff.  Then we'll do a few samples from the defendant

18    and we'll see what you want.  So pick your sample.  You'll need

19    to obviously hand me the documents.  Why don't you hand up ten

20    documents, five documents, not one at a time, and we'll start

21    with the plaintiffs.

22            MS. BAINS:  We can give you our stack and then refer

23    to the number.

24            THE COURT:  That's fine.  Okay.  Which document are

25    you starting with?

C57LMOOC                              Conference

1       MS. BAINS:  The top one, 45316, sorry, 315.

2       THE COURT:  All right.  NR0045315-16 deals with

3    exceptions to the pay freeze, does not involve any of the

4    plaintiffs, but I take it that your argument -- I'll let you

5    make your argument.  Go ahead.

6       MS. BAINS:  Yes.  So this is a document that was

7    produced before, before even the ESI protocol got started and

8    was redacted.  But this shows that Publicis Groupe is approving

9    personnel decisions.  It's centralized decision-making.

10       THE COURT:  All right.  So this goes to your

11    jurisdictional motion over Publicis?

12       MS. BAINS:  Yes, and also shows that all the decisions

13    for local offices are made at a high level.  They're

14    centralized.

15       THE COURT:  Okay.  On the defense.

16       MS. CHAVEY:  Your Honor, I believe, if I'm remembering

17    correctly, we had produced a form of this document in hard copy

18    with redactions over decisions as to individuals other than

19    Carleen Trimble.  We produced it because the plaintiffs had

20    seemed to identify Carleen Trimble as a comparator, as a female

21    without children who received better treatment.  So in

22    connection with other documents about Ms. Trimble that we

23    produced, I believe we produced this document.

24       THE COURT:  Why wouldn't this be part of the relevant

25    set for predictive coding?

C57LMOOC                        Conference

1          MS. CHAVEY:  There is one employee in here from

2    Frankfurt.  But putting that aside, it otherwise appears to be

3    reflective of individual employment decisions.  And the

4    plaintiffs' claim now, which is also what they articulated to

5    us on Friday with respect to a number of documents, is that

6    with regard to individual decisions, individual employment

7    decisions, they're seeking discovery where there appears to be

8    centralized decision-making.

9          That is a theory that we haven't been able to

10   understand.  We've reviewed the complaint again several times

11   after the conversation on Friday to try to find the contours of

12   that theory and we don't particularly understand it.

13         With regard to the issue of personal jurisdiction, I

14   believe that when we responded to the plaintiffs' single

15   request for production, we indicated that we had produced

16   documents already.  So this may be duplicative of what we had

17   already produced.

18         THE COURT:  That doesn't help me.  If it's duplicative

19   of something that was produced in paper form, I'm still not

20   sure why, and I'll even put it a different way, it would seem

21   to me it should be coded as responsive.

22         MS. CHAVEY:  Okay.  We will recode that on that basis.

23         THE COURT:  Let me be even clearer.  As I understand

24   it, it should be coded as responsive for two arguments:  one

25   that plaintiffs' counsel just made that it deals with the issue

C57LMOOC                        Conference

1    of whether Publicis has enough control over MSL to be a

2    defendant in this case jurisdictionally; but the second issue,

3    as I understand it from our previous conferences though this

4    was not articulated at the moment by plaintiffs' counsel, is

5    that the issue of the pay freeze and the exceptions to the

6    freeze being done in ways that prejudice the plaintiffs is a

7    relevant issue.

8              So code it as relevant.  It's one in the plaintiffs'

9    column.

10             MS. CHAVEY:  And as to the issue tags, we are

11   accepting the plaintiffs' coding on that.

12             THE COURT:  Okay.  Next.

13             MS. BAINS:  The next is NR47609.

14             THE COURT:  Hold it.  Are these in any order?

15             MS. BAINS:  They're in order, numerical order.  This

16   is a native file so it's not printed on it.  It's written on

17   it.

18             THE COURT:  Okay.

19             MS. BAINS:  The reason we believe this is relevant is

20   because it shows transfers and critical salary increases for

21   comparator Mr. Chamberlain to the named plaintiffs.  Also for

22   Melanie Babcock --

23             THE COURT:  I thought we decided we were not doing

24   comparators off of the email.

25             MS. BAINS:  No, I think that was about the custodians.

C57LMOOC                        Conference

 1    The custodians that were --

 2                THE COURT:  All right.  So, I'm sorry, who is the

 3    comparator?

 4                MS. BAINS:  The comparator is David Chamberlain.

 5                THE COURT:  What page is that on?

 6                MS. BAINS:  It is on the fourth page.  It was

 7    difficult to print this on all the columns fitting on one page

 8    so we made it a little larger.  But if you match it up, it will

 9    correspond to a salary increase and a transfer.

10                It also shows on the first page Ms. Melanie Babcock,

11    who is one of the declarants that MSL included a declaration

12    from in their opposition to the conditional certification

13    briefing.

14                THE COURT:  So what?

15                MS. BAINS:  So if they're including information from

16    people to oppose our class cert motion.

17                THE COURT:  Information about what?

18                MS. BAINS:  About the job duties and position as a

19    vice president.

20                THE COURT:  Why has that got any relevance to her

21    salary?

22                MS. BAINS:  It has her position and expertise.

23    Another argument that defendants are making is that there's an

24    expertise and that makes all the VPs and SVPs different from

25    each other.

1          THE COURT:  All right.  Let's focus on the David

2     Chamberlain issue.  For the defense.

3          MS. CHAVEY:  Your Honor, we viewed this document, as

4     well, as reflecting just a list of individual employment

5     decisions.

6          As to Mr. Chamberlain, we have produced compensation

7     data and other data that was requested with regard to

8     comparators.  So to mark this entire document as responsive

9     because it contains a piece of data about Mr. Chamberlain did

10    not seem appropriate.  It's a listing of individualized

11    decisions, and your Honor has already ordered that that is not

12    the subject of discovery.

13         MS. BAINS:  Your Honor, that wasn't our understanding

14    of how this process would work.  If a document has relevant

15    information on it or --

16         THE COURT:  If it's repetitive information, to wit,

17    how much money he's getting paid, and you've gotten that in

18    three or four other ways, you're going to -- it may be

19    marginally relevant, but it's going to mess up the predictive

20    coding process.

21         MS. BAINS:  Another thing it includes is an

22    explanation for the pay increase and also some of the duties

23    and --

24         THE COURT:  The explanation being what, promotion or

25    something?

C57LMOOC                    Conference

1          MS. BAINS:  It's a little hard with how it's printed.

2     But in the latter pages, there's explanations for each business

3     motivation, it's called.

4          THE COURT:  So what?

5          MS. BAINS:  So if it's a comparator, then it's

6     explaining why -- I mean apparently --

7          THE COURT:  We're getting to the point -- and the way

8     this is printed, I can't tell what it says about David

9     Chamberlain.

10         MS. BAINS:  If you look at the fourth last page.

11         THE COURT:  Okay.  I guess the question becomes if the

12     only relevance of this document is the David Chamberlain

13     information, how does this work in the coding system so that

14     the computer will know that it's because of David Chamberlain

15     and you're not going to create something where you're now

16     getting every salary increase document like this that doesn't

17     have David Chamberlain or any of the other people who are

18     flagged as either the plaintiffs or the comparators?

19         MS. BAINS:  Plaintiffs would propose that after we

20     speak to Recommind, after our experts talk to Recommind, there

21     could be backup coding on documents such as this.

22         THE COURT:  What do you mean by backup coding?

23         MS. BAINS:  What Mr. Anders described, how there would

24     be sort of out of scope category for documents that we've

25     withdrawn our relevance coding because it doesn't --

C57LMOOC                    Conference

1              THE COURT:  This is putting it in the scope, so to

2      speak.

3              MS. BAINS:  Right.  We'd like to talk to Recommind.

4              THE COURT:  Talk to Recommind.  It's marginal because

5      of David Chamberlain.  If there's a way to train the system

6      that the reason this is in is because David Chamberlain is a

7      comparator, that's one thing.  And maybe what -- I'll leave it

8      to your experts to figure out what to do.  See what is doable

9      and, if you need to, come back to me.

10             Next.

11             MS. BAINS:  The next is NR45698.  It's a spreadsheet.

12             THE COURT:  Okay.  You got to go slowly because I have

13     to find it.

14             MS. BAINS:  Yes.  It's NR45698.

15             THE COURT:  Okay.

16             MS. BAINS:  So, among others, this has named plaintiff

17     Laurie Mayers on it.

18             THE COURT:  All right.  Sounds like you need to handle

19     this like the other documents with the named plaintiffs is

20     train the computer that it's here because of the named

21     plaintiff and not because of all the other folks.

22             MS. BAINS:  It also shows reporting to Publicis, MSL

23     Digital is reporting directly to Publicis, so it's relevant to

24     the personal jurisdiction issue.

25             THE COURT:  Maybe, although by the time you get these

C57LMOOC                      Conference

1   documents, that issue is going to be decided, which is the

2   subject of next Monday's conference.

3          MS. BAINS:  I think we have another iteration

4   scheduled before that.

5          THE COURT:  Excuse me?

6          MS. BAINS:  The next iteration that will be trained

7   from the seed set documents.

8          THE COURT:  You'll be getting documents periodically

9   if that's what you mean.  Yeah, okay.

10          MS. CHAVEY:  And, your Honor, I believe the

11   jurisdictional question pertains to Publicis Groupe SA, which

12   is not referenced on this document.  There are various entities

13   that carry the name Publicis, but they're not the entity at

14   issue.

15          THE COURT:  Do we know what Publicis group this is?

16          MS. CHAVEY:  This is a group, I believe I've seen it

17   referred to as PRCC, that is connected to MSL and we've

18   produced documents thus far that include PRCC.

19          THE COURT:  So it doesn't have anything to do with the

20   jurisdictional issue?

21          MS. CHAVEY:  No.

22          THE COURT:  All right.  So it's relevant because of

23   Laurie Mayers.  Train the computer accordingly.

24          MS. CHAVEY:  And, your Honor, just so that our

25   position is clear on this document, it does mention Laurie

C57LMOOC                    Conference

1    Mayers and her salary, which is not disputed.  We could have a

2    stipulation as to what her salary was.  And it's duplicative of

3    lots of other information that we've provided about Ms. Mayers

4    and that she's provided to us because she knew what her salary

5    was.

6           So with the exception of that entry about her salary,

7    this document appears to us that the plaintiffs are trying to

8    do individualized discovery, which is what the Court has

9    already ordered is not permitted.

10         THE COURT:  All right.  But this does seem to show

11   increases so it may have some relevance as to why she was

12   getting an increase of 7 percent while somebody else was

13   getting increase of 4 percent which, of course, sounds like she

14   was doing very well.

15         MR. BRECHER:  Judge, one thing on this document to

16   keep in mind is that we had already produced very early in the

17   case the data from the human resources database PeopleSoft.

18   That has all of this information, so this is very duplicative

19   of what we've already produced.  So to produce every time a

20   named plaintiff might appear on a chart where they have their

21   salary, we've already given them.  What was point of giving

22   them our entire HR database?

23         THE COURT:  Let me raise this question with you.  If

24   we keep loading things like this in which are marginally

25   relevant but totally repetitive, it is going to affect the

C57LMOOC                    Conference

```
 1    output, obviously.  The defendant has previously said because

 2    of the $5 a document review cost, they want to stop reviewing

 3    after the top 40,000 documents.  I said I'm not deciding that

 4    yet.

 5              But the more of this sort of stuff that's repetitive

 6    that you push into the system, the more likely it is that --

 7    you are going to get cut off, whether it's 40,000 documents,

 8    50,000, whatever it is.  The more of this repetitive stuff that

 9    you load into the system, the less material you're likely to

10    get.

11              If you understand that and you still want this coded

12    as relevant with the subcode of Laurie Mayers, that's fine, but

13    don't complain to me when I cut you off at the end and you get

14    10,000 of these spreadsheets and, you know, that counts against

15    how many documents you get.

16              Is that really what you want?

17              MR. WITTELS:  Your Honor, we don't want to be cut off,

18    but we don't want to be training the system that because the

19    defendants have said, well, we gave you a different document

20    and they make that representation, doesn't necessarily pick --

21              THE COURT:  On this, we've been through this many

22    times.  You've gotten the W-2s, however painfully.  You've

23    gotten other salary information.  It's my understanding you've

24    gotten, however much you may have disliked the way you have

25    gotten it or other things, you have gotten full salary
```

C57LMOOC                        Conference

1    information for the plaintiffs, for comparators, etc., etc.

2            I agree this is marginally relevant.  If we were in a

3    paper world, it's repetitive, but so what.

4            What I'm concerned about -- I don't know how often

5    they run these -- if you load up a lot of this into the system

6    and it gets coded high for relevance because compensation is

7    one of your issue tags and this is a plaintiff, does it get you

8    anything?  And rest assured that I do believe in Rule 1 and

9    26(b)(2)(C) proportionality.  I don't know where the cutoff

10   will be or where I say if you want more, you're paying for it.

11           I'm just telling you if you want this put into the

12   system now, it is going to generate multiples of this document

13   or documents very much like it.  I don't know that that gives

14   you any new information about the named plaintiffs.  And as to

15   everybody else on the document, it's irrelevant unless and

16   until there is opt-ins or class certification.

17           You want it, you know, you got it.  I'm just telling

18   you, I'm making sure you understand the repercussions of that

19   now to an issue that we're going to face in however many months

20   it takes to finish this process when the issue is where do we

21   cut off production based on a cost and relevance issue.

22           If you want it, you have it.  If you don't want it

23   because of that, because it doesn't add anything to your

24   knowledge base, that's fine.  If you don't want to make that

25   decision now, you know, you could make it when you get back to

C57LMOOC                        Conference

1   your office and talk to your colleagues and reflect on it.

2           But I want the record to be clear that a lot of the

3   repetitive material will be multiplied through the use of

4   predictive coding and if this shows up in the top 40,000

5   documents 200 times, that may be 200 narrative documents that

6   you're not going to see depending on where the cutoff is.

7           Do you want to make a decision now or sleep on it?

8           MR. WITTELS:  I think we should reflect on it.

9           THE COURT:  Okay.  Just by tomorrow morning let

10  defendants know what you want done on it.

11          MS. BAINS:  Your Honor, the next document is NR67266.

12          THE COURT:  Is there really an issue of carryover of

13  vacation days in this case?

14          MS. BAINS:  There is an issue about the maternity

15  leave agreements.

16          THE COURT:  What's that got to do with vacation days?

17          MS. BAINS:  It's as applied to this individual's

18  maternity leave policy.

19          THE COURT:  And how do we know this is maternity

20  leave?

21          MS. BAINS:  Because of the lower email.

22          THE COURT:  Okay.  It's an individual who's not one of

23  your parties.

24          MS. BAINS:  There's a statement from corporate HR

25  about an exception to the normal carryover policy.

C57LMOOC                        Conference

1            THE COURT:  What is the normal carryover policy?

2            MS. BAINS:  It's showing that it's centralized at

3    corporate HR and that there's a carryover policy and an

4    exception is being made to it.

5            THE COURT:  All right.  Defense.

6            MS. CHAVEY:  Your Honor, there is no issue in this

7    case that we're aware of with regard to vacation carryover

8    policy.  That's never been alleged, ever, in anything that

9    we've seen or heard from the plaintiffs.

10           And, again, this raises the issue that we don't really

11   understand the scope of the plaintiffs' centralized

12   decision-making theory which doesn't come across in their

13   complaint.  We don't really know what they're referring to.

14           Valerie Morgan, who has been deposed, by the way, is

15   an HR person.  She may have been covering the Boston office at

16   the time although she does sit in New York.  But she's not part

17   of a select centralized team of male decision-makers -- that's

18   some language out of the plaintiffs' conditional certification

19   motion -- narrow inner circle of male executives.  She's

20   obviously not part of any group of male people, and she's not a

21   high-level executive.  She's an HR person who works there.

22           So the centralized decision-making theory that we keep

23   hearing in relation to the responsiveness of these documents

24   again seems to be the plaintiffs' effort to get discovery on

25   lots of individualized decisions that are not part of the case

1    per the Court's rulings already.

2              THE COURT:  All right.  I guess I'm confused as to

3    what the vacation day issue on maternity leave can possibly

4    have to do with sex discrimination, one way or the other, since

5    the only people who get maternity leave are female.  So maybe

6    some got two and a half days of vacation tacked on and others

7    didn't, so what?

8              MS. BAINS:  At the very least, your Honor, we think

9    this is referencing a policy with reference to maternity leave.

10             THE COURT:  It's referencing a policy about vacation

11   days.  It's not relevant.

12             MS. BAINS:  The next one is NR31468.  It's a

13   spreadsheet.

14             THE COURT:  Give me the number again.

15             MS. BAINS:  NR31468.

16             THE COURT:  Okay.

17             MS. BAINS:  Okay.  We believe this document is highly

18   relevant to the individual claims of Ms. Maryellen O'Donohue.

19   One thing she claims is that she was constructively discharged

20   and pushed out and that it was coincidental that Ms. Jeanine

21   O'Kane took over her position a few days after Ms. O'Donohue

22   left the company.  This shows that MS&L was recruiting

23   Ms. O'Kane during the time period when Ms. O'Donohue was still

24   at the company.

25             THE COURT:  I don't see that name on here.

C57LMOOC                      Conference

1          MS. BAINS:  It's under new names as of week of

2     11/16/09 towards the bottom.

3          THE COURT:  All right.  On the defense.

4          MR. BRECHER:  Judge, I think this is another example

5     of a document that is representative of individualized

6     decisions or actions with respect to various individuals.

7          I think the question we have to ask ourselves, is

8     this the type of document that we want the predictive coding to

9     spit out?  It seems to me that they're injecting into the

10     system documents that if we train the computer like this and we

11     get these types of documents, this case will go nowhere.  I

12     don't understand.  It seems that they're on our side, that

13     they're trying to put in documents to mistrain the system

14     perhaps to undermine it and justify their objections.  That's

15     the only reason I can think of.

16          These, we don't want to train the system to produce

17     documents like this.  This is not going to answer any dispute

18     in this case.

19          MS. BAINS:  Your Honor, it directly relates to the

20     dispute of constructive discharge of a named plaintiff and we

21     don't have this anywhere else, so.

22          THE COURT:  I guess one question is -- this is the

23     risk with allowing you to review documents that are

24     quote/unquote nonresponsive -- if you get this document in

25     paper, do you need it run through the predictive coding system

1    because I'm not sure how many names the computer will be able

2    to accept on what we're calling the special coding or whatever

3    you want to call it.  We've got the named plaintiffs.  We've

4    got David Chamberlain, the comparator.

5           Now we're going to have Jeanine O'Kane so that this

6    will be coded as only relevant because of Jeanine O'Kane, which

7    means you're likely to get lots of other documents about

8    Jeanine O'Kane which have nothing to do with this case.  That's

9    even assuming they can do this for an almost unlimited list of

10   names.

11          A solution is keep the paper document but don't use it

12   to train the system.  I'm open to suggestions, but I am

13   concerned that you are going to generate a lot of junk into the

14   system, that this is not generalized enough as a way to train

15   the computer.

16          So you tell me what you want to do with it.

17          MR. WITTELS:  We're going to have to talk, your Honor,

18   to Recommind about this and with the experts because under the

19   same line of thinking that your Honor just articulated, we're

20   concerned that documents that are responsive won't get pulled

21   out and, obviously, there's seems to be a reliability issue

22   here that we're concerned about with respect to the predictive

23   coding methodology that has to be sorted out, if it can be,

24   because defendants keep reiterating they don't understand the

25   complaint, which we think is pretty clear and articulates quite

C57LMOOC                     Conference

1    well and if you look at certain cases -- we're not going to get

2    into a case law argument.

3           But if you have high-level managers and a common

4    centralized policy of decision-making, which we allege, and

5    which many of these documents are showing, that's the theory

6    and those are the theories that the Supreme Court is allowing

7    to go forward.  So when they keep reiterating they don't

8    understand the theory, they then go back to --

9           THE COURT:  This one does not show anything about

10   centralized decision-making or anything else, or if it does,

11   that's not the argument your associate just made to me.

12          MR. WITTELS:  Well, it does, your Honor, because Jim

13   is the centralized decision-maker --

14          THE COURT:  Who's Jim?

15          MR. WITTELS:  He's the president of MSL North America.

16   So it's very relevant to his decision-making.

17          So what we're concerned, sure, we want the computer,

18   if it can be reliable, to review and produce these documents.

19          THE COURT:  Think about one other thing which is if

20   you throw predictive coding out, is this something that would

21   be found with key word searching.  You know, maybe if you're

22   searching for O'Kane, I'm not sure if -- a key word search for

23   Jim would bring up so much garbage, etc.

24          So you want this in with an explanation to Recommind,

25   you all try to work it out.  Just let's be clear, and this is

C57LMOOC                    Conference

 1   not a question for you to answer, it's a comment.  If you're

 2   trying to get the system to work as best it can, that's great.

 3   If you're trying to blow the system up, just think about what

 4   the alternative is which is key word searching.  You've already

 5   seen from the preliminary key word searches how much junk that

 6   brings back.  The budget on this case that the Court will allow

 7   is not unlimited.

 8           MR. WITTELS:  Your Honor, when you reference key word

 9   searching, are you saying, so I can understand it, that that's

10   an alternative or backup methodology that would be used?

11           THE COURT:  What I'm saying is I don't think your

12   predictive coding approach which you and Mr. Neil and DOAR

13   approved and then walked away from -- and I'm not trying to

14   rehash history.

15           Either predictive coding will work, and I don't see

16   that your method is so different from theirs or, for whatever

17   reason, predictive coding won't work in this case, and if we go

18   through this process and at the end of the day, after having

19   spent, you know, six months and $6 billion -- and I'm only

20   being facetious as to one of those figures -- if you prove to

21   me it doesn't work, the question will then be, okay, how do you

22   get the documents?  We're probably not going to do a different

23   predictive coding approach at that point.

24           The other logical thing with 3 million emails is the

25   good old-fashioned terrible key word search approach.

C57LMOOC                    Conference

1          So all I'm saying, and you've already seen some of the

2     results of that because some of the ways that they found the

3     documents for the seed set and working with you and your

4     colleagues was to use key word searches, Boolean key word

5     searches, but instead of reviewing every one of the multiple

6     thousand hits from each of those key word searches, they took

7     the top I think 50 and used that to generate documents for the

8     seed set.

9          So what I'm saying is if you were attempting to blow

10    up the predictive coding system -- and I'm not saying you

11    are -- instead of making it work the best way it can, just

12    remember that the solution of going back to the old-fashioned

13    key words is probably not going to get you a document like this

14    anyway and not without extraordinary expense.

15         So if you want this one in, why don't DOAR and

16    Recommind and one lawyer from each side have a quick conference

17    call and see what you can do with it, the fact that Jim is

18    relevant and the fact that Jennifer O'Kane is relevant.

19         Okay.  Next.

20         MS. BAINS:  Your Honor.

21         THE COURT:  And, obviously, any of these that turn out

22    to be ones that you quote/unquote win on today but decide it's

23    really going to mess the system up and we're merely keeping the

24    paper document on and moving that to a relevant production but

25    not relevant for the predictive coding is always an

C57LMOOC                          Conference

1    alternative.

2            Next.

3            MS. BAINS:  The next document is NR17405.

4            THE COURT:  Hold it.  Okay.

5            MS. BAINS:  This is an excerpt of a much larger

6    document that is a pitch.  But the relevance of this is it has

7    bios for many people, including named plaintiffs and

8    comparators Peter Harris, David Mankowski and others.  And one

9    of defendant's main defenses is that Peter Harris is not a

10   comparator to Maryellen O'Donohue or that someone in corporate

11   is not a comparator to someone in healthcare.  This shows

12   corporate people, digital people working on a healthcare pitch

13   together.  So we think it's relevant.

14           THE COURT:  All right.  Do you have any idea how many

15   pitches there are like this?  It this looks like it's a

16   standard form bio inserted into a particular client pitch.

17   Again, if you wind up with a thousand of these in the system

18   and they're within the most relevant that you get, you're going

19   to get them and that will knock out a thousand narrative

20   documents that you may not get when I do the cutoff.

21           Is this one where merely keeping this document in

22   paper form satisfies what you want or, on the assumption there

23   are going to be lots of pitches with our team bios in them,

24   that to put this through the system is going to, you know, just

25   load the system up with junk?

C57LMOOC                          Conference

1              MR. BRECHER:  Judge, well said, but I have the actual

2      document and it's about 70 pages.  As you can imagine with a

3      public relations firm that generally has to pitch clients,

4      there are hundreds and hundreds of client pitches where

5      people's bios would be included.

6              THE COURT:  That's what I just said.  So the question

7      is, look, plaintiff wants it, it's going to get it, but it's

8      convincing me more and more that there will be a cutoff based

9      on proportionality.

10             Do you want hundreds of these or is one of them

11     enough, and by "one" I mean the paper version of this

12     presentation.  My guess is there's bios like this in every

13     customer presentation.

14             MS. BAINS:  We'll consider it.

15             THE COURT:  Okay.

16             MS. BAINS:  The next document is NR7534.

17             THE COURT:  What am I looking for in this?

18             MS. BAINS:  On the email that starts near the top of

19     the first page, it references Zaneta, that's a named plaintiff,

20     and it talks about her maternity leave.

21             She does not have an employee ID yet and Zaneta is on

22     leave and may not return to work.  We can leave Zaneta and

23     George off the list.

24             And her return to work is a disputed issue, whether

25     she wanted to or not.

C57LMOOC                          Conference

1          THE COURT:  It's about the workplace giving campaign,

2    which I assume is a United Way or something like this.

3          MR. BRECHER:  Judge, first point with Zaneta Hubbard,

4    Zaneta Hubbard is not a named plaintiff.  Zaneta Hubbard was an

5    opt-in plaintiff for the equal pay case.  So she doesn't have a

6    pregnancy discrimination claim at the moment.  She has an equal

7    pay claim that is time barred, No. 1.

8          No. 2, I think this is a critical difference that

9    we're having is they're under the impression that any time a

10   named plaintiff's name appears in any email that they're

11   entitled to that document.  Even if we were in a paper world in

12   a simple single plaintiff employment discrimination case, we

13   would not be producing emails, every email where a plaintiff's

14   name appears.  It just it would be impossible even in a single

15   plaintiff case.  To extrapolate that into a class-wide case is

16   crazy.

17         THE COURT:  All right.  Since this is not an equal pay

18   issue --

19         MS. NURHESSEIN:  Your Honor, if I could add one

20   comment.  Ms. Zaneta Hubbard does have an Equal Pay Act claim.

21   But as my colleague pointed out, the circumstances of her

22   termination are disputed and that relates directly to her

23   damages in the case.  And so we do think it's relevant and also

24   think Mr. Brecher mischaracterized our position.

25         THE COURT:  How is the equal pay and her departure

C57LMOOC                    Conference

1    connected -- what am I missing -- in the complaint?

2            MS. NURHESSEIN:  In terms of the damages to which she

3    would be entitled in terms of front pay and damages.

4            THE COURT:  I thought the Equal Pay Act case is for

5    pay while she is employed.  If she ain't employed, her pay

6    isn't unequal unless you're claiming that she was fired in

7    retaliation for something, which is not part of the opt-in

8    case.  I fail to see it.  And, in any event, in general, this

9    is a United Way campaign email.

10           MS. NURHESSEIN:  Your Honor, the subject, the email

11   may relate in part to the United Way campaign, but it contains

12   responsive information.

13           THE COURT:  That's the question.  I don't see it.

14           Okay.  This one is not relevant.

15           MS. BAINS:  Okay.

16           THE COURT:  Let's cut your list.  One more of yours

17   and then let's go to some of the defendant's list and then you

18   can all go and confer.

19           And it may be that one of the most useful things you

20   can do during that is a very quick phone call if one of you

21   either has your BlackBerry or if not, because you're out of

22   towners, to borrow the plaintiff's or go to the pay phone and

23   get some quick supplemental advice from Recommind so we're not

24   doing a lot of work based on, well, Recommind can code it extra

25   to show the names of plaintiffs or comparators and then find

C57LMOOC                          Conference

1   out that really doesn't work.

2          MS. BAINS:  The next one is NR65386.

3          THE COURT:  Okay.

4          MS. BAINS:  If you could look at the middle of the

5   page in the paragraph that starts "Dear Robert, thanks," in the

6   middle of that paragraph it says, "you know that we are still,

7   the whole group, in a hiring freeze period of time and that we

8   can recruit by exception but that each recruitment has to be

9   authorized by the group's CFO, Jean-Michel, and by Mathias

10  Emmerich, the group HR."

11         This relates to Jean-Michel and Mathias are Publicis,

12  high-up Publicis executives, so it relates to the

13  jurisdictional issues, and also the group-wide, meaning

14  Publicis group-wide freeze.  So we think like the first

15  document we went through, this is relevant for similar reasons.

16         MS. CHAVEY:  Your Honor, Robert Yohansen at JKL Group

17  is not an MSL Group in the Americas.  JKL Group is a

18  Nordic-based company that's part of Publicis Groupe, but it's

19  not part of MSL Group.  This purported class action is confined

20  to public relations employees.

21         THE COURT:  How did this get into MSL?

22         MS. CHAVEY:  Your Honor, I believe it came, it must

23  have come through -- I'm not sure, but I imagine it came

24  through Peter Miller's email box.  Peter Miller is the

25  worldwide chief financial officer; he sits in New York.  And so

C57LMOOC                         Conference

1    by taking on his emails, we have seen lots of emails about

2    things around the world that he may have responsibility for,

3    but it has nothing to do with this case at all or the

4    jurisdictional issue or anything else.

5           MS. BAINS:  Your Honor, Olivier Fleurot, who's the CEO

6    of MSL Group, is also on this.

7           THE COURT:  I know, but if the pay freeze and head

8    count freeze is for a different subsidiary.

9           MS. BAINS:  It's referencing the entire group which it

10   says, you know that we are still, the whole group.  So it

11   references a group-wide decision.

12          THE COURT:  Fine.  Produce it.  I mean mark it

13   relevant for that basis.

14          Okay.  Let's now go to some defendant documents so I

15   can give you some guidance your way and we'll go from there.

16          MR. WITTELS:  Your Honor, while they're looking, one

17   problem from our standpoint is we don't have any phones so

18   we're at a big disadvantage here.  We would have to go out to

19   get to a phone.

20          THE COURT:  You know, the first answer is it's been

21   two years since you've been allowed to bring phones in if you

22   get your smart pass or whatever we call it.  And if you guys

23   haven't done it and you're local, shame on you.  The folks who

24   are not New York-based can't get it.  Mr. Brecher is the only

25   one -- Melville, New York State bar.  You know, on the

C57LMOOC                    Conference

1    plaintiffs' side, you all should have your smart passes.  But

2    if you don't, that's what pay phones are for.

3          MR. WITTELS:  We'll walk outside today but is smart

4    pass the bar card?

5          THE COURT:  Yeah, the bar card.

6          MR. WITTELS:  New York State.

7          THE COURT:  I cannot believe people who have been so

8    upset that we didn't allow it in have not read the 200 notices

9    in the law journal.  If you have your state bar card, you bring

10   it in to our either audio visual or district executive office

11   on the day that's allowed, which I think is maybe a Thursday,

12   and you get issued an S.D.N.Y. bar card which allows you to

13   bring your one cell phone in per lawyer who has that card for

14   the rest of your life.  So the fact you don't know about it,

15   you should.  Okay.  Otherwise, do what you got to do with cell

16   phones.  Just use your time well.

17         Okay.  Personnel action notice, NR67445.  And I guess

18   there are three of these, for the record, 67445, 76345, 76347.

19         MS. CHAVEY:  Your Honor, these are three personnel

20   action notices that we've provided as examples because these

21   are ones that we marked as not responsive, plaintiffs have

22   marked these as responsive.

23         Our position is that these pertain -- I guess two

24   things.  First of all, they pertain to individual employment

25   decisions.  These individuals are not comparators.  They're not

C57LMOOC                        Conference

1    named plaintiffs.  They're not even the opt-ins.

2          But also your Honor had already ruled with regard to

3    the personnel action notices.  That was the subject of a prior

4    conference, and your Honor ordered that the plaintiffs provide

5    us with a sampling proposal, which they did.  We provided all

6    the samples, and we never heard another thing about it.  So to

7    mark these documents as responsive because they pertain to

8    individual decisions is not something that we would agree to.

9          MS. NURHESSEIN:  Your Honor, all the personnel action

10   notices are relevant because, as you can see at the bottom,

11   every PAN has to be approved by both the group CFO or MSL

12   America CFO as well as a representative from North America

13   headquarters.

14         THE COURT:  We dealt with this in a separate way.

15         MS. NURHESSEIN:  Sure.  And, your Honor, if I can just

16   comment on that, if I recall your ruling correctly, you ordered

17   a sample of the PANs.  I believe you ruled that the PANs were

18   relevant, but you ordered a sample based on burden argument

19   articulated by defense counsel.  Their argument was they would

20   have to go through all the personnel files to pull the PANs.

21   That was the reason why I believe you ruled that only a sample

22   would have to be produced.  Here there's no burden and all the

23   PANs relate to our theory of centralized decision-making.

24         THE COURT:  You know what, you can have every PAN that

25   comes up through this system and one less responsive document

C57LMOOC                    Conference

1    for each one.  I'm going to use this as a cutoff.

2            Is it that relevant to you that you want every single

3    one of these, might be thousands of them, and when they tell me

4    that they want to cut off at 40,000 documents or less or more

5    and these are in the top 40,000 responsive documents, I don't

6    want to hear any arguments that you didn't get what you're

7    looking for because you got so many personnel action notices.

8            MS. NURHESSEIN:  And, your Honor, I do understand your

9    rulings today and we can, in light of your comments, we will

10   consider whether we -- we'll discuss it internally, consider

11   whether we need all of them.

12           THE COURT:  That's what the computer will give you.

13   So either these come out because you've done your sampling and

14   I want to go back and try to look at my notes on what we did

15   with that.

16           You know, since these are individual and what you're

17   saying is it shows, not that this really does show it because

18   this has no signatures, at least on some of them, all of them,

19   you know, if what you're trying to show is that personnel

20   actions require some sort of sign-off, the sample in a

21   deposition that you've done should give you that.  I don't see

22   what these give you at all.  It's a form.  The bottom of the

23   form says all salary-related changes and terminations must have

24   two signatures in order to be processed.

25           MS. NURHESSEIN:  Yes, your Honor.  I mean it's an

C57LMOOC                        Conference

1    example of a policy or practice.

2            THE COURT:  What do you need these for?  How many

3    samples did you get through the prior paper discovery of the

4    personnel action notices?

5            MS. NURHESSEIN:  Your Honor, I don't recall the exact

6    count.

7            THE COURT:  Approximate.

8            MS. NURHESSEIN:  It may have been around a hundred or

9    so.

10           THE COURT:  And they all -- it's a form.  Seriously.

11           MS. NURHESSEIN:  Yes, your Honor.  And one thing I

12   would also note is that at the last conference you did indicate

13   to defense counsel that an alternative to producing all the

14   PANs would be for them to stipulate that certain central

15   decision-makers are required to sign off on all the PANs and I

16   don't believe they ever responded to that.

17           THE COURT:  You've got a hundred of them.  You're

18   going to show a hundred of them to the jury, in theory, if you

19   don't get the answer you want at a deposition.  Is 200 or 500

20   going to make any difference?  It's a standard form document.

21   It seems either, you know, there is an explanation that this

22   says it but it's not true and that will be the same whether you

23   have 500 of these or one.

24           Okay.  I'm ruling these as nonresponsive.

25           MR. WITTELS:  Well, your Honor, our concern is that

C57LMOOC                     Conference

1   these are the documents to train the system and while your

2   Honor is alluding to, you know, the cutoff, what we're

3   concerned about is that by knocking documents out that

4   obviously are relevant, because this does show a central

5   policy.

6          THE COURT:  Why are these -- look, it's very simple.

7   Do you want thousands of these?

8          MR. WITTELS:  No.  What we want to do is be sure that

9   the computer is trained properly and I mean that's the --

10          THE COURT:  Training the computer properly means it

11   will say, oh, personnel action notices are relevant.  Any time

12   it sees one of these documents, which is a standard form,

13   regardless of the name of the person or what happened or

14   anything else, it's going to say these documents are relevant.

15          Now, I don't know how many are in the 3 million ESI

16   documents that are in this system, but let's say there are a

17   thousand of these.  That's going to come up relatively high in

18   the coding.  That means, you know, let's say there are 5,000

19   and let's say that I agree with them at a later point that

20   40,000 is the cutoff.  If these are in the top 40,000, you're

21   going to get that and you're not going to get the next 5,000

22   documents that may be much more relevant to you.  Pick your

23   poison.

24          MR. WITTELS:  All right.  May we consider this?

25   Again, it's a matter of walking a delicate line to make sure

C57LMOOC                        Conference

1    that we code it properly and at the same time don't eliminate a

2    relevant genre or category, so.

3              THE COURT:  I still fail to see how a standard form

4    document that isn't signed that you have a hundred samples of,

5    giving you more of them doesn't seem to me is any more

6    relevant.

7              Let me hear from the defense on this.

8              MR. BRECHER:  Judge, quickly, I think we've been down

9    this road before.  That was the whole point of producing the

10   sample PANs.  They had argued we need to see the

11   decision-making, who's approving those.  We explained that a

12   PAN, there's hundreds and thousands of these.  Every time any

13   name is changed, an address is changed, anybody is hired, you

14   know, there's thousands of these.

15             So you ruled give them a sample so that they can see

16   what the decision-making process is.  They gave us a sample

17   size.  We didn't even object to it, Judge.  We gave them the

18   sample PANs.  That was the resolution of the issue.

19             So now they're saying even though we've done sampling

20   and you ordered sampling, give us them all anyway.

21             THE COURT:  I'm ruling these out, period.

22             Next.

23             MR. WITTELS:  Your Honor, you say you're ruling them

24   out, for the purposes of coding, not that they're irrelevant,

25   but they are, in other words, they are relevant, but --

C57LMOOC                        Conference

1          THE COURT:  They are being coded as not relevant for

2    training the system.

3          MR. WITTELS:  Right, even though the document itself

4    is acknowledged to be pertinent and relevant to the

5    centralized.

6          THE COURT:  You have the sample.  That's all you need.

7    You don't need any more.

8          Okay, next, NR7944.  Are these -- you gave me three.

9    Should I put all three?

10         MR. BRECHER:  Separate documents.

11         MS. CHAVEY:  They're separate documents, your Honor.

12   They do all pertain to individual employment decisions that are

13   not related to a plaintiff.  They don't reflect a policy or

14   practice.

15         The first one, 7944 appears to be an exchange about

16   somebody named James's departure and the announcement of it.

17         THE COURT:  Yep.  What's the relevance?

18         MS. CHAVEY:  7944.

19         MS. BAINS:  Your Honor, this must have been one that

20   we inadvertently marked relevant.

21         THE COURT:  Okay.  So you agree it's not relevant.

22         We move on.  NR9120.

23         MS. CHAVEY:  Your Honor, this is an announcement of

24   somebody named Holly Jerrill being promoted, and we don't see

25   what the responsiveness of this would be.  I mean the

C57LMOOC                        Conference

1   announcement is being made by the president of the company, but

2   there's nothing in there to suggest that it has any responsive

3   quality for this case.

4          MS. BAINS:  Okay.  First, I've seen this document

5   marked as responsive by defendants many times, so there's an

6   issue of inconsistency.  And second --

7          THE COURT:  I thought you all worked the

8   inconsistencies out.  If it's not relevant, it should be marked

9   not relevant throughout and you'll need to do a search for it

10  to pull it out.

11         MS. BAINS:  Can I address that?  Actually, I think

12  what defendants did to address the inconsistencies was run a

13  computer program to find exact duplicates.  I can hear what

14  their position is, but it's my understanding that it wouldn't

15  pull out further chains of emails where the relevant part was

16  common to both, so.

17         THE COURT:  Okay.  But marking this relevant in this

18  version doesn't help you, and they have to figure out how to

19  pull all other versions of this unless it's attached to

20  something else that is relevant.

21         So they're going to do the best they can.  To the

22  extent you have information, you know, that says this is also

23  in the system as responsive one, two, three, four, tell them

24  that and that's what I thought you all did last week.

25         MS. BAINS:  We did.

1        THE COURT:  So why is this relevant?

2        MS. BAINS:  This is an email from Jim Tsokanos, the

3   president of North America.  One of our allegations is the

4   reorganization led to the discrimination against women.  In the

5   last paragraph --

6        THE COURT:  I assume Holly is a female.

7        MS. BAINS:  Yes.  In the last paragraph it says Holly

8   will be joining Tara, Maury, our managing directors, and I on

9   the MSL North America team.  It gives color to the

10  reorganization into a centralized North America team.

11       THE COURT:  So any document that has "team" in it is

12  going to be relevant in your view?

13       MS. BAINS:  No, it explains who is part of the team

14  and the reorganization that defendants are unaware of who

15  actually would be part of this centralized team.

16       THE COURT:  First of all, this is in '08.  I thought

17  you said the re-org was later.

18       MS. BAINS:  We allege it started at the beginning of

19  '08.

20       THE COURT:  This sounds like usual internal PR,

21  somebody got promoted, isn't that wonderful.  If what you're

22  saying is the fact that it says the North America team is what

23  makes it relevant, I find that somewhat hard to believe that

24  that is going to make or break your case here.

25       MS. BAINS:  It seems to me the defendants are denying

C57LMOOC                    Conference

1    that they know what the reorganization is and what the parts of

2    it is.  This illuminates that.

3              THE COURT:  Not really.  It doesn't illuminate it to

4    me.

5              MS. CHAVEY:  I can address the issue about the

6    reorganization.  The allegation is that there was a

7    reorganization that began in '08 and is continuing today.

8    That, we still don't know what that is.  As it pertains to the

9    centralized decision-making, again, the allegations in the

10   complaint are virtually nonexistent about centralized

11   decision-making.  To the extent --

12             THE COURT:  Assume it's in the case for this purpose.

13             MS. CHAVEY:  To the extent the allegation is in the

14   case, it is about a male executive team that makes decisions

15   together and Tara being the first person listed, it just

16   doesn't even -- and Holly joining the team doesn't seem like

17   this is the team that's at issue.  But if any team is going to

18   be deemed to be potentially a centralized decision-making team,

19   then the doors are just blown wide open on discovery and this

20   is a fishing expedition and not discovery on a theory that's

21   been articulated.

22             MS. BAINS:  We have the organizational charts that

23   were made after the reorganization that shows exactly who's on

24   the team and, you know, this is building upon that team and

25   they call it consistently the North America team.

C57LMOOC                        Conference

1          THE COURT:  Well, they also refer to Holly and her

2    team.  Team seems to be a word for people who work together.

3          MS. BAINS:  It's not the team that I'm referring to.

4    The MS&L North America team, I haven't seen that referred to

5    anybody else.  It's corporate HR, it's Jim Tsokanos, his

6    regional heads.

7          THE COURT:  All right.  I don't buy your theory but

8    figure out a way to code it that shows that it's the last

9    paragraph, first sentence, that's what makes this document

10   relevant.  It's borderline in the extreme.

11         Next, NR32327.

12         MS. CHAVEY:  This document from April of 2009 is from

13   the same HR person whose name we saw before, Valerie Morgan.

14   She's emailing Neil Dhillon, who's the managing director in

15   Washington, D.C., and she's just talking about potential

16   candidates for a low-level position, assistant account

17   executive.  We don't see what the responsiveness of this is

18   either.

19         MS. NURHESSEIN:  Your Honor, I can address that.

20   First of all, Valerie Morgan is part of the North America or

21   corporate HR team.  She didn't just manage --

22         THE COURT:  So what?

23         MS. NURHESSEIN:  This document is relevant to the

24   jurisdictional, the personal jurisdiction inquiry.  One of the

25   relevant factors under New York CPLR 301, one of the factors

C57LMOOC                        Conference

1    that courts consistently consider when deciding whether a

2    subsidiary is a mere department of the parent is whether the

3    parent is involved in the personnel decisions of the sub and

4    also if it fails to observe corporate formality.

5             A typical example of that is when the parent, when you

6    have employees that are shifted among various subs of the

7    parent.  Here Valerie Morgan is talking about an employee who

8    works for Publicis Consultants, which at the time was a

9    separate subsidiary of Publicis, and talking about potentially

10   shifting an employee from Publicis Consultants to MSL.

11            So we think it's directly relevant to the

12   jurisdictional inquiry and the joint discovery that the Court

13   ordered as part of the jurisdictional discovery order.

14            THE COURT:  Comment?

15            MR. ANDERS:  Your Honor, in this case they're not

16   shifting her over.  It's not a situation where one subsidiary

17   is saying you can borrow our employee.  It looks like they're

18   saying here's somebody you might want to hire.  It looks like

19   it's an external hire.

20            MS. NURHESSEIN:  Your Honor, I would not call that an

21   external hire.  Another thing I didn't mention is you have the

22   same HR person, Valerie Morgan, handling personnel decisions

23   for both Publicis Consultants and MSL, and I think that clearly

24   shows a lack of corporate formalities.

25            MS. CHAVEY:  Your Honor, I'd like to respond as well.

1  Publicis Consultants is what MSL calls a conflict shop.  I

2  don't believe it exists any longer.  But Wendy Lund, who ran

3  Publicis Consultants, was the manager for two of the plaintiffs

4  here, Maryellen O'Donohue and Monique da Silva Moore.  So we

5  never contested that Publicis Consultants is part of the case.

6  We provided discovery about it and here again --

7          THE COURT:  So this is not the Publicis in France that

8  is at issue.

9          MS. CHAVEY:  No.  That's Publicis Groupe SA.  That's

10  the parent company.  Publicis Consultants is just another PR

11  firm that we've enveloped into the case for purposes of

12  discovery here.

13          MS. NURHESSEIN:  Your Honor, I think Ms. Chavey is

14  confusing two separate issues.  There's the Publicis

15  Consultants system there, and then the personal jurisdiction

16  analysis, which is different, and the lack the corporate

17  formalities.

18          THE COURT:  This doesn't show lack of corporate

19  formalities.  I'm going to say this gets coded as not relevant.

20          MS. NURHESSEIN:  Your Honor, we take exception to

21  that.  We believe it does show lack of corporate formality.

22          THE COURT:  You know how to file objections.  I'm sure

23  Judge Carter will love to see you.

24          You're not old enough to take exceptions.  That's an

25  old New York lawyer's term that I think got eliminated in

C57LMOOC                    Conference

1    thirties if not whatever, although some New York state lawyers

2    still use it.

3         Okay, NR14140.

4         MS. CHAVEY:  Your Honor, these three documents that

5    we've just handed up, which are 0014140, 0054589, and 0007799,

6    are all basically financial statements that are of the same ilk

7    and that's why we've grouped them together for purposes of the

8    Court's consideration, but they all are just financial

9    statements.

10        The first one, which is 14140, is of the Los Angeles

11   office, December of '08, and it just shows what the different

12   numbers are in terms of the forecast and the commitments and it

13   doesn't have any responsive quality.

14        THE COURT:  What's the relevance?  And, frankly, that

15   question goes to all three of these.

16        MS. NURHESSEIN:  Your Honor, it's a little hard to

17   read these but generally, the forecasts, I believe that's what

18   this is, the forecasts are relevant for a couple reasons.  One

19   is for Publicis' policy, the Janus book, all the MSL forecasts

20   are rolled up from MSL to corporate headquarters and then they

21   go to Publicis, the parent company in Paris.

22        THE COURT:  You don't need each of these.  You've got

23   the policy statement that says it's rolled up.  What else?

24        Okay.  The document is not relevant.  That goes for

25   all three of them.

C57LMOOC                    Conference

1              Next.  This is probably your last group so pick a good

2      one.

3              Okay, let's start with the first one, NR2248, which

4      seems to be passing on an article about this lawsuit.  What's

5      the relevance?

6              MS. BAINS:  Well, this is directly responsive to not

7      only plaintiffs', one of plaintiffs' requests, but also

8      defendant's request for all correspondence regarding the

9      lawsuit.  So I mean this passing on also to the president of

10     the company, Jim Tsokanos, we think is relevant and also

11     responsive.

12             THE COURT:  Why?

13             MS. BAINS:  Because it's information about the lawsuit

14     that's getting passed on to the president.  Also, it has

15     information about the lawsuit, so if you're talking about --

16             THE COURT:  It's a press release for God's sake.  It's

17     a press release.

18             MS. BAINS:  But if you're talking about the training

19     the system, it has the substance of the lawsuit which is

20     basically the words we're trying and the concepts we're trying

21     to capture in the process.

22             THE COURT:  Well.

23             MS. CHAVEY:  Your Honor, this just appears to be an

24     article from PR week, which is probably based on the press

25     release that the plaintiff issued at the time, and it doesn't

C57LMOOC                      Conference

1    have any relevance.  There's no issue.

2            THE COURT:  I guess this document doesn't have

3    relevance.  The question that I guess plaintiffs are saying is

4    by putting this into the system as relevant, it may pull up

5    internal memos about the lawsuit, etc.  So I think it's on its

6    face a useless document, but for training the system, I'll let

7    it be relevant.

8            MS. CHAVEY:  Your Honor, our position is that training

9    the system with documents that are not responsive isn't going

10   to be effective.

11           THE COURT:  The concepts in the document are

12   responsive, albeit the fact that a press release getting

13   circulated is not particularly interesting.  So, okay, the

14   Court has ruled.

15           Next.  NLR15000.  What is this?

16           MS. CHAVEY:  This document is a long spreadsheet that

17   reflects Twitter coverage of the lawsuit and it's many, many

18   pages and it has a bunch of information about websites and

19   different, I guess, individuals tweeting on Twitter about the

20   lawsuit.  And we do not understand what the responsiveness of

21   this document would be.  It doesn't appear to have any tweets

22   from individuals who, you know, from any of the named

23   plaintiffs, for example, or anybody at MSL Group.  It just

24   doesn't seem to be responsive at all.

25           MS. BAINS:  It's hard to tell just in a few minutes if

C57LMOOC                      Conference

1    it doesn't include anyone from MSL Group or Publicis, but there

2    is commentary in here similar to in the last document about the

3    lawsuit.  It's a little hard to read the way it's printed, but.

4              THE COURT:  The question is sort of considering the

5    way tweets read, what's the point of this?

6              MS. BAINS:  Again, it's the same argument as the last

7    document.  It does have information in here that's I think the

8    same --

9              THE COURT:  Marginally.  I guess the question is how

10   often otherwise do you have documents dealing with Twitter?

11             MS. BAINS:  If there's commentary by an MSL employee,

12   I'm assuming that these are MSL people.  It's a little hard to

13   tell.

14             MS. CHAVEY:  There's no basis for making that

15   assumption, your Honor.

16             THE COURT:  I didn't make that assumption, and even if

17   it is, so what?  I guess my question is you are a PR firm.  Do

18   you have lots of runs with Twitter accounts and is there going

19   to be a way to train the system that the reason this is

20   relevant is not that it's Twitter coverage of something but

21   that it's got to do with this lawsuit.

22             Does the Recommind system allow you to explain the

23   basis for coding?

24             MR. ANDERS:  I don't think so, your Honor.  The way

25   I've had my discussions and what we discussed in response to

C57LMOOC                    Conference

1    plaintiffs' concerns is, you know, potentially having further

2    tagging of particular documents.  But at some point if you have

3    too many of those subtags, it becomes unworkable.

4            THE COURT:  All right.

5            MS. BAINS:  Your Honor, I did notice there are a few

6    entries by Twitter.com/MSL Group, so that's directly from the

7    company.  I can't tell the way this is printed what they wrote,

8    but I do see some commentary in here like, wow.  If MSL is

9    commenting on the lawsuit, I think that's relevant.

10           THE COURT:  I'm not sure it's MSL as opposed to an MSL

11   employee.

12           MS. BAINS:  This is their official Twitter:

13   Twitter.com/MSL_group.

14           THE COURT:  Show me.

15           MS. BAINS:  It's on the third page or fourth page

16   after the cover page.  The commentary is on separate pages.

17           THE COURT:  I don't even see the --

18           MS. BAINS:  It's towards the bottom on the third page

19   of the document, but with the cover page it's the fourth page.

20           THE COURT:  Okay.  Is that MSL's official Twitter

21   page, Twitter account?

22           MS. CHAVEY:  I don't know.  I know that the plaintiffs

23   had asked us in discovery about any social media postings about

24   the lawsuit, and we had not found that there was any after due

25   diligence talking with our client.  So I don't have any reason

1  to think that it is.

2          THE COURT:  Yeah, well, it looks like it might be

3  because what appears to be linked to one of those is a comment

4  that says, please see our official statement http://blog.MSL

5  Group.com, etc.  Okay.  Well --

6          MS. CHAVEY:  Your Honor, the substance of the document

7  appears to be a list of headlines about the lawsuit.  I mean

8  Publicis sued for alleged hundred million dollar gender bias

9  lawsuit.  Yes, it was.

10          MS. BAINS:  There's commentary here too:  I hate to

11  read things like this.  I hope it all gets straightened out, is

12  an example.

13          THE COURT:  And what's the relevance of that?

14          MS. BAINS:  Well, it depends who's saying it.

15          THE COURT:  Frankly, it doesn't matter who's saying

16  it.  Let's say it's Jim Tsokanos.  I hate to read that we've

17  been sued.

18          Look, as with all of this, my concern is if we're

19  looking at this particular document, it is largely irrelevant.

20  If you want to go do a Twitter search historically as to who

21  commented on the lawsuit, including MSL, that's publicly

22  available information.

23          The concern is if this is a standard type document

24  where they run Twitter, you know, commentary on particular

25  client matters, you're going to get so much junk.  And you can

C57LMOOC                    Conference

1   get this in other ways, it would seem to me that this one

2   should get coded as nonresponsive merely to protect your

3   getting junk.  So that's the answer.

4           All right.  Let me give you each back your sets of

5   documents.  This is the plaintiffs' set and this is the

6   defendant's.  All right.  I'm going to take my 11 o'clock

7   conference.

8           You all are going to go into the jury room and keep

9   working this out.  If you resolve it before 1 o'clock, let me

10  know and we'll squeeze you in before lunch, assuming I'm done

11  with the settlement conference I'm about to do.  Otherwise, you

12  can eat lunch from one or two or whenever you want and we'll

13  resume at 2 o'clock and spend as much time as we need to to

14  resolve all this.

15          I would certainly hope perhaps taking five minutes to

16  go to the pay phone and call Recommind and DOAR respectively

17  that you can get some further guidance from the experts on what

18  sort of special coding can be done or whether it's just getting

19  too ridiculous and, therefore, we have to be careful what we're

20  putting in the system.

21          MR. ANDERS:  Your Honor, if I may, on my way in this

22  morning there were two attorneys in front of me bringing in

23  their computers.  Can I bring it in today?

24          THE COURT:  It's too late now because I can't get you

25  the order in any shape of time, so you're out of luck.

1           MR. ANDERS:  Thank you.

2           THE COURT:  If you need to break into separate groups,

3    you can also use the rather claustrophobic mini rooms that are

4    between the two sets of doors on the left.  Make sure things

5    are open.

6           (Recess)

7           THE COURT:  All right.  Where are we?

8           MR. WITTELS:  Judge, I think we made some good

9    progress with the defendants and we have a proposal to make to

10   you and the defendants, I believe, are in agreement with it.

11          The proposal would be this:  We would like to present

12   a number of documents for you to review now that we still have

13   some disagreements about.  We propose then to go back to the

14   room here and finish the hard copy documents we have.

15          Thereafter, we both consulted with our experts about

16   timing.  We would have a call, we have a call scheduled from

17   three to five tomorrow with the experts after we've consulted

18   with them and showed them the issues that are problematic.

19          We would then by Wednesday at six exchange any change

20   in coding that the parties agree on in light of the rulings

21   today and going back to the rulings this morning.

22          Thursday, we have an all day meet and confer with each

23   other scheduled to go over any further disputes in light of the

24   change in coding, to see if we can resolve this and narrow it

25   down to whatever few remaining documents there are, hopefully.

C57LMOOC2

1            And to come back to you on Monday when we're scheduled

2       and have your Honor resolve any further disputes, if you're

3       agreeable to that.

4            THE COURT:  Let's see where we are at the end of

5       today.  I really -- we're going to have a lot to do on Monday

6       with the Publicis-related issues, No. 1, and, two, and I'd have

7       to find in the ever-growing stack of papers you have, but we

8       are obviously getting further and further behind on the

9       schedule you all agreed to and I'd like to try to avoid that.

10           So whatever we can resolve today, as painful as it is

11      to have all-day sessions with you guys, I'd rather do it sooner

12      rather than later.

13           But let's start with the ones that you each want me to

14      give you my 2 cents on and we'll go from there.

15           MS. CHAVEY:  Your Honor, I just wanted to mention that

16      there are some markings in dispute that we have talked about.

17      We just talked about some of them.  And because some of them do

18      relate to the question of personal jurisdiction, our proposal

19      was we would like Publicis Groupe to be involved in those

20      conversations.  So there are some documents in that category

21      that, even if we can resolve other things, we'd like to push to

22      Monday, if we could.

23           THE COURT:  All right.  So whose turn is it or how are

24      we doing this?

25           MS. BAINS:  We have a couple documents and then

C57LMOOC2

1       defendants have a couple documents.

2               THE COURT:  Fine.  Start with plaintiffs.  Okay.

3               The first one you've handed me is NR9153.

4               MS. NURHESSEIN:  Yes, your Honor, and if you turn to

5       the last page of the document, NR9157, you'll see it's an email

6       from Rob Baskin, who is the managing director of the Atlanta

7       office and the head of the south.

8               THE COURT:  So this has to do with exceptions to the

9       hiring freeze?

10              MS. NURHESSEIN:  Yes.  Exactly, your Honor.  And he

11      sent a request again to Peter Miller, the MSL CFO, Jim

12      Tsokanos, who's the president of the Americas, and Tara Lilien,

13      who's North America HR.  And in response to the request, Peter

14      Miller, you see him pushing back, so it's obviously not a mere

15      rubber stamp here.

16              On page 9156, he again alludes to the global hiring

17      and salary freeze, mentions that the sister agencies are

18      running at 120 percent billability and all the brands are being

19      asked implicitly by Publicis to do more with less.

20              And then if you go to page 9155, you know, he grants

21      his approval and it says he got the approval from the higher,

22      again, presumably from Publicis.

23              THE COURT:  What's the objection with respect to this

24      one, which sounds like on one hand while it's an individual

25      hiring or an individual issue, it does sound like it goes to

C57LMOOC2

1    whether there is a hiring freeze and how exceptions are given,

2    etc.

3             MS. CHAVEY:  Your Honor, our objection to the

4    responsiveness marking here is that this is just a one-person

5    employment decision that's being sought.  The email on the last

6    page, 9157, is addressed to Peter Miller, Jim Tsokanos, Tara

7    Lilien.  If we understand the centralized decision-making

8    theory, despite it really not being in the complaint, it's that

9    there's this male executive team that makes decisions as a team

10   and this just doesn't --

11            THE COURT:  Two out of three are male.

12            All right.  This is relevant.

13            Next.

14            MS. NURHESSEIN:  And, your Honor, the next document is

15   10421.  Again, we marked this relevant for, you know, similar

16   reasons.  You look at the last page, again, it's an email from

17   the HR manager of the midwest region seeking approval from

18   Peter Miller again and there's some back and forth with Peter

19   Miller, the CFO, you know, and seeking approval to seal the

20   deal with an employee.

21            And you can see from the first email on page 10421,

22   which begins with here we are again knocking at your door, that

23   this is something that is part of their -- this is their usual

24   process, clearly, to go to Peter Miller to seek approval for

25   any of these hiring decisions.

C57LMOOC2

1           MS. CHAVEY:  And, your Honor, we're looking at this

2    document as different from the one before and we actually did

3    talk outside of your presence about the ones that we would

4    bring forward to get rulings that would then help us come to

5    resolution on the other ones.

6           This one doesn't mention the freeze at all.  And it is

7    an email addressed to Mr. Miller, but it's not addressed to the

8    alleged centralized team, whatever that is.  It doesn't have to

9    do with Mr. Tsokanos at all.  It doesn't have to do with Tara

10   Lillian, Olivier Fleurot.  So it appears to be a one-person,

11   the nature of it is just a one-person request and Mr. Miller

12   makes a decision and they move forward.  But there isn't any of

13   the freeze-related language, and it isn't addressed to a team

14   of people at all.

15          MS. NURHESSEIN:  Your Honor, Peter Miller is one of

16   the members of the centralized decision-making team.  I can't

17   imagine that Ms. Chavey is suggesting we only get documents --

18          THE COURT:  What's his position again?

19          MS. NURHESSEIN:  He's the global CFO of MSL Group.

20   And according to the parent company's policy, the Janus book,

21   he's one of the few individuals with authority to approve these

22   sort of employment decisions.

23          And, again, Ms. Chavey pointed out there is no

24   explicit reference to the hiring freeze.  But as we repeatedly

25   alleged, you know, we're alleging that decisions were made by a

C57LMOOC2

1    centralized team of decision-makers.  And under Second Circuit

2    law, including Rosini v. Ogelvie, that's 798 F.2d 590, and HNOT

3    v. Willis, 228 F.R.D. 476, as well as under Dukes v. Wal-Mart,

4    evidence of centralized decision-making --

5            THE COURT:  One question is you talk about the

6    whatever book you call that, is there any doubt that, any

7    dispute that Peter Miller or somebody at his level or above

8    needed to approve any new hires or salaries over existing

9    salary in the '08, '09, '10 period?  I mean if that's not in

10   dispute, we can save an awful lot of time.

11           MS. NURHESSEIN:  That's true and up until now, it

12   appeared to be a disputed issue.

13           THE COURT:  Why don't you let defendants answer.

14           MS. CHAVEY:  It was different at different times

15   throughout the '08, '09, and '10 period.  There was a hiring

16   freeze, as we've heard a lot about.  There was a salary freeze

17   during portions of those times.  During the freeze, I believe

18   Mr. Miller had authority to approve hires, but I believe

19   compensation increases did not end with him.  At different

20   times they had to go to different people.

21           THE COURT:  Okay.  But if, you know, this document

22   would appear to indicate that he had the authority to come up

23   with an extra five or $10,000 in salary for a new hire.

24           MS. CHAVEY:  Right.  So he did have the authority to

25   give approval of the local office decision or recommendation to

C57LMOOC2

1    hire, so he was the final sign off, yes.

2         THE COURT:  If that can be stipulated to, then we

3    don't need any of this stuff, you know.  On all of this,

4    anything that's not in dispute, that is legitimately not in

5    dispute, you can all handle and save millions of documents of

6    predictive coding or anything else by stipulating to the policy

7    or the practice whatever it is.

8         If you're not able to agree on that or not able to do

9    that without too many caveats that make it unacceptable for the

10   plaintiff, then this document is relevant based on their

11   theory.

12        If you want to move to dismiss or move to do something

13   that their theory of this centralized decision-making doesn't

14   appear anywhere, that's something Judge Carter will have to

15   decide down the road.  As it is, he's got the motion for not

16   class certification but the collective action issue in front of

17   him, and one of those years will have class certification.

18        MS. CHAVEY:  We would certainly try to put together a

19   stipulation that states the facts as we know them.

20        THE COURT:  So this document is relevant until you get

21   a stipulation quickly done, meaning between now and next

22   Monday, that is acceptable to both sides.  I think on a lot of

23   this -- and, I'm sorry, what's the name of the book you keep

24   referring to, the policy?

25        MS. NURHESSEIN:  That's the Janus book, J-A-N-U-S.

C57LMOOC2

1          THE COURT:  If the Janus book says certain things and

2     if you're not going to challenge that, stipulate.  Do whatever

3     you need to do and you'll save thousands if not hundreds of

4     thousands of dollars on both sides on document by document

5     discovery on an issue that's not in dispute.

6          MS. CHAVEY:  Okay.  And our concern about a document

7     like this one, 10421, is that there are probably thousands of

8     documents like this.  And to the extent the plaintiffs would

9     seek to prove that there was a particular practice because

10    Mr. Miller is on this email, then all the emails that don't

11    have Mr. Miller on them or have somebody else, those would all

12    be part of the same issue just to show there's --

13         THE COURT:  Either plaintiffs are creating garbage and

14    they won't be able to complain when they get garbage back, but

15    if the issue on any particular one of these type things is

16    they're using it to show that certain things had to be approved

17    at the quote/unquote management team level, Miller, the

18    president, etc., etc., if you can stipulate to that, you don't

19    need any of these documents.

20         If you can't stipulate to that, this document is

21    relevant.  To the extent it may drag in a lot of other specific

22    hire decisions that don't go to Miller because the computer

23    can't tell the difference, that's a risk plaintiffs will have

24    to take.

25         Okay.  Defense group of documents for guidance.

C57LMOOC2

```
1          MS. CHAVEY:  Your Honor, first looking at 65959, I
2     suppose this may fall into the same bucket we were just
3     discussing.
4          THE COURT:  It does.
5          MS. CHAVEY:  Would you like to move then to 14325?
6          THE COURT:  Delighted.  Okay, what's issue?
7          MS. CHAVEY:  We don't know what the responsiveness
8     here other than there are references to Jim, who is probably
9     Jim Tsokanos, and Maury Shapiro as dictating a format for the
10    business plan slide, otherwise making business decisions.
11         THE COURT:  Let me hear from the plaintiff.
12         MS. BAINS:  We think there's indications in here that
13    this is talking about personnel decisions and Jim having to
14    approve them.
15         THE COURT:  Where does this show anything about
16    business hirings or the like?  This appears to be the
17    California business plan for some time period.
18         MS. BAINS:  In the middle of the page, the paragraph
19    that starts slide 11, it says org chart which needs addition of
20    VP for digital entertainment and elimination of one person per
21    the agreements we came to with NY today.
22         Later, the document in the second last paragraph that
23    starts Jim efforts today.  It says Jim is willing to make the
24    investments and the commitments, but he also expects us to make
25    some hard decisions and execute.
```

1             We think those are talking about --

2             THE COURT:  That last paragraph is meaningless without

3    context.  As to the single line about org chart, you know,

4    again, this may be something stipulable.  If not, my concern is

5    you've got this I don't know how many memos there are every

6    time a particular office was doing their business plan.  Yes,

7    this talks about there might be the need of a VP for digital

8    entertainment and, therefore, eliminating the job of somebody

9    else so that they can fill that job.

10            The problem is, you know that that's why you want

11   this.  The computer is not necessarily going to separate that

12   from anything else about 2009 revenue and all the other things

13   about the various business plans.

14            In order to prove something that you can already prove

15   from the Janus book, are you going to get all sorts of garbage

16   into the predictive coding system and then complain when it

17   gets marked relevant by the computer.  The lawyers in going

18   through it move it into the not relevant pile, but it counts

19   against your quote/unquote 40,000 documents or whatever that

20   cutoff is going to be.

21            If you're saying you'll take your chances, I guess I

22   got to give it to you because it does have a personnel decision

23   being made by New York.  But, I think you're going to get a

24   tremendous amount of junk as a result of this, and I don't want

25   to hear a complaint later that you get all sorts of junk by

C57LMOOC2

1   documents that are similar to this.

2           MS. BAINS:  I think we need to speak with the experts,

3   but it was our impression that we were --

4           THE COURT:  Excuse me one second, and it may be you

5   all need to bring the experts next time we do this.  We should

6   have thought of that ahead of time.  But I think there is a

7   limit under Recommind's system or what DOAR would have been

8   doing to how much you can special code the documents.  If there

9   isn't, I know at least one vendor has some system, but I think

10  it's based on key words, but where their system actually

11  highlights the information that is found to be relevant in a

12  particular document and that helps the computer understand what

13  it's doing.  I have no idea if there's any chance of Recommind

14  doing that or anything else.

15          I think we're dealing with an issue, is New York

16  involved in making staffing decisions, which seems like a

17  no-brainer.  But absent anything else, as long as you

18  understand that I'm giving you this on relevance subject to the

19  possibility that you'll take it out because of a stipulation

20  over the Janus book admitting already that New York had to make

21  these decisions, but that if you don't reach such a stipulation

22  and if the computer pulls in a lot of documents that it thinks

23  are similar to this not because there's a single line in here

24  about two jobs being switched but because of all the other

25  things about California and Los Angeles versus San Francisco

C57LMOOC2

```
 1    and all that jazz, that you're not going to complain to me at
 2    the end of the day that you're getting garbage.
 3            Is that agreed?
 4            MR. WITTELS:  Your Honor, if I may respond to that.
 5    What concerns us about what you're saying is that by virtue of
 6    what may be defendant's refusal to stipulate to something that
 7    we have to prove, i.e., if there are many documents that come
 8    up showing the centralized policy, we get sort of punished in a
 9    sense on perhaps a cutoff that your Honor is considering
10    because of their, you know, conduct rather than ours.
11            In other words, we would like a stipulation perhaps
12    showing there's a centralized policy.  That's what the
13    documents seem to be showing, but they're trying to carve it
14    out by saying not this month or so we're up against a --
15            THE COURT:  We'll see who's offering a reasonable
16    stipulation.  I have the ability, you know, it doesn't
17    necessarily have to be a stipulation as opposed to something I
18    cram down somebody's throat.
19            I understand what you're saying.  I'm just saying that
20    we are taking a lot of documents that look like they're
21    individual job decisions having nothing to do with the
22    plaintiff in order to prove something that if the Janus book is
23    as high level a company policy book as it sounds like, whether
24    they stipulate or not, it's going to be something you can prove
25    and prove by cross-examination of their witnesses and the like,
```

C57LMOOC2

1   but we have to do document production first.

2           So this is marginally relevant, it is.  But, you know,

3   it's going to have repercussions subject to what your expert

4   can tell me next Monday or what their expert can tell me Monday

5   as to the effect on the system.  And while I don't know what

6   the cutoff has to be or will be, as we've said before, there is

7   not an unlimited budget for any lawsuit.  So at some point, you

8   make your decisions, they make their decisions.  If there were

9   a lot more cooperation between the two sides, you all might

10  save a lot of money, but we'll see what happens on the

11  stipulation.

12          But you have to understand that if you're training the

13  system with a document that could cover 20 different subjects

14  and you want it for one line in it, you may wind up getting

15  similar documents that don't have that line in it.  That's all.

16          Understood?

17          MR. WITTELS:  We understand your Honor's position.

18          THE COURT:  The document is to be coded relevant

19  subject to the stipulation issue.

20          Next.

21          MS. CHAVEY:  Next is 39895.

22          THE COURT:  Yep.

23          MS. CHAVEY:  This --

24          THE COURT:  This is an eye test.

25          MS. CHAVEY:  It's an expense report from Monique da

C57LMOOC2

1    Silva Moore, who is a named plaintiff, but it's our position

2    that not every document that pertains to her is responsive.

3    This one shows that she was reimbursed for mileage of 40 miles

4    and she was reimbursed $5 for breakfast.

5            THE COURT:  Let's hear from the defendant as to why

6    Ms. da Silva's expense reports are relevant.

7            MS. BAINS:  Plaintiffs.

8            THE COURT:  Sorry.

9            MS. BAINS:  One of the issues is the amount of

10   international travel and travel that Ms. Monique da Silva Moore

11   and others had to do.  We're willing, if we can do some sort of

12   isolated search for these, we're willing not to put them in for

13   predictive coding purposes.  But that is a disputed issue for

14   at least a few of the plaintiffs.

15           THE COURT:  This, how does this show other than on

16   40 miles she can't have gone very far?

17           MS. BAINS:  Sorry.  We would withdraw this one but

18   there are other expense reports that have --

19           THE COURT:  What you're saying is you want her expense

20   reports that show when she was traveling internationally?

21           MS. BAINS:  Or traveling cross country, something that

22   took her away from her home extensively.  You know, we don't

23   need -- hers and also this is an issue for plaintiff Maryellen

24   O'Donohue and Heather Pierce.

25           THE COURT:  Let's be clear.  She only got 40 miles,

C57LMOOC2

1    looking at the third page.  That was I guess the mileage to the

2    airport since there is a hotel room charge.

3           MS. BAINS:  I see this says business purpose, local

4    travel, and we're willing to withdraw those.  But just there

5    are very similar documents that have international travel or

6    travel across the country.

7           THE COURT:  Wait.  How do you figure out what's travel

8    across the country?

9           MS. BAINS:  I don't have -- I may have an example

10   here.  There are some where the title is international travel.

11          THE COURT:  This actually is air fare to China.  But

12   if you want her expense reports, there's got to be a better way

13   to find it than through predictive coding.

14          MS. BAINS:  And we're willing to come up with a

15   different way that's acceptable to defendants doing a targeted

16   search or looking at some other source.

17          THE COURT:  Let me understand your theory that she was

18   forced to travel internationally and that's bad or that she

19   didn't get the same travel opportunities men got, what's the

20   claim?  What's the theory?

21          MS. BAINS:  Well, part of it is retaliation for taking

22   maternity leave.

23          THE COURT:  What's the theory, what was she forced to

24   do or not do?

25          MS. BAINS:  That she had to travel a lot for her job,

C57LMOOC2

```
 1    more than others, that took her away.
 2                THE COURT:  And how do you prove that?
 3                MS. BAINS:  If we see her travel trips every week.
 4                THE COURT:  Her travel will show she went to China, at
 5    least this report.  How do you compare that to anyone else?
 6    What's the theory here?
 7                MS. BAINS:  Or if we can show she had to travel a lot
 8    more after taking maternity leave.
 9                THE COURT:  What's your theory?  A lot more than what?
10                MS. BAINS:  It's about the work life balance so that
11    her job was made burdensome by international travel, travel
12    across the country after she took leave, that it was --
13                THE COURT:  I fail to see how you're going to prove
14    this, but I assume that all of her expense reports are findable
15    somewhere other than through predictive coding or am I wrong?
16                MS. CHAVEY:  Your Honor, they may be.  They haven't
17    been requested so we haven't looked at them.  In any event,
18    Monique da Silva Moore left MSL essentially at the end of her
19    maternity leave.
20                THE COURT:  So there couldn't have been a difference
21    in post maternity leave travel.
22                MS. BAINS:  I know there's an issue for other
23    plaintiffs as well.
24                THE COURT:  Counsel, it really helps, this is
25    complicated enough, pause before you talk if need be, but don't
```

C57LMOOC2

```
1    give me a theory that's immediately proved to be nonsense.

2              Okay.  The expense reports are out.  If there turns

3    out to be a need for them, you'll get them in some other way.

4    This is somewhat ridiculous.

5              Finally, 26249.

6              MS. CHAVEY:  Your Honor, this email sequence involves

7    Peter Harris, who's been identified as a comparator to at least

8    one of the named plaintiffs, and we deemed this to not be

9    responsive because it's him talking to his managing director,

10   Renee Wilson, about what was on his business plan slides.  And

11   your Honor had ruled in February with regard to the comparators

12   and discussing how to go about getting comparator information

13   or data through the predictive coding that there didn't seem to

14   be a workable way and plaintiffs had requested --

15             THE COURT:  Let me hear what plaintiffs' theory on the

16   relevance of this is.

17             MS. BAINS:  Right.  If you look at the first

18   paragraph, the org chart shows a bunch of U.S. experts in a

19   bunch of areas.

20             One of the defenses is that all the SVPs are not the

21   same, all the VPs are not the same and that they have expertise

22   in areas.  So this --

23             THE COURT:  How does this document without the org

24   chart which it's referring to prove anything?

25             MS. BAINS:  The fact that she's questioning that
```

C57LMOOC2

1      they're experts in areas we think is relevant to the fact that

2      people in certain positions are similar to each other.

3               THE COURT:  What?  Try that again.  I don't

4      understand.

5               MS. BAINS:  So she's talking to Peter Harris, okay,

6      about his org chart and it says your org chart shows a bunch

7      you as experts in a bunch of areas.  So if we're talking about

8      in our collective motion action, we talked about SVPs being

9      similar to each other, VPs being similar to each other, and

10     defendant's defense in their opposition was that SVPs all do

11     different things, VPs all do different things.

12              THE COURT:  You're picking the sentence before the

13     semicolon about the part of the sentence after.  Is everyone

14     really an expert in all those areas or is it better to show

15     gaps, which frankly seems to support the defendants, not you,

16     and without the org chart and without knowing what this is all

17     about, it seems like it's garbage.

18              How does this, without the attached org chart, help

19     you at all when you read the sentence in its full context, not

20     by three dotting it?

21              MS. BAINS:  My understanding of the way productions

22     are going to go are that the attachments are going to be

23     produced.

24              THE COURT:  That's if there was an attachment to this.

25     Was there an attachment?

C57LMOOC2

```
1              MR. ANDERS:  Your Honor, there may have been.  I think
2     I mentioned this last time, for the seed set, we only reviewed
3     the documents that were actually selected and hit.  We did not
4     review the families as well.  When we do the final production,
5     we will produce documents along with families.
6              THE COURT:  The question is if there is, it may be
7     that with the attachment, if there was an attachment that this
8     refers to, that this has got something useful.  As it stands
9     now, I'm going to say it should get coded as not relevant.
10             Next.  Any group who's turn or who has some documents
11    to give me.
12             MS. CHAVEY:  I think there were two others that
13    plaintiffs had hard copies of and we just asked.  That was 7366
14    and 7560.
15             7560, I think we're going to wait and treat that as a
16    Publicis Groupe issue.
17             MS. BAINS:  I don't see a copy, but we'll just hand up
18    our copy.
19             THE COURT:  Which one am I looking at now?
20             MS. BAINS:  It's one document.
21             THE COURT:  7366 through, all right.  You have two
22    copies of it here, so.
23             7366 through 69, what's the relevance?
24             MS. BAINS:  On the second page, the email from Rosalin
25    Fogarty or actually from Rita Masini:  Okay, so we presented
```

C57LMOOC2

1    Peter, Maury is on vacation, we will do Monday.  Need some

2    bullets from Hanna on why 5K spot bonus is justified.

3            So, again, this is showing that approval for

4    compensation has to go to Peter Miller, CFO.

5            THE COURT:  It sounds like you're going to work this

6    out.

7            MS. CHAVEY:  Our concern is, your Honor, there are

8    just likely thousands and thousands of these emails.

9            THE COURT:  Then, you know, try to stipulate.

10   Otherwise, you run the risk that you're going to review

11   thousands of these for the final production.  They run the risk

12   that will reduce the more relevant documents that they could

13   get.  That's a good incentive on both sides, since nobody knows

14   where I'm cutting the production off or saying that after we

15   get to X thousand documents, if the plaintiffs want the next

16   batch, they're going to pay the defendant's review costs.

17   Neither of you know where that's coming out, good reason on

18   something as simple as this that apparently is fairly

19   accurately described in the so-called Janus book that you reach

20   a stipulation on it.

21           But, otherwise, it's relevant.

22           Okay, where does that leave us?  And I don't know

23   whose documents are whose anymore.  If you want them back, you

24   can come get them.  Sort them out.

25           We are already one iteration behind on your schedule.

C57LMOOC2

1  Do you have more documents that you're all going to go through

2  today or what?

3        MS. BAINS:  Yes.  We have a binder of more docs we can

4  go through in hard copy, and if we require more rulings,

5  perhaps we can come back in a couple hours.

6        THE COURT:  All right.  It's quarter to three.  Why

7  don't you go back in the jury room and at 4:30, why don't you

8  tell me where you are in the process, and that is whether you

9  need me, whether you want more time.  I can give you until

10  5:30, 6 o'clock, although the court reporter may not be

11  available after 5 o'clock.

12        MS. CHAVEY:  Your Honor, the plaintiffs have

13  additional hard copy documents, we ran out of ours, but there

14  aren't that many.  I don't know that it will take us as much as

15  an hour even.

16        THE COURT:  As soon as you're ready, you can call

17  chambers.  Use the phone here and all you have to do is pick it

18  up and call 0036 and we'll come up.  But you're not leaving

19  here until you've checked out and we'll go from there.

20        You also should spend a few minutes talking about how

21  you're going to revise the scheduling document to provide a

22  catch up in some way and, hopefully, now that we've resolved

23  all of this, hopefully the further rounds will go much

24  smoother, but hope is hope.

25        MS. CHAVEY:  Your Honor, that raises one other issue.

C57LMOOC2

```
 1    We've heard the Court loud and clear indicating that it should
 2    be partner-level review as the seed set is being populated and
 3    the lawyers you're looking at here on our side of the room have
 4    done many, many, many hours, very late nights, lots of weekend
 5    work to get through the documents.  If we could, I don't know
 6    if the plaintiffs have followed the same protocol, but if we
 7    could --
 8            THE COURT:  Who's doing the document review on the
 9    plaintiffs' side?
10            MS. BAINS:  I am and Ms. Nurhussein.
11            THE COURT:  And what level associates are you?
12            MS. BAINS:  I'm a senior associate and Ms. Nurhussein
13    is an associate as well.
14            THE COURT:  How many years out of college is that?
15            MS. BAINS:  Out of law school, five.
16            THE COURT:  And Ms. Nurhussein?
17            MS. BAINS:  Six years.
18            THE COURT:  All right.  That's senior enough.
19            MS. CHAVEY:  So our thought is if we could bring some
20    additional people, certainly we would have loved to have some
21    fifth year associates join our ranks, but we haven't done so
22    given the Court's direction.  But if we could at this point, we
23    think it would speed things up.
24            THE COURT:  The problem is, is it only the two of you
25    on the plaintiffs' side or is it the two of you plus?
```

C57LMOOC2

1          MS. BAINS:  Two of us.  There was a little bit of

2     review done by also the same level, fifth, sixth year.

3          THE COURT:  The idea is to keep it as a very small

4     team so that there's consistency.

5          MS. BAINS:  Right.  It's never been more than three.

6     And in these latest stages, it's either been me doing it

7     myself, the entire set, or Ms. Nurhussein helping me with a

8     portion of it.

9          THE COURT:  All right.  If you want to bring one

10     associate in to reduce your cost level, that's fine, but it's

11     hard enough at the rate you're all doing it.  So do what you

12     can.  And I really do think none of this should become as

13     problematic as we go forward unless we start seeing totally new

14     types of documents.  I think you know how the rulings are going

15     and, you know, if I have to have you and your experts show up

16     every Monday to keep this on schedule, we're going to have to

17     start doing that.  You know, believe me, I don't want to see

18     you that often.  But, you know, you got to do something to make

19     what is already a very lengthy process not into an indefinite

20     process.

21          All right.  Go back to the --

22          MR. WITTELS:  Your Honor, I have a scheduling issue so

23     if I can, I didn't know we were going to be here all day.  But

24     the two associates from my office who are most familiar with

25     the documents would finish going through that if your Honor

C57LMOOC2

```
 1   would permit.
 2              THE COURT:  That's fine.  But whatever they agree to
 3   or whatever I order in your absence, I don't want to hear any,
 4   you know, they weren't authorized, they weren't senior enough,
 5   they're not a partner in the firm.  If you're comfortable with
 6   them handling it without you, I'm comfortable with it.
 7              MR. WITTELS:  Thank you.
 8              THE COURT:  But also expect that next Monday may be a
 9   full-day affair when we go through the Publicis and MSL with
10   regard to Publicis issue.  Plan accordingly.
11              MR. WITTELS:  Thank you.
12              MR. BRECHER:  Thank you, your Honor.
13              THE COURT:  All right.  So somewhere in the
14   neighborhood, four, 4:30, you'll call and tell me you need me
15   or don't need me, but we'll talk jointly before you leave
16   anyway.
17              (Recess)
18              THE COURT:  All right.  What documents do you have for
19   review now?
20              MS. CHAVEY:  Your Honor, we conferred during the
21   Court's recess and we actually made quite a bit of progress.
22   There are three documents left that we have hard copies of to
23   present to the Court.  As to many of the others, we, the
24   defendant, MSL changed its position and agreed to the
25   responsiveness marking of the plaintiffs.
```

C57LMOOC3

```
 1              And we also had the same conversation in light of the
 2      Court's comments about whether the plaintiffs really want to
 3      invite responsive documents through the predictive coding like
 4      the ones we agreed to mark responsive because we share the
 5      Court's concern that we put garbage in, garbage is going to
 6      come out.  But we are trying to move the process forward and be
 7      cooperative so we took a liberal interpretation of your rulings
 8      and have agreed and the plaintiffs indicated they wanted all
 9      those documents to come in.
10              So there are three left.  The first one I have is
11      59197.  And this is a document that basically relates to
12      Maryellen O'Donohue's work schedule and her responsibilities
13      for a client called Lily and we don't think that -- this is
14      just a very routine kind of email about what a plaintiff is
15      going to be doing and we have not marked and, in fact,
16      plaintiffs haven't requested us to mark every single email
17      showing what plaintiff is doing every day as responsive.
18              THE COURT:  Wait.  Are we looking at the same
19      document?
20              MS. CHAVEY:  59197.
21              THE COURT:  Sorry.  I was handed it in a different
22      order.  What's the relevance?
23              MS. BAINS:  Your Honor, plaintiff Maryellen O'Donohue,
24      one of her claims was that she was on a part-time schedule and
25      paid on a part-time salary.  One of her complaints was that she
```

C57LMOOC3

1    was overloaded with work after the reorganization when

2    Mr. Tsokanos took over the company.  And something she

3    testified to in her deposition was about all the time she had

4    to spend on the Lily business.  So we think -- she, as a

5    result, instead of working three to four days a week, she ended

6    up working seven days a week because she was overloaded with

7    work so we think that's relevant to that.

8            A second reason in the top email it says I think it's

9    just important that we resolve all this time and whether it is

10   billable.  We know based on the questioning and the depositions

11   of the plaintiffs that one of the business justifications will

12   be that certain individual's time was not billable enough.  So

13   to show, you know, that the plaintiff is required to do all of

14   this work and it might not be billable would be relevant.

15           MS. CHAVEY:  And our view is this doesn't say anything

16   about what she was required to do.  She's discussing she made

17   an agreement to go to the client every few weeks.  So this

18   seems to be the opposite of the theory.

19           THE COURT:  Well, that will be the proof issue.  Since

20   it is one of the plaintiffs, it's relevant.

21           Next.

22           MS. CHAVEY:  Next in our stack is 20532.

23           THE COURT:  Okay.

24           MS. CHAVEY:  This also is an individualized employment

25   decision.  It's actually a request by an employee named Margie

C57LMOOC3

1   Mysolin about when she would be considered for a raise.

2            This email is distinct from those the Court already

3   ruled on because it doesn't involve Jim Tsokanos, Peter Miller.

4   It doesn't mention, you know, anything about centralized

5   decision-making.  She makes reference to the raise freeze, but

6   apart from that, there's really nothing in this document and

7   this just falls on the other side of the line, in our view,

8   that this is really going to clog up the predictive coding.

9            MS. NURHESSEIN:  Your Honor, this relates to the

10  global salary freeze which -- global raise freeze, as it says

11  in the document, which, as we discussed, is one of the policies

12  in the case.

13           THE COURT:  Except there is no dispute that there was

14  a raise freeze.  The issue is what exceptions were made for

15  whom.  And this the only reference to the wage freeze and

16  wanting more is from an employee, not from management.

17           MS. NURHESSEIN:  Your Honor, I was just about to get

18  to that.  What I was going to say, this specifically relates to

19  mission criticals.  In the first sentence where she says, do

20  you think I should have put her forth as a mission critical.

21  Mission criticals are basically a list of employees whose names

22  are submitted for raise exceptions during the salary freeze and

23  justification, you know, is usually either because the employee

24  is below the salary band or they haven't received a raise for

25  years or they're a flight risk.  And actually all these mission

C57LMOOC3

1    criticals are compiled at MSL's corporate headquarters in New

2    York and sent to Publicis in Paris for approval.

3         THE COURT:  Is your argument that women were not

4    called mission critical?  What's the theory?

5         MS. NURHESSEIN:  Well, one theory which we've

6    discussed a little bit is that the exceptions to the raise

7    requests were not granted, you know, exceptions were often made

8    for male employees and not female employees.  And another,

9    which this goes to, is that it may be that certain employees

10   were put forward for raise exceptions while others weren't.

11        And this, we received a number of the mission

12   criticals from defense counsel already, but what makes this

13   interesting is it's important to see why decisions were made to

14   omit certain people from the mission criticals list, which this

15   document gets to.

16        THE COURT:  Well, but are any of the people, either

17   Maury Shapiro or Valerie Morgan, high enough up in your chain?

18        MS. NURHESSEIN:  Yes, your Honor.  Valerie Morgan is

19   part of the North America HR team.  Maury Shapiro is the

20   Americas CFO.  So there's the brand global CFO, Peter Miller --

21        THE COURT:  I'll give you this one with the warning

22   that you're going to pick up a lot of individual raise

23   documents that are going to be totally irrelevant because of

24   this.  And if that's how you want to spend your documents,

25   i.e., your money at the end of the day, that's up to you.

C57LMOOC3

1          But, remember, when they go through the first -- and

2     I'll use the 40,000 number although I have not blessed it any

3     way -- when they go through 40,000 documents and you get 5,000

4     documents showing whether somebody who's not a plaintiff did or

5     didn't get a raise or anything else, all of which, unless it's

6     done in some scientific way, is going to be anecdotal and

7     largely useless, don't complain to me that you want me to go

8     beyond 40,000 documents because so much of what got ranked high

9     was garbage.

10         If you understand that, and are willing to say you

11    agree to that now, I'll mark this as responsive.

12         MS. NURHESSEIN:  Your Honor, I can't say that we agree

13    to it right now.  We can confer --

14         THE COURT:  You have to because you can't say I want

15    this marked relevant and then when we get to the end of the day

16    and you get a lot of what frankly is going to be anecdotal

17    junk, you can't say because the defendants had to review a lot

18    of anecdotal junk that we asked them to mark as relevant and

19    those are produced to you as relevant that you should get more.

20         MS. NURHESSEIN:  I understand that, your Honor.  And

21    earlier today I know you had said that we can either make a

22    decision to mark certain documents as relevant or, you know, we

23    could discuss it and get back to you and this is one where I

24    think we would have to -- I think it's clearly relevant and --

25         THE COURT:  When are you going to make the ultimate

C57LMOOC3

1   decision because this is going to be put to bed by no later

2   than Monday of next week.  If you're saying in a day or two,

3   you'll go back and talk to your partners, one of whom abandoned

4   you because you were capable of handling all of this, you can't

5   have it all six ways from Sunday.  What's your pleasure?  It's

6   in or out with the caveat that I've already put on it.

7          MS. NURHESSEIN:  Your Honor, we think it's clearly

8   relevant and we can make a final determination in the next

9   couple of days as to whether we want to include this particular

10  document.

11         THE COURT:  By tomorrow you'll tell them whether you

12  want it in or out.  If you keep it in, it is on the explicit

13  understanding that when you get a lot of these at the end of

14  the day, which may well be at the top of the production curve,

15  that you're not going to say because you got so many of these

16  and not enough of something else, that that's a reason to go

17  deeper into the production set.

18         MS. NURHESSEIN:  And, your Honor, just to clarify,

19  we're coding this as relevant not just because -- it's because

20  it involves an employment decision and explicitly discusses an

21  exception to the raise freeze so it's tied to a policy in the

22  case and it goes to centralized decision-making.  So presumably

23  we want --

24         THE COURT:  Your view of centralized decision-making

25  seems to be three-quarters of the senior members of the

C57LMOOC3

1    organization.  I don't really understand what is the central.

2              MS. NURHESSEIN:  No, your Honor.

3              THE COURT:  Who are the central decision-makers?

4              MS. NURHESSEIN:  Yes, your Honor.  In the second

5    amended complaint we note that --

6              THE COURT:  The one that's not filed?

7              MS. NURHESSEIN:  The one that's not filed but the one

8    that's been filed in the court and Judge Carter is going to be

9    ruling on.

10             THE COURT:  At the moment it's not in the case.

11             MS. NURHESSEIN:  No, but we included a lot of the same

12   information in the original complaint.  I don't know if we

13   named every --

14             THE COURT:  Who are the central decision-makers?

15             MS. NURHESSEIN:  Okay, your Honor, according to the

16   Janus policy, there are five specific individuals that are

17   mentioned.

18             THE COURT:  Maury Shapiro and Valerie Morgan on that

19   list of five?

20             MS. NURHESSEIN:  Not in the Janus policy.  So the

21   Janus policy references Jean-Michel Etienne, who is the CFO of

22   Publicis; Mathias Emmerich, who is the Publicis Groupe general

23   secretary.  And then it references the brand CEO, who in the

24   case of MSL America would be Jim Tsokanos.  The group CFO would

25   be Peter Miller; and Olivier Fleurot, the MSL CEO.

C57LMOOC3

 1              And then in terms of some of the other personnel

 2    decisions, so, for example, the PANs that we referenced, those

 3    need the approval of either Peter Miller or Maury Shapiro, as

 4    well as corporate HR, which would be either Rita Masini or Tara

 5    Lilien.  So it's a pretty circumscribed group of individuals

 6    we're talking about.

 7              THE COURT:  Okay.  You've got Maury Shapiro on here.

 8    Again, I will say it for the third time, and this time I want

 9    an answer.

10              If you don't withdraw the relevance coding for this

11    document, do you understand and do you agree that you may not

12    complain at the end of the day when you get a lot of documents

13    about individual raise decisions and that may, because of cost

14    issues and Rule 26(b)(2)(C), be part of the group of documents

15    you get and, therefore, there may be other documents that

16    you're not going to get.

17              Do you understand and agree to that?

18              MS. NURHESSEIN:  Your Honor, I can't.

19              THE COURT:  That's a yes or no question.

20              MS. NURHESSEIN:  No, I can't agree to that.  But we

21    will -- I need to confer with my colleagues and in light of the

22    rulings --

23              THE COURT:  Sorry.  You're here.  Mr. Wittels has

24    left.  You two are here.  Make a decision.  And I understand

25    you might pull the document later.  I'm just talking about if

C57LMOOC3

1   you don't pull it, do you understand what I've said and do

2   you --

3           MS. NURHESSEIN:  Yes.

4           THE COURT:  -- agree with it?

5           MS. NURHESSEIN:  Yes, your Honor, I understand that.

6           THE COURT:  And you agree?

7           MS. NURHESSEIN:  Yes, your Honor.  I mean and this

8   document, I think, let me just confer with my colleague for one

9   minute.

10          Your Honor, I think we want to keep this one in,

11  especially because it references mission critical.

12          THE COURT:  Counsel, you have it.  What I'm trying to

13  get without waffle so that when you later argue in front of me

14  or Judge Carter or the Second Circuit or the U.S. Supreme

15  Court, do you understand that because this is an individualized

16  raise decision for a person who is not a plaintiff, that if you

17  get a lot of documents like this because of the way predictive

18  coding works, it finds more like this among other things that

19  may well clog up the top-ranked documents, and I'm not going to

20  go beyond a certain cost level.

21          Do you understand and agree to that?  That's my

22  question and that's a yes or no.

23          MS. NURHESSEIN:  Yes, your Honor, I understand, but if

24  I could just add one thing.

25          THE COURT:  No.  Stop.  Yes or no.

C57LMOOC3

1          MS. NURHESSEIN:  Yes, your Honor, I do understand.

2          THE COURT:  Now, counsel, you're about to be in

3     serious trouble.  The question isn't whether you understand

4     which means I understand your position, Judge, and I'll appeal

5     it later.

6          Do you agree?  That's the question.

7          MS. NURHESSEIN:  Your Honor, can I confer with my

8     colleague for one minute?

9          THE COURT:  Yes, which I thought you just did.

10         MS. NURHESSEIN:  Your Honor, we understand and we do

11    agree, although we obviously can't waive our right to object to

12    anything, but we do understand and we do agree.

13         THE COURT:  If you agree, there's no objection

14    possible.  So stop the double talk, confer --

15         MS. NURHESSEIN:  Your Honor, in that case, I can't

16    agree.

17         THE COURT:  Okay.  The document is not relevant.

18         And if you can't agree because you don't have the

19    authority, I suggest that that means Mr. Wittels will have to

20    be here at every subsequent conference all day, all the time,

21    just like we have three partners here from Jackson Lewis.  You

22    either get some courage or get a partner here.

23         Next.

24         MR. BRECHER:  Judge, the last document is NR47822.

25    This is a document that they marked as responsive.  We marked

C57LMOOC3

1    it as nonresponsive.  It's an email, it starts from Kate

2    Wilkinson, who is a named plaintiff.  She's emailing the

3    Harumika team, which is a client, and Kate Greenberg, who's an

4    account supervisor, not a VP, an SVP or managing director or

5    anybody on this centralized management team, says great job and

6    she responds, thanks chica.

7           So we don't see this as a relevant document and one

8    again that we believe is just going to clog up the system with

9    documents that are not responsive.

10          MS. NURHESSEIN:  Yes, your Honor.  This one is

11   relevant and was coded as relevant because it relates to one of

12   the named plaintiffs, Kate Wilkinson, and one of the disputed

13   issues in this case is her performance.  She was placed on

14   probation two months after announcing her pregnancy and so

15   this --

16          THE COURT:  Which was when?

17          MS. NURHESSEIN:  I believe it was, I believe it was

18   fall 2009 she announced her pregnancy.  Two months later she

19   was placed on probation.  And so it was right around this time

20   period and this document, you know, is proof that she was a

21   strong performer.

22          MR. BRECHER:  Judge.

23          THE COURT:  I'm sorry, who's the plaintiff here?

24          MS. NURHESSEIN:  Kate Wilkinson is one of the named

25   plaintiffs, your Honor.

C57LMOOC3

1          THE COURT:  Who's Kate Greenberg?

2          MS. NURHESSEIN:  Kate Greenberg is apparently an

3    account supervisor who worked with Kate Wilkinson.

4          THE COURT:  Well, this seems to be one account

5    supervisor telling Ms. Wilkinson your team did a great job.  Is

6    that really relevant?  And, again, you get the same risks that

7    you're going to get lots of presentations and good work or

8    whatever else the computer thinks is why you're coding this and

9    then you're going to tell me at the end that there's too much

10   garbage in the predictive coding system.

11         MR. BRECHER:  Or, Judge, you might get emails that are

12   relating to.

13         THE COURT:  Multilogger.

14         MR. BRECHER:  To multilogger or a pitch.  So we're

15   going to have all these emails in there, so that's the concern.

16         MS. NURHESSEIN:  Your Honor, again, we believe it's

17   relevant.  I understand given the limitations of the predictive

18   coding system that it could pick up junk.  So given your

19   rulings, we'll agree to withdraw this one if it's between that.

20         THE COURT:  That's fine.  Very good.

21         So what's left that you all have to do?

22         MR. ANDERS:  Your Honor, we briefly spoke about the

23   schedule and how we can get ourselves back on track and stay

24   within the completion date in the order.  Our thought was this,

25   your Honor.  There is time during the final review that we've

C57LMOOC3

1    allotted where we could steal some days from the final review.

2            THE COURT:  Let's steal some from the early review so

3    we get back on track because unless you all start figuring out

4    a way to work better together, you're going to need those end

5    days because there's going to be enough going wrong in each one

6    of these blocks.

7            MR. ANDERS:  My thought was, your Honor, in addition

8    to the final review, the latter iterative reviews should go

9    faster and more smoothly than the earlier ones so we'll need

10   less time there.

11           THE COURT:  What I may do is say let's see where we

12   are after the first iteration of documents gets run because if

13   we continue to have, you know, thousands reduced to hundreds

14   reduced to 800 or to one, you're going to wind up with a

15   special master and, two, this schedule, you're going to finish

16   discovery in the next millennium and that's not going to happen

17   in this court.  So think about it and by the time we finish the

18   first review, let's see where we are.

19           MR. ANDERS:  That was going to be our suggestion, not

20   to do any final dates until we saw how the first round went.

21   Thank you.

22           THE COURT:  Okay.  Now, did I understand you're done

23   or that you're done only based on the number of documents that

24   one or the other of you had in hard copy here so there's still

25   others in dispute?

C57LMOOC3

1          MS. CHAVEY:  The latter, your Honor, the other

2    documents that are in dispute we have electronically, and we

3    looked at them across the street during the midday break but we

4    only had so much time to do that.

5          So we have a plan, as I believe Mr. Wittels indicated,

6    we have agreed that we will exchange by, in light of the

7    Court's rulings today, each party will go back and look further

8    at documents to see what we can agree to withdraw our dispute

9    about.  And we'll exchange our lists of those documents where

10   we were withdrawing our dispute by Wednesday at 6 p.m. Eastern.

11   We then have a call scheduled on Thursday from 8 to 11:30 and

12   then two to six if we need all of those hours.

13         THE COURT:  If you need more hours, spend the weekend,

14   but bring every last document that's in dispute in hard copy on

15   Monday.  We are finishing this first pre-round on Monday come

16   hell or high water.  And, if necessary, I hate to add to your

17   expense, bring DOAR and bring Recommind.

18         If there's any issue as to what's doable or not doable

19   as opposed to is it a relevant document, is it not a relevant

20   document, and how much junk will be pulled into the system

21   because the document has one, you know, buzz word in it that's

22   otherwise irrelevant, bring what you need to bring.  But when I

23   release you Monday from this and whatever we're going to wind

24   up doing with the Publicis-related jurisdictional discovery,

25   including its impact on MSL, we're done with this at that

C57LMOOC3

1    point.  And if you say but, but, but, the answer is going to be

2    that's your record and I'm ruling on what's in front of me.

3           MR. ANDERS:  Your Honor, would it be possible in

4    advance of Monday to get an order allowing a computer on that

5    day so we have a computer with the documents on them?

6           THE COURT:  No, because that's not going to do me any

7    good.

8           MR. ANDERS:  Fair point.

9           THE COURT:  So I don't want documents emailed to me so

10   I can read them on the screen and get even dizzier from all of

11   you.  We're at the point where there shouldn't be too many

12   documents to carry.  Bring them.

13          MS. CHAVEY:  Thank you, and we do appreciate the

14   Court's time attending to these disputes.

15          THE COURT:  All right.  And I do hope that as it's

16   clear that this, if not going to work ultimately, at least work

17   for an iteration or two to see how the system works, cooperate

18   with each other, see what you can stipulate.  If this Janus

19   book has policy statements, stipulate to it, you know.

20          Plaintiffs' concern, I would assume, is that the Janus

21   book will say one thing and your witnesses will come in and

22   say, well, maybe or sometimes or whatever and so they've got to

23   back that up with other documents.

24          And instead of spending hundreds of thousands of

25   dollars on document review to set up the predictive coding

C57LMOOC3

1    system, the expense of running the system, the expense of post

2    review, post iterative reviews, etc., on a lot of documents

3    that are not really on issues in dispute, spend some of that

4    all-day conference time figuring out what you really dispute

5    and what you don't.

6         Obviously, you're not going to agree that you

7    discriminated, etc., etc.  But if there are freezes and the

8    exceptions have to be approved by one of five people or eight

9    people or whatever it is, whatever you can stipulate to, or

10   not, if you can't do it as an affirmative stipulation, a we

11   will not challenge the assertion that or whatever, will reduce

12   the expense on both sides.  It's in your interest to figure out

13   what is the legitimate disputes in the case and what discovery

14   is needed for it.

15         And, frankly, and please pass this on to Publicis'

16   counsel, between now and Monday, plaintiffs and Publicis and

17   MSL, which is why I don't feel uncomfortable saying this,

18   should figure out what issues are legitimately in dispute on

19   the Publicis jurisdictional motion and what aren't.  If there

20   is no doubt that Mr. X from Publicis had to approve certain

21   things, let's try to avoid the fight about the French blocking

22   statute and whatever and get that material.

23         You also obviously should spend some more time talking

24   about what is viable from the MSL system.  We've got a June

25   cutoff for the Publicis motion.  Even under the current

C57LMOOC3

schedule, while you'd be significantly done, you would only be

at somewhere between the third and fourth iteration of the

predictive coding system and yet there are MSL documents that

go to Publicis-related jurisdictional issues.

On the one hand, it's probably impossible or cost

prohibitive to run one system for predictive coding and some

other method of getting a faster approach to certain other

emails, but you all figure out what's viable on both sides and

try to work together instead of the lack of cooperation and

lack of discussion that seems more prevalent here than it

should have been.

And expect to spent the whole day here Monday, if

necessary, because there isn't enough time on the Publicis

issue to not have it under control by the time we're done with

Monday's conference.

Okay.  Usual drill.  I'll require both sides to split

the cost of the transcript.

And I will suggest, Ms. Bains and Ms. Nurhussein, I

don't invoke the trial counsel must be here, but if the two of

you are going to be here, you've got to be able to make

decisions, and if because of the way your firm works or

because, whatever, you need someone else to help you on those

decisions, whether that's Mr. Wittels or another partner, they

got to be here.  I don't have time for I don't know the answer,

I can't commit because I have to talk to someone more senior.

C57LMOOC3

1    That just doesn't work.  Okay.

2            Purchase the transcript, make your arrangements with

3    the reporter.

4            I'll see you next Monday.

5                            o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25