C5E3DAS1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MONIQUE DA SILVA MOORE, et
     al.,
4
                    Plaintiffs,
5
                 v.                        11 CV 1279 (ALC)(AJP)
6
     PUBLICIS GROUPE SA, et al.,
7
                    Defendants.
8
     ------------------------------x
9                                          New York, N.Y.
                                           May 14, 2012
10                                         9:35 a.m.

11   Before:

12                      HON. ANDREW J. PECK,

13                                         Magistrate Judge

14                            APPEARANCES

15   SANFORD WITTELS & HEISLER, LLP
          Attorneys for Plaintiffs
16   BY:  STEVEN WITTELS
          SIHAM NURHUSSEIN
17        DEEPIKA BAINS

18   JACKSON LEWIS LLP
          Attorneys for Defendants MSLGroup
19   BY:  VICTORIA WOODIN CHAVEY
          JEFFREY W. BRECHER
20        BRETT M. ANDERS

21   MORGAN, LEWIS BOCKIUS
          Attorneys for Defendant Publicis
22   BY:  PAUL C. EVANS

23

24

25

C5E3DAS1

```
1              (In open court)

2              THE COURT:  We have at least two items if not more on

3    the agenda today.  One is the jurisdictional discovery and the

4    other is the additional documents in dispute and whatever

5    information, since I see you have your experts here, you all

6    want to give me with regard to the predictive coding documents

7    we've been looking at.

8              I think we should start with the Publicis issue.  Any

9    reason not to, Mr. Wittels?

10             MR. WITTELS:  No, your Honor.  Before we get started,

11   your Honor, I'd like to put something on the record.  A, I'd

12   ask your Honor again to voluntarily recuse yourself from this

13   matter.  And not rule on any further disputes until the recusal

14   motion is decided.

15             THE COURT:  Is there anything new you have to add or

16   are we going to keep revisiting this issue?

17             MR. WITTELS:  No, there are new things, your Honor.

18   As we said in our papers, before the recusal motion was filed

19   we believe your Honor had exhibited the appearance of

20   impropriety to a reasonable person, but even since filing the

21   motion --

22             THE COURT:  I've read your reply papers.  Is there

23   anything new?

24             MR. WITTELS:  There is not, your Honor.  Last week, I

25   believe that last week and on April 25, your Honor had shown a
```

C5E3DAS1

1   hostility by us in favor of the defendants, and the appearance

2   of impropriety including not acting in accordance with the

3   judicial code of conduct in terms of respecting a litigant's

4   rights and exhibiting judicial temperament.  In particular --

5           THE COURT:  Make your motion on paper.  No.  Make your

6   motion on paper.  I've had enough of this, Mr. Wittels.

7           MR. WITTELS:  Your Honor, I would like to say last

8   week you -- you screamed at me.

9           THE COURT:  Excuse me, Mr. Wittels.  The record is

10  crystal clear.  I did not scream.  I raised my voice when you

11  and your colleagues were interrupting me after having been

12  warned and were showing contempt for the Court's rulings,

13  rulings which have been affirmed by Judge Carter.

14          There is a motion to recuse me pending.  The final

15  brief, which, frankly, I think was three days late, depending

16  on how one counts the three days for mail when we are in an ECF

17  system, but it's briefed.  I will be working on it as soon as I

18  can.

19          If you want to go to Judge Carter, to the Second

20  Circuit, do what you have to do.  I'm not going to keep doing

21  this at every conference.  You want to do motions, do a motion.

22  Anything else?

23          MR. WITTELS:  Well, I would like to say last week when

24  I left, your Honor was particularly aggressive towards my

25  female associates in the firm, in a demeaning way.

C5E3DAS1

1          THE COURT:  Give me a break, Mr. Wittels, please stop.

2     You want to make this motion for the press, issue a press

3     release.  Enough.  You said your associates had full authority.

4     You seemed to be under the impression that the federal rules

5     not only allow you to do whatever you want despite Court

6     rulings, but you seem to be under the impression that under the

7     federal rules, you are entitled to every single document that

8     may be responsive regardless of cost.

9          Is that your position really?

10          MR. WITTELS:  Our position is that the federal rules,

11     as affirmed by the U.S. Supreme Court and Second Circuit say

12     that discovery is to be liberal and to lead to --

13          THE COURT:  Answer my question and don't give me a

14     speech.  That's a yes or no question.  Is that your position or

15     not?

16          MR. WITTELS:  I can't answer it as a yes or no because

17     it has to be explained, my response.

18          THE COURT:  Answer yes or no and then explain.

19          MR. WITTELS:  Well, my position is that there are --

20          THE COURT:  Forget it, Mr. Wittels.  Forget it.

21          MR. WITTELS:  I was beginning to answer.

22          THE COURT:  Go ahead.

23          MR. WITTELS:  Yes.  There are limits that courts

24     sometimes impose on discovery which is of course in the case

25     law.  However, the courts don't out of the box, which is

C5E3DAS1

1   happening in this case, before there has been production start

2   making arbitrary limits as to how many documents should be

3   produced, which is what is happening in this e-protocol, given

4   your Honor's predilection towards an untested, uncharted, and

5   new method of predictive coding.  In fact, what we are saying

6   is your Honor has put --

7        THE COURT:  Why don't you issue your press release.

8   Enough.  Thank you.  Democracy goes so far.

9        MR. WITTELS:  So I'm not allowed to put my position on

10  the record?

11        THE COURT:  No.  Make a motion.

12        MR. WITTELS:  So I can't go further to state that your

13  Honor last week told the associates in my courtroom -- in your

14  courtroom to get some courage and that I had abandoned them?

15        THE COURT:  Mr. Wittels, is there any reason that you

16  want to summarize the transcript?  I was here.  If you want to

17  make a further motion, make it.  Otherwise, what I think you

18  are trying to do is trying to get me to lose my temper so you

19  can file another motion.  Stop it.  And stop this untested

20  etc., etc.

21        Mr. Neale, did you or did you not say at the first

22  conference you were in front of me that you supported

23  predictive coding if done right?

24        MR. NEALE:  Your Honor, certainly as a company we do.

25  It doesn't mean that in this case we believe it is being done

C5E3DAS1

1  right.

2            THE COURT:  Okay.  That's fair.  Anything else?

3            MR. WITTELS:  If your Honor's cutting me off and I

4  can't speak.

5            THE COURT:  Go ahead.  I've got all day.  I've got no

6  other cases, just yours.  You want to make written motions but

7  then you want to make speeches.

8            Go ahead.

9            MR. WITTELS:  I would like to say of important to the

10  point that your Honor has a predilection and bias against the

11  plaintiffs' position is the fact that last week, when a

12  document was -- your Honor had ruled was relevant, a key

13  document, document NR 20532, which talked about a mission

14  critical and showed that the corporate parent, Publicis, was

15  involved in the decision making for raises and your Honor

16  deemed it relevant, your Honor said we didn't agree in advance

17  to a limit, and your Honor seems to be considering imposing as

18  to the amount of documents that will be produced at which point

19  the plaintiffs will be forced to bear costs, although your

20  Honor hasn't explicitly stated that.  And originally I

21  understand that was not your Honor's predilection.  Now we

22  wouldn't agree to the document, and because the associates in

23  my firm took a courageous stance and said no, your Honor, we

24  won't agree to waive our rights, your Honor said, fine, the

25  document is irrelevant.

C5E3DAS1

1          That's the problem with the entire process.

2          THE COURT:  Here's the deal, Mr. Wittels.  You've just

3    earned yourself a permanent seat at the table.  You think I'm

4    picking on your associates?  That's fine.  You must be here for

5    all conferences.  They've got three partners here.  You can be

6    here all the time.

7          Do you want to make a motion?  You want to go directly

8    to Judge Carter?  Do you want to go to Chief Judge Preska?  Do

9    you want to go to Chief Judge Jacobs or for all I know Chief

10   Justice Roberts?  Do what you got to do.

11         Anything else on this issue?

12         MR. WITTELS:  On the issue of -- I would argue and

13   state to you that your Honor's statement that a document is

14   relevant in one minute and then when the party refuses to

15   acknowledge --

16         THE COURT:  All right, Mr. Wittels, so you want to

17   engage in a debate, I'll answer you.  Here is what I ruled.  At

18   some point in this case, as with any other case under rule

19   26(b)(C)(2), you will not be able to get every single

20   responsive document regardless of the cost.  What I said to

21   your associates, as I had said on one of the documents or more

22   when you were here, that I was concerned that if that was used

23   to seed the predictive coding set as a relevant document, that

24   too many documents of marginal relevance would get put at the

25   top of the queue in terms of what the predictive coding

C5E3DAS1

software might return as the relevant set.  That in doing so,

whenever the Court decided, which I have not decided where the

cutoff is as I've said repeatedly, but that there will likely

be a cutoff under 26(b)(C)(2), and Federal Rule of Civil

Procedure 1, I said I was concerned that you were then going to

argue that instead of going hypothetically to X number of

documents that the defendants would have to spend the money to

review, because so many of the top documents would be of this

marginal, marginal, barely relevant category, that I wanted you

to understand and your associates after you left to understand,

that if they were going to say, okay, we want to see in the

jargon of the industry more like this out of the predictive

coding set, that they were running the risk that that would be

near the top of the pile, and when there was a cutoff, wherever

that number was, that you would be losing other potentially

relevant documents.  And I didn't want to hear an argument

later that said, well, because so many of the top, let's say

40,000, although that is not my cutoff but I'm using it as an

example instead of X, that 10,000 of the 40,000 were

repetitive, marginally relevant documents about somebody's

maternity leave or whatever that particular document was that

was barely relevant, that I didn't want to hear an argument

that the defendants would have to go from hypothetically 40,000

to 50,000 because there was so much of that coming out.  And I

will say if you want this, you got to tell me that you are not

C5E3DAS1

1    going to make that argument later on.

2             I said that with you; I said that with your associate

3    when you left.  When your associate was not prepared to

4    acknowledge that that risk was a factor, I said we would not

5    use that document as a relevant document for the seed set.

6             Now that we have the experts from Recommind and Doar

7    here, if there is something further they can shed light on that

8    if we get to this today, because you're now using your first

9    half hour on an issue that's not on the table.  If you are

10   going to do this every conference, what I strongly suggest is

11   you go to Judge Carter now, and ask him to stay my handling of

12   the case.  If you're not going to do that, stop asking me when

13   you've got a motion.  Nothing new happened.

14            So please.  And whatever you think happened at the

15   last conference that was unfair were in your reply papers which

16   I did skim.  So let's move on.

17            Is there anything else you'd like to say for the

18   record?

19            MR. WITTELS:  Responding briefly to the point that

20   your Honor just made, about again, your Honor changed a ruling

21   about relevancy to irrelevant after agreeing that the document

22   I mentioned, 20532 --

23            THE COURT:  I just explained the basis for that

24   ruling.  If you don't like that, take your objections.  We're

25   done.  Thank you, Mr. Wittel.  Sit down.

C5E3DAS1

1          MR. WITTELS:  All right.  Well, I have more to say

2     about the proportionality argument that your Honor is bringing

3     up if I might say it.

4          THE COURT:  Go ahead.

5          MR. WITTELS:  My point is this.  I've never been in an

6     experience in federal court or otherwise where a plaintiff must

7     decide in advance of getting discovery that a document is

8     irrelevant so that can somehow anticipate a limit on the

9     documents that will be produced.  This goes to a wholly new

10    system that again your Honor is a proponent of and pushing --

11         THE COURT:  Do you want to use key words in this case?

12         MR. WITTELS:  Key words are used in all discovery when

13    you do --

14         THE COURT:  Counsel, counsel, what is it you would

15    like to do here?  Because on the one hand, your expert and you,

16    despite changing your position three times, said yes, we can do

17    predictive coding but it's sort of like I'll take my ball and

18    go home if you don't want do it my way.

19         So tell me what exactly is it you would like done

20    here?  And I am a quite serious.  Do you want to go back to key

21    words?

22         MR. WITTELS:  We don't think predictive coding as it's

23    being implemented --

24         THE COURT:  That isn't my question.  What is it you

25    want to do?

C5E3DAS1

1              MR. WITTELS:  We would like to abandon predictive

2       coding in this case because it's not working because we are

3       being told out of the box that the presumption of the Court,

4       which is the party who is producing documents should bear the

5       expense is now being shifted to the plaintiff when in a civil

6       rights case --

7              THE COURT:  Stop, stop, stop, please, enough.

8              MR. WITTELS:  Our experts -- may I continue or no?

9              THE COURT:  No.  We're done.

10             MR. WITTELS:  You asked what I thought should be done.

11             THE COURT:  I still haven't heard what it is.

12             MR. WITTELS:  I think we should not use predictive

13      coding.

14             THE COURT:  What should we use?

15             MR. WITTELS:  We should use word searches as they are

16      typically done, and the defendants should produce the documents

17      that are relevant and we should go through them.  Your Honor

18      had a system in place here where the defendants were to produce

19      all the documents irrespective of whether they were, quote, as

20      your Honor called them, junk documents.  There was a clawback

21      provision as I understand it.  All the documents were to be

22      produced.  They didn't have to review them.  That's now been

23      changed and in fact their protocol is changing every time we

24      come down here to this court and every time we have a

25      conference with them.

C5E3DAS1

1          THE COURT:  What are you talking about?

2          MR. WITTELS:  After the seed set and all of the

3     documents found were gone through, through the different

4     iterations, if it was more than 40,000, to use your Honor's

5     example, the defendants were required to produce all the

6     documents to plaintiffs.  There wasn't -- well -- well, your

7     Honor is shaking his head.

8          THE COURT:  I have no idea what you are talking about.

9     If you are saying that after I decided hypothetically that

10    40,000 was the right stopping point that nevertheless they had

11    to produce every other document from 40,001 to 10 million to

12    you, then I have no idea what you are talking about.  After

13    whatever the cutoff was, that was it.  You were done except for

14    a certain sampling, period.

15         MR. WITTELS:  Well, that's my point.  There is no --

16    there has never been in any proceeding until now that I am

17    aware of any stopping point --

18         THE COURT:  You're absolutely wrong.  And that's the

19    whole thing that's before the federal rules committee, that's

20    the whole thing with the proportionality decisions which are

21    becoming much more numerous.  You don't get every single

22    relevant document regardless of the cost.

23         MR. WITTELS:  Well, but relevancy, which is what your

24    Honor is determining now, is never determined based on

25    proportionality.

C5E3DAS1

1          THE COURT:  Of course it is.

2          MR. WITTELS:  Relevancy is -- may I finish.  Relevancy

3     is whether a document is relevant or not and whether it -- you

4     don't have to determine out of the box whether a document is

5     admissible, whether a document --

6          THE COURT:  Counsel, you still seem to be saying that

7     you are entitled to every relevant document that MSL has

8     regardless of the cost and I would like you to cite a case to

9     me that says that.

10         MR. WITTELS:  Well, I can cite to you --

11         THE COURT:  Not now.  Put it in a brief.  Put it in a

12    memo, put it in a letter.  Look, there is a limit.  I've been

13    very patient with you despite what you may think.  I've given

14    many, many hours to this case.  It is unusual for me to have

15    full day hearings on discovery matters and to review hundreds

16    of documents.  I'm doing that and have done that with you.  I

17    don't really feel like engaging in endless debates with you,

18    the only purpose of which seems to be for you to find a gotcha.

19         So, you obviously are not shy.  Your argument in your

20    recusal papers that you're somehow scared of me is laughable.

21    File any motions you want, file any objections you want.  Let's

22    move on.

23         On the Publicis issue.

24         MS. NURHUSSEIN:  Your Honor, so your Honor, as we

25    noted in our letter that was submitted last week, we're now

C5E3DAS1

1    seven months into the jurisdictional discovery schedule.

2              THE COURT:  For most of which you seem to have done

3    nothing.

4              MS. NURHUSSEIN:  Actually, your Honor, we submitted

5    our request, served our requests for production and request for

6    admission back in October, seven months ago in accordance with

7    Judge Sullivan's order.  Unfortunately, we're still waiting for

8    basic discovery from both defendants.

9              THE COURT:  And the first time you raised it with the

10   Court, you're here three days later or a week later.  So give

11   me a document request.  We are going to do this the good old

12   fashioned way.

13             MS. NURHUSSEIN:  Okay, your Honor.  Perhaps it makes

14   sense to start with the request that were served on Publicis

15   which we've grouped in our letter into three main categories.

16   So we can just follow the letter.  The first category we

17   identify and I guess just as background --

18             THE COURT:  I've read your letters.

19             MS. NURHUSSEIN:  Okay.  Three substantive categories

20   and we also had two general concerns.  In terms of Publicis'

21   refusal -- or tendency to produce partial responses and also

22   the invocation of the French blocking statute.

23             In terms of the substantive categories, the first

24   category was compensation and bonus pool data.

25             THE COURT:  Here's what seems to be the difference

C5E3DAS1

1    between you and Publicis.  You want everything, they have given

2    you the policy procedures which I would think the policy

3    question under the case law is if they set the compensation for

4    certain MSL or other employees, then that is a factor leading

5    towards jurisdiction.  Does it matter what the actual contract

6    with Mr. X or Mr. Y is or what that compensation is?

7             MS. NURHUSSEIN:  I don't know, I think the

8    implementation of the policy would also be relevant.

9             THE COURT:  Why?

10            MS. NURHUSSEIN:  Particularly in this case, I guess

11   taking a step back.  First of all, the personal jurisdiction

12   analysis is very fact intensive.  And also it is based on sort

13   of the cumulative context.  If there is a policy we can still

14   hear a response, well, sure, there is a policy, but Publicis

15   just rubber stamped compensation decisions, they weren't really

16   involved.

17            The other concern is MSL here repeatedly referred to

18   their own parent company's policies as, quote unquote,

19   so-called policies in our conditional certification briefing.

20   So I don't think we can necessarily say -- a Court may find

21   that the policy is sufficient, but I think given the defenses

22   that the defendants have raised, it is critical we get --

23            THE COURT:  Have you talked about whether that defense

24   is going to be raised here?  It is truly amazing to me how

25   there seems to be a lack of communication and that to a certain

C5E3DAS1

1    extent is a problem that both sides seem to have.  It appears

2    to me that they have produced information showing that they did

3    indeed set the employment salary and other terms for

4    Mr. Sakanos and Mr. Fluerot and maybe others.

5           Have you asked them, okay, that's the general policy,

6    are you going to argue, Publicis, that even though that was the

7    general policy statement that you would do that, that you

8    didn't do it?  Or to put it another way, before they have to

9    produce out of France every single document, how about you take

10   the 30(b)(6) or substantive deposition, and if they walk away

11   from the policy, that will be the risk that that reopens

12   document discovery?

13          Right now, you want everything in the world when it

14   may be a very simple issue.

15          MS. NURHUSSEIN:  Your Honor, a couple of concerns.  We

16   do plan to do a 30(b)(6) but there are a couple of issues

17   there.  First, in order to do the 30(b)(6) we need the

18   documents.  And second --

19          THE COURT:  Stop.  Stop, one second.  As I understand

20   it, they have produced the Janus book and other policy

21   documents showing what they do about compensation with certain

22   specifics as to individuals, but not dollar amounts, etc.  You

23   take the 30(b)(6) deposition.  It's been a while since I've

24   taken a deposition.  But you show him the Janus book.  Isn't it

25   true, Mr. 30(b)(6) witness or Ms. 30(b)(6) witness, that it

C5E3DAS1

1    says your policy is you set the salary for Mr. Fluerot.  Did

2    you do what?  Did Publicis do that?  Yes or no.  If they say

3    yes, you're done.  You don't need any other documents.  If they

4    say, oh no, that is some silly policy book, but we never follow

5    that or we don't follow it on these specifics.  Normally, I say

6    you only get one deposition.  In this case, it seems to me with

7    all the arrow spatial issues and the French blocking statute

8    issues, that if we can avoid that, that's what the Supreme

9    Court said we should do.

10           So, if you've got the policy statement that gives you

11   the answer you want, and you're just afraid they are going to

12   walk away from it, take the 30(b)(6) deposition.  I am

13   specifically stating now that if they walk away from major

14   issues -- I'll take "major" out.  If they walk away from policy

15   statements about subjects that are a factor in the

16   jurisdictional discovery analysis, I will then reconsider what

17   documents they need to produce and a subsequent 30(b)(6)

18   witness.

19           Why does that not work for the plaintiffs?

20           MS. NURHUSSEIN:  I think our concern, your Honor, is

21   just that since it is our burden on personal jurisdiction that

22   the Court be able to make a decision based on a full record, a

23   full factual record.

24           THE COURT:  If that's the best you can do, that's not

25   a winning argument.

C5E3DAS1

1              MS. NURHUSSEIN:  If I can add one other thing.  I know

2      you said that -- I raised the issue before, the concern we had

3      about the defenses that the defendants have raised.  Just to

4      give you one example, Publicis in its response to one of our

5      requests for admission claims that every single request for a

6      raise exception during the salary freeze they approved.  Again,

7      this kind of goes to the idea that --

8              THE COURT:  They admitted that or they said they

9      didn't?

10              MS. NURHUSSEIN:  They admitted.  It goes both ways.

11              THE COURT:  It sounds to me like you are trying to get

12      your merits discovery from Publicis before you have established

13      jurisdiction over them.  If they've admitted that they've made

14      every raise exception, that may be good or bad for the merits

15      of the case, but it certainly establishes their involvement,

16      which is what you are trying to establish for jurisdictional

17      purposes.

18              Am I missing something?

19              MS. NURHUSSEIN:  The point that I was going to make is

20      that we've received -- there is a lot of conflicting evidence

21      in the record.

22              THE COURT:  Once -- sorry.  Once you have a 30(b)(6)

23      answer, it is binding on Publicis.  That's the effect of the

24      30(b)(6) deposition.

25              MR. EVANS:  If I may, we've already answered her

C5E3DAS1

1    request for admission wherein we've admitted that Publicis

2    Groupe instituted a salary and hiring freeze.  We have admitted

3    that exceptions to that freeze from MSL Group had to be

4    approved by CFO Jean Michel Etienne and General Secretary

5    Mathias Emmerich.  Because we took the position and continue to

6    take the position that all such exception requests were

7    approved, we have produced the e-mail from Mathias Emmerich

8    identifying the back and forth where the approval request

9    flowed to him and Mr. Etienne.  So we've produced specific

10   documents with respect to the implementation of the freeze

11   because there is some question about the implementation.

12        Where we haven't produced specific documents are the

13   compensation of key executives.  We've produced documents that

14   demonstrate those executives that we need to approve, and we've

15   also answered a request for admission that we approve the

16   bonuses for key executives at MSL Group.

17        There are already admissions on the record that

18   plaintiffs can rely upon.

19        MS. NURHUSSEIN:  I guess, your Honor, I mean if the

20   defendants are willing to stipulate to that element --

21        THE COURT:  If it is an admission, it is an admission.

22   Unless I have totally forgotten everything in the federal

23   rules, an admission is binding on them.  And the 30(b)(6) is

24   binding on them.  Why do you need to convert it into a

25   stipulation?

C5E3DAS1

1          MS. NURHUSSEIN:  Okay.  And your Honor --

2          THE COURT:  I got to tell you that if they suddenly,

3  despite all that, backtrack when they make the motion to

4  dismiss, or the reply papers after you do yours, I can order

5  additional discovery at that point.

6          MS. NURHUSSEIN:  Okay.  Understood, your Honor.  I

7  think the point I was trying to make is a policy --

8          THE COURT:  You've made the point.  Anything else on

9  this piece of the application?

10         MS. NURHUSSEIN:  Nothing further, your Honor.  Aside

11  from noting that I don't think Publicis has articulated -- I do

12  think this goes directly to the factors articulated in CPLR 301

13  and 302, and I don't recall defendants articulating any real

14  burden in terms of producing the information.

15         THE COURT:  Next?  Next seem to be the reorganization.

16         MS. NURHUSSEIN:  Yes.

17         THE COURT:  According to their letter, they've

18  produced everything they found.

19         MS. NURHUSSEIN:  Yes, your Honor.  That's what they

20  said in their letter.  And the problem is we don't think that's

21  the case.  Obviously, we are operating at an informational

22  disadvantage.  But even we, without having access to all the

23  documents, are able to identify a few key documents relating to

24  restructuring, including the document that we attached to our

25  letter which is a sort of a form document that's included in

C5E3DAS1

1    the Janus book that any of the subsidiaries have to submit --

2              THE COURT:  Which exhibit?

3              MS. NURHUSSEIN:  I believe that's Exhibit C, the

4    project summary and financial estimates.

5              THE COURT:  Mr. Evans.

6              MR. EVANS:  Your Honor, it is the same issue.  We have

7    produced all the documents that reflect the policy of Publicis

8    with respect to the reorganization of MSL Group.  We have

9    admitted in request for admissions that Publicis Groupe -- and

10   this is their language -- or Maurice Levy, the CEO of Publicis

11   Groupe, participated in the decision to create MSL Group.  We

12   admitted they appointed Olivier Fleurot, the CEO.  We have

13   produced the only document that demonstrates Publicis Groupe

14   involvement in that process.  We have not produced the

15   documents that demonstrate the day-to-day implementation of the

16   policies set forth in the Janus book.

17             As opposing counsel has just referenced, we did

18   produce the Janus book itself.  The Janus book itself contains

19   the form that is a particular form that was filled out.  But it

20   is not relevant to the question of personal jurisdiction as to

21   the particular form being filled out.  The fact that it needs

22   to be filled out is sufficient to have the argument as to

23   whether or not jurisdiction should be conferred on Publicis

24   Groupe.

25             We disagree with the plaintiffs about the significance

C5E3DAS1

1    of that.  But there is no reason to go through and produce each

2    and every document that implements a non-controversial or

3    undisputed policy.

4         MS. NURHUSSEIN:  Your Honor, this is the

5    reorganization that's the center of the plaintiffs'

6    allegations.  It provides a basis for personal jurisdiction

7    under CPLR 301 and 302 as I said before.  The courts in doing a

8    personal analysis as to whether personal jurisdiction attaches,

9    it always comes down to -- or often comes down to the details.

10   It involves sort of the totality of circumstances, and it is a

11   very fact intensive inquiry.  And the extent to which there may

12   be a difference between a case where a parent has some nominal

13   role in a reorganization versus one where the parent was

14   intimately involved.  So documents demonstrating the extent of

15   the parent's involvement and in terms of approving various

16   aspects of the reorganization, those are all going to be

17   relevant.

18        THE COURT:  To the extent you've shown me this project

19   summary and financial estimate, I guess my question is, are

20   there -- how many of these are there, and I'm not quite sure

21   what they show.  Let's start with the basic.

22        MR. EVANS:  With respect to the MSL Group

23   reorganization, I don't know, your Honor, how many there are.

24   I don't believe there are very many.  I am not sure there are

25   more than that one.  We can find that out.  I'm happy to do

C5E3DAS1

1      that.

2                THE COURT:  All right.  Find it out.  And if it's more

3      than one, but less than a bread basket, bigger than a bread

4      basket, if it is not going to break the bank, produce them all

5      so we can just get this behind us.

6                MR. EVANS:  Yes, your Honor.

7                MS. NURHUSSEIN:  Your Honor, there are again, even

8      though we have very limited information, there are other

9      documents that we are aware of.  For example, MSL produced some

10     documents related to the reorganization months ago that

11     reference restructuring plans that were submitted to the parent

12     company.  We've been trying to get those from MSL for several

13     months and they keep deferring because of ESI protocol.  So we

14     haven't been able to get them from MSL and Publicis.  And

15     that's sort of emblematic of the troubles we are having in

16     getting any discovery.

17               MR. EVANS:  Your Honor, we have searched our records

18     for those documents.  We have detailed the individuals with

19     whom we have spoken.  The only document we have that references

20     to plans with respect to the reorganization is the document

21     we've produced.  We have confirmed with our client that that

22     reorganization was structured and put in place by Mr. Fluerot

23     after he became CEO of what was then MSL Worldwide prior to it

24     becoming MSL Group.

25               So, it is not surprising to me they may have more

C5E3DAS1

1   records than we have.  We have searched our records and we have

2   not found anything responsive.

3        We are producing as our 30(b)(6) witness the CFO of

4   the organization Jean Michel Etienne who can answer further

5   questions about that.

6        THE COURT:  By the way, you are going to at the end of

7   the conference spell all these names for the court reporter.

8        MR. EVANS:  Will do.

9        THE COURT:  If you have specific documents

10  Ms. Nurhussein, I suggest that you give them to Mr. Evans and

11  let him search for them out of the Publicis files.  And by

12  searching for them that you know about, they may come up with

13  other documents.  And obviously you're free to ask the 30(b)(6)

14  witness what else might exist.  But when I'm told that they've

15  produced everything and in this case the reorganization is

16  somewhat of an amorphous term, which goes back to I think the

17  first conference we had, I am not sure what else I can do.

18       MS. NURHUSSEIN:  Your Honor, if I can just address

19  that the document I am talking about it is name MSL corporate

20  restructure.  It is a form taken out of the Janus book, a

21  section in that book that is just about restructuring

22  organizations.

23       THE COURT:  Again, if it's out of the Janus book, you

24  have it in the Janus book, you have the ability to ask the

25  30(b)(6) witness all sorts of questions about it.  I'm not sure

C5E3DAS1

1   that anything else is needed.  But if you have specific

2   documents that you can point to Mr. Evans and say, hey, Paul,

3   did you look for this?  Why didn't you find it, etc., etc.,

4   he'll go to the client with it, they'll either say, oh, we

5   didn't think this was covered, or we don't have it, but when

6   looking for it we found three other documents that might be

7   helpful to you.

8         Generally, when a lawyer who is an officer of the

9   court and is putting their license on the line so to speak says

10  I spoke to the client and there are no other responsive

11  documents, there is nothing I can do until you give me

12  ammunition to show that they're not acting in good faith.

13        MS. NURHUSSEIN:  Your Honor, we have done that with

14  defendants in the past.  To the extent we obviously don't have

15  much information.  I know in the past we've sent MSL lists of

16  bullet points after carefully reviewing all their documents of

17  several other documents that we believe exist relating to

18  reorganization, and they repeatedly told us you'll get it as

19  part of the ESI protocol.  I would ask them to conduct a search

20  for those documents now.

21        THE COURT:  We'll deal with MSL when I'm done with

22  Publicis.  So if you've got anything you want Publicis to be

23  searching for, don't be shy, give it to them.

24        Does that conclude our second category so we can move

25  on to the third?

C5E3DAS1

             MS. NURHUSSEIN:  I guess on just the last point, your

Honor.  Just to go back to the example I gave before, the MSL

PowerPoint presentation that referenced the restructuring plans

submitted to Publicis and I believe it was the beginning Bates

number I think was MSL 1362 or somewhere around there.  But, it

references Publicis, so just I would imagine Publicis has it in

its possession, unless you are saying that the one PowerPoint

presentation that Publicis produced related to the organization

is the one referenced in the PowerPoint presentation.

             MR. EVANS:  Your Honor, it is a four-year-old

reorganization that Publicis itself was not day-to-day

handling.  And we have produced the document that was presented

to the P12.  That's the only document that my client has told

me they have.  I've asked.  Counsel raised this on a conference

call.  I've asked them to search further for those documents

and they've reported they do not have any.  I don't know what

more I can do.

             THE COURT:  The only other thing you need to make sure

you do, since the French are not used to U.S. discovery where

certain proportionality limits, "all" means all, not some or

examples.  Make sure, I suspect you already have, but make sure

that they understand "all" means all, and that they have to

look in all the right places and etc., etc.  And if the answer

is still none, then subject to them being severely embarrassed,

among other things, if Ms. Nurhussein is taking their

C5E3DAS1

1  deposition brings to light something that you should have

2  thought of or they should have thought of by asking questions,

3  then the person who is flying over from France may be making a

4  second trip here.  So it is obviously in their interest to do

5  it right and to understand U.S. discovery protocols.

6          MR. EVANS:  I'll reiterate those points, your Honor.

7          THE COURT:  I think the next thing is the 40-plus

8  other subsidiaries.

9          MS. NURHUSSEIN:  Yes, your Honor.  And the

10 significance of this is again, this goes to CPLR 301, and

11 that's a question of whether the Court can assert personal

12 jurisdiction over MSL through its --

13         THE COURT:  Publicis.

14         MS. NURHUSSEIN:  I'm sorry, Publicis.  Through its

15 subsidiaries.  Again, the case law, all the case law says that

16 the courts must look to the cumulative significance of all the

17 activities before incorporation and --

18         THE COURT:  Do you have any good faith belief that all

19 or any of these 40 entities are agents as the 301 law uses it

20 or mere departments of Publicis?

21         MS. NURHUSSEIN:  Your Honor, we know that they operate

22 in New York.  And through the limited discovery that we've seen

23 that we've been able to preview through MSL's seed set, we've

24 seen some evidence that related to some of the subsidiaries in

25 terms of breakdown of lack of corporate formalities, or

C5E3DAS1

1   Publicis making personnel decisions relating to some of the New

2   York based subsidiaries.  But obviously we haven't received

3   discovery related to those subsidiaries.

4           THE COURT:  That's not the question.  Before we go

5   down this path, don't you have some obligation to have a good

6   faith belief, based on something, that any of these 40 are

7   departments or instrumentalities?  Otherwise what you are

8   basically saying, and this I think is something Judge Sullivan

9   discussed with you, that any time a foreign company has a

10  subsidiary in New York, it is subject to jurisdiction in New

11  York.  And this would certainly change New York law

12  dramatically.

13          MS. NURHUSSEIN:  Your Honor, that would be the merits

14  inquiry, if and when Publicis files its dispositive motion

15  based on lack of personal jurisdiction, that would be precisely

16  the question.  But --

17          THE COURT:  What would be precisely the question?

18          MS. NURHUSSEIN:  Whether those subsidiaries, whether

19  any of those subsidiaries, their activities in New York is

20  sufficient or their relationship with Publicis is sufficient to

21  confer jurisdiction over Publicis Groupe.

22          THE COURT:  But assuming we did this in the old

23  two-step approach, do you have any reason to believe that

24  these, any of these 40, are akin to the Hilton Worldwide

25  Reservation System in the case that you yourself cited to make

C5E3DAS1

 1    it such an instrumentality of Publicis?

 2                MS. NURHUSSEIN:  Your Honor, I don't know that I can

 3    identify which ones specifically.  But --

 4                THE COURT:  I guess the question is, is this a fishing

 5    expedition, or is there some basis to believe that Publicis

 6    acts in New York through any of these subsidiaries to such an

 7    extent that under the case law under CPLR 301 it has

 8    jurisdiction here?  And I know you don't have discovery on it.

 9    But, before you get discovery, there seems to me you've got to

10    make some threshold showing.

11                MS. NURHUSSEIN:  Actually, your Honor, we do have some

12    belief, because just to give a couple of examples, the Janus

13    book which is the policy that applies, that governs MSL, also

14    governs Publicis Groupe's other subsidiaries, the salary

15    freeze, which relates to various factors under CPLR 301 and

16    302 --

17                THE COURT:  How can 302 possibly help you here as to

18    the other subsidiaries?

19                MS. NURHUSSEIN:  I take that back.  I meant 301.

20                THE COURT:  Okay.

21                MS. NURHUSSEIN:  The salary freeze and requests for

22    raise exceptions that we've discussed previously, we've seen

23    some e-mails showing that Publicis follows the same policy with

24    respect to its other subsidiaries.  We know that the global

25    hiring and salary freeze was a group-wide freeze.  So I think

C5E3DAS1

```
1    many of the same arguments that apply to MSL would also apply

2    to other subsidiaries at least at a threshold level --

3            THE COURT:  Since MSL is the defendant here, if all

4    you are doing is piggybacking the same arguments as to the

5    others, it would seem to me that either there is enough

6    Publicis involvement in MSL to have jurisdiction, or the fact

7    that they do the same thing to the other companies doesn't seem

8    to get you much.

9            MS. NURHUSSEIN:  Your Honor, I think again it comes

10   down to the fact, comes back to the fact that this is a

11   balancing, the personal jurisdiction analysis of the balancing

12   test that looks at the cumulative --

13           THE COURT:  If all we are talking about is that sort

14   of stuff from the Janus book, is that something that your

15   30(b)(6) witness could testify to as to whether the salary

16   freeze and compensation for the most senior executives etc.,

17   applies to the other New York subsidiaries?

18           MR. EVANS:  Yes, your Honor.

19           THE COURT:  Any reason we shouldn't do it that way?

20           MS. NURHUSSEIN:  I guess I would -- I would ask that

21   Publicis at the very least respond to the interrogatory or some

22   of the interrogatories which seems to be very minimally

23   burdensome.

24           THE COURT:  Which interrogatories?  Let's be specific.

25           MS. NURHUSSEIN:  For example, interrogatory one.
```

C5E3DAS1

1            THE COURT:  Which set?

2            MS. NURHUSSEIN:  Oh.  The first set.

3            THE COURT:  Give me a minute to get.  Is there

4   supplemental responses I believe?

5            MR. EVANS:  Yes, your Honor.

6            THE COURT:  Okay.  Got it.  Interrogatory number one.

7   Part of the problem is if you want me to rule on

8   interrogatories as they are written, this one is an automatic

9   no brainer.

10           So do you think you might want to modify this before I

11  give you any other indication on my ruling?

12           MS. NURHUSSEIN:  Your Honor, just in the interest of

13  reaching some resolution, we could limit this to temporal scope

14  to 2008 to the present.  And we also could limit it to just New

15  York locations.

16           THE COURT:  No kidding.  What is the relevance of the

17  year of acquisition?  And frankly, what is the relevance of the

18  annual revenue?

19           MS. NURHUSSEIN:  Well, year of acquisition, you know,

20  again goes to common ownership.  It is sort of implicit, I

21  guess if we have the percentage ownership, if we have the

22  percentage ownership, the year of acquisition, we can probably

23  live without the year of acquisition.

24           THE COURT:  Have you read the responses?

25           MS. NURHUSSEIN:  Yes, your Honor.

C5E3DAS1

1          THE COURT:  So what else are you really looking for?

2     Limited to New York, you're down to the 41 that you already

3     know about.

4          MS. NURHUSSEIN:  Yes, and the annual revenue is

5     important.  It goes to financial dependence.

6          THE COURT:  How does it go to financial dependence?

7          MS. NURHUSSEIN:  Or actually --

8          THE COURT:  Go ahead.

9          MS. NURHUSSEIN:  What I meant to say, it goes

10    primarily to the agent standard, whether the parent would do

11    all the business --

12          THE COURT:  Does it matter whether they made a million

13    euros or a hundred million euros?

14          MS. NURHUSSEIN:  Yes, your Honor, it would.  If the

15    parent -- if a particular subsidiary generates a huge amount of

16    revenue for the parent, then the parent probably would be

17    compelled to --

18          THE COURT:  So that means every time you've got a

19    highly profitable subsidiary in New York, you are doing

20    business in New York?

21          MS. NURHUSSEIN:  I am not saying you are automatically

22    doing business in New York, but is it is a factor that the

23    Court considers in part in doing the analysis.

24          THE COURT:  Can you give me a case cite in your letter

25    where the revenue was a factor?

C5E3DAS1

1              MS. NURHUSSEIN:  Yes, the <u>Goyette</u> case.

2              THE COURT:  What page of your letter?

3              MS. NURHUSSEIN:  Let me find that.

4              THE COURT:  According to your squib on it, it is on

5    page 10.  <u>Goyette v. DCA Advertising</u>.  Your parenthetical is

6    relevant factors include importance in the New York market to

7    the foreign corporation.

8              That is certainly something you can ask the Publicis

9    30(b)(6) witness in general, obviously, Publicis subsidiaries

10   are doing a great deal of business in New York.  If that's

11   enough, that's enough.

12             MS. NURHUSSEIN:  That's a very subjective response.

13   If they say we are doing -- we don't do that much business and

14   it turns out they are doing a few hundred --

15             THE COURT:  Is the annual revenue of the New York

16   subsidiaries something that is, A, public, and/or B, how easy

17   is that to put together?

18             MR. EVANS:  Your Honor, I don't believe it is public.

19   It is something that could be put together.  We put together

20   the annual revenue for MSL Group in the United States and in

21   New York in response to interrogatory number one.

22             I would say that this is a path if we start to go

23   down, we quickly fall into the fishing expedition discovery

24   that we are trying to avoid here.  The plaintiffs, when they

25   sought jurisdictional discovery from Judge Sullivan in the

C5E3DAS1

1   first place, focused on the relationship between Publicis and

2   MSL Group.  When Judge Sullivan granted that discovery he cited

3   to the Jazinis case in the Second Circuit which makes it clear

4   that a plaintiff needs to establish a prima facie case

5   regarding jurisdiction before discovery should be granted.  And

6   in fact says we recognize that without discovery, it may be

7   extremely difficult for plaintiffs in Jazinis' situation to

8   make a prima facie showing of jurisdiction over a foreign

9   corporation that they seek to sue in the federal courts in New

10  York.  That, however, is the consequence of the problems

11  inherent in attempting to sue a foreign corporation that has

12  carefully structured its business so as to separate itself from

13  the operation of its wholly owned subsidiaries in the United

14  States.

15          The Second Circuit has recognized that it takes more

16  than a subsidiary parent relationship and vague allegations on

17  the part of the plaintiffs to justify jurisdiction in this

18  sort.  We have agreed today to produce a 30(b)(6) witness who

19  can testify generally to Publicis' relationship with its

20  subsidiaries in New York.  To go down this path is burdensome

21  to my client and irrelevant and unnecessary.

22          MS. NURHUSSEIN:  If I can address the Jazinis case,

23  that case is distinguishable because in that case all the

24  plaintiffs put forth were conclusory statements relating to

25  personal jurisdiction factors and also --

C5E3DAS1

1           THE COURT:  Sounds like a lot like the conclusory

2      statements you are making about the New York subsidiaries,

3      putting aside the MSL subsidiary.

4           MS. NURHUSSEIN:  I don't agree with that assessment.

5      I've cited the fact that Publicis Groupe, that all the New York

6      subsidiaries are about the Janus policy, that there is a

7      company-wide salary freeze.  I think there are some of the

8      e-mails we've seen as well.

9           THE COURT:  Considering the amount of revenue that I

10     see on page six as to MSL, I doubt that the revenue from the

11     other subsidiaries is going to change things, but I am not

12     going to rule on this until I find out what else you want.

13     Meaning if we stop here, I might give you that just on the

14     ground of one less thing to worry about objections about, from

15     at least one side.  The other side there might.

16           But if this does start down the slippery slope, then I

17     might be inclined to just stop at the top of the slope.  To mix

18     metaphors.

19           What else do you think you would desperately need or

20     not so desperately need as the case may be?

21           MS. NURHUSSEIN:  If you can just give me one second.

22     Your Honor, if your Honor turns to 13, I think there is a lot

23     of overlap with the previous one so we can probably --

24           THE COURT:  Do you want me to look at it or no?

25           MS. NURHUSSEIN:  Let me see.  Okay, we can probably

C5E3DAS1

1    skip that one.

2              THE COURT:  Okay.

3              MS. NURHUSSEIN:  Then I think the only other one that

4    I'd want to discuss is interrogatory number 15.

5              THE COURT:  We're now in the second set?

6              MS. NURHUSSEIN:  Yes, your Honor.

7              THE COURT:  Next time if you put tabs in between all

8    these, it would make it easier.  Let me find it in your

9    attachments here.

10             MS. NURHUSSEIN:  We'll do that next time, your Honor.

11             THE COURT:  I've got the objections.  Were there

12    supplements on this?

13             MR. EVANS:  There were not, your Honor.

14             THE COURT:  So 15?  How is this relevant?

15             MS. NURHUSSEIN:  If you can give me one minute, your

16    Honor.

17             THE COURT:  Are you still thinking about 15 or are you

18    thinking about something else?

19             MS. NURHUSSEIN:  I'm looking at others as well.

20             THE COURT:  Well, are we done with 15?

21             MS. NURHUSSEIN:  No.  Well, 15 goes to, 15 relates to

22    the mere department test under CPLR 301, particularly the

23    parent's role involving personnel decisions.

24             THE COURT:  You've got their role in personnel

25    decisions.  Does it matter how much the employees, apparently

C5E3DAS1

1    most of whom are not governed by Publicis' role, make?  And

2    were you looking for this individually, collectively?

3              MS. NURHUSSEIN:  Well, individually, your Honor.  And

4    it is relevant because --

5              THE COURT:  Sounds like it's relevant possibly to the

6    merits of your case and that you're trying a backdoor here.

7              MS. NURHUSSEIN:  No.  It's relevant to the

8    jurisdictional question because if the bulk of these --

9              THE COURT:  Let's say subsidiary number 41 has 10

10   employees, one of whom is the CEO appointed by or approved by

11   Publicis and he makes a million euros, and the other nine

12   employees are messengers who make 10,000 bucks each.  So what?

13             MS. NURHUSSEIN:  Well, what's relevant is if Publicis,

14   if the parent company is paying a significant portion of their

15   salaries --

16             THE COURT:  That's not what you asked for here.  So

17   your request is denied.  Move on.

18             MS. NURHUSSEIN:  Okay.  I think the last --

19             THE COURT:  And in the future, let me be clear.  If

20   you ask an overbroad request, it may be that all I am going to

21   do is say the request is overbroad.  Back to the drawing board.

22   Not modify it for you or anything else.  Next?

23             MS. NURHUSSEIN:  Okay.  Your Honor, would it be

24   possible to modify it in the way I just proposed so just --

25             THE COURT:  Everybody that Publicis pays, is that they

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C5E3DAS1

1   actually cut the check for?

2           MS. NURHUSSEIN:  Right.

3           THE COURT:  Are there any?

4           MR. EVANS:  I don't know, your Honor.  I don't believe

5   so.

6           THE COURT:  Wouldn't that come out of the Janus book

7   and/or certainly your 30(b)(6) witness would know the answer to

8   that?

9           MR. EVANS:  I'm sure the 30(b)(6) witness would have

10  the answer.

11          THE COURT:  You can ask the 30(b)(6) witness.  Next?

12          MR. EVANS:  Your Honor, just to clarify, I don't think

13  the witness will be in a position to answer the compensation

14  paid to each those individuals unless --

15          THE COURT:  Correct.

16          MR. EVANS:  Okay.

17          THE COURT:  If the answer is yes, they actually pay

18  directly the president of subsidiary number 41, that there will

19  probably be a leave a blank in the transcript or a follow up

20  request for it, so you might want to find that out internally

21  in advance.

22          MR. EVANS:  Understood.  We are talking about

23  compensation paid from Publicis' accounts to the individuals.

24          THE COURT:  Correct.

25          MR. EVANS:  Thank you, your Honor.

C5E3DAS1

1          THE COURT:  Next.

2          MS. NURHUSSEIN:  Just sort of piggybacking on what

3     Mr. Evans just said, I think there are a lot of similar

4     disputes relating to the 30(b)(6) deposition.  So Publicis had

5     raised a number of objections to the various deposition topics

6     that we had --

7          THE COURT:  Do you want to give me the deposition

8     topic and/or their objections to it since that's not something

9     that was in this packet?

10         MS. NURHUSSEIN:  Okay.  I believe it was raised in

11    Mr. Evans' letter.  I only have one copy.  I don't know if

12    Mr. Evans has an extra copy or anyone else on defense side has

13    an extra copy.

14         MR. EVANS:  I only have one copy, your Honor, but I am

15    happy to hand it up.

16         THE COURT:  In an effort to get the two of you to talk

17    to each other, why don't you both stand at the podium, sharing

18    one copy, and I'll take the other.

19         Was there a written objection document?

20         MR. EVANS:  There is, your Honor.  It is in the form

21    of a letter.

22         THE COURT:  Okay.  So this seems to be a long list of

23    what the witness will testify about.  What is it that you want

24    me to rule on that the witness isn't testifying about?

25         MS. NURHUSSEIN:  Actually, your Honor, so there are a

C5E3DAS1

1    number -- if you look at our original requests, subjects of

2    testimony, a lot of them have been narrowed by defense counsel.

3    So there are a lot of topics.

4              THE COURT:  Has there been a meet and confer on this?

5              MS. NURHUSSEIN:  We've exchanged correspondence on

6    that.

7              THE COURT:  That's not a meet and confer.

8              MR. EVANS:  No, I don't believe so.

9              THE COURT:  Okay.  You can spend some time in the jury

10   room meeting and conferring.  Come on, really.  Really?  We

11   have to do this over and over again?  We've got some highly

12   paid experts sitting around here being either amused or bored

13   or pick some other adjectives but I don't want to get in

14   trouble.  I'm not going to do this.  So let's get to the other

15   issues on the table, and then the two of you can go in the back

16   room, in the jury room, and when you're done if there is a live

17   dispute, you'll bring it to me.  Alternatively, you can come

18   back in a week or two.

19             MR. EVANS:  Your Honor, my understanding of the

20   plaintiffs' concerns with our objections was that it was

21   limited to the broad categories of information that were the

22   subject of the document request disputes we were here before

23   today with respect to the 41 subsidiaries, and the information

24   for individuals' specific compensation.  And that was what I

25   proposed in my letter we address here.  If they have other

C5E3DAS1

1    disputes with other categories of documents, I haven't heard

2    them.

3              THE COURT:  Ms. Nurhussein?

4              MS. NURHUSSEIN:  Your Honor, I would say that's

5    accurate as to most of the disputes, not all of them.

6              THE COURT:  You heard what I said the 30(b)(6) witness

7    can be asked about.  Obviously, it makes no sense to ask, even

8    if the witness had a photographic memory, what did employee

9    Sherlock Holmes of MSL subsidiary number New York two make in

10   2009.  We are not doing individual compensation for anybody.

11             MS. NURHUSSEIN:  I understand that, your Honor.  There

12   are a number of requests or subjects that involve sort of

13   general issues that relate to not just MSL, but other

14   subsidiaries.

15             THE COURT:  Such as?

16             MS. NURHUSSEIN:  For example, the first request,

17   organizational management operational and reporting structure

18   of Publicis.  I am not sure whether or not you --

19             THE COURT:  But the minute you turn to him and say I

20   am not sure what your position is, you're wasting my time.  I'm

21   not sure what your position is, is what the meet and confer is

22   all about.  So, we're done with this for now.

23             I'll give you back, Mr. Evans, the copies you lent me,

24   and when we're done with all the other issues on the table, the

25   two of you and Mr. Wittels and anyone else who has a stake in

C5E3DAS1

1    it can go use the jury room and talk to each other.

2              With that, are we done with Publicis?

3              MS. NURHUSSEIN:  Those are the main disputes, your

4    Honor.  There are a number of --

5              THE COURT:  If you want me to rule on anything, now is

6    your shot.  You've got a very limited discovery period, which

7    you've managed to leave so that you're down to a month.  So,

8    it's now 11 o'clock, we started give or take at 9:30.  If there

9    is anything else you want me to rule on that you've had a good

10   faith meet and confer on, other than the issue we've put a pin

11   in, tell me now because I am not doing it again.

12             MS. NURHUSSEIN:  I think the only other issue on our

13   end is that we are still waiting for a number of documents that

14   we've been waiting for several months now.

15             THE COURT:  Mr. Evans, when are they going to be

16   produced?

17             MR. EVANS:  There is one set of documents waiting to

18   be produced have to do with the budgetary process.  We've

19   agreed to produce the back and forth with MSL on the budgeting.

20   Many of those documents are in storage.  I don't have a date

21   when they are going to be sent back from the storage company

22   yet.  I've told the plaintiffs that I'm pushing for that date.

23   I will provide it to them.

24             THE COURT:  Got to push it harder.  This is a storage

25   company in France?

C5E3DAS1

1              MR. EVANS:  It is, your Honor.

2              THE COURT:  When was the request made?  How much is

3     the issue that they do it in 30 days for one fee, they do it in

4     10 days for quadruple the fee?

5              MR. EVANS:  The request was made in March.

6              THE COURT:  There is something wrong there.  So,

7     you've got a week.  Get it done.  The request was made in March

8     to the storage company and we are at a minimum 45 days and

9     maybe 75 days later, something is wrong.  So, you got a week to

10     get it done.  Okay?

11              What else, Ms. Nurhussein?

12              MS. NURHUSSEIN:  I believe Mr. Evans was going to be

13     supplementing his production in terms of some of the corporate

14     structure documents.

15              MR. EVANS:  Your Honor, the issue here is we have

16     produced a document that was attached I believe to the

17     plaintiffs' submission to the Court on May 3rd that

18     demonstrates the corporate structure of Publicis and how it

19     relates to its U.S. subsidiaries including MSL Group.  The

20     plaintiffs suggested there was something incomplete about this

21     document.  I've confirmed that there is not.  This is the

22     corporate structure.  I could produce another organizational

23     chart that shows the exact same thing.  I'm willing to do so.

24     But there is not any other corporate structure chart out there

25     that is going to show a different interrelationship of entities

C5E3DAS1

```
 1    that leads from Publicis Groupe to MSL Group.

 2               THE COURT:  Ms. Nurhussein, that seems to end that.

 3    No?

 4               With all due respect, you've got to get a little

 5    quicker on this stuff.  Next issue?  Silence usually means

 6    we're done.

 7               MS. NURHUSSEIN:  I just want to confirm, your Honor.

 8               THE COURT:  Let's do it faster, please.

 9               MS. NURHUSSEIN:  I will try, your Honor.  I believe

10    that's all I have right now, your Honor.

11               THE COURT:  Okay.  Do we have a jurisdictional

12    discovery issue as to MSL I take it?  And by that I mean MSL's

13    production.

14               MS. NURHUSSEIN:  Yes, your Honor, we have some issues

15    there as well.

16               THE COURT:  How much of that is live in light of my

17    rulings this morning on policy issues?

18               MS. NURHUSSEIN:  I think some of it still may be.

19               THE COURT:  Then let's get specific.

20               MS. NURHUSSEIN:  Well, I guess, your Honor, the main

21    issue that we have with that we're running into with MSL is

22    that defense counsel has told us that they aren't doing a

23    separate -- aren't going to do an e-mail search for

24    jurisdictional discovery.

25               THE COURT:  But my question is in light of my rulings
```

C5E3DAS1

that we're looking at this from a policy basis and 30(b)(6)

witness basis from Publicis, what else is it that they should

be looking for?  And the "they" is MSL.

MS. NURHUSSEIN:  I believe, your Honor, we have a

number of disputed documents that the parties reviewed as part

of the seed set review.  Some of them I think your rulings

earlier today would probably eliminate some of those documents

but not all of them.  So what I would propose, if it's okay

with your Honor, is that we take some time and see if we can go

through those documents and maybe revisit this issue a little

bit later today?

THE COURT:  Okay.  We'll see how that works.  But,

remember the June deadline is not moving.

MS. CHAVEY:  If I might, we think that your Honor's

rulings this morning do take care of the issues presented in

the documents relating to personal --

THE COURT:  If it's premature because the plaintiffs

are not ready to talk about the issue with me, I don't need you

telling me I'm right or anything else.  Let's wait until there

is a ripe dispute.

MS. CHAVEY:  I understand, but there is a threshold

issue that also I think bears mentioning, and that is Judge

Sullivan had ordered limited discovery with regard to personal

jurisdiction, and he limited the plaintiffs to 20 requests for

production to both defendants, and the plaintiffs issued just

C5E3DAS1

1    one request to MSL Group, and it was limited, and it requested

2    all documents concerning -- and I am going to paraphrase

3    here -- Publicis Groupe's involvement in hiring employees at

4    MSL Group.  And it specifically sought offer letters, letters

5    of demotion, resignation, etc.  It listed certain employees,

6    but I think was intended not to be limited to those employees.

7              So many of the documents that we've looked at as part

8    of the seed set do not fall within the scope of that request in

9    any event.  So whether they fall within the Court's rulings

10   this morning is a separate issue.

11             THE COURT:  Okay.  I'm not sure what all that meant,

12   but --

13             MS. CHAVEY:  Your Honor, what I mean is that MSL Group

14   identified responsive documents as part of the seed set that

15   were responsive to the request issues to MSL Group, not

16   documents that may potentially be related to the personal

17   jurisdiction issue.

18             THE COURT:  I understand.

19             MS. CHAVEY:  We were confining ourselves to the

20   requests that were issued.  So I don't believe that plaintiffs

21   are taking the position that any of the documents in dispute

22   fall within the scope of this request.  I think our

23   understanding --

24             THE COURT:  In any event, since the plaintiff is not

25   yet ready to raise this issue with me, I'm not ready to discuss

C5E3DAS1

1    it.  When we've got a real dispute, we'll get to it.

2            MS. CHAVEY:  Okay.

3            THE COURT:  On the jurisdictional issue as to what

4    effect any of this has, our next issue.

5            MR. EVANS:  If I may, your Honor, I believe you held

6    in abeyance on the jurisdictional issue the response to

7    interrogatory number one that the plaintiffs had asked for.  I

8    just for completeness of the record thought I would address

9    that now.

10           THE COURT:  All right.  Is it possible -- obviously it

11   is possible.  How hard is it to put together, and you can group

12   them in bulk, the total annual revenue of the New York City

13   subsidiaries putting aside MSL because you've already done MSL.

14           MR. EVANS:  It may be easier to do all.  It may be

15   easier to say revenue coming from subsidiaries in New York.

16   The way the system works we can do that, your Honor.

17           THE COURT:  Just do it for the last fiscal year.

18           MR. EVANS:  Yes, your Honor.

19           THE COURT:  So are we now back to the seed set?

20           MR. BRECHER:  Yes, I believe that's accurate.  If I

21   can quickly summarize where we were last time and where we are

22   now.  When we were here last week, we had about I think it was

23   either 760 or somewhere in that range in dispute.  As a result

24   of the Court's ruling, both parties reviewed the documents and

25   reduced that number substantially.  And then we had a pretty

C5E3DAS1

1   much all day meet and confer last week where we went through

2   each one of the documents and reduced it to about 165

3   documents.  But most of the majority of those documents, which

4   are in this binder, relate to the jurisdiction issues which

5   you've already ruled on.  So that is taken care of.  The

6   remaining non-jurisdictional issue disputed documents are much

7   fewer in number, and are in this binder, which I can have

8   handed up to the Court.

9           And even over the weekend we were able to reduce it a

10  little bit more, and there are certain categories that we tried

11  to put them in to the best practical so even though there may

12  be 40 documents there, it maybe only requires half that in

13  rulings.

14          MR. WITTELS:  Your Honor, before your Honor starts

15  addressing the actual documents in dispute, plaintiffs have in

16  light of the meetings with defendants now understand that the

17  defendants are not following the protocol that even your Honor

18  had set for the predictive coding.  They've set up an alternate

19  process which came out when we had their experts on the phone.

20  That was not an alternative process, that's not part of the

21  protocol in terms of their review and that was not shared with

22  plaintiffs during any discussions.  We understand we had with

23  them which now injected a subjective decision-making process by

24  MSL into it by their counsel into every step of the iterative

25  process.

C5E3DAS1

1              Now that we have the experts here or Recommind experts

2     here, they can explain it.  As we understand it they now have a

3     process where after the seed set is first looked at, and sent

4     back, once we come to the seed set, the agreement as to what

5     those documents are, the first documents that will come back

6     will be looked at by the attorneys in some sort of concepts as

7     the element of how they'll review the documents.  Concepts

8     searching and limiting how the documents will thereafter be

9     looked at was something that was never explained to the

10    plaintiff in any of these process to our plaintiffs.

11            THE COURT:  Let me hear directly from the horse's

12    mouth.  So let's hear from Recommind as opposed to you

13    summarizing it.  And, Mr. Wittels, do you want me to swear in

14    both the Recommind folks and the Doar folks?  I frankly think

15    when somebody gets up and talks to me in court, and they may

16    not be lawyers, but I wouldn't expect anything except the

17    truth.  But you complained last time that they weren't sworn

18    without ever asking me to swear them.  So, fool me once, etc.,

19    do you want them sworn?

20            MR. WITTELS:  I think that's appropriate, your Honor.

21            THE COURT:  All right.  Who am I going to hear from,

22    which Recommind person?

23            MR. ANDERS:  You'll hear from Mr. Baskin.  If I may

24    make a two sentence response.  In terms of Mr. Wittels

25    asserting something new has been injected into the protocol

C5E3DAS1

1    during the iterative searching, I would just cite to page 15 of

2    the protocol section C, I'm sorry, section six, where it says

3    during each iterative round, MSL will then review and tag a

4    judgmental sample based -- judgmental based sample consisting

5    of a minimum of 500 documents, including all documents ranked

6    as highly relevant or hot.  During the telephone call earlier

7    on or last week, that's what we discussed, the judgmental

8    sampling.  But a judgmental sample during each iterative round

9    was always in the protocol.

10             With that, Mr. Baskin can discuss further.

11             (Mr. Baskin sworn)

12             THE COURT:  State your full name and title for the

13   record.

14             MR. BASKIN:  David Baskin, vice-president product

15   management, Recommind.

16             THE COURT:  Explain what we are talking about here.

17             MR. BASKIN:  First I'll start from the beginning.

18   Once the seed set is set and the documents are reviewed, there

19   are positive and negative results of that seed set.  So there

20   are documents that are indeed part of the category and those

21   that are not.

22             As part of the iteration or the training of the

23   system, the seed sets that are positive are used to retrieve

24   other documents.  So once those documents are returned, they

25   are now computer suggested and the lawyers would look at those

C5E3DAS1

1    documents.

2           The documents that are returned are returned in a

3    relevancy order based on the computer suggestion and the

4    algorithm of the system.  Additionally, Recommind allows for

5    very advanced technology like concept groups, phrase

6    extraction, key word searching --

7           THE COURT:  Slow down.  Concept groups I understand.

8    What was the second thing?

9           MR. BASKIN:  Phrase extraction.  The most commonly

10   used phrases within a particular set of documents within the

11   document list that is returned by the computer.  There are also

12   additional regular key word searching.  Another components of

13   the system that can be used like filtering in order to find the

14   best or relevant documents for that review.  The defense and

15   the attorneys have all of those tools at their disposal.  Once

16   the system returns the computer suggested documents.

17          THE COURT:  All right.  Mr. Neale?  Let me swear you

18   in and you can then comment on that.

19          (Mr. Neale sworn)

20          THE COURT:  State your name and title for the record.

21          MR. NEALE:  My name is Paul Neale.  I am the CEO of

22   the Doar Litigation Consulting.

23          THE COURT:  All right.  I guess my question is what

24   are your comments or critiques on what Mr. Baskin just said?

25          MR. NEALE:  Well, your Honor, as you know, we were

C5E3DAS1

1    retained to advise the plaintiffs on evaluation and use and

2    defendant's use of predictive coding.  And again, while we as a

3    company are proponents of it, we have been evaluating the steps

4    and the process and have been trying to advise the plaintiffs

5    and the Court accordingly.  And the issue here is that the way

6    in which Mr. Baskin just explained how the Recommind system

7    works, which I have no reason to dispute, is not the way in

8    which the defendants explained that they would use it.

9         So during all of the meet and confer sessions that I

10   was involved in and the hearing in February here, our

11   understanding was that once the seed set was applied, the

12   documents that came back would be subjectively pulled from the

13   most highly relevant documents.  And what we're told now is

14   that that's not actually the case.

15        So we are trying to understand exactly what documents

16   are going to be reviewed for the iterative training, and how

17   counsel or Recommind or both are going to get to those

18   documents and then present them to us.

19        THE COURT:  All right.  I frankly agree with defense

20   counsel that there was discussion at our conference, two

21   conferences, on the predictive coding protocol about using the

22   concept groups to choose the 500 most highly relevant in each

23   group or in a group using one concept group the first time

24   through, another concept group the next time through, etc.

25        Mr. Baskin, is that indeed the way this is going to

C5E3DAS1

1    work?

2            MR. BASKIN:  Concept groups are indeed one of the

3    components that can be used in defining the set of documents to

4    review within a trained category set.

5            MR. NEALE:  Again, your Honor, I understand it could

6    be used and a lot of things could happen.

7            THE COURT:  Let me now ask counsel, what is it

8    exactly -- let's take the first step.  Once we get the seed set

9    in, how are you going to pick the 500 documents for review?  Is

10   it from concept group number one, is it 200 from a concept

11   group, 200 from phrase extraction?  Exactly what's going to

12   happen?

13           MR. ANDERS:  I'll refer to the protocol to preface my

14   answer because it is in the protocol.

15           So your Honor, if you look at the top of page 16, the

16   first full sentence, MSL's attorneys shall act in consultation

17   with the accelerate software experts to make reasonable good

18   faith efforts to select documents in the judgmental sample that

19   will serve to enhance and increase the accuracy of the

20   predictive coding functions.

21           What I envision, your Honor, and what was discussed

22   was when that first round of predictive coding is run, we will

23   use a variety of those tools, in consultation with the

24   Recommind people, to determine what are the best documents to

25   look at.

C5E3DAS1

1           Certainly any documents that come back as marked

2     highly relevant or hot would be reviewed.  But then we are

3     going to look at the actual concept groups.  If there is a

4     concept group that seems to focus on maternity, we'll look at

5     that.  If there is another concept group that again relates to

6     something at issue in the case, we will look at that.  We may

7     run key word searches with the plaintiffs' names to see if we

8     can highlight specific documents that were brought back that

9     relate to plaintiffs, because it is such a fluid process and we

10     don't know exactly what is going to be brought back.

11           The protocol was designed to give us flexibility to

12     focus in on those documents that appear to be the most relevant

13     and be the most useful in training the system.

14           THE COURT:  And is it your intent to be transparent as

15     to that or just to give the 500 documents that you pull as a

16     result of whatever methods you use to the plaintiffs?

17           MR. ANDERS:  I think we've been very transparent in

18     the process.  Given the time limits our proposal would be to

19     use our judgment to pick the documents that are the best to

20     review, we will certainly give the ones that we code yes and

21     the ones we code no.  And then they can review those.

22           THE COURT:  I guess my question, and let me be more

23     precise.  If you pick 200 documents because they are in the

24     maternity concept group and you find another hundred documents

25     because you've run the Da Silva Moore's name in and whatever we

C5E3DAS1

get to 500, are you then going to just say here are our 500
documents, plaintiffs, or are you going to say 200 came from
the concept group about maternity and we got another 100 from
somewhere else, etc.?

MR. ANDERS:  I did not envision going through how each
of those 500 documents were selected.  My thought process was
that if at the end of the process the last random sample
doesn't validate this, we'll have to keep going.  So it is in
our best interest to find the most relevant sets.  But at that
point, no, I did not envision explaining to plaintiffs how
every single judgmental selection was made.

THE COURT:  Mr. Neale, I guess two things.  One, since
ultimately the idea is to find the most relevant documents to
continue to train the system, and at the end of the day the
system will be tested, does it matter is question number one.
And question number two is, if you don't like the way they are
doing it or you want more transparency or whatever it may be,
what would you suggest?

MR. NEALE:  I want to just clarify one thing that I
heard last week which was that these iterative samples are not
supposed to be in any way indicative of highly relevance or
relevance at all, and documents that rank very low on the
relevancy threshold would be included.  So your understanding
of their protocol, as you stated earlier, is consistent with
ours, which was they were going toe focus on highly relevant or

C5E3DAS1

1    relevant documents to better train the system.

2            What we are being told last week is when the seed set

3    is applied, the results presented back conceptually will not

4    actually indicate relevance or not.

5            THE COURT:  Mr. Baskin, is that correct?

6            MR. BASKIN:  All documents returned from the training

7    will be in some way related to the seed set.  So, all documents

8    will be returned that have any kind of a comparison or any type

9    of similarity in terms of content will be returned into the

10   category.  And it will be then sorted by the relevance

11   percentage.  So then there is in turn a document number one

12   versus document number five versus document number 10 in the

13   document return list.

14           THE COURT:  Well, let me try to put that into English.

15   No offense, but let me make sure I understand it.  So let us

16   say that in the concept group maternity, is the idea going to

17   be -- and either you or counsel can answer this, Mr. Baskin --

18   is the idea to take the 100 documents coded as most relevant

19   out of that maternity concept group and look at that as opposed

20   to perhaps the 100 with the lowest ranking or something else?

21           MR. ANDERS:  Your Honor, I don't believe we've decided

22   how many to review in any particular category.

23           THE COURT:  Assuming you've decided, because you've

24   got to get to 500, that you are going to review a hundred in a

25   concept group and we're using maternity following up on your

C5E3DAS1

example.  Would you be taking the most relevant from that

group, that is to say the documents coded by the Recommind

process as the highest likely relevance, or would you not?  And

if not, why would you be going in the lower category as opposed

to the higher?

          MR. ANDERS:  Your Honor, again I don't believe we've

decided exactly within -- using your example of a hundred

maternity documents, whether to review the top hundred, the top

50, the top 25, the bottom 25, just to make sure that ones on

the bottom truly were of marginal relevance.  Again, until we

see what is being brought back, and looking at all of the

concept groups, looking at all the categories, we want to make

sure that we divide up at least 500 documents that we review,

if not more, in as efficient and smart way as possible.  So it

is tough to say within any specific group how many we would

review.

          THE COURT:  I guess what I am trying to figure out is

if the idea is to verify that the most relevant documents are

being used over and over again to keep training the system,

obviously, there is a risk that if you only look at the junk,

and say, okay, yeah, we've looked at 500 documents but these

are not 500 very helpful documents, you're probably not helping

the system for the next iteration.

          Am I missing something?

          MR. ANDERS:  No.  But I think we would review the

C5E3DAS1

majority of the top ranked documents, and if the system is going to rank them based on importance based on the several thousands of documents we've already coded, we are going to obviously weight our review towards the documents the computer thinks is the most highly ranked.  But again, there are other filters, there are other tools we would use, so we are not solely relying on what the computer says is most relevant. That's why it is difficult to say at this point what exactly we are going to review.  I'd like to see what the computer brings back and rely on Recommind's expertise with the system with the filters to make sure we have a sufficient cross section of documents we review.

          MR. BASKIN:  One more thing is that's one iteration of the training.  There are multiple iterations, and as the lawyers are looking at documents and coding them positive and negative, the system will learn with each iteration and continue to bring more of those similar or more of the conceptually or context relevant documents to the forefront. And if one iteration will yield the result of these are negative documents, the system learns from that as well.  So it is beneficial to do both.  But again, looking at most relevant will yield the best result.

          MR. ANDERS:  If I may, one other tool that we'll use that will help throw out a lot of the junk would be as we do these reviews, we will find large groups of documents that are

C5E3DAS1

1    clearly irrelevant.  Documents coming in from ESPN.com.  We

2    will be able to bulk tag those, and before we bulk tag

3    something we'll consult with plaintiffs' counsel.  But at least

4    500.  We can also be bulk tagging groups of thousands of

5    documents based on domain names, in terms of the domain they

6    are coming in from.  So we will be using all these tools to try

7    to filter out as much of the junk and focus on what's mostly

8    relevant.

9              THE COURT:  Mr. Neale?

10             MR. NEALE:  Your Honor, I think you understand that

11   predictive coding is a general term, and there is a lot of

12   flavors.  This is one flavor of it, and our concern has been

13   for some time that this seems to be kind of being made up as we

14   go along.  Because the purpose of the protocol conceptually was

15   for us to come to an agreement as to how this would work.

16             THE COURT:  That worked really well, didn't it.

17             MR. NEALE:  Right.  Well, so the premise that we would

18   agree to use predictive coding was we would understand and

19   ultimately agree with the method.  And here we are very late in

20   the process where, for the first time, I think all of us are

21   hearing a critical aspect of the method and we still don't

22   understand specifically what will happen at the point in which

23   the seed set is applied and what type of unilateral subjective

24   decision-making will be made by counsel that we will not have

25   access to.

C5E3DAS1

1             THE COURT:  Access is a different issue.  And I am not

2    sure in light of the great way the lawyers have been interacted

3    so far whether I will order full transparency or not.  This is

4    certainly consistent in generic terms or in general terms with

5    the protocol that I approved with everybody's input, etc.  And

6    then that Judge Carter approved my approval of, subject, as

7    with all of this, to revisiting as we go and certainly at the

8    end of the day.

9             I'm not prepared, based on what you've said and what

10   they've said, to give a thumbs up or thumbs down to the

11   process.  I would like to see, and to some extent perhaps

12   getting the lawyers out of this and having Recommind and Doar

13   work more cooperatively together.  That may or may not be

14   feasible.  I think we'll have to -- we still haven't finished

15   with our initial seed set issue here.  We'll just have to see

16   what happens.  And obviously you'll be back in front of me, all

17   of you, or at least all the lawyers after each iteration

18   probably, and we'll just see what's happening.

19            I understand your concerns on subjectivity.  On the

20   other hand, I'm not sure that I'm hearing from you what it is

21   that you thought was meant by the sentence at the top of page

22   16.  Or more importantly, as we are going forward, what it is

23   that you would like them to do.  If they just review the top

24   500 documents coded by the system, or the top 400 and another

25   hundred randomly distributed near the middle and bottom to see

C5E3DAS1

how well the system is working.  I am not sure that we are not
going to keep seeing the same 500 every time we go through it.
And as you will recall, you were proposing 2393 or some number
like that but only doing it twice.  And then when they said
they were going to do it seven times but with lesser documents,
you agreed that that was preferrable.

Again, it depends on the detail, but unless you've got
a suggestion that you want to propose now as to how you would
suggest they do this in the first round, using the at least 500
document concept that the Court has approved, other than the
transparency issue, I am not sure where the plaintiffs are on
this.

MR. WITTELS:  May I jump in a bit on this, your Honor.
Because as I understand it, the defendants are going to be
injecting themselves into the review process by using what
they've described as a number methods.  Concept groups being
one of them, phrase extraction, key word searching, filtering.
We've asked defendants in our meet and confers to give us the
concept groups that come back so we understand what they're
selecting and what they're rejecting when they decide what to
go back with.  They've said we are not going to give that so
there is no transparency.

THE COURT:  I got to tell you that I am much more in
favor of transparency when I see a lot more good faith
cooperation among counsel.  So, I am not ruling one way or the

C5E3DAS1

```
 1    other on this.  I suspect this part of the conference is more
 2    informational than something you want a ruling on.  I got to
 3    tell you that we would probably be significantly done with the
 4    predictive coding process and then we may decide that it didn't
 5    work, but we would be much further along if not done if we
 6    weren't spending a significant amount of time with a back and
 7    forth on the first group of documents that were going to be the
 8    seed set.  And yes, a lot of them were marginally relevant and
 9    the Court so ruled, so you're not wrong.  But I am not sure
10    that ultimately at the end of the day it would make that big a
11    difference.  I don't know.  And if you get along not only with
12    the Court better, but with each other better, then I will be
13    more inclined to rule that transparency is required in an area
14    where otherwise it is not.  So, we'll see.
15              If there is anything else you want me to rule on now
16    with respect to that, other than that defendant should be more
17    transparent, which I would be inclined to want, but plaintiff
18    has to be more cooperative.
19              MR. NEALE:  Just two points.  If there isn't
20    transparency and the defendants cherrypick those documents as
21    they're going to review, we may come to a point where we
22    actually agree with the calls that they are making about those
23    documents, but not know how they are engineering the system to
24    define relevance, and therefore what's being excluded.  So
25    again -- we are not going to have the information --
```

C5E3DAS1

1          THE COURT:  At a minimum, however they get these

2     documents the Court has already ruled and they had agreed, or

3     maybe it is they had agreed and I ruled, that they would be

4     giving you and the plaintiffs all 500 or a thousand or however

5     many documents it is they review, and whether they coded them

6     as relevant, and which issue code tags they put on it or not

7     relevant, other than a limited group which are the privilege

8     ones.

9          MR. NEALE:  To my point, though, unless we know how

10    they came to select those five or so hundred documents, we

11    won't know.  So again, we may agree quickly as to the judgment

12    calls made on those documents.  We won't know how they were

13    selected in the way in which it is going to affect how the

14    system performs going forward.

15          As an example, there is a category presented by the

16    system that to them seems wholly irrelevant.  I think we've

17    used at one point like holiday party.  So looking at all these

18    a concept grouping of documents about the holiday party.  So

19    let's set that aside and look at things related to compensation

20    and otherwise you are not going to be measuring whether there

21    is highly relevant information within that grouping.

22          THE COURT:  Which grouping, holiday party?

23          MR. NEALE:  Holiday party, which there arguably may

24    be.  By counsel injecting their subjective decision-making as

25    to what they determine to be --

C5E3DAS1

1          THE COURT:  I think I may be missing something, but

2     assuming that holiday party were one of the concept groups they

3     were going to look at, they would be taking a certain number of

4     documents from that group and coding them either relevant or

5     irrelevant.  As I understand it, even if they're not willing to

6     be transparent and on everything else, anything that they are

7     bulk tagging, like ESPN.com sources or whatever, they are going

8     to be telling you about.

9          So, what am I missing other than the possibility that

10    you want them to review every single document before tossing

11    them, which obviously defeats the whole purpose of the system?

12         MR. NEALE:  Right.  That's certainly not what we're

13    suggesting.  I think there should be a defined set of documents

14    that we both understand coming back from the system that will

15    be used.  So our understanding was that essentially they were

16    going to skim across the top of 500 or so highly relevant

17    documents presented back by the system, and that was not a

18    completely subjective determination.  If the system were

19    operating as some others do and presenting it just back

20    randomly, again, we are not going to suggest that there is some

21    step in the process that affects that.

22         THE COURT:  Are you suggesting that whatever else they

23    look at they should just look at and give you the top 500 from

24    the system without any breakdown of that into concept grouping

25    or anything else?

C5E3DAS1

1          MR. NEALE:  I think we should agree to the process

2     that's going to be used to select those documents.  And then

3     have some insight into it.

4          THE COURT:  To some extent, and again, I have more

5     faith in the experts than I do in the lawyers on working this

6     through.  Doesn't it make sense to wait and see what the system

7     output is, share that in some way, so you can say let's not

8     look at holiday party, let's look at something else?  So it is

9     subjective but something that you're both doing.

10          My only concern with that level of transparency is the

11     total lack of cooperation and fighting over everything that I

12     am seeing from the lawyers here on both sides.

13          MR. NEALE:  But I think the effect of the results here

14     certainly in this case and as a much broader implication, so I

15     think in the interest of making sure that people understand

16     kind of what this is all about, and how parties handle this,

17     even in the most adverse circumstances, is an important

18     threshold to meet.  And the fact that we are just now hearing

19     for the first time how -- and from Mr. Anders, he at this point

20     still isn't sure exactly what documents how he is going to get

21     to the documents once he gets to that process.  The specific

22     effect in this case is that the number of iterations required

23     is driven by the delta, the change in the number of documents

24     presented back, which is a separate issue.  Because I

25     specifically asked is that 5 percent against the total number

C5E3DAS1

1    of documents presented back by the Recommind system as

2    relevant.  And was told yes.  And now what I am being told is

3    it actually is what we should expect is through the iterations

4    you only see irrelevant documents, and therefore the system

5    will be -- that will be proof that the system is trained.

6    That's a significant contradiction from what -- I saw your

7    face -- what I think we all understood.  But that specifically

8    what we were told last week on the call.

9             MR. ANDERS:  If I may, because a lot was just said

10   there.

11            THE COURT:  Let me just interrupt.  Let's finish this

12   thought, the reporter needs a break.

13            MR. ANDERS:  Okay.  First off, we've been very

14   transparent through this process, and I think as your Honor

15   noted upfront, referenced the fact that there would be concept

16   groups being searched, that this is a fluid process.  And that

17   we are not going to know exactly what we are going to review

18   until we see what is coming back.  I think the critical point

19   that Mr. Neale may be missing is at this point he is trying to

20   get into the black box workings of how predictive coding

21   actually works.  My point is that it is in everybody's best

22   interest, including most specifically defendant's best

23   interest, to review the right documents.  Because if we were to

24   cherrypick documents that have nothing to do with the case that

25   are irrelevant, and we all agree they're irrelevant and use

C5E3DAS1

1    that to train the system, there is a greater chance that we are

2    going to fail the validation at the end.  So it doesn't serve

3    our interest to cherrypick irrelevant documents so we all agree

4    that they're irrelevant.  It is in our best interest to train

5    the system correctly so we can zero in on the right documents.

6    And potentially, as your Honor will recall, the protocol calls

7    for potentially less than seven iterative rounds being done.

8    Again, it is in our best interest to train the system quickly

9    so we don't have to do seven iterative rounds.

10           So the idea we may cherrypick documents is not in our

11   best interest.  And we've been very transparent and upfront

12   about this idea of concept searching and how we are going to

13   try to pick the documents.

14           And my concern, even though your Honor had commented

15   that it was a somewhat relaxed schedule for the protocol, we've

16   allotted four days for defendants to review during each

17   iterative round.  If we now have to before the review tell

18   plaintiffs' counsel here are the concept groups, we think we

19   are going to look at these.  Here is another group we may run

20   these search terms, that's going to eat up time.  Our plan was

21   to get the iterative documents back, work with Recommind to

22   review the documents that seem to make the most sense to

23   review, be able to do that quickly and turn that over.  And my

24   concern is that by injecting the further level of communication

25   that Mr. Neale wants, it is just going to delay that part of

C5E3DAS1

1    the process.

2                THE COURT:  All right.  Well, I think absent any

3    further application from Mr. Wittels, at this point I hear the

4    issues, I'm not prepared to rule one way or the other, we'll

5    see what develops from the first round.  I would suggest that

6    at a minimum, and this is a suggestion, it is not yet an order,

7    that you may not have to tell Mr. Neale and Mr. Wittels and

8    Mr. Wittels' colleagues what the other concept group that you

9    didn't look at were in the first round, because that will come

10   up in a later round presumably.  But, that you can seriously

11   consider being able to describe the process you used and why

12   you chose the maternity group or the compensation concept group

13   and what else you did to generate the documents that you

14   produced.  Again, that's not the Court's order.  That is a

15   suggestion.  We'll see how it works.

16               If in doing that the first time it causes the same

17   sort of problems we've had with the seed set, we'll see what

18   happens thereafter.  Anything from throwing the whole process

19   out and going to the key word system, which is not necessarily

20   going to get plaintiffs more documents, most likely will get

21   them less, or will go to a refinement of the predictive coding

22   system that has much more of Mr. Neale's concepts in it than

23   currently.

24               At this point I hear what you are all saying.  It is

25   helpful to hear from Mr. Neale and Mr. Baskin as opposed to

C5E3DAS1

1    getting it through the lawyers.  And unless I'm hearing an

2    application for a specific ruling from either side, we'll take

3    a short break for the reporter and then we'll come back and

4    finish up.  We'll take a five minute recess.

5              MR. WITTELS:  May we have 10 minutes so we have time

6    to talk to the experts and use the bathroom?

7              THE COURT:  Make it fast.  No more than 10, and come

8    back as soon as you can in less than that.

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C5eWdas2

1          THE COURT:  Are we ready to go through these

2    documents?

3          MR. BRECHER:  Yes, your Honor.

4          Judge, before we begin, I don't know if you want the

5    consultants to remain or if they can be excused at this point.

6          THE COURT:  The one question left over from last time,

7    and you may all have the answer from the conferences you had

8    amongst yourselves, but no one has told me yet, is:  Does the

9    Recommind system have a way to indicate with respect to a

10   document that is marked as relevant why it is relevant either

11   because a name is on it or it's got a particular phrase, or

12   does the computer just figure that out from the bulk of

13   documents?

14         MR. BASKIN:  For each document, the system highlights

15   the terms that is contextually similar to the other documents,

16   the seed documents.

17         THE COURT:  Stop for a minute.  What I'm asking is,

18   let's say a seed document has a lot of information, but the

19   reason it was marked relevant is, for example, that it refers

20   to the plaintiff DaSilva.  Is there a way that in training the

21   system as opposed to when the system reports back after the

22   seed set that the system can be told the reason we've marked

23   this relevant is because it has this name, or the reason we've

24   marked this multipage document as relevant is because it has

25   this phrase in it?

C5eWdas2

1          MR. BASKIN:  There are ways in the system to

2     additionally mark categories, subcategories, let's say.  So if

3     you have a category on compensation, and the subcategory is in

4     a plaintiff's name, then you can mark both, at which point you

5     will know that it's also compensation as well as DaSilva.

6          THE COURT:  And that's with respect to a document

7     being used as a seed.

8          MR. BASKIN:  Depending.  Seed or the computer

9     suggested the lawyer's coding the document and telling the

10     system this is the reason.

11          MR. ANDERS:  During our call last week, your Honor, I

12     had indicated as we've gone through the process going forward,

13     we will subcode for plaintiffs' names to address that

14     compensation document that was at issue last week.

15          THE COURT:  Okay.  I don't know if we need them for

16     any of these documents.  The other issue that I do want to

17     raise with the parties today, and maybe we should do it before

18     we go through these documents so I do have Mr. Baskin's input

19     in particular, is the issue that Mr. Wittels raised at the last

20     conference or two conferences ago, whenever it was, on the

21     issue of the stay.  I am revisiting it sua sponte because of

22     the objections that were filed, not that the objections scared

23     me or any of that stuff, but there were some points made in the

24     objection that Mr. Wittels did not make in raising the issue at

25     the conference that I think make it worthwhile to revisit the

C5eWdas2

1    issue.  So maybe we should do that first.

2            First of all, Mr. Wittels, and I know you'll now say

3    I'm picking on your side again, but you do realize, and I'm

4    looking at page four, where you talk about the four-factor

5    test, and I don't know which of the three of you here wrote

6    this, but the cases you cited -- Hilton v. Braunskill,

7    Hirschfeld v. Board of Elections, and Mohammed v. Reno -- for

8    this, and it should have been obvious from the way you

9    described your substantive points, all had to do with a stay

10   pending appeal.  So a stay of a District Court's judgment or

11   decision or order while the case was on appeal to the circuit,

12   what that has to do with a stay of discovery I have no idea.

13           Can any of you explain this to me?  Or was this done

14   out of California or something?

15           MR. WITTELS:  I apologize, your Honor.  Again,

16   initially I wasn't prepared to address it today, so I don't

17   have the papers with us on the stay.  If you give us time over

18   the lunch break, I can come back and answer that.

19           THE COURT:  I'm frankly hoping we're not coming back.

20   But with all due respect, credibility of lawyers, and how much

21   do I have to read every single case they cite, your credibility

22   isn't helped when you cite something that is so totally off

23   point that it's the wrong standard for the wrong issue.

24           Be that as it may, and that's just more, I would call

25   it for your purposes, a law office management issue of which

C5eWdas2

1    associate wrote this draft of objections and how that got out

2    of your office -- I can't remember who signed it.

3              Is it under your signature?

4              MR. WITTELS:  Maybe.

5              THE COURT:  No.  It's under Ms. Wipper's signature.

6              That's sort of totally, more than sloppiness, and with

7    all due respect, when you say in No. 3, "a four-part test,

8    whether the stay applicant has demonstrated a substantial

9    possibility of success on appeal," and you're talking about a

10   stay of discovery, somebody's eyes should have lit up and said

11   that doesn't sound right.

12             The correct standard generally from the context of a

13   stay during the pendency of a motion to dismiss or other

14   dispositive motion is that the Court will generally look to

15   three factors, the breadth of the discovery sought, any

16   prejudice that would result, and the strength of the motion,

17   and I'm citing, to start, from Silverberg's book, Civil

18   Practice in the Southern District of New York, Section 24:5.

19   In particular, among other cases dealing with that standard is

20   the decision in Antimonopoly, Inc. v. Hasbro, Inc., 1996 WL

21   101277, Southern District of New York, March 7, 1996, by a

22   magistrate judge who I know you have a high regard for, to wit,

23   it's my decision, and to summarize, under 26(c), it's clear the

24   court has discretion to stay the discovery for good cause and

25   that good cause may be shown where a party has filed a

C5eWdas2

1   dispositive motion such as a motion to dismiss.  This is

2   especially so where the stay is for a short period of time and

3   the opposing party will not be prejudiced by the stay.  Two

4   related factors that the courts consider in deciding a motion

5   for a stay of discovery are the breadth of the discovery sought

6   and the burden of responding to it.  Another factor that the

7   courts consider is whether the party opposing the stay would be

8   unfairly prejudiced by a stay."

9           With that, in light of the fact that if additional

10  plaintiffs opt in, that will change what documents are

11  responsive, since we have been excluding from the seed set

12  documents that deal with specific decisions by people or

13  affecting people other than the group of named plaintiffs, I

14  guess my question at this point where I'm interested in both

15  good use of judicial resources and where proportionality and

16  costs are a factor, and if we go further down the road with

17  this predictive coding process and then 20 more people opt in,

18  we're going to have to revamp the system and I don't know that

19  one can just do that by searching for their name at this point.

20          Mr. Baskin is shaking his head no.  Perhaps,

21  Mr. Baskin, you could address that.  And then what I'd like

22  defendants to address is what are the costs or what is the

23  prejudice to putting discovery on hold since generally it is

24  the plaintiff that wants to proceed quickly, which doesn't seem

25  to be their mode of operation here, and go from there.

C5eWdas2

1        Mr. Baskin, I take it if more parties join the case,

2    we'd have to start over almost from scratch.

3        MR. BASKIN:  No, I don't think so at all.  I think all

4    the work done to the day of, to that particular day will be all

5    valuable, and what will happen is that you will have all the

6    categories set in terms of whether it's maternity,

7    compensation, whatever the different categories are, with the

8    right documents, whether they are part of the named plaintiff's

9    set.

10       THE COURT:  Let me be more clear.  In going through

11   the seed set documents, if there was something that was a

12   general policy statement on an issue, it was included.  If it

13   was something about the salary or the maternity leave of a

14   particular person, it was marked irrelevant unless it was for

15   one of the named plaintiffs, for the most part.  There may be

16   other exceptions, but I certainly remember reviewing last time

17   you were all here, last week, documents and saying, okay, this

18   isn't about the plaintiff, it's not a policy decision, it's not

19   relevant.  So, you've got, let's say, compensation, but you've

20   got relevance and nonrelevance and the ones that deal with

21   people who are not the group of current named plaintiffs are

22   being coded as not relevant.

23       How would one then have to get into the system if we

24   were totally done with the predictive coding methodology here

25   when new people got added?  What would have to be done?

C5eWdas2

1          MR. BASKIN:  If my assumption is correct, the names

2     can be easily found through the searching mechanism, so you can

3     go back into the categories that have been coded and the

4     relevant and nonrelevant documents as a subcategory of those

5     particular individual categories, and then find the specific

6     plaintiff names that have been added to the case, at which

7     point, they can be rereviewed for relevance, but they're going

8     to be part of a particular category anyway.

9          THE COURT:  Your colleague, I think, is trying to

10    raise his hand.

11         Let me swear you in.

12         (Eric Seggebruch sworn)

13         MR. SEGGEBRUCH:  Your Honor, I was involved in this,

14    so I just wanted to clarify for the record.  We had set up the

15    categories, different issue categories in the case that are

16    being coded, and so what plaintiffs' objection was to try and

17    say the document was responsive to some category such as

18    maternity leave but only responsive because it was due to a

19    named plaintiff and then, secondarily, a similar document was

20    not responsive because it was out of scope, that the system

21    would have no way to differentiate.  So what we've done on a

22    going-forward basis to create the differentiation is to simply

23    create issue tags in the system for the named parties so that

24    later if the class was certified or more plaintiffs come into

25    play, then we are able very simply to segregate those documents

C5eWdas2

```
1    that are about a particular issue and then if it pertains to

2    other parties not yet in the case now, we will still have those

3    documents as exemplar documents to feed the predictive coding

4    system.

5            So, in other words, a document, if it's about

6    maternity leave is first and foremost about maternity leave,

7    and, secondarily, it's either in scope or out of scope based on

8    whether it's a named plaintiff or not at this point.

9            THE COURT:  I understand from looking at one of the

10   maternity leave documents we looked at last time is that it was

11   marked as irrelevant because it was while on maternity leave,

12   somebody of a different name will cover for me, neither of

13   those were the named plaintiffs so it was marked as not

14   relevant.

15           MR. SEGGEBRUCH:  So the clarification, just to

16   restate, is that will be on a going-forward basis so that that

17   category, that additional categorization meaning a named

18   plaintiff being in scope will be on a going-forward basis as

19   those documents are reviewed going forward.

20           THE COURT:  But as you're reviewing more and more

21   documents going forward, from each iteration of the seed set,

22   you're not going to be refining for people who are not

23   currently plaintiffs but who might get added in later on.

24           MR. SEGGEBRUCH:  The document would be first and

25   foremost about maternity leave.  It will be secondarily coded
```

C5eWdas2

1    for which named plaintiff it is about right now, and then for a

2    document that is not about a party that has not yet been added

3    or is not yet a plaintiff, those documents are still about

4    maternity leave, and then those documents that are about

5    maternity leave can then secondarily be looked at for whether

6    they contain the name of a party, for example.  So a document

7    is not about maternity leave and not about maternity leave,

8    it's always about maternity leave, and the secondary basis is

9    whether it's about a named plaintiff would be that it's

10   presently in scope and then it could later become in scope

11   should another party be added to the case.  So if we have Jones

12   in scope today and we handle Jones in scope today and Smith

13   comes into scope tomorrow, the document is still about

14   maternity leave and is easily located as having to do with

15   Smith.

16           THE COURT:  Let me hear from Mr. Neale if he has any

17   comments on that.

18           MR. NEALE:  Your Honor, I think we understand that

19   conceptually those documents would still be there.  I guess one

20   of the issues we have had going through this process is of all

21   the documents within maternity leave, how specifically are we

22   going to get to those that are responsive given the scope of

23   discovery now, as you now suggested, how are we going to define

24   those that come into scope later.  And I think what we're

25   hearing is that we'll be limited to the named plaintiffs.  And

C5eWdas2

1    so if that's the only way in which we're going to find

2    documents that are responsive at different stages of the case,

3    I guess I would leave it up to the lawyers to determine whether

4    that's actually responsive to the requests.

5        MR. BASKIN:  Two things.  One, it's going to be part

6    of a category, so, maternity documents --

7        There are two things.  First, the category of

8    maternity leave in this example will still be a part of the

9    review process, so the document will be in that particular

10    category, whether it's in scope or out of scope today, for the

11    different plaintiffs involved.  The second thing is that when

12    it's already part of that particular maternity leave for the

13    future, it can be easily found with the additional review for

14    the in-scope plaintiffs because they're already part of that

15    category.  So, the training will not affect, the training of

16    the system is not going to be affected by the actual names of

17    the plaintiffs.

18        MR. NEALE:  I guess practically, if we had maternity

19    leave as a category, and based on the seed set, there are

20    documents sitting in that category, and let's say there's a

21    thousand of them and subjectively through this process, prior

22    to the first iteration it's determined that 20 documents from

23    that category are going to be reviewed, what I don't think we

24    understand is how, based on those 20 documents, will the system

25    be able to determine whether it is now responsive or responsive

C5eWdas2

1    later, despite the fact that it will still remain in the

2    category doesn't get to the next level as to whether it's

3    actually responsive or not.  So I think that added to the issue

4    you raised would suggest that it's better to wait and get a

5    complete picture of the scope of discovery before going through

6    the process because I don't think it's as straightforward as is

7    being suggested.

8              THE COURT:  Let me turn to the lawyers for a minute.

9              Is there any down side from the defendants' point of

10   view, or to put it in the words of the test, any prejudice to

11   the defense by stopping the legal fees until Judge Carter rules

12   on the motion for opt-in certification at which point we'll be

13   back to where we are, but the seed set will now include anyone

14   who opts in?  Yes, that may mean you won't be doing anything

15   for, whether it's one month or six months, but usually

16   defendants say that if I get to trial the sixth of never,

17   that's okay with me.  So is there anything costwise,

18   reputationwise, or anything else, that suggests you do this now

19   with severe risks that it may be as simple as Mr. Baskin says

20   to add in the new plaintiffs, if there are new plaintiffs, or

21   it may not be, in which case obviously if you want to go

22   forward now, I'm not going to be hearing anything with respect

23   later to, We spent so much money training the system, we don't

24   want to do something for opt-in plaintiffs one through five or

25   one through 200, or however many there are?  And there may be

1    none; I don't know what Judge Carter is going to do.

2         All the experts can sit down for now while I

3    concentrate on the lawyers.

4         MS. CHAVEY:  Your Honor, at this point, our position

5    is that the plaintiffs' motions filed February 29, we've

6    incurred significant expense over the last two-plus months

7    getting to this point of being --

8         THE COURT:  But the question is:  If we stop it now

9    and then have to pick it up in a month, a week, six months,

10   what is the cost or what is the harm?  Yes, you've spent a lot

11   of money between now and then, and if the plaintiff had

12   presented this argument differently a week ago, but it was only

13   a week ago that they made this request and I denied it, there

14   may have been a prior application, but it also doesn't raise

15   the right standard and the right points, so, whatever is done

16   is done.  And from what Mr. Baskin is saying, whatever is done

17   would still have to have been done anyway.  So my question is

18   whether we're talking weeks, months, that's out of my control:

19   What is the prejudice, if any, to defendants from going forward

20   under the current schedule as opposed to waiting until Judge

21   Carter rules?

22        MS. CHAVEY:  Your Honor, one aspect of the test

23   articulated was the strength of the motions that are pending.

24   Our position, which we made clear in our opposition brief, is

25   that the motions are not meritorious, and so we may wait until

C5eWdas2

1    Judge Carter rules and he may well deny conditional

2    certification in which case we will have lost a lot of time.

3              THE COURT:  That's true.  But why is that bad for

4    defendant?

5              MS. CHAVEY:  What we're trying to do is avoid the

6    wasting of the significant resources that we've expended

7    working vigorously to get the seed set in order so that we can

8    continue implementing the ESI protocol.  We don't think the

9    plaintiffs have met the standard for a stay.

10             THE COURT:  The real question is this, and to some

11   extent it's how do you want to spend your client's money,

12   although there is also the factor implicit in this standard of

13   how do you want the Court to spend its time.  We started at

14   9:30 this morning.  It's now 12:20.  We haven't touched the

15   binder now reduced to seven categories but still several

16   hundred documents.  And this is after spending virtually all

17   day last week on this issue and from the issue raised about the

18   quote/unquote subjective review of the seed set, I can see

19   myself spending the rest of my life on this case, subject to a

20   recusal motion, and then having to do it all over again if

21   Judge Carter grants the conditional certification motion.  And,

22   frankly, since conditional certification of an FLSA opt-in is

23   not that onerous a standard, I don't know whether you're going

24   to win or not, and if not, we hit the ground running exactly

25   where we stop things today either way.  But since there was a

C5eWdas2

1   significant number of the documents I reviewed last week with

2   you all that was classified as either irrelevant or barely,

3   marginally relevant because it dealt either with or didn't deal

4   with a named plaintiff, it strikes me that there is going to

5   be, and since the training set, yes, there are going to be

6   eight broad categories, or whatever it was you said in terms of

7   broad categories that had issue codes, I'm not a hundred

8   percent sure that if conditional certification is granted and X

9   number of people opt in that there won't be a somewhat

10  different way of looking at some of this material.

11          If you want to take the chance that with no

12  proportionality proposed at that point because here's your

13  chance to save that money, that we're going to go forward and

14  if Judge Carter denies all their motions, fine, but if he

15  grants them, then as people opt in, you're going to have to

16  keep rejiggering the system, whatever that cost is, which may

17  be as simple as Mr. Baskin said, and it may not be, and you and

18  the plaintiffs' counsel cannot agree on virtually anything in

19  this case, my inclination sitting here today after reading the

20  objections and further reflection is unless there is some

21  prejudice to the defendant other than the passage of time,

22  which I don't see as really being a prejudice to a defendant,

23  if this were the other way around, where a defendant wanted a

24  stay and the plaintiff said I want to get to trial as soon as

25  humanly possible, I still don't hear any real prejudice.

C5eWdas2

1        MS. CHAVEY:  Your Honor, given the plaintiffs' delay

2   in raising the issue, what we'd like to do, whether a stay is

3   imposed or not, is avoid throwing out all of the work that

4   we've done to this point.

5        THE COURT:  Everything you've done is done.  That's

6   clear, and whatever additional fixing of it needs to be done

7   because there are new plaintiffs added, some of whose documents

8   we coded either by consent of the parties or by my rulings is

9   not relevant because it didn't involve a named plaintiff,

10  clearly everything that involved the named plaintiffs that

11  involved the general issues in the case all stands.  I don't

12  see anything in the conditional certification motion that would

13  change that.  I'm not sure whether there is anything in the

14  motion to amend the complaint that will add a new issue, but

15  even there, it strikes me as additive, not changing what you've

16  already done.

17       MS. CHAVEY:  Your Honor, in light of what you just

18  said in terms of any rulings by Judge Carter adding to the

19  case, if that would just be added to the seed set establishment

20  that we've already conducted, then a stay would not be

21  objectionable to us.

22       THE COURT:  All right.  Then in that case, a stay is

23  granted.  And I guess in light of that, it is probably

24  unnecessary for me to review this binder of material, not that

25  that's why I am doing this.

C5eWdas2

1          MR. ANDERS:  Your Honor, I'd just like to clarify

2     whether or not the stay applies --

3          THE COURT:  It does not apply to Publicis because

4     that's a jurisdictional issue.  This is just the merits

5     discovery as to MSL.

6          MR. ANDERS:  And I think there's additional

7     jurisdictional documents, but I'll let Ms. Chavey speak to

8     that.

9          MS. CHAVEY:  We actually have two binders, one of

10    which, I think, has been handed up, the smaller of the two.

11    The other one is the one that the parties are going to confer

12    about that relate to documents that are arguably responsive to

13    the jurisdictional issue.

14         THE COURT:  At this point, the jurisdictional motion

15    is going to be briefed for sure and most likely decided before

16    the predictive coding system is anywhere near final.  So I

17    don't think there should be any such discovery as to that.  As

18    to whether some of those documents in the binder, since they've

19    already been produced, are relevant to the jurisdictional issue

20    and should be taken off the nonrelevant list and just used as

21    physical paper copy production, I would have no problem with

22    you doing that, and plaintiffs can use it for whatever it's

23    worth.

24         Plaintiffs' counsel can tell me what they want to do

25    on the jurisdictional binder.  Or now that I've ruled in your

C5eWdas2

1    favor, are you going to object to that?

2                MR. WITTELS:  Your Honor, may we have four minutes to

3    discuss this, given your Honor's ruling, there are some issues

4    about the jurisdiction, to try to decide what we're requesting.

5                THE COURT:  We're getting very close to the lunch

6    hour.  Do you want to come back at 2:00, or is it really a very

7    quick discussion amongst your group?

8                MR. WITTELS:  If you just give us four minutes, I can

9    let you know whether we can make it back or not.

10               THE COURT:  Four minutes.  The clock is ticking.

11   Before you go, Mr. Wittels, I assume we can now release the

12   experts.

13               MR. WITTELS:  Yes, your Honor.

14               THE COURT:  Thank you, Mr. Baskin, Mr. Seggebruch, Mr.

15   Neale, and Mr. Klimov for being here.

16               (Recess)

17               MR. WITTELS:  Your Honor, in light of the stay, we had

18   obviously been anticipating that MS&L's position was that a lot

19   of the documents, as Ms. Nurhussein indicated, would come to us

20   related to jurisdiction from MS&L when the ESI protocol was

21   worked out.

22               THE COURT:  You want a stay, but you don't want a

23   stay?

24               MR. WITTELS:  What I'm saying is yes, we want the

25   stay, but there were certain documents that we were going to

C5eWdas2

ask the Court for areas such as the salary freeze, to have

advance defendants in light of the discovery cutoff on

jurisdiction --

      THE COURT:  There has been one discovery request to

them on jurisdictional grounds.  Right?

      MR. WITTELS:  We were going to ask the Court to allow

us, before your ruling, to allow us to add a few requests to

MSL within the time period because we now have, there's a

30-day window we would have to make a request before.

      THE COURT:  You have no time.  I mean, if you made the

request today, their response would be due June 14, give or

take, depending on where a weekend hits.  The discovery cutoff

is June 18, and that's not even the discovery cutoff on

jurisdiction per se, it's when Publicis has to make its motion,

and they've got to have a chance to be familiar with and

respond to any of this material.  In light of my rulings on the

Publicis discovery, I can't imagine that there is anything much

that you could get from MSL that would be relevant, and I'm not

inclined to make them go through an extensive ESI protocol or

any other system to find material unless it is crucial.  If you

want to have a meet and confer with MSL and come back to me in

a week or two, or whatever, if you can't agree, I'll have to

deal with it.  I'm not going to deal with it on the fly now

when you haven't made the request, as such.  You haven't spoken

to MSL.

C5eWdas2

1          MR. WITTELS:  We would be happy to confer and, if we

2     couldn't reach agreement, ask your Honor to resolve the

3     dispute, if we had wanted to add a few demands.

4          THE COURT:  When do you want to come back?  The more

5     this keeps going in circles, and let me be clear, you got what

6     you asked for.  This sounds like "I asked for a stay, the Court

7     denied it, I filed objections to Judge Carter, lo and behold,

8     the Court reconsidered and gave me what I wanted, and now I'm

9     not happy again."

10          Is there anything I can do that would make you happy?

11          MR. WITTELS:  Your Honor.

12          THE COURT:  That's somewhat of a rhetorical question,

13     so I guess my question is this.  I have no intention, as I've

14     said to you repeatedly, in granting another extension of the

15     June 18 motion date and discovery cutoff.  You knew that even

16     if we had stayed on schedule with the ESI protocol, you would

17     not have all your ESI-related documents until sometime in

18     September, long after this motion is fully briefed and perhaps

19     decided, but if you want to come back sometime, you tell me

20     when you want to come back.

21          MR. WITTELS:  Can we advise your Honor after

22     conferring with the defendants this week, by Friday, whether we

23     want to come back, or Thursday?

24          THE COURT:  Sure, but by the time you come back, I'm

25     busy the beginning of next week, it would be Thursday or Friday

C5eWdas2

of next week, if someone doesn't take all of those slots, and
I've got a trial starting May 29.  There is a very limited time
period.  Needless to say, this case has used up more than its
share of judicial resources.  Whenever you want, that's fine,
but I'm not going to extend the discovery cutoff date for the
Publicis discovery.

          Do you want to meet and confer over lunch and come
back after 2:00?  Fortunately for you and unfortunately for me,
my 2:00 conference on another case got moved to tomorrow, this
morning.  That's one of the things I checked at our convenience
break for the reporter previously.  Whatever you want.

          MR. WITTELS:  We need to look back at what your
Honor's rulings, how your Honor's rulings have impacted what we
think we need on the jurisdiction.  So we need today to really
go over that and talk to the defendants by tomorrow, and if
your Honor keeps open tentatively a slot for us next week, we
can let you know in the next two, three days.

          THE COURT:  I don't tentatively keep slots open.  If
another case that wants a settlement conference, a discovery
conference, or anything else, books it, they book it.  I make
myself very available to parties, particularly in this case.
If you want to come in on Friday, I could probably squeeze you
in this Friday.  If you want to wait, you'll wait.  But I don't
know when you're planning on taking the 30(b)(6) deposition.
If I don't see you until May 25, and that's to even rule

C5eWdas2

1   whether you can get any documents from MSL beyond what they're

2   willing to give you, I somewhat think you're setting me up for

3   an issue as to the June 18 date.  And I don't like to be set

4   up.

5              MS. CHAVEY:  Your Honor, I believe the deposition date

6   is June 6.  Also, just to make sure our position's clear, we

7   would not agree to plaintiffs' request for permission to issue

8   additional discovery requests on MSL.

9              THE COURT:  I understand.

10             MR. WITTELS:  There is one point I'd like to make,

11  your Honor.  When I came down originally to, I think, the

12  initial conference, my understanding is that under Rule 26, the

13  defendant has to produce documents irrespective of whether

14  there's an ESI protocol in place, which is what defendant has

15  been using throughout to not produce certain documents, but if

16  a document is pertinent and relevant to jurisdictional

17  questions --

18             THE COURT:  Sure.  And how are they supposed to find

19  it?  I don't know what you're living in.  In the old paper

20  days, yes, because generally if there was a dispute about the

21  XYZ contract, except for a few things floating around in the

22  wrong place, you would go to the file on the XYZ contract and

23  pull out the pieces of paper.  Now, yes, they have an

24  obligation to produce.  Frankly, if you want to go that route,

25  they have an obligation to produce and they can use their ESI

C5eWdas2

1    protocol, or monkeys, and they'll produce what they produce.

2            You can't have your cake and eat it too.  If you want

3    material from them that was part of the original document

4    requests that goes to jurisdictional issues without issuing new

5    requests, that they can find easily, that's one thing.  It's

6    another if you're saying let's have a stay of the ESI protocol

7    except now we want an expedited production of ESI for

8    jurisdictional purposes.

9            Do you want me to not give you the stay?  I don't

10   understand what you want, Mr. Wittels, so you figure it out.

11   If you want a conference this Friday, I'll schedule it.  If you

12   want one for sure next week, I'll schedule you.  If you want to

13   think about it, you'll write me a letter, and if there's a

14   slot, there's a slot.  What can I tell you?

15           MR. WITTELS:  Thank you.

16           THE COURT:  And I assume you'll notify Judge Carter

17   that you are withdrawing the objections filed as to the stay.

18           MR. WITTELS:  Yes.

19           THE COURT:  Then the usual drill.  Both sides can

20   split the cost of the transcript and I think we're done,

21   although I see Ms. Chavey standing so maybe we're not done.

22           MS. CHAVEY:  Thank you, Judge.

23           I just have a question.  There are other discovery

24   matters that are ongoing other than the ESI protocols.

25           THE COURT:  Such as?

C5eWdas2

1          MS. CHAVEY:  Such as some additional written discovery

2     requests that have been issued to us, some depositions that we

3     may wish to take, things that are not related to the ESI

4     protocol.

5          THE COURT:  I'm sorry.  Depositions of your people or

6     you of the plaintiffs'?

7          MS. CHAVEY:  Us of people other than the plaintiffs.

8     We haven't issued any notices, but we would like to continue

9     with discovery in the case as long as it isn't related to the

10    ESI protocol.

11         THE COURT:  As long as it is not something that is

12    dependent on the ESI that is being produced.  I mean, for

13    example, I would assume that the plaintiffs won't be taking MSL

14    depositions until they've gotten the documents so that their

15    depositions are effectively stayed by the ESI stay.  If there

16    are nonparties that either side wants to depose that are not

17    dependent in any way on MSL's document production, yes, let's

18    get all of that done as much as possible.

19         When you say there are written document requests

20    outstanding, written requests to you, from you?

21         MS. CHAVEY:  They're to us from the plaintiffs with

22    regard to the crash of a particular hard drive, and we're in

23    the process of preparing our responses.  We would assume that

24    we should just continue to do that.

25         THE COURT:  Correct.  The stay only affects ESI.

C5eWdas2

1                    MS. CHAVEY:  Okay.

2                    MR. BRECHER:  Judge, just one other quick issue.  On

3       the production of W2s, if you remember, months ago --

4                    THE COURT:  I remember too well.

5                    MR. BRECHER:  We allowed them to review and produce, I

6       think, approximately 2,200 W2s, and, at that time,

7       Ms. Nurhussein had sent us a list of 15, or so.  I forget the

8       exact number of W2s that were missing.  We looked into it and

9       said, You have them, or we produced the ones that were missing.

10      But more recently they sent us a list following Judge Carter's

11      order of several hundred, 700 or more, missing W2s.  What the

12      list was, was not really a list of missing W2s, it was a list

13      of employees every year during the class period and then they

14      said produce them all.  As it turned out most of those were

15      periods where they weren't employed, but we had to cross-check

16      and figure out which ones were truly missing, which ones

17      weren't employed, etc.  So we sent them a list of people who

18      really weren't in the class period during the time.  We've

19      asked them to confirm that.

20                   We also realized there were some business units that

21      were stored separately.  We've identified those.  We produced

22      over the weekend another 200 W2s.  We're working on it.  I just

23      want to let the Court know we're trying to get the remaining

24      missing W2s to the extent we can identify them.  But I just

25      wanted to advise the Court of that.

C5eWdas2

1        MS. BAINS:  Your Honor, I just wanted to quickly

2  respond to that because Mr. Brecher has misrepresented all of

3  what has transpired here regarding W2s.

4        THE COURT:  I guess one question is do I care.  Are

5  you asking me to rule on anything?

6        MS. BAINS:  I would like to clear the record.

7        In fact, we complied with Judge Carter's orders

8  regarding W2s.  Defendants moved their deadlines and did not

9  get back to us until we had started going through the W2s until

10  more than two weeks after, but I won't get into all the

11  details.  I just wanted to clear the record.

12        MR. BRECHER:  For the record, Judge, I didn't

13  misrepresent anything, and if you'd like any of the

14  correspondence related to that, I'm happy to provide it to the

15  Court.

16        THE COURT:  No.  Thank you.  Are we done now?

17        MR. WITTELS:  Yes, your Honor.

18        THE COURT:  Perhaps during the semi-quiet period you

19  all can all have a drink together or break bread or do

20  something to lower the temperature.

21        Usual drill.  I require both sides to purchase the

22  transcript and split the cost.  It contains the Court's

23  rulings.

24        We are adjourned.

25        (Proceedings adjourned)