UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MONIQUE DA SILVA MOORE, et al.,                    :

                         Plaintiffs,                    :          11 Civ. 1279 (ALC) (AJP)

               -against-                    :          **OPINION AND ORDER**

PUBLICIS GROUPE & MSL GROUP,                    :

                     Defendants.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

          Plaintiffs' "Motion for Recusal or Disqualification" (Dkt. No. 169) is based not on any claim that the Court has an actual bias, but rather on "an appearance of partiality."  (Dkt. No. 192: Pls. Reply Br. at 1 n.1: "Plaintiffs have never accused Judge Peck of actual bias or sought to impugn Judge Peck's integrity.  Plaintiffs' only ground for recusal is that the facts taken together create an appearance of partiality.")  Plaintiffs' recusal motion is <u>DENIED</u>.

## FACTUAL BACKGROUND

         The main ground of plaintiffs' motion is that my support for predictive coding showed bias favoring MSL and coerced plaintiffs into assenting to the concept of predictive coding. The chronology of events in this case puts the lie to plaintiffs' claim.

         This case was referred to me on November 28, 2011.  (Dkt. No. 48.)  Well before that date, MSL had informed plaintiffs that it "proposes using keywords as well as the analytical tools available in the Axcelerate review platform, which includes predictive coding . . . ." (Dkt. No. 178: Anders Aff. Ex. 2: Anders 10/21/11 Letter to Wipper at 3; <u>see also</u> Anders Aff. Ex. 3: Anders

11/3/11 Letter to Wipper at 4-9.)  Plaintiffs requested that MSL fully disclose its proposed predictive coding methodology for plaintiffs' consideration.  (See Dkt. No. 124: Nurhussein 3/19/12 Aff. Ex. E: Wipper 11/9/11 Letter to Anders at 5; see also id. Ex. D: Wipper 10/25/11 Letter to Anders at 2.)

**December 2, 2011 Conference**

I held my first conference with the parties on December 2, 2011.  (Dkt. No. 51: 12/2/11 Conf. Tr.)  During that conference, MSL's counsel stated that an open issue was "plaintiff's reluctance to utilize predictive coding to try to cull down" approximately three million electronic documents from the agreed-upon custodians.  (12/2/11 Conf. Tr. at 7-8.)  Because of my Search, Forward article that I would call to the parties' attention at the conference, I stated that:  "You must have thought you died and went to Heaven when this was referred to me," to which MSL's counsel responded:  "I'm just thankful that, you know, we have a person familiar with the predictive coding concept."  (12/2/11 Conf. Tr. at 8-9.)  Plaintiffs did not move to recuse me at that time for making this comment.   To the contrary, plaintiffs' counsel clarified that MSL had "over simplified [plaintiffs'] stance on predictive coding," i.e., that they were not opposed but had "multiple concerns . . . on the way in which [MSL] plan to employ predictive coding" and plaintiffs wanted "clarification."  (12/2/11 Conf. Tr. at 21.)

The Court did not rule on any predictive coding issue but offered the parties the following advice:

> Now, if you want any more advice, for better or for worse on the ESI plan and whether predictive coding should be used, or anything else . . . I will say right now, what should not be a surprise, I wrote an article in the October Law Technology News called Search Forward, which says predictive coding should be used in the appropriate case.

Is this the appropriate case for it?  You all talk about it some more.  And if you can't figure it out, you are going to get back in front of me.  Key words, certainly unless they are well done and tested, are not overly useful.  Key words along with predictive coding and other methodology, can be very instructive.

I'm also saying to the defendants who may, from the comment before, have read my article.  If you do predictive coding, you are going to have to give your seed set, including the seed documents marked as nonresponsive to the plaintiff's counsel so they can say, well, of course you are not getting any [relevant] documents, you're not appropriately training the computer.

(12/2/11 Conf. Tr. at 20-21, emphasis added.)[1]  The conference adjourned with the parties agreeing to further discuss the ESI protocol.  (12/2/11 Conf. Tr. at 34-35.)[2]

**My October 2011 Search, Forward Article**

As noted, at the December 2, 2011 conference I alerted the parties to my article, Search, Forward: Will manual document review and keyword searches be replaced by computer assisted coding?, appearing in the October 2011 issue of Law Technology News.  See Andrew Peck, Search, Forward, L. Tech. News, Oct. 2011, at 25-26, 29.  The article reviewed the problems with manual review and keyword searches (if poorly done), and generally described how computer-assisted review, a/k/a predictive coding, worked.  See Da Silva Moore v. Publicis Groupe, 11 Civ. 1279, --- F.R.D. ----, 2012 WL 607412 at *2-3 (S.D.N.Y. Feb. 24, 2012) (Peck, M.J.) (quoting Search, Forward, L. Tech. News, Oct. 2011, at 29), adopted, 2012 WL 1446534 (S.D.N.Y. Apr. 26,

---

[1]    At the December 2 conference when discussing whether the parties thought that a special master would be useful, I alluded to my familiarity with the ediscovery industry, stating: "You know, I know enough people in the industry that I can recommend some, or you all can get your vendors to recommend somebody . . . ."  (12/2/11 Conf. Tr. at 22.)

[2]    On December 16, 2011, plaintiffs filed Rule 72 Objections to my ruling at the December 2 conference as to limits on emotional distress damages.  (Dkt. No. 55: Pls. 12/16/11 Rule 72 Objections.)  Plainly, plaintiffs were not afraid to disagree with the Court (as is their right).

4

2012).  I ended the article with the comment that lawyers could view the <u>Search, Forward</u> article "as a sign of judicial approval" of predictive coding, but only for appropriate cases, stating:

> In my opinion, computer-assisted coding should be used on those cases where it will help "secure the just, speedy, and inexpensive" (Fed. R. Civ. P. 1) determination of cases in our e-discovery world.

Andrew Peck, <u>Search, Forward</u>, L. Tech. News, Oct. 2011, at 29.  Having had this article and my general opinion about predictive coding brought to the parties' attention at the December 2 conference, plaintiffs did not move for my recusal.

**January 4, 2012 Conference**

Plaintiffs' counsel wrote asking the Court to postpone the next scheduled conference, stating that "[a]lthough plaintiffs are prepared to consider the use of predictive coding as a search method in general, Plaintiffs need more time to evaluate and provide feedback on [MSL's] draft proposal and its methodology."  (Dkt. No. 178: Anders Aff. Ex. 5: Wipper 12/19/11 Letter to Court, at 2.)  Plaintiffs said that after their consultant (DOAR Litigation Consulting) examined MSL's proposal, the "parties then may engage in dialogue in order to address the issues, if any, that require resolution by the Court."  (<u>Id</u>.)  The Court granted the extension (over MSL's objection), and reminded the parties to read my article:  "As to predicative coding, you should read my article, 'Search, Forward' in the Oct. 2011 issue of Law Technology News." (Dkt. No. 58: 12/20/11 Memo Endorsed Order.)

On January 3, 2012, in anticipation of the January 4, 2012 conference, <u>plaintiffs</u> submitted a letter to the Court containing their discovery proposals, including an ESI protocol utilizing predictive coding.  (Anders Aff. Ex. 6: Wipper 1/3/12 Letter to Court.)  Plaintiffs informed the Court that they "have attempted to work within Defendants' proposed methodology while

honoring their restrictions" but that "Plaintiffs believe that Defendants' proposed use of predictive coding while arbitrarily imposing a cap [on cost] runs counter to the reasoning behind the use of predictive coding."  (Id. at 2.)[3/]  Plaintiffs' proposed protocol stated that "the following is a summary of the Parties' agreement on the use of Predictive Coding" for search of MSL's email archive. (Anders Aff. Ex. 6: 1/3/12 Wipper Letter to Court, attached "Plaintiffs Proposed Protocol Relating to the Production of Electronically Stored Information ('ESI')" at 12.)  Plaintiffs' Proposed Protocol, in a section entitled "General Overview of Predictive Coding Process," described that MSL would use Recommind's Axcelerator software and develop a "seed set" to train the computer, it would be a transparent process, and it would include quality testing.  (Pls. Proposed Protocol at 12-20.)  In other words, after discussions with its consultant DOAR, plaintiffs were proposing using predictive coding, but with certain differences in the details compared to MSL's proposal.

At the January 4, 2012 conference, after addressing other discovery issues, the parties turned to the email search issue.[4/]  The following colloquy occurred:

> MS. WIPPER [Plaintiffs' Counsel]:  . . . I'd like DOAR to respond and give you an overview, if we may, of our proposal on predictive coding.
>
> THE COURT:  All right, though I guess I'd like to know where it differs [from MSL's].

---

[3/]     Subsequently, the Court agreed with plaintiffs that MSL's proposal of a 40,000 email/$200,000 production cutoff was not justified. (Dkt. No. 71: 1/4/12 Conf. Tr. at 49-52; Dkt. No. 97: 2/8/12 Conf. Tr. at 73.)  See also Da Silva Moore v. Publicis Groupe, 11 Civ. 1279, --- F.R.D. ----, 2012 WL 607412 at *3 (S.D.N.Y. Feb. 24, 2012) (Peck, M.J.), adopted, 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012).

[4/]     On January 18, 2012, plaintiffs filed Rule 72 Objections to certain of my discovery rulings (unrelated to predictive coding) from the January 4 conference.  (Dkt. No. 69: Pls. 1/18/12 Rule 72 Objections.)

MS. WIPPER:  Well, its actually a direct response to their proposal.

. . . .

MR. NEALE [CEO of DOAR, Plaintiff's Consultant]:  . . . <u>We have not taken issue with the use of predictive coding</u>, or frankly, with the confidence levels that they have proposed . . . .

(1/4/12 Conf. Tr. at 51, emphasis added.)  The parties spent time conferring with each other while the Court handled another case, and later in the afternoon reported that they had made "a lot of progress."  (1/4/12 Conf. Tr. at 53-55.)  In discussing what needed to be done and when the next conference would be, MSL counsel Anders noted he would be on vacation, and the Court suggested that another lawyer such as Ms. Chavey cover in his absence so as not to lose time.  (1/4/12 Conf. Tr. at 60-61.)  The Court also noted that while he might not be working on the case, Anders could involve his firm's Florida ediscovery counsel, Ralph Losey, who I stated I knew "very well."  (1/4/12 Conf. Tr. at 61.)[5]  Counsel then suggested a date for the next conference, and the Court noted that "That's LegalTech week," but that February 2 would work.  (1/4/12 Conf. Tr. at 66.)  Counsel did not ask what I would be doing at LegalTech.[6]

---

[5]   Losey had not and has not entered an appearance as counsel of record in this case.  Neither plaintiffs nor MSL's counsel informed the Court at that time that Losey had been involved in drafting MSL's ediscovery protocol.  Plaintiffs did not ask me to explain how I knew Losey, nor did plaintiffs seek my recusal based on my knowing Losey.

[6]   Even if plaintiffs' counsel was not then aware of what LegalTech is, plaintiffs' vendor, DOAR, was familiar with it, and indeed was an exhibitor at prior LegalTech conferences at which I had spoken.  <u>See</u>, <u>e.g.</u>, LegalTech 30th Anniversary Program Guide, <u>available at</u> http://www.legaltechshowguide-digital.com/legaltechshowguide/2011guide?pg=70#pg70 (last visited June 14, 2012).

**Legal Tech**

I was a speaker at seven panels in connection with LegalTech on January 30, 31 and February 1, 2012.[7]  LegalTech is run by ALM (the company that publishes The American Lawyer, Law Technology News and other publications).  LegalTech New York 2012 had thirty-nine sponsors, including Recommind, and 186 exhibitors, not to mention hundreds of paying attendees.[8] I did not speak at any panels sponsored by Recommind, nor did I receive any expense reimbursement or compensation from Recommind during LegalTech 2012 nor at any other conference.  The panels in which I participated at LegalTech 2012 involved general ediscovery issues (such as cooperation, preservation, proportionality, etc.), effective keyword searching, and

---

[7]    I have been a frequent speaker at ediscovery CLE programs around the country since before the 2006 amendments to the Federal Rules of Civil Procedure.  I am reimbursed for travel expenses for attending out-of-town conferences.  In addition, starting in 2011 I have been paid teaching fees for speaking at some ediscovery programs where the audience can obtain CLE credits, including LegalTech 2012.

[8]    See LegalTech New York 2012 Sponsors, LegalTech An ALM Event, http://www.legaltechshow.com/r5/cob_page.asp?category_id=71685&initial_file=cob_page-sponsors.asp (last visited June 14, 2012); LegalTech New York 2012 Brochure at 20-21, available at http://www.almevents.com/CustomerFiles_sri/upload/wysiwyg_pics/Legal Tech.pdf (last visited June 14, 2012); LegalTech New York 2013 Exhibitor & Sponsor Prospectus at 4-7, available at http://legaltechexhibitors.hotresponse.com/hotdata/publishers /almlegaltechshow/legalexhib/pdfs/LegalTechNY2013prospectus.pdf (last visited June 14, 2012).

predictive coding.[9/]  My participation in these educational panels (for which attendees received CLE credit), and that of the other panelists, was arranged <u>before</u> this case was referred to me.

Another panelist on two of the panels was Ralph Losey, national ediscovery counsel in the Florida office of Jackson Lewis, MSL's counsel.  (Dkt. No. 178: Anders Aff. Ex. 10: Losey Aff. ¶ 8.)  Losey's affidavit makes clear that we have never had any <u>ex parte</u> communication about this lawsuit.  Losey stated:

> I have never spoken with U.S. Magistrate Judge Andrew J. Peck about this case nor had any other <u>ex parte</u> communication with him about this case.

(Anders Aff. Ex. 10: Losey Aff. ¶ 6.)  I confirm that.  (<u>See also</u> Dkt. No. 158: 4/2/12 Order.)[10/] Those panels (and my preparation for them) involved only the subject of computer-assisted review in general terms and in comparison to other search techniques (like manual review and keywords). In other words, the level of the panel discussion was similar to that of my <u>Search, Forward</u> article. There was absolutely no discussion of the details of the predictive coding protocol in this case, or in what a predictive coding protocol should look like in general.  While plaintiffs' recusal motion makes it sound like I spoke at length about this case on these panels, that simply is not true.  Typical

---

[9/]    <u>See</u> LegalTech New York 2012 Event Program Guide, <u>available at</u> http://www. almevents.com/CustomerFiles_sri/upload/wysiwyg_pics/ALM-Media-Legal-Tech-NY-Show%20Guide_HiRes.pdf (last visited June 14, 2012).

The tracks on which I spoke were sponsored by vendors (Clearwell/Symantic, Xerox, Epiq, Autonomy, EMC, BIA and Renew Data), who are competitors of Recommind (and DOAR).  All offer ediscovery tools for keyword searches and some also offer a form of computer-assisted review technology.

[10/]    My only meetings with Losey have been at the Sedona Conference and other ediscovery conferences, <u>i.e.</u>, in professional/educational settings, not in any personal settings.  I also read his ediscovery blog, along with many other ediscovery blogs and newsletters.

9

of my minor reference during panels to this case (without mentioning the case name, at a time when

the case was not yet all over the ediscovery blogs) is this passing reference:

> I've actually only seen computer-assisted review being utilized in one of my cases. It is still ongoing at the moment.  There is more or less agreement that they're willing to go that route, although [there is] still lots of discussion about exactly what sources are going to be input and other things that are still in front of me--so I'm not going to say much more about it.   The only thing I will say is when the District Judge referred the matter to me and I saw from the letters that had been submitted to the District Judge that the defendant was particularly pushing using computer-assisted review, I couldn't resist and the first thing I said to them when they walked into my courtroom, was saying to the defendants, "Boy, you must have thought you died and went to heaven when this discovery matter got referred to me in light of my article on the subject."

(Dkt. No. 171: Wittels Aff. Ex. B: Excerpt of a Video Recording of the Judicial Perspectives on

Technology-Assisted Review Panel at LegalTech NY 2012.)[11]/

---

[11]/   Similarly, the following exchange took place during a webinar discussion on January 11, 2012 hosted by ReviewLess:

> M.J. PECK:  I'll also tell one quick war story, which is in the first case where I know that the parties are using predictive coding. They had a conference in front of me – a general discovery status conference – and the defendant was saying that they were about to use predictive coding but they had not yet had a buy-in from the plaintiff. And I just smiled and said "And when you got assigned to me you, the defendant, must have thought you died and went to Heaven" in light of my Search article in Law Technology News. And indeed, whether because of that comment or otherwise, plaintiff said "Oh no no, we're ok with using computer-assisted review; we just had some questions about the exact process."  And they went out and they worked it all out.
>
> MODERATOR:  The alternative was to ask you to recuse yourself, I suppose, Andy?
>
> M.J. PECK:  No doubt.

(Wittels Aff. Ex. A: Audio Recording of ReviewLess Panel, available at http://www.esibytes.com/?p=2122.)

**February 8, 2012 Conference and DOAR's Press Release**

        The Court's next conference in this case was on February 8, 2012.  (Dkt. No. 97: 2/8/12 Conf. Tr.)  In advance of the conference, plaintiffs and MSL wrote to the Court enclosing their proposed ESI protocols and highlighting their areas of difference.  (See Dkt. No. 124: Nurhussein 3/19/12 Aff. Ex. H: Wipper 1/25/12 Letter to Court; Dkt. No. 171: Wittels Aff. Ex. Z: Anders 1/25/12 Letter to Court.)  Plaintiffs' proposed protocol, like MSL's, used predictive coding. (Nurhussein 3/19/12 Aff. Ex. H: Wipper 1/25/12 Letter to Court at 3-5 & Proposed Protocol at 20-35.)  Plaintiffs, however, proposed training the computer with two rounds of iterative review of 16,555 documents reviewed each round, while MSL's proposal was for up to seven rounds of review of at least 500 documents per round.  (See Nurhussein 3/19/12 Aff. Ex. H: Wipper 1/25/12 Letter to Court, Proposed Protocol at 31-34; Wittels Aff. Ex. Z: Anders 1/25/12 Letter to Court at 6-7; 2/8/12 Conf. Tr. at 70-89.)  The Court heard argument on these issues from the parties' counsel and their ediscovery vendors at the February 8, 2012 conference.  (See 2/8/12 Conf. Tr.)[12]

        The Court's rulings at the February 8 conference are summarized in my February 24, 2012 opinion, and will not be repeated here.  Da Silva Moore v. Publicis Groupe, 11 Civ. 1279, --- F.R.D. ----, 2012 WL 607412 at *3-6 (S.D.N.Y. Feb. 24, 2012) (Peck, M.J.), adopted, 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012).  Suffice it to say that the Court was comparing plaintiffs' predictive coding protocol and defendant MSL's predictive coding protocol. (2/8/12 Conf. Tr. at 57-

---

[12]    Although plaintiffs did not ask the Court to place the consultants under oath (see generally 2/8/12 Conf. Tr.), which the Court would have done if asked (compare Dkt. No. 202: 5/14/12 Conf. Tr. at 49-50), plaintiffs raised the failure to swear the consultants in as one ground for their objections to my February 8 decisions (Dkt. No. 93: Pls. Rule 72(a) Objections at 12). Judge Carter upheld my decision.  Da Silva Moore v. Publicis Groupe, 11 Civ. 1279, 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012).

89.)  See Da Silva Moore v. Publicis Groupe, 2012 WL 607412 at *5-6.  The Court accepted MSL's predictive coding protocol, with seven iterative review rounds, but with the caveat that if the system was not stabilized at that point, the parties would present quality control verification information to the Court and further rounds would be ordered to stabilize the system.  (2/8/12 Conf. Tr. at 76-77, 83-84, 88.)  See  Da Silva Moore v. Publicis Groupe, 2012 WL 607412 at *6.

Moreover, plaintiffs' consultant, DOAR's CEO Paul Neale, agreed that, in general, computer-assisted review works and works better than most alternatives.  (2/8/12 Conf. Tr. at 76.)  Neale noted that "it is fair to say we are big proponents of it."  (2/8/12 Conf. Tr. at 76.)  Neale added, however, that "[t]his is new technology and it has to be proven out" and that plaintiffs "don't at this point agree that this is going to work."  (2/8/12 Conf. Tr. at 75.)

A few days after the February 8 conference, plaintiffs' consultant DOAR issued a press release about my February 8 oral ruling and touted DOAR's role in this "'important step in the wider adoption of predictive coding technologies.'"  (Dkt. No. 178: Anders Aff. Ex. 8: 2/13/12 DOAR Press Release.)  It is worth quoting DOAR's press release in full:

**DOAR Experts Advise Plaintiffs in Hearing Before Magistrate Judge Peck on the Use of Predictive Coding**

*First Federal Judicial Acceptance on Predictive Coding Limits*

For Immediate Release
Monday, February 13, 2012

New York, NY - In the first federal case where Predictive Coding use will be adopted by both the court and the parties, DOAR Litigation Consulting CEO, Paul Neale, and Vice President of Discovery Consulting, Gene Klimov, advised Plaintiffs' counsel on the development of an electronically stored information ("ESI") protocol that includes the use of predictive coding.  DOAR participated in the negotiations with defense counsel and in the drafting of a comprehensive ESI protocol in da Silva Moore, et al. v. Publicis Groupe SA, et al., which will be jointly submitted by the

parties.  Furthermore, DOAR evaluated the defendants' proposed use of predictive coding and ensured that the process will be transparent enough to allow plaintiffs to verify the reliability of the process.  Plaintiffs' counsel will participate in every stage of the review of the documents that will seed, train and verify the process.

Mr. Neale presented the plaintiffs' position to the court during a hearing on February 8, 2012 before Magistrate Judge Andrew Peck of the Southern District of New York.  The parties plan to submit a final version of the joint protocol on February 17, 2012 after which it is expected that Judge Peck will issue a written opinion.

"While we most often advise producing parties on the use of alternative technologies such as predictive coding, I believe that our support of the requesting party in this case will prove to be an important step in the wider adoption of predictive coding technologies," Mr. Neale states.  "Gene and I are honored to be working with the lawyers at Sanford Wittels & Heisler on such an important precedent-setting case in the area of Electronically Stored Information (ESI) and the use of predictive coding."

Predictive coding (or computer assisted review) is a rapidly evolving technology that provides parties in litigation with an alternative to the time and cost associated with the traditional, manual review of large volumes of documents.  However, while the use of predictive coding is growing, its reliability and defensibility have yet to be fully explored by the courts.

da Silva Moore, et al. v. Publicis Groupe SA, et al., 11-CV-1279, is being heard by Judge Peck in the U.S. District Court, Southern District of New York.

(Anders Aff. Ex. 8: DOAR 2/13/12 Press Release.)[13/]

The Court notes that even at the May 14, 2012 conference, DOAR's Neale repeated under oath his company's approval of predictive coding generally, stating:

Well, your Honor, as you know, we [DOAR] were retained to advise the plaintiffs on evaluation and use and defendants' use of predictive coding.  And again, while we as a company are proponents of it, we have been evaluating the steps and the process and have been trying to advise the plaintiffs and the Court accordingly.

---

[13/]  DOAR's press release caused the case to be widely discussed about in ediscovery blogs.  It is interesting that while plaintiffs seem to suggest that because Recommind issued press releases in late February and early March 2012, that somehow supports their assertion that I should be recused (Dkt. No. 170: Pls. Br. at 10-11), but plaintiffs totally ignore their own consultant DOAR's February 13, 2012 press release.

(5/14/12 Conf. Tr. at 51-52, emphasis added.)[14]

After the February 8 conference (and DOAR's February 13 press release), the parties submitted their "final" ESI Protocol which the Court "so ordered."  (Dkt. No. 92: 2/17/12 ESI Protocol & Order.)  Plaintiffs included a paragraph in the Protocol objecting to it "in its entirety," noting that "Plaintiffs [had] submitted their own proposed ESI protocol [including predictive coding] to the Court, but it was largely rejected."  (2/17/12 ESI Protocol & Order ¶ J.1 at 22.)

### Plaintiffs' Objections to the Court's February 8, 2012 Rulings

Plaintiffs filed their objections to my February 8 rulings on February 22, 2012.  (Dkt. No. 93: Pls. Rule 72(a) Objections; see Dkt. No. 94: Nurhussein Aff.; Dkt. No. 95: Neale Aff.)  Plaintiffs' consultant, DOAR CEO Neale, reiterated that:  "As stated during the February 8, 2012 hearing and cited in Judge Peck's opinion, I am a proponent of the use of predictive coding, when it can be validated as reliable."  (Dkt. No. 125: Neale 3/19/12 Aff. ¶ 9.)  Plaintiffs also conceded that they were willing to consider the use of predictive coding, "if it was established as reliable."  (Dkt. No. 123: Pls. Rule 72 Objections Reply Br. at 5, 10.)  Plaintiffs distinguished between generalities and details:  "As Plaintiffs repeatedly warned, although the use of predictive coding may be appropriate under certain circumstances, the devil is in the details."  (Id. at 1, emphasis added.)

---

[14]   The following colloquy also occurred at the May 14 conference:

> THE COURT:  . . . . Mr. Neale, did you or did you not say at the first conference you were in front of me that you supported predictive coding if done right?

> MR. NEALE:  Your Honor, certainly as a company we do.  It doesn't mean that in this case we believe it is being done right.

(5/14/12 Conf. Tr. at 5-6.)

Plaintiffs' objections referred to my <u>Search, Forward</u> article and my panels at LegalTech, noting that I "primarily discussed, as a general matter, the propriety of computer-assisted document review (no doubt meaning some variations of predictive coding), but the real question was whether MSL's specific protocol would adequately address its Rule 26 obligations." (<u>Id.</u> at 1-3, 7-8.)

### <u>The Court's February 24, 2012 Decision is Affirmed by Judge Carter</u>

The Court issued its formal opinion on the ESI protocol on February 24, 2012. <u>Da Silva Moore</u> v. <u>Publicis Groupe</u>, 11 Civ. 1279, --- F.R.D. ----, 2012 WL 607412 (S.D.N.Y. Feb. 24, 2012) (Peck, M.J.). Judge Carter overruled plaintiffs' objections and adopted my decision on April 26, 2012. <u>Da Silva Moore</u> v. <u>Publicis Groupe</u>, 11 Civ. 1279, 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012).

On March 9, 2012, the Court held a further discovery conference. (Dkt. No. 209: 3/9/12 Conf. Tr.) Plaintiffs did not raise recusal at all at the conference. (<u>See generally</u> 3/9/12 Conf. Tr.)

### <u>Plaintiffs' Recusal Request and Motion</u>

It was not until March 28, 2012 that plaintiffs wrote a letter asking me to recuse myself from the case. Because MSL wrote that it would want a chance to respond, I entered an order asking plaintiffs whether they wanted me to rule based on letter-briefs or whether they wanted to file a formal motion, and added the following comment:

> The Court notes that my favorable view of computer assisted review technology in general was well known to plaintiffs before I made any ruling in this case, and I have never endorsed Recommind's methodology or technology, nor received any reimbursement from Recommind for appearing at any conference that (apparently) they and other vendors sponsored, such as Legal Tech. I have had no discussions with Mr. Losey about this case, nor was I aware that he is working on the case. It appears that after plaintiffs' counsel and vendor represented to me that they

15

> agreed to the use of predictive coding, plaintiffs now claim that my public statements
> approving generally of computer assisted review make me biased.  If plaintiffs were
> to prevail, it would serve to discourage judges (and for that matter attorneys) from
> speaking on educational panels about ediscovery (or any other subject for that
> matter).  The Court suspects this will fall on deaf ears, but I strongly suggest that
> plaintiffs rethink their "scorched earth" approach to this litigation.

(Dkt. No. 158: 4/2/12 Order.)

On April 13, 2012, plaintiffs filed their recusal motion.  (Dkt. No. 169: Motion; see also Dkt. No. 170: Pls. Recusal Br.; Dkt. No. 171: Wittels Aff.)

**Subsequent Events in the Case**

On April 20, 2012, plaintiffs asked Judge Carter to hold off on ruling on their objections to my February 8 and February 24 rulings about predictive coding until the recusal motion was decided; on April 25, 2012, Judge Carter rejected their request.  (Dkt. No. 174: 4/25/12 Memo Endorsed Order.)

Also on April 25, I held a further discovery conference.  (Dkt. No. 180: 4/25/12 Conf. Tr.)  At the start of the conference, plaintiffs asked me to stay discovery until Judge Carter ruled on their pending motions to further amend their complaint and for FLSA collective action certification. (4/25/12 Conf. Tr. at 2-3.)  Only after I denied that application did plaintiffs ask that I take no further action in the case until after I (and presumably Judge Carter) ruled on plaintiffs' recusal motion. (4/25/12 Conf. Tr. at 13.)  I denied that request.  (4/25/12 Conf. Tr. at 14.)  The order in which plaintiffs raised those two applications is indicative of their apparent strategy of seeing whether they prevail on matters and when they do not, only then raising recusal.

On May 14, 2012, I sua sponte reconsidered plaintiffs' request and stayed MSL's review and production of ESI pending Judge Carter's ruling on plaintiffs' motion to amend the

complaint and for collective action certification; MSL originally objected but then did not oppose the stay, which I entered in order to avoid the expense of redoing discovery if collective action certification was granted.  (Dkt. No. 202: 5/14/12 Conf. Tr. at 71-84.)  See Da Silva Moore v. Publicis Groupe, 11 Civ. 1279, 2012 WL 1698980 at *1 (S.D.N.Y. May 14, 2012) (Peck, M.J.).

## ANALYSIS

## I.    RECUSAL LEGAL STANDARD

Under 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  "The purpose of § 455(a) 'is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.'"  Green v. N.Y.C. Health & Hosps. Corp., 343 F. App'x 712, 713 (2d Cir. 2009) (quoting Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 865, 108 S. Ct. 2194, 2205 (1988)).[15/]

"In determining whether Section 455(a) requires recusal, the appropriate standard is objective reasonableness – whether 'an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal.'"  United States v. Carlton, 534 F.3d 97, 100 (2d Cir.), cert. denied, 555 U.S. 1038, 129 S. Ct. 613

---

[15/]    Accord, e.g., United States v. Amico, 486 F.3d 764, 775 (2d Cir. 2007) (Section 455(a)'s "purpose is the protection of the public's confidence in the impartiality of the judiciary."); Hardy v. United States, 878 F.2d 94, 96 (2d Cir. 1989); Barnett v. United States, 11 Civ. 2736, 90 Cr. 0913, 2012 WL 1003594 at *1 (S.D.N.Y. Mar. 26, 2012) ("The purpose of these [recusal] provisions is 'to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.'"); SEC v. Razmilovic, No. CV-04-2276, 2010 WL 2540762 at *4 (E.D.N.Y. June 14, 2010) ("The test under Section 455(a) 'deals exclusively with appearances. Its purpose is the protection of the public's confidence in the impartiality of the judiciary.'"); United States v. Pavlisak, No. 89-CR-0194, 1991 WL 111232 at *5 (N.D.N.Y. Apr. 25, 1991), aff'd, 954 F.2d 811 (2d Cir. 1992).

(2008); accord, e.g., Green v. N.Y.C. Health & Hosps. Corp., 343 F. App'x at 713-14; In re

Basciano, 542 F.3d 950, 956 (2d Cir. 2008), cert. denied, 555 U.S. 1177, 129 S. Ct. 1401 (2009);

United States v. Wecht, 484 F.3d 194, 213 (3d Cir. 2007) ("'The test for recusal under § 455(a) is

whether a reasonable person, with knowledge of all the facts, would conclude that the judge's

impartiality might reasonably be questioned.'"); United States v. Lauersen, 348 F.3d 329, 334 (2d

Cir. 2003) ("Disqualification under section 455(a) requires a showing that would cause 'an objective,

disinterested observer fully informed of the underlying facts [to] entertain significant doubt that

justice would be done absent recusal.'"), cert. denied, 541 U.S. 1044, 124 S. Ct. 2190 (2004).[16]

Thus,

> the existence of the appearance of impropriety is to be determined "not by
> considering what a straw poll of the only partly informed man-in-the-street would
> show[,] but by examining the record facts and the law, and then deciding whether a
> reasonable person knowing and understanding all the relevant facts would recuse the
> judge."

United States v. Bayless, 201 F.3d 116, 126-27 (2d Cir.), cert. denied, 529 U.S. 1061, 120 S. Ct.

1571 (2000).[17]  "The Court of Appeals has cautioned that when answering this question [i.e., the

---

[16]  See also, e.g., Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc., 08 Civ. 6143, 2011 WL 6153708 at *1 (S.D.N.Y. Dec. 7, 2011) ("The standard for recusal is an objective one– i.e., 'Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned?'" (quoting United States v. Lovaglia, 954 F.2d 811, 815 (2d Cir. 1992)); Webster v. Wells Fargo Bank, N.A., 08 Civ. 10145, 2009 WL 5178654 at *15 (S.D.N.Y. Dec. 23, 2009), aff'd, 458 F. App'x 23 (2d Cir. 2012); In re Savage & Assocs., P.C., 05 Civ. 2072, 2005 WL 578919 at *1 (S.D.N.Y. Mar. 9, 2005) ("The Second Circuit has held that 28 U.S.C. § 455 requires disqualification where 'an objective, disinterested observer fully informed of the underlying facts [would] entertain significant doubt that justice would be done absent recusal.'"); Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. Int'l Union, 332 F. Supp. 2d 667, 670 (S.D.N.Y. 2004).

[17]  Accord, e.g., In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1313 (2d Cir. 1988), cert.
(continued...)

objective test], 'the grounds asserted in a recusal motion must be scrutinized with care, and judges should not recuse themselves solely because a party claims an appearance of partiality.'" <u>Barnett</u> v. <u>United States</u>, 2012 WL 1003594 at *1.

        To establish a basis for recusal, "[m]ovants must overcome a presumption of impartiality, and the burden for doing so is substantial." <u>Metro. Opera Ass'n, Inc.</u> v. <u>Local 100, Hotel Emps. Int'l Union</u>, 332 F. Supp. 2d at 670 (quotations omitted); <u>accord, e.g.</u>, <u>United States</u> v. <u>Denton</u>, 434 F.3d 1104, 1111 (8th Cir. 2006) ("A judge is presumed to be impartial, and 'the party seeking disqualification bears the substantial burden of proving otherwise.'").[18/]

        "Discretion is confided in the district judge in the first instance to determine whether to disqualify himself.  The reasons for this are plain.  The judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion." <u>In re Drexel Burnham Lambert Inc.</u>, 861 F.2d at 1312 (citation omitted); <u>accord, e.g.</u>, <u>In re Basciano</u>, 542 F.3d at 956; <u>In re Certain Underwriter</u>, 294 F.3d 297, 302 (2d Cir. 2002); <u>United States</u> v. <u>Roldan-Zapata</u>, 916 F.2d 795, 802 (2d Cir. 1990), <u>cert. denied</u>, 499 U.S. 940, 111 S. Ct. 1397 (1991).[19/]  "[A] judge

---

[17/]    (...continued)
        <u>denied</u>, 490 U.S. 1102, 109 S. Ct. 2458 (1989); <u>Chevron Corp.</u> v. <u>Donziger</u>, 783 F. Supp. 2d 713, 721 (S.D.N.Y. 2011); <u>Albert</u> v. <u>Watkins Glen Int'l, Inc.</u>, No. 10-CV-6613, 2011 WL 98545 at *3 (W.D.N.Y. Jan. 12, 2011); <u>Reynoso</u> v. <u>Selsky</u>, No. 02-CV-6318, 2010 WL 1404139 at *3 (W.D.N.Y. Mar. 30, 2010).

[18/]    <u>See also, e.g.</u>, <u>Giladi</u> v. <u>Strauch</u>, 94 Civ. 3976, 1996 WL 18840 at *1 (S.D.N.Y. Jan. 18, 1996); <u>Bin-Wahad</u> v. <u>Coughlin</u>, 853 F. Supp. 680, 683 (S.D.N.Y. 1994); <u>Farkas</u> v. <u>Ellis</u>, 768 F. Supp. 476, 478 (S.D.N.Y. 1991).

[19/]    <u>See also, e.g.</u>, <u>Chevron Corp.</u> v. <u>Donziger</u>, 783 F. Supp. 2d at 721 (Section 455(a) "makes disqualification a matter addressed to the district judge's discretion, subject to review only for abuse." (fns. omitted)); <u>United States</u> v. <u>Shaw</u>, 06 Cr. 0041, 2009 WL 1106784 at *1 (continued...)

has an affirmative duty . . . not to disqualify himself unnecessarily, particularly 'where the request for disqualification was not made at the threshold of the litigation and the judge has acquired a valuable background of experience.'" Nat'l Auto Brokers Corp. v. Gen. Motors Corp., 572 F.2d 953, 958 (2d Cir. 1978), cert. denied, 439 U.S. 1072, 99 S. Ct. 844 (1979); accord, e.g., LoCascio v. United States, 473 F.3d 493, 498 (2d Cir.), cert. denied, 552 U.S. 1010, 128 S. Ct. 554 (2007); United States v. Yonkers Bd. of Educ., 946 F.2d 180, 183 (2d Cir. 1991).  "A judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." In re Drexel Burnham Lambert Inc., 861 F.2d at 1312; accord, e.g., In re Literary Works in Elec. Databases Copyright Litig., 509 F.3d 136, 140 (2d Cir. 2007); Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. Int'l Union, 332 F. Supp. 2d at 670; In re Certain Underwriter, 294 F.3d at 302.

"In deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." In re Drexel Burnham Lambert Inc., 861 F.2d at 1312; accord, e.g., In re Basciano, 542 F.3d at 956; In re Certain Underwriter, 294 F.3d at 302.[20]  This is because "[l]itigants are entitled to an unbiased

---

[19]    (...continued)
(S.D.N.Y. Apr. 23, 2009) ("A district judge has discretion 'in the first instance to determine whether to disqualify himself.'"); Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. Int'l Union, 332 F. Supp. 2d at 670 ("The decision to grant or deny a recusal motion is committed to the sound discretion of the judge to whom the motion is directed.").

[20]    See also, e.g., Williams v. United States, 00 Cr. 1008, 2011 WL 3296101 at *20 (S.D.N.Y. July 28, 2011); Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. Int'l Union, 332 F. Supp. 2d at 670.

judge; not to a judge of their choosing."  In re Drexel Burnham Lambert Inc., 861 F.2d at 1312;

accord, e.g., Mulligan v. Loschiavo, 173 F. App'x 26, 28 (2d Cir. 2006).[21]  Moreover,

> the public interest mandates that judges not be intimidated out of an abundance of caution into granting disqualification motions: "A trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may create the [appearance] of bias," and "'[a] timid judge, like a biased judge, is intrinsically a lawless judge.'"

Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. Int'l Union, 332 F. Supp. 2d at 670.[22]

## II.   DA SILVA MOORE'S RECUSAL MOTION IS UNTIMELY

### A.   Legal Standard

Although 28 U.S.C. § 455 does not explicitly address timeliness, such a requirement

"has been read into this section," addressing two underlying concerns.  Apple v. Jewish Hosp. &

Med. Ctr., 829 F.2d 326, 333 (2d Cir. 1987); accord, e.g., Taylor v. Vt. Dep't of Educ., 313 F.3d 768,

794 (2d Cir. 2002) (Sotomayor, C.J.); United States v. Brinkworth, 68 F.3d 633, 639 (2d Cir. 1995);

Polizzi v. United States, 926 F.2d 1311, 1321 (2d Cir. 1991).[23]  "First, judicial resources should not

---

[21]   See also, e.g., Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc., 2011 WL 6153708 at *7; United States v. Shaw, 2009 WL 1106784 at *1; Thorpe v. Zimmer, Inc., 590 F. Supp. 2d 492, 494 (S.D.N.Y. 2008); Hoffenberg v. United States, 333 F. Supp. 2d 166, 172-73 (S.D.N.Y. 2004).

[22]   See also, e.g., Markus v. United States, 545 F. Supp. 998, 1000 (S.D.N.Y. 1982) (Weinfeld, D.J.) ("If adverse rulings during the course of a litigation were to be accepted per se to disqualify a judge on the ground that his impartiality might reasonably be questioned, then every disappointed litigant would have it within his power to remove a judge from continuing with the case assigned to him.  It would open the way to 'judge shopping.'"), aff'd, 742 F.2d 1444 (2d Cir. 1983).

[23]   See also, In re Digital Music Antitrust Litig., 06 MDL 1780, 2007 WL 632762 at *8 (S.D.N.Y. Feb. 27, 2007); Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 97 Civ. 5499, 2003 WL 282187 at *2 (S.D.N.Y. Feb. 7, 2003), aff'd, 124 F. App'x 73 (2d Cir.), (continued...)

be wasted; and, second, a movant may not hold back and wait, hedging its bets against the eventual outcome." Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d at 334; accord, e.g., LoCascio v. United States, 473 F.3d 493, 497 (2d Cir. 2007), cert. denied, 552 U.S. 1010, 128 S. Ct. 554 (2007); United States v. Brinkworth, 68 F.3d at 639; Gil Enters., Inc. v. Delvy, 79 F.3d 241, 247 (2d Cir. 1996); In re IBM Corp., 45 F.3d 641, 643 (2d Cir. 1995) (A "prompt application avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters."); United States v. Yonkers Bd. of Educ., 946 F.2d 180, 183 (2d Cir. 1991).[24/]

Recusal motions must be made "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d at 333; accord, e.g., Weisshaus v. Fagan, 456 F. App'x 32, 34 (2d Cir. 2012); United States v. Amico, 486 F.3d 764, 773 (2d Cir. 2007).[25/]  Courts have held that:

---

[23/]    (...continued)
cert. denied, 546 U.S. 1016, 126 S. Ct. 660 (2005); In re Gaming Lottery Sec. Litig., 96 Civ. 5567, 2001 WL 1020905 at *5 (S.D.N.Y. Sept. 5, 2001); Katzman v. Victoria's Secret Catalogue, 939 F. Supp. 274, 277 (S.D.N.Y. 1996), aff'd, 113 F.3d 1229 (2d Cir. 1997); Lamborn v. Dittmer, 726 F. Supp. 510, 515 (S.D.N.Y. 1989).

[24/]    See also, e.g., In re Gaming Lottery Sec. Litig., 2001 WL 1020905 at *5; Painewebber Inc. v. Nwogugu, 98 Civ. 2441, 1998 WL 912062 at *2 (S.D.N.Y. Dec. 30, 1998); Katzman v. Victoria's Secret Catalogue, 939 F. Supp. at 277.

[25/]    See also, e.g., Silver v. Kuehbeck, 217 F. App'x 18, 23 (2d Cir. 2007); LoCascio v. United States, 473 F.3d at 497; Gil Enters., Inc. v. Delvy, 79 F.3d at 247; United States v. Brinkworth, 68 F.3d at 639; In re IBM Corp., 45 F.3d at 643; United States v. Yonkers Bd. of Educ., 946 F.2d at 183; Polizzi v. United States, 926 F.2d at 1321; In re Digital Music Antitrust Litig., 2007 WL 632762 at *8; Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 2003 WL 282187 at *2; In re Gaming Lottery Sec. Litig., 2001 WL 1020905 at *5; Universal City Studios, Inc. v. Reimerdes, 104 F. Supp. 2d 334, 349 (S.D.N.Y. 2000); Painewebber Inc. v. Nwogugu, 1998 WL 912062 at *2; Katzman v. Victoria's Secret Catalogue, 939 F. Supp. at 277.

> For purposes of timeliness, the applicant is charged with knowledge of all facts "known or knowable, if true, with due diligence from the public record or otherwise." Any other rule would allow a member of a law firm aware of facts that might lead to judicial disqualification to sit on the information, wait to see which way the wind appears to be blowing with the judge, and then to come forward in an effort to get rid of the judge if a colleague responsible for a case begins to perceive that the judge is unreceptive to the client's position or even simply wants a delay.

Universal City Studios, Inc. v. Reimerdes, 104 F. Supp. 2d at 349-50; accord, e.g., United States v. Daley, 564 F.2d 645, 651 (2d Cir. 1977) (motion for recusal untimely because, inter alia, the facts upon which it was based "as a matter of public record, were at all times ascertainable by counsel"), cert. denied, 435 U.S. 933, 98 S. Ct. 1508 (1978).[26]

In deciding whether a recusal motion is timely, a court looks to a number of factors, including whether:  "(1) the movant has participated in a substantial manner in trial or pre-trial proceedings; (2) granting the motion would represent a waste of judicial resources; (3) the motion was made after the entry of judgment; and (4) the movant can demonstrate good cause for delay." Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d at 334 (citations omitted); accord, e.g., Weisshaus v. Fagan, 456 F. App'x at 34; United States v. Amico, 486 F.3d at 773; Taylor v. Vt. Dep't of Educ., 313 F.3d at 794-95; United States v. Brinkworth, 68 F.3d at 639.[27]

---

[26]   See also, e.g., In re Digital Music Antitrust Litig., 2007 WL 632762 at *9; Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 2003 WL 282187 at *4.

[27]   See also, e.g., In re Digital Music Antitrust Litig., 2007 WL 632762 at *8; Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 2003 WL 282187 at *2; Painewebber Inc. v. Nwogugu, 1998 WL 912062 at *2; Katzman v. Victoria's Secret Catalogue, 939 F. Supp. at 277; Lamborn v. Dittmer, 726 F. Supp. at 514-15.

"Furthermore, the Second Circuit has warned that a recusal motion made after the entry of judgment is 'presumptively untimely.'" Katzman v. Victoria's Secret Catalogue, 939 F. Supp. at 278 (citing Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d at 334); accord, e.g.,
(continued...)

**B.**     <u>Application</u>

Plaintiffs' seek my recusal due to my advocacy of predicative coding, relationship with Losey and speaking engagements at LegalTech.  (<u>See generally</u> Dkt. No. 170: Pls. Br.; Dkt. No. 192: Pls. Reply Br.)  Plaintiffs and defendants, however, have been aware of my view on predicative coding since at least December 2, 2011, and my relationship with Losey and engagement with LegalTech since January 4, 2012.  (<u>See</u> page 6 above.)

During the first conference on December 2, 2011, I made the parties aware of my knowledge of predictive coding and recommended that parties read my <u>Search, Forward</u> article.  (<u>See</u> pages 2-3 above.)  Specifically, I said:

> Now, if you want any more advice, for better or for worse on the ESI plan and whether predictive coding should be used, or anything else . . . I will say right now, what should not be a surprise, <u>I wrote an article</u> in the October Law Technology News <u>called Search Forward, which says predictive coding should be used in the appropriate case.</u>

(<u>See</u> page 2 above, emphasis added.)  Indicating that I am familiar with the ediscovery industry and know several people involved, when discussing whether a special master would be useful, I said, "You know, I know enough people in the industry that I can recommend some, or you all can get your vendors to recommend somebody . . . ." (<u>See</u> page 3 n.1 above.)  I also made the comment, "You must have thought you died and went to Heaven when this was referred to me" (<u>see</u> page 2 above), and MSL's counsel responded that counsel was "just thankful that . . . we have a person familiar with the predictive coding concept" (<u>see</u> page 2 above).

---

[27]/     (...continued)
<u>Blake</u> v. <u>Potter</u>, 03 Civ. 0743, 2010 WL 4536974 at *2 (S.D.N.Y. Nov. 8, 2010); <u>Painewebber Inc.</u> v. <u>Nwogugu</u>, 1998 WL 912062 at *2.

On December 20, 2011, I granted plaintiffs' request for an adjournment of the upcoming discovery conference, and in doing so reminded the parties to read my article, stating, "As to predictive coding, you should read my article, 'Search, Forward' in the Oct. 2011 issue of Law Technology News."  (See page 4 above.)

During the January 4, 2012 conference, while discussing substitute counsel for MSL counsel Anders during his vacation, I made the parties aware that I knew Ralph Losey, a partner in MSL's counsel's ediscovery practice group.  (See page 6 above.)  The following colloquy occurred:

> THE COURT:  I know every lawyer thinks they're indispensable and I'm not pulling the "Jackson Lewis is a big firm and you're all fungible," but is there not another person who may be less email savvy or computer savvy than you, such as Ms. Chavey, for example, who can follow up, along with the folks from Recommind and plaintiffs' counsel, and not lose an entire week because you're on vacation?
>
> MS. CHAVEY:  Of course, your Honor.
>
> THE COURT:  And I happen to know, it may not be on this case, if it's a true e-discovery dispute, I happen to know your Florida e-discovery counsel very well --
>
> MR. ANDERS:  He knows a little bit.
>
> THE COURT:  You can bring Mr. Losey into the mix if need be.
>
> MR. ANDERS:  OK, understood.

(Dkt. No. 71: 1/4/12 Conf. Tr. at 61, emphasis added; see page 6 above.)  Also at the January 4 conference while setting the date for the next conference, I implicitly made it known that I would be unavailable due to my speaking engagements at LegalTech.  (See page 6 above.)  The following colloquy occurred:

> THE COURT: OK, next, date for our next court conference, what's your pleasure?
>
> . . . .

      MS. CHAVEY: Your Honor, what about February 2nd?

      THE COURT: That's LegalTech week. Yes, by Thursday that's OK. February 2nd at 9:30.

(1/4/12 Conf. Tr. at 66; see page 6 above.)  Plaintiffs' ediscovery consultant, DOAR, is very familiar with the Legal Tech conferences.  (See page 6 n.6 above.)

      Plaintiffs argue that their motion should "not be denied as untimely [because]: (1) the case remains in its early stages; (2) granting the motion would not represent a waste of judicial resources; (3) the motion was not made after entry of judgment; and (4) Plaintiffs have acted promptly upon discovering the relevant facts." (Pls. Reply Br. at 6.)

      With respect to the first factor, plaintiffs have been active participants in pretrial proceedings since before my first conference on December 2, 2011.  While plaintiffs are correct that the case is in its early stages, discovery has been ongoing since at least October 2011 (see Dkt. No. 44: 10/12/11 Order), if not before.  At conferences and through written communications, plaintiffs have enlisted both myself and the District Judges with respect to the ediscovery protocol, adjournments, issues arising during depositions, stipulations and other pretrial issues.  (See, e.g., Dkt. No. 88: 2/8/12 Conf. Tr.; Dkt. No. 91: 2/2/12 Telephone Conf. Tr.; Dkt. No. 92: 2/17/12 ESI Protocol & Order; Dkt. No. 108: 3/8/12 Stipulation & Order; Dkt. No. 109: Am. Joint Scheduling Order; Dkt. No. 118: 3/19/12 Stipulation & Order; Dkt. No. 128: 3/28/12 Memo Endorsed Order; Dkt. No. 209: 3/9/12 Conf. Tr.; Da Silva Moore v. Publicis Groupe, 11 Civ. 1279, --- F.R.D. ----, 2012 WL 607412 (S.D.N.Y. Feb. 24, 2012) (Peck, M.J.), adopted, 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012).)

With respect to the second factor, this case was referred to me on November 28, 2011 for general pretrial supervision.  (See page 1 above.)  Since that time, I have familiarized myself with this case and have expended considerable time and attention in responding to the parties' discovery issues and disputes.  While plaintiffs assert that "granting the motion would not represent a waste of judicial resources" (Pls. Reply Br. at 6), another magistrate judge would have to spend ample time to familiarize himself or herself with this complex case.  Moreover, plaintiffs have stated that if recusal is granted, they will ask Judge Carter to review and overturn my decisions and orders in the case.  (Pls. Br. at 25.)

With respect to the third factor, while it is true that, as plaintiffs assert, "the motion was not made after entry of judgment" (Pls. Reply Br. at 6), it is also true that plaintiffs waited to seek my recusal until after I adopted MSL's predictive coding protocol (see pages 14-15 above).  Plaintiffs themselves assert that "[p]redictive coding without proper safeguards will impact the merits of this case."  (Pls. Reply Br. at 7.)  Courts in the Second Circuit have required "a prompt application [to avoid] the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters."  In re IBM Corp., 45 F.3d 641, 643 (2d Cir. 1995).  It appears that plaintiffs are improperly using the recusal motion as "fall-back position" to an unfavorable ruling.  See, e.g., Weisshaus v. Fagan, 456 F. App'x 32, 34 (2d Cir. 2012) (Motion held untimely.  "Although there was no dispositive ruling as to [defendant] at the time [plaintiff] brought her recusal motion, the district court aptly noted that the motion came on the heels of its direction that [plaintiff] submit to a deposition, thus strongly suggesting that the motion was a mere fall-back position in response to an adverse ruling."); Silver v. Kuehbeck, 217 F. App'x 18, 23-24 (2d Cir. 2007) (Motion held untimely.  "[A]fter the April 18, 2005 settlement conference, from

which [plaintiff] was 'left with no choice but to assume that what transpired . . . may have colored' the district court's perception, [plaintiff] continued to litigate the case for two more months, even appearing before the Court for oral arguments on the motion to dismiss on May 23 without requesting recusal.  It thus appears that [plaintiff] held back his 'recusal application as a fall-back position in the event of adverse rulings on pending matters.'"); LoCascio v. United States, 473 F.3d 493, 497 (2d Cir. 2007) (recusal motion untimely where plaintiff "made no mention of the above remark until after the District Court had denied his motion to amend and after it had denied his § 2255 petition."), cert. denied, 552 U.S. 1010, 128 S. Ct. 554 (2007); Gil Enters., Inc. v. Delvy, 79 F.3d 241, 247 (2d Cir.1996) ("In the face of defeat, [plaintiff] now seeks to do just that which this Court warned against in In re IBM and use its post-hoc recusal motion as a 'fall-back position.' Since [plaintiff]'s objection was raised well later than 'the earliest possible moment,' and because [plaintiff] has failed to demonstrate any bias on the part of the district court beyond [the Judge]'s own expressed frustration, we reject this ground for relief."); Armenian Assembly of Am., Inc. v. Cafesjian, 783 F. Supp. 2d 78, 88 (D.D.C. 2011) ("[I]t appears that the filing of the [recusal] motion was motivated by the fact that Plaintiffs received a largely adverse decision from the Court rather than by the sudden discovery of an alleged bias."); Katzman v. Victoria's Secret Catalogue, 939 F. Supp. 274, 278 (S.D.N.Y. 1996) (Plaintiff "and her counsel now seek to do just that which the Second Circuit and other courts have warned against; namely, use a post-judgment recusal motion to try to get a second bite at the apple."), aff'd, 113 F.3d 1229 (2d Cir. 1997).

With respect to the fourth factor, plaintiffs assert that they "have acted promptly upon discovering the relevant facts" but provide no explanation for their delay.  (See Pls. Reply Br. at 6.) Despite plaintiffs' knowledge as of December 2, 2011 of my views on predicative coding, and by

January 4, 2012 as to my relationship with Losey and my speaking at LegalTech (see pages 2-3, 6 above), plaintiffs did not request my recusal until March 28, 2012 by letter (see page 14 above) and did not file their formal recusal motion until April 13, 2012 (see page 15 above). The movant "is charged with knowledge of all facts 'known or knowable, if true, with due diligence from the public record or otherwise.'" Universal City Studios, Inc. v. Reimerdes, 104 F. Supp. 2d 334, 349 (S.D.N.Y. 2000); accord, e.g., Armenian Assembly of Am., Inc. v. Cafesjian, 783 F. Supp. 2d at 87 (timeliness rule "'has been applied when the facts upon which the [recusal] motion relies are public knowledge, even if the movant does not know them.'"). Plaintiffs here had the requisite knowledge no later than January 4, 2012, but the recusal request did not come until nearly three months later. (See pages 14-15 above.) Courts have found shorter delays to be untimely. See, e.g., Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d 326, 334 (2d Cir. 1987) (motion untimely where party waited two months after events giving rise to charge of bias or prejudice before making its recusal motion, despite fact that other of the "factors do not support a finding of untimeliness"); Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 97 Civ. 5499, 2003 WL 282187 at *1, *4 (S.D.N.Y. Feb. 7, 2003) (two-month delay untimely), aff'd, 124 F. App'x 73 (2d Cir.), cert. denied, 546 U.S. 1016, 126 S. Ct. 660 (2005); Katzman v. Victoria's Secret Catalogue, 939 F. Supp. at 278 (two-month delay untimely); Lamborn v. Dittmer, 726 F. Supp. 510, 515 (S.D.N.Y. 1989) ("Recusal motions are often denied on the basis of untimeliness where there has been only a short delay." (citing, inter alia, In re Martin-Trigona, 573 F. Supp. 1237, 1244-45 (D. Conn. 1983) (motion untimely based on twelve-day delay), appeal dismissed, 770 F.2d 157 (2d Cir. 1985), cert. denied, 475 U.S. 1058 (1986))). I have made no efforts to hide my views, relationships or affiliations. If

plaintiffs truly believed that any of these issues, individually or collectively, created a bias or the appearance of partiality, they should have promptly moved for my recusal.

Accordingly, plaintiffs' recusal motion is untimely. In any event, it also is meritless, as will be discussed in the following sections.

## III.   DA SILVA MOORE'S RECUSAL MOTION IS MERITLESS

Plaintiffs assert that my recusal is required due to:  (1) my "public comments concerning the case" (Dkt. No. 170: Pls. Br. at 12-14; Dkt. No. 192: Pls. Reply Br. at 8-9), (2) my "participation on pro-predictive coding panels with defense counsel Ralph Losey while presiding over the parties' dispute on predictive coding" (Pls. Br. at 14-15; Pls. Reply Br. at 7-8), (3) my "numerous speaking engagements in favor of predictive coding, which were at least indirectly sponsored and funded by Recommind and other e-discovery vendors" (Pls. Br. at 15-17), and (4) my "failure to disclose [my] activities enhances the appearance of impropriety" (Pls. Br. at 19-21).

### A.   Speaking Engagements

With respect to my speaking engagements on the subject of computer-assisted review, I only spoke generally about computer-assisted review in comparison to other search techniques.  (See pages 7-9 above.)  The fact that my interest in and knowledge about predictive coding in general overlaps with issues in this case is not a basis for recusal.  See, e.g., Hoatson v. N.Y. Archdiocese, 280 F. App'x 88, 90 (2d Cir. 2008) (In a case involving the Catholic Church, fact that the district judge was "member of the Guild of Catholic Lawyers of the Archdiocese of New York," had received an award from that organization and occasionally attended its meetings discussing Catholic education and Catholic commitment to social justice was not a basis for appearance of impropriety recusal.); Hu v. Am. Bar Ass'n, 334 F. App'x 17, 19 (7th Cir. 2009) (A

"judge's membership in a bar association, or his receipt of reimbursement for participating in bar-association activities, does not create the type of relationship that would cause us to doubt his ability to preside impartially over a case in which the bar association is a party."); Lunde v. Helms, 29 F.3d 367, 370-71 (8th Cir. 1994) (no basis for recusal where judge was an alumnus of the university defendant, had made financial contributions to the university and had participated in the university's educational programs), cert. denied, 513 U.S. 1155, 115 S. Ct. 1111 (1995); Wu v. Thomas, 996 F.2d 271, 275 (11th Cir. 1993) (recusal not required where judge made past contributions to the university defendant and held position as unsalaried adjunct professor), cert. denied, 511 U.S. 1033, 114 S. Ct. 1543 (1994); Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1117-18 (4th Cir. 1988) (judge's Sierra Club membership before appointment to the bench did not require recusal from case where the Sierra Club was a party), cert. denied, 491 U.S. 904, 109 S. Ct. 3185 (1989); United States v. Alabama, 828 F.2d 1532, 1543-44 (11th Cir. 1987) ("all judges come to the bench with a background of experiences, associations and viewpoints . . . . A judge is not required to recuse himself merely because he holds and has expressed certain views on a general subject."   Judge's background as civil rights lawyer and state legislator did not require disqualification in desegregation case, but other factors did.), cert. denied, 487 U.S. 1210, 108 S. Ct. 2857 (1988); Shaw v. Martin, 733 F.2d 304, 316 (4th Cir.) ("One who has voted as a legislator in favor of a statute permitting the death penalty in a proper case cannot thereafter be presumed disqualified to hear capital cases as a judge or predisposed to give a death sentence in any particular case."), cert. denied, 469 U.S. 873, 105 S. Ct. 230 (1984).[28/]

---

[28/]     See also, e.g., Armenian Assembly of Am., Inc. v. Cafesjian, 783 F. Supp. 2d 78, 90 (D.D.C.
(continued...)

While speaking on ediscovery panels in January 2012, I mentioned that I had a case in front of me using computer-assisted review, but I did not mention the parties or counsel involved. (See page 9 & n.11 above.)  The only arguably identifiable statement was the "died and went to Heaven" comment.  (See page 9 & n.11 above.)  This comment, however, was originally made in open court at the December 2, 2011 conference and was available in the public transcript.  (See page 2 above.)  Consequently, this is not a recusable statement.  See, e.g., United States v. Pitera, 5 F.3d 624, 626-27 (2d Cir. 1993) (upholding district court's denial of recusal motion by defendant in narcotics prosecution, where judge had lectured to the DEA Task Force including advice on steps to take to increase convictions, but also spoke at a PLI program for criminal defense lawyers, and the "record discloses that the Judge commendably lectures to a variety of trial practice seminars"),

---

28/     (...continued)
2011) ("The fact that the Court appears to share a cultural interest in glass art with [defendant] would not lead a reasonable person to question the Court's impartiality.  Judges are not soulless automatons; they are permitted to have social and cultural interests outside the courtroom.  The fact that a judge's interests overlap with those of a litigant does not ordinarily raise questions about her ability to act impartially in her capacity as a judge." (citation omitted)); Wessmann v. Bos. Sch. Comm., 979 F. Supp. 915, 916-17 (D. Mass. 1997) (in a school desegregation case, recusal denied based on judge's past activities as a civil rights lawyer and membership in the Lawyer's Committee for Civil Rights of the Boston Bar Association); Samuel v. Univ. of Pittsburgh, 395 F. Supp. 1275, 1278 (W.D. Pa. 1975) (denying recusal motion and distinguishing "between a Federal judge's expression of personal philosophy (which is certainly permissible) and his expression of an opinion on some facet of a particular case which is before him (which would be impermissible)"), vacated on other grounds, 538 F.2d 991 (3d Cir. 1976); compare Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 865-77, 108 S. Ct. 2194, 2205-06 (1988) (requiring recusal where judge served on board of trustees of university that had a financial interest in the litigation); United States v. Cooley, 1 F.3d 985, 995 (10th Cir. 1993) (In a case involving abortion protesters, the Tenth Circuit held "that at least after the judge's volunteer appearance on national television to state his views regarding the ongoing protests, the protesters, and his determination that his injunction was going to be obeyed, a reasonable person would harbor a justified doubt as to his impartiality in the case involving these defendants.").

cert. denied, 510 U.S. 1131, 114 S. Ct. 1103 (1994); United States  v. Yonkers Bd. of Educ., 946

F.2d 180, 184-85 (2d Cir. 1991) (finding "no impropriety" in the District Judge's public comments

in the media about a pending case because the judge "only restated what he had been saying in open

court for the past few years and did not discuss the details of remedy implementation"); Wilborn v.

Wells Fargo Bank, N.A. (In re Wilborn), 401 B.R. 848, 863 (Bankr. S.D. Tex. 2009) ("Here, the

undersigned judge's disagreement with certain legal arguments previously rejected by this Court and

others, expressed at the Dallas Seminar, are not sufficient to warrant recusal."); Metro. Opera Ass'n,

Inc. v. Local 100, Hotel Emps. Int'l Union, 332 F. Supp. 2d 667, 674-75 (S.D.N.Y. 2004) ("[T]he

summary of factual findings from the Opinion, used as a springboard in the [CLE] Presentation to

discuss 'best practices' in electronic discovery to avoid such findings, is insufficient to require

recusal, even when a motion to reconsider was pending.").[29]

       The Metropolitan Opera case is particularly instructive.  There, Judge Preska issued

a "lengthy opinion" granting judgment for plaintiff and awarding it attorneys' fees based on

defendants' discovery abuses.  See Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. Int'l Union,

332 F. Supp. 2d at 669.  While a motion for reconsideration was pending, Judge Preska gave a

presentation at a BNA CLE program "on the topic of electronic discovery and how technological

---

[29]    Moreover, Canon 3(A)(6) of the Code of Conduct for United States Judges provides: "A
judge should not make public comment on the merits of a matter pending or impending in
any court. . . . The prohibition on public comment on the merits does not extend . . . to
scholarly presentations made for purposes of legal education." Code of Conduct for United
States Judges, Canon 3(A)(6) (emphasis added), available at http://www.uscourts.gov/
Viewer.aspx?doc=/uscourts/RulesAndPolicies/conduct/Vol02A-Ch02.pdf (last visited
June 14, 2012). My comments on LegalTech (and other ediscovery) panels, for which the
audience could receive CLE credit, constitutes scholarly presentations for purposes of legal
education.

advances might affect discovery obligations." Id. at 669-70.  "The Presentation began with a summary of selected discovery failures set out in the Opinion, . . . and proceeded to recommend . . . steps to take to avoid these and other pitfalls in electronic discovery, including steps that echoed findings in the Opinion." Id.  Judge Preska denied defendants' § 455(a) disqualification motion.  Id. at 676.  Movants "argue[d] that a few of the phrases in the course of the Presentation are indicative of [the judge's] 'personal involvement' or 'emotional commitment' to one side of the dispute," including reference to a colloquial comment that the [defendant] "'junked'" some of its computers. Id. at 672-73.  Judge Preska responded:  "Whether or not my subjective pedagogical intent was successfully conveyed, the remarks complained of could not be interpreted by the objective disinterested observer as conveying the level of personal involvement required for recusal." Id. at 673.  Judge Preska concluded:

> As noted above, the Presentation began with a summary of selected findings in the Opinion relevant to the seminar topic.  Movants do not suggest that the summary inaccurately reported what the Opinion stated but object because certain of the findings recited detail "failings" of defendants and their counsel and because some of those findings are challenged in the motion for reconsideration.  First, the finding that certain actions (or inactions) constituted failings by defendants and their counsel was the very basis of the Opinion. . . .

> Second, as noted above, the audience was informed that a reconsideration motion was pending.  Movants nowhere explain why a reasonable observer would assume from this summary of findings from the Opinion, recited for the stated purpose of advising counsel how to avoid similar failures in the future, that the Court could not decide the pending motion for reconsideration in an impartial manner any more than he or she would make that assumption from merely reading the Opinion.  Accordingly, the summary of factual findings from the Opinion, used as a springboard in the Presentation to discuss "best practices" in electronic discovery to avoid such findings, is insufficient to require recusal, even when a motion to reconsider was pending.

> . . . .

Having "carefully weigh[ed] the policy of promoting public confidence in the judiciary against the possibility that those questioning [my] impartiality might be seeking to avoid the adverse consequences of [my] presiding over their case." I find that movants have not carried their substantial burden of showing that a reasonable observer, with knowledge and understanding of the relevant facts, would "entertain significant doubt that justice would be done absent recusal," based upon the Presentation at the BNA seminar. Accordingly, movants' motion to disqualify is denied.

Id. at 674-75, 676 (citations omitted).

My comments were nowhere near the comments in Metropolitan Opera, which were not a basis for recusal. I did not mention this case by name. (See pages 8-9 above.) While I briefly mentioned that I had a case in front of me where a party proposed using predictive coding (and noted that, on the record, I had made the "died and went to heaven" comment), the case was not yet the subject of publicity (which only resulted after the February 13, 2012 press release by plaintiffs' consultant DOAR) and the objective reasonable observer would not have known that those brief comments referred to this case. (See pages 9, 11-12 above.) Moreover, the comments were minor and fleeting, involved only facts on the public record and, like Metropolitan Opera, were for educational purposes.

To the extent plaintiffs are complaining about my general discussion at these CLE presentations about the use of predictive coding in general, those comments would not cause a reasonable objective observer to believe I was biased in this case. I did not say anything about predictive coding at these LegalTech and other CLE panels that I had not already said in my Search, Forward article, i.e., that lawyers should consider using predictive coding in appropriate cases. My position was the same as plaintiffs' consultant, DOAR CEO Neale. (See page 11 above.) Both plaintiffs and defendants were proposing using predictive coding in this case. (See page 5 above.)

I did not determine which party's predictive coding protocol was appropriate in this case until the February 8, 2012 conference, <u>after</u> the panels about which plaintiffs complain.[30/]

In objecting to my February 8 ruling, plaintiffs informed Judge Carter that while predictive coding may be appropriate under certain circumstances, "the devil is in the details." (<u>See</u> page 13 above.)[31/]  I did not discus the "details" of a predictive coding protocol (<u>e.g.</u>, number of iterations needed to train the computer, how many "seed" documents would be used, appropriate sample size) at any of the LegalTech or other CLE panels (or in my <u>Search, Forward</u> article), nor did any of the other panelists.  Thus, a reasonable objective observer would not think that my comments at these educational panels gives the appearance of bias for MSL or against plaintiffs. My participation in the panels, like Judge Preska's CLE presentation in <u>Metropolitan Opera</u>, does not require recusal.

---

[30/]   Plaintiffs' assertion that they "reluctantly assented to predictive coding in principle under compulsion from Judge Peck" (Dkt. No. 170: Pls. Br. at 2 n.3) is belied by plaintiffs' -- and their consultant DOAR's -- proposals to use predictive coding and support of predictive coding, as discussed above.  Moreover, plaintiffs have not shown any hesitation to file objections to Judge Carter, starting as early as their December 16, 2011 objections to certain of my rulings at the December 2, 2011 conference (<u>see</u> page 3 n.2 above) long before any detailed judicial discussion as to predictive coding protocols.  Plaintiffs' additional claim that I disregarded their concerns "in [my] haste to give judicial blessing to predictive coding" (Pls. Br. at 2 n.3; <u>see also</u> <u>id.</u> at 5, 13-14) also is silly; I could have achieved that same goal (if I had it, which I did not) by approving plaintiffs' predictive coding protocol.

[31/]   DOAR CEO Neale also referred to the difference between predictive coding in general and the details of any specific protocol, stating:

> "Your Honor, I think you understand that predictive coding is a general term, and there is a lot of flavors.  This is one flavor of it . . . ."

(Dkt. No. 202: 5/14/12 Conf. Tr. at 59.)

### B.   Counsel Losey & Recommind's Participation in LegalTech

While I participated on two panels with defense counsel Losey, we never had any ex parte communication regarding this lawsuit.  (See page 8 above.)  My preparation for and participation in ediscovery panels involved only ediscovery generally and the general subject of computer-assisted review.  (See pages 7-8 above.)   Losey's affidavit makes clear that we have never spoken about this case, and I confirm that.  (See page 8 above.)  During the panel discussions (and preparation sessions), there was absolutely no discussion of the details of the predictive coding protocol involved in this case or with regard to what a predicative coding protocol should look like in any case.  (See pages 8-9 above.)  Plaintiffs' assertion that speaking on an educational panel with counsel creates an appearance of impropriety is undermined by Canon 4 of the Judicial Code of Conduct, which encourages judges to participate in such activities.  See Code of Conduct for United States Judges, Canon 4 ("A judge may engage in extrajudicial activities, including law-related pursuits and . . . educational . . . activities, and may speak, write, lecture, and teach on both law-related and nonlegal subjects."), available at http://www.uscourts.gov/Viewer.aspx?doc=/ uscourts/RulesAndPolicies/con duct/Vol02A-Ch02.pdf (last visited June 14, 2012).[32]

---

[32]   See Code of Conduct for United States Judges, Canon 4 Commentary ("Complete separation of a judge from extrajudicial activities is neither possible nor wise; a judge should not become isolated from the society in which the judge lives. As a judicial officer and a person specially learned in the law, a judge is in a unique position to contribute to the law, the legal system, and the administration of justice, including revising substantive and procedural law . . . . To the extent that the judge's time permits and impartiality is not compromised, the judge is encouraged to do so, either independently or through a bar association, judicial conference, or other organization dedicated to the law."), available at http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/RulesAndPolicies /conduct/Vol02A-Ch02.pdf (last visited June 14, 2012).

The cases make clear that participation on an educational panel with counsel is not a basis for recusal, for sound policy reasons.  See, e.g., Leja v. Schmidt Mfg., Inc., No. Civ. 01-5042, 2010 WL 2571850 at *2 (D.N.J. June 22, 2010) ("In my own case, during the course of 31 years on the bench, I have developed numerous personal friendships with members of the Bar and have participated in many charitable, legal and public service organizations in which lawyers, law firms and other judges have participated. This is probably the experience of most judges. To permit such associations to become grounds for recusal would either push judges towards a hermit like existence or open the floodgates to recusal motions."); In re Wolverine Proctor & Schwartz, LLC, 397 B.R. 179, 183 (Bankr. D. Mass. 2008) ("[T]he Court rejects [creditor's] assumption that [the judge's] service on the Financial Literacy Committee with [counsel], and numerous other volunteer lawyers and fellow judges, gives rise to a disqualifying connection and establishes reasonable grounds for doubting this Court's impartiality."); In re Healy, No. 04-28375-D-13L, 2006 WL 3751617 at *4 (Bankr. E.D. Cal. Dec. 18, 2006) ("It is common knowledge, of course, that judges regularly appear on panels and at presentations for members of the bar, and that such events are regularly advertised in various publications that might be viewed by both the public and the bar. But it is not reasonable to conclude that the participation of a judge with members of the bar who appear before the judge's court would create a predisposition, or an appearance of a predisposition, to favor the members of the bar who participate over those who do not.  The Debtor's assertion of an appearance of impropriety is undermined by Canon 4 of the Code of Conduct, which not only permits judges to participate in such activities, but encourages judges to do so."); Moran v. Clarke, 213 F. Supp. 2d 1067, 1073 (E.D. Mo. 2002) ("A judge's involvement with other attorneys in bar association activities is not a basis for recusal. Indeed, the commentary to Canon 4 . . . encourages

judges to 'contribute to the improvement of the law, the legal system, and the administration of justice . . . . [T]he judge is encouraged to do so, either independently or through a bar association, judicial conference, or other organization dedicated to the improvement of the law.' A judge should not be required to withdraw from all social relationships and live in seclusion.'"); Bailey v. Broder, 94 Civ. 2394, 1997 WL 73717 at *2 (S.D.N.Y. Feb. 20, 1997) ("If my 'relationship' with [counsel (because of bar association and court-related social activities)] were to require recusal under the instant circumstances, I daresay recusal would be required in so many other cases because of my acquaintance with an attorney that I -- and probably most other judges -- would be unable to function in our jobs."); Rosado v. Bridgeport Roman Catholic Diocesan Corp., 970 A.2d 656, 671 (Conn.) (Court "can conceive of no reason to depart from the rule that [a judge's] membership in a task force concerning a particular legal issue does not justify disqualification of a judge simply because the judge's service happens to be coincident with his participation in a case dealing with the same issue."), cert. denied, 130 S. Ct. 500 (2009).[33/]

        Plaintiffs further assert that I failed to notify them of my ex parte communications with defense counsel Losey.  (Dkt. No. 170: Pls. Br. at 7-8, 14-15, 19-21.) Canon 3(A)(4) provides: "a judge should not initiate, permit, or consider ex parte communications or consider other

---

[33/]    Plaintiffs assert that LegalTech may be viewed as trade show, not "a forum to 'contribute to the improvement of the practice of law.'"  (Dkt. No. 192: Pls. Reply Br. at 7 n.12.) LegalTech has both trade show and educational components.  See LegalTech New York 2012 Brochure at 3, available at http://www.almevents.com/CustomerFiles_sri/upload/wysiwyg_pics/LegalTech.pdf (last visited June 14, 2012).  I was a speaker for educational panels which were approved for continuing legal education credit by the New York State CLE Board.  See CLE FAQ, LegalTech An ALM Event, http://www.legaltechshow.com/r5/showkiosk.asp?category_id=71685&listing_id=3963076 (last visited June 14, 2012).  I received no compensation, directly or indirectly, from MSL, MSL's counsel, or MSL's vendor Recommind.

communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers."  Code of Conduct for United States Judges, Canon 3(A)(4), available at http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/RulesAndPolicies/conduct/Vol02A-Ch02 .pdf (last visited June 14, 2012).  Here, I had no ex parte communications with Losey "concerning a pending or impending matter," and thus nothing to disclose to plaintiffs.  (See page 8 above.)  Moreover, I never tried to hide the fact that I knew Losey.  I specifically advised counsel that I knew Losey "very well" and also alluded to my engagement with LegalTech during the January 4, 2012 conference.  (See page 6 above.)  Had plaintiffs been concerned, they could have followed up with the Court.  Thus, I had no duty to notify the parties.

Plaintiffs cite to Pfizer Inc. v. Kelly (In re School Asbestos Litig.), 977 F.2d 764, 782 (3d Cir. 1992), in furtherance of their argument that my "participation on pro-predictive coding panels with defense counsel Ralph Losey while presiding over the parties' dispute on predictive coding requires [my] recusal."  (Pls. Br. at 14-15.)  In re School Asbestos Litig. is inapposite because in that case the judge:

> attended a predominantly pro-plaintiff conference on a key merits issue; the conference was indirectly sponsored by the plaintiffs, largely with funding that he himself had approved; and his expenses were largely defrayed by the conference sponsors with those same court-approved funds.  Moreover, [the judge] was, in his own words, exposed to a Hollywood-style "pre-screening" of the plaintiffs' case: thirteen of the eighteen expert witnesses the plaintiffs were intending to call gave presentations very similar to what they expected to say at trial.

Pfizer Inc. v. Kelly (In re School Asbestos Litig.), 977 F.2d at 782.  The panels in which I participated are distinguishable.  First, I was a speaker at educational conferences, not an audience member.  Second, the conferences were not one-sided, but concerned ediscovery issues including search methods in general.  Third, while Recommind was one of thirty-nine sponsors and one of 186

exhibitors contributing to LegalTech's revenue (see page 7 above), I had no part in approving the sponsors or exhibitors (i.e., funding for LegalTech) and received no expense reimbursement or teaching fees from Recommind or LegalTech, as opposed to those companies that sponsored the panels on which I spoke.  Fourth, there was no "pre-screening" of MSL's case or ediscovery protocol; the panel discussions only covered the subject of computer-assisted review in general.[34]

Plaintiffs assert that  my "numerous speaking engagements in favor of predictive coding, which were at least indirectly sponsored and funded by Recommind and other e-discovery vendors, mandate recusal."  (Pls. Br. at 15-17.)  Plaintiffs correctly assert that:

> the Second Circuit cautioned that: "[R]ecusal may be required after accepting meals or lodging from organizations that may receive a significant portion of their general funding from litigants or counsel to them . . . .  [A]ccepting something of value from an organization whose existence is arguably dependent upon a party to litigation or counsel to a party might well cause a reasonable observer to lift the proverbial eyebrow. . . . Judges should be wary of attending presentations involving litigation that is before them or likely to come before them without at the very least assuring themselves that parties or counsel to the litigation are not funding or controlling the presentation."

(Pls. Br. at 16 (quoting Aguinda v. Texaco, Inc. (In re Aguinda), 241 F.3d 194, 206 (2d Cir. 2001).)

Plaintiffs, however, fail to appreciate the difference between the facts in In re Aguinda and this case.

Plaintiffs assert that Recommind indirectly sponsored me at LegalTech.  (Pls. Br. at 15-17, 23, 24-25; Pls. Reply Br. at 7.)  LegalTech New York 2012 had thirty-nine sponsors, 186 exhibitors, and hundreds of paying attendees. (See page 7 above.)  Unlike In re Aguinda, LegalTech did not receive

---

[34]    Plaintiffs' reliance on United States v. Amico, 486 F.3d 764, 767 (2d Cir. 2007), is also misplaced.  (Pls. Br. at 14-15.)  In Amico, the Second Circuit held that the district judge's handling of and reaction to the judge's prior dealings with the government's main cooperating witness concerning a mortgage application for the judge himself created an appearance of partiality.  United States v. Amico, 486 F.3d at 775-76.  The Court fails to see how Amico has any applicability to the facts in the present litigation.

a "significant portion of [its] general funding from litigants or counsel" or Recommind.  Compare Aguinda v. Texaco, Inc. (In re Aguinda), 241 F.3d at 206.  Recommind sponsored the Emerging Technology and Information Governance tracks; my panels were on tracks sponsored by other companies.  (See page 8 n.9 above.)  Thus, "the source of the payments [do] not give the appearance of influencing the judge in the judge's judicial duties or otherwise give the appearance of impropriety," Code of Conduct for United States Judges,  Canon  4(H),  available at http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/RulesAndPolicies/conduct/Vol02A-Ch02.pdf (last visited June 14, 2012), because Recommind's support of LegalTech was one minor source of Legal Tech's funding and was not affiliated with the panels on which I spoke.

        My comments at LegalTech (and all other ediscovery conferences at which I recently was a speaker) addressed my interest in and support for computer-assisted review in general in cases where it is appropriate.  (See pages 7-8 above.)  My comments were in-line with my Search, Forward article also discussing the use of predictive coding in appropriate cases.  (See pages 3-4 above.)  "Engaging in such law-related activities– including speeches that comment on current events and legal developments–is permitted not only because judges are citizens, but because they are particularly knowledgeable on such topics."  In re Judicial Misconduct, 632 F.3d 1289, 1289 (9th Cir. 2011).  My comments about computer-assisted review are supported by Canon 4 of the Code of Conduct that encourages judges to "speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice."  Code of Conduct for United States Judges Canon 4 (A)(1), available at http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/ RulesAndPolicies/conduct/Vol02A-Ch02.pdf (last visited June 14, 2012).

There are probably fewer than a dozen federal judges nationally who regularly speak at ediscovery conferences.  Plaintiffs' argument that a judge's public support for computer-assisted review is a recusable offense (Pls. Br. at 12-17, 23; Pls. Reply Br. at 4-6) would preclude judges who know the most about ediscovery in general (and computer-assisted review in particular) from presiding over any case where the use of predictive coding was an option, or would preclude those judges from speaking at CLE programs.  Plaintiffs' position also would discourage lawyers from participating in CLE programs with judges about ediscovery issues, for fear of subsequent motions to recuse the judge (or disqualify counsel).  Taken further, it would preclude any judge who speaks at a CLE conference about any ediscovery subject from handling future cases involving ediscovery.  Such a position defies logic and is inconsistent with the Code of Conduct for United States Judges.  See, e.g., Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn), 401 B.R. at 871-72 ("The Committee on Codes of Conduct of the Judicial Conference of the United States clearly desires that federal judges be free to convey their legal opinions at CLE presentations so that practitioners may benefit from their experience and perspective.  As such, the Code of Conduct for United States Judges expressly allows for, and encourages, federal judges to engage in 'scholarly presentation[s] made for the purposes of legal education.'  At both the Dallas Seminar and the LSU Seminar, the undersigned judge did exactly that.  To recuse himself in this suit would therefore be improper." (citations omitted)).

Moreover, in Samuel v. Univ. of Pittsburgh, the court distinguished the difference between a judge's personal philosophy and discussions of opinion regarding a particular case:

> It is particular concern to me that counsel seems here to misapprehend the critical distinction between a Federal judge's expression of personal philosophy (which is certainly permissible) and his expression of an opinion on some facet of

> a particular case which is before him (which would be impermissible). . . . If this distinction did not apply, a judge could neither write books nor articles, nor could he speak on legal subjects. Indeed, he could not write opinions, since such a contention as asserted by [plaintiffs' counsel] would then disqualify him from hearing subsequent cases involving the same points of law.
>
> Unless it has been the intention of Congress that only ciphers be appointed to the federal bench (an absurd theory), the expression of opinion on legal matters is certainly permitted. Federal judges give, indeed are usually invited to give, their views in many different formal and informal situations. Almost invariably those views bear some relation to litigation which has been or will be before them. That counsel disagrees with a judge's opinion, so expressed, cannot be grounds for disqualification.

Samuel v. Univ. of Pittsburgh, 395 F. Supp. at 1278.  Here, my comments at ediscovery conferences related to the general use of predictive coding in appropriate cases, and I did not express any opinion regarding the specific issues in this case.  Consequently, neither my comments nor the fact that Losey was on some panels with me, nor the fact that MSL's vendor Recommind sponsored different panels at LegalTech, separately or collectively, are a basis for recusal.

## IV.   RECUSAL IS NOT REQUIRED BASED ON MY IN-COURT COMMENTS

### A.   Legal Standard

"Generally, claims of judicial bias must be based on extrajudicial matters, and adverse rulings, without more, will rarely suffice to provide a reasonable basis for questioning a judge's impartiality." Chen v. Chen Qualified Settlement Fund, 552 F.3d 218, 227 (2d Cir. 2009).[35]  As the Supreme Court has noted:

---

[35]   Accord, e.g., United States v. Saez, 371 F. App'x 202, 204 (2d Cir.), cert. denied, 131 S. Ct. 256 (2010); Matrix Essentials, Inc. v. Quality King Distribs., Inc., 324 F. App'x 22, 25 (2d Cir. 2009); DeMartino v. United States, No. 07 CV 1412, 2010 WL 3023896 at *9 (E.D.N.Y. Aug. 2, 2010); SEC v. Razmilovic, No. CV-04-2276, 2010 WL 2540762 at *4 (E.D.N.Y. June 14, 2010).

First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

Liteky v. United States, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994) (citation omitted).[36/] The

Supreme Court stressed that "[n]ot establishing bias or partiality . . . are expressions of impatience,

dissatisfaction, annoyance,  and even anger, that are within the bounds of what imperfect men and

women, even after having been confirmed as federal judges, sometimes display." Liteky v. United

States, 510 U.S. at 555-56, 114 S. Ct. at 1157.[37/]  Additionally, a "judge's ordinary efforts at

---

[36/]    Accord, e.g., Webster v. Penzetta,  458 F. App'x 23, 25-26 (2d Cir. 2012); Weisshaus v. Fagan  456 F. App'x 32, 35 (2d Cir. 2012); United States v. Horsford, 422 F. App'x 29, 31 (2d Cir. 2011); Loeber v. Spargo, 391 F. App'x 55, 59 (2d Cir. 2010), cert. denied, 131 S. Ct. 2934 (2011); United States v. Carlton, 534 F.3d 97, 100 (2d Cir.), cert. denied, 555 U.S. 1038, 129 S. Ct. 613 (2008); Calderon v. Perez, 10 Civ. 2562, 2011 WL 293709 at *42 (S.D.N.Y. Jan. 28, 2011) (Peck, M.J.), report & rec. adopted, 2011 WL 1405029 (S.D.N.Y. Apr. 5, 2011); A.S. Goldmen, Inc. v. Phillips, 05 Civ. 4385, 05 Civ. 5496, 2006 WL 1881146 at *41 (S.D.N.Y. July 6, 2006) (Peck, M.J.), report & rec. adopted, 2007 WL 2994453 (S.D.N.Y. Oct. 15, 2007).

[37/]    Accord, e.g., United States v. Horsford, 422 F. App'x at 31; United States v. English, 629 F.3d 311, 321 (2d Cir. 2011); Gottlieb v. SEC, 310 F. App'x 424, 425 (2d Cir.), cert. denied, 130 S. Ct. 511 (2009); Francolino v. Kuhlman, 365 F.3d 137, 143-44 (2d Cir.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Chevron Corp. v. Donziger, 783 F. Supp. 2d 713, 722 (S.D.N.Y. 2011); Calderon v. Perez, 2011 WL 293709 at *42; Teachers4Action v. Bloomberg, 552 F. Supp. 2d 414, 416 (S.D.N.Y. 2008); A.S. Goldmen, Inc. v. Phillips, 2006
(continued...)

courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration-remain immune." Liteky v. United States, 510 U.S. at 556, 114 S. Ct. at 1157.[38/]

     "A judge is not to be faulted as biased or prejudiced because he has considered that the effective discharge of his responsibility over proceedings before him . . . has demanded the consistent rejection of an attorney's contentions or strong measures to prevent what he regards as inexcusable waste of time." Rosen v. Sugarman, 357 F.2d 794, 798 (2d Cir. 1966) (Friendly, C.J.).[39/] "Moreover, an occasional display of irritation . . . does not suffice to show personal bias or prejudice, whether the irritation was justified or not." Rosen v. Sugarman, 357 F.2d at 798.[40/]

### B.    Application

     Plaintiffs argue for recusal alleging that I have taken "personal offense" to plaintiffs' filing of objections to my rulings and plaintiffs' filing of this recusal motion (Dkt. No. 170: Pls. Br. at 21-22), and that I have "chastised and yelled at Plaintiffs' counsel" and "intimidated Plaintiffs for disagreeing with rulings" (Dkt. No. 192: Pls. Reply Br. at 1-2).  Plaintiffs' arguments lack merit.

---

[37/]    (...continued)
WL 1881146 at *41.

[38/]    Accord, e.g., Chevron Corp. v. Donziger, 783 F. Supp. 2d at 722; Calderon v. Perez, 2011 WL 293709 at *42; Teachers4Action v. Bloomberg, 552 F. Supp. 2d at 416; A.S. Goldmen, Inc. v. Phillips, 2006 WL 1881146 at *41.

[39/]    Accord, e.g., Charron v. United States, 200 F.3d 785, 789 (Fed. Cir. 1999); United States v. Panza, 612 F.2d 432, 440 (9th Cir. 1979), cert. denied, 447 U.S. 925, 926, 100 S. Ct. 3019, 3020 (1980).

[40/]    Accord, e.g., Charron v. United States, 200 F.3d at 789; cf., e.g., United States v. IBM Corp. (In re IBM Corp.), 618 F.2d 923, 932 (2d Cir. 1980) ("'Judges, while expected to possess more than the average amount of self-restraint, are still only human.  They do not possess limitless ability, once passion is aroused, to resist provocation.'").

Plaintiffs assert that my "repeated comments towards Plaintiffs may create an appearance of such partiality and -- collectively with [my] other conduct -- warrant recusal." (Pls. Br. at 21.)[41/]  "A judge's comments that form the basis of a recusal motion should not be viewed in isolation, but rather must be viewed in context."  Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn), 401 B.R. 848, 860 (Bankr. S.D. Tex. 2009).[42/]  While I have been critical of plaintiffs'

---

[41/]   The cases plaintiffs cite in support of this argument (Pls. Br. at 22) are inapposite, since the factual circumstances were very different.  In both cases, the judge was reversed, and upon remand, expressed his resultant personal offense to the party and counsel.  United States v. Holland, 655 F.2d 44, 45, 47 (5th Cir. 1981) (holding that "a reasonable man would be convinced that the trial judge's impartiality might be questioned" where the judge commented "that [defendant] had 'broken faith' with the court at his first trial by consenting to the judge visiting the jury room but then raising the issue on appeal" and stated "that he intended to increase [defendant]'s sentence" because of these circumstances); Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 158, 163, 165 (3d Cir. 1993) (judge's "impartiality may reasonably be questioned" in a non-jury case where the case was reversed and remanded, and the judge responded directly "to the mandamus petition by letter to petitioners' counsel").

[42/]   See also, e.g., LoCascio v. United States, 473 F.3d 493, 497 (2d Cir.) (finding that a judge's comments, including comment that he might institute disbarment proceedings against counsel, when read in context, "revealed neither 'an opinion that derives from an extrajudicial source' nor 'such a high degree of favoritism or antagonism as to make fair judgment impossible'"), cert. denied, 552 U.S. 1010, 128 S. Ct. 554 (2007); United States v. Pearson, 203 F.3d 1243, 1277 (10th Cir.) (judge's comments that motion was "'irrelevant' and 'close to being malicious'" did not warrant recusal "[a]fter reviewing the judge's comments in context"), cert. denied, 530 U.S. 1268, 120 S. Ct. 2734 (2000); In re Martinez–Catala, 129 F.3d 213, 219-20 (1st Cir. 1997) (judge's remark that the plaintiffs were "'political sweet potatoes,'" meaning hacks, and that they should "'forget the Constitution,'" when viewed in context, were little more than an appropriate warning to plaintiffs' counsel); Chevron Corp. v. Donziger, 783 F. Supp. 2d 713, 722 (S.D.N.Y. 2011) ("The Court's comments from the bench on various occasions . . . upon which the [defendant] Representatives rely— . . . are wholly innocuous when read in context . . . ."); Bin-Wahad v. Coughlin, 853 F. Supp. 680, 686 (S.D.N.Y. 1994) ("Were a reasonable person to consider the court's alleged comments in the context in which defendant has presented them, he or she might possibly consider disqualification appropriate.  However, to lend clarity to these statements, I am quite certain that this same reasonable person would want to hear the full record to completely understand the circumstances in which they were

(continued...)

counsel at times, my criticism and resulting frustration are solely due to counsels' performance, and are not a basis for recusal.

        Plaintiffs assert that I have "characterized Plaintiffs' objections as 'whining' and [have] warned Plaintiffs against filing" objections.  (Pls. Br. at 22, citing Dkt. No. 97: 2/8/12 Conf. Tr. at 20-22.)[43/]  The referenced colloquy follows:

> THE COURT:  . . . How soon can you [move for class and collective action certification]?
>
> . . . .
>
> [Pls. Counsel] MS. WIPPER:  Your Honor, we would object to moving the briefing schedule to an earlier period given the discovery disputes in this case.
>
> THE COURT:  That wasn't my question.  My question is, how soon can you do it?  Democracy ends very quickly here, meaning you don't want to give me a date other than no later than April 1, 2013.  I get to pick the date and you get to whine to Judge Carter.

---

[42/]    (...continued)
made."); Lis v. Mammott, No. CIV-84-779, 1990 WL 1648 at *1 (W.D.N.Y. Jan. 9, 1990) ("Here there can be no reasonable basis for recusal when the context of this Court's alleged statements is understood."); cf. Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. Int'l Union, 332 F. Supp. 2d 667, 672 (S.D.N.Y. 2004) ("Movants' argument that the Presentation was a comment on the merits of a pending matter, however, ignores the substance and context of the Presentation.").

[43/]    Plaintiffs cite to United States v. Offutt, 348 U.S. 11, 75 S. Ct. 11 (1954), in support of their argument that my in-court comments toward plaintiffs' attorneys create an appearance of partiality.  (Pls. Reply Br. at 2-3.)  The judge's actions in United States v. Offutt went far beyond what has occurred in this case.  See United States v. Offutt, 348 U.S. at 12, 15 n.2-3, 75 S. Ct. at 12, 17 n.2-3 (Judge's statements exceeded the limits of normal criticism regarding the handling of a case and "the restraints of conventional judicial demeanor" where the judge said to counsel:  "'If you say another word I will have the Marshal stick a gag in your mouth. . . .  You have forfeited your right to be treated with the courtesy that this Court extends to all members of the Bar,'" and to the jury:  "'You have been compelled to sit through a disgraceful and disreputable performance on the part of a lawyer who is unworthy of being a member of the profession; and I, as a member of the legal profession, blush that we should have such a specimen in our midst.'").

(2/8/12 Conf. Tr. at 20-21.)  While I could have chosen my words more carefully, I was merely expressing my frustration with counsel Wipper's failure to answer my question.  Expressions of impatience, dissatisfaction, annoyance, and even anger are not grounds for recusal.  See, e.g., United States v. English, 629 F.3d 311, 321 (2d Cir. 2011) (Judge's statement that "'I must tell you in a 27-kilo case I don't think I've ever let anybody out'" was not evidence of bias when the judge's bail denial decision was "explicitly tied to the facts before the court and w[as] fully explained on the record."); Gottlieb v. SEC, 310 F. App'x 424, 425 (2d Cir.) (Recusal motion was without merit where the judge and plaintiff "clashed and had words in open court to the effect that Judge Preska said that 'I am God in my courtroom' and [plaintiff] defiantly responded with 'You are not God anywhere.'" (quotations omitted)), cert. denied, 130 S. Ct. 511 (2009); SEC v. Razmilovic, No. CV-04-2276, 2010 WL 2540762 at *5 (E.D.N.Y. June 14, 2010) ("Moreover, my characterization of [defendant]'s conduct in this action to date as 'arrogance' does not demonstrate such a 'deep-seated favoritism' of the SEC or 'unequivocal antagonism' towards [defendant] so as to evidence my bias or partiality in this action."); cf. Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. Int'l Union, 332 F. Supp. 2d at 672 ("The fact that I used the colloquial term 'junked' instead of the word 'dismantled' . . . is hardly a basis for recusal.").

Moreover, I have expressed frustration with both sides in this case.  Earlier in the same conference, I stated: "I've seen many a big case in this court go a lot more smoothly than this.  As I say, I cannot speak to what happened before I inherited the case, but I expect cooperation. Stop the whining and stop the sandbagging.  This goes for both sides.  Get along."  (2/8/12 Conf. Tr. at 13.)

Plaintiffs' assertion that I have sought to dissuade them from objecting to my rulings (Pls. Reply Br. at 1-2) is false.  I have reminded the parties at nearly every conference, usually more than once, that they have the right to take their objections to Judge Carter.  For example, at the April 25, 2012 conference I said, "And you have the right to take objections to Judge Carter, which you're not shy about, so take your objections. Stop arguing with me." (Dkt. No. 180: 4/25/12 Conf. Tr. at 34.)[44/]

Plaintiffs argue for recusal alleging that the Court has labeled "Plaintiffs intransigent 'scorched earth' litigants." (Pls. Br. at 22, citing Dkt. No. 158: 4/2/12 Order at 2.)  Plaintiffs take this out of context.  In response to plaintiffs' recusal letter, I instructed plaintiffs to "advise as to whether they wish to file a formal motion or for the Court to consider the letter as the motion" and concluded by stating that "If plaintiffs were to prevail [on recusal], it would serve to discourage judges . . . from speaking on educational panels about ediscovery (or any other subject for that matter).  The Court suspects this will fall on deaf ears, but I strongly suggest that plaintiffs rethink their 'scorched earth' approach to this litigation." (4/2/12 Order at 1-2, quoted more fully on pages 14-15 above.)  Courts often use the phrase "scorched earth" to describe hardball litigation tactics designed to complicate

---

[44/]    See also, e.g., Dkt. No. 71: 1/4/12 Conf. Tr. at 72-73; 2/8/12 Conf. Tr. at 93, 97-98; Dkt. No. 209: 3/9/12 Conf. Tr. at 28; 4/25/12 Conf. Tr. at 10, 34, 46; Dkt. No. 194: 5/7/12 Conf. Tr. at 47; Dkt. No. 202: 5/14/12 Conf. Tr. at 9.

and prolong litigation and drive up litigation costs.[45]  My "scorched earth" comment provides no basis for recusal.

Plaintiffs further claim that I called their discovery requests "blackmail to convince the defendants to settle," and that I "intimated" that I "was waiting for Plaintiffs' 'funding source' to 'run out,' implying that [I] desired they drop the case and that [I] would put them through the ringer on discovery until they do so."  (Pls. Reply Br. at 2.)  Plaintiffs again take what I actually said out of context.  At the April 25, 2012 conference, the following colloquy occurred:

> [Pls. Counsel] MR. WITTELS:  Well, the defendants have taken the position we're not giving you any discovery beyond the seven people.  If there are decisions regarding employees who are not among the seven and there --
>
> THE COURT:  If there is a company-wide policy, you are entitled to that.
>
> You are not entitled, because that's called blackmail to convince the defendant to settle, to say I need information  about virtually every employee who might be in the class, which obviously is extraordinarily expensive, in order to prove that there is a class.  That's not what the case law says.  And that's what you seem to be asking for. While at the same time saying let's stay discovery.  So I don't know if your funding source has run out.  But you keep reinventing the wheel at every conference.

---

[45]    See, e.g., Burlington N. & Santa Fe Ry. v. United States, 556 U.S. 599, 615, 129 S. Ct. 1870, 1881 (2009) ("The District Court criticized the [plaintiffs] for taking a 'scorched earth,' all-or-nothing approach to liability . . . ." (quotations omitted)); T-Peg, Inc. v. Vt. Timber Works, Inc., 669 F.3d 59, 62 n.5 (1st Cir. 2012) ("'But it hardly violates [the Copyright Act's] purpose to discourage scorched-earth litigation tactics that tie up intellectual property for years.'"); United States v. Kimsey, 668 F.3d 691, 692 (9th Cir. 2012) ("embroiled in a contentious, scorched-earth lawsuit, in which eighteen lawyers bombarded each other and the district court with over 500 pleadings"); Young Again Prods., Inc. v. Acord, 459 F. App'x 294, 295 n.2 (4th Cir. 2011) (The parties "pursued a scorched-earth policy for resolving this dispute and are now embroiled in litigation nationwide."); HyperQuest, Inc. v. N'Site Solutions, Inc., 632 F.3d 377, 383 (7th Cir. 2011) ("These kinds of scorched-earth tactics are an unfortunate waste of everyone's time.").

(4/25/12 Conf. Tr. at 8-9.)[46]   The Court was reminding plaintiffs that they are only entitled to discovery related to either the named plaintiffs or to company policies to support a motion (not yet filed, much less granted) for class certification; plaintiffs are not entitled to discovery about individual potential class members until plaintiffs have moved for and been granted class certification.  Plaintiffs cannot take class action discovery, at great expense to defendants, as if their class motion already was granted.  The costs of extensive discovery have long been recognized as a factor forcing defendants to settle even meritless cases.[47]

---

[46]   In further support of their "blackmail" argument, plaintiffs also cite to Hudson Legal's E-Discovery Judges in Charlotte: Post-CLE Summary.  (Pls. Reply Br. at 1 n.3.)  The context reads:  "Peck focused on embracing technology, saying that unless we're prepared to abandon discovery, we must be versed in e-discovery . . . . Otherwise, we will not live up to Federal Rules of Civil Procedure (FRCP) (the just, speedy, and inexpensive determination of every action and proceeding), ensuring that e-discovery is not used as blackmail to make a defendant settle the case."  E-Discovery Judges in Charlotte: Post-CLE Summary, Hudson Legal, http://hudsonlegalblog.com/e-discovery/e-discovery-judges-charlotte-post-cle-summary.html (last visited June 14, 2012).

  Nor did I "intimate" that I was waiting for plaintiffs' funding source to run out; rather, I wondered if plaintiffs were making seemingly conflicting requests (i.e., asking for more expansive discovery while simultaneously requesting a discovery stay) because plaintiffs might have run out of funding and were hoping that a more expansive discovery ruling would lead defendants to settle the case.

[47]   See, e.g., Bondi v. Capital & Fin. Asset Mgmt. S.A., 535 F.3d 87, 97 (2d Cir. 2008) ("This Court . . . has taken note of the pressures upon corporate defendants to settle securities fraud 'strike suits' when those settlements are driven, not by the merits of plaintiffs' claims, but by defendants' fears of potentially astronomical attorneys' fees arising from lengthy discovery."); Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d 116, 122-23 (2d Cir. 2003) ("The PSLRA afforded district courts the opportunity in the early stages of litigation to make an initial assessment of the legal sufficiency of any claims before defendants were forced to incur considerable legal fees or, worse, settle claims regardless of their merit in order to avoid the risk of expensive, protracted securities litigation."); Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 107 (2d Cir. 2001) ("Because of the expense of defending such suits, issuers were often forced to settle, regardless of the merits of the action.  PSLRA addressed these concerns by instituting . . . a mandatory stay

(continued...)

Plaintiffs further assert that I "tried to bait and intimidate counsels' female lawyers into waiving Plaintiffs' legal rights on the proportionality issue." (Pls. Reply Br. at 2.) Plaintiffs allege that I "agreed that a particular 'hot' document was relevant and should be coded as responsive, but that ruling came with a quid-pro-quo: Plaintiffs must waive their right to object to his ruling setting a hard cap on the number of documents they will get in discovery." (Pls. Reply Br. at 2.) Plaintiffs once again mis-characterize what occurred. During the May 7, 2012 conference (which lasted all day), plaintiffs' lead counsel Steven Wittels asked for permission to leave the conference. (Dkt. No. 194: 5/7/12 Conf. Tr. at 77-78.) The Court permitted him to leave after being assured that he was comfortable with his two associates handling the remainder of the conference in his absence. (5/7/12 Conf. Tr. at 78.) The Court and counsel later discussed whether an email that did not involve any named plaintiff or centralized decision-making, but rather another employee asking when she would be considered for a raise, should be coded as "relevant" for purposes of the "seed set" to train the predictive coding computer algorithm. I warned plaintiffs that if marginally-relevant

---

[47]/    (...continued)
of discovery so that district courts could first determine the legal sufficiency of the claims in all securities class actions." (citations omitted)); Kassover v. UBS A.G., 08 Civ. 2753, 2008 WL 5395942 at *3 (S.D.N.Y. Dec. 19, 2008) ("PSLRA's discovery stay provision was promulgated to prevent conduct such as: (a) filing frivolous securities fraud claims, with an expectation that the high cost of responding to discovery demands will coerce defendants to settle; and (b) embarking on a 'fishing expedition' or 'abusive strike suit' litigation."); Nat'l Org. for Women v. Sperry Rand Corp., 88 F.R.D. 272, 277 (D. Conn. 1980) ("Discovery [in this employment discrimination case] is not to be used as a weapon, nor must discovery on the merits be completed precedent to class certification."); 45C Am. Jur. 2d Job Discrimination § 2319 (2012) ("Discovery for the purposes of [class] certification 'is not to be used as a weapon' . . . ."); 3 Emp't Discrimination Coordinator § 133:31 (2012) ("Precertification discovery on the merits therefore, should be directed to the employer's policies and practices."); 10 Fed. Proc., L. Ed. § 26:14 (2012) ("While there is no hard and fast rule that discovery relating to class issues is not proper before class certification has been sought or granted, discovery generally cannot take place in a class action unless and until the class has been certified." (fns. omitted)).

documents about raises for people other than the named plaintiffs were coded as relevant, the predictive coding software would code similar documents (about individual, non-plaintiff employees) as relevant, possibly distorting what would be classified as the top-ranked documents. I stated that the email could be coded as relevant if plaintiffs were willing to take this risk, in terms of the possibility that the Court, applying Rule 26(b)(2)(C) proportionality, would agree with MSL to cut-off production at some point. (5/7/12 Conf. Tr. at 80-88.) In this context, the following colloquy occurred:

> THE COURT:   . . . Again, I will say it for the third time, and this time I want an answer.
>
> If you don't withdraw [plaintiffs' request for] relevance coding for this document, do you understand and do you agree that you may not complain at the end of the day when you get a lot of documents about individual raise decisions and that may, because of cost issues and Rule 26(b)(2)(C), be part of the group of documents you get and, therefore, there may be other [more relevant] documents that you're not going to get.
>
> Do you understand and agree to that?
> . . . .
>
> [Pls. Counsel] MS. NURHESSEIN:  Your Honor, we understand and we do agree, although we obviously can't waive our right to object to anything, but we do understand and we do agree.
>
> THE COURT:  If you agree, there's no objection possible. So stop the double talk, confer --
>
> MS. NURHESSEIN:  Your Honor, in that case, I can't agree.
>
> THE COURT:  Okay.  The document is not [to be coded as] relevant.
>
> And if you can't agree because you don't have the authority, I suggest that that means Mr. Wittels will have to be here at every subsequent conference all day, all the time, just like we have three partners here from [MSL's counsel] Jackson Lewis.  You either get some courage or get a partner here.

(5/7/12 Conf. Tr. at 86-88.)

In sum, my comments regarding plaintiffs' counsel Sanford Wittels & Heisler's handling of the case were neither unfounded[48] nor so extreme to suggest bias against plaintiffs. See, e.g., Matrix Essentials, Inc. v. Quality King Distribs., Inc., 324 F. App'x 22, 25 (2d Cir. 2009) ("That the district judge was critical of some aspects of [plaintiff]'s presentation is not improper and does not justify reassignment."); Chen v. Chen Qualified Settlement Fund, 552 F.3d 218, 227-28 (2d Cir. 2009) ("Here, the record demonstrates that Judge Korman was critical of the quality of [counsel's] representation in this case.  On one occasion, Judge Korman used derogatory language in referring to [counsel's] affidavit . . . . Given that the quality of [counsel's] work was inextricably intertwined with the court's consideration of the fees application, it was not inappropriate for Judge Korman to express an opinion regarding [counsel's] handling of the case."); Charron v. United States, 200 F.3d at 789 ("The judicial comments and actions upon which the [plaintiffs] rely, however, merely reflect Judge Horn's evaluation and criticism of [plaintiffs' attorney's] handling of the cases and her perception that his professional performance was severely deficient. . . . The judge's comments and actions, however, do not establish either personal bias and prejudice or the appearance of partiality."); United States v. IBM Corp. (In re IBM Corp.), 618 F.2d 923, 932 (2d Cir. 1980) ("Our reading of the record does disclose that on several occasions Chief Judge Edelstein has expressed his dissatisfaction with counsel for [defendant]. There have been exchanges in the courtroom and in robing room conferences which indicate that [the judge] has, whether justifiably or not, reached the conclusion that he has been 'baited' by counsel by their persistence in raising points which he

---

[48]/  For example, in seeking a stay of discovery, plaintiffs recently cited cases dealing with stays of judgments pending appeal, "something that is so totally off point that it's the wrong standard for the wrong issue." (5/14/12 Conf. Tr. at 72; see generally 5/14/12 Conf. Tr. at 72-74.)  Nevertheless, the Court researched the correct standard and granted the stay. (5/14/12 Conf. Tr. at 84.)

believed had already been determined by previous rulings."); Chevron Corp. v. Donziger, 783 F. Supp. 2d at 723 ("Here, there is no allegation of extra judicial source.  And the rulings complained of, which in some cases are rather different than the [plaintiffs'] Representatives' distorted and misleading accounts of them, plainly do not fall within the rarest circumstances in which they could evidence the requisite bias or appearance of partiality . . . . Disagreement or dissatisfaction with the Court's rulings is not enough to succeed on this [recusal] motion.  An adversary system inherently has one side that wins and another that loses.  If losses compromised the appearance of justice, this system would grind to a halt." (quotations & fns. omitted)); Armatullo v. Taylor, 04 Civ. 5357, 2005 WL 2386093 at *19 (S.D.N.Y. Sept. 28, 2005) ("[W]hile Justice Berkman expressed great impatience with [petitioner], it cannot be said that she exhibited 'a deep-seated favoritism or antagonism that would make fair judgment impossible.'").[49/]

       For all of these reasons, recusal is not warranted based on my in-court comments.

---

[49/]    Cf. Calderon v. Perez, 10 Civ. 2562, 2011 WL 293709 at *44 (S.D.N.Y. Jan. 28, 2011) (Peck, M.J.) ("[D]efense counsel 'cannot, by his behavior, instigate admonitions and then claim that his client is suffering because he's being admonished.'"), report & rec. adopted, 2011 WL 1405029 (S.D.N.Y. Apr. 5, 2011); Celleri v. Marshall, No. 07-CV-4114, 2009 WL 1269754 at *15 (E.D.N.Y. May 6, 2009) (Trial court's comments did not deprive petitioner of a fair trial where, inter alia, "many of the trial judge's statements, of which petitioner complains, could be reasonably interpreted as warranted under the circumstances and/or provoked by defense counsel's conduct."); Martinez v. Kelly, 01 Civ. 11570, 2005 WL 1863854 at *7 (S.D.N.Y. Aug. 4, 2005) (Trial court's comments did not deprive petitioner of a fair trial where, inter alia, "many of the trial court's remarks to [defense counsel] and its interjections during his and other defense counsel's cross-examination of prosecutions witnesses were made in response to [defense counsel's] repeated refusals to comply with the court's rulings and directives and the combative tone he often took towards the court."), aff'd, 253 F. App'x 127 (2d Cir. 2007), cert. denied, 555 U.S. 852, 129 S. Ct. 111 (2008); Gumbs v. Kelly, 97 Civ. 8755, 2000 WL 1172350 at *12 (S.D.N.Y. Aug. 18, 2000) (Peck, M.J.) (Trial court's reprimands of defense counsel in front of the jury did not deprive petitioner of a fair trial where, inter alia, "counsel invited much of the criticism directed at him, apparently in a deliberate strategy to extend an already laborious and complicated trial.").

## CONCLUSION

For the reasons discussed above, plaintiffs' recusal motion (Dkt. No. 169) is <u>DENIED</u>

as untimely and in any event as without merit.


SO ORDERED.

Dated:  New York, New York
    June 15, 2012

               _____
               **Andrew J. Peck**
               United States Magistrate Judge


Copies **by ECF** to:  All Counsel
         Judge Andrew L. Carter, Jr.

G:\DASILVAMOOREvPUBLICIS–R