C79mmoac

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MONIQUE DA SILVA MOORE, et al.,

 4                    Plaintiffs,

 5              v.                        11 Civ. 1279 (ALC)

 6   PUBLICIS GROUPE SA and
     MSLGROUP,
 7                                        Conference
                     Defendants.
 8   ------------------------------x

 9
                                         New York, N.Y.
10                                       July 9, 2012
                                         3:30 p.m.
11   Before:

12           HON. ANDREW J. PECK

13                                       Magistrate Judge

14
             APPEARANCES
15

16
     SANFORD WITTELS & HEISLER LLP
17        Attorneys for Plaintiffs
     BY:  STEVEN L. WITTELS
18        SIHAM NURHUSSEIN

19
     JACKSON LEWIS LLP
20        Attorneys for Defendant MSLGroup
     BY:  JEFFREY W. BRECHER
21

22   MORGAN LEWIS & BOCKIUS LLP
          Attorneys for Defendant Publicis Groupe
23   BY:  PAUL C. EVANS

24

25

 1              (Case called)

 2              THE COURT:  I have read your submissions on the

 3    remaining issues on jurisdictional discovery.  Let's take them

 4    one at a time.  Let's let Mr. Wittels take the starting point.

 5              MR. WITTELS:  Good afternoon, your Honor.  If the

 6    Court please, Ms. Nurhussein will take this.

 7              THE COURT:  Sure.

 8              MS. NURHUSSEIN:  Thank you, your Honor.

 9              We conferred with defense counsel.  We were able to

10    reach agreement on several categories of documents.  As both we

11    and defense counsel noted in our respective letters, there are

12    really four main areas of dispute or four main outstanding

13    issues.  I'll start with the first category, which is

14    Publicis's role in the reorganization, Publicis and Maurice

15    Levy, who is the CEO of Publicis.  Throughout the discovery

16    process Publicis's counsel repeatedly represented to us and the

17    Court that Mr. Levy --

18              THE COURT:  Short-change the history and get to what

19    it is you want them to do now and what they don't want to do,

20    and we'll go from there.

21              MS. NURHUSSEIN:  What we would like them to do is

22    search for the discoverable information in Mr. Levy's documents

23    relating to the organization.

24              THE COURT:  Paper or email or both?

25              MS. NURHUSSEIN:  Both.

C79rmacc

3

1          THE COURT:  Mr. Evans?

2          MR. EVANS:  Your Honor, we have conferred with Mr.

3  Levy and we have retrieved all responsive hardcopy documents.

4  I think the issue where we disagree with plaintiffs' counsel is

5  whether or not we should need to search the email accounts of

6  Mr. Levy.  Publicis has already admitted that Mr. Levy

7  participated in the decision to create MSLGroup with Olivier

8  Fleurot, the CEO of MSLGroup.  We have produced the PowerPoint

9  that was presented to Publicis's P12 on the subject.

10          After the last conference and producing budgeting

11  documents referenced at the conference, there are comments

12  contained within that production that depict the correspondence

13  from MSLGroup, from Olivier Fleurot, to Publicis on the

14  subject.  So we think that the plaintiffs have that which they

15  need to make their argument with respect to jurisdiction.  To

16  have to search the email account of the CEO of Publicis Groupe,

17  who sits in France and is subject to the French blocking laws,

18  is too extreme at this stage.

19          THE COURT:  Do you have any idea what the volume is,

20  what language it's in, and whether there are counterparts to

21  the emails in the United States?

22          MR. EVANS:  There won't be any counterparts in the

23  United States that are Publicis Groupe documents, since there

24  are no Publicis Groupe employees here.

25          THE COURT:  I wasn't clear perhaps.  The question was

1    if Mr. Levy was emailing to, and I'll use fictitious names,

2    John Watson at MSL New York, presumably there are copies in the

3    Watson email file at MSL.  That just changes the burden from

4    Publicis to MSL, but it avoids the French blocking statute

5    unless there is a binding corporate rule or something else that

6    makes the material already in New York part of the French

7    privacy regime.

8            MR. EVANS:  The creation of MSLGroup generally

9    happened between Olivier Fleurot, who is in France, and Maurice

10   Levy, who was in France, so emails would be at the French level

11   in any event.  In terms of the size of their account, we do not

12   know.  We did pull as part of our leading up this conference

13   accounts of Jean-Michel Etienne and Mathias Emmerich, who is

14   the general secretary.  We have some corrupted files, but of

15   the files we have been able to pull, we have 350,000 emails, or

16   documents.

17           THE COURT:  What is it that you want to argue?

18   Presumably you have the admission that Mr. Levy of Publicis

19   from France participated in creating MSL.  Either that is

20   sufficient by itself along with the other evidence you have or

21   it isn't.  What difference does it make what the details are

22   provided that when you make an argument, they don't then come

23   back and try to shoot holes in it?

24           MS. NURHUSSEIN:  Your Honor, we certainly can make

25   that argument.  But under the jurisdictional analysis of

1    C.P.L.R. 301, one of the factors to look at is the actual

2    degree and nature of the parent's involvement, not just the

3    fact that the parent had some involvement in a restructuring

4    but the exact nature and degree.

5          THE COURT:  Is that what the Publicis 30(b)(6) witness

6    testified to?

7          MS. NURHUSSEIN:  Your Honor, if I recall correctly,

8    the 30(b)(6) witness said that Mr. Levy was essentially the

9    person who would have knowledge and who was behind the

10   reorganization.

11         THE COURT:  That's not the question per se.  The

12   question is did the witness say, we were intimately involved,

13   we were not involved?  The wording matters.

14         MS. NURHUSSEIN:  Your Honor, if I recall correctly, I

15   think the 30(b)(6) witness provided some conflicting testimony

16   where on the one hand he said that Mr. Levy was behind the

17   reorganization and at the same time he said that MSL was the

18   one that implemented it.  I think in this particular case --

19         THE COURT:  That is not a conflict as you have just

20   described it.  Keep going.

21         MS. NURHUSSEIN:  I think in this particular case

22   having some written discovery that actually reflects the extent

23   to which Publicis was driving the process, the extent to which

24   Publicis created the network for its own benefit, all of those

25   are things that courts within the circuit say bear upon the 301

C79rmacc

1   analysis and whether corporate formality is observed during the

2   restructuring process.

3       If I could also respond to when Mr. Evans pointed out

4   that they were searching Mr. Etienne's and Mr. Emmerich's

5   emails.  My understanding is that those emails relate primarily

6   to the requests for raise exceptions to the salary and hiring

7   freeze and not necessarily to the reorganization.

8       MR. EVANS:  If I may respond, your Honor.  The test

9   for jurisdiction deals with the nature and degree and

10  involvement of a parent in the operations of the entities that

11  it owns.  It would have to do with how they operate, not how

12  they are created.  The cases cited by plaintiffs with respect

13  to restructurings were about restructurings of operations that

14  existed.

15      Publicis has admitted that it was involved in the

16  creation of MSLGroup.  The 30(b)(6) deposition witness

17  testified in response to a question from Mr. Wittels that

18  Maurice Levy, the Publicis Groupe chairman, initiated the

19  organizational restructuring of the holding company's PR,

20  corporate communications, and events practices in the hope of

21  creating a premier PR network with MSL.

22      He also testified in response to another question,

23  "What the group and Mr. Levy has decided to do is to create a

24  big PR network which would have significant ranking in the

25  workplace on a worldwide basis.  I consider this as part of the

 1    strategy of the group to use as best we can its access.  But

 2    the decision is just to constitute a big PR network."  He went

 3    on to say the implementation of that strategy was then

 4    undertaken by Mr. Fleurot.

 5         THE COURT:  My inclination, since we are already

 6    taking the briefing schedule and have held it much longer than

 7    I would have liked, is to say I think you have enough.  Make

 8    your argument at the time under Judge Carter's schedule when we

 9    finish the rest of the jurisdictional discovery.

10         If you feel you get sandbagged by Publicis when they

11    put in their reply papers, and in order to encourage them not

12    to, I will seriously consider letting you have further

13    discovery and a surreply in the event that you argue that

14    Publicis created MSL and they argue not a legal argument but

15    come up with facts that are different from what the 30(b)(6)

16    witness testified to.

17         MR. WITTELS:  May I speak just briefly?

18         THE COURT:  I generally don't like tag-teaming.  If

19    you feel you must, you must.

20         MR. WITTELS:  I don't want to tag-team.

21         MS. NURHUSSEIN:  Your Honor, the one thing we wanted

22    to clarify is that there doesn't appear to be a dispute that

23    Publicis was behind the creation of MSLGroup, at least now

24    there doesn't appear to be.  Before, there was a dispute as to

25    that.  What we are concerned about is, again, just that

 1   Publicis is withholding documents that would allow us to test

 2   their argument that --

 3            THE COURT:  Their argument that they created it?

 4            MS. NURHUSSEIN:  No.  The argument that they may have

 5   created it but really all the actual process and the

 6   implementation of the restructuring was driven by MSL.

 7            THE COURT:  There is no evidence that Mr. Levy was

 8   involved in that implementation.  You had the 30(b)(6) witness

 9   who was testifying about implementation from Publicis's point

10   of view.  Unless you're telling me that that person committed

11   perjury, it seems to me you have the ammunition you need.

12            I understand your argument.  Again, you're going to

13   argue that they implemented it, that they created it.

14   Depending on what the defendants say in their reply papers, if

15   necessary, I will cause them to review Mr. Levy's emails at

16   that point.  I frankly don't think that is going to happen.  I

17   think you're going to get what you need by making the arguments

18   you make in your opposition papers.

19            Now let's move on.  The next one is Re:Sources.

20            MS. NURHUSSEIN:  Yes, your Honor.

21            THE COURT:  On that, let me tell you where I think I'm

22   coming from, and then you can argue from there.  It might make

23   sense, since they are in New York, to have a 30(b)(6) witness

24   from Re:Sources testify as to their relationship to Publicis in

25   France and MSL in New York and connect the dots that way.  That

1    is also probably the fastest.

2              Whether that requires them to be subpoenaed or

3    whether, between Publicis and MSL, you will accept a deposition

4    notice on their behalf or accept the subpoena as counsel for

5    Re:Sources so that is not held against you in any way, that's

6    what I'm leaning towards.  I'll hear from whichever side least

7    likes that leaning to argue differently.

8              MR. EVANS:  Perhaps that's me.  Your Honor, we would

9    take the position that the plaintiffs have had months of

10   discovery to raise issues with respect to the shared services

11   model undertaken into the United States.  They have known that

12   Re:Sources was a distinct legal entity.  They took the

13   deposition of our 30(b)(6), witness who testified about the

14   extent of Publicis's involvement in the provision of shared

15   services.

16             We have consistently from the beginning explained that

17   process and explained and produced documents that reflect the

18   limited times in which Publicis in France actually gets

19   involved in the shared services offered by Re:Sources in the

20   United States to other entities within the United States.  At

21   this stage of the litigation, we are already extending the

22   discovery schedule.  It's going to result in additional delay

23   of the process.  It's unnecessary and it's untimely.

24             THE COURT:  Ms. Nurhussein?

25             MS. NURHUSSEIN:  Your Honor, we don't know how

 1    defendants can make an argument about timeliness given that we

 2    served the requests in October and they didn't produced the

 3    documents until March at the earliest.

 4         THE COURT:  The key question is the time between March

 5    and now.

 6         MS. NURHUSSEIN:  Yes, your Honor.  We have followed up

 7    repeatedly about our product discovery requests.  My

 8    understanding from the last conference was there were a lot of

 9    questions relating to non-MSL subsidiaries that your Honor

10    suggested we get through the 30(b)(6) deposition.  Your Honor

11    also noted at the last conference that if Publicis were to walk

12    away from its policies, we would potentially be entitled to

13    additional discovery, which is exactly what happened with

14    respect to the Re:Sources manual.

15         Dong Tso Chen, the 30(b)(6) witness, said that he

16    didn't know whether the manual was implemented with respect to

17    MSL, and he repeatedly distanced himself from the policy,

18    calling it best practices but not something that the

19    subsidiaries necessarily followed.

20         We would be amenable to doing the 30(b)(6) deposition

21    of a Re:Sources person.  To my understanding, Publicis counsel

22    John Spitzig I believe is also affiliated with Re:Sources.  So

23    I don't see what the difficulty would be there.  I think that

24    possibly would be the quickest and cleanest way to get the

25    information with minimal burden to Publicis.

```
1              MR. EVANS:  As an initial matter, we never described

2    the shared services model policy that applied from Publicis to

3    any entity, including Re:Sources or MSLGroup.  We described the

4    Janus book as the relevant policies, and the witness confirmed

5    during the deposition what we said all along, which is that

6    those are the policies and they are enforced.

7              With respect to Re:Sources, I don't represent

8    Re:Sources, so I can't accept service of a subpoena or agree to

9    allow anyone at Re:Sources to be deposed.  As I said before, I

10   think the request is untimely.  I think the plaintiffs had

11   ample opportunity to take discovery on jurisdiction from any

12   number of sources and that they chose to take the route they

13   did and they should live with it.

14             THE COURT:  As to Re:Sources, I guess you're going to

15   have to serve a subpoena limited to a half-day deposition and

16   limited solely to any connection between Publicis and

17   Re:Sources on behalf of Publicis providing services for MSL.

18   Nothing about Re:Sources and other New York or any other

19   company except MSL and Publicis.

20             You will have to describe in whatever detail what it

21   is you want the 30(b)(6) witness to be prepared on.  If there

22   are fights about that, let's try get whoever is going to be

23   counsel for Re:Sources in quickly.  I certainly want this

24   discovery period to end so that the briefing can be finalized.

25   That's the Court's ruling.
```

1        Once you talk to Re:Sources, you may find that as an

2   affiliate company to your two companies -- by your two, I'm

3   referring to Publicis and MSL -- that they will authorize

4   somebody to accept that subpoena to get the process moving,

5   whether that is Mr. Evans, Mr. Brecher, some other attorney in

6   the corporate hierarchy.  It's not very hard to serve a

7   subpoena on a corporation anyway, but I certainly would like to

8   see that deposition done by the end of this month, if not

9   sooner.

10       Next, the deficiencies, alleged deficiencies, in Mr.

11  Etienne's knowledge.

12       MR. WITTELS:  Your Honor, on this point, we ask that

13  this question be deferred for the following reason and that

14  there not be a ruling on this today.  Given that there is now

15  an extension on the briefing schedule for us to put in our

16  papers asking the defendants to produce more documents that

17  have been targeted to jurisdictional questions, we would like

18  to see what they produce to see if in fact we want to follow up

19  with that deposition.  It may well also be that some of the

20  issues that we wanted to ask him about will be covered by the

21  30(b)(6) topics that are addressed to Re:Sources.

22       THE COURT:  Other than item 12 on the list -- and I'm

23  working off of your letter, Mr. Wittels, your firm's letter,

24  whoever signed it -- it seems that everything else, 12, 13, 14

25  have to do with Re:Sources and I assume would be eliminated by

C72lmooc

 1      that.  There is a lot of other material.

 2              I'm happy to defer it.  But because time is on

 3      nobody's side, particularly the Court's, I want to make sure

 4      that if we are coming back to this, it's not going to result in

 5      a delay because one of you is unavailable.  I tried to get you

 6      in last week, and somebody asked that that conference be moved

 7      to today.  I understand last week was a semi-holiday, although

 8      I was working.  But I don't want to lose more time.

 9              If you're confident that this is likely to go away,

10      and by looking at a lot of it I think it is likely to go away,

11      either because it's covered by Re:Sources or whatever, then

12      that's fine.  But if not, even though it takes up my time, I

13      don't want to risk that you want to come back at a time when

14      I'm on trial and then we lose another week or two.

15              MR. WITTELS:  May I confer with Ms. Nurhussein?

16              THE COURT:  Sure.

17              MR. WITTELS:  Your Honor, we are very sensitive to,

18      obviously, not having to request again a time shift given the

19      calendar and wanting to get this motion briefed.  What we would

20      propose is if we do come back, we think it could be done with a

21      Skype deposition pretty quickly, with a limited time, an hour

22      or two, to follow up on anything that is not covered by the

23      documents they produce.

24              THE COURT:  You run the risk that once we hit August,

25      if we hit August, it is not unusual for Europe to shut down.

C79ampoc                                                                    14

1    If everything else is ready and we have deferred this and a

2    problem arises, that's the risk you will have to take, or we

3    can go forward now.  There are only about five topics once you

4    get rid of Re:Sources.

5          MR. WITTELS:  They are limited on the first page, 6

6    and 7, to the --

7          THE COURT:  Are we arguing them or not?  You can defer

8    it.  You just risk with deferral that there may not be the

9    ability to deal with it in a timely fashion.  And I'm not going

10   to hold up the briefing in this forever.  Or we can do it now.

11   It's up to you.

12         MR. WITTELS:  Since we are here, your Honor, perhaps

13   we should go through them.

14         THE COURT:  That's fine.

15         MR. WITTELS:  If they get us the documents timely,

16   within the near future, we will have time to decide whether we

17   want to depose him.  If not, we can notice him up before the

18   end of the month.

19         THE COURT:  OK.  Location of the P12 meetings, is that

20   something that is now going to be covered by some document

21   production, if I'm remembering right, if those meetings

22   occurred in New York?

23         MR. EVANS:  There was testimony that there were some

24   meetings that took place in New York and others that did not.

25   The witness didn't know the exact dates of the meetings that

```
 1    were in New York.
 2              THE COURT:  Remind me, what is P12 meetings?
 3              MR. EVANS:  It is an executive committee over Publicis
 4    Groupe.
 5              THE COURT:  Perhaps the easiest thing to do is to come
 6    up with a list of which of those meetings were in New York and
 7    when.
 8              MR. EVANS:  We can do that from 2008 forward, which is
 9    the time period we have agreed with the plaintiffs for the
10    other production.
11              THE COURT:  Mr. Wittels and Ms. Nurhussein, does that
12    work?
13              MR. WITTELS:  One moment.  That would be fine, your
14    Honor.
15              THE COURT:  Good.  We have agreement.  Miracle of
16    miracles.
17              Next is item 4, whether the boards are controlled by
18    Publicis.  If my recollection is correct, and I read these
19    letters a long time ago, since you put the conference off, but
20    there is going to be the identity of the members of the
21    Publicis and MSL boards.  Yes?
22              MR. EVANS:  It's been produced, your Honor.
23              THE COURT:  Then I don't understand what the issue is
24    on this.  You know who they are.  Anything else sounds like
25    argument.
```

C79ampc6

 1            MR. WITTELS:  We have the names.  The question is

 2     control.  In terms of direction and in terms of how the board

 3     would operate, we don't have.

 4            THE COURT:  That you have in the Janus book.  It seems

 5     to me you're looking for argument here.  You also can Google or

 6     do independent research as to whether any of these people work

 7     for Publicis or are, quote-unquote, outside independent

 8     directors.  I'm denying any further deposition on that subject.

 9            The next one, which is item 5, seems to be the same

10     thing.

11            MR. WITTELS:  In that one, from our quote, you can see

12     the witness is stepping away from the policy, not familiar with

13     the system, slightly different from how others are.

14            THE COURT:  I'm not sure how that establishes

15     jurisdiction over Publicis.  If anything, it sounds like MSL is

16     more independent.  You're going to have the identity of the

17     board.  That's enough.  Next.

18            The next one is 7, about the RIF, reduction in force.

19            MR. WITTELS:  He obviously could not answer the

20     germane questions.

21            THE COURT:  The germane question is jurisdiction over

22     Publicis.  That's the overarching question.  I'm not sure

23     whether or not MSL is part of the reduction in force during the

24     hiring freeze period.  How does that tie back to Publicis one

25     way or the other?

C792amcc

```
1              MR. WITTELS:  We know it was initiated from Publicis,
2    but we don't know the extent of it, I guess.  That's the issue.
3              THE COURT:  The extent of it is not relevant
4    jurisdictionally.  Whether they fired one person in the RIF or
5    50, it's either or not the fact that Publicis, quote-unquote,
6    ordered it, if that's what the testimony is.  You're not
7    helping me here.  The request is denied.
8              MR. WITTELS:  Sorry.  The question, though, was
9    whether MSL was part of the reduction in force that took place.
10             THE COURT:  Is that a yes-or-no question?  Do you want
11   a yes-or-no interrogatory answer to that?
12             MR. WITTELS:  Yes.
13             THE COURT:  Any problem with answering that, either
14   yes, no, or however many sentences it takes?
15             MR. EVANS:  The problem with answering the question is
16   that it mischaracterizes the testimony of the witness.  The
17   witness testified at length about the hiring freeze and salary
18   freeze and Publicis's role in that.  He was then shown a
19   document that was not a part of any 30(b)(6) notice, where the
20   reduction in Publicis Groupe subsidiary employees worldwide was
21   described as having been a reduction in force, meaning people
22   left and people were not hired.
23             He was asked a question that is outside the scope of
24   the case.  Even the use of the term "reduction in force," while
25   it was in the press release that he was shown, really isn't
```

 1    accurate.  So it's a tough question to answer yes or no, your

 2    Honor.  I could put that in an interrogatory response.

 3         THE COURT:  Answer it in whatever way is appropriate.

 4    Just answer it.

 5         The rest of these all have to do with Re:Sources.  So

 6    I think we're done with this.  Yes, Mr. Wittels?

 7         MR. WITTELS:  I think maybe 15 was covered.

 8         THE COURT:  What difference does it make?

 9         MR. WITTELS:  I think the benefit plans is a question

10    that goes to jurisdiction, whether they are using the same

11    plans, whether they control how the benefit plans are set up

12    and operate with respect to the higher-up executive personnel.

13    They didn't have any knowledge of that.

14         THE COURT:  As I read the answer he gave, the 401(k)

15    is handled by the U.S., not by Publicis, looking at their

16    answer and your chart repeating their answer.  I think it is

17    more a question that you don't like the answer than that they

18    didn't know the answer.

19         MR. WITTELS:  That was on medical benefits, your

20    Honor.

21         THE COURT:  That says 401(k).  I'll read it.

22    "Q. Does Publicis Groupe include any of the subsidiaries in its

23    401(k) retirement programs?

24    "A. This is a matter which is handled in the U.S.  I'm not

25    familiar with it."  Etienne deposition at 166, lines either 15

C79tmoeC

1  to 19 or 24 to the next page, depending on the way each of you

2  have quoted it.

3       MR. WITTELS:  Can we have that, your Honor?  Given his

4  unfamiliarity and given that it was a topic, can we have an

5  interrogatory response on that?

6       THE COURT:  No.  First of all, where is it a topic in

7  your 30(b)(6) notice?  And why is the answer any different than

8  what he just told you?  It is not done by France.  You make an

9  assumption in the way you ask the questions, and when you are

10 told that that assumption is incorrect, you said the witness

11 didn't know anything.  Based on the information you have both

12 given me, the request is denied.

13       Let's go to the privileged and redaction logs.  I

14 can't wait.  Mr. Evans, do you have anything to say prefatory

15 on that?

16       MR. EVANS:  As an initial matter, your Honor, and it

17 is set forth in our papers, plaintiffs had our privileged an

18 redaction logs at the beginning of May.  We have been before

19 this Court since that time.  They never raised the issue.  They

20 raised it the day before the end of the discovery.  I view it

21 as a kitchen sink attempt to put forth a litany of all their

22 concerns at the last minute.  I think it is untimely and should

23 be denied on that basis alone.

24       THE COURT:  Mr. Wittels and Ms. Nurhussein?

25       MS. NURHUSSEIN:  Your Honor, if we are talking about

C79zmocc

1    timeliness, I would point out --

2            THE COURT:  Don't tell me how long they had your

3    requests.

4            MS. NURHUSSEIN:  No.  What I was going to point out is

5    that it is their obligation to produce their privilege log

6    along with their documents.  They produced their privilege log,

7    as Mr. Evans pointed out in May.

8            THE COURT:  We are now sitting here in July.

9            MS. NURHUSSEIN:  We did raise this issue within a few

10    weeks of receiving the privilege log.

11            THE COURT:  You raised it with me for the first time.

12    The answer is, of course, your letter at the end of June.

13            MS. NURHUSSEIN:  Actually, June 15th, I believe.

14            THE COURT:  Whenever your first letter came in.  Yes,

15    June 15th is correct.  I am not going to rule it untimely.

16    However, if you lose a few of these, I suggest you either give

17    up or I am, as I mentioned in the order setting forth this

18    conference -- no, some other order -- you may well wind up

19    paying on a per document basis, one side or the other.

20            Either this material is privileged or and you're

21    wasting my time or it's not privileged and the other party is

22    wasting my time.  Hand me a sample document and we'll go from

23    there.

24            MR. EVANS:  If I may, your Honor, the plaintiffs have

25    never raised with me that they believe these documents are not

1    privileged.  They have simply contested the sufficiency of the

2    log.  They were, I think, pretty clear on that at our last

3    call.  But I have the documents with me.  In light of your

4    order the last week, the plaintiffs and defendants both

5    identified documents within each category.

6         THE COURT:  Let's start with the first one.  Hand it

7    up.  Let me ask Ms. Nurhussein, is that correct, that you are

8    not challenging whether these are privileged, you just think

9    their log wasn't sufficient?

10        MS. NURHUSSEIN:  Your Honor, we don't have sufficient

11   information due to the deficiencies in the current log to

12   challenge their designation.  The problem is they don't provide

13   any description of what documents.  All the descriptions are

14   sort of generic email from such and such person to such and

15   such person.  It is difficult for us to tell, just based on the

16   face of the document, whether it actually contained privileged

17   information.

18        MR. EVANS:  If I may, your Honor, these are really a

19   series of documents, so one at a time is a little bit

20   misleading.

21        THE COURT:  Hand me the series that you think are all

22   related, Ms. Nurhussein.  I must say, considering that this

23   document went to Mr. Evans and Ms. Chavey, normally I don't

24   even require parties to --

25        MS. NURHUSSEIN:  Your Honor, the first one I had on my

1    list was Publicis 000306.

2            MR. EVANS:  It's document number 2 on the privilege

3    list.

4            MS. NURHUSSEIN:  My log says email from M. Emmerich to

5    in-house counsel.

6            THE COURT:  Let me get out which exhibit somebody's

7    letter was on the privilege log.  Let's make sure we are all on

8    the same page.  What I have just been handed has no Bates

9    numbers of any sort, so I have no idea what it is.

10           You're saying this is the Emmerich?

11           MR. EVANS:  That is document 2, your Honor.

12           THE COURT:  Why is it given to me with a further email

13   from somebody to you and Ms. Chavey?

14           MR. EVANS:  The log should actually read in this

15   instance "to inside and outside counsel."  What happened in

16   this case and the series of emails, as the plaintiffs surmised

17   and said in their letter, is that in order to avoid having to

18   collect electronic email accounts in light of the French

19   blocking laws, our client was particularly sensitive, they

20   forwarded us emails responsive to requests for information,

21   most of which had to do with the salary hiring freeze.

22           So, the mails will reflect in some cases the back-and-

23   forth between in-house counsel or outside counsel and somebody

24   at the client, in other cases will simply be emails forwarding

25   information received as a result of those communications.

```
 1              THE COURT:  Putting aside the forwarding to you, which

 2   really wasn't part of the original process but was just the way

 3   of getting it produced, it appears to be from Emmerich, senior

 4   VP and general secretary, to John Spitzig.

 5              MR. EVANS:  Yes, who is in-house counsel.

 6              MR. WITTELS:  I thought it said "to Bob et Rennee."

 7              MR. EVANS:  The subject is Bob et Rennee.

 8              THE COURT:  My question is, what is this all about?

 9   Are you suggesting that I need to see the whole email chain to

10   better review it?  It looks like several of these are similar.

11              MR. EVANS:  Almost all of these are the same.  We

12   produced every document after the email from Mr. Emmerich to

13   Mr. Spitzig.  So the email chain that he forwarded has been

14   produced.  What has not been produced in all of these cases

15   with respect to these emails are the forwarding of the email to

16   in-house or outside counsel.

17              THE COURT:  That is, frankly, not relevant to

18   anything.  Any further discussion from the plaintiffs?

19              MR. WITTELS:  I guess the reason we brought this up,

20   your Honor, is because, again, all the privilege logs we have

21   seen --

22              THE COURT:  I'm sorry to interrupt you.  It sounds

23   like there was either the usual lack of communication or the

24   usual distrust of each other that's all too prevalent in this

25   case.  Yes, the log might have been better, etc.  You now
```

C79amocc

 1   understand what this is, which is largely transmittal emails

 2   from a nonsubstantive, from somebody at Publicis to a lawyer at

 3   Publicis.  Can we move on?

 4          MR. WITTELS:  Yes.  I would ask, though, is it

 5   regarding requesting legal advice, seeking legal advice?

 6          THE COURT:  It's a cover email.  It is dear Joe,

 7   attached is what you asked for.  As I understand what Mr. Evans

 8   just said, everything that was attached has been produced to

 9   you, and they just didn't produce the internal legal

10   transmittal memo for fear that that was waiving some privilege.

11   It is what we call in the practice here a nonevent email.

12   Frankly, under 502 I don't know why you don't just show it to

13   them and be done with this.  In any event, I'm not ordering it

14   to be produced.

15          Now the question is, having gone through one of these,

16   can I forgo all that are agreed to be similar to this?  Or I'll

17   start reviewing them and one side or the other is paying

18   sanctions under Rule 37.

19          MR. WITTELS:  Your Honor, maybe I just didn't

20   understand what Mr. Evans was saying.  Your Honor certainly

21   articulated it so I do understand it.  Can I understand that

22   that is the case, all of the documents that are cover letters

23   attached documents that have been already produced to

24   plaintiffs?  Is that correct?

25          MR. EVANS:  Yes, that is correct, insofar as there are

1   cover letters.  There are some emails, and I can show you an

2   example if you like, which reflect the conversation between

3   inside counsel and the client regarding this case.

4          THE COURT:  If Mr. Wittels wants me to review those, I

5   will.  Are we done with what we are calling the cover memo

6   emails?

7          MR. WITTELS:  Yes.  Mr. Evans, just tell me what

8   number that goes to.  Is it to 64?  It's hard to tell.

9          MR. EVANS:  That is, every email, every document up

10  through 62 before you get to an expense report, are either

11  cover emails or emails reflecting the investigation for

12  documents in the case.

13         THE COURT:  Let me give this one back to you.  Let's

14  move on to the first of your semi-substantive ones.  Whoever

15  the person in the back of the room was, we have sufficiently

16  bored her that she is gone.  What am I looking at here?

17         MR. EVANS:  In response to request for information

18  reflecting travel by Publicis employees to New York, we

19  produced expense reports for all Publicis employees that

20  reflected travel to New York.  In my opinion, the substance of

21  those emails themselves was irrelevant, but for nonattorneys we

22  just produced it to avoid any dispute.

23         For attorneys, <we redacted it and included it on the

24  log so that they would have a date or dates of the travel but

25  otherwise not potentially disclose any privileged information

C79ameoc

1      reflected by the substance.

2              THE COURT:  This is which document on the log you just

3      handed me?

4              MR. EVANS:  The document you are looking at is

5      privilege log document 63 and is the expense forms related to

6      travel by Publicis Groupe general counsel Russell Kelly.

7              THE COURT:  Was this not produced at all or was it

8      produced with redactions?

9              MR. EVANS:  Simply as a block page that said

10     "Redacted."  The purpose was to have the date on the log that

11     they would be able to have to reflect the travel.

12             THE COURT:  All right.  I also note the document is in

13     French.  Certain words like "taxi" translate.  Mr. Wittels?

14             MR. WITTELS:  Your Honor, on this point, given again

15     not having a description, we believe the federal rules requires

16     you to at least tell the basis of what the topic is and who the

17     cc is sort of standard practice to list everyone.

18             THE COURT:  It is an expense report.  There is no

19     narrative on it except to the extent of itemizing expenses, and

20     in the course of that noting people that Mr. Kelly had meals or

21     some such with.  Whether that is privileged or not, I don't

22     know.  On the other hand, for your purposes who cares?  Mr.

23     Kelly of Publicis came to New York.

24             MR. WITTELS:  If Publicis lawyers are involved in

25     doing work --

C79zmoone

```
 1              THE COURT:  Counsel, he is in New York.  He is a
 2   Publicis lawyer.  You have that fact.  I can, I guess, have
 3   them produce the expense report up through the heading, which
 4   shows that it's Kelly, it's Publicis.  It's an expense report
 5   dated in the European style December 18, 2008.  OK?  He came to
 6   New York as shown on that expense report.  What else do you
 7   need?
 8              MR. WITTELS:  We would need what your Honor described
 9   as well as when he came to New York and what the purpose of the
10   trip was.
11              THE COURT:  That's not shown on here.  Literally, it
12   says, "Hotel," such and such a date, "not in New York."
13   Another date not in New York.  Third date, hotel New York City
14   and a charge for it.  There are then charges for meals, taxi,
15   etc.  Most of which by the dates had nothing to do with New
16   York, because this, for whatever reason, is his travel for
17   quite a long period of time.
18              MR. WITTELS:  It's relevant, your Honor, to whether
19   Publicis --
20              THE COURT:  What is relevant?
21              MR. WITTELS:  The fact that Publicis attorneys are in
22   New York doing business.
23              THE COURT:  Thanks.  Stop.  Produce this report with
24   the cover entry that I mentioned, the person's name and the
25   date of the report And the hotel date where it says "Hotel New
```

C79amooc

 1    York City."  That's it, period.  Any problem with that, Mr.

 2    Evans?

 3            MR. EVANS:  No, your Honor.

 4            THE COURT:  Good.  Do that for all the other expense

 5    reports that are on this list, which is another half dozen or

 6    whatever.

 7            Anything else you want, Mr. Wittels?

 8            MR. WITTELS:  Not from the privilege log.  Thank you.

 9            THE COURT:  Let me again give this back to you, Mr.

10    Evans.

11            On the redaction logs, let me see one sample of the

12    redacted document and its corresponding unredacted version.

13    What am I looking at?

14            MR. EVANS:  These are travel expense records like the

15    ones we just looked at for nonattorneys within Publicis Groupe

16    for travel to New York.  We redacted out pages that reflected

17    travel not to New York and left in everything else that related

18    to New York.

19            THE COURT:  What is the objection?  Do you really want

20    to know that somebody was in Chicago or Seattle or whatever,

21    which has nothing to do with New York?  Remember, this is doing

22    business in New York, not a securities case or the like where

23    doing business anywhere on the continental U.S. applies.

24            MS. NURHUSSEIN:  Yes, your Honor, I understand.  The

25    issue that we have with the redaction log is that defendants

C79amore.c

 1   have unilaterally determined that the this information is not

 2   relevant.  We do concede that the information that you just

 3   referred to, we wouldn't push for information --

 4        THE COURT:  Is there a reason the two of you don't

 5   talk to each other?

 6        MS. NURHUSSEIN:  Your Honor, the problem is the log.

 7   Again, this goes back to deficiencies in the redaction log.

 8   The log says, "Contains nonresponsive information,"

 9   semicolon --

10        THE COURT:  I renew my question.  You have just heard

11   what Mr. Evans said.  Is there a reason, and I don't know whose

12   fault it is, but you're all taking my time because the two of

13   you won't talk to each other.  I don't know whose fault it is

14   and frankly I don't care.  You have now heard what has been

15   redacted and why.  Regardless of how bad their redaction list

16   is, this isn't kindergarten.  This isn't a law school exam

17   where I give their redaction log a grade.

18        This is you're asking me for a ruling.  Having heard

19   that they redacted non-New York travel, is there any objection

20   to that?  Yes or no.

21        MS. NURHUSSEIN:  No, your Honor, there is no objection

22   to that.  I would ask defense counsel whether that's the only

23   basis for all the redactions in all of these expense reports,

24   whether the only reason for the redactions is because it

25   relates to non-New York travel.

1           MR. EVANS:  That's correct.  As it says in our

2    privilege log, reflect travel to location to other than New

3    York.

4           MS. NURHUSSEIN:  The redaction log gave a different

5    impression to me on that.

6           THE COURT:  If you had spoken, you might have figured

7    this out.  I'm returning the redaction material.

8           MS. NURHUSSEIN:  Your Honor, just for the record, we

9    did confer with defense counsel.  I don't recall that --

10          THE COURT:  All I can tell you is neither of you are

11   helping the progress of this case.  There is enough serious

12   substantive issues to be dealt with that when you can't figure

13   out the reason for redaction, which is so crystal clear if you

14   spoke to each other, something is wrong.

15          Are there any other issues as to jurisdictional

16   discovery other than me setting a deadline for its completion

17   at this point?

18          MR. EVANS:  There is one other document, your Honor.

19   It actually is a one-page document.  I handed you three pages.

20   That is the unredacted version coming up now.  This is a

21   document that was also redacted for relevance.  It is the group

22   structure chart that was produced to plaintiffs.  We redacted

23   those with ownership interests in Publicis Groupe itself but

24   left any information that contained information regarding

25   Publicis's relationship with the subsidiaries or entities

C79xmooc

 1   listed on here.

 2           THE COURT:  What is the objection?

 3           MS. NURHUSSEIN:  Your Honor, I guess it is two things.

 4   The point that relates specifically to this document is that we

 5   believe we are entitled to see the overall corporate structure

 6   and the interrelationship among all the entities.

 7           THE COURT:  Why are you entitled to anything above

 8   Publicis?  You're trying to prove that Publicis Groupe is doing

 9   business in New York.  If Sherlock Holmes and Mr. Moriarty own

10   shares in Publicis Groupe and they are not in New York, what

11   difference does it make?

12           MS. NURHUSSEIN:  Your Honor, we can let this one go in

13   the interests of resolving this.

14           THE COURT:  Thank you.  Good.  The documents are going

15   back to Mr. Evans.  Any other issues from the plaintiff or the

16   defendant before we set a deadline to complete the

17   jurisdictional discovery?

18           MR. EVANS:  No, your Honor.

19           MS. NURHUSSEIN:  Your Honor, the last issue we wanted

20   to raise is that your Honor granted us leave to serve two

21   additional requests on defendant MSL.  We had served those.  In

22   response to one related to Publicis policies that are imposed

23   on MSL and the other relating to Publicis' involvement in

24   client pitches and other client matters, there were a couple of

25   documents in response to the first request, no documents in

C792mccc

 1    response to the second.

 2            We did confer with defense counsel, counsel for MSL.

 3    Our question was really, given the informational asymmetry,

 4    what kind of search they conducted for documents, granted given

 5    that they were apparently unable to uncover any responsive

 6    document.

 7            THE COURT:  Do your clients who were employees of MSL

 8    know of any Publicis involvement or Publicis documents that

 9    weren't produced that either would prove to me that Mr. Brecher

10    and his colleagues didn't do a good job or --

11            MS. NURHUSSEIN:  Your Honor, we do know of extensive

12    Publicis involvement in client pitches.  It's just a question

13    as to whether, in addition to the sort of emails that we have

14    seen as part of our review and a couple of individual client

15    pitches that we saw as part of that review process, whether

16    there is anything else.  Again, today, they are the ones who

17    have most of the information and would be in a better position

18    to identify responsive documents.

19            THE COURT:  I understand.  But this is a common

20    problem that lawyers for whatever reason don't like to talk to

21    their clients.  Your clients worked there for umpteen years.

22    If there is a smoking gun or even not a smoking gun, you would

23    think your clients would know about it and would tell you about

24    it.

25            Any response from MSL, Mr. Brecher?

C79Rmac6

1           MR. BRECHER:  Thank you, your Honor.  First, I wasn't

2    aware that this was going to be an issue today, since, as you

3    previously ruled, if they were going to bring up something,

4    they needed to bring it to your attention at least two days

5    beforehand to avoid the problem of one side not being aware

6    that an issue was going to be raised.

7           Putting that aside for the moment, we did have a

8    meet-and-confer, Ms. Chavey and I, with Mr. Wittels and Ms.

9    Nurhussein.  We stated that we conducted a reasonable inquiry

10   based on the request that was made but that they should refer

11   to our objections as well.  You had ordered previously that we

12   produce policy documents, not every single email on the

13   implementation.  That's what we tried to accomplish.

14          MS. NURHUSSEIN:  I simply ask defense counsel if they

15   can indicate what sort of search they conducted.  Because we

16   don't have access to the same information that defendants have,

17   we would at a minimum ask that they indicate what sort of

18   sources they searched, just so we can also be in a position to

19   assess whether they conducted a diligent search.

20          MR. BRECHER:  Your Honor, this issue was raised before

21   the Court maybe two months ago, when they again said they want

22   to know exactly what we did.  We explained to the Court we are

23   not required to tell them every step we took and who we spoke

24   with.  We are supposed to make a reasonable, diligent effort,

25   and we have made that representation.

1            We are not obligated, unless the Court requires us to

2    do so, to disclose our work product and how we responded.  They

3    haven't disclosed every individual plaintiff they spoke with

4    and what documents they looked at and what drawers they looked

5    in at their homes and which computers.  We haven't asked them

6    to do so.  They have said they have produced all documents in a

7    reasonable, diligent fashion, and we have taken their word for

8    it.  That's my response to that, your Honor, which we have

9    already addressed, by the way.

10            THE COURT:  At this point we are going to move on.

11    How soon can Publicis produce whatever is left to be produced?

12    It had better be a date with July in it.

13            MR. EVANS:  Your Honor, the only documents left to be

14    produced are from the email accounts of the two individuals I

15    mentioned earlier and documents related to one stock share

16    program that I can produce this week.  The emails, there were

17    four corrupted files when they were sent to our vendor, so I

18    don't know the extent of those files.

19            Of those that I have, there were 350,000 emails -- I'm

20    sorry -- 500,000 emails in the set.  Restricting it to

21    communications between MSLGroup and Publicis Groupe, we should

22    be able to review and produce responsive documents from those

23    that I have in two weeks.

24            THE COURT:  That is July 23.  Do whatever you need to

25    do about the corrupted files.  Is the corruption likely to be

 1  in the originals or in the transportation, for lack of a better

 2  word, from France to you and you to your vendor?

 3          MR. EVANS:  We believe it is the latter.  We are

 4  having them sent on visible media, and we hope that will solve

 5  the problem.

 6          THE COURT:  Make sure you're using FedEx and other

 7  things to speed.

 8          MR. EVANS:  Surely.

 9          THE COURT:  July 30 is the end of this discovery,

10  hopefully sooner.  Therefore, plaintiffs opp. brief is due no

11  later than August 13.  Assuming that the last thing is either

12  the July 23 production of the emails or the Re:Sources

13  disposition, if all of that gets done sooner, that will

14  advance, namely, make earlier, your opposition papers.  So, no

15  later than August 13.

16          If there are any problems, I expect to know about it

17  long before July 30 because I'm not going to be inclined to

18  hold the briefing any further.  I assume that on the emails you

19  will do a rolling production once your vendor gets through it

20  so it can be done sooner than July 23, other than perhaps the

21  corrupted material.

22          MR. EVANS:  Yes, your Honor.

23          THE COURT:  Good.  When do you all want to come back?

24  If all this goes according to plan, there may not be anything

25  for us to do, since the MSL-oriented discovery is on hold until

 1   after people opt in or don't opt in.  That's probably going to

 2   take a while.  Shall we leave it without a scheduled conference

 3   date?

 4           MR. WITTELS:  That probably makes the most sense, your

 5   Honor.

 6           MR. EVANS:  I agree, your Honor.

 7           MR. BRECHER:  I agree.

 8           THE COURT:  The usual drill.  I think MSL can get a

 9   free pass on this transcript and piggyback off of Publicis.

10   But Publicis and plaintiff will share the cost of the

11   transcript 50-50.

12           The usual drill.  If you're filing objections, 14 days

13   starts running today.  Make your arrangements with the court

14   reporter.  We are adjourned.

15           (Adjourned)

16

17

18

19

20

21

22

23

24

25