UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

**Monique Da Silva Moore**; **Maryellen
O'Donohue**; **Laurie Mayers**; **Heather
Pierce**; **Katherine Wilkinson**, and **Zaneta
Hubbard**, on behalf of themselves and all others
similarly situated,

        Plaintiffs,

      - against -

**Publicis Groupe SA and MSLGroup**,

        Defendants.
--------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12 - 3 -12
```

11 Civ. 1279 (ALC) (AJP)

**Memorandum & Order**

**ANDREW L. CARTER, JR., District Judge:**

## INTRODUCTION

The original complaint was filed by Monique da Silva Moore on February 24, 2011

against Defendants MSLGroup ("MSL") and Publicis Groupe SA ("Publicis")[1]. Ms. da Silva

Moore was the sole class representative and the complaint contained allegations of gender

discrimination in violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§§ 2000(e), et seq., N.Y. Exec. Law § 296, subd.1(a), N.Y.C. Admin. Code § 8-107, subd. 1(a),

and Massachusetts General Laws Chapter 151B. The complaint also alleged violations of the

Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., including unlawful

retaliation. Ms. da Silva Moore filed an amended complaint on April 14, 2011 ("FAC"), adding

Maryellen O'Donohue, Laurie Mayers, Heather Pierce, and Katherine Wilkinson as named

plaintiffs and adding claims under the Equal Pay Act, 29 U.S.C. §§ 206, et seq. and N.Y. Labor

Law § 194 (New York's Equal Pay Act). The FAC also complained about pregnancy

---

[1] Publicis is the parent company of MSL.

discrimination in violation of Title VII, 42 U.S.C. § 2000e(k) et seq., violations of the FMLA on behalf of Plaintiff Pierce and unlawful retaliation under the FMLA on behalf of Plaintiff Pierce. The FAC withdrew the claim under the Massachusetts General Laws Chapter 151B.  MSL answered the FAC on June 3, 2011 and Publicis contested the Court's personal jurisdiction.

On August 2, 2012, Plaintiffs filed a second amended complaint ("SAC") that asserts additional facts and converts opt-in plaintiff, Ms. Zenata Hubbard, to a named plaintiff. Plaintiffs submit that the proposed SAC simplifies and narrows the scope of their Equal Pay Act collective action class, sets forth additional facts concerning MSL's common policies and practices that Plaintiffs contend are unlawful, and includes supplemental facts supporting personal jurisdiction over Publicis.  The SAC also seeks double awards for willful violations of the New York Equal Pay Law, and clarifies that the claims brought under the New York Equal Pay Law, New York State Human Rights Law, and the New York City Human Rights Law are limited to those individuals employed in New York.

Plaintiff asserts that this Court has jurisdiction over Defendants pursuant to the federal courts' subject matter jurisdiction.  Defendant Publicis challenges the Court's personal jurisdiction and moves for summary judgment pursuant to New York Civil Practice Law and Rules (C.P.R.L.) §§ 301 and 302.  On June 18, 2012, Publicis filed its Motion for Summary Judgment for Lack of Personal Jurisdiction with the Court. On August 14, 2012, Plaintiffs separately moved to strike the declaration of Peter Miller in support of Defendant Publicis' Motion for Summary Judgment for Lack of Personal Jurisdiction.

For the reasons stated below, the Court denies Defendant Publicis' Motion for Summary Judgment for Lack of Personal Jurisdiction and Plaintiffs' Motion to Strike the Declaration of Peter Miller.

## BACKGROUND

On February 24, 2011, Plaintiffs sued Defendants MSLGroup ("MSL") and Publicis

Groupe SA ("Publicis") in the Southern District of New York. Although MSL concedes that

New York has personal jurisdiction over it, Publicis argues that it is not subject to personal

jurisdiction in New York. For its part, Plaintiffs oppose these motions.

MSLGroup Americas, Inc. is a wholly owned subsidiary of MMS USA Investments, Inc.,

which is a wholly owned subsidiary of MMS USA Holdings, Inc., which is jointly owned by

Publicis Groupe U.S. Investments LLC (69.9% ownership interest) and Publicis Groupe

Investments BV (30.1% ownership interest), both of which are fully owned by Publicis Groupe

SA. (See Publicis' Facts Nos. 51-53.) Thus, MSL is indirectly owned by Publicis. Publicis refers

to this subsidiary as "the PR and events arm of Publicis Groupe."

Publicis has at least 40 wholly-owned subsidiaries with New York offices. (Def. Publicis

Group SA's Second Supp. Objections and Resps. To Pls.' First Set of Interrogs. No. 1.) Publicis

has media buying, healthcare communications, creative network, marketing, advertising, and

print publication operations in New York. (Etienne Dep. at 252-255.) In 2011, North America

generated almost half (47%) of Publicis' total revenue. (Etienne Dep. at 47; 2009 Publicis

Groupe SA Annual Report (http://publicisgroupe.com/en/media/display/id/2658); 2011 Publicis

Groupe SA Annual Report (http://www.publicisgroupe.com/documents/instant-report-2011-

en.pdf)). Publicis received over $1 billion dollars in revenues (approximately $1,168,790,119)

from the New York offices of its wholly-owned subsidiaries in 2011. (Def. Publicis Groupe SA's

Second Supp. Objections and Resps. To Pls.' First Set of Interrogs. No. 1). Publicis received

$255,081,674 from New York clients of its subsidiaries in 2011. (Def. Publicis Groupe SA's

Second Supp. Objections and Resps. To Pls.' First Set of Interrogs. No. 1.) MSL, just in the

United States, earned 2.8% of Publicis' overall revenues in 2008; 2.4% of Publicis' overall revenues in 2009; 2.1% of Publicis' overall revenues in 2010; and 1.9% of Publicis' overall revenues in 2011. (Def. Publicis Groupe SA's Second Supp. Objections and Resps. To Pls.' First Set of Interrogs. No. 2.)

The Publicis CFO supervises the finances of Publicis, MSL and Publicis' other wholly owned subsidiaries. (Etienne Dep. at 26-27; Poterala Decl. at 23.) The CFOs of all Publicis subsidiaries, including MSL's New York-based CFO, report to the CFO of Publicis. (Etienne Dep. at 28.) Publicis' CFO must approve the recruitment, promotion, and termination of Branch financial executives, including the CFO and his main reports at MSL. Janus Book Vol. 1 Pg. 97. MSL must obtain approval from Publicis' CFO before entering into a contract that includes a joint liability clause which binds a Publicis holding company. (Etienne Dep. at 70.)

Publicis requires MSL to distribute the Janus Book, the Publicis policy guide, to all MSL employees. (Janus Book Vol. 1 Pg. 3, 79; Mayers Decl. at 22; McDonough Decl. at 15; Etienne Dep. at 66-67.) Publicis Finance Services, a wholly-owned subsidiary of Publicis, authored the Janus Book. All of MSL's human resources rules and procedures must incorporate Publicis policies. Janus Book Vol. 1 Pg. 77. MSL must send a copy of its human resources policies to the Groupe General Secretary "for the avoidance of misunderstanding." Janus Book Vol. 1 Pg. 77.

The Janus Book provides that the Internal Audit Department's mission "is to ensure that [Publicis' and its subsidiaries'] operations are in accordance with best practices, that [their] accounting records reflect the underlying reality of operations and that all procedures are correctly applied." (Etienne Dep. at 79; Janus Book Vol. 1 Pg. 68-69.) To ensure compliance with its policies, Publicis' internal audit group audits Publicis-owned entities. Publicis maintains a complaint procedure for accounting and auditing matters. Any MSL employee may submit a

4

complaint regarding accounting and auditing matters to Groupe management. Janus Book Vol. 1 Pg. 70.

Plaintiffs' theory of pay discrimination alleges that Publicis approves compensation decisions, including salary increases and raises for MSL employees. (Perlman Decl. at 16; Pierce Decl. at 31; da Silva Moore 2/28/12 Decl. at 30; Hubbard Decl. at 22; da Silva Moore Dep. at 8, 13-16; McDonough Decl. at 19.) Indeed, Publicis required MSL to obtain the Publicis General Secretary's approval of any salary increase, bonus payment, or termination payment for any MSL Key Executive and any salary increase or termination payment over $125,000 for any MSL employee. (Def. Publicis Groupe SA's Response to Plaintiff's Rule 56.1 Statement of Material Facts, 33, at ¶ 86; 27, at ¶ 71.) Publicis also pays long term incentive benefits to certain MSL executives.

Publicis decides and approves the amount of money of MSL's "bonus pool" each year, which represents the total funds it plans to distribute to employees who are employed by agencies under the MSL Brand. (Def. Publicis Groupe SA's Objs. And Resps. To Pls.' Second Set of Reqs. For Admis. No. 17; Def. Publicis Groupe SA's Objections and Resps. To Pls.' Second Set of Interrogs. No. 12; Etienne Dep. at 180; Janus Book Vol. 1 Pg. 81.) Publicis decides the method MSL must use to distribute bonuses to MSL employees. Janus Book Vol. 1 Pg 81.

Publicis' Management Board has picked MSL employees, including employees who work in New York, and MSL's CFO, to be beneficiaries of stock options. (Etienne Dep. at 167-169, 237-238.) Publicis' Management Board determines the number of stock options to be granted to each beneficiary, including MSL employees, some of whom work in New York. (Def. Publicis Groupe SA's Response to Plaintiff's Rule 56.1 Statement of Material Facts, 29, at ¶ 79.)

Publicis' Management Board determines and evaluates the performance goals each beneficiary, including MSL employees, must achieve in order to exercise stock options. (Def. Publicis Groupe SA's Response to Plaintiff's Rule 56.1 Statement of Material Facts, 30, at ¶ 80.)

## DISCUSSION

**A.     Motion for Summary Judgment for Lack of Personal Jurisdiction**

1.      Standard of Review

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)

(summary judgment is unwarranted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts.... The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (internal citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone "will not defeat an otherwise properly supported motion for summary judgment." Id. at 247–48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed." R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" BellSouth Telecomms., Inc. v. W .R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) (quoting Research Automation Corp., 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions where the jurisdictional issue is in dispute:

> If the defendant asserts in a Rule 56 motion that undisputed facts show the absence of jurisdiction, the court proceeds, as with any summary judgment motion, to determine if undisputed facts exist that warrant the relief sought. If the defendant contests the plaintiff's factual allegations, then a hearing is required, at

which the plaintiff must prove the existence of jurisdiction by a preponderance of the evidence.

Ball v. Metallurgie Hoboken–Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990) (citations omitted).

2.      Relevant Law

Personal jurisdiction over the foreign defendants in this case is governed by New York law. Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001) (citing Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997)). The Court must consider: (1) whether New York law would confer jurisdiction by New York courts over defendant Publicis and (2) whether the exercise of jurisdiction over Publicis comports with the Due Process Clause of the Fourteenth Amendment.  Id.

Under New York law, there are two bases for personal jurisdiction over out-of-state defendants: (1) general jurisdiction pursuant to C.P.L.R. § 301 and (2) long-arm jurisdiction pursuant to C.P.L.R. § 302.

**i.      General Jurisdiction Under C.P.L.R. § 301**

Under C.P.L.R. § 301, a New York court may exercise jurisdiction over a non-domiciliary defendant "on causes of action wholly unrelated to acts done in New York," when the defendant is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence' in the jurisdiction.'"  Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 198 (2d Cir. 1990) (quoting Simonson v. Int'l Bank, 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1964)).  A corporation is "doing business," and is therefore "present" in New York and subject to personal jurisdiction, with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York "not occasionally or casually, but with a fair measure of permanence and

8

continuity." Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985) (quoting Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917)).

Under section 301 of the New York Civil Practice Law and Rules ("CPLR"), New York subjects a foreign corporation to general jurisdiction if it is "doing business" in the State. Courts will find that a foreign parent corporation is doing business in New York "when the subsidiary is acting as an agent for the parent, or when the parent's control is so complete that the subsidiary is a 'mere department' of the parent." ESI, Inc. v. Coastal Corp., 61 F.Supp.2d 35, 51 (S.D.N.Y. 1999) (citing Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 865 (2d Cir. 1996)). Determining whether an entity is a "mere department" requires "a fact-specific inquiry into the realities of the actual relationship between the parent and subsidiary." Koehler, 101 F.3d at 865.

To determine whether the subsidiary is a "mere department" of the parent corporation, a court must consider the following factors set forth in Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.: (1) "common ownership," (2) "financial dependency of the subsidiary on the parent corporation," (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities," and (4) "the degree of control over the marketing and operational policies exercised by the parent." 751 F.2d 117, 120-22 (2d Cir. 1984). Accord Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184-85 (2d Cir. 1998) (applying Beech factors). While the first factor, common ownership, is "essential" for an assertion of jurisdiction, "[t]he other three are important, but not essential." Tese-Milner v. De Beers Centenary A.G., 613 F.Supp.2d 404, 416 (S.D.N.Y. 2009). Accord ESI, 61 F.Supp.2d at 52. As such, "[t]he overall weighing of the various factors thus necessitates a balancing process, and not every factor need weigh entirely in the plaintiffs' favor." Reers v. Deutsche Bahn AG, 320 F.Supp.2d 140, 156 (S.D.N.Y. 2004) (quotation marks

omitted). When applying the Beech test, "[e]stablishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability." GEM Advisors, Inc. v. Corporacion Sidenor, S.A., 667 F.Supp.2d 308, 319 (S.D.N.Y. 2009) (quotation marks omitted).

Plaintiffs contend that this Court has general jurisdiction over Publicis based on its wholly owned New York subsidiary, MSL. Publicis owns MSL and concedes the common ownership requirement is met here.

As to the second factor of financial dependency of the subsidiary on the parent corporation, MSL maintains its own distinct financial accounts in which revenues remain, and are used to pay operating expenses, as cash reserves, etc. (Miller June 18, 2012 Dec. ¶ 11-12; Antonucci Dec. ¶ 10.) Compare ESI, 61 F.Supp.2d at 53 ("[When reviewing the financial dependency factor,] [c]ourts also inquire whether the subsidiary retains its own profits or whether they are received by and reported on the financial statements of the parent.") with Gallelli v. Crown Imports, LLC, 701 F.Supp.2d 263, 273-74, No. 08 Civ. 3372, 2010 WL 1177449, at *8 (E.D.N.Y. Mar. 20, 2010) ("Courts considering [the second Beech factor] have held that a finding of financial dependency requires a showing that the subsidiary would be unable to function without the financial support of the parent.") (citing Reers, 320 F.Supp.2d at 157). Thus, MSL appears to be financially independent from Publicis. Compare, e.g., Cassese v. Washington Mut., Inc., 262 F.R.D. 179, 185 (E.D.N.Y. 2009) (finding a subsidiary a "mere department" where the parent exercised control over the subsidiary with respect to lending and loan servicing activities, the two companies shared common management who controlled the day to day operations of the subsidiary, and the parent's financial statements include earnings derived from the lending and servicing activities of the subsidiary).

"In examining the third factor, interference with executive personnel and failure to observe corporate formalities, courts look to, inter alia, whether the parent ... shifts executives along its subsidiaries [and] whether the parent pays the executives' salaries ...." See ESI, 61 F.Supp.2d at 54. Publicis appointed MSL's Chief Executive Officer, Olivier Fleurot, who is based in Paris, France, and approved the appointments of Chief Financial Officer, Peter Miller, who is based in New York, New York, and Chief Talent Officer Sophie Martin-Chantepie, who is based in Paris, France. (Supp. Response to Interrogatory No. 10; Miller Dec. ¶¶ 2, 5; Etienne Dep. 143:2-8.) The current CEO of MSL used to be the CEO of Publicis Worldwide. (Etienne Dep. at 91.) He also serves on Publicis' P12 executive committee. (Def. Publicis Groupe SA's Objections and Resps. To Pls.' Second Set of Interrogs. No. 6; Etienne Dep. at 83; Janus Book Vol. 1 Pg. 97.) See Volkswagenwerk, 751 F.2d at 121-22 (finding interference where some directors and officers of the parent and subsidiary overlapped, the parent paid those directors' and officers' salaries, and executives were transferred between the parent and subsidiary as needed). However, Publicis does not require that it approve appointments for executives within the MSLGroup Americas management structure, such as the appointment of President Jim Tsokanos or Chief Executive Officer Maury Shapiro. (Etienne Dec. ¶ 10.) Furthermore, MSL maintains its own books and records separate and apart from Publicis and files its own tax returns. (Miller Dec. ¶¶ 7, 8, 10, 12.) Thus, Publicis' minimal involvement in the selection of executives at the MSLGroup brand level and the observance of corporate formalities weigh against finding MSL as a mere department of Publicis.

As to the fourth factor of control over the marketing and operational policies exercised by the parent, MSLGroup Americas and its agencies develop, place, and pay for all their advertising in the United States. (Miller Dec. ¶ 16.) MSL also maintains its own website for the MSL brand,

and MSLGroup Americas maintains its own website as well. (Miller Dec. ¶ 17, 18.) The agencies that comprise MSLGroup Americas are largely responsible for day-to-day business practices such as setting the prices of its services and billing clients. (Miller Dec. ¶ 14.) MSLGroup Americas and its agencies are also responsible for the development and maintenance of their own client relationships. (Id. ¶ 19; Etienne Dep. at 68:9-11.) Publicis does encourage the subsidiaries it owns, including MSL, to collaborate when it is in the best interest of Publicis, its subsidiaries, and its clients. (Def. Publicis Groupe SA's Objections and Resps. To Pls.' Second Set of Reqs. For Admis. No. 19; Janus Book Vol. 1 Pg. 18, 54; da Silva Moore 8/12/12 Decl. ¶ 11; O'Donohue 8/10/12 Decl. ¶ 11.) Publicis encourages cooperation between Groupe Brands and Business Units, including MSL, on new business pitches. Janus Book Vol. 1 Pg. 57.

In sum, Publicis has common ownership of MSL. The other Beech factors do not clearly show that MSL is a "mere department" of Publicis and this Court declines to exercise general jurisdiction over Publicis. Nevertheless, as discussed below, this Court has specific jurisdiction over Publicis arising from its business activity.

ii.     **Specific Jurisdiction Under C.P.L.R. § 302**

C.P.L.R. § 302(a)(1) provides, in relevant part: "[A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person or though an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." C.P.L.R. § 302(a)(1) (McKinney's 2012).  In addition to finding that the defendant has transacted business within the state or contracted anywhere to supply goods or services within the state, "the claim asserted must arise from that business activity." Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (citing McGowan v. Smith, 52 N.Y.2d 268, 273, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981)).  This provision permits jurisdiction "only over a

12

defendant who has 'purposefully availed himself of the privilege of conducting activities within New York and thereby invok[ed] the benefits and protections of its laws.'" Fort Knox Music Inc. v. Baptiste, 203 F.3d 193, 196 (2d Cir. 2000) (quoting Parke-Bernet Galleries v. Franklyn, 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970)).  "A defendant may not be subject to jurisdiction based on 'random,' 'fortuitous,' or 'attenuated contacts.'" Avecmedia, Inc. v. Gottschalk, No. 03-cv-7831 (BSJ), 2004 WL 1586411, at *4 (S.D.N.Y. July 14, 2004) (citing Burger King v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174 (1985)).  "The contacts must provide a fair warning to defendant of the possibility of being haled into court in the forum state." Id. (citations omitted).  A substantial relationship is one that is "direct," Jacobs v. Felix Bloch, 160 F. Supp.2d 722, 739 (S.D.N.Y. 2001), and not "too attenuated," Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 66 (2d Cir. 2012) (quoting Johnson v. Ward, 4 N.Y.3d 516, 520, 797 N.Y.S.2d 33, 829 N.E.2d 1201 (2005)).

C.P.L.R. § 302(a)(1) is a "single act statute and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195 (1988) (internal quotation marks omitted); Best Van Lines, Inc. v. Walker, 490 F.3d 239, 248 (2d Cir. 2007) ("[P]roof of one transaction . . . in New York is sufficient to invoke [long-arm] jurisdiction, even though the defendant never enters New York.") (citing Deutsche Bank v. Montana Bd. of Investments, 7 N.Y.3d 65, 71, 818 N.Y.S.2d 164 (2006)).  Although "[t]he mere existence of defendant's telephone calls into New York are not sufficient to sustain New York long arm jurisdiction," when "the purpose of the calls is for the defendant to actively participate in business in New York, then they alone may support a finding of New York long

13

arm jurisdiction under C.P.L.R. § 302(a)(1)." <u>Carlson v. Cuevas</u>, 932 F. Supp. 76, 78 (S.D.N.Y. 1996) (citing <u>Parke-Bernet</u>, 26 N.Y.2d at 17–18).  Put another way, a single communication may be considered a "business transaction" where it was "related to some transaction that had its center of gravity inside New York, into which a defendant projected himself." <u>Three Five Compounds, Inc. v. Scram Technologies, Inc.</u>, No. 11-cv-1616 (RJH), 2011 WL 5838697, at *4 (S.D.N.Y. Nov. 21, 2011) (quoting <u>Maranga v. Vira</u>, 386 F.Supp.2d 299, 306 (S.D.N.Y. 2005)).

Plaintiffs have presented adequate allegations and sufficient jurisdictional evidence to demonstrate specific jurisdiction under section 302(a)(1). These facts are sufficient to show that Publicis transacted business in New York. Specific jurisdiction over Publicis stems from Publicis' personal and direct contacts with New York.

Publicis instituted a salary and hiring freeze on all of its subsidiaries, including MSL. (Def. Publicis Groupe SA's Objections and Resps. To Pls.' First Set of Reqs. For Admis. No. 1; Def. Publicis Groupe SA's Objections and Resps. To Pls.' Second Set of Reqs. For Admis. No. 18; Etienne Dep. at 95-96.) Publicis directed MSL CFO Peter Miller to help enforce the freeze among MSL personnel. (Etienne Dep. at 110.) During the salary and hiring freeze instituted by Publicis, Publicis also reviewed proposed salary increases submitted by Brands to confirm that the agency and the Brand followed the proper process for justifying such increases. (Etienne Dep. at 109:12-25.) Publicis CFO Jean-Michel Etienne and Publicis General Secretary Mathias Emmerich had to approve proposed hiring or compensation decisions during Publicis' company-wide salary and hiring freeze. (Def. Publicis Groupe SA's Objections and Resps. To Pls.' Second Set of Reqs. For Admis. No. 8; Etienne Dep. at 98, 109.) Publicis lifted the hiring and salary freeze on MSL on January 27, 2011. (McDonough Decl. at 19.) The Publicis CEO decided on a brand by brand basis when each brand could exit the freeze. (Etienne Dep. at 190.)

After the salary and hiring freeze in 2008, compensation and hiring decisions had to be approved by Publicis in Paris, France. MSL was not allowed to manage raises without justification. (McDonough Decl. ¶ 19; Etienne Dep. at 107:6-23, 207:16-208:3, 209:12-19.) First, the agency seeking to hire or increase an employee's compensation was required to justify the decision to Brand management. (Etienne Dep. at 107:6-23, 207:16-208:3, 209:12-19). If the Brand approved, the Brand was then required to obtain approval from Publicis CFO Jean-Michel Etienne and/or Senior Vice President and General Secretary Mathias Emmerich before implementing a proposed hiring decision or compensation increase. (Etienne Dep. at 107:24-108:12, 109:7-9; Resp. to RFA No. 8.)

Publicis maintains oversight over MSL's personnel issues. MSL must report its personnel costs and changes, including recruits and departures, to Publicis on a regular basis in brand performance and action reports. (Etienne Dep. at 217.) Publicis directs MSL to develop a training program and budget aimed at improving and ensuring the "employability" of personnel. Janus Book Vol. 1 Pg. 100. Publicis offers two training programs to certain MSL employees. The first is an Executive Development Program; the second is financial training regarding the use of the financial reporting system. (Miller 8/28/12 Decl. ¶ 6.) MSL pays Publicis for the costs of this training.

Publicis transacts business activities in New York. Publicis has conducted P12 meetings in New York. (Etienne Dep. at 84:4-15.) Publicis admits that its employees travel to New York for business purposes on limited occasions, such as to meet with management of certain Brands in which Publicis invests. (Etienne Dep. at 95:3-10.) In some instances, Publicis' CFO, Jean Michel Etienne, travels to New York for meetings related to the financial performance of certain Brands. (Etienne Dep. at 95:11-19.) Employees in Publicis' internal audit department travel to

15

Publicis-owned entities around the world, including New York, to ensure that the entities are compliant with relevant Publicis policies. (Etienne Dep. at 78-79.) Publicis General Secretary Mathias Emmerich travels to New York for business purposes. (Defendant Publicis Groupe SA's Response to Plaintiffs' Rule 56.1 Statement of Material Facts, 2 at ¶ 4.) It is undisputed that Publicis employees travel to New York to meet with individuals employed under the Re:Sources Brand. (Betley Dep. at 16:20-23 (noting that Jean-Yves Naouri travels to New York approximately one time every four to six weeks).)

In addition to the CFO of MSL, the CFOs of Publicis' wholly-owned subsidiaries Saatchi & Saatchi and Publicis Health Care Communications are all based in New York. (Etienne Dep. at 31.) Publicis Worldwide USA, a Publicis-owned Brand, has an office in New York. (Etienne Dep. at 62-64.) Until September of 2007, Publicis was publicly traded on the New York Stock Exchange. (Etienne Dep. at 181.)

Publicis disputes that such facts are sufficient to demonstrate specific jurisdiction. First, Publicis asserts that it has no physical presence in New York and, thus, personal jurisdiction cannot be established. (See Publicis' Memorandum in Support of Motion for Summary Judgment for Lack of Personal Jurisdiction at 25; Etienne Decl. at 1.) Yet, the New York Court of Appeals and the Second Circuit have rejected the argument that a court does not have personal jurisdiction over a corporation because it lacks physical presence here. Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988) ("proof of one transaction in New York is sufficient to invoke jurisdiction [under 302(a)(1) ], even though the defendant never enter[ed] New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted"); PDK Labs v. Friedlander, 103 F.3d 1105, 1109 (2d Cir. 1997) (same). "Communications into New York will

16

only be sufficient to establish personal jurisdiction if they were related to some transaction that had its center of gravity inside New York, into which a defendant projected himself." Three Five Compounds, 2011 WL 5838697, at *7 (quoting Maranga v. Vira, 386 F.Supp.2d 299, 306 (S.D.N.Y. 2005)).  Plaintiffs' claim for discriminatory pay and hiring arose directly from Publicis' hiring and salary freeze and exceptions thereto, such that Publicis had "fair warning . . . of the possibility of being haled into court" in New York. See Avecmedia, 2004 WL 1586411, at *4  (citing Burger King, 471 U.S. at 475.  Accordingly, § 302(a)(1) confers personal jurisdiction over defendant Publicis.

### iii. Due Process

To satisfy the minimum contacts required by the Due Process Clause of the Fourteenth Amendment, the defendant's "conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there."  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559 (1980).  A nonresident defendant has minimum contacts with the forum state if he or she commits "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228 (1958).  Moreover, a defendant's contacts with the forum must be "continuous and systematic," or the suit must arise out of or be related to those contacts.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416, 104 S.Ct. 1868 (1984).

"Ordinarily . . . if jurisdiction is proper under the C.P.L.R., due process will be satisfied because C.P.L.R. § 302 does not reach as far as the constitution permits."  Newbro v. Freed, 337 F. Supp.2d 428, 434 (S.D.N.Y. 2004) (quoting Topps Co. v. Gerrit J. Verburg Co., 961 F. Supp. 88, 90 (S.D.N.Y. 1997)).  "At bottom, the limitations on exertion of personal jurisdiction, as

reflected in Section 302(a)(1)'s requirement of purposeful activity, exist to satisfy constitutional requirements of due process." Id. (quotation omitted).

The causes of action for pay discrimination, discriminatory hiring, and related employment decisions arise out of Publicis' company-wide decisions directed to New York. Thus, Publicis "purposefully availed [itself] of the privilege of conducting business in New York and therefore [it] could reasonably anticipate being haled into court in this forum." World-Wide Vokswagen, 444 U.S. at 297.  Accordingly, the application of C.P.L.R. § 301(a)(1) to Publicis in this case does not offend Due Process.

Publicis has not raised a due process challenge to personal jurisdiction. Nevertheless, exercising personal jurisdiction over Publicis comports with due process considerations. Where personal jurisdiction is appropriate under section 302(a), the requirements of due process are met. See D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 105 (2d Cir. 2006) ("[T]he constitutional requirements of personal jurisdiction are satisfied because application of N.Y. C.P.L.R. § 302(a) meets due process requirements.") (citing United States v. Montreal Trust Co., 358 F.2d 239, 242 (2d Cir. 1966)). With regard to the reasonableness inquiry, it is Publicis' burden to make a "compelling case" that exercising jurisdiction over Publicis in New York is unreasonable. Burger King Corp., 471 U.S. at 477, 105 S.Ct. 2174. Publicis does not so argue, much less put forth a compelling case. Accordingly, exercising jurisdiction over Publicis does not offend traditional notions of fair play and substantial justice.

## CONCLUSION

Based on the above, Defendant Publicis' motion for summary judgment for lack of personal jurisdiction is DENIED. Because Plaintiffs have failed to comply with this Court's Standing Order requiring a party to schedule a pre-motion conference and submit a pre-motion

letter before filing any motion with limited exception, Plaintiffs' motion to strike Peter Miller's

Declaration is DENIED. Defendant's request for attorney's fees and costs incurred in filing the

opposition to strike Peter Miller's Declaration is DENIED because Plaintiffs' filing of the

motion to strike was not in bad faith.

SO ORDERED.

Dated: New York, New York
December 3, 2012

_____
ANDREW L. CARTER, JR.
United States District Judge