# Exhibit 5



Representing Management Exclusively in Workplace Law and Related Litigation

Jackson Lewis LLP
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, NJ 07960-6834
Tel 973 538-6890
Fax 973 540-9015
www.jacksonlewis.com
Richard J. Cino - Managing Partner

| | | | |
|---|---|---|---|
| ALBANY, NY | DETROIT, MI | MINNEAPOLIS, MN | PORTSMOUTH, NH |
| ALBUQUERQUE, NM | GREENVILLE, SC | MORRISTOWN, NJ | PROVIDENCE, RI |
| ATLANTA, GA | HARTFORD, CT | NEW ORLEANS, LA | RALEIGH-DURHAM, NC |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | RICHMOND, VA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SACRAMENTO, CA |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAINT LOUIS, MO |
| BOSTON, MA | LAS VEGAS, NV | ORANGE COUNTY, CA | SAN DIEGO, CA |
| CHICAGO, IL | LONG ISLAND, NY | ORLANDO, FL | SAN FRANCISCO, CA |
| CINCINNATI, OH | LOS ANGELES, CA | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | MEMPHIS, TN | PHOENIX, AZ | STAMFORD, CT |
| DALLAS, TX | MIAMI, FL | PITTSBURGH, PA | WASHINGTON, DC REGION |
| DENVER, CO | MILWAUKEE, WI | PORTLAND, OR | WHITE PLAINS, NY |

MY DIRECT DIAL IS: (973) 451-6305
MY EMAIL ADDRESS IS: ANDERSB@JACKSONLEWIS.COM

November 15, 2012

**VIA ELECTRONIC MAIL (jessica_schau@nysd.uscourts.gov)**

Hon. Andrew J. Peck
United States Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

　　　　　　　　　Re:　　*da Silva Moore, et al. v. Publicis Groupe SA, et al.*
　　　　　　　　　　　　　Case No. 11-CV-1279

Dear Judge Peck:

　　　　　In accordance with your Order dated October 16, 2012, the parties have conferred regarding a revised schedule for e-discovery as well as regarding revisions to the ESI Protocol in light of the addition of twenty-five (25) individuals who have filed consent forms to join the conditionally-certified collective action since the Notice was mailed.[1]  Specifically, on November 5, 2012, MSL provided to plaintiff a letter setting forth its proposed revisions to the e-discovery schedule and ESI Protocol.  (See Exhibit A.)  Thereafter, on November 12, 2012, the parties participated in a telephone conference and, on November 13, 2012 at 5:37 p.m., Plaintiffs provided their proposed revisions to the e-discovery schedule and ESI Protocol.  (See Exhibit B.)  Although Plaintiffs proposed some significant changes to the ESI Protocol, MSL agreed with some of the concepts proposed by Plaintiffs.  However, MSL disagreed as to other concepts and, for some, sought clarification from Plaintiffs.  MSL provided its response to Plaintiffs the following day on November 14, 2012 at 2:30 p.m.  (See Exhibit B.)  At 8:08 p.m., Plaintiffs provided their response, disagreeing with several of the proposals submitted by MSL.  (See Exhibit B.)

---

[1] In addition to the six Named Plaintiffs identified in the Second Amended Complaint, there are 27 individuals who have filed consent forms to join this action (two filed consent forms before the Notice was mailed).  Thus, there are a total of 33 individuals who have joined the action either as Named Plaintiffs or opt-ins.  Though as noted herein, six individuals previously signed a general release and thus MSL has requested permission to strike their consents.  In accordance with Your Honor's Order, a list of all Named Plaintiffs and opt-ins is attached as Exhibit G.



As a result, there are several issues that will need to be resolved by the Court as it relates to the ESI Protocol and how it should be revised in light of the inclusion of the opt-in Plaintiffs. For ease of review, we have identified below the areas in which the parties agree, as well as those areas in which the parties disagree. In addition, there remain a number of open issues for which MSL has not received a response from Plaintiffs.

## A.    Areas Of Agreement

At present, the parties are in agreement as to the following proposed modifications to the ESI Protocol.

### 1.    Custodians (Opt-In Plaintiffs)

MSL has agreed to collect and incorporate into the database of documents to be reviewed the e-mail accounts of the opt-in Plaintiffs, subject to the open issue below regarding the scope of the search as to unasserted Title VII claims. Although there are a total of 27 opt-in Plaintiffs, on October 29, 2012, MSL submitted a letter to Judge Carter requesting permission to file a motion to strike six of the opt-in Plaintiffs because they previously signed release agreements. (See Exhibit C.) Plaintiffs have opposed MSL's request and the parties are awaiting a ruling from Judge Carter. The inclusion of these six individuals will depend on Judge Carter's ruling.

### 2.    New Random Sample

Once the additional e-mail accounts are incorporated into the database of documents to be reviewed, MSL agreed to generate a new random sample for joint review. The purpose of the new random sample is to provide the parties with an updated baseline from which to evaluate the effectiveness of the predictive coding process. At this time, MSL is seeking clarification from Plaintiffs regarding the proposed size of the random sample, since it appears Plaintiffs are requesting a Confidence Level of 95% with a Confidence Interval of +/- 5%. The ESI Protocol entered by the Court called for a Confidence Level of 95%, but a Confidence Interval of +/- 2%.

### 3.    Predictive Coding – Iterative Training Rounds

The parties have agreed that, rather than seek input from Plaintiffs after each round of predictive coding, MSL will conduct the iterative training rounds. The agreement by the parties on this aspect of the ESI Protocol should streamline the process.

## B.    Areas of Disagreement

At present, the parties disagree as to the following proposed modifications to the ESI Protocol.



### 1.    Custodians (Supervisors And Comparators)

MSL has agreed to collect and incorporate into the database of documents to be reviewed the e-mail accounts of the supervisors for the opt-in Plaintiffs, subject to the open issue below regarding the scope of the search as to unasserted Title VII claims. We calculate the number of supervisors to be 32. (See Exhibit B, p. 2.) We provided this list to Plaintiffs' counsel on November 14, 2012 and solicited their input as to any modifications or corrections they believe are necessary. In response, Plaintiffs objected to the inclusion of the opt-in Plaintiffs' supervisors and suggested that the e-mail accounts of the opt-in Plaintiffs' comparators would be more relevant and that MSL should collect the comparators' e-mail accounts instead of the supervisors. However, the Court has already ruled that the e-mail accounts of comparators need not be collected. (See Exhibit D, Transcript of February 8, 2012 Hearing at p. 31:1-5.) Additionally, Plaintiffs have not identified who the alleged comparators are that they wish to be included. MSL would agree to keep the supervisors' e-mail accounts out of the database, at Plaintiffs' request.

The opt-in Plaintiffs assert claim under the Equal Pay Act ("EPA") that they were paid less money than their male counterparts. As a result, what is likely to be most relevant to their claims are e-mail communications, if any, that contain information regarding the basis or justification for compensation decisions. Such communications would more likely be found in the supervisors' e-mail accounts than in the e-mail accounts of the opt-in Plaintiffs and certainly not in the e-mail accounts of any comparators. Furthermore, as a measure of compromise and good faith, MSL agreed after consulting with Plaintiffs to collect the e-mail accounts of the opt-in Plaintiffs and include them in the database of documents to be reviewed, as stated above, even though the e-mail of supervisors would likely result in the production of more responsive documents.

### 2.    Date Range For Collection Of Additional E-Mail Accounts

Because the maximum statute of limitation for a claim under the EPA is three years, and because the opt-in Plaintiffs filed their consent forms at various times, MSL proposed a time period of **July 1, 2009 to November 1, 2012, three years prior to the earliest opt-in form filed**. This time period will ensure that e-mail accounts are collected for a full three-year period prior to the date that each opt-in Plaintiff filed her consent form.

Plaintiffs have objected to MSL's proposed time period and assert that the end-date for the collection of e-mail accounts should extend beyond November 1, 2012 to some unidentified date in the future. Plaintiffs' proposal is inconsistent with the ESI Protocol entered by the Court on February 24, 2012, which provides a fixed date range for the collection of e-mail accounts. Specifically, the end date for the collection of e-mail accounts was February 24, 2011 – the date on which this lawsuit was commenced. The protocol entered by the Court did not contemplate that the parties would continuously recollect e-mail account and "redo" the review process at regular intervals. This issue was fully addressed by Your Honor, and after Plaintiffs' objections (see DKT No. 69) arguing the decision was "clearly erroneous," affirmed by Judge Carter (see DKT No. 86).



As previously discussed with the Court, Plaintiffs' proposal is unreasonable from a practical perspective. Given the number of custodians and the volume of documents at issue, it would be incredibly burdensome (and expensive) for MSL to replicate the process set forth in the ESI Protocol (either the original or the yet-to-be-revised protocol) at periodic intervals for the remainder of this case.

### 3.     Preparation Of Supplemental Seed Set

As of the time the Court stayed the ESI Protocol on May 14, 2012, the parties had virtually completed the preparation of the seed set. The seed set is comprised of approximately 16,000 documents. There are approximately 125 documents where the parties disagreed as to relevance. Of these 125 documents, the vast majority related to jurisdictional issues, an issue that has been fully briefed by the parties in connection with Publicis Groupe SA's motion for summary judgment. The remaining documents for which a ruling is needed fall into six general categories (i.e., maternity leave, salary review sheets, Krista Webster, Vicki Fite Performance Evaluations, Ann Arbor Trip, and Lilly (client of MSL)). As a result, once a ruling is made on these six general categories, the seed set will be complete.

Plaintiffs argue that a new or augmented seed set needs to be prepared because, according to Plaintiffs, the definition of responsiveness has changed. Although the scope of discovery has slightly changed in that documents regarding the opt-in Plaintiffs EPA claims will now be discoverable, this change does not warrant the preparation of a new seed set. Rather, based on the extensive seed set already prepared, the Axcelerate software already has a significant number of documents coded to the "Compensation" issue code (i.e., 4,360 documents).     Therefore, the Axcelerate software generally has been trained as to what a compensation document looks like and will start to return similar looking documents during the iterative training rounds.[2]  During each round of training, after the software returns suggested documents, we intend to apply filters and other tools to identify documents regarding the named and opt-in Plaintiffs so those documents can be coded. As previously mentioned in Court, we will also use other tools within the Axcelerate software to focus our review during each round of training on the most relevant documents. Therefore, it is unnecessary to further augment the seed set because the system will continue to be trained during the iterative training rounds. Moreover, MSL must ensure that the iterative training is done properly and correctly because there will be a quality control check at the end of the process.

### 4.     Preparation Of Final Production Set

Pursuant to the ESI Protocol entered by the Court on February 24, 2012, at the conclusion of the iterative training rounds and prior to the final search and production, MSL is to generate a second random sample of the remainder of the database (i.e., those documents which would not be reviewed during the final manual review of documents for relevance and privilege) (the "null set"), for the purpose of calculating the effectiveness of the predictive coding process.

---

[2] We are attempting to secure the attendance of a representative of Recommind to attend the November 20, 2012 conference and to be available to provide further clarification if requested by the Court.


**jackson|lewis**

Attorneys at Law

Hon. Andrew J. Peck
United States Magistrate Judge
November 15, 2012
Page 5

For example, the review will examine whether the null set contains any highly relevant documents and/or if it contains some relevant documents, whether they are duplicative, cumulative or "more of the same." In addition, prior to conducting the final search and review, under principles of proportionality, MSL retains the right to make an application to the Court that the number of documents it is required to review be limited. As this Court commented on May 7, 2012, the Plaintiffs are not entitled to unlimited discovery or every document conceivably relevant, rather, there would come a point where the Court would make a ruling as to what was a reasonable number of documents for MSL to have to produce based on principles of proportionality. (See Exhibit E, Transcript of May 7, 2012 Hearing at pp. 74:9-21; 82:21 – 88:23.) The Court advised Plaintiffs that there may be a cut-off, and the Plaintiffs needed to decide whether they wanted their allotted number of documents – whatever that allotted number turned out to be – to include hundreds of duplicative and marginally relevant documents. (Id.)

Plaintiffs have proposed a significant departure from the existing ESI Protocol in that they now propose that after the iterative training rounds, MSL "create a complete production set." (See Exhibit B.) The fundamental problem with Plaintiffs' proposal is that MSL likely will not be in a position to create a complete production set until it receives guidance from the Court as to what is an appropriate number of documents to produce in this case under principles of proportionality. Plaintiffs' proposal removes the important step of performing quality control through a second random sample *after* predictive coding has been completed, but *before* the final review has commenced. Under Plaintiffs' proposal, MSL would be required to go through the expensive process of conducting a final review, prior to validating the results of predictive coding through a joint review of a second random sample.

In their November 14, 2012 correspondence, Plaintiffs also mistakenly argue that MSL's proposal calls for MSL to generate and review a final random sample after it has set a cut-off for the number of documents MSL has to review and produce. To the contrary, the setting of a cut-off point will go hand in hand with the review of a final random sample for quality control purposes. That is, after MSL has completed the iterative training rounds, MSL will make a proposal to Plaintiffs as to the number of documents they believe should be reviewed *along with an explanation as to the basis for their proposal.* (See Exhibit B.) For example, based on the results of the iterative training rounds, MSL may propose that all documents within a particular issue code (*e.g.,* compensation) with a relevancy rating of 70% or higher be reviewed because that appears to be the threshold where the relevance of documents drops off. For another issue code (*e.g.,* work/life balance) the threshold – or cliff – may be at 60%. As noted by the Court on January 4, 2012, because a proportionality analysis involve an analysis of both the results as well as the costs, MSL's proposal of an appropriate cut-off point also will include an explanation of the anticipated costs. (See Exhibit F, Transcript of January 4, 2012 Hearing at pp. 49:3-50:16; 52:7-21). Finally, to validate MSL's proposed cut-off point, and prior to conducting the final review and production, MSL will generate and review a final random sample from the null set and share the results with Plaintiffs. Obviously, if that final random sample reveals the existence of highly relevant documents in the null set, then either the cut-off point will need to be modified or additional rounds of predictive will need to be run.



**5.    Appointment Of A Special Master**

Plaintiffs propose that all future disputes regarding relevancy be decided by a Special Master.  MSL disagrees with Plaintiffs' proposal. Through the development of the seed set, Your Honor has already ruled on a significant number of relevancy issues.  As a result, many of the key areas of dispute have been decided already and the boundaries of relevancy for this matter have been fairly well defined.  Moreover, given Your Honor's familiarity with the case and the nuanced issues, to the extent there are further disputes related to relevancy, we anticipate the Court is in the best position to resolve these disputes.  As the Court is aware, Plaintiffs have appealed almost every decision made by this Court.  Adding a Special Master to the mix will only provide one more level of appeals—appealing the Special Master's rulings to Your Honor, then appealing your rulings to Judge Carter.   Appointing a Special Master would undoubtedly lead to further delay.

**C.    Open Issues**

**1.    Size of Random Sample**

Plaintiffs' November 13, 2012 e-mail defines the size of the random sample as follows: "a size sufficient to ensure that it will with high probability contain sufficient responsive documents to allow estimating a 95% confidence interval on recall with a margin of error of 0.05 on a recall scale of 0.0 to 1.0."  This statement by Plaintiff is unclear.  On November 14, 2012, we asked Plaintiffs to confirm, in language consistent with the existing ESI Protocol, that what they meant to say was "a confidence level of 95% with a confidence interval of +/- 5%."  If so, then the size of Plaintiffs' proposed random sample would be smaller than that which is provided for in the current ESI Protocol (i.e., confidence level of 95% with a confidence interval of +/- 2%).  To date, Plaintiffs have not responded to MSL's request for confirmation.  In any event, MSL believes it is appropriate to have a larger random sample than presently contemplated by Plaintiffs and suggest a confidence interval of +/- 3%.

**2.    Procedure In The Event Additional E-Mail Accounts Are Added To The Database**

Plaintiffs' November 13, 2012 e-mail also contains the following proposal:  "If and when additional documents are added to the collection and evaluated for production, the procedure will be repeated, treating the new documents as a new collection to be produced from and evaluated by a new sample." In response, on November 14, 2012, MSL requested that Plaintiffs provide clarification as to what they meant by this statement. For example, it was unclear if Plaintiffs were proposing that the entire predictive coding process above would be repeated if additional e-mail accounts were added in the future.  If so, that process may be overly cumbersome depending on the volume of additional documents.  Therefore, MSL proposed that, in the event additional e-mail collections will need to be reviewed, the parties should meet and confer regarding an appropriate review method based on the number of documents at issue.  We have not heard back from Plaintiffs regarding our proposal.



**3.    Scope Of Title VII Discovery**

During the parties' meet and confer teleconference on November 12, 2012, Plaintiffs' counsel asserted that even though the opt-in Plaintiffs asserted only EPA claims, MSL should expand the scope of the review to include a search for documents regarding potential Title VII claims by the opt-in Plaintiffs that have not yet been asserted. MSL believes Plaintiffs' request is premature because Plaintiffs have not provided any description of these alleged Title VII claims; therefore, *even if* MSL were to agree to expand the search as requested, which MSL has not done, the e-mail could not possibly be reviewed for responsiveness nor could MSL determine the relevancy of documents regarding claims that have not been asserted. In an effort to further consider Plaintiffs' position and evaluate whether a compromise could be reached on the issue of Title VII discovery, on November 13, 2012, MSL requested that Plaintiffs advise as the nature of each of the opt-in Plaintiff's potential Title VII claims. (See Exhibit B.) This request was necessitated by Plaintiffs' counsel's statement that the opt-in Plaintiffs have varying forms of Title VII claims *(i.e.,* some have alleged failure to promote claims, others have pregnancy claims, etc.). To date, Plaintiffs have not responded to our request. If and when Plaintiffs assert the nature of their purported, but unasserted, Title VII claims, MSL will further consider this issue.

**4.    Proposed Modification To The ESI Schedule**

The existing schedule as set forth in the Court's April 13, 2012 Order provided the parties with approximately 170 days to complete the ESI Process, starting with the production of the Initial Random Sample on March 21, 2012 and concluding with the final document production on September 7, 2012. Although Plaintiffs have not responded to MSL's most recent proposal concerning a revised e-discovery, the two proposals only vary by 15 days and, the longer of the two proposals calls for the process to be completed in 135 days.

MSL's proposal for a revised e-discovery schedule is as follows:

| | |
|---|---|
| 30 Days: | Parties review new random sample and resolve any disputes regarding relevancy designations. |
| 30 Days: | MSL to conduct iterative rounds of predictive coding. |
| 30 Days: | Parties review final random sample to validate predictive coding. |
| 30 Days: | Final review of the top-ranked documents (i.e., the number of documents to either be agreed to by the parties or ordered by the Court to be reviewed). |
| 15 Days: | Privilege review and production. |

\*   \*   \*   \*   \*


Attorneys at Law

We thank the Court for its consideration of the above.

Respectfully submitted,

JACKSON LEWIS LLP

Brett M. Anders

BMA:jg
Enclosures

cc:     All counsel of record (via e-mail)(w/encl.)

4842-4386-1009, v. 1

# EXHIBIT A

Representing Management Exclusively in Workplace Law and Related Litigation

# jackson lewis

Attorneys at Law

| | | | |
|---|---|---|---|
| Jackson Lewis LLP | ALBANY, NY | DETROIT, MI | MINNEAPOLIS, MN | PORTSMOUTH, NH |
| 220 Headquarters Plaza | ALBUQUERQUE, NM | GREENVILLE, SC | MORRISTOWN, NJ | PROVIDENCE, RI |
| East Tower, 7th Floor | ATLANTA, GA | HARTFORD, CT | NEW ORLEANS, LA | RALEIGH-DURHAM, NC |
| Morristown, NJ 07960-6834 | AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | RICHMOND, VA |
| Tel 973 538-6890 | BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SACRAMENTO, CA |
| Fax 973 540-9015 | BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAINT LOUIS, MO |
| www.jacksonlewis.com | BOSTON, MA | LAS VEGAS, NV | ORANGE COUNTY, CA | SAN DIEGO, CA |
| Richard J. Cino - Managing Partner | CHICAGO, Il | LONG ISLAND, NY | ORLANDO, FL | SAN FRANCISCO, CA |

Direct Dial: 973-451-6305
Email Address: andersb@jacksonlewis.com

CINCINNATI, OH · LOS ANGELES, CA · PHILADELPHIA, PA · SEATTLE, WA
CLEVELAND, OH · MEMPHIS, TN · PHOENIX, AZ · STAMFORD, CT
DALLAS, TX · MIAMI, FL · PITTSBURGH, PA · WASHINGTON, DC REGION
DENVER, CO · MILWAUKEE, WI · PORTLAND, OR · WHITE PLAINS, NY

November 5, 2012

**VIA ELECTRONIC MAIL**
Deepika Bains, Esq.
Sanford Heisler, LLP
1350 Avenue of the Americas
31st Floor
New York, NY 10019

Re:    da Silva Moore et al. v. Publicis Groupe SA, *et al.*
        Case No. 11-CV-1279

Dear Deepika:

As you know, the Court has required the parties to submit a revised ESI schedule by November 15, 2012. Therefore, we would like to schedule a teleconference to discuss proposed revisions to the ESI schedule and protocol. Please advise if you are available in the late afternoon on November 7, 2012.

In advance of our meet and confer session, the following is our proposal for modifying the ESI schedule and protocol:

First, we are in the process of having our client collect the e-mail accounts of the opt-in Plaintiffs and their supervisors. Under separate cover we will provide you with the names of the individuals we understand to be the supervisors, so that you can provide input.

Second, the time period for the e-mail account collection will be July 1, 2009 to November 1, 2012. While this time period will be over-inclusive for some opt-in Plaintiffs, it is expansive enough to cover the longest potential statute of limitations period for each opt-in Plaintiff.

Third, although we are collecting the e-mail accounts of the opt-in Plaintiffs, at this point, it may be unnecessary to include their e-mail accounts in the database of documents to be searched (i.e., the "review set"). Because the opt-in Plaintiffs' claims are limited to claims under the Equal Pay Act, the benefit of searching their individual e-mail accounts may be outweighed by the burden and expense of conducting such searches, as well as the fact that the discovery may be more easily obtained from some other sources. We will reassess after we have more information regarding the quantity of documents contained within the e-mail accounts and the anticipated cost of incorporating those accounts into the review set.

Fourth, once the supervisors' e-mail accounts are added to the review set, we will review a new random sample taken from the updated database. Not only will the results be



Deepika Bains, Esq.
Sanford Heisler, LLP
November 5, 2012
Page 2

incorporated in the seed set, but it will also provide the parties with an updated baseline from which to gauge the effectiveness of the predictive coding process.

Fifth, as it relates to the revised schedule, Judge Peck has instructed the parties that the schedule cannot be longer or more expansive than the prior schedule. Therefore, we propose that the new schedule follow the same format and timing as the original schedule. We will provide specific dates under separate cover, however, the general time frame will be as follows:

| | |
|---|---|
| 30 Days | Review new random sample. |
| 90 Days | Conduct iterative rounds of predictive coding. |
| 14 Days | Review of final random sample to validate predictive coding results. |
| 21 Days | Review of documents identified through predictive coding and production. |

As it relates to the above schedule, one variable that will impact the start date on which the process can start will be the amount of time it takes to collect the various e-mail accounts. That is, we cannot start the process of reviewing a new random sample until the additional e-mail accounts have been collected and processed. As soon as we have more information regarding the anticipated length of time for collection, we will advise you.

In the meantime, please advise whether you are available on Wednesday, November 7, 2012 to discuss the above.

Thank you.

Very truly yours,

JACKSON LEWIS LLP

Brett M. Anders

BMA:jg
cc:    Janette Wipper, Esq. (via electronic mail)
       Siham Nurhussein, Esq. (via electronic mail)
       George Stohner, Esq. (via electronic mail)
       Paul C. Evans, Esq. (via electronic mail)
       Victoria Woodin Chavey, Esq. (via electronic mail)
       Jeffrey Brecher, Esq. (via electronic mail)

# EXHIBIT B

## Anders, Brett M. (Morristown)

| | |
|---|---|
| **From:** | Siham Nurhussein <SNurhussein@sanfordheisler.com> |
| **Sent:** | Wednesday, November 14, 2012 8:08 PM |
| **To:** | Anders, Brett M. (Morristown) |
| **Cc:** | Susan Rubenstein; Janette Wipper; Brecher, Jeffrey W. (Long Island); Chavey, Victoria Woodin (Hartford) |
| **Subject:** | RE: da Silva Moore |

Brett,

Thanks for circulating your proposed custodian list and for your comments on Plaintiffs' proposed changes to the ESI protocol.

Re: the custodians, MSL and Plaintiffs agree that the collection will have to expand given that there are 26 new opt-in Plaintiffs. The only question appears to be which individuals' email accounts should be added to the collection. Regardless of who the additional custodians are, we interpret your email as agreeing to the addition of up to 20 new custodians (not including the 26 opt-in Plaintiffs, whose email accounts you have also agreed to add). Based on a cursory review of the custodian list that you just circulated this afternoon, we do not agree with the inclusion of most of the "supervisors" on your list. MSL previously suggested that e-discovery should be limited to the opt-in Plaintiffs' claims under the EPA; by this logic, the e-mail accounts of the opt-in Plaintiffs and their comparators (not their supervisors) would be the most relevant sources of data. Accordingly, please let us know if you agree to the inclusion of the opt-in Plaintiffs' comparators in lieu of their supervisors.

Re: your comments on our proposal, we are pleased that both parties agree that the addition of 26 opt-in plaintiffs necessitates some changes to the protocol. We are still in the process of reviewing your comments with our experts. However, based on our preliminary review, it appears that there are some major areas of dispute. These include:

- - MSL's position that "the preparation of a new seed set is not necessary." Plaintiffs believe that, now that the collection is being expanded significantly and the definition of responsiveness has changed (based on the addition of the new opt-in plaintiffs), the system must be re-trained by drawing a new seed set from the updated collection (to be jointly reviewed by the parties).
- - MSL's proposal to draw the final random sample from the null set rather than the entire collection. Plaintiffs believe only the latter approach will allow the parties to properly assess the effectiveness of the predictive coding review.
- - MSL's proposal to generate and review a final random sample *after* it has set a cutoff for the number of documents MSL has to review and produce. Plaintiffs believe this approach is backwards, and that a decision cannot be made as to the cutoff before the quality control stage.

At a minimum, our proposal is contingent on the inclusion of the above three components. Accordingly, please let us know by 10am tomorrow whether you will reconsider your position on these points. If not, Plaintiffs propose that the parties submit separate proposals to the Court tomorrow given the time constraints and the fundamental differences in our respective approaches.

Thanks,

Siham

**From:** Anders, Brett M. (Morristown) [mailto:AndersB@JacksonLewis.com]
**Sent:** Wednesday, November 14, 2012 2:30 PM
**To:** Siham Nurhussein

**Cc:** Susan Rubenstein; Janette Wipper; Brecher, Jeffrey W. (Long Island); Chavey, Victoria Woodin (Hartford)
**Subject:** RE: da Silva Moore

Siham,

Please see our responses to your proposal below.  As you will see, there are a few areas where we disagree as well as a few areas where we need clarification from you.  To that end, please provide clarification as soon as possible.

In addition, and as previously discussed, the following is a list of the individuals we understand supervised the opt-in Plaintiffs and whose e-mail accounts we intend to collect.  Please advise as soon as possible if you have any proposed modifications or corrections to this list.

1. Stephanie Smith
2. Jeanine O'Kane
3. Matt Gardner
4. Joe Carberry
5. Bill Orr
6. Anne DeSchweinitz
7. Kelly Dencker
8. Katie Adams
9. Joel Curran
10. Ellen F. Schneidau
11. Wendy Lund
12. Margy Meislin
13. Stephanie Koze
14. Michael Morsman
15. Tom Vickery
16. Chuck Alston
17. Renee Wilson
18. Rob Baskin
19. Kyle Farnham
20. Catherine Falcetti
21. Elise Titan
22. Don Hannaford
23. Jim Tsokanos
24. Neil Dhillon
25. Bruce Mackenzie
26. Vicki Fite
27. Kelly Walsh
28. Christine Abbott
29. David Bashaw
30. Anita Bose
31. Caryn Carmer Previdi
32. Dan McGinn

Please get back to me as soon as possible since we need to respond to Judge Peck by tomorrow, November 15, 2012.

Brett M. Anders
Attorney at Law
Jackson Lewis LLP
220 Headquarters Plaza

East Tower, 7th Floor
Morristown, NJ 07960

973-451-6305 | Direct
973-538-6890 | Main
973-540-9015 | Fax

andersb@jacksonlewis.com

www.jacksonlewis.com
**Representing management exclusively in workplace law and related litigation.**
**Confidentiality Note:**  This e-mail, and any attachment to it, contains privileged and confidential information intended
only for the use of the individual(s) or entity named on the e-mail.  If the reader of this e-mail is not the intended recipient,
or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is
strictly prohibited.  If you have received this e-mail in error, please immediately return it to the sender and delete it from
your system.  Thank you.

**From:** Siham Nurhussein [mailto:SNurhussein@sanfordheisler.com]
**Sent:** Tuesday, November 13, 2012 5:36 PM
**To:** Brecher, Jeffrey W. (Long Island); Susan Rubenstein
**Cc:** Anders, Brett M. (Morristown); Chavey, Victoria Woodin (Hartford); Janette Wipper
**Subject:** RE: da Silva Moore

Hi Jeff,

Following up on our call yesterday, we are providing you with our proposed changes to the ESI protocol. As we noted
yesterday, we believe the current protocol needs to be tweaked in light of the addition of 26 new opt-in plaintiffs. Since
the existing protocol has proven to be unexpectedly time-consuming as well as burdensome to the parties and the
Court, we also propose streamlining the process via a much simpler protocol. Our proposal, set out below, will reduce
the number of joint steps from 9 to 2 while shortening the time schedule:

a.   MSL will update its database to include, e.g.:

The addition of all opt-in plaintiffs as custodians (26 additional custodians). **MSL Response:  We will agree to the
inclusion of the opt-in Plaintiffs as custodians in the database of documents to be reviewed.  However, as set forth in
our October 29, 2012 letter to Judge Carter, we do not believe the following individuals should be included as opt-in
Plaintiffs, and thus, custodians: Ellyn Caravetta, Maryanne Caruso, Margy Meislin, Lori Laurent Smith, Erica Bersin and
Laura Hall.  Therefore, we will await the Court's guidance as to whether these individuals are proper opt-in Plaintiffs
and, correspondingly, whether they should be included as custodians for purposes of e-discovery.**
Broader temporal scope to capture discoverable information from the new opt-in plaintiffs, some of whom are current
employees. Consistent with FRCP 26(e), MSL should supplement its ESI production beyond its proposed end-date for the
collection of e-mail accounts (November 1, 2012). **MSL Response:  We do not agree to further extending the collection
period beyond November 1, 2012.**

b.   MSL will produce a new random sample for joint review, which will "provide the parties with an updated baseline from
which to gauge the effectiveness of the predictive coding process." Letter, B.M. Anders to D. Bains, November 5, 2012.
MSL will also produce a new set of seed set documents for joint review. To minimize the burden on the Court, any
disputes regarding the coding of the jointly reviewed documents (initial random sample and seed set) will be resolved by
a Special Master, to be agreed upon by the parties. **MSL Response:  We will agree to producing a new initial random
sample.  Please confirm that you propose a Confidence Level of 95% with a Confidence Interval of +/- 5% for the size
of the random sample. (See comment below.)  As it relates to a new seed set, we have been advised that the
preparation of a new seed set is not necessary.  The current seed set comprises of approximately 16,000 documents
which we understand is sufficient for the initial training of the software.  As we conduct the iterative training rounds,**

we will use the various tools within Axcelerate to further train the software as to the inclusion of the opt-in Plaintiffs. However, in light of your statement that the opt-in Plaintiffs have varying forms of Title VII claims (e.g., failure to promote, pregnancy, etc.), for each opt-in Plaintiff, please provide us with a summary of the nature of their Title VII claims. This information is necessary to enable us determine the types of documents which may be relevant to their alleged claims. We will need this information prior to starting the review of the new initial random sample. Lastly, we do not agree to the use of a Special Master. Practically speaking, Judge Peck has already ruled on a significant number of relevancy issues which were brought to the Court's attention through the development of the seed set. As a result, the key areas of dispute have been ruled on already and, based on his intimate knowledge of the case, any further disputes as it relates to relevancy can be resolved relatively quickly.

a.  MSL will create a complete production set using whatever methods and procedures it deems appropriate, including, should it so desire, consulting Plaintiffs as to relevancy, etc. **MSL Response: This is acceptable to the extent that it contemplates that MSL will be responsible for conducting the iterative rounds of training. However, given the parties' disagreements regarding proportionality and the appropriate number of documents to be reviewed/produced when weighing the benefit versus the burden and expense, a final production set cannot be completed until after the parties agree, or obtain a ruling from the Court, concerning the appropriate number of documents to be manually reviewed for final production. As you may recall, Judge Peck clearly stated that he would apply the principles of proportionality to this case and that he would make a threshold determination as to the number of documents that MSL had to review and produce. Therefore, MSL proposes that after it completes the iterative rounds of predictive coding, it makes a proposal as to the number of documents to be reviewed for production (e.g., the top ranked 40,000 documents – or whatever number agreed to by the parties or determined by the court). MSL will provide an explanation as to the basis for its proposal. At that point, but prior to final review and production, MSL will generate and the parties will review a second random sample comprised of the remaining documents (e.g., everything other than the top-ranked 40,000 documents – or whatever number agreed to by the parties or determined by the court) to determine whether it contains any relevant documents and, if so, the nature of those documents (e.g., are they highly relevant or "more of the same.")**

b.  Upon completion of the production set, MSL will generate

   a simple random sample from the entire collection, produced and unproduced, of a size sufficient to ensure that it will with high probability contain sufficient responsive documents to allow estimating a 95% confidence interval on recall with a margin of error of 0.05 on a recall scale of 0.0 to 1.0; **MSL Response: As set forth above, we believe this random sample should be conducted prior to the final review of documents, especially since the parties may need guidance from the Court regarding appropriate number of documents to be reviewed. Also, our position is that this random sample should be drawn from the "null set" or those documents we do not intend to manually review as part of the final review process. Lastly, please confirm that, as it relates to the size of the random sample, what you mean to say is that we will use a sample size that will allow a standard statistical Confidence Level of 95% and a Confidence Interval of +/-5%.**
   a list specifying the unique ID of every document in the simple random sample and whether or not it is included in the production set; **MSL Response: This is moot in light of the comment above that the random sample be drawn from the null set.**
   a list specifying the unique ID of every document in the collection and the score or scores assigned to it by the final predictive model or models used by MSL. **MSL Response: We will need to get back to you regarding this proposal. In theory, it is acceptable, however, we may need to modify the language.**

c.  Representatives of the parties will make a responsiveness determination on each document in the simple random sample. Documents in the simple random sample should be reviewed in a random order, and neither the production status nor the score(s) assigned by predictive modeling should displayed to personnel making responsiveness assessments. Any disputes regarding the coding of the final random sample will be resolved by a Special Master. **MSL Response: Generally, this is acceptable. However, for the reasons mentioned above, we do not agree to the use of a Special Master. Also, the production of all documents within the random sample to Plaintiffs' counsel is with the understanding that any privileged documents or any highly sensitive non-responsive documents may be withheld.**

d. Each party will make whatever statistical calculations it deems appropriate based upon the responsiveness determinations and production set inclusion status, including recall, precision, elusion, etc. **MSL Response: This is acceptable.**

e. Based on the estimates of production set effectiveness from the random sample, a determination will be made as to whether further searching for responsive documents is necessary. Any disputes regarding this issue will be resolved by the Court. **MSL Response: As set forth above, MSL's position is that this should be done prior to the final manual review of documents.**

f. If and when additional documents are added to the collection and evaluated for production, the procedure will be repeated, treating the new documents as a new collection to be produced from and evaluated by a new sample. **MSL Response: Can you explain further what you mean by this statement? For example, are you stating that if additional e-mail accounts are added in the future, the process above will be repeated? If so, that process may be overly cumbersome depending on the volume of additional documents. In the event that additional e-mail collections will need to be reviewed, the parties should meet and confer regarding an appropriate review method based on the number of documents at issue.**

With the abovementioned tweaks to the protocol, the parties should be able to complete the e-discovery process much more quickly. We propose the following timetable:

30 Days:      Parties review new random sample and seed set documents

30 Days:      MSL to conduct iterative rounds of predictive coding **MSL Response: This is acceptable.**

60 Days:      Parties review final random sample to validate predictive coding **MSL Response: This should be reduced to 30 days, and then an additional 30 days should be allocated to the final review of the top-ranked documents (the number of documents to either be agreed to by the parties or ordered by the court).**

5 Days:       Automated privilege review and production. **MSL Response. We do not agree to an automated privilege review. As a result, this period should be increased to 15 days.**

Please let us know as soon as possible whether you agree with the proposal outlined above. If there are particular aspects with which you disagree, please indicate so and provide your reasons.

Thanks,
Siham

**From:** Brecher, Jeffrey W. (Long Island) [mailto:BrecherJ@jacksonlewis.com]
**Sent:** Monday, November 12, 2012 5:09 PM
**To:** Susan Rubenstein; Siham Nurhussein
**Cc:** Anders, Brett M. (Morristown); Chavey, Victoria Woodin (Hartford)
**Subject:** da Silva Moore

Susan—

Confirming our conversation today, you will speak with your expert regarding our November 5, 2012 letter and provide us with changes to our proposal or the ESI protocol suggested by your expert. Because we must submit a letter to Judge Peck on November 15, please get back to us as soon as possible so we have an opportunity to review with our expert. Also, you agreed to provide us with a list of supervisors for the opt-in Plaintiffs so we can discuss collecting their e-mail. Thanks.

**Jeffrey W. Brecher**
**Jackson Lewis LLP**
**58 South Service Road, Suite 410**
**Melville, NY 11747.**
**Phone:  (631) 247-4652**
**Fax:  (631) 247-0417 or 0418**
brecherj@jacksonlewis.com

Representing management exclusively in workplace law and related litigation

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

Brett M. Anders
Attorney at Law
Jackson Lewis LLP
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, NJ 07960

973-451-6305 | Direct
973-538-6890 | Main
973-540-9015 | Fax

andersb@jacksonlewis.com

www.jacksonlewis.com
**Representing management exclusively in workplace law and related litigation.**

**Confidentiality Note:**  This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail.  If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited.  If you have received this e-mail in error, please immediately return it to the sender and delete it from your system.  Thank you.

# EXHIBIT C

# jackson|lewis

Representing Management Exclusively in Workplace Law and Related Litigation

Attorneys at Law

**Jackson Lewis LLP**
**90 State House Square**
**8th floor**
**Hartford, CT 06103**
**Tel. 860-522-0404**
**Fax. 860-247-1330**
**www.jacksonlewis.com**

| | | | |
|---|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MORRISTOWN, NJ | PORTSMOUTH, NH |
| ALBUQUERQUE, NM | HARTFORD, CT | NEW ORLEANS, LA | PROVIDENCE, RI |
| ATLANTA, GA | HOUSTON, TX | NEW YORK, NY | RALEIGH-DURHAM, NC |
| AUSTIN, TX | INDIANAPOLIS, IN | NAPA, CA | RICHMOND, VA |
| BALTIMORE, MD | JACKSONVILLE, FL | NORFOLK, VA | SACRAMENTO, CA |
| BIRMINGHAM, AL | LAS VEGAS, NV | OMAHA, NE | ST. LOUIS, MO |
| BOSTON, MA | LONG ISLAND, NY | ORANGE COUNTY, CA | SAN DIEGO, CA |
| CHICAGO, IL | LOS ANGELES, CA | ORLANDO, FL | SAN FRANCISCO, CA |
| CINCINNATI, OH | MEMPHIS, TN | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | MIAMI, FL | PHOENIX, AZ | STAMFORD, CT |
| DALLAS, TX | MILWAUKEE, WI | PITTSBURGH, PA | WASHINGTON DC REGIO |
| DENVER, CO | MINNEAPOLIS, MN | PORTLAND, OR | WHITE PLAINS, NY |
| DETROIT, MI | | | |

MY DIRECT DIAL IS: 860-331-1534
MY EMAIL ADDRESS IS: VICTORIA.CHAVEY@JACKSONLEWIS.COM

October 29, 2012

**VIA E-MAIL:** ALCarterNYSDChambers@nysd.uscourts.gov

Hon. Andrew L. Carter, Jr.
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:   *da Silva Moore, et al. v. Publicis Groupe SA, et al.*
      **Case No. 11-CV-1279;**
      **Defendant's Request for Pre-Motion Conference**

Dear Judge Carter:

    We represent Defendant, MSLGROUP Americas, Inc. ("MSL"), sued herein as MSLGroup. In accordance with Rule 2(A) of your Individual Rules, we write to request a pre-motion conference. We seek to file a motion to strike the opt-in consents of six individuals who signed valid release agreements in which they waived the very claims they seek to pursue in this case. These six individuals are: Erica Beth Bersin, Ellyn Caravetta, Maryanne Caruso, Laura Hall, Margy Lucas Meislin, and Lori Laurent Smith (collectively, "Opt-Ins").

    Plaintiffs could obviate the need for this requested motion if they withdraw the consents they improperly filed in breach of the Release Agreements. If Plaintiffs do not withdraw the improper consents, however, MSL will be forced to pursue the requested motion, and this Court should strike the consents pursuant to established law.

## I.    Background

    On June 29, 2012, the Court granted Plaintiffs' motion for conditional certification of the Equal Pay Act ("EPA") collective action. Plaintiffs raised the issue of the inclusion of those who previously signed releases for the first time in a belated status report submitted to the Court on July 25, 2012. In response, MSL objected to the inclusion of any putative member of the collective action who had signed a release and pointed out at that time that Plaintiffs had not

previously objected to the exclusion of individuals who signed releases, even though MSL advised the Court that individuals who signed releases were excluded from the list of individuals scheduled to receive a mailing of the Notice. *See* Tr. July 20, 2012, pp. 23-24 ("Judge, we have no objection to using a third-party administrator. Our proposal would be we were to collect the names. Like I said, there's about 125 individuals who we believe would fall in the definition. These are individuals who held those titles, and having[1] signed a release upon their termination."). Plaintiffs also did not object or otherwise raise this issue at the court conference held on July 20, 2012, during the parties' meet and confer on July 25, 2012 or during their numerous communications between July 20, 2012 and July 25, 2012 regarding the content and form of the Notice.

When MSL objected to the inclusion of such individuals in response to Plaintiffs' status report, Plaintiffs argued it was premature to exclude these individuals from receiving Notice. On August 2, 2012, the Court issued an Order that the names of those who signed releases should be included in the mailing, but expressly reserved its ruling regarding whether individuals who signed releases would be permitted to proceed, (*see* Dkt. #266 "The Court reserves the question of the exclusion of these employees from the collective action for a subsequent date"), likely anticipating the issue would be moot if none who signed a release filed a consent form. But six have, and the issue is now ripe. These six individuals are: Erica Beth Bersin, Ellyn Caravetta, Maryanne Caruso, Laura Hall, Margy Lucas Meislin, and Lori Laurent Smith.

## II.   The Consents Should Be Stricken Because The Opt-Ins Knowingly And Voluntarily Waived Their Equal Pay Act Claims Pursuant To Release Agreements

"It is clear that a plaintiff may waive a claim under Title VII (and, by extension, under the Equal Pay Act) as part of a voluntary settlement, provided that her consent to the release was voluntary and knowing." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 532 (7th Cir. 1996), *citing Riley v. American Family Mutual Ins. Co.*, 881 F.2d 368, 371 (7th Cir. 1989); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n. 15 (1974); *see also Benson v. Nynex, Inc.*, 2001 U.S. Dist. Lexis 6945 (S.D.N.Y. May 31, 2001) (granting summary judgment to employer in EPA claim where employee signed a release); *Cordoba v. Beau Dietl & Associates*, 2003 WL 22902266, at *4 (S.D.N.Y. Dec. 8, 2003) ("[A]n employee may validly waive a discrimination claim so long as the waiver is made knowingly and voluntarily") (citations omitted).

Courts in this district routinely dismiss complaints on 12(b)(6) motions where, as here, the plaintiff signed a valid release. *See, e.g., Laramee v. Jewish Guild for the Blind*, 72 F.Supp.2d 357, 360 (S.D.N.Y. 1999) (granting motion to dismiss employment discrimination complaint because plaintiff signed release); *Kramer v. Vendome Group LLC*, 2012 WL 4841310, at *3 (S.D.N.Y. Oct. 4, 2012) (same). Because the six Opt-Ins identified above signed releases, the Court should strike these consents.

---

[1] This is an error in the transcription; "having" should be "have not".

Hon. Andrew L. Carter, Jr.<br>
United States District Judge<br>
October 29, 2012<br>
Page 3

Very truly yours,

JACKSON LEWIS LLP

/s/

Victoria Woodin Chavey

cc:    All counsel of record (via e-mail)
           Magistrate Judge Peck (via fax)

# EXHIBIT D

1

```
C28rdasc
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   MONIQUE DA SILVA MOORE, et al.,
 3
 4              Plaintiffs,
 4
 5          v.                          11 Civ. 1279 (ALC)
 5
 6   PUBLICIS GROUPE and MSL GROUP,
 6                                      Conference
 7              Defendants.
 7
 8   ------------------------------x
 8
 9                                      New York, N.Y.
 9                                      February 8, 2012
10                                      3:00 p.m.
10
11   Before:
11
12          HON. ANDREW J. PECK
12
13                                      Magistrate Judge
13
14
14
15          APPEARANCES
15
16
16
17   SANFORD WITTELS & HEISLER LLP
17          Attorneys for Plaintiffs
18   BY:  JANETTE L. WIPPER (tel.)
18        DEEPIKA BAINS
19        SIHAM NURHUSSEIN
19
20
20   JACKSON LEWIS LLP
21          Attorneys for Defendants
21   BY:  JEFFREY W. BRECHER
22        BRETT M. ANDERS
22
23
23   ALSO PRESENT:
24
24        PAUL J. NEALE
25        DAVID BASKIN
25
```

C28rdasc

1    promotion, including the pay freeze, we think those especially.
2          THE COURT:  Slow down one minute.  Which exhibit is
3    your custodian list?
4          MS. BAINS:  The custodians are listed at the beginning
5    of page 17 of the protocol.
6          THE COURT:  Thank you.  How many of these 44, or we
7    are now down to 43, are ones that are in dispute?
8          MS. BAINS:  There are 7.  Start with the ones that are
9    starred with the comparators that the parties agreed last time
10   and defense counsel represented to the Court that we would cull
11   down those database sets before adding them to Axcelerate.  It
12   seems that defense counsel has withdrawn that.
13         THE COURT:  Let's deal with the 7 comparators.
14         MR. ANDERS:  Thank you, your Honor.  If you look at
15   the record of the last time we were here, we did not agree to
16   do anything.  What we agreed was that we would first take a
17   look at those accounts and then make the decision.  We were
18   willing to consider.  We never made an affirmative agreement to
19   do anything.
20         Our current position is for these additional people,
21   we don't believe they should be included as it relates to the
22   comparators.  Our feeling is that as comparators, we don't see
23   what in their email accounts could be of relevance to decisions
24   made about them.  Certainly emails from higher-ups about their
25   employment, we have those people.  But I don't see what in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
                                                           26
        C28rdasc
1    comparators' email account could be relevant.
2               THE COURT:  Ms. Bains?
3               MS. BAINS:  On that theory there is a comparator
4    already on the defendants' list, number 6, Kelly Dencker.  If
5    we are going to throw out all comparators, we would like to get
6    in all decision-makers instead of taking up a spot.
7               THE COURT:  There is no magic number.  If you're
8    telling me you don't want Kelly Dencker even though they wanted
9    it, I'm sure they are going to be happy to reduce the list, and
10   that will make their list 29 subject to whoever gets added.  So
11   be careful what you wish for.  Let's erase Kelly Dencker.  Do
12   you want Kelly Dencker or not?
13              MS. BAINS:  We want Kelly Dencker if we are going to
14   include comparators.
15              THE COURT:  Tell me about comparators, what it is that
16   means when you run the same email search.
17              I have another case that we have stalled a few times
18   and it is now their turn.  I'm going to put you on hold, Ms.
19   Wipper.  Ms. Wipper, you're going to have to be disconnected.
20   You can call back in 15 minutes.
21              MS. WIPPER:  OK, your Honor.
22              (Recess)
23              MS. BAINS:  I think we were talking about comparators.
24   We think that the comparators are important because their
25   emails will contain important discussion of their job duties,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

C28rdasc

1    which is directly relevant to the claims, especially for the
2    EPA claims.
3            THE COURT:  Aren't you better off deposing?  Is there
4    any dispute as to what their job duties are?
5            MS. BAINS:  Yes.  In the depositions of the
6    plaintiffs, already plaintiffs have claimed that some men were
7    comparators, and the questioning was geared towards showing
8    that those particular men were not their comparators based on
9    their job duties, etc.
10           THE COURT:  I guess my question is, and I'd have to go
11   back and look at all your predictive coding approach to this,
12   unless you run the comparators as a separate unit, are all the
13   other things you're asking for the other 30-plus relevant from
14   the comparators?  And by asking for job responsibility type
15   information through an email search, are you then getting that
16   from everybody, including the president of the company?  I'm
17   not quite sure how, since you want different things from these
18   people, that would work out.
19           MS. BAINS:  We propose to do a targeted search before
20   adding the comparators so that they would be culled down to
21   just the issues that would be relevant to comparators before
22   they are added.
23           THE COURT:  How are you targeting that search, so to
24   speak?
25           MS. BAINS:  We wanted to give search terms to defense

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

28

C28rdasc

1  counsel, but then defense counsel said they were taking them
2  off completely.  We would like to create a search term list to
3  apply to the comparators' mailboxes before they are added to
4  the Axcelerate system and subjected to predictive coding.
5              THE COURT:  Then what?
6              MS. BAINS:  Subject them to predictive coding.
7              THE COURT:  Subjecting them to predictive coding,
8  unless you are searching their data for this, you are reducing
9  the volume, but that means that whatever the words are or the
10 seeds are is going to run across all 37 to 44 people.  It makes
11 no sense to me.  If you want to get your ESI consultant help me
12 out, that's fine.
13             MS. BAINS:  Yes, please.
14             MR. NEALE:  Your Honor, Paul Neale.  I think in this
15 instance the way to address that would be to add another
16 category to the seed set review that would relate to the issues
17 associated with the comparators.
18             THE COURT:  What I think I'm hearing, and maybe I'm
19 wrong here, it seems to me that the search of the comparators
20 data is totally different from the search of everybody else.
21             MR. ANDERS:  Your Honor, not only is it totally
22 different, but if they are looking for emails which would tend
23 to show their job duties, that is going to be most of their
24 emails.  Conceivably, there will be emails saying do you want
25 to handle this meeting or here is a PowerPoint for the next

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

C28rdasc

1    presentation.  I am having difficulty even understanding how we
2    would find those types of emails.  It is almost every email
3    related to their job and what they are doing.
4         THE COURT:  Mr. Neale?
5         MR. NEALE:  I think there are two approaches here,
6    your Honor.  We will discuss predictive coding, but the random
7    sampling of the total document set will bring documents up
8    regardless of what search term they were or weren't responsive
9    to, so you will see comparator data during that process.
10        THE COURT:  This is a case where the plaintiffs worked
11   at the company.  What is it that you expect to see in the
12   comparators' email that is relevant?  Describe the concepts to
13   me.  Frankly, I don't disagree that whether they are
14   comparators or not is a relevant issue, but I don't see why, if
15   you want to find out what their job duties were and these
16   people have no stake in the case, you don't just take their
17   deposition.
18        MS. BAINS:  We do want to take their depositions.  To
19   answer your question about the specific things we would be
20   looking for, for example, one of the plaintiffs testified about
21   her job duties, including client contact.  We would look for
22   client contact in the comparators.
23        THE COURT:  That's ridiculous.  That means basically
24   forget sophisticated searches, any email from one of these
25   comparators to or from a client is relevant?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

C28rdasc

1      MS. BAINS:  I mean on the substantive issues regarding
2  contacts.
3      THE COURT:  How do you train a computer for that?  How
4  do you do a key word on that?  I'm having a very hard time
5  seeing what it is you expect.  You've got the plaintiffs'
6  emails.  If you don't have their emails, you have their memory
7  of them.  If comparator whoever, Kelly Dencker, I don't know if
8  that is a he Kelly or a she Kelly, but if Kelly wrote to a
9  client and said, I'd like to meet with you next week to discuss
10  the following presentation, that's what you're looking for?
11      MS. BAINS:  That would be part of it.
12      THE COURT:  What else?  You keep giving me this is
13  part of it.  If you want me to order this done, you've got to
14  tell me how it is that it could be done in a reasonable way.
15      MS. BAINS:  I think we could treat the comparators as
16  a separate search.
17      THE COURT:  Then what is that search going to be?
18  Also, by the way, we've gone from throw the comparators into
19  the bundle but do a little key word screening first to reduce
20  volume to now we are at the let's do the comparators separate,
21  and I'm still not hearing how you're going to search through
22  their emails separately.
23      MS. BAINS:  One of our allegations is that they were
24  given opportunities, including job assignments, etc., that
25  plaintiffs weren't.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

C28rdasc

1          THE COURT:  That is basically every substantive email,
2     every business email they have.  All right, comparators are out
3     at this time without prejudice to you coming up with some
4     scientific way to get at this.  Otherwise, take the deposition
5     and go from there.
6          I think we are down to six or seven where you
7     disagree.
8          MS. BAINS:  There are about eight.  All of the other
9     eight are managing directors or the CEO, former CEO, of the
10    company.
11         THE COURT:  If the former CEO is before the time
12    period that you allege the discrimination started --
13         MS. BAINS:  It's within the class period.
14         THE COURT:  When was the last time the former CEO was
15    the CEO?
16         MS. BAINS:  2009.
17         MR. ANDERS:  April '09.
18         THE COURT:  Remind me when the class period starts
19    here.
20         MS. BAINS:  2008 for promotions and pregnancy
21    discrimination and pay, but 2005 for --
22         THE COURT:  The pay I thought we are getting at for
23    all the payroll data and other things.  What is the anecdotal
24    that you are looking for here?
25         MS. BAINS:  That's not an issue here.

# EXHIBIT E

```
                                                          1
      C57LMOOC                    Conference
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 2
 3    MONIQUE DA SILVA MORE, et al.,
 3
 4                   Plaintiffs,
 4
 5          v.                            11 CV 1279 (ALC)(AJP)
 5
 6    PUBLICIS GROUPE SA, et al.,
 6
 7                   Defendants.
 7
 8    ------------------------------x
 8                                        New York, N.Y.
 9                                        May 7, 2012
 9                                        9:35 a.m.
10
10    Before:
11
11                     HON. ANDREW J. PECK,
12
12                                        Magistrate Judge
13
13                     APPEARANCES
14
14    SANFORD WITTELS & HEISLER, LLP
15         Attorneys for Plaintiffs
15    BY:  STEVEN WITTELS
16         SIHAM NURHUSSEIN
16         DEEPIKA BAINS
17
17    JACKSON LEWIS LLP
18         Attorneys for Defendants MSLGroup
18    BY:  VICTORIA WOODIN CHAVEY
19         JEFFREY W. BRECHER
19         BRETT M. ANDERS
20
21
22
23
24
25
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

73

C57LMOOC2

1           MR. ANDERS:  Your Honor, there may have been.  I think
2    I mentioned this last time, for the seed set, we only reviewed
3    the documents that were actually selected and hit.  We did not
4    review the families as well.  When we do the final production,
5    we will produce documents along with families.
6           THE COURT:  The question is if there is, it may be
7    that with the attachment, if there was an attachment that this
8    refers to, that this has got something useful.  As it stands
9    now, I'm going to say it should get coded as not relevant.
10          Next.  Any group who's turn or who has some documents
11   to give me.
12          MS. CHAVEY:  I think there were two others that
13   plaintiffs had hard copies of and we just asked.  That was 7366
14   and 7560.
15          7560, I think we're going to wait and treat that as a
16   Publicis Groupe issue.
17          MS. BAINS:  I don't see a copy, but we'll just hand up
18   our copy.
19          THE COURT:  Which one am I looking at now?
20          MS. BAINS:  It's one document.
21          THE COURT:  7366 through, all right.  You have two
22   copies of it here, so.
23          7366 through 69, what's the relevance?
24          MS. BAINS:  On the second page, the email from Rosalin
25   Fogarty or actually from Rita Masini:  Okay, so we presented
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

74

C57LMOOC2

```
 1    Peter, Maury is on vacation, we will do Monday.  Need some
 2    bullets from Hanna on why 5K spot bonus is justified.
 3             So, again, this is showing that approval for
 4    compensation has to go to Peter Miller, CFO.
 5             THE COURT:  It sounds like you're going to work this
 6    out.
 7             MS. CHAVEY:  Our concern is, your Honor, there are
 8    just likely thousands and thousands of these emails.
 9             THE COURT:  Then, you know, try to stipulate.
10    Otherwise, you run the risk that you're going to review
11    thousands of these for the final production.  They run the risk
12    that will reduce the more relevant documents that they could
13    get.  That's a good incentive on both sides, since nobody knows
14    where I'm cutting the production off or saying that after we
15    get to X thousand documents, if the plaintiffs want the next
16    batch, they're going to pay the defendant's review costs.
17    Neither of you know where that's coming out, good reason on
18    something as simple as this that apparently is fairly
19    accurately described in the so-called Janus book that you reach
20    a stipulation on it.
21             But, otherwise, it's relevant.
22             Okay, where does that leave us?  And I don't know
23    whose documents are whose anymore.  If you want them back, you
24    can come get them.  Sort them out.
25             We are already one iteration behind on your schedule.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

75

C57LMOOC2

1   Do you have more documents that you're all going to go through
2   today or what?
3           MS. BAINS:  Yes.  We have a binder of more docs we can
4   go through in hard copy, and if we require more rulings,
5   perhaps we can come back in a couple hours.
6           THE COURT:  All right.  It's quarter to three.  Why
7   don't you go back in the jury room and at 4:30, why don't you
8   tell me where you are in the process, and that is whether you
9   need me, whether you want more time.  I can give you until
10  5:30, 6 o'clock, although the court reporter may not be
11  available after 5 o'clock.
12          MS. CHAVEY:  Your Honor, the plaintiffs have
13  additional hard copy documents, we ran out of ours, but there
14  aren't that many.  I don't know that it will take us as much as
15  an hour even.
16          THE COURT:  As soon as you're ready, you can call
17  chambers.  Use the phone here and all you have to do is pick it
18  up and call 0036 and we'll come up.  But you're not leaving
19  here until you've checked out and we'll go from there.
20          You also should spend a few minutes talking about how
21  you're going to revise the scheduling document to provide a
22  catch up in some way and, hopefully, now that we've resolved
23  all of this, hopefully the further rounds will go much
24  smoother, but hope is hope.
25          MS. CHAVEY:  Your Honor, that raises one other issue.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

82

C57LMOOC3

1   criticals are compiled at MSL's corporate headquarters in New
2   York and sent to Publicis in Paris for approval.
3          THE COURT:  Is your argument that women were not
4   called mission critical?  What's the theory?
5          MS. NURHESSEIN:  Well, one theory which we've
6   discussed a little bit is that the exceptions to the raise
7   requests were not granted, you know, exceptions were often made
8   for male employees and not female employees.  And another,
9   which this goes to, is that it may be that certain employees
10  were put forward for raise exceptions while others weren't.
11         And this, we received a number of the mission
12  criticals from defense counsel already, but what makes this
13  interesting is it's important to see why decisions were made to
14  omit certain people from the mission criticals list, which this
15  document gets to.
16         THE COURT:  Well, but are any of the people, either
17  Maury Shapiro or Valerie Morgan, high enough up in your chain?
18         MS. NURHESSEIN:  Yes, your Honor.  Valerie Morgan is
19  part of the North America HR team.  Maury Shapiro is the
20  Americas CFO.  So there's the brand global CFO, Peter Miller --
21         THE COURT:  I'll give you this one with the warning
22  that you're going to pick up a lot of individual raise
23  documents that are going to be totally irrelevant because of
24  this.  And if that's how you want to spend your documents,
25  i.e., your money at the end of the day, that's up to you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C57LMOOC3

1         But, remember, when they go through the first -- and
2    I'll use the 40,000 number although I have not blessed it any
3    way -- when they go through 40,000 documents and you get 5,000
4    documents showing whether somebody who's not a plaintiff did or
5    didn't get a raise or anything else, all of which, unless it's
6    done in some scientific way, is going to be anecdotal and
7    largely useless, don't complain to me that you want me to go
8    beyond 40,000 documents because so much of what got ranked high
9    was garbage.
10        If you understand that, and are willing to say you
11   agree to that now, I'll mark this as responsive.
12        MS. NURHESSEIN:  Your Honor, I can't say that we agree
13   to it right now.  We can confer --
14        THE COURT:  You have to because you can't say I want
15   this marked relevant and then when we get to the end of the day
16   and you get a lot of what frankly is going to be anecdotal
17   junk, you can't say because the defendants had to review a lot
18   of anecdotal junk that we asked them to mark as relevant and
19   those are produced to you as relevant that you should get more.
20        MS. NURHESSEIN:  I understand that, your Honor.  And
21   earlier today I know you had said that we can either make a
22   decision to mark certain documents as relevant or, you know, we
23   could discuss it and get back to you and this is one where I
24   think we would have to -- I think it's clearly relevant and --
25        THE COURT:  When are you going to make the ultimate

84

C57LMOOC3

1   decision because this is going to be put to bed by no later
2   than Monday of next week.  If you're saying in a day or two,
3   you'll go back and talk to your partners, one of whom abandoned
4   you because you were capable of handling all of this, you can't
5   have it all six ways from Sunday.  What's your pleasure?  It's
6   in or out with the caveat that I've already put on it.
7        MS. NURHESSEIN:  Your Honor, we think it's clearly
8   relevant and we can make a final determination in the next
9   couple of days as to whether we want to include this particular
10  document.
11       THE COURT:  By tomorrow you'll tell them whether you
12  want it in or out.  If you keep it in, it is on the explicit
13  understanding that when you get a lot of these at the end of
14  the day, which may well be at the top of the production curve,
15  that you're not going to say because you got so many of these
16  and not enough of something else, that that's a reason to go
17  deeper into the production set.
18       MS. NURHESSEIN:  And, your Honor, just to clarify,
19  we're coding this as relevant not just because -- it's because
20  it involves an employment decision and explicitly discusses an
21  exception to the raise freeze so it's tied to a policy in the
22  case and it goes to centralized decision-making.  So presumably
23  we want --
24       THE COURT:  Your view of centralized decision-making
25  seems to be three-quarters of the senior members of the

C57LMOOC3

1   organization.  I don't really understand what is the central.
2           MS. NURHESSEIN:  No, your Honor.
3           THE COURT:  Who are the central decision-makers?
4           MS. NURHESSEIN:  Yes, your Honor.  In the second
5   amended complaint we note that --
6           THE COURT:  The one that's not filed?
7           MS. NURHESSEIN:  The one that's not filed but the one
8   that's been filed in the court and Judge Carter is going to be
9   ruling on.
10          THE COURT:  At the moment it's not in the case.
11          MS. NURHESSEIN:  No, but we included a lot of the same
12  information in the original complaint.  I don't know if we
13  named every --
14          THE COURT:  Who are the central decision-makers?
15          MS. NURHESSEIN:  Okay, your Honor, according to the
16  Janus policy, there are five specific individuals that are
17  mentioned.
18          THE COURT:  Maury Shapiro and Valerie Morgan on that
19  list of five?
20          MS. NURHESSEIN:  Not in the Janus policy.  So the
21  Janus policy references Jean-Michel Etienne, who is the CFO of
22  Publicis; Mathias Emmerich, who is the Publicis Groupe general
23  secretary.  And then it references the brand CEO, who in the
24  case of MSL America would be Jim Tsokanos.  The group CFO would
25  be Peter Miller; and Olivier Fleurot, the MSL CEO.

C57LMOOC3

```
 1              And then in terms of some of the other personnel
 2     decisions, so, for example, the PANs that we referenced, those
 3     need the approval of either Peter Miller or Maury Shapiro, as
 4     well as corporate HR, which would be either Rita Masini or Tara
 5     Lilien.  So it's a pretty circumscribed group of individuals
 6     we're talking about.
 7              THE COURT:  Okay.  You've got Maury Shapiro on here.
 8     Again, I will say it for the third time, and this time I want
 9     an answer.
10              If you don't withdraw the relevance coding for this
11     document, do you understand and do you agree that you may not
12     complain at the end of the day when you get a lot of documents
13     about individual raise decisions and that may, because of cost
14     issues and Rule 26(b)(2)(C), be part of the group of documents
15     you get and, therefore, there may be other documents that
16     you're not going to get.
17              Do you understand and agree to that?
18              MS. NURHESSEIN:  Your Honor, I can't.
19              THE COURT:  That's a yes or no question.
20              MS. NURHESSEIN:  No, I can't agree to that.  But we
21     will -- I need to confer with my colleagues and in light of the
22     rulings --
23              THE COURT:  Sorry.  You're here.  Mr. Wittels has
24     left.  You two are here.  Make a decision.  And I understand
25     you might pull the document later.  I'm just talking about if
```

87

C57LMOOC3
1   you don't pull it, do you understand what I've said and do
2   you --
3                MS. NURHESSEIN:  Yes.
4                THE COURT:  -- agree with it?
5                MS. NURHESSEIN:  Yes, your Honor, I understand that.
6                THE COURT:  And you agree?
7                MS. NURHESSEIN:  Yes, your Honor.  I mean and this
8   document, I think, let me just confer with my colleague for one
9   minute.
10               Your Honor, I think we want to keep this one in,
11  especially because it references mission critical.
12               THE COURT:  Counsel, you have it.  What I'm trying to
13  get without waffle so that when you later argue in front of me
14  or Judge Carter or the Second Circuit or the U.S. Supreme
15  Court, do you understand that because this is an individualized
16  raise decision for a person who is not a plaintiff, that if you
17  get a lot of documents like this because of the way predictive
18  coding works, it finds more like this among other things that
19  may well clog up the top-ranked documents, and I'm not going to
20  go beyond a certain cost level.
21               Do you understand and agree to that?  That's my
22  question and that's a yes or no.
23               MS. NURHESSEIN:  Yes, your Honor, I understand, but if
24  I could just add one thing.
25               THE COURT:  No.  Stop.  Yes or no.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

88

C57LMOOC3

```
 1            MS. NURHESSEIN:  Yes, your Honor, I do understand.
 2            THE COURT:  Now, counsel, you're about to be in
 3    serious trouble.  The question isn't whether you understand
 4    which means I understand your position, Judge, and I'll appeal
 5    it later.
 6            Do you agree?  That's the question.
 7            MS. NURHESSEIN:  Your Honor, can I confer with my
 8    colleague for one minute?
 9            THE COURT:  Yes, which I thought you just did.
10            MS. NURHESSEIN:  Your Honor, we understand and we do
11    agree, although we obviously can't waive our right to object to
12    anything, but we do understand and we do agree.
13            THE COURT:  If you agree, there's no objection
14    possible.  So stop the double talk, confer --
15            MS. NURHESSEIN:  Your Honor, in that case, I can't
16    agree.
17            THE COURT:  Okay.  The document is not relevant.
18            And if you can't agree because you don't have the
19    authority, I suggest that that means Mr. Wittels will have to
20    be here at every subsequent conference all day, all the time,
21    just like we have three partners here from Jackson Lewis.  You
22    either get some courage or get a partner here.
23            Next.
24            MR. BRECHER:  Judge, the last document is NR47822.
25    This is a document that they marked as responsive.  We marked
```

# EXHIBIT F

1

```
1214KDASC                      CONFERENCE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MONIQUE Da SILVA MOORE, et
al.,

                Plaintiffs,

        v.                        11 CV 1279 (RJS)

PUBLICIS GROUPE, et al.,

                Defendants.

------------------------------x
                                  New York, N.Y.
                                  January 4, 2011
                                  10:58 a.m.

Before:

                HON. ANDREW J. PECK,

                                      Magistrate Judge

                        APPEARANCES

SANFORD WITTELS & HEISLER LLP
        Attorneys for Plaintiffs
JANETTE WIPPER
DEEPIKA BAINS

JACKSON LEWIS LLP
        Attorneys for Defendant MSL Group
BRETT M. ANDERS
VICTORIA WOODIN CHAVEY
ALSO PRESENT:

PAUL J. NEALE, DOAR Litigation Consulting
GENE KILMOV, DOAR Litigation Consulting
ERIC SEGGEBRUCH, Recommind
CRAIG CARPENTER, Recommind
```

49

1214KDASC                    CONFERENCE

 1          MS. WIPPER:  Well, the main issue is cost because --
 2          THE COURT:  No, but where?  In other words --
 3          MS. WIPPER:  It's impacting the methodology.
 4          THE COURT:  Well, the question becomes the review.
 5  And my understanding of the way this works is by the time that
 6  the system spits this out, and whether it's the top 40,000 or
 7  whether the break point is 50,000 documents or 30,000, that
 8  90-something percent of the relevant documents are going to be
 9  found in the top hits, and that the costs of reviewing the rest
10  is not worth the candle in most cases.
11          Now, where that line gets drawn is something that I
12  can't decide until I've seen the results.  In other words, when
13  one sees the results, as I understand it from this method, one
14  can see a sharp drop-off at a certain point, at which you then
15  still sample the documents that are not going to be reviewed,
16  and that's part of this whole iterative process.
17          If you are seeing that the top 40,000 documents give
18  you 90 percent of the responsive documents, and it's going to
19  cost a million dollars to go to the next hundred thousand
20  documents for eyes-on review, to get another 5 percent, it's
21  probably not worth it.  If it's worth it to go to the top
22  50,000 because that's where the cliff line seems to be, that's
23  what people are going to have to do.
24          It also may be that once privilege is determined, that
25  they will let you -- the rest of this is so likely to be junk,

50

1214KDASC                    CONFERENCE

1   that you want, under an attorneys'-eyes-only or some process,
2   an informal basis, you want to look at the documents that go
3   from 40,000 to 80,000, you can look at them and if you tell
4   them, you know, gee, having looked at it, there's a lot of good
5   stuff here, then there's some problem with the process.
6           I'm not saying 40,000 is the cutoff -- I can't really
7   determine that -- and I invite both sides' experts to tell me
8   if I've gotten this wrong but I've sat through a lot of
9   training sessions on this, wherever that cliff is, that where
10  is where the break should be.  So if that was the only problem
11  you had with that part of the predictive coding process, then
12  it sounds like you all can go down this road, all of this,
13  without prejudice to additional search as may be necessary and
14  additional processes as may be necessary.
15          So is that the only problem, Ms. Wipper, or is there
16  anything more?
17          MS. WIPPER:  No, there's a dispute about the scope of
18  relevancy.  What happened --
19          THE COURT:  I've ruled on that.  That's what we spent
20  the morning doing.
21          MS. WIPPER:  OK.
22          THE COURT:  So whatever rulings I gave on that are
23  going to apply to the emails as well.  So any positions they
24  were taking in the ESI protocol are now going to have to be
25  revised, based on what I have done this morning, and similarly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1214KDASC                    CONFERENCE
1    on your side.
2            MS. WIPPER:  OK, and also I'd like to respond to
3    defense counsel's description of their proposal.  I'd like DOAR
4    to respond and give you an overview, if we may, on our proposal
5    on predictive coding.
6            THE COURT:  All right, though I guess I'd like to know
7    where it differs.
8            MS. WIPPER:  Well, it's actually a direct response to
9    their proposal.
10           THE COURT:  OK.
11           MS. WIPPER:  So who am I going to hear from?
12           MR. NEALE:  Paul Neale, your Honor.
13           THE COURT:  Mr. Neale?
14           MR. NEALE:  I actually think you pointed to exactly
15   the issue.  We have not taken issue with the use of predictive
16   coding or, frankly, with the confidence levels that they have
17   proposed except for the fact that it proposes a limit -- the
18   ultimate result of 40,000 documents before we have seen any of
19   the results coming out of the system.
20           THE COURT:  I've already said -- and I want to make
21   sure that defense counsel realizes it -- I'm not buying your
22   40,000 as a pig in a poke.  I understand the concept, but where
23   that line will be drawn -- whether it's 40,000, 50,000, 60,000,
24   20,000 -- is going to depend on what the statistics show for
25   the results.

52

1214KDASC              CONFERENCE
1       MR. ANDERS:  I guess, your Honor, that's why I stood
2   up before, because I wanted to ask you something.  I understand
3   that that cliff line may be at 80,000 documents.  The reason
4   why we picked the 40,000 is what we're trying to do is also
5   incorporate the cost element.  We picked 200,000 as what we
6   think --
7       THE COURT:  Proportionality requires consideration of
8   results as well as costs.  And if stopping at 40,000 is going
9   to leave a tremendous number of likely highly responsive
10  documents unproduced, it doesn't work.  Plus, of course once
11  you have the predictive coding run, the cost after that is how
12  much you're doing an eyes-on review of.  And once you've weeded
13  out the privilege documents -- and I assume you either have the
14  502(d) order or you will be providing one for me to sign off
15  on, because I think in a case of this size, if you're not
16  agreeing to one, you're committing malpractice -- how much
17  money you spend thereafter is a result of how much you want to
18  know what's in the documents or, putting it perhaps a different
19  way, CYA.  If the first 60,000 are clearly showing that they're
20  highly relevant but you're running out of money after 40,000,
21  don't review the other 20,000.  That's up to you.
22      MR. ANDERS:  We've considered that, your Honor, and I
23  think the attorney-eyes-only type of agreement or designation
24  may be appropriate here, because one of the concerns we have
25  is, some of the plaintiffs are now working for competitors.  To
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

53

1214KDASC                    CONFERENCE
1    the extent that they're seeing --
2              THE COURT:  This is not a case where I assume, other
3    than on anecdotal, that there is going to be much need for the
4    individual plaintiffs to look at the documents.  I'm sure you
5    can all work that out.
6              Now, unfortunately it's 1:00 o'clock.  I'm happy to
7    have you come back.  I've got a 2:00 o'clock, and there may be
8    a 3:30 from people who forgot to show up this morning and were
9    told to try to get their act together and get here this
10   afternoon.  You can come back this afternoon, you can come back
11   in a day or two.  I think we have made some good progress, and
12   I know that you're coming from further away than usual, so I'd
13   like to make the most use of your time.
14             What's your pleasure?  You want to come back at 3:30
15   in the afternoon and use the time from now to then?  You can
16   use the jury room.
17             MR. ANDERS:  Maybe, your Honor.  The only reason why I
18   say that is, tomorrow I am leaving the country for a week for a
19   family vacation, so I'm out of pocket for a week; I'll have
20   some email but not a lot.  So, again, I don't want to impose on
21   everybody else, but that's my scheduling issue, so I'm not sure
22   how much we'll get done within the next week.
23             THE COURT:  That's why I'm suggesting you maximize --
24   I don't know what time your flight home is -- well, you're in
25   Morristown.

# EXHIBIT G

**Exhibit G: List of Plaintiffs**

1. Monique da Silva Moore
2. MaryEllen O'Donohue
3. Heather Pierce
4. Laurie Mayers
5. Katherine Wilkinson
6. Zaneta Hubbard
7. Carol Perlman
8. Becky Lauer
9. Kelly McKenna
10. Stephanie Andrzejewski
11. Ellyn Caravetta
12. Wendy Raenae Clark
13. Holly Marie Richmond
14. Amanda Rosen.
15. Robyn Leventhal
16. Diana Scott
17. JoEllen Zumberge
18. Maryanne Caruso
19. Lori Laurent Smith
20. Erica Bersin
21. Erin Libit
22. Krista Webster
23. Margy Meislin
24. Melanie Babcock
25. Larissa Severenko Surchin
26. Sheila Gruber McLean
27. Michelle Dianne Overall
28. Megan Jordan
29. Erin Ortiz
30. Emily Buchanan
31. Nyree Dawn Wright
32. Laura Hall
33. Nancy Brenner