# Exhibit 6

# SANFORD HEISLER, LLP

555 Montgomery Street, Suite 1206
San Francisco, CA 94111
(415) 795-2020
Fax: (415) 795-2021
Email: jwipper@sanfordheisler.com
www.sanfordheisler.com

1666 Connecticut Ave. NW
Suite 300
Washington D.C. 20009
Fax: (202) 499-5199

1350 Avenue of the Americas
31st Floor
New York, NY 10019
Fax: (646) 402-5651

November 15, 2012

**VIA EMAIL**
Honorable Andrew J. Peck
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 20 D
New York, New York   10007-1312

**Re:  *da Silva Moore, et al. v. Publicis  Groupe SA, et al., Case No. 11-CV-1279***

Dear Judge Peck:

Consistent with Your Honor's October 11, 2012 Order (Doc. No. 322), Plaintiffs hereby submit in advance of the conference scheduled to take place on **November 20, 2012, at 9:30 AM**, a revised discovery schedule and proposed changes to the e-discovery protocol and/or procedures related to the twenty-six (26) new Opt-in Plaintiffs. In accordance with the directive of this Court, counsel for Plaintiffs and MSL ("the parties") have met and conferred regarding their proposed changes to the protocol.[1] While the parties agree that the addition of 26 Opt-in Plaintiffs necessitates some changes to the protocol, they were unable to reach agreement regarding certain fundamental issues. Accordingly, the parties agreed to separately submit their respective proposals regarding the nature and scope of the changes each side believes are appropriate to resolve the current discovery issues in this case.

In order to best facilitate conveying Plaintiffs' proposed changes to the Court, Plaintiffs would like to bring their consulting experts, David Lewis of David D. Lewis Consulting, LLC, and Doug Forrest of ILS, to the November 20 conference. Dr. Lewis holds a Ph.D. in Computer Science, has published over 75 articles on information retrieval and statistical evaluation, and is a co-founder of the TREK Legal Track. Mr. Forrest is the Director of the ILS' eDiscovery Analytics Group. *See* Curriculum Vitae of David Lewis and Doug Forrest (attached as Ex. A).

---

[1] The parties participated in a telephonic meet and confer on November 12, 2012. In addition, the parties exchanged several e-mails regarding their proposed changes to the protocol on November 12, 13 and 14.

## I.   **Introduction**

Both the parties and the Court agree that the contours of this case have changed dramatically since the adoption of the ESI protocol, and that the addition of 26 Opt-in Plaintiffs requires a "redo" of the protocol. Indeed, on May 14, 2012, Your Honor stayed the ESI protocol pending resolution of Plaintiffs' conditional certification motion because **"if we go further down the road with this predictive coding process and then 20 more people opt in, we're going to have to revamp the system."** *See* May 14, 2012 Tr. at 74 (attached as Ex. B). *See also id.* **("if additional plaintiffs opt in, that will change what documents are responsive").**  This is precisely what has occurred. On June 29, 2012, Judge Carter granted Plaintiffs' conditional certification motion, and 26 additional women have since opted in to the Equal Pay Act ("EPA") collective action – a nearly 500% increase in the number of Plaintiffs. Moreover, the parties have agreed to add up to 20 additional custodians (supervisors under MSL's proposal; comparators under Plaintiffs' proposal), bringing the total number of new custodians to 40 or 46 (depending on whether Opt-ins who signed severance agreements are included). This is roughly a 150% increase from the original protocol's custodian list. Thus, the addition of new parties essentially redefines the scope of discovery and requires a revisiting of certain of this Court's rulings as well as a re-examination of the existing e-discovery protocol.

The need to "revamp" the protocol in light of the 26 new Plaintiffs also reinforces Plaintiffs' belief that the issues in this class litigation may be too complex for the use of predictive coding. For example, even though the Title VII class period is ongoing, and some of the EPA Opt-in Plaintiffs are current employees, the protocol arbitrarily cuts off discovery at the Complaint-filing date. (MSL has agreed to time periods for the new Opt-in Plaintiffs through November 1, 2012, but as discussed below, even this is insufficient.)  Even more problematic, the current protocol is ill-suited to handle the inevitable expansion of the collection and the broader relevancy definitions that will follow the Court's ruling on Plaintiffs' class certification. If the Court certifies the Title VII class, the Title VII class members will automatically become part of the case, and will be entitled to discovery; if class certification is denied, these individuals are likely to assert their claims (which have been tolled pending the class certification decision) by becoming plaintiffs. **In short, regardless of how the Court rules, the additional Title VII class members / plaintiffs (potentially hundreds of 120 employees) would need to be incorporated into the ESI protocol, requiring yet another reboot of the protocol.**

Notwithstanding these concerns, Plaintiffs have met and conferred with their experts and with defense counsel in an attempt to make the protocol more workable and offer solutions that comply with the Court's previous rulings. In particular, Plaintiffs believe the following changes to the protocol (discussed in Section III) are necessary in light of the addition of 26 new Opt-in Plaintiffs:

- **Expanded Collection**: At a minimum, the parties agree that the e-mail accounts of the new Opt-in Plaintiffs will need to be added to the collection.[2] The parties also appear to

---

[2] However, as discussed in more detail below, MSL objects to the collection and review of the e-mail accounts of six Opt-ins who signed severance agreements.

agree that up to 20[3] other custodians should be added to the collection, although there is a dispute as to which custodians should be added.(MSL has proposed the addition of the Opt-in Plaintiffs' purported supervisors, while Plaintiffs believe the Opt-in Plaintiffs' comparators are more likely to have information relevant to the EPA claims.) With the addition of new Opt-in Plaintiffs, including current employees, and the ongoing class period, the temporal scope of discovery will also have to be broadened.

- **Broader Scope of Relevance**: The parties also appear to agree that the scope of relevance has changed dramatically now that there are 26 additional Opt-in Plaintiffs. At a minimum, documents relating to the claims of the 26 new Plaintiffs will now need to be coded as relevant. Rather than revamping the protocol once again post-class certification, Plaintiffs also propose that the scope of relevance be broadened to encompass Title VII class members.

- **New Random Sample / Seed Set**: Both parties recognize and agree that a new random sample is necessary as a consequence of the addition of 26 new Plaintiffs to the case. Given the expanded collection and broader scope of relevance, Plaintiffs also believe that a new batch of seed set documents should be drawn from the updated collection and reviewed by the parties. (MSL's position is that a new seed set is not necessary.) This will ensure that the system is properly trained to pick up documents that have only now become relevant.

- **Increased Importance of Quality Control**: The fact that the new collection is larger and more diverse poses challenges for predictive coding and makes proper quality control even more important. To enable the parties and the Court to properly assess the effectiveness of the predictive coding protocol, the final random sample should be drawn from the entire collection (not the null set, as MSL proposes). In addition, MSL should not be permitted to set a cutoff for the number of documents it has to review and produce *before* it has generated and reviewed a final random sample.

- **Streamlined Process**: Given the expanded collection and other complexities associated with the addition of 26 new parties, Plaintiffs have made an effort to streamline the protocol. Plaintiffs' proposal reduces the number of joint steps from nine to two, and compresses the timetable for e-discovery, all with a view towards increasing efficiency and minimizing the burden imposed on the parties and the Court.

**Plaintiffs' entire proposal is contingent on the inclusion of certain safeguards to ensure the accuracy and effectiveness of the process**. These include: the preparation and joint review of new seed set based on the expanded collection; the drawing of the final random sample from the entire collection (rather than the null set); and the inclusion of a quality control stage (e.g., review of a final random sample that conforms to Plaintiffs' proposal) before any decision is made regarding a cutoff on the total number of documents MSL needs to review and produce.

---

[3] MSL's proposed custodian list includes 32 supervisors, 12 of whom were already included in the ESI protocol, leaving a total of 20 new custodians (excluding Opt-ins).

## II.      The 26 New Opt-in Plaintiffs

In accordance with this Court's Order of October 11, 2012, Plaintiffs are providing the Court with a complete list of the Opt-in Plaintiffs. (*See* Complete List of 33 Opt-in Plaintiffs, attached hereto and marked as Exhibit C.)

## III.     Plaintiffs' Proposed Changes to the e-Discovery Protocol and/or Procedures Related to the Opt-ins

Plaintiffs propose streamlining the e-discovery process by offering an alternative, much simpler protocol. Plaintiffs' proposal, as set forth below, will reduce the number of joint steps from nine to two, while shortening the time schedule.  The goal is to expedite the process and minimize the burden on the parties and the Court, while at the same time capturing discoverable information for the new 26 Opt-in Plaintiffs and class members.  The proposed protocol is summarized below and will be explained in more detail by Plaintiffs' experts at the conference:

### A.   Updated Database

The parties agree that the collection will need to be expanded in light of the 26 new Opt-in Plaintiffs. However, there remain some disputes regarding the appropriate custodians and temporal scope:

### 1.   Custodians

MSL has agreed to update its database to include all Opt-in Plaintiffs as custodians except for six Opt-in Plaintiffs who signed severance agreements.[4] MSL previously sought to omit women who signed severance agreements from the class list, but Plaintiffs raised serious questions as to the validity of the releases, and noted that these questions were more appropriately addressed on summary judgment. The Court sided with Plaintiffs, ordering MSL to send notice to women who signed severance agreements. (Doc. No. 266) After six women who signed severance agreements opted in to the EPA collective action, MSL resurrected its arguments (previously rejected by Judge Carter) in an attempt to limit the class. The issue is currently pending before Judge Carter; until he rules otherwise, the six women in question remain Opt-in Plaintiffs and are entitled to discovery.[5]  Accordingly, they should be added as custodians.

In addition to the Opt-in Plaintiffs, MSL has expressed its willingness to add up to 20 additional custodians. *See* Nov. 14, 2012 e-mail from B. Anders to S. Nurhussein (attached as Ex. D).  However, while MSL proposes the addition of the Opt-in Plaintiffs' purported supervisors to the custodian list, Plaintiffs believe the e-mails of the Opt-in Plaintiffs'

---

[4] These employees are Ellyn Caravetta, Maryanne Caruso, Margy Meislin, Lori Laurent Smith, Erica Bersin and Laura Hall.

[5] Indeed, if the Court excludes the six women from the custodian list until Judge Carter rules on the viability of their EPA claims – a decision that is likely to be deferred until summary judgment – the parties will once again have to revamp the protocol at the summary judgment stage. This is not only inefficient, but also prejudicial to the six Opt-in Plaintiffs, who would be denied discovery needed to challenge MSL's summary judgment motion. (For example, certain Opt-in Plaintiffs have suggested that they were unaware they were signing away their rights when they took MSL's severance package; under MSL's proposal, these Opt-ins would be denied discovery relating to this issue.)

comparators are more likely to contain information relevant to an EPA analysis.[6] *See, e.g., Downes v. J.P. Morgan Chase*, 2006 U.S. Dist. LEXIS 27386, at *6 (S.D.N.Y. May 8, 2006) (noting that wages of male comparators, whether they were similarly situated to plaintiff, and whether their work was substantially equal were questions of triable fact in EPA case). Plaintiffs are in the process of compiling the comparator list and will be prepared to discuss at the conference.

## 2.  Temporal Scope

Both parties agree that the addition of 26 new Opt-in Plaintiffs means the temporal scope of discovery will be broader. However, there remain disputes as to the appropriate cut-off. MSL has proposed collecting the e-mail accounts of the Opt-in Plaintiffs from July 1, 2009 through November 1, 2012. However, this arbitrary cutoff ignores the fact that three of the opt-in Plaintiffs (Sheila McLean, Nyree Wright, Nancy Brenner) are current employees; imposing an arbitrary November 1, 2012 cutoff denies them discoverable information relating to their claims.

Even setting aside the fact that there are current employees, MSL should be required to produce discovery beyond the Complaint-filing date (or November 1, 2012 for new Opt-ins). This is not only consistent with Rule 26(e)'s mandate that parties have an ongoing duty to supplement their productions, Fed. R. Civ. P. 26(e), but also appropriate given that Plaintiffs allege a continuing violation of Title VII. *See* SAC ¶¶ 252 ("The class consists of all female public relations employees, who are, have been, or will be employed by Defendants in the United States at any time during the applicable liability period, including until the date of judgment in this case."), 253, 281-82 (Doc. No. 285). Indeed, Judge Carter has alluded to the fact that the class period in this case is ongoing. Doc. No. 250 at 12. Once the Court rules on Plaintiffs' class certification motion, the ESI protocol will once again have to be revamped (expanded collection, later time period, broader relevance definition) to incorporate the Title VII class.

The addition of 26 new Opt-in Plaintiffs also entitles Plaintiffs to broader discovery from the other custodians. Under the current protocol, members of MSL's regional management team (office Managing Directors and Region Presidents) are included as custodians, but with certain date limitations. The Court previously ruled that Plaintiffs were only entitled to discovery of those accounts for the time period during which a Plaintiff worked under the relevant custodian in the relevant office/region. *See, e.g.,* Feb. 8, 2012 Tr. at 36-37 (Ex. B). For example, discovery from Neil Dhillon, the Managing Director of the DC office, is currently limited to the time period from September 8, 2008 to May 31, 2010. (This was based on the fact that none of the previous Plaintiffs worked in the DC office beyond May 2010.) However, this time period should be adjusted to, at a minimum, September 8, 2008 to November 1, 2012 (with a continuing obligation to supplement), as two of the new Opt-in Plaintiffs worked in the DC office over a longer time period (Sheila McLean worked in the DC office from August 8, 2005 to the present and Nyree Wright worked there from April 4, 2011 to the present.) The time periods of other custodians should also be adjusted in comparable situations.

---

[6] The EPA prohibits discrimination "on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. 206(d). It does not require proof of intentional discrimination. *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 640 (2007).

## B.  Broader Scope of Relevance

The fact that the definition of responsiveness has changed with the addition of 26 Opt-in Plaintiffs does not appear to be in dispute. For example, the Court previously ruled that a document regarding a raise request for Margy Meislin (an SVP who recently opted in to the EPA collective action) should be coded as non-relevant because she was not a plaintiff at the time. This and similar documents relating to other newly added Plaintiffs should now be coded as relevant. As discussed in more detail below, this broader definition of relevance has implications for the initial random sample and seed set, both of which will have to be re-reviewed.

Similarly, recognizing that most of the EPA Opt-in Plaintiffs also have overlapping Title VII claims, Plaintiffs propose that the parties mark as relevant not just documents relating to the 26 Opt-in Plaintiffs' EPA claims, but also those relating to their Title VII claims. All of the Opt-in Plaintiffs have some combination of pay, promotion, and pregnancy/caregiver claims. To avoid another redo of the protocol down the line, documents relating to all such claims should be coded as relevant.

Just as the addition of 26 new Opt-in Plaintiffs necessitates changes to the protocol, so will the upcoming class certification decision require some revamping of the protocol. If class certification is granted, the Title VII class members will automatically become part of the case; if class certification is denied, they are likely to assert their claims (which have been tolled pending the class certification decision) by becoming plaintiffs. In either scenario, the Title VII class members / plaintiffs will need to be incorporated into the ESI protocol. In anticipation of these issues, and to avoid another "reset" of the protocol months down the line, Plaintiffs propose a definition of responsiveness that is broad enough to encompass the Title VII class members.

## C.  New Initial Random Sample and Seed Set

The parties agree that, in light of the expanded collection and broader definition of relevance, MSL will need to produce a new random sample for joint review. However, the parties disagree regarding the need to produce a new seed set. MSL's position is that "the preparation of a new seed set is not necessary." Nov. 14, 2012 e-mail from B. Anders to S. Nurhussein (Ex. D). However, Plaintiffs believe a new batch of seed set documents must be drawn from the updated collection (which will differ dramatically from the original collection in both size and substance). There are potentially several hundred (possibly thousand) seed set documents that were previously marked non-relevant, but are now relevant because they relate to one of the new Opt-in Plaintiffs. Failing to re-draw and re-review the seed set will impact the effectiveness of the predictive coding process. *See* Lewis Decl. at ¶¶ 44; Forrest Decl. ¶ 30.

## D.  Iterative Rounds

Following the joint review of the initial random sample and seed set, and the resolution of any coding disputes, Plaintiffs propose that MSL conduct seven rounds of iterative review. To streamline the process, Plaintiffs would not require joint review of the iterative documents, although Plaintiffs would make themselves available to answer questions and/or confer with MSL as needed. Plaintiffs' willingness to play a smaller role in this phase of the protocol is

contingent on the adoption of appropriate quality control standards, as discussed in more detail below, and the use of Plaintiffs' coding to train the system for future iterations. Assuming these safeguards are in place, Plaintiffs believe the decrease in the number of meet and confer steps from nine to two (i.e., eliminating the seven meet and confers associated with the iterative rounds) will increase efficiency without sacrificing the accuracy of the protocol. *See generally* Lewis Decl.; Forrest Decl. ¶¶ 13-21.

## E.  Production Set and Final Random Sample

The fact that the new collection is larger and more diverse poses challenges for predictive coding and makes proper quality control even more important. Accordingly, Plaintiffs' alternative protocol devotes considerable attention to the evaluation phase of the protocol – namely, ensuring that the predictive coding review has been effective. Plaintiffs' proposal is summarized below, and described in more detail in the declarations of Dr. Lewis and Mr. Forrest. (*See generally* Ex. E-F)

Plaintiffs propose that MSL create a complete production set using whatever methods and procedures it deems appropriate, including, should it so desire, consulting Plaintiffs as to relevancy. Upon completion of the production set, MSL should generate:

(i)    a simple random sample from the entire collection, produced and unproduced, of a size sufficient to ensure that it will with high probability contain sufficient responsive documents to allow estimating a 95% confidence interval on recall with a margin of error of 0.05 on a recall scale of 0.0 to 1.0;

(ii)   a list specifying the unique ID of every document in the simple random sample and whether or not it is included in the production set; and

(iii)  a list specifying the unique ID of every document in the collection and the score(s) assigned to it by the final predictive model(s) used by MSL.

*See* Forrest Decl. ¶ 4, Lewis Decl. at ¶¶ 31-40.

Under Plaintiffs' proposal, representatives of the parties will make a responsiveness determination on each document in the simple random sample. *Id.* Documents in the simple random sample should be reviewed in random order, and neither the production status nor the score(s) assigned by predictive modeling should be displayed to personnel making responsiveness assessments. *See* Forrest Decl. ¶ 4.

Each party will make whatever statistical calculations it deems appropriate based upon the responsiveness determinations and production set inclusion status, including recall, precision, elusion, etc. *Id.* ¶ 5. Based upon the estimates of production set effectiveness from the random sample, a determination will be made as to whether further searching for responsive documents is necessary. *Id.* ¶ 6. Any disputes regarding this issue will be resolved by the Court. *Id.*

If and when additional documents are added to the collection and evaluated for production, the procedure will be repeated, treating the new documents as a new collection to be produced from and evaluated by a new sample. *Id.* ¶ 7.

MSL's proposal appears to differ from Plaintiffs' in the following fundamental ways. First, MSL insists on drawing the final random sample from the null set rather than the entire collection. As discussed in the Lewis Declaration, MSL's approach would make it impossible to estimate recall and to determine how effective predictive coding has been at prioritizing responsive documents for review. Lewis Decl. ¶¶ 32-34. *See also* Forrest Decl. ¶¶ 22-25. By contrast, Plaintiffs' proposed sampling strategy will allow the parties to properly assess the effectiveness of the predictive coding review. *See generally*, Lewis Decl.; Forrest Decl. ¶¶ 26-27.

Second, MSL proposes generating and reviewing a final random sample *after* it has set a cutoff for the number of documents it has to review and produce. MSL has it backwards: a decision cannot be made as to the (inevitably arbitrary) cutoff before the quality control stage. Lewis Decl. ¶¶ 42-43; Forrest Decl. ¶¶ 28-29. Plaintiffs' proposal allows statistical validation of "any claim that the effectiveness of predictive coding has reached any purported 'cliff edge.'" Forrest Decl. ¶ 33.

## F. Special Master

To minimize the burden on the Court, Plaintiffs propose that any disputes regarding the coding of the jointly reviewed documents (random sample and seed set) be resolved by a Special Master. Your Honor raised this possibility during various conferences, noting that a Special Master might be more appropriate given the volume of documents in dispute. *See* April 25, 2012 Tr. at 18-19 (noting that "another possibility… is for me to give you a special master who can go through all these [coding disputes] in light of my rulings") (Ex. B). *See also* Dec. 12, 2011 Tr. at 20, 22, 24; Feb. 8, 2012 Tr. at 8, 13, 94; April 25, 2012 Tr. at 21, 24; May 7, 2012 Tr. at 6-8, 91. (MSL has not agreed to this aspect of Plaintiffs' proposal.)

## IV.   Plaintiffs' Proposed Changes to Discovery Schedule

The abovementioned modifications to the existing protocol will provide the parties with an opportunity to complete the e-discovery process much more quickly, and with less of a burden on the parties and the Court. *See generally* Bains Decl. (Ex. G); Forrest Decl. ¶¶ 8-11 (Ex. F). For example, the existing protocol requires seven (7) iterative rounds with joint review, whereas the new proposed protocol does not. Indeed, Plaintiffs' proposed alternative protocol reduces the number of joint steps from nine to two. Plaintiffs propose the following timetable, which is significantly shorter than MSL's. **However, Plaintiffs' timetable depends on the volume of documents to be produced, particularly the size of the final random sample.**

30 Days:      Parties review new random sample and seed set documents;

30 Days:      MSL to conduct iterative rounds of predictive coding;

60 Days:      Parties review final random sample to validate predictive coding; and

5 Days:        Automated privilege review and production.[7]

      Plaintiffs interpret the Court's October 11, 2012 Order as requesting the parties to propose changes to the e-discovery schedule and protocol. If the Court would like the parties to submit proposed changes to other aspects of the case schedule, Plaintiffs will do so. However, given that the threshold issues relating to the ESI protocol will have a significant impact on other aspects of the schedule, Plaintiffs believe it would be difficult at this stage to set deadlines for, e.g., the completion of all depositions, expert discovery, and class certification.

      We thank the Court for its time and consideration.


Respectfully Submitted,

/s/ Janette Wipper

Janette Wipper


Cc:      All counsel of record
       Judge Andrew L. Carter

Enclosures

---

[7] See Forrest Decl. ¶¶ 36-40.

# Exhibit A

# DAVID D. LEWIS

David D. Lewis Consulting, LLC
1341 W. Fullerton Ave., #251
Chicago, IL 60614
Ph. (773) 975-0304
Fax (773) 289-0507
*consult@DavidDLewis.com*
*www.DavidDLewis.com*

*Curriculum Vitae*
24-Oct-2012

## Education & Awards

Fellow, American Association for the Advancement of Science (2006).

Ph.D. (1992) & M.S. (1988), Computer Science, Univ. of Massachusetts
• 1992 American Society for Information Science Doctoral Forum Award

B.S., Computer Science (1985) & B.A., Mathematics (1985), Michigan State Univ.

## Employment

*Independent Consultant* (2000-)
• Commercial & Nonprofit Clients: Designed algorithms, software, and processes for information retrieval, data mining, natural language processing, and statistical evaluation. Analyzed data sets. Trained personnel. Advised on competitors, market opportunities, and commercial products. Performed due diligence for investors. Co-wrote successful Phase I and Phase II SBIR grant proposals for clients. Inventor on successful patent applications. Consulting expert and expert witness work in patent and e-discovery cases. Advised investment groups on patent valuations. Served on scientific advisory boards. Wrote technical white papers.
• University-Based Research: Collaborated with university faculty, resulting in refereed publications and widely used open source software. Supervised students and developers. Managed subcontracts. Co-wrote applications receiving grant and contract funding of almost 10 million dollars. Developed two major new information retrieval test collections, including first public test collection for e-discovery. Advised on technology transfer.

*Visiting Research Fellow, Dept. of Computer Science, Royal Holloway Univ. of London (Jan. - Feb. 2003)*
• Advised on applications of text mining technology.

*Co-Founder, Ornarose, Inc.*(2001-2004)
• Co-founded startup to build text and data mining software. PI on two successful NSF SBIR Phase I grants.

*Adjunct Assistant Professor* (1998-2000), Univ. of Pennsylvania
• Presented guest lectures. Collaborated with U Penn faculty.

*Principal Technical Staff Member* (1996-2000), *Technical Staff Member* (1992-1996)
AT&T Bell Labs and AT&T Labs
• Designed and led development of text classification and data mining platform. Supervised summer students and developer. Conducted research leading to publications and six patents. Built prototypes for, and consulted with, AT&T business units. Advised AT&T and AT&T Ventures on acquisitions of external technology and companies. Developed new public test collections for information retrieval research.

**Employment**, *cont.*

*Research Associate* (rank: Assistant Professor) (1991-1992)
Center for Information and Language Studies, Univ. of Chicago
• Co-taught seminar on IR. Conducted research. Supervised research assistants and developers on IR and NLP projects. Wrote grant proposals and received two subcontracts totaling $100,000. Developed and distributed first public test collection for text categorization research.

*Independent Consultant* (1988-1992)
• Consulting on information retrieval, natural language processing, and knowledge representation.

*Research Assistant*, Dept. of Computer Science, Univ. of Mass. (1985-1991)
• Conducted research on IR, NLP, and machine learning. Supervised developers and student employees. Prepared and presented class lectures. Wrote portions of grants receiving funding of $2.4 million.

*Summer Intern*, Honeywell, Inc. (Summer 1984)
• Implemented NLP systems for relational database search and document processing.


## Tutorials, Summer Schools, Online Courses, and Short Courses

• Machine Learning for E-Discovery in Legal Cases. *UIUC Data Sciences Summer Institute 2012.*

• Machine Learning for Discovery in Legal Cases: *Machine Learning Summer School (MLSS 2011).*

• Information Retrieval for E-Discovery: *SIGIR '10*, OLP online course.

• Text Mining (published title varies): *JSM '06, Infornortics '07, SIGIR '07.*

• Introduction to Logistic Regression (published title varies): *SIGIR '05, KDD '05, AAAI '08, SIGIR '09.*

• Text Mining for Surveillance I. *DIMACS Tutorial on Statistical and Other Analytic Health Surveillance Methods.* (June 2003).

• Text Mining. *CCR/DIMACS Workshop on Mining Massive Data Sets and Streams: Mathematical Methods and Algorithms for Homeland Defense* (June 2002).

• Machine Learning for Information Organization (published title varies): *Infonortics '01, ICML '01, SIGIR '01, ASIS&T '01, ACL '02, SIGIR '02, ASIS&T '02, SIGIR '03, SIGIR '04, Infonortics '05.*

• Advanced Machine Learning for Information Retrieval (* w/ Yoram Singer): *SIGIR '99*, SIGIR '00*.*

• Introduction to Machine Learning for Information Retrieval (* w/ Yoram Singer): *SIGIR '97, SIGIR '98, SIGIR '99*, SIGIR '00*, CIKM '00.*

• Natural Language Processing for Information Retrieval (* w/ Liz Liddy): *ACL '93*, SIGIR '93*, SIGIR '94*, ASIS '94.*

## Organizational Activities

• Member of planning committees for DOD & NIST evaluations of NLP & IR systems (MUC-3 & MUC-4, TREC-1 through TREC-6; TREC Genomics Pre-Track Workshop (2002); TREC-2004 to present; TREC-2005, 2006, 2007 Genomics Track Steering Committees).  Designed and directed the first and second NIST TREC text classification evaluation (TREC-4 and TREC-5 Filtering Tracks, 1996). Co-designed/directed with Jason Baron and Doug Oard the first NIST TREC electronic discovery evaluation (TREC-2006 Legal Track, 2006).  Co-coordinator TREC-2012 Legal Track (decision was made not to run it).

• Co-Organizer, *Workshop on Strategic Research Directions in AI: Knowledge Representation, Discovery, and Integration*, 2003.

• Chair & Founder, *Workshop on Operational Text Classification*, 2001 (OTC-01 & OTC-03).  Organizing committee (OTC-02).

• Publicity Chair, *SIGIR '97.*  Mentoring Chair (founded program), *SIGIR '01.* Awards Chair, *SIGIR '01.* Mentor, *SIGIR '03.*  Best Paper Committee Chair, *SIGIR '03.*

• Session Leader, *NSF Information and Data Management Workshop*, 2000.

• Session Leader, *NSF IR Tools Workshop,* 1998.

• Founder and moderator (1995-), *DDLBETA (Text Classification Mailing List),* 400+ subscribers.

• Secretary, *ACM Special Interest Group on Information Retrieval*, 1995-1997, 2003-2010.

• Program Chair (Information Retrieval), *Symposium on Document Analysis and Information Retrieval*, 1995.

• Co-chair, *AAAI Fall Symposium on Active Learning*, 1995.

• Co-chair, *Workshop on Learning in Intelligent Information Retrieval* at *Eighth International Workshop on Machine Learning*, 1991.

## Other Service Activities

• External Advisory Board: Columbia Univ. Center for Research on Information Access (CRIA) (1996-?).

• Editorial boards: *ACM Transactions on Information Systems* (Associate Editor: 1994-2001), *Computational Linguistics* (1993-1995), *Encyclopedia of Information Retrieval* (1999-?), *Information Retrieval* (1997-2001), *Journal of Artificial Intelligence Research* (2000-2003), *Journal of Natural Language Engineering* (1994-2001).

• Co-Editor, *ACM Transactions on Information Systems Special Issue on Text Categorization* (1994).

• Program committees: SIGIR (1993-1998, 2000, 2002, 2011 2012), SIGIR Best Paper Committee (2009), ARPA HLT (1993), WVLC (1993), ACL (1994), CIKM (1994), SDAIR (1994-1996), AAAI Workshop on

Integrating Multiple Learned Models (1996), IJCAI Digital Libraries Workshop (1997), KDD (1997), AI & Statistics (1997-98), ICML (1998, 2000), Uncertainty (1999), WDA (2001), CEAS (2004), IJCNLP (2004), AIRWeb (2005), ECIR (2007), HLT (2009), ACL (2010), ECIR 2010 LSHC Workshop and others.

• Review panels: NSF SBIR (1993).  NSF-CISE-IIS (2000).

• Graduate Student Representative, Computer Science Dept., U Mass Amherst (1987-1988).

• Cognitive Science Steering Committee, U Mass Amherst (1986-1988).

• Dissertation Committees: Michelle Keim (U. Washington, 1997).  Ken Lang (CMU, unfinished: founder, *wisewire.com*).  Marc Ringuette (CMU, unfinished: self-described software playboy).  Aynur Dayanik (Rutgers, 2006).

• MentorNet mentor (1999-2001).

# Publications and Talks

## Patents (issued)

Chowdhury, A. R., Beitzel, S. M., Lewis, D. D., Kolcz, A. *Web query classification.* Patent No. 7,779,009 (August 17, 2010).

Guyon, I., Reiss, E. P., Doursat, R., Weston, J. A. E., Lewis, D. D. *Data mining platform for bioinformatics and other knowledge discovery.* Patent No. 7,542,947 (Jun 2, 2009).

Lewis, D. D., Singhal, A. K., and Stern, D. L. *Method and apparatus for communicating information in a supervised learning system.* Patent No. 6,523,017, Feb 18, 2003. Continuations: 6,668,248 (Dec 23, 2003); 6,931,383 (Aug 16, 2005).

Church, K. W., Helfman, J. I., and Lewis, D. D. *Method for retrieving texts which are similar to a sample text.* Patent No. 5,970,484, Oct 19, 1999.

Cohen, E. and Lewis, D. D. *Retrieval system and method.* Patent No. 5,950,189, Sep 7, 1999.

Knowles, K. A. and Lewis, D. D. *Finding an e-mail message to which another e-mail message is a response.* Patent No. 5,905,863, May 18, 1999.

Lewis, D. D. *Method and apparatus for training a text classifier.* Patent No. 5,675,710, Oct 7, 1997.

Catlett, J. A., Gale, W. A., and Lewis, D. D. *Training apparatus and method.* Patent No. 5,671,333, Sep 23, 1997.

## Peer-Reviewed Journal Articles

Oard, D. W., Baron, J. R., Hedin, B., Lewis, D. D., Tomlinson, S. Evaluation of Information Retrieval for E-Discovery. *Artificial Intelligence and Law*, vol. 18, no. 4, pp. 347-386, December 2010.

Beitzel, S. M., Jensen, E. C., Lewis, D. D., Chowdhury, A., Frieder, O. Automatic Classification of Web Queries Using Very Large Unlabeled Query Logs. *ACM Transactions on Information Systems*, vol 25, no. 2, April 2007.

Genkin, A., Lewis, D. D., and Madigan, D. Large-Scale Bayesian Logistic Regression for Text Categorization. *Technometrics*, vol. 49, no. 3, pp. 291-304, August 2007.

Lewis, D. D.; Yang, Y.; Rose, T.; and Li, F. RCV1: A New Benchmark Collection for Text Categorization Research. *Journal of Machine Learning Research*, vol. 5, pp. 361-397, 2004.

Cohen, E. and Lewis, D. D., Approximating Matrix Multiplication for Pattern Recognition Tasks. *Journal of Algorithms*, vol. 30, pp. 211-252, 1999.

Lewis, D. D. and Knowles, K. A., Threading Electronic Mail: A Preliminary Study. *Information Processing and Management*, vol. 33, pp. 209-217, 1997.

Lewis, D. D. and Sparck Jones, K.,  Natural Language Processing for Information Retrieval. *Communications of the ACM*, vol.  39, pp. 92-101, Jan, 1996.

Chinchor, N., Hirschman, L., and Lewis, D. D.,  Evaluating Message Understanding Systems: An Analysis of the Third Message Understanding Conference (MUC-3).  *Computational Linguistics*, vol. 19, pp. 409-449, Sep, 1993.

Lewis, D. D., Croft, W. B., and Bhandaru, N.,  Language-Oriented Information Retrieval.  *International Journal of Intelligent Systems*, vol.  4, pp. 285-318, 1989.


## Peer-Reviewed Conference Papers


Agam, G., Argamon, A., Frieder, O., Grossman, D., Lewis, D. Content-Based Document Image Retrieval in Complex Document Collections. *Document Recognition and Retrieval XIII, Proc. SPIE Int. Soc. Opt. Eng. 6500*,  pp. 65000S-1 to 65000S-12, 2007.

Dayanik, A., Lewis, D., Madigan, D., Menkov, V., Genkin, A. Constructing Informative Prior Distributions from Domain Knowledge in Text Classification. *Proceedings of the 29th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pp. 493-500, 2006.

Agam, G., Argamon, A., Frieder, O., Grossman, D., Lewis, D., Sohn, G., Voorhees, K.  A Complex Document Information Processing Prototype. *Proceedings of the 29th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, 2006. (Poster paper.)

Lewis, D., Agam, G., Argamon, A., Frieder, O., Grossman, D., Heard, J.   Building a Test Collection for Complex Document Information Processing. *Proceedings of the 29th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, 2006. (Poster paper.)

Lewis, D., Agam, G., Argamon, A., Frieder, O., Grossman, D., Heard, J.   Building a Test Collection for Complex Document Information Processing. *Proceedings of the 29th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, 2006. (Poster paper.)

Beitzel, S., Jensen, E. C., Frieder, O., Grossman, D.  Lewis, D. D., Chowdhury, A., Kolcz, A.  Improving Automatic Web Query Classification via Semi-Supervised Learning. *ICDM '05: The Fifth IIEE International Conference on Data Mining*, 2005.

Agam, G., Argamon, S., Frieder, O., Grossman, D., Lewis, D.  "Document Information Processing: Towards Software and Test Collections," *2005 Symposium on Document Image Understanding Technology*, 2005.

Beitzel, S., Jensen, E. C., Frieder, O., Grossman, D.  Lewis, D. D., Chowdhury, A., Kolcz, A. "Automatic web query classification using labeled and unlabeled training data," *Proceedings of the 28th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pp. 581-582, 2005. (Poster paper.)

Madigan, D., Genkin, A., Lewis, D. D., Fradkin, D. "Bayesian Multinomial Logistic Regression for Author Identification," *25th International Workshop on Bayesian Inference and Maximum Entropy Methods in Science and Engineering*, pp. 509-516, 2005.

Madigan, D., Genkin, A., Lewis, D. D., Argamon, S., Fradkin, D., Ye, L. ``Author Identification on the Large Scale," *Joint Annual Meeting of the Interface and the Classification Society of North America*, 2005.

Madigan, D., Eyheramendy, S., Lewis, D. D., "On the Naive Bayes Model for Text Categorization," *Proceedings of the Ninth International Workshop on Artificial Intelligence & Statistics*, 2003.

Iyer, R. D., Lewis, D. D., Schapire, R. E., Singer, Y., and Singhal, A., "Boosting for Document Routing ," *Proceedings of the Ninth International Conference on Information and Knowledge Management*, McLean, VA, pp. 70-77, 2000.

Lewis, D. D., Stern, D. L., and Singhal, A., "ATTICS: A Software Platform for Online Text Classification," *Proceedings of SIGIR '99: 22nd International Conference on Research and Development in Information Retrieval*, pp. 267-268, 1999.

Keim, M., Lewis, D. D., and Madigan, D., "Bayesian Information Retrieval: Preliminary Evaluation," *Preliminary Papers of the Sixth International Workshop on Artificial Intelligence and Statistics*, pp. 303-310, 1997.

Cohen, E. and Lewis, D. D., "Approximating Matrix Multiplication for Pattern Recognition Tasks," E*ighth Annual ACM-SIAM Symposium on Discrete Algorithms*, pp. 682-691, 1997.

Lewis, D. D., Schapire, R. E., Callan, J. P., and Papka, R., "Training Algorithms for Linear Text Classifiers," *SIGIR '96: Proceedings of the 19th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pp. 298-306, 1996.

Lewis, D. D., "Evaluating and Optimizing Autonomous Text Classification Systems," *SIGIR '95: Proceedings of the 18th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pp. 246-254, 1995.

Ittner, D. J., Lewis, D. D., and Ahn, D. D., "Text Categorization of Low Quality Images," *Symposium on Document Analysis and Information Retrieval*, pp. 301-315, 1995.

Lewis, D. D. and Ringuette, M., "A Comparison of Two Learning Algorithms for Text Categorization," *Third Annual Symposium on Document Analysis and Information Retrieval*, Las Vegas, NV, pp. 81-93, 1994.

Lewis, D. D. and Gale, W. A., "A Sequential Algorithm for Training Text Classifiers," *SIGIR 94: Proceedings of the Seventeenth Annual International ACM-SIGIR Conference on Research and Development in Information Retrieval*, pp. 3-12, 1994.

Lewis, D. D. and Catlett, J., "Heterogeneous Uncertainty Sampling for Supervised Learning," *Machine Learning: Proceedings of the Eleventh International Conference on Machine Learning*, pp. 148-156, 1994.

Church, K., Gale, W., Helfman, J., and Lewis, D., "Fax: An Alternative to SGML," *Proceedings of the 16th International Conference on Computational Linguistics (COLING '94)*, pp. 525-529, 1994.

Lewis, D. D., "An Evaluation of Phrasal and Clustered Representations on a Text Categorization Task," *Fifteenth Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pp. 37-50, 1992.

Croft, W. B., Turtle, H. R., and Lewis, D. D., "The Use of Phrases and Structured Queries in Information Retrieval," *Fourteenth Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pp. 32-45, 1991.

Lewis, D. D. and Croft, W. B., "Term Clustering of Syntactic Phrases," *Thirteenth Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pp. 385-404, 1990.

Croft, W. B. and Lewis, D. D., "An Approach to Natural Language Processing for Document Retrieval," *Tenth Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pp. 26-32, 1987.

**Unrefereed Conference Proceedings Articles, Non-Peer-Reviewed Journal Articles, Book Chapters, and Miscellaneous Publications**

Lewis, D. D. and Hagen, R. J. "Intelligent Review Technology: Improving the Practice of Document Review in Legal Discovery", version 2. Commercial White Paper, Kroll Ontrack, 2011.

Lewis, D. D. Afterword: Data, Knowledge, and E-Discovery. *Artificial Intelligence and Law*, vol. 18, no. 4, pp. 481-486, December 2010.

Lewis, D. D. and Jytyla, R. A. "Intelligent Review Technology: Improving the Practice of Document Review in Legal Discovery". Commercial White Paper, Kroll Ontrack, 2010.

Oard, D. W., Baron, J. R., Lewis, D. D. "Some Lessons Learned to Date from the TREC Legal Track (2006-2009)". Manuscript, Feb. 24, 2010. *http://trec-legal.umiacs.umd.edu/ LessonsLearned.pdf*

Martentette, B. J., Bell, S. T., Adair, C. K., Fisher, D., Lewis, D. D., Gerding, D. "Team Process Measurement: Comparing Team Member and Observer Ratings," 25th Annual Conference of the Society for Industrial & Organizational Psychology (SIOP 2010), 2010. (Poster abstract in conference program.)

Agam, G., Argamon, S., Frieder, O., Grossman, D., Lewis, D. "Content-Based Document Image Retrieval in Complex Document Collections," *Document Recognition and Retrieval XIV,* Proc. SPIE Vol. 6500, pp. 65000S-1 to 65000S-12, 2007.

Baron, J. R., Lewis, D. D., Oard, D. W. "TREC-2006 Legal Track Overview," *Text REtrieval Conference (TREC 2006),* 2007, pp. 79-98.

Agam, G., Argamon, S., Frieder, O., Grossman, D., Lewis, D. "Complex Document Information

Processing: Prototype, Test Collection, and Evaluation," *Document Recognition and Retrieval XIII,* Proc. SPIE Vol. 6067, pp. 60670N-1 to 60670N-11, 2006.

Dayanik, A., Genkin, A., Kantor, P., Lewis, D. D., Madigan, D., Menkov, V. "DIMACS at the TREC 2005 Genomics Track," *Text REtrieval Conference (TREC 2005),* 2006.

Agam, G., Argamon, S., Frieder, O., Grossman, D., Lewis, D. "Complex Document Information Processing: Towards Software and Test Collections," *First International Conference on Intelligence Analysis Methods and Tools,* 2005.

Dayanik, A., Fradkin, D., Genkin, A., Kantor, P., Lewis, D. D., Madigan, D., Menkov, V. "DIMACS at the TREC 2004 Genomics Track," *Text REtrieval Conference (TREC 2004),* 2005.

Gomes, C., et al. Report of the Workshop on Strategic Research Directions in AI: Knowledge Representation, Discovery, and Integration. Lewis, D. (editor). Cornell University, 2003.

Anghelescu, A., Boros, E., Lewis, D., Menkov, V., Neu, D., Kantor, P. "Rutgers Filtering Working at TREC 2002: Adaptive and Batch," *Text REtrieval Conference (TREC 2002),* 2003.

Dumais, S. T., Sebastiani, F., and Lewis, D. D. "Report on the Workshop on Operational Text Classification Systems (OTC-02)," *SIGIR Forum,* vol. 36, no. 2, 2002.

Lewis, D. D, Pollak, T., and Romeo, S. "Supervised Learning for Classifying Nonprofit Programs: A Preliminary Study (Abstract)," *Workshop on Operational Text Classification Systems (OTC-02),* 2002.

Allan, J., et al. "Challenges in Information Retrieval and Language Modeling: Report of a Workshop Held at the Center for Intelligent Information Retrieval, University of Massachusetts Amherst, September 2002," 2002.

Lewis, D. D. and Sebastiani, F., "Report on the Workshop on Operational Text Classification Systems (OTC-01)," *SIGIR Forum,* vol. 35, no. 2, 2001.

Lewis, D. D., "Applying Support Vector Machines to the TREC-2001 Batch Filtering and Routing Tasks," *Text REtrieval Conference (TREC 2001),* 2002.

Lewis, D. D., "Machine Learning for Text Categorization: Background and Characteristics," *Proceedings of the Twenty-First National Online Meeting,* pp. 221-226, 2000.

Singhal, A., Choi, J., Hindle, D., Lewis, D. D., and Pereira, F., "AT&T at TREC-7," *The Seventh Text REtrieval Conference (TREC-7),* pp. 239-252, 1999.

Condliff, M. K., Lewis, D. D., Madigan, D., and Posse, C., "Bayesian Mixed-Effects Models for Recommender Systems," *ACM SIGIR '99 Workshop on Recommender Systems: Algorithms and Evaluation,* 1999.

Lewis, D. D., "Naive (Bayes) at Forty: The Independence Assumption in Information Retrieval," *European Conference on Machine Learning,* pp. 4-15, 1998.

Lewis, D. D., "The TREC-5 Filtering Track," *The Fifth Text REtrieval Conference (TREC-5),* pp. 76-96, 1997.

Lewis, D. D., "Information Retrieval and the Statistics of Large Data Sets," *Proceedings of the NRC Massive Data Sets Workshop,* pp. 143-147, 1997.

Cohn, D. and Lewis, D., Active Learning Symposium *AI Magazine,* vol. 17, pp. 83Spring, 1996.

Lewis, D. D., "The TREC-4 Filtering Track," *The Fourth Text REtrieval Conference (TREC-4),* pp. 165-180, 1996.

Lewis, D. D., "Challenges in Machine Learning for Text Classification," *Proceedings of the Ninth Annual Conference on Computational Learning Theory,* pp. 1, 1996.

Lewis, D. D., "Active by Accident: Relevance Feedback in Information Retrieval," *AAAI Fall Symposium on Active Learning,* Nov. 1995.

Lewis, D. D., A Sequential Algorithm for Training Text Classifiers: Corrigendum and Additional Data *SIGIR Forum,* vol. 29, pp. 13-19, Fall, 1995.

Kwok, K. L., Grunfeld, L., and Lewis, D. D., "TREC-3 Ad-Hoc, Routing Retrieval and Thresholding Experiments Using PIRCS," *Overview of the Third Text REtrieval Conference (TREC-3),* pp. 247-255, Apr. 1995.

Lewis, D. D., "A Brief Overview of Information Retrieval," *Proceedings IEEE Automatic Speech Recognition Workshop.* Snowbird, Utah, pp. 66, 1995.

Lewis, D. D. and Hayes, P. J., Guest Editorial *ACM Transactions on Information Systems ,* vol. 12, pp. 231Jul, 1994.

Callan, J. P. and Lewis, D. D., "The Efficiency Issues Workshop Report," *The Second Text Retrieval Conference (TREC-2),* pp. 303-304, Mar. 1994.

Lewis, D. D., "Natural Language Processing and Text Classification: Position Paper," *Proceedings of the Workshop on Future Directions in Text Analysis, Retrieval, and Understanding,* Chicago, IL, pp. 52-57, Feb. 1993.

Lewis, D. and Smeaton, A. "Workshop on: Use of Natural Language Processing at TREC," The First Text REtrieval Conference (TREC-1), pp. 365-366, 1993.

Lewis, D. D., Representation and Learning in Information Retrieval 1992. Department of Computer Science; Univ. of Massachusetts. Ph.D. Thesis.

Lewis, D. D. and Tong, R. M., "Text Filtering in MUC-3 and MUC-4," *Proceedings of the Fourth Message Understanding Conference (MUC-4),* McLean, VA, pp. 51-66, 1992.

Lewis, D. D. Text Representation for Intelligent Text Retrieval: A Classification-Oriented View. In: *Text-Based Intelligent Systems*, ed. Jacobs, P. S. Hillsdale, NJ: Lawrence Erlbaum, 1992.pp. 179-197.

Lewis, D. D., "Feature Selection and Feature Extraction for Text Categorization," *Proceedings of Speech and Natural Language Workshop,* Harriman, NY, 1992.

Lewis, D. D., "Learning in Intelligent Information Retrieval," *Eighth International Workshop on Machine Learning,* pp. 235-239, 1991.

Lewis, D. D., "Evaluating Text Categorization," *Proceedings of Speech and Natural Language Workshop,* pp. 312-318, 1991.

Lewis, D. D., "Data Extraction as Text Categorization: An Experiment with the MUC-3 Corpus," *Proceedings of the Third Message Understanding Evaluation and Conference,* San Diego, CA, 1991.

Lewis, D. D., "Representation Quality in Text Retrieval: An Introduction and Experiment," *Proceedings of Speech and Natural Language Workshop,* pp. 288-295, 1990.

Lewis, David D. Desiderata for IR Parsing, and an Evaluation of the Transportable Understanding Mechanism Package (TRUMP). COINS, U Mass Amherst. M.S. Thesis.


## Talks (selected)

• Predictive Coding and Validation. *Carmel Valley E-Discovery Retreat*, Monterey, CA, July 24, 2012. (Panel)

• A Brief Overview of Technology-Assisted Review. Talk presented on panel *Predictive coding: What is it? What's next? Why is it important?* at the event *Strategies for Spanning the E-Discovery Divide*, part of the *2012 Masters Series for Legal Professionals*, Chicago, IL, June 20, 2012.

• Will Technology-Assisted Predictive Modeling and Auto-Classification End the 'End-User' Burden in Records Management? *National Conference on Managing Electronic Records*, Chicago, IL, May 7, 2012. (w/ Jason Baron)

• The E-Discovery Games: A Closer Look at Technology Assisted Document Review. *ACEDS Web Seminar*, Apr. 15, 2012, and Kroll Ontrack Webinar, April 25, 2012. (w/ Kara Kirkeby)

• Statistics and E-Discovery. *Chicago chapter of the American Statistical Association monthly meeting*, Chicago, IL, Mar. 20, 2012

• Computer-Assisted Review Technology - Will This Change the E-Discovery Game? *Breakfast Sponsored by TechLaw Solutions*, Chicago, IL, Mar. 16, 2012. (Panel)

• Understanding and Implementing a Computer-Assisted Review Workflow. *ACEDS Web Seminar*, Nov. 30, 2011. (Panel)

• Predictive Coding: A More Efficient and Less Expensive Search – But will the Courts Agree? *The Federal Bar Association, Western Pennsylvania Chapter, E-Discovery Series,* Oct. 27, 2011. (Panel)

• Machine Learning and Automated Review. *Chicago Association for Litigation Support annual CALSMposium.* Oct. 11, 2011. (Panel)

• Improving Searches; Recall & Precision, TREC Study, Iterative Search Term Analysis. *Chicago Association for Litigation Support annual CALSMposium.* Oct. 11, 2011. (Panel)

• Relativity Assisted Review. *Relativity Fest*, Sep. 26, 2011. (Panel)

- E-Discovery as Machine-Aided Annotation of a Finite Population.  SIGIR 2011 Information Retrieval for E-Discovery (SIRE) Workshop, Beijing, China, July 28, 2011.

- Data, Knowledge, and E-Discovery. *International Conference on Artificial Intelligence and Law*, Pittsburgh, PA, June 7, 2011.

- Mock Hearing on the Disposition of Computer Tapes - You Render the Verdict - American Idol Style! *National Conference on Managing Electronic Records*, Chicago, IL, May 24, 2011. (w/ Hon. James Francis, Anne Kershaw, and Steven Bennett)

- A Brief Introduction to Non-Linear Review. *Chicago Chapter of the Association for Litigation Support Professionals*, Chicago, IL, Mar. 8, 2011.

- Information Retrieval for Electronic Discovery. *Michigan Information Retrieval Meetup*, Livonia, MI, Feb. 17, 2011.

- Machine Learning in Electronic Discovery. *Chicago Machine Learning Meetup*, Chicago, IL, Feb. 9, 2011.

- (Naive) Bayesian Text Classification for Spam Filtering. *Minimizing Market MAYhem: Statistical Applications in Direct Marketing, the Spring Conference of the Chicago Chapter of the American Statistical Association*, 2004.

- Text Mining: New Technologies from Old Concepts. *NFAIS*, 2004. (Panel)

- (Spam vs.) Forty Years of Machine Learning for Text Classification. *Spam Conference*, Cambridge, MA, 2003.

- That Sounds Like "Mine": Some Thoughts on Text and Speech Mining. *AT&T Speech Days,* Florham Park, NJ, Oct. 2002.

- Generative and Discriminative Models in Text Classification. *Workshop on Challenges in Information Retrieval and Language Modeling, Univ. of Massachusetts at Amherst, Amherst, MA,* Sep. 2002.

- Automatic Text Categorization.  Testimony for hearing of National Research Council project on *Tools and Strategies for Protecting Kids from Pornography and Their Applicability to Other Inappropriate Internet Content* (Mar. 2001).

- Classifying and Mining Documents. *SPIE Document Recognition and Retrieval IX* (Jan. 2001).

- Next-Generation Information Access on the Web (panel). *ACM Conference on Information and Knowledge Management* (Nov. 2000).

- Text Categorization and Text Mining, *ACM SIGKDD International Conference on Knowledge Discovery & Data Mining: Workshop on Text Mining,* (Aug 2000).

- Machine Learning for Text Categorization: Background and Characteristics, *National Online Meeting and IOLS,* (May 2000).

• Naive (Bayes) at Forty: The Independence Assumption in Information Retrieval, *European Conference on Machine Learning*, 1998.

• Research Directions in Information Retrieval, *NSF Information and Data Management Workshop*, 1998.

• What Have We Learned, and Where are We Going?, *Infonortics Search Engine Meeting*, 1998.

• Challenges in Machine Learning for Text Classification, *Conference on Computational Learning Theory*, 1996.

• An Overview of Information Retrieval, *IEEE Signal Processing Society Workshop on Automatic Speech Recognition*, 1995.

• An Industry View on Education for IR (panel), *ACM SIGIR Conference on Research and Development in Information Retrieval*, 1995.

• Language Processing in Academia and Industry (panel), *American Society for Information Science Annual Conference*, 1994.

• Statistical Language Processing in Information Retrieval (panel), *IEEE Conference on Artificial Intelligence for Applications*, 1993.

• Optical Character Recognition and IR (panel), *Symposium on Document Analysis and Information Retrieval*, 1993.

• Natural Language and Information Retrieval (panel), *Workshop on Future Directions in Text Analysis, Retrieval, and Understanding, 1991.*

• Language-Oriented Information Retrieval (panel), *American Society for Information Science Annual Conference*, 1988.

• Evaluation in Information Retrieval, *DARPA Workshop on the Evaluation of Natural Language Processing Systems*, 1988.

• Invited talks at institutions, including AT&T, BBN, Bellcore, Brooklyn Poly, Cancer Research UK, Carnegie Mellon, CDC, CNI-IRI Pisa, Columbia, CUNY - Queens, Colorado State, Cornell, DEC, DePaul, EBay, Fuji Xerox, General Electric, IBM, Johns Hopkins, Just Systems, Lincoln Labs, MathSoft, Michigan State, Microsoft –Cambridge, Microsoft – Redmond, MIT, MITRE, National Library of Medicine, Naval Research Laboratory, NEC, NYU, Siemens, Synopsys, Syracuse U., Thinking Machines, Thomson Publishing, Toyota Technological Institute, Unisys, U. California Berkeley, U. California Santa Cruz, U. Chicago, U. Dortmund, U. Glasgow, U. Illinois Chicago, U. Illinois UC, U Limerick, U. Massachusetts, U. Michigan, U. Pitt, U Maryland BC, U. Sheffield, U. Utah, U. Washington, U. Wisconsin, West Publishing, Xerox.

## Douglas Forrest, Esq

Eastern Regional Director –eDiscovery Strategy & Management
International Litigation Services

## Professional Experience

**International Litigation Services**        **July 2010 – present**
*Eastern Regional Director –eDiscovery Strategy & Management*
Helping law firms and corporate legal departments with planning best strategies and practices to obtain and produce electronic discovery in conformance with current rules of civil procedure and case law.

**Ozmosys, Inc**                        **May, 2010 – present, 2000 – 2006**
*Chief Technology Officer*
Designed and developed on-line client-administered service, being OEM'ed by Lexis as LexisNexis Research® Total Alerts, to deliver individualized e-mails consolidating new content from web sites, Lexis Trackers, Factiva folders, CourtLink, direct publisher feeds, RSS feeds, etc..   Clients include Arnold & Porter, Bingham McCutchen, Cozen O'Connor, Cravath, Credit Suisse, Davis Polk, Debevoise, DLA Piper, Gibson Dunn, Goldman Sachs, Howrey, Morgan Stanley, Reed Smith, UBS, Wilmer Hale, Winston & Strawn.

Developed Web 2.0 on-line practice area/client daily newsletter service OEM'ed by LexisNexis as LexisNexis Clipper.

Developed the on-line technology behind the *LexisNexis Legal Industry Monitor*, *Thompson Elite Daily Docket* and Institutional Investors' *Mutual Fund Daily*, *Hedge Fund Daily* and *Compliance Daily*

**Encore Discovery Solutions**            **August 2009 – May 2010**
*Director, Northeast Region*
Opening NY region for Phoenix-based non-proprietary e-discovery vendor, maintaining and developing contacts with NY- and DC-based corporations and AmLaw 200 firms.

**Guidance Software, Inc**                **May 2006 – August 2009**
*e-Discovery Specialist (January 2009 – August 2009)*
Responsible for ensuring success of all Eastern US pay-per-use clients such as Verizon, GE, AOL, Bell Canada, etc.
*e-Discovery Services Manager (August 2007 – December 2008)*
*e-Discovery Business Manager (May 2006 - August 2007)*
Managed e-discovery professional services sales team.

**Independent Consultant**                    1984 – 1989, 1998 - 2006

- Created PDA Application prototype to monitor Point-Of-Purchase materials usage in 1,700 store national retail chain.
- Created workflow-enabled Operations Control system to capture, track and review all hours, services, rentals and expenses and create invoices in accounting system for major litigation and trial services vendor.
- Designed Electronic Evidence processing system for major litigation support vendor.
- Developed zero-footprint, insert-and-run CD application for debtor's' data distributions in a $10 billion+ bankruptcy.

**Special Counsel/LIT, Inc.**                    1993 – 1998

*Executive Director, Technical Services Division:*    Acted as primary technological strategist in developing, and chief presenter in marketing, Xerox/Special Counsel Alliance initiative to legal community.

*Vice President, Research & Development*:    Conceived, designed and created *WIDE* (Workflow Document Imaging Environment) for Skadden, Arps, Slate, Meagher & Flom to image, index, distribute and manage daily receipt of 15,000 pages of docket materials in 100,000 cases cluster. *WIDE* was to have served as basis of proposed Xerox/Special Counsel enterprise document management SAS offering.

Conceived, designed and oversaw development of *LIT CaseWorks*, a *Lotus Notes*-based enterprise-class integrated case management and litigation support system used at Cravath, Swaine & Moore; Simpson Thacher & Bartlett and Dickinson Wright.

*Director of Litigation Services:*    Litigation support sales and project and account management for clients including Paul, Weiss, Cravath, Simpson Thacher, Chadbourne & Parke, Akin Gump, etc.

**MicroEdge, Inc.**                    1989 – 1993

*Vice President Professional Services*

Built consulting and training divisions for PC software company, including business development, project management and systems analysis. Led development of award-winning system to handle $34 billion Mexican debt refinancing for Citibank.

**Cravath, Swaine & Moore**                    1979 – 1984

*Senior Litigation Associate*:    Significant involvement in complex litigation, including antitrust analysis for HBO and Time, Inc., IBM antitrust litigation, Iranian hostage defense preparation, international arbitration proceedings and pro bono representation of Phoenix House.

**Breed, Abbott & Morgan**                    1976-1979

*Litigation Associate*:    Work on matters for Honeywell, Armco Steel, National Distillers, Arthur Andersen, etc, with significant attention to antitrust, including monopsony claims.

## Education

Stanford Law School (J.D., 1976, Note Editor, *Stanford Law Review)*
Antioch College (B.A., 1973)

# Exhibit B

1

C5E3DAS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MONIQUE DA SILVA MOORE, et
al.,

                    Plaintiffs,

          v.                          11 CV 1279 (ALC)(AJP)

PUBLICIS GROUPE SA, et al.,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      May 14, 2012
                                      9:35 a.m.

Before:

                    HON. ANDREW J. PECK,

                                      Magistrate Judge

                    APPEARANCES

SANFORD WITTELS & HEISLER, LLP
     Attorneys for Plaintiffs
BY:  STEVEN WITTELS
     SIHAM NURHUSSEIN
     DEEPIKA BAINS

JACKSON LEWIS LLP
     Attorneys for Defendants MSLGroup
BY:  VICTORIA WOODIN CHAVEY
     JEFFREY W. BRECHER
     BRETT M. ANDERS

MORGAN, LEWIS BOCKIUS
     Attorneys for Defendant Publicis
BY:  PAUL C. EVANS

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

74

C5eWdas2

1  dispositive motion such as a motion to dismiss.  This is
2  especially so where the stay is for a short period of time and
3  the opposing party will not be prejudiced by the stay.  Two
4  related factors that the courts consider in deciding a motion
5  for a stay of discovery are the breadth of the discovery sought
6  and the burden of responding to it.  Another factor that the
7  courts consider is whether the party opposing the stay would be
8  unfairly prejudiced by a stay."
9         With that, in light of the fact that if additional
10  plaintiffs opt in, that will change what documents are
11  responsive, since we have been excluding from the seed set
12  documents that deal with specific decisions by people or
13  affecting people other than the group of named plaintiffs, I
14  guess my question at this point where I'm interested in both
15  good use of judicial resources and where proportionality and
16  costs are a factor, and if we go further down the road with
17  this predictive coding process and then 20 more people opt in,
18  we're going to have to revamp the system and I don't know that
19  one can just do that by searching for their name at this point.
20         Mr. Baskin is shaking his head no.  Perhaps,
21  Mr. Baskin, you could address that.  And then what I'd like
22  defendants to address is what are the costs or what is the
23  prejudice to putting discovery on hold since generally it is
24  the plaintiff that wants to proceed quickly, which doesn't seem
25  to be their mode of operation here, and go from there.

```
                                                              1
     C28rdasc
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   MONIQUE DA SILVA MOORE, et al.,
 3
 4             Plaintiffs,
 4
 5        v.                              11 Civ. 1279 (ALC)
 5
 6   PUBLICIS GROUPE and MSL GROUP,
 6                                        Conference
 7             Defendants.
 7
 8   ------------------------------x
 8
 9                                        New York, N.Y.
 9                                        February 8, 2012
10                                        3:00 p.m.
10
11   Before:
11
12             HON. ANDREW J. PECK
12
13                                        Magistrate Judge
13
14
14
15        APPEARANCES
15
16
16
17   SANFORD WITTELS & HEISLER LLP
17        Attorneys for Plaintiffs
18   BY:  JANETTE L. WIPPER (tel.)
18        DEEPIKA BAINS
19        SIHAM NURHUSSEIN
19
20
20   JACKSON LEWIS LLP
21        Attorneys for Defendants
21   BY:  JEFFREY W. BRECHER
22        BRETT M. ANDERS
22
23
23   ALSO PRESENT:
24
24        PAUL J. NEALE
25        DAVID BASKIN
25
```

C28rdasc

1  talking with the defense is their view is we should finish
2  phase 1 altogether before even considering what falls into
3  phase 2 and what to do with it.  Given the time line associated
4  with this process and the scope of discovery, I don't see us
5  finishing phase 1 before the discovery deadline approaches.
6          THE COURT:  If that's the only problem, I'll extend
7  the discovery cutoff date.
8          MR. ANDERS:  Your Honor, I apologize, but we haven't
9  finished the custodians yet.
10          THE COURT:  This is custodian-oriented.
11          MR. NEALE:  The suggestion was moving certain
12  custodians into phase 2.  I'm just saying if we add that to the
13  sources, among the sources that are phase 2, it raises the
14  issue that --
15          THE COURT:  If that's the only problem, which is
16  timing, I can deal with that.
17          Two down, four or five to go.  Who is next?
18          MS. BAINS:  All of the others are managing directors.
19          THE COURT:  Where are they located and are they the
20  managing directors of any office that a named plaintiff works
21  in?
22          MS. BAINS:  The first is Steve Bryant.  It's managing
23  director.
24          THE COURT:  Give me the number from your page 17-18.
25          MS. BAINS:  Number 32.

C28rdasc

```
 1              THE COURT:  What office is he?
 2         MS. BAINS:  Seattle.
 3              THE COURT:  Does any plaintiff work in Seattle?
 4         MS. BAINS:  None of the current plaintiffs.
 5              THE COURT:  That's what we are taking discovery on.
 6   He's out, as is any other managing director of an office that
 7   doesn't have a plaintiff working at it.  Despite your colleague
 8   in San Francisco not liking my approach, that's why you're
 9   going to do your conditional certification sooner rather than
10   later.  You get some plaintiffs who work in Seattle opting in,
11   and we have to reconsider this.
12         MS. BAINS:  The next is number 34, Carl Farnham,
13   managing director of Atlanta.  We have a plaintiff from plant a
14   who worked in the Atlanta office.
15              THE COURT:  During the period that Mr. Farnham worked
16   there?
17         MS. BAINS:  I don't have that information with me.
18         MR. ANDERS:  Your Honor, our understanding is he
19   became the managing director in June of 2010, and at that point
20   no plaintiffs were working in the Atlanta office.
21              THE COURT:  Based on that representation, he's out.
22   Next.
23         MS. BAINS:  The next is Megan Gross.
24              THE COURT:  Number 36.
25         MR. ANDERS:  Your Honor, she became a managing
```

```
                                                              1
       C4p9mooc
 1     UNITED STATES DISTRICT COURT
 1     SOUTHERN DISTRICT OF NEW YORK
 2     ------------------------------x
 2
 3     MONIQUE DA SILVA MOORE, ET
 3     AL.,
 4
 4                    Plaintiffs,
 5
 5             v.                        11 CV 1279 (ALC) (AJP)
 6
 6     PUBLICIS GROUPE SA, ET AL.,
 7
 7                    Defendants.
 8
 8     ------------------------------x
 9                                      New York, N.Y.
 9                                      April 25, 2012
10                                      2:06 p.m.
10
11     Before:
11
12                    HON. ANDREW J. PECK
12
13                                      Magistrate Judge
13
14                         APPEARANCES
14
15     SANFORD, WITTELS & HEISLER, LLP
15          Attorneys for Plaintiffs
16     BY:  STEVEN LANCE WITTELS
16          DEEPIKA BAINS
17          SIHAM NURHUSSEIN
18     JACKSON LEWIS LLP
18          Attorneys for Defendant MSLGroup
19     BY:  BRETT M. ANDERS
19          JEFFREY W. BRECHER
20
20     MORGAN, LEWIS & BOCKIUS LLP
21          Attorney for Defendant Publicis Groupe SA
21     BY:  PAUL C. EVANS
22
22
23
24
25
```

18

C4p9mooc

1  resume looking for a position in HR.  We marked as not
2  relevant.  We get a response that that should be relevant.  An
3  employee who is not a plaintiff, they're out-of-office
4  assistant said I will be out of on maternity leave until June
5  5, please contact so and so.  We marked that as not relevant.
6  Plaintiff said that's relevant.
7          What I tried to do was start breaking it out into
8  broader categories that we can possibly address.
9          One suggestion would be allow us to go through the
10 3300.
11         Another suggestion would be maybe go through five
12 hundred.  I think if we go through five hundred, we'll get a
13 good sense of categories, discuss those categories with
14 plaintiff, and then bring that to your Honor.
15         But my concern is a lot of what I'm seeing is
16 something that your Honor has already ruled on in terms of what
17 is relevant and what's not.
18         THE COURT:  You all want to come back Friday?  I'm on
19 trial next week.  Unless -- if you want to stick around until
20 after the 3:00 conference, the trial may or may not crater
21 based on some issues that the parties raised at the last time.
22 Otherwise I'm not seeing you next week.  But if we do deal with
23 500, I'm certainly willing to suffer through it on Friday.
24         Another possibility -- although it's expensive and we
25 can either do it on a loser-pay or on a 50/50 cost shift is for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C4p9mooc

1    me to give you a special master who can go through all of these
2    in light of my rulings.
3            But frankly, Mr. Wittels, if that description of these
4    documents is correct, I am not going to let you destroy the
5    predictive coding protocol process because of a difference of
6    opinion as to relevance on which I have ruled.
7            MS. BAINS:  Your Honor, I'll address this.  I don't
8    agree with Mr. Anders' characterization of our coding.
9            In fact, I got this e-mail yesterday saying that
10   plaintiffs coded things that were individual decisions who are
11   not the named plaintiffs.  So did MSL.  Many, many, times.
12   There are also at least 20 that I counted manually.  Examples
13   of the same exact document being coded as relevant and not
14   relevant.  Identical documents.  And I have some examples with
15   me.
16           THE COURT:  Well that has to be cleaned up.
17           MS. BAINS:  So I don't think that the answer is coming
18   up with broad categories because, honestly, when we went
19   through the coding we couldn't figure their coding out because
20   of all of the inconsistencies.  So it raises a lot of issues
21   with us about the accuracy of the process and the reliability
22   of the process if the coding going into it is going to be
23   inaccurate.
24           THE COURT:  That's certainly true.  How many people
25   coded, if we're seeing inconsistent coding?

1

```
    1c20sasc
 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 2
 3  MONIQUE DA SLIVA MOORE,
 3
 4              Plaintiff,
 4
 5          v.                        11CV01279
 5
 6  PUBLICIS GROUPE,ET AL,
 6
 7              Defendant.
 7
 8  ------------------------------x
 8                                New York, N.Y.
 9                                December 2, 2011
 9                                5:00 p.m.
10
10  Before:
11
11                  HON. ANDREW J. PECK,
12
12                                Magistrate Judge
13
13                  APPEARANCES
14
14  SANFORD WITTELS & HEISLER
15      Attorney for Plaintiff
15  BY:  STEVEN WITTELS
16       SIHAM NURHUSSEIN
17
17  JACKSON LEWIS
18      Attorney for Defendant
18  BY:  VICTORIA WOODLIN CHAVEY
19       JEFFREY BRECHER
20
21  MORGAN LEWIS & BOCKIUS, LLP
21  BY:  GEORGE STOHNER
22  Attorneys for Defendant Publicis Groupe
22
23
24
25
```

20

1c20sasc

1    iterate process and something may come up later.  But I'm not
2    going to have them do an e-mail search because you have two or
3    three documents that refer to various types of reorg when, in a
4    week or two, if you all get your act together -- and if you
5    don't, you know, you may wind up with a special master or me
6    choosing your e-Discovery plan.  Just get the e-Discovery plan
7    done.  Get all of the ESI.  And then figure out what is
8    missing.  And that's the Court's ruling.
9                Now, if you want any more advice, for better or for
10   worse on the ESI plan and whether predictive coding should be
11   used, or anything else, if the case -- I will say right now,
12   what should not be a surprise, I wrote an article in the
13   October Law Technology News called Search Forward, which says
14   predictive coding should be used in the appropriate case.
15               Is this the appropriate case for it?  You all talk
16   about it some more.  And if you can't figure it out, you are
17   going to get back in front of me.  Key words, certainly unless
18   they are well done and tested, are not overly useful.  Key
19   words along with predictive coding and other methodology, can
20   be very instructive.
21               I'm also saying to the defendants who may, from the
22   comment before, have read my article.  If you do predictive
23   coding, you are going to have to give your seed set, including
24   the seed documents marked as nonresponsive to the plaintiff's
25   counsel so they can say, well, of course you are not getting

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

1c20sasc
```
 1   even-steven.
 2              MS. NURHUSSEIN:  And, your Honor, one final point, we
 3   had also --
 4              THE COURT:  You know, there is -- well, look, if you
 5   all want to go to a special master on this limited point then,
 6   you know, who cannot just rule on anything, but who can help
 7   you all perhaps put your ESI plan together, but yes, somebody
 8   has to pay that person's freight.  You know, I know enough
 9   people in the industry that I can recommend some, or you all
10   can get your vendors to recommend somebody or whatever it is
11   going to be.  If you are perfectly happy, you know, arm
12   wrestling over it and bringing back the issue, once you have
13   finished your meet and confer, which will be some date we'll
14   pick, which will be before Christmas so this is ready to run
15   over the Christmas holiday or whatever, we'll get this moving.
16   If you want a master, either side, tell me.  If you don't,
17   that's fine, too.
18              MS. NURHUSSEIN:  Okay, your Honor.  That sounds good
19   to us, your Honor.
20              The additional point I wanted to make --
21              THE COURT:  What sounds good, my general speaking or
22   you want a master, or you don't.
23              MS. NURHUSSEIN:  I think to have a follow-up
24   conference to try to bring some closure to the dispute we have
25   been having about ESI.  But the related point I wanted to make
```

1c20sasc

1   soon as we have a deadline for the production of the documents,
2   you're going to sit down and come up with a relatively fair
3   schedule -- take "relatively" out of that sentence.  A fair
4   schedule that, you know, might be two for one, might by one for
5   one, might depend on witness availability.  But you are going
6   to start cooperating more, and you're going to get a schedule
7   done.
8           MS. NURHUSSEIN:  Okay, thank you, your Honor, we'll
9   discuss the deposition schedule with defense counsel.
10          Thank you.
11          THE COURT:  Any issues from the defense, and any view
12  from the defense on a special master or not?
13          MS. CHAVEY:  Your Honor, it sounds like you don't want
14  to go further into the deposition issue?
15          THE COURT:  Not unless you really think that I am so
16  wrong that you are going to say something that is going to
17  change my mind.
18          MS. CHAVEY:  We do think that, by virtue of serving
19  the notices for the plaintiff's depositions --
20          THE COURT:  Are you ready to take the plaintiff's
21  depositions?
22          MS. CHAVEY:  We are.  We had -- we have been ready
23  since September to take the plaintiff's depositions.  We have
24  three depositions scheduled for next week.  A fourth is
25  scheduled for the week after.  Because of scheduling, those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1

C28rdasc
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  MONIQUE DA SILVA MOORE, et al.,
3
4              Plaintiffs,
4
5          v.                        11 Civ. 1279 (ALC)
5
6  PUBLICIS GROUPE and MSL GROUP,
6                                    Conference
7              Defendants.
7
8  ------------------------------x
8
9                                    New York, N.Y.
9                                    February 8, 2012
10                                   3:00 p.m.
10
11  Before:
11
12          HON. ANDREW J. PECK
12
13                                   Magistrate Judge
13
14
14
15          APPEARANCES
15
16
16
17  SANFORD WITTELS & HEISLER LLP
17          Attorneys for Plaintiffs
18  BY:  JANETTE L. WIPPER (tel.)
18          DEEPIKA BAINS
19          SIHAM NURHUSSEIN
19
20
20  JACKSON LEWIS LLP
21          Attorneys for Defendants
21  BY:  JEFFREY W. BRECHER
22          BRETT M. ANDERS
22
22
23  ALSO PRESENT:
24
24          PAUL J. NEALE
25          DAVID BASKIN
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

C28rdasc

```
 1              THE COURT:  You're Ms.?
 2          MS. NURHUSSEIN:  Siham Nurhussein for plaintiffs.
 3              THE COURT:  It will take me a while to figure out who
 4     is who.  Go ahead.
 5          MS. NURHUSSEIN:  Understandable, your Honor.  If I
 6     could respond to a couple of points Mr. Brecher mention.  First
 7     of all, this is the first we have heard as to the sort of
 8     search he has conducted.
 9              THE COURT:  I suspect that is because you and they
10     don't talk to each other or don't talk to each other very well.
11          MS. NURHUSSEIN:  Actually, your Honor, he mentioned
12     that we raised this issue for the first time in terms of the
13     types of complaints we were aware of on Monday.  We actually
14     sent an email on January 30th, so over a week ago, raising all
15     these concerns, identifying at least one --
16              THE COURT:  Let's get to the merits.  You each think
17     you sandbagged each other.  You may well be on your way to a
18     special master if I lose too much patience with you.  But let's
19     get to the merits.
20              On the employment discrimination complaints, what is
21     it that you want them to do that they haven't done or what is
22     it you think is missing other than you think the company is
23     rife with discrimination and therefore there should be more?
24     That I can't rule on.
25          MS. NURHUSSEIN:  Your Honor, I think we do need
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

C28rdasc

1    one.
2           Number two, modification of the Rifkind rule, Rifkind
3    being the senior partner of my old firm Paul Weiss Rifkind.
4    The modification is all letters will be responded to within a
5    week, sooner if at all possible, certainly no later than a
6    week.
7           With all due respect, I don't know how it got here.
8    Maybe it's because when you were in front of Judge Sullivan
9    originally, the case was not given as much judicial supervision
10   as it needed, but you're out of control here.  You all had
11   better cooperate with each other.  If you don't, I am going to
12   withdraw Ms. Wipper's telephone privileges; and if you want a
13   regular 9 o'clock every Friday conference or whatever, we'll do
14   it, until I lose even more patience with you, and then you'll
15   get a special master, and whoever loses each issue in front of
16   the special master will pay the special master's fees of
17   several hundred to a thousand dollars an hour.
18          I've seen many a big case in this court go a lot more
19   smoothly than this.  As I say, I cannot speak to what happened
20   before I inherited the case, but I expect cooperation.  Stop
21   the whining and stop the sandbagging.  This goes for both
22   sides.  Get along.  You're going to run out of your judicial
23   time.  And I don't just mean the discovery period will end.
24   You're not my only case, you're not my only big case.  At some
25   point I'm going to say every conference is two hours with you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

94

C28rdasc

1    probably work through Lincoln.
2                MR. ANDERS:  That's probably the 20th.
3                THE COURT:  Presidents Day is the 20th.  Lincoln's
4    birthday is going to be either the 13th or the 14th.  Thursday
5    the 16th, does that work for all of you?
6                MR. ANDERS:  Yes, your Honor.
7                MS. BAINS:  Sure.  Can we set an intermediate deadline
8    to have a draft from one party to the other?  It became a
9    problem last time because we didn't have enough time to review
10   it.
11               THE COURT:  Sure.  Who is drafting it?
12               MR. ANDERS:  I'll draft it, your Honor.
13               THE COURT:  Can you get them a draft by Monday?
14               MR. ANDERS:  Yes, your Honor.
15               THE COURT:  Good.
16               MS. BAINS:  Thank you.
17               THE COURT:  With all due respect to both of you, if I
18   have to start doing Mickey Mouse of who does a draft to whom
19   when on something somewhere between what's already on paper so
20   all you have to do is delete all the arguments and the things
21   that one side or the other lost -- it should be a no-brainer.
22   You will have the transcript.  Really, if you all can't do
23   this, you're going to encourage me greatly to give you a
24   special master and run your bills up instead of me dealing with
25   all of you.

```
                                                              1
        C4p9mooc
 1      UNITED STATES DISTRICT COURT
 1      SOUTHERN DISTRICT OF NEW YORK
 2      ------------------------------x
 2
 3      MONIQUE DA SILVA MOORE, ET
 3      AL.,
 4
 4                      Plaintiffs,
 5
 5              v.                          11 CV 1279 (ALC) (AJP)
 6
 6      PUBLICIS GROUPE SA, ET AL.,
 7
 7                      Defendants.
 8
 8      ------------------------------x
 9                                          New York, N.Y.
 9                                          April 25, 2012
10                                          2:06 p.m.
10
11      Before:
11
12                      HON. ANDREW J. PECK
12
13                                          Magistrate Judge
13
14                           APPEARANCES
14
15      SANFORD, WITTELS & HEISLER, LLP
15           Attorneys for Plaintiffs
16      BY:  STEVEN LANCE WITTELS
16           DEEPIKA BAINS
17           SIHAM NURHUSSEIN
18      JACKSON LEWIS LLP
18           Attorneys for Defendant MSLGroup
19      BY:  BRETT M. ANDERS
19           JEFFREY W. BRECHER
20
20      MORGAN, LEWIS & BOCKIUS LLP
21           Attorney for Defendant Publicis Groupe SA
21      BY:  PAUL C. EVANS
22
22
23
24
25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

21

C4p9mooc

1   materially, to work through this?
2           I'm not going to look at 3300 documents.  I'll tell
3   you that right now.  They can be categorized.  They can, you
4   know, you all pull some sort of sample.  You could have a
5   special master who gets paid by the hour.
6           You tell me what you want.
7           MR. ANDERS:  Your Honor I think one initial decision
8   is, from plaintiffs, do you agree to abide by Judge Peck's
9   ruling that --
10          THE COURT:  Asked that way, there is no way they can
11  answer that other than yes unless they are total idiots.
12          MR. ANDERS:  Your Honor, my point is I have examples
13  of documents here that are individualized decisions for
14  nonplaintiffs.  And if the position is plaintiffs still think
15  that those are relevant and should be in, well we now have a
16  fundamental disagreement over something I believe your Honor
17  has ruled on.
18          MS. BAINS:  I think we need to understand the thought
19  process behind MSL's coding because in the fifteen minutes I
20  had to review this after getting notice of it, I found at least
21  five documents that MSL itself coded as relevant that were
22  individual personnel decisions for employees who were not
23  plaintiffs.
24          Now if there's some --
25          THE COURT:  To the extent they're giving you more than
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

24

C4p9mooc
1  you, you know, that rules for all 3300.
2          Do you want someone to review all 3300 sitting down
3  with you?  That will be a special master.  That's fine too.
4          MR. WITTELS:  I think, your Honor, taking over for
5  Ms. Bains.
6          We just got these documents.  We haven't had time,
7  very compressed amount of time to look at --
8          THE COURT:  This is your schedule, guys.  This is the
9  stipulation you asked me to resolve -- to approve, by the way,
10 at a time when you still didn't want me to decide anything but,
11 hey, that's another story.
12         Here's the schedule.  It's a stipulation both of you
13 asked for.  I approved it.  You're now woefully behind schedule
14 already at the first wave.  We need to resolve that.
15         I'm asking how you want to resolve that.  You gave
16 them the documents Monday.  So what do you mean you just got
17 something?
18         MR. WITTELS:  Your Honor, the compressed schedule is
19 based on your Honor having put us on a very short timetable.
20 We wouldn't have agreed to that type of timetable.
21         THE COURT:  But you did.
22         MR. WITTELS:  We had no choice.  We were forced into a
23 very short timetable to review as many --
24         THE COURT:  Mr. Wittels, stop.
25         MR. WITTELS:  I'm just saying, your Honor, to review
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1

C57LMOOC                    Conference
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  MONIQUE DA SILVA MORE, et al.,
3
4            Plaintiffs,
4
5       v.                          11 CV 1279 (ALC)(AJP)
5
6  PUBLICIS GROUPE SA, et al.,
6
7            Defendants.
7
8  ------------------------------x
8                                   New York, N.Y.
9                                   May 7, 2012
9                                   9:35 a.m.
10
10 Before:
11
11               HON. ANDREW J. PECK,
12
12                                   Magistrate Judge
13
13                    APPEARANCES
14
14 SANFORD WITTELS & HEISLER, LLP
15     Attorneys for Plaintiffs
15 BY:  STEVEN WITTELS
16     SIHAM NURHUSSEIN
16     DEEPIKA BAINS
17
17 JACKSON LEWIS LLP
18     Attorneys for Defendants MSLGroup
18 BY:  VICTORIA WOODIN CHAVEY
19     JEFFREY W. BRECHER
19     BRETT M. ANDERS
20
21
22
23
24
25

              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

6

C57LMOOC                    Conference
1           MR. ANDERS:  Your Honor, if I could just briefly
2   address that.  In terms of what we discussed on Friday as a way
3   to resolve the 800 that are in dispute, our proposal to
4   plaintiffs was as follows.
5           As we reviewed, we identified approximately nine
6   different categories where the documents where we disagreed
7   could be classified:  documents regarding individualized
8   personnel decisions, org charts where plaintiffs were not
9   mentioned, client presentations.
10          Our proposal to plaintiffs' counsel was for each of
11  those categories, we each select a representative sampling of
12  the types of documents that fall within those categories.  For
13  some categories we would only need a few because there's much
14  of the same, financial spreadsheets, for example.  Other
15  categories we may need more.  But the idea was pick some number
16  that we each select the documents that we think are
17  representative, provide that to your Honor, and based on your
18  Honor's rulings, we can then go back and apply it to the rest
19  of the set.
20          Plaintiffs, you know, I believe they rejected that
21  proposal.  Their response was they want to preserve their
22  rights and get a ruling on each of the at that point 970
23  documents we were disagreeing on.
24          THE COURT:  Let's start with the samples and go from
25  there.  And if plaintiffs want a ruling on every particular
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

7

C57LMOOC                    Conference

1   document in the 800, we'll see whether we go to a special
2   master or I've got all afternoon free as well today.  We'll see
3   what we do but, you know.
4           MR. WITTELS:  Our response, your Honor, why -- what we
5   were willing to do Friday was go through all the documents.
6   Defendants said they had to leave and we were prepared to sit
7   there and go through them on the phone and we proposed that but
8   the defendants didn't want to do that, so.
9           THE COURT:  Would you all like to do that this morning
10  in the jury room, and I'll deal with what's left on a sample
11  basis or a document-by-document basis starting at 2 o'clock.
12          MR. WITTELS:  We're ready to do that.  The problem we
13  had, just so your Honor knows, with the sampling was this.  We
14  asked the defendants and we said Friday, we put it in -- I
15  think we put it in writing as well, we would like to know which
16  of the documents fall into which of these categories because,
17  obviously, if it was an expense report, that was maybe a
18  category we could live with.  But they were very broad
19  categories, generation operation, which meant many things or
20  could mean many things.
21          So we asked them to tell us which of the 900 fit into
22  which category because, obviously, if they're going to pull a
23  few samples, they would have to know from what group they're
24  pulling.  They didn't do that so we don't know where they fall
25  in in these categories.

8

C57LMOOC                    Conference
 1            THE COURT:  Here's my question.  We had this on the
 2    docket for today.  I'd like to use at least between now and 11
 3    when the next case comes in to get as much done as possible.  I
 4    don't feel that it's useful when it just keeps throwing the
 5    schedule off if you all, for whoever's fault, and I don't know,
 6    but you all needed to be ready to proceed today.
 7            So tell me how you'd like to proceed.  I hear
 8    Mr. Anders say samples out of nine categories at least to
 9    start.  If there is something you'd like to do, look, you want
10    me to start going through document one through 860 or whatever
11    number we're talking about, that's fine, but at some point
12    you're either going to say I understand your rulings, Judge, we
13    can stop the process or it's going to cost you.  It's not my
14    job to review hundreds and hundreds, almost a thousand
15    documents.  That's what special masters are for who you pay by
16    the hour.
17            You tell me what you'd like to do.  I'm willing to do
18    whatever you want, and I'm willing to give you all of the today
19    except for the roughly hour and a half or two hours that I've
20    got a settlement conference coming in at 11 o'clock.
21            MR. WITTELS:  May I confer for one minute?
22            THE COURT:  Sure.
23            MS. CHAVEY:  I'm ready, your Honor.
24            MR. WITTELS:  Your Honor, we would like to go back
25    into the room, but we'd like to show you a few documents so we
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

91

C57LMOOC3
1    allotted where we could steal some days from the final review.
2            THE COURT:  Let's steal some from the early review so
3    we get back on track because unless you all start figuring out
4    a way to work better together, you're going to need those end
5    days because there's going to be enough going wrong in each one
6    of these blocks.
7            MR. ANDERS:  My thought was, your Honor, in addition
8    to the final review, the latter iterative reviews should go
9    faster and more smoothly than the earlier ones so we'll need
10   less time there.
11           THE COURT:  What I may do is say let's see where we
12   are after the first iteration of documents gets run because if
13   we continue to have, you know, thousands reduced to hundreds
14   reduced to 800 or to one, you're going to wind up with a
15   special master and, two, this schedule, you're going to finish
16   discovery in the next millennium and that's not going to happen
17   in this court.  So think about it and by the time we finish the
18   first review, let's see where we are.
19           MR. ANDERS:  That was going to be our suggestion, not
20   to do any final dates until we saw how the first round went.
21   Thank you.
22           THE COURT:  Okay.  Now, did I understand you're done
23   or that you're done only based on the number of documents that
24   one or the other of you had in hard copy here so there's still
25   others in dispute?