# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **MONIQUE DA SILVA MOORE,** | ) | |
| **MARYELLEN O'DONOHUE,** | ) | |
| **LAURIE MAYERS, HEATHER** | ) | |
| **PIERCE, KATHERINE WILKINSON,** | ) | |
| **on behalf of themselves and all others** | ) | |
| **similarly situated, and ZANETA** | ) | |
| **HUBBARD, on her own behalf.** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| | ) | **Civ No. 11-CV-1279 (ALC) (AJP)** |
| | ) | |
| **v.** | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| **PUBLICIS GROUPE SA, and** | ) | |
| **MSLGROUP,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |
| _____ | | |

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
# MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

I.  INTRODUCTION ...........................................................................................................1

II.  STATEMENT OF RELEVANT FACTS...........................................................................4

   A.  BACKGROUND...............................................................................................................5

      1.  Defendants' Corporate Structure ............................................................................5

      2.  Gender Stratification at Publicis and MSL .............................................................6

   B.  PUBLICIS AND MSL ARE HIGHLY CENTRALIZED ENTITIES, WITH COMMON POLICIES AND A DISCRETE GROUP OF DECISION-MAKERS.......................................6

      1.  Publicis' Common Policies and Centralized Decision-Making Structure ..............7

      2.  MSL's Common Policies and Centralized Decision-Making....................................8

          a.  MSL's Salary Bands........................................................................................9

          b.  Global Hiring and Salary Freeze .................................................................. 10

          c.  Common Policies Impacting Leave Takers and Caregivers .......................... 11

          d.  MSL's Facially Discriminatory Maternity Leave Policy............................... 12

   C.  MSL'S DEEPLY ENTRENCHED, TOP-HEAVY CULTURE OF GENDER BIAS INFORMS ITS DECISION-MAKING REGARDING PAY, LEAVE, TERMINATION AND OTHER EMPLOYMENT MATTERS .................................................................. 13

      1.  MSL Values Female Employees for Their Appearance, not Their Performance ............... 14

      2.  MSL Has a Pattern of Bullying Female Employees and Judging Them More Harshly Than Their Male Counterparts........................................................................... 16

      3.  MSL Fosters Pernicious Gender Stereotypes About Working Mothers and Punishes Women Who Take Maternity Leave .................................................................. 17

      4.  MSL Stigmatizes Women Who Avail Themselves of Flexible Work Arrangements ............................................................................................................. 19

      5.  MSL's Gender Stratification and the Presence of a "Boys' Club" Culture Perpetuates the Company's Culture of Gender Discrimination Against Women........................................... 19

D. DEFENDANTS' FLAWED HR POLICIES AND PRACTICES INSULATE AND PROMOTE DISCRIMINATORY DECISION-MAKING ........................................................ 20

    1. Inadequate Policies and Procedures for Preventing Discrimination ..................................... 20

    2. Inadequate Policies and Procedures for Monitoring Discrimination, Including Failure to Conduct a Pay Equity Analysis ............................................................................................... 21

    3. Inadequate Policies and Procedures for Investigating and Responding to Complaints of Discrimination ..................................................................................................................... 22

    4. HR Bias in Favor of President Tsokanos ............................................................................. 23

E. COMPELLING STATISTICAL AND ANECDOTAL EVIDENCE SHOWS THAT THE CLASS WAS HARMED BY DEFENDANTS' DISCRIMINATORY POLICIES AND PRACTICES ................................................................................................................................ 23

    1. Pay Class ............................................................................................................................. 23

        a. Statistical Evidence of Pay Discrimination ................................................................. 24

        b. Anecdotal Evidence of Pay Discrimination ................................................................ 24

    2. FMLA Class ........................................................................................................................ 26

        a. Statistical Evidence of Discrimination of Women Who Take Leave ........................... 26

        b. Anecdotal Evidence of Discrimination of Women Who Take Leave .......................... 26

            i. *Defendants' Pattern of Terminating Women During or After Leave* .............. 27

            ii. *Pattern of Forcing out New Mothers by Changing Their Jobs* ...................... 28

            iii. *MSL Targets Women in the Caregiver/Flex Schedule Category* ..................... 29

III. LEGAL ARGUMENT .......................................................................................................... 29

A. BACKGROUND OF PLAINTIFFS' TITLE VII CLAIMS ...................................................... 30

    1. Disparate Treatment: Pattern-or-Practice ........................................................................... 30

    2. Disparate Impact ................................................................................................................. 32

B. THE ESTABLISHED *TEAMSTERS* PROCEDURE PROVIDES THE ROAD MAP FOR THIS ACTION ................................................................................................................................ 33

C.  PLAINTIFFS MEET EACH OF THE RULE 23(a) REQUIREMENTS ................................. 34

　1.  Plaintiffs Hurdle Numerosity, Which Is Presumed at a Class of Forty ................................. 34

　2.  Plaintiffs Easily Satisfy Commonality and This Action Is the Antithesis of *Dukes*............. 34

　　a.  A Recap of the Supreme Court's Decision in *Wal-Mart Stores Inc. v. Dukes* .............. 35

　　b.  Post-*Dukes* Courts Have Found Commonality in Circumstances Analogous to This Case........................................................................................................................................ 37

　　c.  Commonality Exists for the Disparate Treatment Claims: Plaintiffs Provide Significant Proof the Defendants Operate Under a General Policy of Discrimination ................... 38

　　　i.  *Defendants Confer All Decision-Making Authority on an Openly Sexist Cabal* ............................................................................................................................ 38

　　　ii.  *Defendants' Employment Data Is Statistically Significant and Compelling Evidence of Classwide Discrimination* ................................................................. 40

　　　iii.  *Anecdotal Evidence Strongly Demonstrates Pervasive Discrimination* .......... 41

　　d.  Commonality Exists for the Disparate Impact Claims: Plaintiffs Mount a Classwide Challenge to Uniform, Facially Neutral Policies That Adversely Affected the Class ................................................................................................................................ 42

　3.  Defendants' Common Practices Also Easily Satisfy Typicality ............................................ 42

　4.  Plaintiffs and their Counsel are Far More than Adequate to Represent the Class; Defendants Will Be Unable to Mount Any Meaningful Challenge to Adequacy .................................... 43

D.  PLAINTIFFS' CLAIMS MAY BE CERTIFIED UNDER FED. R. CIV. P. 23(b)(2) and (b)(3)...................................................................................................................................... 43

　1.  Under Well-Established Law, the Classwide Injunctive Claims (*Teamsters* Phase I) Should Be Certified Under Fed. R. Civ. P. 23(b)(2) and (c)(4) ......................................................... 43

　2.  The Court Should Certify the Remedial Claims (*Teamsters* Phase II) Under (b)(3) ........... 44

　　a.  *Common Issues Predominate Over Individual Ones* ..................................................... 44

　　b.  *A Class Action Is by Far the Superior Way to Resolve This Dispute* ............................ 46

E.  PLAINTIFFS' PRELIMINARY TRIAL PLAN SHOWS THAT THE CASE IS APT FOR CLASS TREATMENT.................................................................................................. 49

IV.     CONCLUSION.................................................................................................................. 50

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abram v. United Parcel Serv. of Am., Inc.*, 200 F.R.D. 424 (E.D. Wis. 2001) ................. 39

*Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F. 3d 107 (2d Cir. 2004) ................... 17

*Barefield v. Chevron, U.S.A., Inc.*, No. C 86-2427 TEH, 1988 U.S. Dist. LEXIS 15816 (N.D. Cal. Dec. 6, 1988) ................................................................................................... 49

*Bazile v. City of Houston*, 858 F. Supp. 2d 718 (S.D. Tex. 2012) ............................................ 31

*Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07 Civ. 2207 (JGK), 2010 U.S. Dist. LEXIS 79679 (S.D.N.Y. Aug. 5, 2010) .................................................................................................. 43

*Bristol Village, Inc. v. Louisiana-Pacific Corp.*, No. 12-cv-263S, 2012 U.S. Dist. LEXIS 183342 (W.D.N.Y. Dec. 31, 2012) ................................................................................... 44

*Brown v. Nucor Corp.*, 576 F.3d 149 (4th Cir. 2009) ............................................................. 30

*Calibuso v. Bank of Am. Corp.*, 893 F. Supp. 2d 374 (E.D.N.Y. 2012) .................................. 37

*Chen-Oster v. Goldman Sachs & Co.*, 877 F. Supp. 2d 113 (S.D.N.Y. 2012) ............ 35, 37, 38

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135 (2d Cir. 2012) ...................................... *passim*

*Craik v. Minn. State Univ. Bd.*, 731 F.2d 465 (8th Cir. 1984) .................................................. 31

*Cronas v. Willis Group Holdings, Ltd.*, No. 06 Civ. 15295 (RMB), 2011 U.S. Dist. LEXIS 122736 (S.D.N.Y. Oct. 18, 2011) ................................................................................. 37, 39

*Duke v. Univ. of Texas at El Paso*, 729 F.2d 994 (5th Cir. 1984) .............................................. 5

*Easterling v. Connecticut Dept. of Correction*, 278 F.R.D. 41 (D. Conn. 2011) ........... *passim*

*EEOC v. Boeing Co.*, 577 F.3d 1044 (9th Cir. 2009) ............................................................... 14

*EEOC v. Bloomberg L.P.*, 778 F. Supp. 2d 458 (S.D.N.Y. 2011) .......................................... 30

*EEOC v. Dial Corp.*, 259 F. Supp. 2d 710 (N.D. Ill. 2003) ................................................... 49

*EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F. 3d 872 (7th Cir. 1994) ....... 41

*EEOC v. Pitre*, No. 1:11-cv-00875 RB/KBM, 2012 U.S. Dist. LEXIS 179146 (D.N.M. Nov. 30, 2012) ................................................................................................................. 49

iii

*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012) ...................................... 3

*Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415 (N.D. Ill. 2003) ................................... 3, 39

*Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012) .................................................. 34

*Gentry v. Super. Ct.*, 42 Cal. 4th 443 (Cal. 2007) ............................................................. 47

*Grant v. Bethlehem Steel Corp.*, 635 F.2d 1004 (2d Cir. 1980) ........................................... 41

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ................................................................. 32

*Gulino v. Bd. of Ed.*, No. 96 CV 8414 (KMW), 2012 U.S. Dist. LEXIS 172687 (S.D.N.Y.
 Dec. 4, 2012) ....................................................................................................... 44

*Hernandez v. C&S Wholesale Grocers, Inc.*, No. 06 CV 2675 (CLB)(MDF), 2008 U.S.
 Dist. LEXIS 118666 (S.D.N.Y. July 30, 2008) .............................................................. 43

*Hnot v. Willis Group Holdings*, 228 F.R.D. 476 (S.D.N.Y. 2005) ...................................... 39

*Iorio v. Allianz Ins. Co. of Am.*, 05 CV 633 JLS (CAB), 2009 U.S. Dist. LEXIS 97657
 (S.D. Cal. Oct. 21, 2009) ........................................................................................ 49

*Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324 (1977) ................................................. *passim*

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996) ...................................................... 5

*In re High-Tech Employees Antitrust Litig.*, 11-cv-2509-LHK-PSG, 2013 U.S. Dist.
 LEXIS 49784 (N.D. Cal. Apr. 4, 2013) ............................................................... 31, 36

*In re: Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) .............. 48

*Jenkins v. Raymark Indus.*, 782 F.2d 468 (5th Cir. 1986) ................................................. 49

*Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359 (7th Cir. 2001) ..................................... 31

*Karp v. Cigna Healthcare, Inc.*, 882 F. Supp. 2d 199 (D. Mass. 2012) .................... 33, 34

*Kassman v. KPMG*, 11 Civ. 3743 (JMF), 2013 U.S. Dist. LEXIS 17491 (S.D.N.Y. Feb. 7,
 2013) .................................................................................................................. 37

*Kerner v. City & Cty. of Denver*, Civ. A. No. 11-cv-00256-MSK-KMT, 2012 U.S. Dist.
 LEXIS 187114 (D. Col. Nov. 30, 2012) ..................................................................... 47

*Kerner v. City & Cty. of Denver*, Civ. A. No. 11-cv-00256-MSK-KMT, 2013 U.S. Dist.
 LEXIS 41280 (D. Col. Mar. 25, 2013) ................................................................ 46, 47

*Lewis v. City of Chicago*, 130 S. Ct. 2191 (2010) ............................................................. 32

*Loyd v. Phillips Bros.*, 25 F.3d 518 (7th Cir. 1994) ........................................................ 41

*McClain v. Lufkin Indus.*, No. 9:97-CV-063, 2005 U.S. Dist. LEXIS 42545 (E.D. Tex.
        Jan 13.2005) ............................................................................................................ 31

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012)
        .......................................................................................................... 37, 40, 44

*McReynolds v. Sodexho Marriott Servs. Inc.*, 349 F.Supp.2d 1 (D.D.C. 2004).......... 30, 31

*Meiresonne v. Marriott Corp.*, 124 F.R.D. 619 (N.D. Ill. 1989)....................................... 39

*Meyer v. U.S. Tennis Ass'n*, 11 Civ. 6268 (ALC)(MAD), 2013 U.S. Dist. LEXIS 60091
        (S.D.N.Y. Apr. 25, 2013)..................................................................................*passim*

*Mills v. Foremost Ins. Co.*, 511 F.3d 1300 (11th Cir. 2008) ............................................... 5

*Moore v. Napolitano*, 269 F.R.D. 21 (D.D.C. 2010).................................................*passim*

*Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611 (S.D.N.Y. 2012).................... 43

*Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003) .......................................... 17

*Ottaviani v. SUNY New Paltz*, 875 F.2d 365 (2d Cir. 1989) ............................................ 31

*Palmer v. Combined Ins. Co. of Am.*, 217 F.R.D. 430 (N.D. Ill. 2003) ............................ 49

*Parra v. Basha's Inc.*, 2013 U.S. Dist. LEXIS 76792 (D. Ariz. May 31, 2013) ... 37, 43, 46

*Perkins v. S. New Eng. Tel. Co.*, 669 F. Supp. 2d 212 (D. Conn. 2009) ........................... 47

*Pitre v. Western Elec. Co.*, 843 F.2d 1262 (10th Cir. 1988) ....................................... 31, 49

*Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005)............................................................. 14

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ........................................................ 14

*Quinonez v. Empire Today, LLC.*, No. C 10-02049 WHA, 2010 U.S. Dist. LEXIS 117393
        (N.D. Cal. Nov. 4, 2010)........................................................................................... 47

*Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133 (2000) .................................... 14

*Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147 (2d Cir. 2001).................*passim*

*Rossini v. Ogilvy & Maher Inc.*, 798 F.2d 590 (2d Cir. 1986)................................ 3, 39, 45

*Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999) ........................................................ 33

*Stender v. Lucky Stores*, 803 F. Supp. 259 (N.D. Cal. 1992) ........................................... 31

*Stiller v. Costco*, No. 09-CV-2473-H (BLM), 2010 U.S. Dist. LEXIS 140297 (S.D. Cal. Dec. 13, 2010) ................................................................................................................ 43

*Stinson v. City of New York*, 282 F.R.D. 360 (S.D.N.Y. 2012) ............................ 44, 45, 46

*U.S. v. City of New York*, 276 F.R.D. 22 (E.D.N.Y. 2011) ................................... 44, 48, 49

*U.S. v. City of New York*, 713 F. Supp. 2d 300 (S.D.N.Y. 2010) ..................................... 30

*U.S. v. City of New York*, No. 11-5113-cv(L), 2013 U.S. App. LEXIS 9671 (2d Cir. May 14, 2013) ........................................................................................................................ 33

*U.S. v. Gregory*, 871 F.2d 1239 (4th Cir. 1989) ............................................................. 41

*U.S. v. N.Y. City Transit Auth.*, No. 04-CV-4237, 2010 U.S. Dist. LEXIS 102704 (E.D.N.Y. Sept. 24, 2010) ............................................................................................. 32

*Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243 (S.D.N.Y. 2007) ............................... 43

*Velez v. Novartis Pharms. Corp.*, 04 Civ. 09194 (CM), 2010 U.S. Dist. LEXIS 125945 (S.D.N.Y. Nov. 30, 2010) ......................................................................................... 43, 49

*Wal-mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ......................................*passim*

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) ............................................ 32

*Wright v. Stern*, 450 F. Supp. 2d 335 (S.D.N.Y. 2006) .................................................. 30

**FEDERAL STATUTES**

FED. R. CIV. P. 23(A) ...........................................................................................3, 39, 45

FED. R. CIV. P. 23(B) .................................................................................................*passim*

**SECONDARY AUTHORITIES**

Amy C.J. Cuddy & Peter Glick, *When Professionals Become Mothers, Warmth Doesn't Cut the Ice*, 60 J. SOC. ISSUES 701 (2004) .............................................................................. 17

Donald Deere, *Conduct a Pay Equity Study to Mitigate Litigation Risks*, SOCIETY FOR HUMAN RESOURCE MANAGEMENT (Sept. 7, 2010) ........................................................ 21

FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE ..................... 31

Jackson Lewis, *Lily Ledbetter Fair Pay Act of 2009 Becomes Law*, JACKSON LEWIS (Jan. 29, 2009) ..................................................................................................... 21

Letter from Dianna B. Johnston, Assistant Legal Counsel, EEOC, (Feb. 2, 2007) (on file with the EEOC) .................................................................................................... 18

MORGAN LEWIS, LEDBETTER FAIR PAY ACT OF 2009: BRACE FOR THE NEW WAVE OF DISCRIMINATION LITIGATION 19 (2009) .......................................................... 21

Pat McGovern et al., *Postpartum Health of Employed Mothers 5 Weeks After Childbirth*, 4 ANNALS OF FAMILY MEDICINE 159 (2006) .................................................... 12

RAGAN'S PR DAILY SALARY AND JOB SATISFACTION SURVEY ............................................. 6

Steve Barrett, *Fleurot Tweet Clarifies MSL's Management Change*, PR WEEK (Aug. 31, 2012) ..................................................................................................... 1

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, NOTICE NO. 915.002, ENFORCEMENT GUIDANCE: UNLAWFUL DISPARATE TREATMENT OF WORKERS WITH CAREGIVING RESPONSIBILITIES (2007) ............................................................................... 17

## I.      **INTRODUCTION**

This Motion for Class Certification is not a close call.  Even in a post-*Dukes* world, Plaintiffs' evidence satisfies – by a wide margin – the elements needed to certify four sub-classes comprising about 200 female employees victimized by Defendants' rampant gender and pregnancy discrimination.  Salary disparities as high as 10.8% per class member annually (ranging from $15,000 per year in 2008 to nearly $18,500 in 2010) and termination rates as high as 70% for leave takers are eye-popping evidence of systemic class-wide discrimination.[1]  The facts in this case are so compelling – and Defendants' discriminatory conduct so undeniable – that even MSL's own President admits that at least *"50 per cent of what is in [this lawsuit] is true."*[2]

Discrimination based on gender and pregnancy is Defendants' standard operating procedure The Company vests complete authority over salaries and other major employment decisions on a small crew of mostly male executives.[3]  At the center of the cabal is MSL Americas President Jim Tsokanos,[4] who lives, breathes and practices gender discrimination on a regular, serial basis.

Tsokanos himself was a beneficiary of the Company's institutionalized gender bias. A decade ago, several female employees complained to HR about Tsokanos' penchant for staring at their breasts and making sexual comments[5], only to see him rewarded with a promotion. By selecting Tsokanos as President of the Americas – in essence, the face of the Company – Defendants gave him the green light to spread his own virulent brand of sexism.  And he did.

Much of Tsokanos' hostility was directed toward MSL's senior women – the Vice Presidents

---

[1]  *See generally* "Evaluating Pay Difference by Gender and the Relationship between Taking FMLA Leave and Subsequent Termination at Publicis Groupe and MSLGroup," dated May 10, 2013 ("Madden Report") ("Ex. 2") and Rebuttal Report dated June 3, 2013 ("Madden Rebuttal Report") ("Ex. 4").

[2]  McLean Dep. ("Ex. 27") at 33:10-16 (referencing comments made by Renee Wilson, MSL's new President (at the time, the Managing Director of MSL's New York office).

[3]  *See* Sec. II.B., *infra*.

[4]  Tsokanos served as President of MSL Americas from January 2008 through August 2012. The day his departure (widely assumed to be a termination) was announced, MSL CEO Olivier Fleurot tweeted the following Warren Buffett quote: "If you lose money for the company, I'll be understanding. If you lose a shred of the company's reputation, I'll be ruthless." *See* "Fleurot Tweet Clarifies MSL's Management Change," PR Week (Aug. 31, 2012), available at http://www.prweekus.com/fleurot-tweet-clarifies-msls-management-change/article/256966/.

[5]  *See* Sec. II.C., *infra*.

("VPs") and Senior Vice Presidents ("SVPs") who make up the proposed pay class.  One of his first acts as President was to recruit kindred male spirits (including another serial harasser) to replace the few women who held leadership positions, sending a clear message that women were devalued at MSL. For VPs and SVPs, many of whom reported directly to Tsokanos, there was no escaping the rampant gender bias:  Threatened by these accomplished women, Tsokanos consistently minimized their accomplishments, questioned their ability, and treated them like mere arm candy, while heaping accolades and other perks on the men in his "boys' club."  This gender bias – which is firmly entrenched in Defendants' culture – infuses the decision-making process. Pay discrimination is enabled by Defendants' salary bands – which permit dramatic pay variations within the positions at issue and lack adequate objective criteria. It was also enabled by policies placing Tsokanos and a handful of other executives in charge of all pay and other employment terms regarding the class.

Women with young children are a dying breed at MSL. In a Company where pregnancy is a deadly sin and women returning from leave are written off as "maternity minds," it is no surprise that new mothers find they no longer have a future.  Defendants also promulgated leave policies that give fathers and adoptive parents longer paid parental leaves than women who bear their own children.

MSL and Publicis ratified Tsokanos' and male management's discriminatory policies and practices.  Further, Defendants failed to monitor the decision-making process or place any other checks over harasser-in-chief Tsokanos and his ilk, allowing them to ride roughshod over MSL's U.S. operations. This departmental dysfunction, coupled with Defendants' centralized decision-making structure and biased leadership, created a perfect storm for gender discrimination to take root.

The results are hardly surprising.

*First*, with regard to compensation, Defendants' data shows *gender-based pay disparities of a staggering 9-10% per class member – over $15,000 on average in 2008 and 2009, and over $18,500 on average in 2010.* Plaintiffs also offer weighty anecdotal evidence in support of their claims that female

class members were paid drastically less than men in the same positions.

*Second*, even with a small data set, Plaintiffs show that employees who take pregnancy/ FMLA leave are fired in disproportionately large numbers.  Like the gender-based pay disparities, these "excess terminations" result from discriminatory corporate policies and the concentration of decision-making authority in the hands of a small committee of openly chauvinistic male executives.

*Third*, employees who become pregnant or take maternity leave are routinely discriminated against in other ways. Defendants adopted facially-discriminatory leave policies favoring fathers and adoptive parents over new mothers.  And, when class members return from maternity leave, they are subject to additional discrimination such as slashed schedules (and pay), unreasonable time and travel demands, and other mistreatment designed to drive them out of the workplace.

This confluence of facts presents the ideal situation for class certification.  As to Rule 23(a), (1) *numerosity* is not a significant issue.  The 200 member class exceeds the 40-member threshold for presumptive numerosity, and is geographically dispersed.  (2), *commonality* is readily satisfied where Plaintiffs' claims revolve around uniform corporate practices and/or highly-centralized decision-making. *See, e.g*., *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012); *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 424 (N.D. Ill. 2003); *Rossini v. Ogilvy & Mather Inc.*, 798 F.2d 590, 598 (2d Cir. 1986) (In gender discrimination class suit, plaintiff alleged that a small, central group made training and promotion decisions for advertising agency. Held: Rule 23 commonality dictate satisfied).   (3), the same factors readily support a finding of *typicality*; Plaintiffs demonstrate that they and the class members were discriminated against in the same basic manner.   (4), Plaintiffs and their counsel are more than *adequate* to represent the class.

As to Rule 23(b), this case is ripe for certification under (b)(2) and (b)(3).  The Court should certify the claims for class-wide declaratory and injunctive relief under (b)(2); Plaintiffs have plainly shown that Defendants have "acted or refused to act on grounds that apply generally to the class."  The

Court should further certify the claims for monetary and individual injunctive relief under (b)(3). Given the strong glue binding the class, the common issues in this case – whether Defendants engaged in a pattern or practice of discrimination; whether their policies had a disparate impact on the class members – *predominate* over individual issues. In similar cases, courts have granted such hybrid (b)(2)-(b)(3) certification. *See, e.g., Ellis*, 285 F.R.D. at 535-40; *Stinson v. City of New York*, 282 F.R.D. 360, 379-84 (S.D.N.Y. 2012); *U.S. v. City of New York*, 276 F.R.D. 22 (E.D.N.Y. 2011).

Accordingly, this Court should certify the following four sub-classes:

(1) A **pay class** consisting of all female PR professionals in MSL's U.S. offices employed in job codes LM115 (SVPs) and/or LM 120 (VPs) at any point between February 2008 and the date of final judgment[6], a definition that is consistent with the Equal Pay Act ("EPA") class that this Court conditionally certified in June 2012 (Doc. No. 250);

(2) An **FMLA/pregnancy leave class** consisting of all female PR professionals in MSL's U.S. offices who:

    (i)     took FMLA leave and/or pregnancy/maternity leave at any point between February 2008 and the date of judgment; or

    (ii)    took FMLA and/or pregnancy/maternity leave since January 2007 and whose employment terminated at any point between February 2008 and the date of judgment;

(3) A **caregiver class** consisting of all female PR professionals in MSL's U.S. offices who worked a reduced schedule (less than 35 hours per week) or had any other flexible work arrangement at any point between February 2008 and the date of judgment;

(4) A **(b)(2) injunctive relief class** for class-wide declaratory and injunctive relief.

## II.    <u>STATEMENT OF RELEVANT FACTS</u>

On February 24, 2011, Plaintiff Monique da Silva Moore filed a Class Action Complaint against Publicis and MSL. Currently, 32 named and EPA opt-in Plaintiffs bring this action. Plaintiffs seek to file a Third Amended Complaint, adding an FMLA class and an additional named Plaintiff. Despite the

---

[6] Plaintiffs allege continuing violations (*see* SAC ¶¶ 253,262,272,282,293,333, Prayer for Relief at E, G) and, accordingly, seek to certify a class through the date of judgment. Although Defendants apparently take the position that Magistrate Peck cut off the class period at the original Complaint-filing date (February 24, 2011), this argument has already been rejected by this Court. *See* Doc. 250 at 12: "Defendants argue that the Court set the class period for February 24, 2011… In fact, the class period has not been set, but some discovery was limited to February 24, 2011." Indeed, the Magistrate Act does not vest Magistrates with authority to make such a decision. 28 USC § 636.

unusually restrictive limitations placed on class certification discovery in this case, Plaintiffs have amassed powerful evidence of discrimination – including *substantial direct proof* of Company-wide discrimination.[7]

### A.  BACKGROUND

#### 1.  Defendants' Corporate Structure

Publicis Groupe is a French-based global communications firm. All of its subsidiaries adhere to common policies and a centralized decision-making structure set at the highest levels of Publicis.

Defendant MSLGroup, a wholly owned subsidiary of Publicis since 2002, is the "PR arm" of Publicis. Like its parent, MSLGroup is headquartered in France. MSLGroup does business in the United States through MSL Americas. It employs approximately several hundred PR professionals in a handful of locations across the U.S. – New York, Boston, Washington D.C., Atlanta, Chicago, Ann Arbor/Detroit, Seattle, San Francisco, and Los Angeles.  Approximately 75% of MSL's U.S. employees work in its New York office, its American corporate headquarters. Beginning in 2008, Defendants

---

[7] These are just a few examples. First, Judge Peck limited class discovery to written policies, while denying Plaintiffs any discovery regarding their implementation. Dec. 14, 2012 Tr. ("Ex. 73") at 31. Second, Judge Peck limited the temporal scope of document discovery and depositions as well, to February 24, 2011, the date on which the original Complaint was filed. Jan. 4, 2012 Tr. at 64-65; May 20, 2013 Tr. ("Ex. 72") at 11-13. Third, Judge Peck ordered the parties to identify and depose all class certification witnesses. Ex. 73 at 36-37. He gave Plaintiffs only one week to identify all witnesses; during this unprecedented timeframe, Plaintiffs could only look to the opt-in Plaintiffs. (By contrast, class plaintiffs typically support a Rule 23 motion with any affidavits they are able to muster.) Fourth, Judge Peck ordered Plaintiffs to submit an expert report by May 10, 2013 – before the vast majority of depositions had taken place – and gave Plaintiffs only four business days to submit a rebuttal expert report. Docket No. 416. Defendants exploited these rulings to forestall clearly relevant lines of inquiry. For example, defense counsel instructed Company witnesses not to answer questions about (i) complaints made by individual Plaintiffs; (ii) the Company's definition of diversity; (iii) a witness' comment that "fifty percent of the allegations in the Complaint are true"; (iv) employment decisions taken against class members; (v) class members who suffered consequences for taking maternity leave; (vi) the Company's response to the lawsuit; (vii) complaints of discrimination and harassment made about President Tsokanos; and (viii) Tsokanos' termination in September 2012. This greatly hampered Plaintiffs' ability to develop their class evidence, which focuses not only on formal policies but on unwritten practices, direct and circumstantial evidence of the employer's intent, and the existence of widespread gender disparities. If this Court denies class certification, in whole or in part, Plaintiffs will seek additional class discovery and the opportunity to refile the motion on a more adequate record. Given that the scope of discovery in this case was severely circumscribed, an outright denial of certification would be premature.  *See, e.g.*, *Duke v. Univ. of Texas at El Paso*, 729 F.2d 994, 996 (5th Cir. 1984) (remanding for additional pre-certification discovery where plaintiff was "prejudiced by the cropping of her opportunity to discover" certain employment practices); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008) (denial of class certification premature given the lack of factual information available); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1086 (6th Cir. 1996).

restructured MSL Americas into four regions, with President Tsokanos at the helm.

Publicis subsidiaries adhere to a highly-centralized reporting structure. For most of the relevant time period, MSL Americas' region heads reported directly to President Tsokanos, who reported directly to MSLGroup CEO Fleurot, who in turn reported directly to Publicis CEO Levy as well as Publicis CFO Jean-Michel Etienne and Publicis General Secretary Mathias Emmerich.

### 2.  Gender Stratification at Publicis and MSL

Defendants' corporate structure is characterized by a high degree of gender stratification. Women account for 70 to 85 percent of employees in the PR industry, and a significant majority of MSL employees.[8]  Despite the predominantly female workforce, MSL and Publicis have maintained a disproportionately male leadership throughout the class period. [9]  MSL Americas' male-dominated leadership structure mirrors that of its parents. President Tsokanos recruited male hires to oversee most of MSL's regions and marginalized or terminated qualified internal female candidates.

### B. PUBLICIS AND MSL ARE HIGHLY CENTRALIZED ENTITIES, WITH COMMON POLICIES AND A DISCRETE GROUP OF DECISION-MAKERS

According to Plaintiffs' expert Dr. Richard Martell, Publicis and MSL are *"the most centralized entit[ies] that I can recall seeing."* Martell Dep. ("Ex. 74") at 178:7.  Defendants promulgate mandatory policies at corporate headquarters (in New York and Paris) and implement them uniformly across MSL's U.S. offices.[10] The involvement of a centralized male decision-making team in employment decisions is significant and pervasive. The team included:

- at the parent company (Publicis Groupe): Publicis CFO Jean Michel Etienne and General Secretary Mathias Emmerich;

- at the brand level  (MSLGroup): CEO Olivier Fleurot and Global CFO Peter Miller; and

- at the business unit level (MSL Americas): President Tsokanos and CFO Maury Shapiro.

---

[8] See Expert Report of Richard F. Martell (May 10, 2013) ("Martell Report") ("Ex. 1"), at 10-13; Ragan's PR Daily Salary and Job Satisfaction Survey,  http://web.ragan.com/raganforms/RAGAN_salary_whitepaper_v5_ maprevised.pdf
[9] *See* Second Amended Complaint ("SAC"), ¶ 9-17
[10] Martell Report ("Ex. 1") at 6-10; Martell Rebuttal Report (June 3, 2013) ("Ex. 3") at 25-28.

These six men made discriminatory pay, leave, and termination decisions that adversely impacted the class of female PR professionals. MSL's national and global HR directors – Rita Masini (Chief Talent Officer for MSL Americas), Tara Lilien (HR Director for MSL Americas), and Sophie Martin Chantepie (Global HR Director for MSLGroup) – did nothing to stand in their way.

## 1. Publicis' Common Policies and Centralized Decision-making Structure

Publicis' common policies and procedures are memorialized in *Janus: The Book* ("Ex. 42"), its global policy manual. According to Janus, Publicis is a global "family" of subsidiaries with a common "way" to "behave" and "operate." As Publicis' CFO testified, "[t]here is no possibility to deviate." Etienne Dep. ("Ex. 15") at 66-6, 74-77; *see also* Ex. 74 at 184:21-185:1-9.

To effectuate and enforce Janus' mandates across the subsidiaries, Publicis not only hand-selects their leadership, but also holds tight control over leaders' terms of employment.

- Publicis Chairman & CEO Maurice Levy approves "recruitment and promotions" of Brand executives like MSLGroup CEO Olivier Fleurot. Ex. 42 at Publicis00000944.

- Publicis CFO Etienne approves "recruitments, promotion or terminations" of Brand financial executives like MSLGroup CFO Miller and CFO Shapiro (*Id.* at Publicis00000944).

- Publicis General Secretary Emmerich approves "all contracts or employment offer letters" for Key Executives like MSL President Jim Tsokanos and any changes thereto (*Id.* at Publicis00000926), including his "entire compensation package." (*Id.* at Publicis00000944).

- Publicis General Secretary Emmerich approves "**all base salaries**, and increases in base salary, of other employees who earn more than 250,000 Euro – who include the nearly all male leadership team at MSLAmericas – *i.e.*, Senior Vice Presidents/Managing Directors ████████, ██ ████, ████████, and ████████ (*Id.* at Publicis00000927).

Publicis vests its hand-selected male executives with decision-making authority for MSL employees, including the women who make up the class. Ex. 42 at p. 80-81 (*Id.* at Publicis00000927-8)(President Tsokanos authorizes all salary increases and all bonuses; CEO Fleurot and CFO Miller and the Groupe authorize "all aspects of [brand] bonuses", and Publicis General Secretary Emmerich "judges the overall fairness of the allocation."); *see also* Ex. 15 at 99-100.

Publicis also keeps a tight rein on employment decisions at MSL through rigorous financial

reporting and monitoring requirements.  Miller Dep. ("Ex. 28") at 88:25-89:16; Ex. 27. 103:3-104:23.

On an annual, quarterly and monthly basis, MSL must submit proposed budgets and forecasts

("Commitments") to Publicis for its approval. (Ex. 42 at Publicis00000968-972; Ex. 28 at 23:6-25, 79:2-

80:24, 91:10-95:20). Commitments are used by corporate HQ to **"tightly control personnel costs"**

such as **salaries** and **leave benefits** of MSL employees.   (Ex. 42 at Publicis00000968; Ex. 43 at

Publicis00000462-463);  Ex. 28  at  43:9-18,  89:19-90:15,  99:19-100:17,  103:10-20,  105:15-111:11.

Commitments are also used to set the "headcount" – whether there should be layoffs or new hires. Ex.

42 at Publicis00000969; Ex. 43 at Publicis00000503. Through this extensive oversight process,

corporate leadership analyzes employment actions and costs and formulates action plans – including

delaying or reducing raises and planning terminations.  Ex. 28 at 111-114, 114-117; Exs. 5-7; Ex. 27 at

309:6-310:18.

### 2.   MSL's Common Policies and Centralized Decision-making

The centralized control at Publicis cascades down to its subsidiaries. *See* Martell Report ("Ex.

1") at 9-10. Mirroring its parent's highly centralized structure, MSL has uniform HR policies and

practices, which govern compensation, leave, and other employment matters. These protocols include:

MSLGroup Americas 'Pay for Performance' Guide ("Ex. 45"); the MS&L Performance Management

and Compensation Guide – North America ("Ex. 49"); the MS&L U.S. Policy Guide ("Ex. 44"); and

the MSL Salary Bands, *See* Ex. 47 at MSL004955-4970; Ex. 48 at MSL006415.

Like Janus, MSL's common policies empower the same discrete group of male executives at

with decision-making authority. During most of the relevant time period, CEO Fleurot, CFO Miller and

President Tsokanos assumed the key decision-making roles.[11]

Defendants' witnesses confirmed that employment decisions could not be made at the local

---

[11] *See* Performance Management and Compensation Guide (Ex. 49) and Personnel Action Notices (e.g. Ex. 59)  (requiring employee pay to be approved by MSL's Corporate HR and CFO Miller and/or Shapiro); Pay for Performance Policy (all salary increases must be approved by CFO Miller and Global HR); Sample PAN, MSL005500 ("Ex. 58") ; Heldring Dep. ("Ex. 17") at 31-32.

level, and instead had to go through corporate HQ in New York and Paris.[12] This evidence of centralization was echoed by Plaintiffs and the class[13]:

- "Jim [Tsokanos] made all the decisions regarding restructuring, terminations, promotions, salaries, raises, freezes… everyone just talked about it, whether it was… hearing it from Kelly [Dencker] or Stephanie [Koze] or Tara [Lilien] in HR, all the decisions laid in Jim's hands... Jim pushed it through to Paris, then Paris would also have to agree, but it first had to go through Jim. And Peter Miller, that was another name." Severenko Dep. ("Ex. 36") at 52-54.

- "I knew that Jim was the ultimate decision-maker, I recalled a conversation with Jeanine O'Kane regarding my salary, and based on that conversation, I knew that she needed to seek approval through Jim and Publicis." Andrzejewski Dep. ("Ex. 10") at 82:16-21

- "As you went up the ladder… all of the things that [the office Managing Directors] did had to be reviewed by the regional heads and then by Jim… [Managing Directors] did not have the ability to… make a pay increase happen on their own." Mayers Dep. ("Ex. 25") at 195.

- "Everything in North America had to go up through Jim, Peter, Maury, and anything in New York also included [COO] Tony Cofone… that was just known." Buchanan Dep. ("Ex. 12") at 74:5-25.

- "From [HR] it would go to Jim Tsokanos and Peter Miller… then it would be sent to Paris… It was a chain that I heard from my supervisors, from our managing director. It was made clear to us…" Libit Dep. ("Ex. 21") at 182-83.

Local and regional management lacked authority to hire staff or make pay decisions.[14] The centralized decision-making team (New York and Paris; Tsokanos et al.) held the reins.

### a.    MSL's Salary Bands

MSL's centralized decision-makers are guided by uniform salary bands. The bands are used to establish: (i) base salary, (ii) equity adjustments to base salary, (iii) merit raises, (iv) raises upon promotions, MSLGroup Americas 'Pay for Performance' Guide, Ex. 45 at p.1, MSL000804-807; and exceptions to the hiring/salary freeze. Ex. 48 at 2, MSL006415-6426 (illustrating how salary level

---

[12] Ex. 22 at 126:9-130:5 (salary increases); 135:14-137:21, 141:21-143:9,  144:8-11, 145:7-146:24 (bonuses); 150:8-11 (relocation costs); 158:13-159:13 (pay of "key executives"); 165:7-23 (counteroffers); 171:23-172:4, 175:18-176:9 (hiring salary offers).

[13] *See also* Ex. 7 (compiling testimony)

[14] Employees who are lower in the hierarchy, such as VPs and SVPs, are even more powerless. Their input is often disregarded. Ex. 27 at 191:5-23 ("I had no authority... The decisions were made by New York and Paris."); *id.* at 247:4-25 (requests for salary changes, hiring, etc. "almost always" came back with modifications); *id.* at 294:18-295:9 ("I asked for a raise for Heather Pierce in 2008 that was denied when she was pregnant... She was working very hard. She was contributing. Her pay was at the low end of the scale... So, there was no other reason to deny [apart from pregnancy]"); Ex. 26 at 86:14-13 ("I had no participation in raises… I really had no authority in raises"). VPs and SVPs are so insulated from the decision-making process that they do not know the salaries of their own direct reports; cannot recommend an amount for an increase; and are often notified of raises via cryptic post-it notes. *See, e.g.*, Ex. 35 at 128:10-24; Ex. 20 at 86:14-87:13; Ex. 38 at 150:7-20.

adjustments were set from New York to Paris along with the salary bands to demonstrate where employees' salaries fall in the bands).  Among other things, the bands:

- Provide a uniform salary structure and framework for salary administration, which consists of salary ranges by industry-wide job titles based upon competitive market salaries.

- Set **wide ranges** for VPs and SVPs; the low and high end of the ranges could be $20,000-$70,000 apart for the same jobs.  Or there might be no upper limit at all. However, the salary ranges associated with lower level positions at MSL are narrow.[15]

- According to MSL's policies, "[t]he salary bands may be wide to allow for **flexibility** in pay decisions." Pay for Performance Policy at 4. However, the policies fail to define the criteria "and contain no quality standards, controls, or metrics by which to apply "flexibility."

Defendants' male-dominated decision-making team took advantage of the broad salary bands and the lack of objective criteria to implement pay policies in a way that disadvantaged the class.[16]

### b.      Global Hiring and Salary Freeze

In or around October 2008, Publicis imposed a global hiring and salary freeze on all of its subsidiaries, including MSL. *See* E-mail dated October 22, 2008, Ex. 67 at Publicis0002076-2078; *see also* Ex. 28 at 125-128; 30(b)(6) Lilien Dep. ("Ex. 22") at 188-189; Ex. 15 at 95-96. The hiring and salary freeze further consolidated what was already a highly-centralized decision-making structure.[17] It also exacerbated existing salary disparities for women, which were locked in at 2008 pay rates.

At the start of the freeze, female VPs and SVPs earned about $15,000 less annually than comparable men at MSL. By the time the freeze ended at MSL in early 2011, those annual disparities had increased to over $18,000.  *See* Ex. 4 at Table R1 (average disparities for women increased from 9.6% at the end of 2008 to 10.8% at the end of 2010).

---

[15] For example, MSL's 2010 range for Account Associates in New York was $▓▓▓ to $▓▓▓. By contrast, the range for VPs in New York was $▓▓▓ to $▓▓▓, for SVPs was $▓▓▓+ (the sky's the limit). *See* Exs. 47 and 48.

[16] *See* Sec. II.C., II.E. *infra*. *See also, e.g.* Ex. 65, NR_0008877-78, (Tsokanos setting a male SVP's salary at a rate that is double of many female SVPs).

[17] During the freeze, salary levels of MSL employees were locked across the board. Exceptions could be requested in limited circumstances for 'mission critical' employees, but that required several levels of approval; first, MSL Americas' corporate headquarters (Tsokanos), then MSL's global CFO, HR director, and CEO; and ultimately, two men in Paris: Publicis General Secretary Emmerich and CFO Etienne. See Ex. 15 at 107-109, 204-205, 209; Ex. 28 at 122, 125-126; Ex. 51, MSL005268-5270; Ex. 53, MSLAX_0008897-8898; Ex. 52, MSLAX_0001137-1138.

During the salary and hiring freeze, requests from local decision-makers were routinely denied. *See* Ex. 64, NR_9099-9101 (CFO Miller denied Rob Baskin's, MD of the Atlanta office, request for a new hire); Ex. 56, NR_0022519 (Tara Lilien: "Paris approved very few increases at this time"). MSL's CEO explicitly acknowledged that "the exception policy takes away local management authority." Ex. 56, MSLAX_19293-95. Even after the freeze was lifted, Defendants kept MSL Americas on a tight leash, requiring all proposed salary level recommendations (whether through new hires or increases) to be sent to the Global CFO [Miller] and the Global HR Director [Chantepie] so that the CEO [Fleurot] could personally review and approve them. *See* Ex. 51, MSL005268.

### c.  Common Policies Impacting Leave Takers and Caregivers

MSL's centralized control is not limited to compensation. Decisions regarding FMLA leave, reinstatement, and termination are also determined at the highest levels of the Company – primarily by President Tsokanos, CFO Miller, and Publicis.   Ex. 42, Publicis00000968-72; Ex. 43 at Publicis00000462-63).

During the applicable time period, President Tsokanos and corporate HR decided various other employment actions that impacted the class. For example, decisions regarding terminations – including terminations of women within the FMLA class – are largely made at MSL's corporate headquarters in New York.[18] In some cases, Publicis  is involved;[19] for example, MSL sought approval from Publicis for a "restructuring" eliminating the positions of Wendy Lund, Monique Da Silva Moore, and MaryEllen O'Donohue, all of whom had young children and one of whom – Ms. Da Silva Moore – was on maternity leave.[20] MSL's centralized decision-making team is also responsible for changing employees' terms and conditions of employment after they return from leave. *See* Sec. II.E.2.b(i)-(ii)

---

[18] *See, e.g.,* Ex. 29 at 19-24, 27.
[19] *See, e.g.,* Janus, Vol. II ("Ex. 43"), at 121 ("Publicis Groupe has defined specific authorization and reporting procedures for restructuring plans."). Publicis signed an R1 form authorizing MSL's restructure. The form provides projected savings and costs, headcount reduction, and a list of employees to be terminated. This list includes Wendy Lundy, MaryEllen O'Donohue, and Monique da Silva Moore. *See* Ex. 54, MSLAX_0015654.
[20] *See* Publicis00002498 ("Ex. 69").

11

*infra*. And, corporate HR regularly makes decisions that deprive class members on reduced schedules of full compensation when they work beyond their scheduled days. *See* Sec. II.E.2.b(iii).

### d.    MSL's Facially Discriminatory Maternity Leave Policy

Like other policies contained in the U.S. Policy Guide ("Ex. 44"), MSL's "Maternity Leave & FMLA" policy uniformly applies to all MSL employees.  And, like the pay policies, MSL's maternity leave policy is promulgated and controlled at the highest levels of the Company. Masini Dep. ("Ex. 24") at 210-213 ("these [leave] policies were given to us by Publicis Groupe"), 221. As part of its standardized procedure, corporate HR prepares a "maternity leave plan" for pregnant employees, setting out the dates of leave, the portion that is paid, and other terms and conditions.[21]

Astonishingly, Defendants offer *no* paid <u>parental</u> leave to female employees who give birth. Ex. 44 at 83.[22]  By contrast, it rewards new fathers with one week of paid parental leave and adoptive parents with six weeks of paid parental leave. *Id*; Ex. 22 at 243-248 (acknowledging that MSL's maternity leave policy does not provide comparable period of parental leave as paternity and adoption leave policies).[23]  This facial inequity is purposeful discrimination against women.

The flaws in MSL's policy are summed up by the *EEOC Enforcement guidance: Unlawful disparate treatment of workers with caregiving responsibilities*.[24] It states:

> while employers are permitted by Title VII to provide women with leave specifically for the period that they are incapacitated because of pregnancy, childbirth, and related medical conditions, **employers may not treat either sex more favorably with respect to <u>other kinds of leave, such as leave for childcare purposes</u>**. (emphasis added)

---

[21] *See* Sample Maternity Leave Arrangement, MSL011520 ("Ex. 63").
[22] Under MSL's maternity leave policy, employees who give birth receive six to eight weeks of short-term disability. This is the postpartum period that a woman typically remains incapacitated after giving birth. *See* Pat McGovern et al., Postpartum Health of Employed Mothers 5 Weeks After Childbirth, ANNALS OF FAMILY MEDICINE, Mar. 2006, at 159, http://www.pubmedcentral.nih.gov/articlerender.fcgi?artid=1467019.  If a new mother wants to take additional time off to care for her baby, she will not be paid. Ex. 44 at 83. *See also* New Parents Guide to: Publicis Benefits (Ex. 55, MSLAX_0017889-17897).
[23] Many class members expressed frustration with the discriminatory and draconian nature of MSL's policy. *See, e.g.,* Ex. 26 at 32-34, 38; Ex. 36 at 174:15-176:14.
[24] U.S. Equal Employment Opportunity Commission. (2007, May 23). Enforcement guidance: Unlawful disparate treatment of workers with caregiving responsibilities, in E.E.O.C. Compliance Manual, 2, § 615. Washington, DC: Author. Retrieved from: http://www.eeoc.gov/policy/docs/caregiving.pdf.

Defendants do just that – codify its standard operating procedure of pregnancy discrimination into its own policies, an egregious violation against a predominantly female workforce of childbearing age (i.e. MSL's workforce is 75% female and their average age is mid-30s).[25]

## C. MSL'S DEEPLY ENTRENCHED, TOP-HEAVY CULTURE OF GENDER BIAS INFORMS ITS DECISION-MAKING REGARDING PAY, LEAVE, TERMINATION AND OTHER EMPLOYMENT MATTERS

The cadre of executives who made compensation and other employment decisions for the class shared a "common mode of exercising discretion" permeated with gender bias. While this bias is personified in President Tsokanos, it has guided Defendants' decision-making for years.[26] Indeed, Tsokanos' ascendance is itself a symptom of the Company's deeply ingrained culture of discrimination. In 2002 and 2003, when Tsokanos was the MD of MSL's Atlanta office, multiple female employees lodged sexual harassment complaints against him.[27] But rather than deal with Tsokanos' incessant bad behavior, Defendants promoted him, giving him a broader platform to channel his gender bias into discriminatory decisions.[28]

As the head of MSL Americas, President Tsokanos mainstreamed gender discrimination by openly – and unabashedly – using gender and caregiving status as a factor in decision-making. The rest of Defendants' leadership embraced and/or ratified this approach, further perpetuating the Company's

---

[25] Defendants place other discriminatory roadblocks in the path of new mothers. For example, MSL's FMLA policy sets a 12-week cap on the amount of leave an employee can take within a 12-month period.[25] *See* Ex. 44 at 81-82. This has a disparate impact on women/maternity leave-takers, who comprise the vast majority of employees who take leave at MSL. *See* Sec. E.2.a, *infra*. Before extending their leave under the FMLA, maternity leave takers must exhaust all their vacation time; but, new fathers and adoptive parents do not need to meet this requirement in order to take FMLA leave. *See* Ex. 44 at 83-85. In addition, MSL employees who take leave – the vast majority of whom are women – are not eligible for raises or promotions during the time they are on leave, and are forced to wait until the next cycle. *See* Performance Management and Compensation Guide, Ex. 49 at 6, MSL012994-13000.

[26] For example, Mark Hass, the previous CEO of MSLGroup, was widely reputed to have engaged in inappropriate conduct with female employees. *See, e.g.,* Ex. 36 at 106:11-23.

[27] In 2002, a female PR professional submitted a written complaint against President Tsokanos (then Managing Director of the Atlanta office), stating "I have on more than one occasion overheard inappropriate remarks (of the sexual nature) come from [him]." Ex. 60. In 2003, another another female PR professional employee submitted a written complaint against President Tsokanos (and threatened to file legal action) stating: "To go a day without the head of our office stare at my chest in an inappropriate manner… just doesn't happen… I'm not the only one who has been the victim of his sexual comments and inappropriate staring…" Ex. 60.

[28] In 2004, Tsokanos was made MD of MSL's New York office (its corporate headquarters, housing roughly 75% of MSL's U.S. employees). Then, in January 2008, Defendants elevated Tsokanos to President of MSL. Publicis Groupe selected Tsokanos as President and approved his salary. *See* Ex. 42. at 80.

discriminatory culture. Defendants' general gender bias and hostility to women guided its decision-making.[29] This translated into lower compensation, greater termination rates and other adverse employment actions for members of the class. *See* Sec. II.E., *infra*.

### 1.  MSL Values Female Employees For Their Appearance, Not Their Performance

Witnesses from both sides testified that MSL's leadership – especially Tsokanos – routinely commented on the appearance of female professionals, often using sexually loaded terms.[30] *See, e.g.*, Curran Dep. ("Ex. 14") at 64-69 (Company witness testified that Tsokanos referred to several high-level female PR professionals in a sexualized way); Ex. 28 at 149-50. Such gendered comments make it clear that the Company has a biased perception of women's role in the agency: no matter how capable, they are perceived as "window dressing," not as leadership material.[31] For example:

- "[Tsokanos] made a number of comments that…suggested that there were reasons for his treatment of Kelly [a female SVP] that were not related to her performance… He would laugh at her about her appearance…. He told me once that **what do we need Kelly for, we will just have Heather Hall [another female SVP] walk the halls at GM and she will come back with lots of business**." Tsokanos referred to Hall as "Vanna White." Ex. 27 at 151:7-25.

- "I witnessed Jim making comments about women's body parts with some of the other male MDs" including comments like **"that woman has nice breasts, or look at that hot woman over there**." Webster Dep. ("Ex. 38") at 72:19-73:4, 83:6-12.

---

[29] The Supreme Court has long recognized that a decision-maker's use of gender stereotypes supports an inference of discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 234-35 (1989). Such comments need not directly relate to an adverse employment acton to be probative of a discriminatory state of mind. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 152 (2000); *see also e.g.*, *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044,1050 (9th Cir. 2009)(fact that supervisor "frequently made demeaning and derogatory comments about women was sufficient to support an inference of discriminatory animus… even though the comments were not directed specifically at [the plaintiff] or made in regard to decisions about her employment"); *Plotke v. White*, 405 F.3d 1092, 1107 (10th Cir. 2005).

[30] A focus on women's appearance perpetuates "sex role spillover," a phenomenon in which attitudes and expectations regarding women's behavior outside the workplace are transferred into the workplace and thus define women in reference to their traditional, circumscribed roles as helpers or sex objects and not serious professionals. Miranda Oshige, Note, What's Sex Got to Do with It?, 47 STAN. L. REV. 565, 571-74 (1995).  Indeed, "[w]hen an employee is complimented for physical attractiveness" it "draw[s]attention away from work accomplishments." Sharon A. Lobel, Sexuality At Work: Where Do We Go from Here?, 42 J. VOCATIONAL BEHAV. 136, 142 (1993).  Sexual attractiveness, instead of character, competence, hard work, and achievement, is then set as the basis for professional evaluations.  AM. PSYCHOL. ASS'N, REPORT OF THE APA TASK FORCE ON THE SEXUALIZATION OF GIRLS, 32-33 (2007). Women are then transformed from professionals into "smart, attractive SWF, 49," motivating employers to give promotions elsewhere.  Oshige, at 571-74 (internal citations omitted).

[31] *See* Ex. 25 at 40:19-41:14 ("their bias was to hire men for… senior positions… I asked [Curran] about [a senior] job and [he said] '[Y]ou really don't want to handle all that financial stuff, do you?").

- President Tsokanos **commented on a female co-worker's breast size** and "how great she looked in her outfits and how curvy she was yet so thin." Ex. 16 at 42-43. He "**referred to us as the two hot girls in the office**, and that's why he sat us together." *Id.*

- "I remember [Tsokanos] speaking very poorly about Wendy Lund... About Wendy Lund's body. **I remember he talked about the size of her butt.**" Lauer Dep. ("Ex. 19") at 65:3-18.

- "In my first month, [Tsokanos] was very chummy with me and **would comment about my hot body and how hot my ass looked in my dress**. And he would invite me to after work functions, which made me feel like **he was carting me around**." Ex. 16 at 46-47.

- During an interview of a highly qualified female candidate, "Jim goes 'we definitely should hire her because she has such great tits…She would really bring up the spirits in the office'…all he focused on was what she looked like…. **She was highly qualified. However… he didn't refer to her resume at all. All he referred to was her 'tits.'**" Ex. 19 at 83:10-85:4.

In addition, President Tsokanos routinely harassed female employees by groping them, leering at them, and subjecting them to a host of degrading comments. *See generally* Ex. 8 (compiling deposition testimony). Even the most senior female executives could not escape Tsokanos' perception of them as mere sexual objects. *See* Ex. 27 at 165:7-15 (referencing Tsokanos comments about Wendy Lund, a former member of MSL's executive leadership team). Indeed, the more senior women were subjected to the most severe harassment and discrimination. Numerous witnesses have testified to Tsokanos' pervasive sexual harassment, e.g:

- "[Tsokanos] **sexually harassed me often**." Ex. 16 at 36-44. "One situation that was awful was the day my pet died. I was very upset, naturally…I had a very important presentation that I was giving with Jim to one of our clients. I explained that I just lost my pet and I needed to go to the hospital... And as I was walking out of his office, **he tapped my ass and he said: And by the way, you look great -- you look hot in that dress.** So let's go sell this." *Id.* at 46-48.

- "[President Tsokanos] was **always staring at women's body parts**, which I felt very uncomfortable…I felt that he was staring at women's breasts a lot." Ex. 19 at 73:2 – 74:5.

- "And, [Tsokanos] started talking about Wendy [Lund, EVP at MSL] and [said]… **can't you just imagine that porno flick**." Ex. 27 at 165:7-15.

- "[President Tsokanos said, you know, most Hispanic men are short with small penises, but that looks like that's not your situation. You seem always happy. Your husband must be accommodating you the best way he can, huh?" Ex. 19 at 62:10 – 63: 9.

- "**He stared at my breasts every single time I met with him**, so I wore a scarf with every interaction with him to cover my breasts." Ex. 16 at 37:12-15.

15

Other members of MSL's leadership followed his lead. For example, MD Dhillon, a personal recruit of Tsokanos, repeatedly harassed and degraded female employees. At an office holiday party held at his house, Dhillon "ma[de] unwanted comments toward female staff," "insisted that everybody take shots," and "suggested that **if you [female employees] don't get up and dance that you wouldn't be getting a raise that year."** Ex. 21 at 265:9-266:16; Ex. 27 at 282:12-283:5. He "inappropriately touch[ed]" female interns. Ex. 27 at 284:10-19. In a separate incident, when Dhillon and a female subordinate were attending a conference at a hotel, he invited her up for a drink then proceeded to remove his clothing and force himself on her. Ex. 16 at 115-117 ("And then he dropped his pants, and that's when I went for the door. And as I tried to leave, he shut the door before I could get through it, and he stuck his tongue down my throat. And I pushed him away and I left."). He routinely used sexual and gender-biased language. *See, e.g.*, Ex. 21 at 266:10-16 ("foul language" towards female staff at party); *Id.* at 274-77 ("inappropriate sexually explicit comments to female staff"); *Id.* at 290:7-291:5 (called female employee "a bitch").[32]

### 2. MSL Has a Pattern of Bullying Female Employees and Judging Them More Harshly Than Their Male Counterparts

Not surprisingly, President Tsokanos' stereotypical views of women as sexual objects was matched by a general disdain towards them and a seeming desire to put them in "their place." Several witnesses have testified that Tsokanos had a pattern of bullying female employees, especially senior-level women such as those in the pay class. *See generally* Ex. 8. Among other things, he routinely humiliated them, questioned their ability, and minimized their accomplishments. *See, e.g.*, Ex. 27 at 161:3-163:11; Ex. 38 at 71:24-74:23, 87: 4 – 88:25; Ex. 16 at 36-38; Ex. 27 at 179:6-180:1; Ex. 19 at 176:18-180; Ortiz Dep. ("Ex. 31") at 131:13 – 134:02; Ex. 36 at 37-38.

---

[32] Other men at the Company have also taken their cues from leadership and further perpetuated a sexist culture. *See, e.g.*, Ex. 25 at 63:17-64:6 (male SVP in Ann Arbor office posted inappropriate images on Twitter at a work conference – and was soon after rewarded with a promotion and pay increase by Tsokanos); Caruso Dep. ("Ex. 13") at 32-33, 36:24-38:4, 150:23-151:8 (testifying that male SVP in New York office was "rude and dismissive" to female employees, and drew pubic hair on a mannequin in a female employee's office); Ex. 25 at 63:17-19 (noting that a male SVP would often make comments about women's appearance).

By contrast, Tsokanos did not bully male employees. *See* Ex. 16 at 38; Ex. 38 at 73:21-74:23, 87:4-88:25. Instead, he offered them "constructive feedback." Ex. 38 at 73: 21- 74: 23.

### 3. MSL Fosters Pernicious Gender Stereotypes About Working Mothers and Punishes Women Who Take Maternity Leave

President Tsokanos had a particular disdain for women who became pregnant, took leave, or adjusted their schedules to care for children. His comments and conduct reflected invidious gender stereotypes about working moms – most notably, that they are less committed to their careers, that they are no longer able to focus on their work, and that motherhood is generally incompatible with agency life.[33] The evidence shows that this stereotype is deeply entrenched at MSL, and persists despite clear evidence that women with children can – and do – succeed at their jobs. *See* Ex. 5 and 8 (compiling testimony). For example:

- At one meeting, "there [were] a couple of women coming back from maternity leave that day… [Tsokanos] made the comment about 'oh, they are returning. **Here we go again with more maternity minds**. These women have to get up to speed again'." Ex. 19 at 56:6-58:4

- "[President Tsokanos] said 'MaryEllen, the reality is **you just cannot do your job as a part-time mom and be successful in this role**.' And she said, 'I'm literally on planes day and night and I disagree with you.'" Ex. 38 at 91: 8 – 92: 16; *id.* at 93, 95-96.

- President Tsokanos said O'Donohue "is **playing Miss Mommy** and didn't focus on the new business pitches." Ex. 19 at 67:8-22. He made comments "about how…. '**She didn't focus. She couldn't concentrate. All she worried about was her children**'… He would make comments… like 'oh, she is probably doing something for her children or she can't be reached'… which were not true. She would be on a client call." *Id.* at 166:18-168:10.

- "**[T]here was a general attitude that I don't think was at all founded… that [women with kids] were somehow not pulling their weight or equal to everyone**, and it was spoken out loud in meetings, team meetings, in the hallway, kind of just general day-to-day chatter or comment." Ex. 31. at 128:14-130:6. *See also id.* at 167:8-170:24.

---

[33] The Supreme Court recognizes that "the faultline between work and family [is] precisely where sex-based overgeneralization has been and remains the strongest." *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 738 (2003). Indeed, "women operate under pressure from ambient stereotypes saying that mothers can't be serious professionals." Amy J.C. Cuddy & Peter Glick, *When Professionals Become Mothers, Warmth Doesn't Cut the Ice*, 60 J. SOC. ISSUES 701, 701 (2004). Female caregivers are subject to the expectation that they "should not, will not, or cannot be committed to their jobs." EEOC, NOTICE NO. 915.002, ENFORCEMENT GUIDANCE: UNLAWFUL DISPARATE TREATMENT OF WORKERS WITH CAREGIVING RESPONSIBILITIES (2007), *available at* www.eeoc.gov/policy/docs/caregiving.html. Such stereotypes can be the basis of a "maternal wall" to professional achievement for individuals with caregiving responsibilities. *Id.* It is for this reason that "where stereotypes are considered, the notions that mothers are insufficiently devoted to work, and that work and motherhood are incompatible, are properly considered to be, themselves, gender-based [violations of Title VII]." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F. 3d 107, 121 (2d Cir. 2004).

Given MSL's attitudes towards women with children, it is not surprising that the Company also stigmatizes the taking of maternity leave. As Tsokanos stated, maternity leave was just "a four-month vacation," Ex. 19 at 57:7-23, a viewpoint that took hold throughout the Company. *See* Babcock Dep. ("Ex. 11") at 80:2-81:22 ("Someone called my maternity leave vacation and gave me assignments to work on while I was on maternity leave"). Female employees who need to take time off from work for pregnancy-related reasons often encounter resistance, even harassment. *See, e.g.,* Ex. 27 at 264:23-265:23. *See also id.* (comments were made to female employee to the effect of "why would you want to have another baby, don't you have enough"). During one budget call, Tsokanos openly complained that "these maternity leaves are killing us." Ex. 27 at 256:20-2.

MSL's entrenched bias against women who take leave or have caregiving responsibilities translates directly into discriminatory employment decisions. For example:

- At a management meeting, Tsokanos shockingly announced that MSL did not have to give raises to women returning from maternity leave: **"[T]hey just got back from a four-month vacation being on maternity leave. So at least we are safe and secure keeping the budget low and not asking for any more money, and they have nowhere else to go**." He specifically referenced many of the women in the proposed class. Ex. 19 at 57; Leventhal Dep. ("Ex. 20") at 145:18-25.

- "[A]n SVP in the D.C. office told me that when she was interviewed for the job by Tsokanos and Neil [Dhillon], **Jim asked her if she had children. And she said no. And then he asked her if she planned to have children.**" Again, she said no. Ex. 27 at 264:23-265:2. Only after receiving these assurances did MSL hire her. *Id.*[34]

MSL's preference against child-bearing women informed its other employment decisions. For example, of the senior-level women hired after Ms. Da Silva Moore, Ms. O'Donohue, and other working moms were pushed out, virtually none had children. *See, e.g.,* Da Silva Moore Dep. ("Ex. 29") at 29 ("there seemed to be a trend… of hiring women without children"); O'Donohue Dep. ("Ex. 30") at 263:5-264:9.

---

[34] The EEOC has noted that "an employer may not refuse to hire a woman because she is pregnant." Further, a fact finder is likely to presume that an employer who asks female applicants about their pregnancy or parental status has factored the answers into any adverse selection decisions. *See* EEOC Informal Discussion Letter dated February 2, 2007, http://www.eeoc.gov/eeoc/foia/letters/2007/pregnancy_discrimination.html.

### 4. MSL Stigmatizes Women Who Avail Themselves of Flexible Work Arrangements

For employees who work reduced schedules or have other flexible work arrangements – the overwhelming majority of whom are women with young children – the gender stereotyping is even more pronounced. *See generally* Exs. 5 and 8 (compiling testimony). The following anecdote from Plaintiff MaryEllen O'Donohue is illustrative:

> Tsokanos said in belittling tone and in front of other employees:  "**You presented a great plan, but can you implement this plan, you know, on a flex schedule and with two small children at home.**" *See* Ex. 30 at 92:20-93:6.   "[I]f I presented the best plan at the meeting, why was I the only one questioned?… He wasn't asking Peter [Harris] if he could implement his plan at the end. He was asking me." *Id.* at 98:22-99:6.[35]

Despite touting various flexible work plans (e.g. reduced workweeks, "phase back" for new mothers, and telecommuting), MSL penalizes and stigmatizes women who try to avail themselves of these arrangements. As one class member testified: "There was no flexible policy at MS&L. Jim really discouraged that and made that vocally known that any type of flexible remote work schedule …did not show the amount of commitment that [one] should have and [that] just disproportionately impacted women versus men." Ex. 36 at 49-50. *See also* Scott Dep. ("Ex. 35") at 61:4-20.[36]

### 5. MSL's Gender Stratification and the Presence of a "Boys Club" Culture Perpetuates the Company's Culture of Gender Discrimination Against Women

When he assumed the presidency of MSL Americas, Tsokanos demoted the few women who held regional leadership positions and replaced them with men, including MD Dhillon; Joe Carberry, president of the West; and Joel Curran, president of the Midwest (the "big swinging dick" Tsokanos had

---

[35] Defendants' own witnesses have admitted the inappropriateness of Tsokanos' comments. Wilson Dep. ("Ex. 40") at 140-142; Fite Dep. at 72-73.

[36] Defendants' new flexibility policy discriminates based on gender on its face.  *See* MSL's Flexibility with Accountability Policy, Ex. 46 (codifying gender stereotypes in "'Phase Back' for New Moms/ 'Flex Hours' for New Dads"). *See also* EEOC, NOTICE NO. 915.002, ENFORCEMENT GUIDANCE: UNLAWFUL DISPARATE TREATMENT OF WORKERS WITH CAREGIVING RESPONSIBILITIES (2007), *available at* www.eeoc.gov/policy/docs/caregiving.html. ("Of course, adverse actions that are based on sex stereotyping violate Title VII, even if the employer is not acting out of hostility.")

in mind for the role).[37] In some cases, Tsokanos' hand-tapped cronies reflected – and actively promoted – his own sexist ideals. *See* Sec. II.C.1, *supra* (Dhillon's sexual predation upon employees).

Further, several witnesses testified that there is a "boys club" at MSL, with men given more accolades, better opportunities, better perks, and greater access to leadership.[38] Membership in the boys' club apparently translates into greater compensation and other perks.[39]

## D. DEFENDANTS' FLAWED HR POLICIES AND PRACTICES INSULATE AND PROMOTE DISCRIMINATORY DECISION-MAKING

Rather than prevent and address discriminatory decision-making, MSL's flawed HR policies and practices insulate and promote it. *See generally* Ex. 9 (compiling testimony). This departmental dysfunction has served as a prime breeding ground for gender discrimination, allowing discriminatory decision-making to continue unchecked.

### 1. Inadequate Policies and Procedures for Preventing Discrimination

Many of MSL's problems can be traced to HR's failure to institute appropriate policies and procedures to prevent discrimination. Tasked with the obligation to "develop the training curriculum" for all MSL employees (Ex. 24 at 54:12-24, 61:3-7) and to ensure that "appropriate policies were in place" (Ex. 24 at 64: 10-17), HR was remarkably wanting.[40] For instance, Rita Masini, Chief Talent Officer for MSL Americas and its highest ranking HR executive, confessed that in the five years she worked at MSL, she was aware of only one nationwide training for EEO and sexual harassment. Ex. 24 at 65:17-66:7. Tara Lilien, the other key HR executive, confirmed that the Company offered only one

---

[37] Ex. 25 at 75. President Tsokanos testified that he only referred to himself as a "big swinging dick." 162-63. Regardless, such clearly inappropriate and gendered language should not have been used in the workplace.

[38] *See* Ex. 25 at 51:6-52:7 ("[Tsokanos] did not encourage… any of the women who worked for him in the same way that he would encourage the men. You could see that he had… favorites… all men"); *id.* at 78:19-79:11; Ex. 36 at 37-38 ("There was a boys' club for sure… they have a club and you're outside the club"); Perlman Dep. ("Ex. 32") at 231:10-14 ("I've been part of all-boys' networks pretty much my entire life… I have never seen it so entrenched as it seems to be with Jim … and his team."); Ex. 16 at 38 (Tsokanos never sarcastic with or critical of male employees; "he was always chummy and old boys club acting with these men in front of me").

[39] *See, e.g.,* Ex. 36 at 37-38 ("Jim had a different relationship with the men in the boys' club. They had unfettered access to him. They were always joking and you know, pats on the back and getting awards and bonuses and choice of accounts."); Ex. 32 at 71:16-72:8; Ex. 25 at 156:8-21.

[40] Ex. 24 at 64:18-65:6 (noting Publicis' role in developing MSL's HR processes).

training, of very limited scope and duration.  Lilien Dep. ("Ex. 23") at 84: 23–85:14 ("I think it went 45 minutes to an hour … and based on Q&A, 15 to 30 [minutes for managers].").  The proof is in the pudding: rampant gender bias and perpetual gender-based disparities.

Moreover, while MSL's compensation policies purportedly link pay to performance, the Company fails to conduct regular and consistent performance reviews. *See, e.g.*, Ex. 27 at 154, 218 (one performance review in 13 years). Nor do employees' salaries meaningfully correlate with their performance. HR's lax oversight further enables Defendants to implement the Company's compensation policies in a discriminatory manner.

### 2. Inadequate Policies and Procedures for Monitoring Discrimination, Including Failure to Conduct a Pay Equity Analysis

Similarly, Defendants have done nothing to monitor their employment decisions to ensure employees are paid and otherwise treated fairly.  The standard mechanism for doing so is to conduct a pay equity analysis on a semi-regular basis. *See* Ex. 74 at 202:14-203:1; *id.* at 199:11-14.[41] Nevertheless, MSL's witnesses testified that they are not aware of the Company ever doing so.[42]

MSL's failure to conduct a pay equity analysis is especially egregious because the Company has long been on notice regarding potential pay disparities. A persistent wage gap between men and women in the PR industry has been documented for over 30 years, s*ee* Martell Rebuttal Report ("Ex. 3") at 29 n. 80 (collecting literature),[43] and many of MSL's female employees have complained to HR about discriminatory treatment. *See* Ex. 9. MSL's compensation policies mandating that equity considerations guide pay decisions were thrown out the window. It is no surprise that Plaintiffs' experts uncovered

---

[41] *See also* Welch Consulting, "Conduct a Pay Equity Study to Mitigate Litigation Risks" (Sept. 7, 2010), http://www.shrm.org/hrdisciplines/compensation/Articles/Pages/PayEquityStudy.aspx. Defense counsel concede that a pay equity analysis should be done.  *See* Jackson Lewis, "Lily Ledbetter Fair Pay Act of 2009 Becomes Law" (Jan. 29, 2009), http://www.jacksonlewis.com/legalupdates/article.cfm?aid=1616; Morgan Lewis, "Ledbetter Fair Pay Act of 2009," at 19, http://www.morganlewis.com/ pubs/LEPG_LedbetterFairPayAct_Webcast_12feb09.pdf).

[42] Ex. 24 at 231-233; Ex. 23 at 40-44; Ex. 40 at 27-28; Ex. 28 at 141-142; Tsokanos Dep. ("Ex. 37") at 214, 218; Ex. 14 at 913.

[43] *See also* Dozier, D.M., ShaB.-L., & Shen, H. (2012). Why woman earn less than men: The cost of gender discrimination in U.S. Public Relations. Public Relations Journal, 7, 1-20. (Ex. 71).

statistically significant pay disparities. *See* Sec. ii.E., *infra*.

### 3. Inadequate Policies and Procedures for Investigating and Responding to Complaints of Discrimination

MSL's top HR executives, Lilien and Masini, testified to the absence of defined policies and protocols to prevent, investigate, or ameliorate discrimination and harassment. *See* Ex. 24 at 99: 2-12; Ex. 23 at 281:20 -282: 7, 131: 14-23, 271: 6-12. Ms. Masini, the Chief HR executive responsible for creating and implementing "best practices" for HR nationwide, admitted the Company had no protocol for preparing reports that would memorialize alleged discrimination for investigatory purposes (Ex. 24 at 122: 13-21) and no "formal process" for documenting even the most basic details of a discrimination complaint. (Ex. 24 at 97: 16-25)  When asked, "If someone came to you and said, 'Ms. Masini, I have been harassed by Mr. Tsokanos… how would you go about responding...?", she responded, "…I would have written down everything … and then gone to Tara Lilien, who is our employee relations 'expert'…" Ex. 24 at 96: 2-23.  Lilien, the so-called "expert," testified she also had no protocol in place and was clueless about how the policy worked for documenting or investigating a complaint. Ex. 22 at 271:25-272:10, 278:15-23.[44]

Many witnesses complained to HR about gender discrimination and/or harassment, only to have their grievances fall on deaf ears. *See* Ex. 9. (compiling testimony). Often, Masini responded with the same callous refrain: **"That's just Jim, you know how he is."** *See, e.g.,* Ex. 38 at 80: 9-16, 85: 15 – 86:11; Ex. 27 at 165:25-166:14; Ex. 16 at 37:6-9. Even when MSL's HR representatives personally witnessed discriminatory comments or conduct firsthand, they did nothing. *See, e.g,* Ex. 16 at 51: 6-25, 52:2-8 (Masini present when Tsokanos made a "derogatory comment and action mimicking African-

---

[44] This lack of a protocol is borne out by the fact that MSL has failed to produce documents relating to complaints lodged by class members. Unless MSL is deliberately withholding the documents in violation of the Court's Order compelling their production, see Jan. 4, 2012 Tr. at 7-11; 26-27.  Defendant's failure to produce the documents suggests that its HR department failed to appropriately document the complaints.

American people").[45] *See also* Ex. 21 at 276:2-277:10 (Masini present when Dhillon called female employee a "bitch"); *id*. at 280:24-281:12.[46]

### 4. HR Bias in Favor of President Tsokanos

Further compounding HR's systemic flaws was Masini's transparent bias in support of Tsokanos, her former colleague and friend. *See* Ex. 24 at 35:15-37:14, 38:10–16, 42:9-43, 47:8-48:12. This conflict of interest manifested itself in her reluctance to either implement or enforce basic HR policies or to facilitate the processing and tracking of numerous complaints against him. To make things worse, Tsokanos himself had oversight authority over matters pertaining to HR, even problems involving him directly. Ex. 24 at 84:24-85:11. Together, these facts contributed to the widely held – and accurate – impression among MSL employees that Tsokanos was untouchable and that it was futile to complain about him. *See, e.g.,* Ex. 38 at 80: 9-16; Ex. 30 at 83:17-84:6 ("Rita's allegiance was to Jim"); Ex. 19 at 152:23-154:4 ("[HR and Tsokanos] were all on the same side of the boat"). Even worse, employees who complained could face dire consequences, as Ms. Masini was known to share confidential HR matters with Tsokanos and discuss them in public spaces. *See* Ex. 38 at 109: 20-112:16; Ex. 19 at 63:21-64:13.

### E. COMPELLING STATISTICAL AND ANECDOTAL EVIDENCE SHOWS THAT THE CLASS WAS HARMED BY DEFENDANTS' DISCRIMINATORY POLICIES AND PRACTICES

There is compelling statistical and anecdotal evidence that MSL's common, gender-biased mode of treating its workers led to discriminatory outcomes for the women in the class.

### 1. Pay Class

---

[45] *See also* Ex. 16 at 51-52: 6-25, 2-8 ("[Tsokanos] was acting like he was an ape and he was hemming and hawing and behaving like a monkey, describing our target audience of an event."). Other witnesses have testified regarding similar racist comments and conduct. *See, e.g.,* Ex. 19 at 95:12-19 (Tsokanos made comments about an African-American female employee's hair and "monkey descent"); *id*. at 93:17-94:7 (testifying regarding two African-American female employees who said they experienced racism from Tsokanos); *id*. at 62:10-63: 9 (derogatory remarks about Hispanic men); Ex. 40,143-144.

[46] Masini's testimony that she "had not heard that women were subjected to discrimination or sexual harassment" strains credulity. Ex. 24 at 96: 17-21. It flies in the face of the testimony of numerous women who recounted outrageous incidents of discrimination involving Tsokanos and others, both verbally and in writing.

### a.   Statistical Evidence of Pay Discrimination

Plaintiffs' statistical analysis shows that Defendants systematically failed to pay female VPs and SVPs base salaries comparable to their male counterparts.[47] Plaintiffs' experts found statistically significant gender disparities in pay during each year in the relevant time period. On average, during the 2008-2010 time period, MSL paid women in the Pay Class base salaries that were 9-10.8% less than those paid to comparable men – a "coefficient" that is significantly higher than that in many other cases that have been certified.   *See* Ex. 4 at 19. Plaintiffs' experts found these gender disparities after controlling for the effects of numerous variables, including time at Publicis, age (to reflect the amount of prior experience), job title, and location (to reflect cost of living differences).   *See Id.* at 19.[48] The probability that this pay chasm between male and female VPs and SVPs could have occurred by chance is less than 5%, or 2.38 standard deviations beyond zero. *See Id.* at 19.[49]   Courts generally consider 1.96 standard deviations (95% certainty) statistically significant *prima facie* evidence of discrimination.[50]

### b.   Anecdotal Evidence of Pay Discrimination

Plaintiffs' statistical evidence is brought to life by compelling anecdotes of pay discrimination from 21 women[51] – roughly 1 of every 7 members of the proposed pay class.[52]   *See generally* Ex. 6. This evidence demonstrates that Defendants' common policies, as applied by a biased centralized

---

[47] *See generally* "Evaluating Pay Difference by Gender and the Relationship between Taking FMLA Leave and Subsequent Termination at Publicis Groupe and MSLGroup," dated May 10, 2013 ("Madden Report") and Rebuttal Report dated June 3, 2013 ("Madden Rebuttal Report").

[48] The population analyzed by Plaintiffs' experts -- female employees in job codes LM115 and LM120 in MSL's core offices – is identical to the one this Court conditionally certified pursuant to the EPA. *See* Doc No. 250.

[49] *See also*, Ex. 2, Table 2 at 17.

[50] Plaintiffs' expert report also provides a model for how monetary damages could be calculated – a model that Defendants do not challenge. *See* Madden Rebuttal Report, Ex. 4 at 1.

[51] Notably, 33 women (including the Named Plaintiffs) have filed consents to join the Equal Pay Act collective action. Given the tight time constraints imposed by the court for class discovery, and the requirement that every witness sit for a deposition, not every opt-in plaintiff was able to testify in support of class certification. However, the fact that there are 33 EPA opt-in Plaintiffs – 31 of whom fall within the scope of the proposed Title VII Pay Class – further supports Plaintiffs' allegations of widespread pay discrimination.  Each of the 33 Plaintiffs attested in her consent form that she believed she was underpaid compared to comparable men.

[52] Because Defendants have refused to produce updated data, Plaintiffs do not have a precise count of the class size. Plaintiffs base their estimate on the class list that was produced following conditional certification of the EPA class, which has the same scope (VPs and SVPs) as the proposed Title VII class. That list included 154 women.

decision-making team, translate directly into discriminatory compensation decisions. In sum, despite holding the same position and the same general responsibilities as their male counterparts, female VPs and SVPs are consistently – and significantly – underpaid.  To cite just a few examples:

- MSL paid **Monique Da Silva Moore** and **MaryEllen O'Donohue**, SVPs with long careers at MSL, roughly $120,000 less than Peter Harris, a male SVP who had "the exact same job,[53]" but who was recruited by President Tsokanos' and was a valued member of his "boys' club."[54]

- MSL paid **Becky Lauer,** an SVP in MSL's New York office, *roughly half* the salary of Mike Huckman and approximately $50,000 less than Paul Gallagher, despite both men being hired into comparable positions.  President Tsokanos had a direct hand in these decisions. *See* Ex. 19 at 146-148. Adding insult to injury, he asked Ms. Lauer to "show [her highly compensated male counterparts] the ropes" and share her media contacts with them because they had no PR experience, no experience working with clients, and no media contacts. *Id.* at 107:15-16.

- **Kelly McKenna,** a VP in the San Francisco office, was paid $22,000 less than Brian Baker, a male VP in the same office who had less experience than her and poorer performance. McKenna Dep. ("Ex. 26") at 73-74. This pay disparity only widened once Ms. McKenna returned from her FMLA leave in 2011, when she received a twenty-percent pay cut for working a "reduced schedule" and the same hours as Baker. *Id.* at 144-145.[55]

- **Laurie Mayers,** an SVP in MSL's Ann Arbor office (and later Washington, DC), earned about $60,000 less than David Binkowski, a male SVP; even though Ms. Mayers had superior qualifications and more experience, Binkowski was "well liked by Jim" and accordingly "deemed more valuable."[56] In addition, MSL hired Michael Morsman as an SVP in the Ann Arbor office – at a higher salary than Ms. Mayers – and quickly promoted him above her.[57]

- MSL paid ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, an SVP in the New York office, $130,000 – less than every other male employee in that office. In fact, MSL paid her *below the lower limit* of the SVP salary band,[58] even though she was widely regarded as a "star" performer.[59]  When the Company finally modified her salary in April 2010, it raised her only to the very bottom of the salary band.[60]  As part of that same salary proposal, Tsokanos sought an increase for ▇▇▇▇▇▇▇▇, a male *VP* in the NY office, from $145,000 to $165,000 -- $20,000 more than the upper limit of the VP salary band, and $15,000 more than the new salary of ▇▇▇▇▇▇▇▇, an *SVP*.[61] Defendants raised his salary yet again – to $180,000 – that same year.[62]

---

[53] Ex. 30 at 140:25-141:16; 129:15-23; Ex. 29 at 38, 101-02, 260-262, 275-75.
[54] Ex. 19 at 176:18-180 (discussing Harris' favored status); Ex. 32 at 71:16-72:8 (same).
[55] McKenna was also passed over for promotion to SVP in favor of a less-qualified man, even though she was already performing SVP duties. *See id.* at 27-28. She earned approximately $120,000 less than him.
[56] Ex. 25 at 156:8-21 ("It was just a very clear-cut instance of how… **Jim's favoritism would just completely throw the salaries out of whack**.").
[57] *Id.* at 44:10, 48:16-25, 144:4-23.
[58] *See* Mission Critical Request (April 1, 2010), ("Ex. 62") MSL006400.
[59] *See* Ex. 10 at 104-105; *see also* Ex. 30 at 37; and Ex. 37 at 161 ("Stephanie [Andrzejewski] was a star and she did a great job for us.").
[60] *See* Ex. 62
[61] *See* Ex. 48.
[62] *See* Ex. 57.

### 2. FMLA Class
#### a. Statistical Evidence of Discrimination of Women Who Take Leave

In support of Plaintiffs' pregnancy discrimination claims, Plaintiffs' experts examined whether there were any differences in the likelihood of termination for employees who took FMLA leave. Women are the overwhelming majority of MSL employees who take FMLA leave; between 2007 and 2010, 54 women took FMLA leave compared to only 2 men. *See* Madden Report, Ex. 2 at 10. Plaintiffs' experts found that, of the MSL employees who took FMLA leave between 2007 and 2010, a staggering 70% were terminated by mid-2011. *Id.* at 10. Dr. Madden further concluded:

- Publicis' professional track employees who took FMLA leave between 2007 and 2010, were 3.6 times more likely to be *involuntarily* terminated than were similarly situated employees who did not take such leave.

- Publicis' professional track employees who took maternity leave between 2007 and 2010, were 3 times more likely to be *involuntarily* terminated than were similarly situated employees who did not take such leave.

- Publicis' women professional track employees who took FMLA leave between 2007 and 2010, were 3 times more likely to be *involuntarily* terminated than were similarly situated employees who were male or did not take such leave. Ex. 4 at 18.

#### b. Anecdotal Evidence of Discrimination of Women Who Take Leave

Plaintiffs' class certification motion is also supported by deposition testimony from 9 members of the proposed pregnancy/leave class – roughly 1 for every 6 class members. Moreover, if one factors in anecdotes Plaintiffs' witnesses shared regarding other class members, the ratio of anecdotes to class members rises to roughly 1 out of 2 – a staggering figure.  Consistent with Dr. Madden's report, Plaintiffs' anecdotal evidence reveals rampant pregnancy discrimination at MSL. Upon returning from leave, MSL's female employees are terminated, marginalized and subjected to host of other adverse employment actions. *See generally* Ex. 5 (compiling deposition testimony).

### i.   Defendants' Pattern of Terminating Women During or After Leave

Ms. Da Silva Moore's story – over a decade of service culminating in her termination while on leave – typifies the pregnancy discrimination faced by women at MSL. In December 2009, less than two weeks before Ms. Da Silva Moore's scheduled return from maternity leave, Tsokanos called her with an ultimatum: accept a different position with Publicis Consultants (a division of MSL) in New York, or face termination. Because Ms. Da Silva Moore was a mother of a newborn and two other children, and because the new position would have required her to relocate from Maine to New York, she asked if there was any flexibility with the transition period. Tsokanos insisted that she move immediately and refused to reimburse any of her relocation expenses, despite granting significant transition time and reimbursements to male employees who were relocating. MSL thus forced Ms. Da Silva Moore to accept a termination in January 2010. As she testified, "I believe he purposely put together a position that he thought I would not take, and that was a way for him, upon my return of maternity leave… to push me out." Ex. 29 at 19-23, 27, 63-64.

Ms. Da Silva Moore's story is part of a broader pattern of discrimination at MSL:

- Defendants terminated Zaneta Hubbard, an Account Supervisor in the Atlanta office, in December 2008, while she was on maternity leave. MSL blamed the "economic downturn" and "clients slashing budgets." However, Ms. Hubbard's male peers were retained.[63]

- Defendants terminated Heather Wadia, a VP in MSL's San Francisco office, in August 2009, while she was on maternity leave. Ms. Wadia was an MSL veteran and a strong performer; the "reason" for her termination was that there was no work for her. Ex. 26 at 43:16-44:4. However, shortly after terminating Ms. Wadia, MSL filled her position with Brian Baker, who had previously worked with Carberry at another company. *Id.*

- Defendants terminated another VP in MSL's San Francisco office, Lori Hirson, in November 2009, three weeks after she returned from maternity leave. MSL hired a male employee, David Libby, to take over Mr. Hirson's team and work. Ex. 26 at 73:16-74:10.

This pattern of firing new mothers is so pervasive that one witness testified "I… just had… a rising star… quit because she was pregnant and…was afraid she wouldn't have a job when she came back." Ex. 27 at 34:2-7. *See also* Ex. 26 at 114:9-115:1 ("there's an unfortunate pattern in the [SF]

---

[63] Hubbard Dep. ("Ex. 18") at 103:8-15.

office of terminating women with kids…"); Ex. 30 at 213:4-214:2 (MSL "punishes women from coming back from maternity leave… [they] suddenly either have to transfer or don't have a job"); Ex. 36 at 69:21-70:9; Ex. 10 at 173:8-28.

### ii. Pattern of Forcing Out New Mothers By Changing Their Jobs

In addition to firing women who take leave, MSL regularly subjects women with children to hostile treatment to drive them out of the Company. New mothers often find their jobs unrecognizable upon returning to work. This includes onerous travel schedules,[64] fewer opportunities,[65] increased and arbitrary "face time" demands, involuntary part-time status,[66] and other changes.[67] *See* generally Ex. 5 and 8 (collecting testimony). Several women felt they were forced to resign because the work environment at MSL became intolerable after they had children.[68]

---

[64] *See, e.g.,* Pierce Dep. ("Ex. 33") at 158-60 (MSL demanded constant bicoastal travel and flippantly disregarded her concerns; it became clear that the Company "was not interested in having me stay there"); Ex. 10 at 28:25-29:9 ("when I returned from maternity leave, my responsibilities and job changed, including significantly more travel"); *id.* at 100:24-101:19, 114:4-22, 165:7-20; Ex. 30 at 10:12-24; 28:22-29:7; Ex. 20 at 113:117-118:2 (observing that O'Donohue's travel schedule became "extremely burdensome").

[65] Employees who return from maternity leave report being "mommy-tracked." Women who had been held up as rising stars suddenly are blocked from advancement and otherwise marginalized. *See, e.g.,* Ex. 35at 55:2-21, 57:5-58:12, 166:9-19 (status changed to *persona non-grata*); Ex. 36 at 47:12-48:14, 124:21-125:7, 157:10-158:5 (frozen out of promotion and sidelined); Ex. 32 at 14:16-21 (non-promotion); Ex. 10 at 74:25-75:11, 78:4-14 (forced to work on single piece of business); Ex. 20 at 140:13-24 (no longer asked to be on committees and attend conferences); Ex. 29 at 15. Many such women feel compelled to leave MSL once they realize there is no future for them. *See, e.g.,id.* at 85-8.

[66] *See, e.g.,*Ex. 26 at 117:20-118:11; Ex. 36 at 180; Ex. 13 at 134-36; Ex. 20 at 121:5-18; *id.* at 123:16-124:12. A number of these women are the primary breadwinners of their respective families and struggle to make ends meet after their hours – and, thus, their salaries – are slashed. *See, e.g.,* Ex. 26 at 117:20-118:11 (Leah Davis "came back from maternity leave, was asked to go to a three-day-week work schedule, which she tried to fight. She didn't want to do that. She's the breadwinner in her family"); Ex. 20 at 123:16-124:12 (discussing Ms. Begun's reduced schedule). Often, being placed on a reduced schedule is the first step towards being terminated. *Id.*

[67] MSL punishes new mothers by altering or revoking previously agreed-upon flexible work arrangements. For example, when one employee who had a longstanding agreement to telecommute from Pennsylvania returned from leave, Tsokanos suddenly insisted that she spend more time in the New York office. *See* Ex. 10 at 115-16, 126:25-127:16, 165:7-20; Ex. 30 at 37:2-12 (Tsokanos said Andrzejewski "better get that baby and bring that baby to New York"); Ex. 29 at 311-312 (same); Ex. 36 at 63-64 ("when [Andrzejewski] came back from maternity leave, she was pushed by Jim to basically travel multiple times a month overseas… I remember her calling me at home… crying because she basically said 'there's no way out of this. I've talked to Jim and he said if I want my job, I need to do this…'").

[68] *See, e.g.* Ex. 36 at 132:2-25 ("I hadn't wanted to leave…. but I really kind of came to this point where it was so intolerable and I felt like I kind of hit this dead end… and I didn't like working for a company…that was discriminatory and Jim in particular. I really felt that I sort of sidelined and pushed out…I had to leave."); Ex. 20 at 131 ("when I left the company, it was after all these women [with children] who I knew… were forced out…, were terminated...the writing was on the wall and if I didn't leave, I could be next"); Ex. 30 at 146:8-14 ("I felt forced out of the company… I did not have a career path at the agency anymore… I was being viewed as a liability as a working mother"); Ex. 33 at 217-18.

### iii.  MSL Targets Women in the Caregiver / Flex Schedule Category

In addition, there is extensive evidence that MSL has a pattern of underpaying and otherwise marginalizing employees who have flexible work arrangements – primarily those who work 3 or 4-day work weeks and are accordingly paid 60% or 80% of their salaries. This practice had a disparate impact on women with young children, as they made up the vast majority of employees with such arrangements. Moreover, MSL pressures working mothers into working well beyond their reduced schedules while still paying the reduced rate, thus compensating only a fraction of their time. This was not a real accommodation for women; it was a predatory win-win for the Company.

Named Plaintiff MaryEllen O'Donohue's story is typical. A longtime employee of MSL, Ms. O'Donohue had worked a reduced 4-day schedule on-and-off for years. However, when Tsokanos assumed the presidency, he pushed her to work full-time for part-time pay:

> Jim was inundating me with assignments. He knew I was working a flex schedule. He continued to inundate me... but my pay continued to reflect the discounted pay.

Ex. 30 at 16:10-22, 77:14-24. *See also* Ex. 19 at 183:11-185:4 ("[Tsokanos] always interrupted [O'Donohue's 4-day schedule]. We always had new business pitches. He would assign them on the days that she had scheduled to be at home with her children. Basically, it appeared that he was trying to force her out, making her life so miserable, so inconvenient for her"); Ex. 36 at 55:4-56:11 (Tsokanos was "pushing and pushing [O'Donohue]… the work that he was throwing on her was basically a full-time schedule… I saw her in the office all the time…").[69]

### III.    LEGAL ARGUMENT

---

[69] Several other female employees testified in like fashion. *See, e.g.,* Ex. 36 at 109:23-110:11 ("I really felt taken advantage of… they were essentially getting a full-time SVP level performance out of me for the price, the salary of a supervisor, which is what I was making… with the four day. I had taken a 20 percent pay cut."); Rosen Dep. ("Ex. 34") at 162, 216-217, 225; Ex. 27 at 264:23-265:23.

## A. BACKGROUND OF PLAINTIFFS' TITLE VII CLAIMS

### 1. Disparate Treatment: Pattern-or-Practice

To succeed on their pattern-or-practice claim, plaintiffs must prove that intentional discrimination was the company's "standard operating procedure." *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 158 (2d Cir. 2001) (citations omitted). Here, a small cadre of mostly male executives treated female employees as an underclass unfit for the pay, benefits, and respect accorded to similarly situated or even less able men. "Standard operating procedure" is an apt term.

Unlike in most cases, Plaintiffs offer *direct* evidence of Defendants' discriminatory intent. As seen above, Defendants' parental leave policy is discriminatory *on its face*. And the executives in charge of compensation regularly betray their sexist attitudes – such as President Tsokanos' remark that the Company didn't have to give women returning from maternity leave raises because they had new babies and thus had nowhere else to go. Ex. 19 at 57.

Plaintiffs also provide circumstantial evidence, which falls into the two familiar types used in pattern-or-practice cases: "(1) statistical evidence aimed at establishing the defendant's past treatment of members of the protected group, and (2) testimony from protected class members detailing specific instances of discrimination." *Robinson*, 267 F.3d at 158.[70]

The purpose of statistical evidence is to support the inference that disparities were intentional – i.e. that they did not arise by chance, but because of prejudice. Statisticians typically rule out chance when the disparities reach 1.96 standard deviations, or a 5% likelihood that non-discriminatory factors are responsible. *See, e.g.*, *Wright v. Stern*, 450 F. Supp. 2d 335, 363 (S.D.N.Y. 2006); *McReynolds v. Sodexho Marriott Servs.*, 349 F. Supp. 2d 1, 9 (D.D.C. 2004) (disparity of greater than 1.96 deviations

---

[70] Direct evidence, statistical evidence, and anecdotal evidence may each suffice to prove a pattern or practice of discrimination. *See id.* at 158-59 ("gross" statistical disparities may alone prove a pattern-or-practice); *EEOC v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 469 n.7 (S.D.N.Y. 2011) (direct evidence may suffice); *U.S. v. City of New York*, 713 F. Supp. 2d 300, 317 (S.D.N.Y. 2010) ("[W]hen there is a small number of employees, anecdotal evidence alone can suffice.")(citation omitted); *see also Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009).

"sufficient to raise an inference of discrimination"). But in smaller data sets like ours – for which even gaping disparities may not rise to this level of significance – lesser deviations can serve as potent proof of discrimination. *See, e.g., Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 153 (2d Cir. 2012) (87% percent certainty sufficient due to small sample size and lack of promotions among the class).[71] In addition, the sheer magnitude of a discriminatory effect (or "coefficient") may often be more revealing than standard deviations. *See, e.g.*, Federal Judicial Center, *Reference Manual on Scientific Evidence* 252-53 (3d ed. 2011); *Stender v. Lucky Stores*, 803 F. Supp. 259, 323 n.22 (N.D. Cal. 1992). Here, for example, pay disparities of 8-10% (more than $15,000-18,500) per class member annually are eye-popping evidence of systemic discrimination.

Further, because there is nothing magical about the line between 94.9% and 95.1% probability (or 1.95 and 1.97 standard deviations), evidence may be *probative* of a pattern or practice without definitively *establishing* that fact. *See, e.g., Ottaviani v. SUNY New Paltz*, 875 F.2d 365 (2d Cir. 1989) (declining to set a specific threshold at which statistical disparities automatically give rise to a rebuttable presumption of discrimination; without such presumption, statistics are "persuasive" rather than "dispositive"). Thus, the Second Circuit has instructed that "there is no minimum statistical threshold" to make out a prima facie case for employment discrimination and that courts should look at the totality of the circumstances. *Chin*, 685 F.3d at 153 (citing cases).[72]

---

[71] Similarly, in cases with smaller numbers, "the use of aggregate data in regression analysis is often appropriate [because a] small sample size may distort the statistical analysis and may render any findings not statistically probative. In such a case, the use of aggregate numbers may allow for a [more] robust analysis and yield more reliable and more meaningful statistical results." *In re High-Tech Employees Antitrust Litig.*, 11-CV-2509-LHK-PSG, 2013 U.S. Dist. LEXIS 49784, at *80-81 (N.D. Cal. Apr. 4, 2013)(citations omitted).

[72] *See also, e.g., Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1267-69 (10th Cir. 1988) (totality of evidence, including statistics, supported verdict where disparities did not rise to level of statistical significance); *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362 (7th Cir. 2001)(Posner, J.)("The 5 percent test is arbitrary... A lower significance level... when corroborated by other evidence, need not be deemed worthless."); *Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 476 n.13 (8th Cir. 1984); *McReynolds*, 349 F. Supp. 2d at 26 (disparities in the "intermediate zone" of 1.65-1.96 deviations, "in conjunction with other relevant evidence, can be sufficient... to create an issue of fact" in discrimination case) (citation omitted); *McClain v. Lufkin Indus.*, 2005 U.S. Dist. LEXIS 42545, at *23 (E.D. Tex. Jan 13. 2005) ("disparities falling just short of the traditional standard of 2 (or 1.96) standard deviations may sometimes be meaningful, since consistent shortfalls in every category are probative of a pattern of discrimination, especially when other evidence confirms allegations of discrimination."), *rev'd in part on other grounds*, 519 F.3d 264, 280 (5th Cir. 2008) (affirming finding of significant disparate impact); *Bazile v. City of Houston*, 858

31

## 2.   Disparate Impact

Defendants promulgated policies which vested final authority on pay and dismissals in a discrete, centralized group of decision-makers with a known bias against women. These corporate leaders were afforded wide-ranging, subjective control over salaries.  Defendants' policies had a severe disparate impact on women's pay.

With regard to the FMLA/pregnancy leave and caregiver classes, Defendants adopted certain facially neutral leave and flex schedule policies, but similarly entrusted their implementation and enforcement to the same inner core, which consisted of at least one notorious chauvinist (Tsokanos) and several others who adopted, ratified and/or enabled his sexism. The wide berth afforded to this clique means women often face the axe after taking FMLA leave.  And other such policies – e.g., the limitation on medical leave to twelve weeks per year, and MSL's reduced schedule policies – disproportionately disadvantage pregnant women and working mothers. Because the same policies disparately impact the entire class, class treatment is appropriate.

A disparate impact claim targets "facially neutral employment practices that have adverse effects on protected groups." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986-87 (1988).  Such a claim is "established if an employer uses an employment practice that causes a disparate impact." *Lewis v. City of Chicago*, 130 S. Ct. 2191, 2198 (2010)(citations omitted).  "Unless and until the defendant pleads and proves a business-necessity defense, the plaintiff wins simply by showing the stated elements." *Id.*  The focus of a disparate impact case is on the policy and not the individual actions of managers; the employer's intent is irrelevant.  *Griggs v. Duke Power Co.*, 401 U.S. 424, 433 (1971).

To prove their disparate impact claims, Plaintiffs need only: (1) identify a facially neutral employment policy; (2) demonstrate the existence of "substantial" or "significant" disparities between

---

F. Supp. 2d 718, 766-67 (S.D. Tex. 2012) (statistics showing 10-15% probability that disparities arose by chance supported finding of discrimination); *U.S. v. N.Y. City Transit Auth.*, 2010 U.S. Dist. LEXIS 102704, at *35-36 (E.D.N.Y. Sept. 24, 2010) ("Statistics are clearly not required, especially when the sample size is too small to produce meaningful results.")(citation omitted).

the class and its male counterparts; and (3) establish a causal relationship between the two. *Robinson*, 267 F.3d at 160. The same type of statistical and anecdotal data used as circumstantial evidence of a disparate treatment violation is commonly used to prove an impact claim. *See*, *e.g.*, *id*. at 160-61. Similarly, discrepancies are evaluated on a "case-by-case basis"; a disparity of 1.96 standard deviations (or 95% certainty) is regarded as statistically significant and may generally suffice to show a disparate impact. *See, e.g., Smith v. Xerox Corp*., 196 F.3d 358, 365-67 (2d Cir. 1999). However, smaller disparities may also be highly relevant under the particular circumstances. *See Chin*, 685 F.3d at 153. Where, as here, Plaintiffs challenge specific practices that cannot be separated into component parts, the Court should consider each practice as a whole. *See id.* at 154-55; *Ellis*, 285 F.R.D. at 519 n.19, 531-33 (N.D. Cal. 2012).

### B. THE ESTABLISHED *TEAMSTERS* PROCEDURE PROVIDES THE ROAD MAP FOR THIS ACTION

In *International Brotherhood of Teamsters v. U.S*., 431 U.S. 324 (1977), the Supreme Court provided a roadmap for trying this class case. Under *Teamsters*, pattern-or-practice disparate treatment cases are bifurcated into a classwide **liability** phase (Phase I) and a **"remedial"** or damages phase (Phase II). At Phase I, Plaintiffs need only prove that Defendants operated under a "pervasive practice" or "standard operating procedure" of intentional discrimination. *Teamsters*, 431 U.S. at 336, 360; *U.S. v. City of New York*, 2013 U.S. App. LEXIS 9671, at *24-27 (2d Cir. May, 2013); *Robinson*, 267 F.3d at 158. *Teamsters* Phase I is the quintessential class proceeding. It returns a single answer on the single question of whether the entire class has been subject to a pattern or practice of discriminatory treatment. If the answer is "yes," classwide liability is established and the Court may award classwide injunctive relief. *E.g*., *Teamsters*, 431 U.S. at 361; *Robinson*, 267 F.3d at 159, 170; *Karp v. Cigna Healthcare, Inc*., 882 F. Supp. 2d 199, 210 (D. Mass. 2012).

Further, a "yes" at Phase I establishes a presumption that each class member was individually discriminated against. Phase II then handles their individual claims. At Phase II, each individual

employee need only show that he or she suffered an adverse employment action; the burden is on the employer to show that the particular action was taken for non-discriminatory reasons. *See e.g. Teamsters*, 431 U.S. at 361-62; *Robinson*, 267 F.3d at 159-60; *Karp*, 882 F. Supp. 2d at 210-11. The fact-finder will then award individual equitable and compensatory relief, including damages, to those employees determined to be "actual victims" of discrimination. *See, e.g.*, *Robinson*, 267 F.3d at 160.

An equivalent two-step procedure applies to Plaintiffs' **disparate impact** claims: (i) a classwide injunctive phase followed by (ii) an individual remedial phase. *See, e.g., Chin*, 685 F.3d at 148, 151-52; *Easterling v. Connecticut Dept. of Correction*, 278 F.R.D. 41, 46 (D. Conn. 2011).

The Supreme Court recently reaffirmed the *Teamsters* procedure in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 n.7, 2561 (2011), and it retains its full force and effect.

## C.  PLAINTIFFS MEET EACH OF THE RULE 23 (A) REQUIREMENTS

### 1.  Plaintiffs Hurdle Numerosity, Which is Presumed at a Class of 40

"Courts generally presume numerosity where a class consists of 40 or more members." *Meyer v. U.S. Tennis Ass'n*, 11 Civ. 6268, 2013 U.S. Dist. LEXIS 60091, at *11 (S.D.N.Y. Apr. 25, 2013) (Carter, J.) (citation omitted). *See also Moore v. Napolitano*, 269 F.R.D. 21, 28 (D.D.C. 2010) (citing cases certifying 29-36 member classes). "[C]ourts do not require evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Floyd v. City of New York*, 283 F.R.D. 153, 161 (S.D.N.Y. 2012) (citation omitted).

Here, the pay class consists of at least 150 members and easily satisfies numerosity. The FMLA/pregnancy class also surpasses the 40-member threshold and is geographically diverse.

### 2.  Plaintiffs Easily Satisfy Commonality; This Action is the Antithesis of *Dukes*

Commonality demands that the class' claims "depend on a common contention which is capable of classwide resolution…. [C]ommonality has never been understood to require that all issues be identical as to each class member but rather requires that plaintiffs identify some unifying thread… that

34

warrants class treatment." *Meyer*, 2013 U.S. Dist. LEXIS 60091, at \*12-13 (citations omitted).  The question before the court is "whether the record evidence demonstrates a likelihood that common answers will be determined via a class action approach..." *Id.* at \*15.

Here, by definition, Plaintiffs will make their Phase I showing on common proof.  Phase I will generate common answers on whether Defendants had a general policy or practice of discrimination, whether their policies had a disparate impact on the class, and whether the class as a whole is awarded injunctive relief.  Moreover, the claims of the class members are tied together by a "common mode of exercising discretion that pervades the entire company." *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 118 (S.D.N.Y. 2012) (citing *Dukes*, 131 S.Ct at 2554-55).

### a.      A Recap of The Supreme Court's Decision in *Wal-Mart Stores Inc. v. Dukes*

In *Dukes*, the Court was "presented with one of the most expansive class actions ever."  131 S. Ct. at 2547.  From this opening line, the Court zeroed in on the unique scope of the *Dukes* class, namely that the three plaintiffs represented a 1.5 million member class and wished to sue "about literally millions of employment decisions at once." *Id.* at 2552.  Because of this, the trial court planned to bypass *Teamsters* Phase II and award damages to all members based on the results of 137 test cases – a procedure dubbed "Trial by Formula."  *See id.* at 2550, 2560-61.  Under this approach, a "yes" on Phase I would have impermissibly provided a non-rebuttable presumption that all 1.5 million employees were "actual victims" of discrimination; they would have each received an average award, discounted by the percentage of test cases decided in Wal-Mart's favor.  *See id.* at 2560-61.

Against this backdrop, *Dukes* held plaintiffs' evidence of commonality to be insufficient, for reasons totally inapplicable to the present action:

- **Class size.**  In contrast to the unprecedented class of 1.5 million employees, this case includes classes of roughly 150 (pay claims) and 50 (pregnancy/FMLA and caregiver).

- **Class scope.**  While *Dukes* included all female employees at 3,400 stores, who were not subject to any common employment policies, this case includes employees in just two job codes at fewer than a dozen offices, all subject to the same high-level employment policies.

- **Written policies.** The only relevant written policy identified in *Dukes* prohibited discrimination. Here, class members were subject to a facially discriminatory parental leave policy, and numerous other written policies (e.g. salary bands, the Janus Book, and the written salary freeze policies) alleged to have directly resulted in systematic discrimination.

- **Theory of the case.** The *Dukes* class relied on a theory that discrimination occurred because of highly-localized discretion exercised by many thousands of decision-makers operating independently (deemed the "opposite" of a class-wide policy by the Court). In this case, plaintiffs challenge centralized, uniform policies administered by the same few executives, as well as HR's persistent failure to address blatant discrimination.

- **Direct evidence.** In *Dukes*, plaintiffs offered no evidence of discriminatory intent on the part of the decision-makers, who numbered in the thousands. Plaintiffs' policy expert testified that Wal-Mart was "vulnerable" to gender bias – a vague, subconscious discriminatory "culture" – but could not even attest to whether 0.5% or 95% of decisions might be affected. Here, MSL has facially discriminatory policies, and the relevant decision-makers, fewer than ten in total, practiced open and notorious discrimination with immediate, tangible effects.

- **Statistical evidence.** In *Dukes*, plaintiffs' statistical analysis did not support the existence of widespread disparities on a localized basis and thus was wholly divorced from their theory of localized, discretionary decision-making.[73] Here, Plaintiffs present statistically significant classwide disparities, including annual pay disparities of $15,000-$18,500 per class member and up to 13 "excess terminations" tied to taking pregnancy leave. And, Plaintiffs' statistics directly correlate to their theory of centralized policies and decision-making.

- **Anecdotal evidence.** The *Dukes* plaintiffs offered affidavits from 8/1000 of one percent of the class, deemed by the Court to lack probative value. Here, Plaintiffs offer testimony from roughly 14% of the pay class, 33 EPA opt-in forms, and testimony from 9 members of the FMLA/pregnancy leave and caregiver classes (which collectively including anecdotes relating to 22 women). The evidence is both quantitatively and qualitatively powerful.

- **Disparate impact claim.** The *Dukes* plaintiffs pursued only a pattern-or-practice claim of intentional discrimination. Thus, the Court focused on the inherent difficulties of proving the subjective intent behind millions of employment decisions made by many thousands of discrete and autonomous individuals. Here, Plaintiffs pursue both a disparate treatment *and* a disparate impact claim, the latter of which focuses strictly on policies and disregards intent.

- **Manageability.** *Dukes* presented a morass of more than one million largely unrelated claims. The district court's proposed solution – the "trial by formula" test case procedure – violated both Title VII and due process. Here, the litigation will be guided and dominated by Defendants' common policies and practices. And, a relatively small class size of about 250 employees makes the established two-phase *Teamsters* approach both feasible and efficient.

---

[73] In *Dukes*, there was no suggestion that disaggregated data would be too limited to yield statistically meaningful results. *Cf., e.g., In re High-Tech Employees Antitrust Litig.*, 2013 U.S. Dist. LEXIS 49784, at *80-81. Rather, each broad region had 80-85 stores and each store had up to 500 staff positions at any one time. *Dukes*, 131 S. Ct. at 2547. It would have been entirely possible to break down the data further and still have large enough samples to determine whether disparities consistently existed at a more localized level.

Thus, *Dukes* is inextricably tied to its specific factual and evidentiary deficiencies: a sprawling, monster class with class members having virtually nothing in common other than their sex and the lawsuit.  *See, e.g., Chen-Oster v. Goldman Sachs & Co.*, 877 F. Supp. 2d 113, 118-19 (S.D.N.Y. 2012) (Sand, J.) (distinguishing *Dukes*); *Cronas v. Willis Group Holdings, Ltd.*, 06 Civ. 15295, 2011 U.S. Dist. LEXIS 122736, at *9-10 (S.D.N.Y. 2011) (same).   As distilled by Judge Posner:

> *Wal-Mart* holds that if employment discrimination is practiced by the employing company's local managers, exercising discretion granted them by top management... rather than implementing a uniform policy established by top management to govern the local managers, a class action by more than a million current and former employees is unmanageable.

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488 (7th Cir. 2012).

### b.   Post-*Dukes* Courts Have Found Commonality in Circumstances Analogous to This Case

Post-*Dukes* courts have found commonality satisfied in discrimination cases (naturally involving less gigantic class numbers) where the employer has adopted a common policy or practice that limits the discretion of the class members' immediate supervisors and/or centralizes such discretion in the hands of upper management.  *See, e.g.*, *McReynolds*, 672 F.3d at 488-92 (company-wide "teaming" and "account distribution" policies which "exacerbate racial discrimination"); *Moore*, 2013 U.S. Dist. LEXIS 25248, at *56-58 (specific promotions process); *Ellis*, 285 F.R.D. at 498-99, 509-19 (uniform policies and practices with regard to company's promotion system, including direct involvement of CEO and regional executives in the process); *Parra v. Basha's Inc.*, 2013 U.S. Dist. LEXIS 76792, at *33-43 (D. Ariz. May 31, 2013) (common wage scales).[74]   "[I]n contrast to the scattershot claims in *Dukes*," the class members' claims here are based on a "common contention, thereby meeting the

---

[74] Similarly, courts have rejected *Dukes*-based motions to strike class allegations where plaintiffs pled the existence of HQ-level policies which limited supervisors' discretion.  *See, e.g., Kassman v. KPMG*, 11 Civ. 3743, 2013 U.S. Dist. LEXIS 17491, at *19-23 (S.D.N.Y. Feb. 7, 2013); *Chen-Oster*, 877 F. Supp. 2d at 118-19 ("What characterized…[*Dukes*] was fragmented discretion untethered to any companywide policy and procedure."); *Calibuso v. Bank of Am. Corp.*, 893 F. Supp. 2d 374, 389 (E.D.N.Y. 2012) (commonality adequately pled where "plaintiffs argue[d] that, because the common compensation and account distribution systems rely on criteria that systematically favors male [employees], there is a discriminatory impact on women.").

commonality requirement." *Chen-Oster*, 877 F. Supp. 2d at 119.

> **c.**   **Commonality Exists on the Disparate Treatment Claims: Plaintiffs Provide Significant Proof the Defendants Operate Under a General Policy of Discrimination**

> > **i.**   **Defendants Confer All Decision-Making Authority on an Openly Sexist Cabal**

This case is the opposite of *Dukes*. Plaintiffs advance a narrow pay class of about 150 female employees in two positions–and an even narrower FMLA/pregnancy and caregiver class–who are tied together by distinct policies.  *See, e.g*., *Ellis*, 285 F.R.D. at 509. Instead of offering a theory of a localized free-for-all, without any "common mode" of exercising that discretion[75], Plaintiffs assert that the disparities here arose from highly centralized decision-making.  Since at least 2003, final pay and termination decisions for all class members were entrusted to an inner circle of predominantly male executives at Defendants' New York and Paris headquarters. *See* Sec. II.B., *supra*. *See generally*  Exs. 42 and 43. One of the Chiefs among these decision-makers was President Tsokanos, whose obvious and pervasive sexism became a matter of Company lore.

However, despite Tsokanos' twisted character, Defendants' executive leadership repeatedly promoted him, made him the face of the Company, and ratified his employment actions.  HR, the traditional bulwark against discrimination and harassment, was ineffectual and did nothing to address his conduct and the discriminatory corporate culture that he and his cohorts perpetuated. As President, Tsokanos represented and spoke for the Company; thus, Plaintiffs have introduced substantial direct proof of discrimination that is absent in most other class cases.  To compound this situation, Defendants left Tsokanos untouched until a year and a half into this action.

Defendants' belated attempt to distance themselves from President Tsokanos is futile.  Plaintiffs have offered direct evidence that Tsokanos' well-known sexism infected the employment terms involving the class.  For example, he opined in effect that managers needed a "big swinging dick" to

---

[75] *Dukes*, 131 S. Ct. at 2554-55.

earn the big bucks and that women with babies should not be given pay raises.

Unlike the situation in *Dukes, see* 131 S. Ct. at 2554-55, it is reasonable to infer that Tsokanos'

animus towards the class tainted every matter he touched – which, according to Company policy, was

every employment outcome at issue in this case.   The Court need not delve into the subjective intent of

thousands of decision-makers, but only a very small group.  Commonality is patently obvious. *See, e.g.*,

*Rossini v. Ogilvy & Mather, Inc*., 798 F.2d 590, 598 (2d Cir. 1986) (Rule 23(a) satisfied under *Falcon*

where "evidence was offered to show that many of the decisions…were made by the same, central

group of people," which "would indicate that [defendant] discriminated in the same general

fashion")(citations omitted); *Ellis*, 285 F.R.D. at 511-19 (focusing on "high level management

involvement" in promotion system); *Hnot v. Willis Group Holdings Ltd.*, 228 F.R.D. 476, 485

(S.D.N.Y. 2005) (typicality "met if plaintiffs' evidence shows that an employer discriminated in the

same general fashion against employees and other class members through the agency of the same key

actors.").

As courts have emphasized, "[w]hen blame for discrimination is laid at the feet of a single

decisionmaker, or a small group of individuals, it is comparatively easy to find commonality." *Abram v.

United Parcel Serv. of Am., Inc.*, 200 F.R.D. 424, 432 (E.D. Wis. 2001); *Ellis v. Elgin Riverboat Resort*,

217 F.R.D. 415, 424 (N.D. Ill. 2003) ("Commonality is relatively easily satisfied when a single

individual or a small, centralized group makes decisions."); *see Dukes*, 131 S. Ct. at 2551 (indicating

that commonality is met when claims involve alleged bias by same individual).[76]

As summed up in *Ellis*, the evidence here:

indicates that officers at the regional and corporate levels are involved in [pay] decisions.

---

[76] *See also Cronas*, 2011 U.S. Dist. LEXIS 122736, at *8 (certifying 317-member settlement class "where pay and promotion decisions were subject to a single ultimate decision-maker"); *Meiresonne v. Marriott Corp*., 124 F.R.D. 619, 623 (N.D. Ill. 1989) (defendant had centralized promotions system in which a single Committee played "a significant role in all relevant promotions").  *Cf., e.g*., *Strouchler v. Shah*, 891 F. Supp. 2d 504, 518 (S.D.N.Y. 2012) (case involving denial of Medicaid benefits: even though "the facts of each class member's diagnoses and evaluations are unique to that individual," "it is highly likely that plaintiffs will be able to establish commonality" where challenged program had "centralized" elements, including that eligibility was determined by a limited set of doctors with a review process supervised by a single individual).

Furthermore, the fact that the scope of this suit is confined to [decisions involving two titles] by a much smaller group of decisionmakers than in *Dukes* – decisionmakers who form a relatively small coherent group – makes it far less "unbelievable" that these managers would exercise their discretion in a common way.  *Dukes*, 131 S. Ct. at 2555.  To the contrary, Plaintiffs have offered persuasive evidence of a common direction emanating from [Defendants'] upper management.

285 F.R.D. at 519.  Further, this case:

presents not simply the absence of a policy, as in *Dukes*, but discrete companywide policies guided and supervised by a relatively small and coherent group of company executives. These policies and practices, set and enforced by upper management, provide the "glue" that the Supreme Court sought – but did not find – in *Dukes* . . . .

*Ellis*, 285 F.R.D. at 530.  This case is even more compelling than *Ellis*, which was in turn "even more compelling" than *McReynolds*.  *Id.* at 533.  The "glue" in this litigation comes down to Jim Tsokanos – an infamous discriminator and harasser – and the small team of corporate executives who empowered him and ratified his behavior.  *Dukes* demanded glue; Plaintiffs submit proof stronger than cement.

> ### ii.      Defendants' Employment Data is Statistically Significant and Compelling Evidence of Classwide Discrimination

Even with an unusually small data set, Plaintiffs have shown pay disparities rising above two standard deviations. Given the number of employees and the centralized compensation structure at the Company, it would not be feasible to disaggregate the data by location or by type of decision.  *See, e.g.*, *Ellis*, 285 F.R.D. at 521-24.  Because the disparities allegedly arise from uniform policies and centralized rather than localized decision making, it is reasonable to infer that the nationwide disparities manifested themselves throughout the Company.  *See id.* at 524 ("If, as Plaintiffs allege, promotion decisions are based upon the biased attitudes of the CEO and upper management, one would expect disparities in all, or at least in most, regions.").  In other words, the statistical effect on the class is not driven by one or two rogue supervisors in anomalous locales but by the agglomeration of a common decision-making process; it simply takes sufficient data, namely, an aggregated analysis, to fairly capture that effect.

Similarly, the data on FMLA terminations also rises to the level of statistical significance, a

stunningly significant finding given the limited number of observations in the available data.  Assuming that the disparities dip below the usual benchmark of 1.96 standard deviations, the fact finder may still plainly infer the existence of classwide discrimination under these circumstances.  *See, e.g.*, *Chin*, 685 F.3d at 153.  In addition to statistical proof, Plaintiffs proffer policies that are discriminatory on their face and damning anecdotal evidence.

The sheer magnitude of the disparities is especially potent evidence of a standard operating procedure of discrimination.  Defendants' pay data indicates stark across-the-board discrepancies ranging up to 10.8% per class member annually.  As stated by Plaintiffs' experts, these differences "are very large and occur in every year." (Ex. 2 at 15).   Further, of the employees who took FMLA leave between 2007 and 2010, about seventy percent were terminated.  Women who took maternity leave were more than twice as likely to be fired as other employees.[77]

### iii.    Anecdotal Evidence Strongly Demonstrates Pervasive Discrimination

Even with the constraints placed on them by Judge Peck's rulings, Plaintiffs submit anecdotal evidence from more than fourteen percent of the pay class—more than one thousand times the proportion deemed lacking in *Dukes* and very similar to the one-eighth ratio cited as adequate.  131 S. Ct. at 2556 (citing *Teamsters*, 431 U.S. at 338). As set forth above, Plaintiffs' testimony provides a scathing indictment of the Company and its male leadership.  This evidence confirms Plaintiffs' policy-based and statistical proof.  *See Hnot*, 228 F.R.D. at 484 ("Anecdotal information can be important in 'bringing the cold numbers convincingly to life'") (citation omitted).

Plaintiffs also submit anecdotal evidence relating to a substantial portion of the pregnancy/ maternity class, further bolstering their policy-based and statistical evidence.  In *Velez v. Novartis*, 244

---

[77] These striking pay and termination figures are akin to the "inexorable zero."  *Cf., e.g.*, *EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 878-79 (7th Cir. 1994); *U.S. v. Gregory*, 871 F.2d 1239, 1245 (4th Cir. 1989); *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1004, 1015 (2d Cir. 1980).  The fact that Defendants' practices perpetuated such glaring disparities year after year "is strong evidence that [they were] intended to do so."  *Loyd v. Phillips Bros.*, 25 F.3d 518, 524 n.4 (7th Cir. 1994).

F.R.D. 243, 265-67 (S.D.N.Y. 2007), the court certified a pregnancy discrimination class based on anecdotal evidence alone. As in *Velez*, Plaintiffs' testimony is qualitatively persuasive and speaks to a general pattern of discrimination. And Plaintiffs' evidence of other forms of gender discrimination, such as proof of dramatic pay disparities, "sheds light on their anecdotal evidence of pregnancy discrimination" and supports an inference that such discrimination pervaded the Company. *Id.* at 267. As with the pay claims, such discrimination was effectuated through a common mechanism, i.e. the policies and decisions of a small cadre of biased male executives.

> **d.**   **Commonality Exists in the Disparate Impact Claims: Plaintiffs Mount a Classwide Challenge to Uniform, Facially Neutral Policies That Adversely Affected the Class**

Plaintiffs' disparate impact claims satisfy commonality largely for the reasons that their disparate treatment claims do. Because the class was subject to the same allegedly discriminatory policies, the same questions will be raised and will necessarily yield the same answers. *See, e.g.*, *Ellis*, 285 F.R.D. at 531 ("Although the [disparate treatment] analysis applies with equal force to Plaintiffs' disparate impact claim, the Court briefly addresses disparate impact separately because under *Dukes*, the disparate impact analysis is even clearer."). Here, the policies are even more clearly uniform than in *Ellis*, since they were centrally administered. Thus, commonality is satisfied.

> **3.   Defendants' Common Practices Also Easily Satisfy Typicality**

Typicality is intertwined with commonality and is often addressed together. *See Dukes*, 131 S. Ct. at 2551 n.5. "It is axiomatic that [w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Meyer*, 2013 U.S. Dist. LEXIS 60091, at *25 (internal citation omitted).

As with commonality, Plaintiffs and the class claim to have been discriminated against in the same fashion, due to common practices. Each employee's claims "arise from the same course of events"

and they "make similar legal arguments to prove the defendants liability." Phase I will determine class liability. The "particularities of [Plaintiffs'] circumstances do not threaten to become the focus of the litigation any more so than those of the other members of the putative class." *Id.* at *25-26 (citations omitted). *See Parra*, 2013 U.S. Dist. LEXIS 76792, at *76 ("plaintiffs' pay claims rest on legal theories that apply to all putative class members"); *Floyd*, 283 F.R.D. at 176 ("Because the named plaintiffs' claims arise from the same policy or practice and the same general set of facts as do the claims of the putative class members, the typicality prong is satisfied.").

### 4. Plaintiffs and their Counsel are Far More than Adequate to Represent the Class; Defendants Will Be Unable to Mount Any Meaningful Challenge to Adequacy

Adequacy "is measured by two standards.  First, class counsel must be qualified, experienced and generally able to conduct the litigation. And second, the class members must not have interests that are antagonistic to one another." *Meyer*, 2013 U.S. Dist. LEXIS 60091, at *26 (citation omitted).

Plaintiffs' counsel, Sanford Heisler, is highly experienced and well-versed in employment class actions and has vigorously prosecuted this case on behalf of the class.  The Court should appoint Sanford Heisler as class counsel under Fed. R. Civ. P. 23(g).[78]  Further, over the course of this action, the named Plaintiffs have taken their duties as class representatives seriously and have adequately and vigorously represented their fellow employees.  There are no conflicts of interest which would defeat certification. *See Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 616 (S.D.N.Y. 2012) (Carter, J.) (adequacy met when "there is no evidence that Plaintiffs' and the Class Members' interests are at odds.").

### D. PLAINTIFFS' CLAIMS MAY BE CERTIFIED UNDER FED. R. CIV. P. 23(B)(2) AND (B)(3)

---

[78] *See, e.g., In re Novartis Wage & Hour Litig.*, No. 09 Civ. 0437; *Stiller v. Costco*, 2010 U.S. Dist. LEXIS 140297, at *18-19 (S.D. Cal. Dec. 13, 2010); *Velez v. Novartis Pharms. Corp.*, 2010 U.S. Dist. LEXIS 125945, at *46-47, 62-63 (S.D.N.Y. Nov. 30, 2010); *Bellifemine v. Sanofi-Aventis U.S. LLC*, 07 Civ. 2207 (JGK), 2010 U.S. Dist. LEXIS 79679, at *4, 16-17 (S.D.N.Y. Aug. 5, 2010); *Hernandez v. C&S Wholesale Grocers, Inc.*, 06 CV 2675, 2008 U.S. Dist. LEXIS 118666 (S.D.N.Y. July 30, 2008); *Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 268-69 (S.D.N.Y. 2007).

**1.  Under Well-Established Law, the Classwide Injunctive Claims (*Teamsters* Phase I) Should be Certified Under Fed. R. Civ. P. 23(b)(2) and (c)(4)**

The first stage of the proceedings in this case will result in a determination of liability to the class and classwide injunctive relief.  It is well-established in this Circuit that the injunctive phase of a discrimination case is tailor-made for (b)(2) certification.  *See, e.g.*, *Robinson*, 267 F.3d at 167-69; *Gulino v. Bd. of Ed.*, 96 CV 8414, 2012 U.S. Dist. LEXIS 172687, at *25-33 (S.D.N.Y. Dec. 4, 2012); *Easterling*, 278 F.R.D. at 45-47; *City of New York*, 276 F.R.D. at 33-35.[79]

The practices challenged in this action present issues "that can most efficiently be determined on a class-wide basis," after which class-wide injunctive relief may issue.  *McReynolds*, 672 F.3d at 491.  As stated in *Ellis*:

> because class members complain of a pattern or practice that is generally applicable to the class as a whole, and any classwide injunctive relief would address said pattern or practice, Plaintiffs have met the requirements of (b)(2) ... In addition, because liability turns on Defendant's alleged patterns or practices, adjudication of liability is also appropriate under (b)(2) in the first stage of trial. Furthermore, liability under Plaintiffs' disparate impact theory turns on Defendant's specific employment practices that, Plaintiffs contend, have classwide discriminatory effects.

285 F.R.D. at 536-37 (internal citations omitted).  Here, Plaintiffs seek various class-wide declaratory and injunctive relief, which is aptly suited for (b)(2) certification.  *See, e.g.*, *Gulino*, 2012 U.S. Dist. LEXIS 172687, at *29-30, 34-39.[80]

**2.  The Court Should Certify the Remedial Claims (*Teamsters* Phase II) Under (b)(3)**

**a.  Common Issues Predominate Over Individual Ones**

As stated by this Court in *Meyer*;

---

[79] *See generally Floyd*, 283 F.R.D. at 173 ("…(b)(2) suits remain appropriate mechanisms for obtaining injunctive relief in cases where a centralized policy is alleged to impact a large class of plaintiffs, even when the magnitude (and existence) of the impact may vary by class member"); *Bristol Village, Inc. v. Louisiana-Pacific Corp.*, 12-CV-263S, 2012 U.S. Dist. LEXIS 183342, at *27-29 (W.D.N.Y. Dec. 31, 2012) (court may certify (b)(2) injunctive class and (b)(3) damages class); *Stinson*, 282 F.R.D. at 379-84 (same).

[80] The Court may also certify Phase I under Rule 23(b)(3). As discussed above, Phase I is a classwide proceeding based entirely on common proof.  No individual questions are at issue.  Thus, common issues reign and predominance is easily satisfied.  *See Moore*, 2013 U.S. Dist. LEXIS 25248, at *67-69.  Further, a single proceeding on these issues is superior to a multitude of individual suits.  Certification (i) facilitates efficiency and uniformity and (ii) prevents many class members' claims from falling by the wayside. *See id.* at *70-71.

"[P]redominance" . . . tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. . . . This requirement can be satisfied only if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.

2013 U.S. Dist. LEXIS 60091, at * 28 (internal citations omitted).  Individual distinctions among the class members "do not defeat predominance unless they overshadow those common threads that bind the claims of a putative class." *Id.* at *31.  A finding of Rule 23(a) typicality "goes a long way towards satisfying" the Rule 23(b)(3) requirement that common issues predominate. *Stinson*, 282 F.R.D. at 382 (citing *Rossini*, 798 F.2d at 598).

This case is similar to *Ellis*, if not more compelling.  There, the court held that plaintiffs' challenge to defendant's common employment practices "will resolve significant issues with respect to the class as a whole, and this dwarfs individualized issues as to particular employment decisions."  285 F.R.D. at 538.  As to the pattern-or-practice claims, the *Teamsters* Phase I inquiry "predominates because it has a direct impact on every class member's effort to establish liability and on every class member's entitlement to . . . monetary relief." *Id.* (citation omitted).  "Similarly," the disparate impact claim raises "issues best addressed with respect to the entire class." *Id.*  "Adjudicating these issues on a classwide basis is necessary before any individualized proceeding can occur." *Id.*

The *Teamsters* framework accounts for the fact that individualized questions are presented at Phase II.  But, this "does not, on its own, defeat class certification."  *Id.* at 539.  As in *Ellis*, "the individualized hearings required are narrow in scope and significance when compared to the threshold, classwide issues subject to generalized proof." *Id.*  *See also Stinson*, 282 F.R.D. at 383 (plaintiffs' ability to prove unlawful pattern-or-practice on generalized proof predominates over possibility that individual mini-trials may be needed to show which summonses lacked probable cause); *Moore*, 2013 U.S. Dist. LEXIS 25248, at *67-69 & n.16 (individual issues at Phase II "do not destroy predominance"); *Kerner v. City & Cty. of Denver*, Civ. Action No. 11-cv-00256-MSK-KMT, 2013 U.S.

45

Dis. LEXIS 41280, at *8-9 (D. Col. Mar. 25, 2013) (in title VII case, fact that "significant adjudicative time may be spent on individual damages" does not predominate where the "common issues of law and fact are broad and substantial."); *Parra*, 2013 U.S. Dist. LEXIS 76792, at *103-106 (in pay discrimination case, need for individualized damages findings did not defeat predominance when company operated under a common discriminatory policy).

### b.  A Class Action Is by Far the Superior Way to Resolve this Dispute

There are essentially three ways to resolve this dispute: (i) dozens of individual actions on all issues; (ii) resolution of the Phase I issues in this Court, along with a multiplicity of individual remedial actions in competing forums; and (iii) the consolidation of all proceedings in this Court, ie. a classwide liability trial followed by a streamlined remedial phase. The third alternative is the only one that will allow class members to receive notice of the action and fully avail themselves of the *Teamsters* paradigm and the efficiencies of class procedures.  Can be there be any doubt that it is "superior to other available methods for fairly and efficiently adjudicating the controversy"? *Meyer*, 2013 U.S. Dist. LEXIS 60091 at *28 (citing FED. R. CIV. P. 23(b)(3)).  The "strong commonality" between the class members, or the fact that they were all aggrieved by a uniform practice, is "precisely the type of situation for which the class action device is suited."  *Stinson*, 282 F.R.D. at 383 (citation omitted).

The four superiority factors (*see* Rule 23(b)(3)(A-D)) all solidly favor certification. *First*, given the common questions on liability and the class members' ability to opt-out of the monetary relief portion of the case or to pursue claims in the remedial phase, "class members have a diminished interest in individually controlling the common portions of this action." *Ellis*, 285 F.R.D. at 540; *accord Parra*, 2013 U.S. Dist. LEXIS 76792, at *118.   *See also Moore*, 2013 U.S. Dist. LEXIS 25248, at *70-71; *Stinson*, 282 F.R.D. at 383; *Kerner*, 2013 U.S. Dist. LEXIS 41280, at *10-12.   Although the pay disparities are statistically significant, they may provide inadequate incentive for each of them to litigate individual claims. *See, e.g., Kerner*, 2013 U.S. Dist. LEXIS 41280, at *10-12 (even relatively high-

value claims can be "negative value" in light of need for complex statistical proof).[81]   To evade the burden of damages proceedings based on the fact that class members may not have the knowledge or wherewithal to pursue separate suits "would be to annihilate the most basic principles of justice." *Kerner v. City & Cty. of Denver*, Civ. Action No. 11-cv-00256-MSK-KMT, 2012 U.S. Dist. LEXIS 187114, at *35 (D. Col. Nov. 30, 2012), *adopted,* 2013 U.S. Dist. LEXIS 41280.

*Second*, Plaintiffs are not aware of competing litigation in any other forum.  *See Ellis*, 285 F.R.D. at 540; *Meyer*, 2013 U.S. Dist. LEXIS 60091, at *36.  Rather, counsel's and the Court's unique familiarity with the claims and evidence is bound to foster efficiency.  *See Easterling*, 278 F.R.D. at 50. Even if the Court declines to certify, it will still be faced with 33 individual claims.  *See Perkins v. S. New Eng. Tel. Co.*, 669 F. Supp. 2d 212, 221 (D. Conn. 2009) (certifying FLSA collective action: "fairness and procedural considerations" weighed "heavily" in favor of certification because over 60 plaintiffs had already opted in); *id.* at 225 (discussing (b)(3)superiority).

*Third*, it is desirable to concentrate the action in the Southern District of New York, where the Company is based and the most of its employees are located.  Thirty-three employees are already pursuing their claims here.

*Finally*, manageability, the bugbear of *Dukes*, is not a serious concern.  There are only about 200 class members, who share common experiences of discrimination.  In *Ellis*, the court certified a Title VII remedial class almost three times as large.  285 F.R.D. at 540 (class of 700 members is manageable).   Classwide adjudication is "far more manageable than the alternative individual proceedings on all issues" and "prevents inconsistent verdicts."  *Id. See also Moore*, 2013 U.S. Dist. LEXIS 25248, at *70-71; *Easterling*, 278 F.R.D. at 50-51.  As the Second Circuit has cautioned, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored, and should be the exception rather than the rule."  *In re: Visa Check/MasterMoney Antitrust Litig.*, 280

---

[81] *See also, e.g., Quinonez v. Empire Today, LLC*, No. C 10-02049 WHA, 2010 U.S. Dist. LEXIS 117393, *12 (N.D. Cal. Nov. 4, 2010) ($22,000 individual claim is "modest"); *Gentry v. Super. Ct.*, 42 Cal. 4th 443, 458 (Cal. 2007).

F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.) (internal citations omitted).  As stated in *City of New York*,

following the completion of Phase I:

> Class proceedings have already achieved significant economies of time, effort, and expense... The liability-phase class marshaled significant statistical and testimonial evidence—likely beyond the capability of any individual plaintiff to procure... By proving that the City engaged in classwide discrimination against a protected group, the liability-phase class significantly reduced the burden of time and expense on any individual victim of discrimination to obtain relief. Through their considerable efforts litigating this case over the last four years, the putative subclass representatives and their counsel have amassed considerable case-specific knowledge, experience, and expertise that will enable them to efficiently and intelligently litigate questions common to the . . . subclasses during the remedial phase of the case.

276 F.R.D. at 49-50.

Especially given the small size of the class, it would be impractical and inefficient to hold a Phase I liability trial but decline to proceed to Phase II for the entire class if classwide liability is found. This would leave most class members with partial relief and cut them off from the remedies to which they are by law entitled.  The alternate scenario to either (b)(3) certification or consolidated remedial proceedings in this Court is unpalatable.  Instead of receiving notice of this action and being able to participate in streamlined procedures, class members would have to independently discern the existence of the Phase I outcome and file their own separate claims in courts throughout the country.  Many will lack an adequate incentive to initiate such suits.  Leaving the class members to their own devices would also make it more difficult for them to obtain the benefit of the presumption to which they are entitled under *Teamsters*.  Naturally, there would be unnecessary duplication of efforts.

Separate remedial proceedings in different tribunals could also create a tangle of conflicting results.  In theory, aggregate back pay awards could exceed the classwide disparities shown in the data. The problem is exacerbated on the termination claims, where class members may have competed for the same jobs.  In a joint Phase II, the jury could sort out who would have held the positions absent Defendants' discriminatory practices; if the Court finds that a jury would be unable to fairly determine this issue, it may apportion damages on a *pro rata* basis.  *See Easterling*, 278 F.R.D. at 48-49; *City of*

*New York*, 276 F.R.D. at 45. Neither of these approaches is feasible in fragmented litigation. Further, atomization of this case would greatly impede the imposition of a possible punitive damages award, a critical component of Title VII's statutory enforcement regime.[82]

### E. PLAINTIFFS' PRELIMINARY TRIAL PLAN SHOWS THAT THE CASE IS APT FOR CLASS TREATMENT

Plaintiffs suggest the trial plan tentatively adopted in *Ellis* (*see id*. at 545-46), modified as discussed in n. 83 with regard to the assessment of punitive damages:

Stage One:

*The jury decides:*

- Whether Defendants engaged in a pattern or practice of discrimination (liability for classwide disparate treatment);
- Whether Defendants' conduct meets the standard for an award of punitive damages, and the maximum aggregate punitive damages award;
- Whether Defendants are liable to Named Plaintiffs and other testifying Plaintiffs for gender discrimination and, if so, in what amount.

*The Court decides:*

- Whether Defendants' employment practices have had an adverse impact on the class (prima facie case of disparate impact).
- If yes on prima facie disparate impact case, Whether Defendants' employment practices were justified by business necessity (defense to the disparate impact claim), and if so, whether there was a less discriminatory alternative;
- In the event of a liability finding for either pattern-or-practice discrimination and/or disparate impact discrimination, appropriate class-wide injunctive relief;

---

[82] Plaintiffs propose that the Phase I jury decide both the propriety and amount of class-wide punitive damages. *See Velez v. Novartis Pharms. Corp*., 04 Civ. 09194 (CM), 2010 U.S. Dist. LEXIS 125945, at *10-11. Then, punitives can be apportioned in accordance with the back pay and compensatory damages awards. *See, e.g., EEOC v. Dial Corp*., 259 F. Supp. 2d 710 (N.D. Ill. 2003); *Palmer v. Combined Ins. Co. of Am*., 217 F.R.D. 430, 438-39 (N.D. Ill. 2003); *Barefield v. Chevron, U.S.A., Inc*., No. C 86-2427 THE, 1988 U.S. Dist. LEXIS 15816, at *15-17 (N.D. Cal. Dec. 6, 1988). *See also Iorio v. Allianz Ins. Co. of Am*., 2009 U.S. Dist. LEXIS 97657, at *17-18 (S.D. Cal. Oct. 21, 2009) (in class case, punitives may be awarded as ratio to compensatories); *Jenkins v. Raymark Indus*., 782 F.2d 468, 474-75 (5th Cir. 1986). This would not run afoul of *Dukes* or other law as only those class members found to be "actual victims" of discrimination will receive punitives; awards will be made in direct proportion to the actual harm they suffered and can be adjusted as needed to ensure they are not excessive.

In the alternative, the Court should follow *Ellis*: (a) at Phase I, a finding of "[w]hether [Defendants'] conduct meets the standard for an award of punitive damages"; and (b) at Phase II, a determination of the "aggregate amount of punitive damages owed to the class and the share of said damages owed to each class member." 285 F.R.D. at 542-46. *See also EEOC v. Pitre*, No. 1:11-cv-00875, 2012 U.S. Dist. LEXIS 179146, at *30-31 (D.N.M. Nov. 30, 2012).

Either of these methods of assessing punitives falls apart if the case is fragmented and dispersed to multiple forums. Such a course would leave the fact finder unable to (i) fairly determine whether Defendants' classwide conduct warrants punitive damages and, if so, (ii) to adequately punish them.

<u>Stage Two:</u>

- Individual hearings to determine injunctive relief, back pay and compensatory damages and adjudicate individual defenses; and
- The amount of punitive damages owed to each class member, to be based on the back pay and compensatory awards and other proportionality concerns

## IV.     <u>CONCLUSION</u>

If any case cries out for class certification, this is it.  Even with restricted class discovery, Plaintiffs have amassed compelling direct and circumstantial evidence of pervasive Company-wide discrimination against women.  This discrimination emerged in a single manner—through uniform corporate policies and highly-centralized decision-making.  Adjudicating the class members' claims in separate individual actions defies logic and would impede their ability to obtain the relief they are entitled to under the law.


Dated: July 12, 2013


**SANFORD HEISLER, LLP**


/s/ Janette Wipper
_____
Janette Wipper Esq.
Siham Nurhussein, Esq.
Tom Henderson, Esq.
Susan Rubenstein, Esq.

*Attorneys for the Plaintiffs and the Class*

50