UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | |
|---|---|
| MONIQUE DA SILVA MOORE, MARYELLEN O'DONOHUE, LAURIE MAYERS, HEATHER PIERCE, and KATHERINE WILKINSON, on behalf of themselves and all others similarly situated, and ZANETA HUBBARD, on her own behalf. | : : : : : : : : |
| Plaintiffs, | : : |
| -against- | : : |
| PUBLICIS GROUP SA and MSLGROUP, | : : : |
| Defendants. | : |

--------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5-15-14

1:11-cv-1279 (ALC) (AJP)

**ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs Monique da Silva Moore and other class representatives (specifically, "Named Plaintiffs"; generally, "Plaintiffs") brought this action against Defendants Publicis Group SA ("Publicis") and MSLGroup ("MSL") (collectively, "Defendants") alleging gender discrimination. After engaging in extensive discovery, Plaintiffs moved this Court to certify three subclasses—a pay class, a pregnancy class, and a caregiver class. (ECF No. 424). On March 31, 2014, in a summary order, the Court denied Plaintiffs' motion without prejudice. (ECF No. 530). This Order expounds upon the Court's prior ruling.

**I.     Procedural History**

This case began early in 2011. (See Compl., ECF No. 1). After contentious discovery and pre-trial proceedings, Plaintiffs had amended their complaint twice, and sought to amend a third time. (See Mot. Third Am. Compl., ECF No. 435). This Third Amended Complaint sought to define three subclasses—a pay class, a pregnancy discrimination class, and a caregiver

class; to add class Family Medical and Leave Act ("FMLA") claims; and to add an additional

named Plaintiff.    (See Pls.' Letter dated June 9, 2013, ECF No. 450-1).    Concurrently with their

third attempt to amend the complaint, Plaintiffs filed for class certification.    (Mot. Class Cert.,

ECF No. 424).    With their motion to amend still outstanding, Plaintiffs based their motion for

class certification on this proposed Third Amended Complaint.    (Pls.' Mem. Supp. Class Cert. 4,

ECF No. 431).    Defendants objected to yet another amended complaint, and to that end, chose to

oppose only those claims in Plaintiffs' Motion for Class Certification that they thought had a

basis in the Second Amended Complaint—the pay class.    (See, e.g., MSL's Opp. Class Cert. 7

n. 5, ECF No. 453).    Plaintiffs' Motion to Amend was subsequently denied.    (ECF No. 509).

The Court held oral argument on the Motion for Class Certification on February 4, 2014.

(ECF No. 525).    At oral argument, Plaintiffs revised and clarified the subclasses they sought to

certify.    (Oral Arg. Tr. 38-39, Feb. 4, 2014).    Most importantly, although Plaintiffs had sought

certification of a Pregnancy Discrimination Act/FMLA combined subclass in their motion

papers, they modified that subclass to be simply under the Pregnancy Discrimination Act.    (Oral

Arg. Tr. 39, Feb. 4, 2014).    Plaintiffs also clarified that they sought certification of each subclass

under both, Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.    (Oral Arg. Tr.

38-39, Feb. 4, 2014).    Because, however, Plaintiffs had only just then modified the pregnancy

subclass with little to no notice to Defendants, the Court made it clear at oral argument that it

would not address the pregnancy subclass regardless of the version of the complaint in which it

was rooted.    (Oral Arg. Tr. 40-44, Feb. 4, 2014).    Nor will the Court address the caregiver

subclass without adequate briefing on the issue from both parties.[1]    Therefore, the Court only

---

[1] The Court does not decide if Plaintiffs' caregiver subclass was adequately pleaded in the

considers Plaintiffs' motion to certify the pay class in this Order.[2]

## II.    Factual Background

Named Plaintiffs are former employees of Defendant MSL.   (Second Am. Compl. ["SAC"] ¶¶ 64-69, ECF No. 285).   Named Plaintiffs representing class claims for pay discrimination were all employed in Vice President ("VP") and Senior Vice President ("SVP") roles in MSL's offices across the country.   (SAC ¶¶ 73, 113, 138, 166, ECF No. 285). Plaintiffs allege that there are at least 150 female employees in these roles at MSL.   (Pls.' Mem. Supp. Class Cert. 34, ECF No. 431).

Publicis is a French-based global communications firm.   (Pls.' Mem. Supp. Class Cert. 5, ECF No. 431).   MSL, a wholly owned subsidiary of Publicis, is the "PR [Public Relations] arm" of Publicis.   (Pls.' Mem. Supp. Class Cert. 5, ECF No. 431).   Although MSL is headquartered in France, it does business in the United States through MSL Americas.   (Pls.' Mem. Supp. Class Cert. 5, ECF No. 431).   It has offices across the United States—New York, its American headquarters; Boston; Washington, D.C.; Atlanta; Chicago; Ann Arbor/Detroit; Seattle, San Francisco; and Los Angeles.   (Pls.' Mem. Supp. Class Cert. 5, ECF No. 431).   In 2008, MSL was restructured, and Jim Tsokanos was made President of MSL Americas.   (Pls.' Mem. Supp. Class Cert. 5, ECF No. 431).

Women constitute 70 to 85 percent of employees in the PR industry.   (Pls.' Mem. Supp. Class Cert. 6, ECF No. 431).   Nevertheless, Plaintiffs allege, Defendants "maintained a disproportionately male leadership throughout the class period."   (Pls.' Mem. Supp. Class Cert.

---

operative Second Amended Complaint.

[2] The Court has discretion on questions of class certification.   Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 139 (2d Cir. 2001).

6, ECF No. 431).   According to Plaintiffs, of this male leadership, six men in particular—

Tsokanos; Maury Shapiro, Chief Financial Officer ("CFO") of MSL Americas; Olivier Fleurot,

Chief Executive Officer ("CEO") of MSLGroup; Peter Miller, Global CFO of MSLGroup; Jean

Michel Etienne, CFO of Publicis; and Mathias Emmerich, General Secretary of Publicis—

formed, what Plaintiffs describe as a "cabal."   (Pls.' Mem. Supp. Class Cert. 1, 6, ECF No. 431).

This "cabal," Plaintiffs say, "made discriminatory pay, leave, and termination decisions that

adversely impacted the class of female PR professionals."   (Pls.' Mem. Supp. Class Cert. 7, ECF

No. 431).

      As evidence of this "cabal," Plaintiffs cite to the Janus book, Publicis's global policy

manual, as well as MSL's policy guides.   (Pls.' Mem. Supp. Class Cert. 7, ECF No. 431).   The

Janus book requires "approval" from the Publicis members of the "cabal" for certain

recruitments, promotions, terminations, base salaries, and salary increases.   (Pls.' Mem. Supp.

Class Cert. 7, ECF No. 431).   Plaintiffs admit, however, that this policy does not affect class

members.   (See Pls.' Mem. Supp. Class Cert. 7, ECF No. 431).   Plaintiffs also allege that

Publicis "keeps a tight rein on employment decisions at MSL through rigorous financial

reporting and monitoring requirements."   (Pls.' Mem. Supp. Class Cert. 7-8, ECF No. 431).   As

for MSL, Plaintiffs point to similar policies that they say "empower the same discrete group of

male executives with decision-making authority."   (Pls.' Mem. Supp. Class Cert. 8, ECF No.

431).   One such example is the MS&L[3] Performance Management and Compensation Guide –

North America.   (Nurhussein Decl. Ex. 49, July 12, 2013, ECF No. 426).   This Guide mandates

regular performance appraisals by supervisors and practice leaders, ties pay raises to

_____

[3] MS&L was the former name of MSL Americas.

4

performance appraisals, defines salary bands for different positions, states that bonuses are discretionary, and sets forth timelines for when VPs and SVPs may be eligible for raises. (Nurhussein Decl. Ex. 49, July 12, 2013, ECF No. 426). Absent from this Guide is any facially discriminatory pay policy. (Nurhussein Decl. Ex. 49, July 12, 2013, ECF No. 426). Also missing is a clear vesting of unfettered authority in members of the "cabal." (Nurhussein Decl. Ex. 49, July 12, 2013, ECF No. 426).

Plaintiffs, though, point to the Guide's application in practice. They argue that the "cabal" "took advantage of the broad salary bands and the lack of objective criteria" to discriminate against women. (Pls.' Mem. Supp. Class Cert. 10, ECF No. 431). Plaintiffs theorize that a salary freeze, put in place in October 2008, further concentrated decision-making power over VP and SVP salaries in the hands of the "cabal," who were given discretion to grant exceptions to the freeze. (Pls.' Mem. Supp. Class Cert. 10, ECF No. 431). To that end, they cite to an e-mail from Miller, Global CFO for MSL, in which he states that "the exception policy takes away local management authority." (Pls.' Mem. Supp. Class Cert. 10, ECF No. 431; Nurhussein Decl. Ex. 56, July 12, 2013, ECF No. 426). Plaintiffs further support their contention that the "cabal" made discriminatory decisions by citing anecdotal evidence of gender stereotyping and sexual harassment at MSL, primarily by Tsokanos. (Pls.' Mem. Supp. Class Cert. 13-17, 19-20, ECF No. 431). Finally, Plaintiffs offer expert evidence on statistical disparities in pay between genders and on the vulnerability of Publicis's and MSL's policies to gender discrimination (social science study). (Nurhussein Decl. Exs. 1-4, July 12, 2013, ECF No. 426). Plaintiffs' statistical experts examined base pay of VPs and SVPs between 2008 and 2010 and concluded that on average, women were paid 8.5% less than comparable men.

5

(Nurhussein Decl. Ex. 4, July 12, 2013, ECF No. 426).   Their social science expert concluded

that Defendants' policies made it "vulnerable" to discrimination on the basis of gender.

(Nurhussein Decl. Ex. 2, July 12, 2013, ECF No. 426).

      Not surprisingly, Defendants vigorously dispute Plaintiffs' proof.   At the outset, both

Defendants emphasize that they have express policies prohibiting "all forms of discrimination,

including gender discrimination and harassment based on sex."   (MSL's Opp. Class Cert. 7,

ECF No. 453; Publicis's Opp. Class Cert. 4-5, ECF No. 454).   Publicis's policies against

discrimination can be found in the Janus book, which it describes as "a high-level policy

framework" "that calls for the fair and equitable treatment of all individuals employed by

Publicis subsidiaries."   (Publicis's Opp. Class Cert. 4, ECF No. 454).   Publicis also highlights

its minimal involvement in compensation decisions for MSL employees.   (Publicis's Opp.

Class. Cert. 5, ECF No. 454).   It concedes only that it instituted "a financial oversight

mechanism" in conjunction with the salary and hiring freeze that began in 2008, and ended early

in 2011.   (Publicis's Opp. Class Cert. 6-7, ECF No. 454).   This mechanism involved a multi-

tier process, beginning with management in the local office who first submit the request for an

exception.   (Publicis's Opp. Class Cert. 6, ECF No. 454).   After gaining approval at the MSL

Americas and MSL Global levels, the request was, only then, submitted to Publicis management,

particularly two members of the alleged "cabal," Etienne and Emmerich, for final approval.

(Publicis's Opp. Class Cert. 6-7, ECF No. 454).   Publicis asserts that that financial oversight,

however, never extended to evaluating the merits of any particular decision; rather, it was limited

to analyzing the "business justification" for the decision in relation to the particular office's

"financial performance."   (Publicis's Opp. Class Cert. 6-7, ECF No. 454).

Each of MSL's offices in the United States is a separate business unit, that is, local management bears responsibility to ensure its office is running at a profit.   (MSL's Opp. Class. Cert. 7, ECF No. 453).   Consequently, each individual office was responsible "for making decisions . . . concerning revenue and expense matters, including those relating to employees." (MSL's Opp. Class Cert. 8, ECF No. 453).   MSL stresses that Tsokanos was only involved in compensation decisions "[f]or employees who reported directly to [him] or worked directly on accounts for which he was responsible."   (MSL's Opp. Class Cert. 8 n. 8, ECF No. 453; see Nurhussein Decl. Ex. 62, July 12, 2013, ECF No. 426 (noting a recommendation from Tsokanos only for an employee on the account he supervised)).   Although its performance appraisal system seeks review from peers, colleagues, and direct reports, it is the employee's direct manager who assigns an overall performance rating, which is later used to determine an appropriate raise for the employee in conjunction with other business factors such as the financial condition of the office.   (MSL's Opp. Class Cert. 9-10, ECF No. 453).   Procedures changed during the salary and hiring freeze, when Managing Directors of the different offices were required to justify any compensation or hiring decisions and seek approval from members of the "cabal" and Human Resources.   (MSL's Opp. Class Cert. 11-15, ECF No. 453).   MSL, like Publicis, underscores that review of these exceptions "focused on the financial condition of the office seeking approval and whether the decision was consistent with that financial condition"; not on the substantive merits of the exceptions.   (MSL's Opp. Class Cert. 15, ECF No. 453).

MSL vehemently disagrees that the "all-male cabal," as Plaintiffs define it, even existed. (MSL's Opp. Class Cert. 16, ECF No. 453).   It claims that Fleurot, CEO of MSLGroup and an

alleged member of the "cabal," was not even involved in reviewing compensation decisions until at least April 2010.  (MSL's Opp. Class Cert. 16, ECF No. 453; Nurhussein Decl. Ex. 56, July 12, 2013, ECF No. 426).  Nor, it says, did Tsokanos participate in the review of compensation decisions.  (MSL's Opp. Class Cert. 16-17, ECF No. 453 (relying on depositions of Named Plaintiffs and of individuals involved in the financial review of compensation decisions, as well as on e-mails, charts, and other documents regarding compensation review from which Tsokanos is absent)).  More importantly, MSL notes, three women from Human Resources were involved in the review of compensation decisions.  (MSL's Opp. Class Cert. 18, ECF No. 453).

Defendants also put forth their own expert testimony.  In contrast to Plaintiffs' statistical experts' study on base pay, Defendants' statistical expert reviewed the specific compensation decisions that Plaintiffs allege the "cabal" made.  (Chavey Decl. Ex. 2C, Aug. 13, 2013, ECF No. 452).  He found no statistically significant disparities based on gender in the compensation decisions made at MSL between 2008 and 2011.  (Chavey Decl. Ex. 2C, Aug. 13, 2013, ECF No. 452).  Defendants' social science expert primarily questions the reliability of Plaintiffs' expert's methodology and conclusions.  (Chavey Decl. Ex. 2D, Aug. 13, 2013, ECF No. 452).  He challenges Plaintiffs' expert's findings as unsupported by scientifically sound methods or by actual examination of the allegedly discriminatory decisions that form the basis of this action. (Chavey Decl. Ex. 2D, Aug. 13, 2013, ECF No. 452).

## III.    Discussion

Plaintiffs propose a pay class of female VPs and SVPs who worked at any of MSL's U.S. offices on or after February 2008 and through the date of final judgment in this action.[4]

---

[4] The class period is contested, but the resolution of the parties' dispute is not necessary to this

Plaintiffs propose that the class action be adjudicated in a bifurcated proceeding—a liability phase and a remedial phase. Int'l Brotherhood of Teamsters v. U.S., 431 U.S. 324, 336 (1977).

### A. Legal Standard

Class actions, governed by Federal Rule of Civil Procedure 23, are "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)). "[T]o justify a departure from that rule [then], 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" Walmart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2550 (2011) (quoting E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)). As a result, a court considering a motion for class certification must conduct a "rigorous analysis" of whether the party seeking to certify a class has met the requirements of Rule 23. Dukes, 131 S. Ct. at 2551. Often, such a "rigorous analysis" will include resolving factual disputes relevant to each Rule 23 requirement. In re AIG, Inc. Sec. Litig., 689 F.3d 229, 238 (2d Cir. 2012). A court must find, by a preponderance of the evidence, that the requirements of Rule 23 are met before it can certify a class. Dukes, 131 S. Ct. at 2551-52.

To certify a class under Rule 23, Plaintiffs must meet all four requirements of Rule 23(a), and at least one Rule 23(b) category. See Fed. R. Civ. P. 23. The four prerequisites of Rule 23(a) are commonly abbreviated as: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. Marisol v. Giuliani, 126 F.3d 372, 375 (2d Cir. 1997). Plaintiffs must also show the class is ascertainable, that is, it can be defined "by reference to objective criteria." In re Initial

---

Order.

9

Public Offerings Sec. Litig. [In re IPO], 471 F.3d 24, 44-45 (2d Cir. 2006); In re Fosamax Prods.
Liab. Litig., 248 F.R.D. 389, 395 (S.D.N.Y. 2008) (quoting In re Methyl Tertiary Butyl Ether
Prods. Liab. Litig., 209 F.R.D. 323, 337 (S.D.N.Y. 2002)).   Rule 23(b) enumerates the types of
classes that may be certified.   Rule 23(b)(2) allows for certification of a class seeking injunctive
or declaratory relief for the class as a whole.   Fed. R. Civ. P. 23(b)(2).   A class seeking
certification under Rule 23(b)(3) must have "questions of law or fact common to class members
[that] predominate over any questions affecting only individual class members."   Fed. R. Civ. P.
23(b)(3).   Rule 23(b)(3) also requires that the court find "that a class action is superior to other
available methods of adjudication."   Fed. R. Civ. P. 23(b)(3).   In so determining, the court may
consider, inter alia:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

### B.   Rule 23(a)

Because Plaintiffs' proposed class must meet all four requirements of Rule 23(a) before it
can be certified, the proposed class's failure to meet any one of those requirements, necessarily
hinders Plaintiffs' class ambitions.   Here, Plaintiffs' proposed pay class does not have
"questions of law or fact common to the class."

"[A]ny competently crafted class complaint literally raises common questions."   Dukes,

131 S. Ct. at 2551 (internal quotation marks and citations omitted).   Commonality, though, requires more—the "classwide proceeding [must] generate common answers apt to drive the resolution of the litigation."   Id. (emphasis in original).   "[T]he mere claim by employees of the same company that they have suffered a Title VII injury . . . gives no cause to believe that all their claims can productively be litigated at once."   Id.   For commonality, the class's "claims must depend on a common contention . . . that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."   Id.

The Supreme Court's ruling in Dukes is particularly instructive because of its similarity to this case.   In Dukes, three former female employees of Walmart sought to represent a class of 1.5 million members "who allege[d] that the company discriminated against them on the basis of their sex by denying them equal pay or promotions."   131 S. Ct. at 2547.   They intended to prove gender discrimination under the disparate impact and disparate treatment theories.   Id. at 2548.   The essence of their claim was that "local manager's discretion was exercised disproportionately in favor of men."   Id.   The Court held that certification was inappropriate because the class lacked commonality.   Id. at 2556-57.   In so concluding, the Court explained that

> in resolving an individual's Title VII claim, the crux of the inquiry is "the reason for a particular employment decision," Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876 (1984).   Here respondents wish to sue about literally millions of employment decisions at once.   Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was I disfavored.

Id. at 2552 (emphasis in original).

11

Like in Dukes, Plaintiffs here allege Title VII disparate treatment and disparate impact claims.  (Pls.' Mem. Supp. Class Cert. 30-32, ECF No. 431).   For its disparate treatment claim, Plaintiffs must prove that intentional discrimination was the company's "standard operating procedure."   Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 158 (2d Cir. 2001), abrogated on other grounds by Dukes, 131 S. Ct. at 2550-57.   As evidence of intentional discrimination, Plaintiffs' argue that the company's "standard operating procedure" was to allow "a small cadre of mostly male executives [to treat] female employees as an underclass unfit for the pay, benefits, and respect accorded to similarly situated or even less able men."  (Pls.' Mem. Supp. Class Cert. 30, ECF No. 431).   For its disparate impact claim, Plaintiffs must identify a facially neutral employment policy, demonstrate the existence of significant disparities between the class and its male counterparts, and establish a causal relationship between the two.   Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986-87 (1988).   Plaintiffs again point to Defendants' "policies which vested final authority on pay and dismissals in a discrete, centralized group of decision-makers with a known bias against women."  (Pls.' Mem. Supp. Class Cert. 32, ECF No. 431).   Plaintiffs offer up statistical and anecdotal evidence as proof.  (Pls.' Mem. Supp. Class Cert. 30, 33, ECF No. 431).

Plaintiffs argue that they "easily satisfy commonality."  (Pls.' Mem. Supp. Class Cert. 34, ECF No. 431).   They assert that the liability phase "will generate common answers on whether Defendants had a general policy of practice of discrimination, whether their policies had a disparate impact on the class, and whether the class as a whole is awarded injunctive relief." (Pls.' Mem. Supp. Class Cert. 35, ECF No. 431).   Defendants maintain that Plaintiffs cannot satisfy commonality.  (MSL's Opp. Class Cert. 21, ECF No. 453).   They contend that there was

12

no centralized decision-making or "cabal"; instead, decisions were made locally and were "highly individualized." (MSL's Opp. Class Cert. 21-32, ECF No. 453).

Plaintiffs admit that there is no facially discriminatory pay policy in either Publicis's Janus book, or in any of MSL's guidebooks. (See generally Pls.' Mot. Class Cert., ECF No. 431). Rather, as evidence of both, the company's "standard operating procedure" of intentional discrimination and its facially neutral policy, they point to a six-member "cabal" that they say made discriminatory compensation decisions against the class. (Pls.' Mem. Supp. Class Cert. 30-34, ECF No. 431). This "cabal" included two officers from Publicis, two from MSL Global, and two from MSL Americas. (Pls.' Mem. Supp. Class Cert. 1, 6, ECF No. 431). But Plaintiffs are unable to identify with any consistency the discriminatory nature of each of their decisions.

Among Plaintiffs anecdotal evidence are many troubling accounts of clear sexual harassment. (See generally Pls.' Mem. Supp. Class Cert., ECF No. 431). But the anecdotes attribute this shameful behavior primarily to Tsokanos and one or two of his, in Plaintiffs words, "kindred spirits." (Pls.' Mem. Supp. Class Cert. 2, ECF No. 431). Absent entirely are any anecdotes of sexual harassment or discrimination against the remaining five members of the "cabal," whose fault seems to have been only that they were male and were in a position to review compensation decisions. Nor have Plaintiffs linked Tsokanos in any meaningful way to the remaining members of the "cabal," such that his disgraceful attitude and behavior may be extrapolated to them.

Moreover, Plaintiffs' evidence repeatedly places the allegedly discriminatory compensation decisions in the context of the company's budgetary and financial constraints.

(See, e.g., Oral Arg. Tr. 47, Feb. 4, 2014; Pls.' Mem. Supp. Class Cert. 7-8, ECF No. 431 ("Publicis also keeps a tight rein on employment decisions at MSL through rigorous financial reporting and monitoring requirements.")).   Of course, were Defendants using the budgetary and financial constraints as a veil for discriminatory decisions, it would not permit them to escape liability.   But Plaintiffs have adduced no evidence that would allow this Court to conclude that those budgetary and financial constraints were, in fact, simply a pretext to concentrate decision-making power in a small "cadre of [male] executives" who would discriminate against women in its compensation decisions.   (Pls.' Mem. Supp. Class Cert. 13, ECF No. 431).

In stark contrast to Plaintiffs' theory of a centralized decision-making "cabal" is evidence that compensation decisions were local and individualized in nature.   MSL's appraisal policy requires that an employee's direct manager aggregate feedback from different sources before assigning an overall performance rating.   (MSL's Opp. Class Cert. 9-10, ECF No. 453).   That performance rating, along with a number of other factors such as the office's financial performance, is then used by the office's managing director to determine what, if any, raise the office should recommend the employee receive.   (MSL's Opp. Class Cert. 9-10, ECF No. 453). It is only if the managing director chooses to recommend a raise for a particular employee that the matter is even brought to the attention of members of the alleged "cabal."   At oral argument, Plaintiffs responded to this point by seeking to expand the "cabal" to include the managing directors of each of MSL's offices.   (Oral Arg. Tr. 52-53, Feb. 4, 2014).   But again, Plaintiffs' anecdotal evidence does not support Plaintiffs' contention that each of these individual managing directors made discriminatory decisions on matters of employee compensation.

To supplement their evidence, Plaintiffs offered reports from statistics and social science

experts who concluded, respectively, that there was a sex-based disparity in pay most likely attributable to gender discrimination and that Publicis and MSL's policies made them "vulnerable" to gender discrimination.   (Nurhussein Decl. Exs. 1-4, July 12, 2013, ECF No. 426).   Defendants' experts categorically disagreed.   (Chavey Decl. Exs. 2C-2D; Aug. 13, 2013, ECF No. 452).   The Court finds neither social science expert's conclusions persuasive.   Insofar as the statistical analyses are concerned, although the Court recognizes that each expert's analysis has its limitations that made it the subject of a motion to strike, the Court finds the analysis by Defendants' expert more persuasive because it specifically analyzes the allegedly discriminatory decisions the "cabal" made rather than attempting to control the variability that is inherent in an analysis on base pay.

Without the distinguishing decision-making "cabal," Plaintiffs' case mirrors Dukes. Like in Dukes, the evidence here demonstrates that local managers exercised discretion over pay and promotion decisions.   Local office compensation decisions were individualized and relied on each employee's account management skills, work responsibilities, actual or potential business generation, importance to the office, and criticality to local client relationships. (MSL's Opp. Class Cert. 22-23, ECF No. 453).   The decisions also took into account the business needs and financial condition of that local office.   It is inescapable then, that, like in Dukes, "merely showing that [Defendants'] policy of discretion has produced an overall sex-based disparity does not suffice."   131 S. Ct. at 2556.

That many different female MSL employees may have been denied equal pay by a variety of individuals "for a variety of reasons under a variety of policies in a variety of locations, does not make the questions in each class member's case common to the others."

Oakley v. Verizon Comm'n'cns., Inc., No. 09 Civ. 9175 (CM), 2012 WL 335657 at *14 (S.D.N.Y. Feb. 1, 2012). "In other words, the possibility that the same law was violated in a variety of ways does not lead to the 'common answers' that make [this] class litigation a productive endeavor." Id. (citing Dukes, 131 S. Ct. at 2551).

### C. Rule 23(b)

Plaintiffs seek hybrid certification of their pay class—(b)(2) certification of the liability phase and (b)(3) certification of the damages phase. Following Dukes's ban on (b)(2) certifications of classes where more than injunctive relief is sought, some district courts have allowed for such hybrid certification. See, e.g., Easterling v. Connecticut Dep't of Corr., 278 F.R.D. 41 (D. Ct. 2011). "Rule 23(b)(2) applies . . . when a single injunction or declaratory judgment would provide relief to each member of the class." Dukes, 131 S. Ct. at 2557. Rule 23(b)(3), on the other hand, may be appropriate for certification of the class's monetary claims. But Plaintiffs' failure to meet the requirements of Rule 23(a) renders the inquiry under Rule 23(b) unnecessary. Nevertheless, the Court notes that even if Plaintiffs were able to meet the requirements of Rule 23(a), they would still be unable to meet the requirements of Rule 23(b).[5]

### 1. Predominance

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." Comcast, 133 S. Ct. at 1432. "The predominance requirement of Rule 23(b)(3) tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. Jacob v. Duane Reade, 289 F.R.D. 408, 418 (S.D.N.Y. 2013) (quoting Myers v. Hertz Corp., 624 F.3d

---

[5] The Court does not comment on the appropriateness or feasibility of certification under Rule 23(b)(2) or of hybrid certification in this Order.

16

537, 547 (2d Cir. 2010)) (internal quotation marks omitted).   This test is met only "if resolution

of some of the legal or factual questions that qualify each class member's case as a genuine

controversy can be achieved through generalized proof, and if these particular issues are <u>more</u>

<u>substantial</u> than the issues subject only to individualized proof."   <u>Moore v. PaineWebber, Inc.</u>,

306 F.3d 1247, 1252 (2d Cir. 2002).   Therefore, "[w]hile a plaintiff need not show the

'exclusivity' of common questions, it must show their predominance."   <u>Jacob</u>, 289 F.R.D. at 418

(quoting <u>Weiner v. Snapple Beverage Corp.</u>, No. 07 Civ. 8742, 2010 WL 3119452, at *5

(S.D.N.Y. Aug. 5, 2010)).

      Should this case proceed in the manner that Plaintiffs suggest, it would require

individualized inquiries into the actions of each managerial employee who influenced a class

member's pay and the particular circumstances of any change in the class member's

compensation or lack thereof.   (MSL's Opp. Class Cert. 36-40, ECF No. 453).   Moreover, if the

class is able to put forth <u>prima facie</u> evidence of discrimination, Defendants may then rebut that

evidence with unique defenses for each class member, demonstrating legitimate, non-

discriminatory reasons for its decisions.   (Pls.' Mem. Supp. Class Cert. 33-34, ECF No. 431).

These would necessarily involve individualized examinations of each class member's

compensation decisions.   Not only will there need to be individual investigation into liability

issues, but there will also need to be individualized calculation of damages—compensatory,

punitive, back pay, and front pay—based on the circumstances of each class member's case.

(Pls.' Mem. Supp. Class Cert. 33-34, ECF No. 431).   As such, these issues would predominate

over any common issues.

### 2. Superiority

Rule 23(b)(3) also requires a plaintiff to show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining superiority, a court examines Rule 23(b)(3)'s nonexclusive list of factors for consideration. Most important of these factors to this case is the manageability of a class action. Fed. R. Civ. P. 23(b)(3)(D).

As discussed above, this case will require individual "mini" trials for each class member. Plaintiffs' proposal for bifurcating this case into the liability and damages portions of the trial would not remedy this situation—the individual trials must address both liability and damages issues. (Pls.' Mem. Supp. Class Cert. 33, ECF No. 431). With approximately 150 class members according to Plaintiffs' estimate, that will require 150 individual trials. (See Pls.' Mem. Supp. Class Cert. 24, ECF No. 431). It does not appear, then, that a class action would fairly and efficiently adjudicate the claims currently before the Court.

## IV.   Conclusion

For the foregoing reasons, the Court denied Plaintiffs' Motion for Class Certification in its March 31, 2014 Summary Order.

**Dated:**   May 15, 2014

New York, New York

ANDREW L. CARTER, JR.
United States District Judge